IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA RECEIVED
NORTHERN DIVISION

2007 APR -5  A 11: 30

NORRIS FOSTER, )
)
)                          CIVIL ACTION NO.:
Plaintiff,              )                          2:06-CV-00405-ID-SRW
)
v.                         )
)
MID STATE LAND & TIMBER      )
COMPANY, INC., D/B/A         )
SEDGEFIELDS PLANTATION,      )
)
Defendant.             )

## DEFENDANT MID STATE LAND & TIMBER COMPANY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MID STATE'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF NORRIS FOSTER'S CLAIMS

COMES NOW Defendant Mid State Land & Timber Company, Inc. (hereafter referred to as "Mid State"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, and submits this Memorandum of Law in Support of Defendant's Motion for Summary Judgment as to Plaintiff Norris Foster's ("Foster") Complaint.

## I. INTRODUCTION

In his Complaint, Foster, a former employee of Mid State, asserts claims of race discrimination as to his termination, compensation, and terms and conditions of employment. The undisputed facts, however, defeat Foster's conclusory allegations of discrimination. Specifically, as to his termination claim, Foster has corroborated

the bases for his termination when he admitted in his deposition that he impermissibly solicited clients for tips, criticized his supervisor's hunting methods to his coworkers, violated the terms of a written memorandum concerning proper attitude and tipping procedures, and failed to complete or properly perform his assigned tasks. As to his wage claim, the undisputed evidence set forth by Mid State establishes that white employees hired at higher wages possessed special skills and met Mid State's specific needs at the time they were hired, thereby negating Foster's claim that he was similarly-situated to the white employees referenced in his Complaint. Finally, Foster's sworn testimony concerning the alleged discriminatory use of wood chips demonstrates the baselessness of his purported "terms and conditions" claim. In sum, Foster has confirmed the legitimate reasons for his termination under oath, failed to identify a proper comparator for his compensation claim, and conceded by his sworn testimony that his "terms and conditions" claim is based on decisions not actionable under the law of this Circuit. Consequently, Mid State is entitled to judgment as a matter of law as each claim in Foster's Complaint.

## II. STATEMENT OF FACTS

A.    Background on Mid State.

Sedgefields Plantation ("Sedgefields") was an approximately 13,000 acre parcel of property outside of Union Springs, Alabama. (Deposition of David Carroll

("Carroll Dep."), pertinent portions of which are attached hereto as Exhibit A, at 18:17-21.) Mid State owned Sedgefields Plantation ("Sedgefields") from1997 until May 19, 2006, when Mid State sold Sedgefields to Tolleson Land and Timber. (Affidavit of David Carroll ("Carroll Aff."), attached hereto as Exhibit B, ¶ 2.) While Sedgefields was under the management of Mid State, the property was used primarily for quail and deer hunting operations, with the added benefit of marketable timber. (Carroll Dep. at 19:7 through 23:7.)

In April 2005, Mid State hired David Carroll ("Carroll") to manage Sedgefields. (Carroll Dep. at 8:11-16.)  Carroll was charged with improving the property, grooming it properly, and helping Mid State to uncover "a diamond in the rough." (Carroll Dep. at 23:12 through 24:4.) During the initial months of his employment, Carroll primarily utilized the existing staff[1] while he assessed the more than twenty square miles of property to ascertain what needed to be done with the property. (Second Affidavit of David Carroll ("Carroll Aff. II"), attached hereto as Exhibit C, ¶ 3.)  After he had evaluated the property and assessed Mid State's needs, in September 2005, Carroll hired Joel Norman ("Mr. Norman"), the manager of Mill

---

[1] Mr. Carroll did make one hire shortly after he was hired. (Carroll Aff. II ¶ 3.) In May 2005, Mr. Carroll hired Corey Balkcam ("Balkcam"), at the request of Lee, to fulfill an immediate need for assistance with mowing the fields and performing ground maintenance in the coming summer months. (Carroll Aff. II ¶ 3.) Balkcam worked a couple of weeks and then quit. (Carroll Aff. II ¶ 3.)

Pond Plantation in Thomasville, Georgia, an area renowned around the world for superior quail hunting. (Carroll Aff. ¶ 4.) Mr. Norman was hired to cultivate and manage the land at Sedgefields for wild quail habitation in hopes of returning Sedgefields to its former prominence as a top rated quail hunting plantation. (Carroll Aff. ¶ 4.)

B.    Midstate's Employees at Sedgefields.

In March/April of 2005, immediately prior to the hiring of Carroll, there were only seven Mid State employees working at Sedgefields. (Deposition of Roy Lee ("Lee Dep. II")[2], attached hereto as Exhibit D, at 78:12 through 79:10). Of the seven, only one was white–Denise Pierce, who worked as a secretary. (Lee Dep. II at 78:12 through 80:14.) Two other employees worked at the lodge doing the cooking and cleaning. *Id.* The other four, including Roy Lee ("Lee") and Foster, performed general laborer duties. (Lee Dep. II at 80:15 through 83:20.)

After Carroll was hired, Henry Tarver ("Tarver"), black male, was hired on June 7, 2005.[3] (Lee Dep. II at 87:11-23; Second Amended Complaint (Harris) ¶ 5.) The next hire was William "Brother Man" Beckwith ("Brother Man" or "Beckwith"),

---

[2] There were two depositions of Roy Lee. The first deposition, taken on October 11, 2006, will be referred to as "Lee Dep." and the second deposition, taken on January 18, 2007, will be referred to as "Lee Dep. II."

[3] Prior to Tarver, Carroll had hired Corey Balkcam, at the request of Lee, to meet Mid State's immediate need for assistance with mowing the fields and performing ground maintenance. Balkcam worked a couple of weeks and quit. See Note 1 and citations therein.

white male, on July 25, 2005. (Lee Dep. II at 87:11-23; Second Amended Complaint (Harris) ¶ 12.) The next hire by Mid State was Jeffrey Harris ("Harris"), black male, on September 6, 2005. (Lee Dep. II at 91:14-17; Second Amended Complaint (Harris) ¶ 2.) Mr. Norman, white male, was then hired on or about September 19, 2005 to be the quail operations manager. (Lee Dep. II at 93:2-10; Second Amended Complaint (Harris) ¶ 13.) "Brother Man" Beckwith was fired in September 2005, shortly after Mr. Norman was hired, leaving eleven Mid State employees working at Sedgefields. (Lee Dep. II at 102:11-17.)

On November 21, 2005, Joseph May ("May") and Will Hubbard ("Hubbard"), white males, were hired. (Lee Dep. II at 102:18 through 104:18; Deposition of Norris Foster, ("Foster Dep."), pertinent portions attached hereto as Exhibit E, at 110:7-10.) Norris Foster was terminated on December 28, 2005. (Foster Complaint ¶ 2.) On December 29, 2005, May voluntarily quit. (Carroll Aff. II ¶ 3.) Harris was injured on December 29, 2005 and never returned to work. (Deposition of Jeffrey Harris ("Harris Dep."), pertinent portions attached hereto as Exhibit F, at 37:19-21 and 40:19-21.) Chance Hamm ("Hamm"), white male, was hired in January 2006 to work at Sedgefields. (Carroll Dep. at 113:4-9.) After Hamm's hiring in January 2006, Mid State did not hire any new employees for Sedgefields. *Id.*

None of the white employees at Sedgefields who were hired in late 2005

received a raise in 2006. (Carroll Aff. II ¶4. ) On the other hand, all of the black employees did: on January 1, 2006, Willie "BB" Mack ("Mack") received a raise to $8.00 per hour, Demetrius Parham ("Parham") to $7.50 per hour, Harris to $7.50 per hour, and Tarver to $7.50 per hour. (*Id.* ¶ 4.) Foster received a $.50 raise to $7.50 per hour on his final paycheck. (Carroll Dep. at 154:6-16.) On May 19, 2006, Mid State sold Sedgefields to Tolleson resulting in the termination of the employment of all of Mid State's employees at Sedgefields. (Affidavit of David Carroll, filed in support of Defendant's Emergency Motion for Independent Examination, attached hereto as Exhibit N, ¶ 2.)

C.    Foster's Employment and Claims.

Foster is a black male and former employee of Mid State. (Compl. ¶ 2.) Foster was first hired to work at Sedgefields in 1993. (Foster Dep. at 51:20 through 52:9.) According to Foster, after Mid State purchased Sedgefields in May 1997, Mid State became his employer. (Foster Dep. 53:17 through 54:4.) In 2001, Foster's employment with Mid State ended. (Foster Dep. at 54:2-4.) Foster testified during his deposition that he was laid off as part of a reduction in force. (Foster Dep. at 57:14-21.) According to Lee,[4] an employee of Mid State in 2001 and the individual

---

[4] Lee is also a black male. (Plaintiff's Second Amended Compl., *Harris, et al. v. Mid State Land & Timber, Inc.*, In the United States District Court for the Middle District of Alabama, Civil Action No. 2:06-CV-875-ID-CSC, ¶ 6.)

6

who later rehired Foster to work for Mid State in 2005, Foster was terminated for stealing. (Foster Dep. at 65:11 through 67:8; Declaration of Roy Lee ("Lee Decl."), attached hereto as Exhibit G.)    In February 2005, Lee rehired Foster to work at Mid State. (Foster Dep. at 64:1-6; 69:3-18.)  Although Foster represented that he was providing true and accurate information on his application for employment, Foster lied about his past employers, a past termination, and his criminal history. (Foster Dep. at 75:20 through 76:21; 78:23 through 79:16; 81:19 through 82:15.)  After he was hired, Foster reported to work for a few days before he was sent home for failure to provide the proper identification required to verify his right to work. (Foster Dep. at 69:3-12.)

When Foster returned to work with the necessary identification, his duties included working with the dogs and horses and using the tractor as needed. (Foster Dep. at 69:22 through 70:6.)  Foster was also responsible for cleaning the barn, along with  Harris and sometimes Mack, two other black employees.[5] (Foster Dep. at 126:13-18.)  Sedgefields had eight horses and two mules during the time Foster worked there. (Foster Dep. at 123:1-10.)

Although Foster complains about cleaning the barn, there is no dispute that the barn was not used for most of the year.  Most of the horses had their shoes removed

---

[5] When Foster first began working at in February/March 2005, he, Mack, and Parham would clean the barn. (Foster Dep. at 125:20 through 126:4.)

7

and were placed in the "big pasture" after the hunting season was over in March (Foster Dep. at 120:20-22), and were not returned to the barn until late September or early October when it was time to get the horses in shape for the hunting season. (Foster Dep. at 119:18 through 120:12.; Lee Dep. II at 83:21through 86:18.)[6] During this "off-season" time from late March through late September or early October, there was generally no need to clean the barn as there were no horses in the barn.[7] (Foster Dep. at 122:10-23.)

Before Mr. Norman came, according to Foster, <u>during the hunting season</u> when the barn was used regularly, they would put the horses in the barn only at night, and would have the horses standing on "naked concrete."[8] (Foster Dep. At 123:11 through 126:12.) When Foster let the horses out in the morning, it would only take "one scoop" to clean each stall and "it would take maybe fifteen minutes to [clean the whole barn]." (Foster Dep. at 123:11 through 126:12.)

---

[6] Three to four horses (for the Broadhead family) were kept and fed in the small pasture near the barn. (Lee Dep. II at 99:12-21.) According to Lee, these horses being kept near the barn did not require the barn to be cleaned: "Nobody [was] cleaning the barn at that time . . . because there wasn't no horses in there." (Lee Dep. II at 94:1-14.)

[7] On those occasions during the "off-season" when horses were scheduled for riding, Lee testified he would bring the horses into the barn and "put hay down and let them stand on the hay all night." (Lee Dep. II at 97:11-12; 99:12-21.)

[8] There is some discrepancy here between the testimony of Plaintiff Foster and Plaintiff Lee, with Lee denying that horses were ever kept standing on bare cement. (Lee Dep. II at 97:11-22.) Perhaps this discrepancy can be explained by the fact that the horses, prior to Mr. Norman's hire, were kept on the outside unless they were to be ridden the next day.

On September 19, 2005, Mr. Norman was hired and subsequently became Foster's supervisor. (Foster Dep. at 71:4-12.) According to Foster, Mr. Norman did things "a little different" with the horses. (Foster Dep. at 123:20-22.) First, Mr. Norman kept and fed the horses in the barn every night during the hunting season. (Lee Dep. II at 97:11-22.) Second, Mr. Norman began covering the concrete floors of the barn stalls with cedar shavings so that the horses would not have to stand on bare concrete. (Lee Dep. II at 97:23 through 98:18; Foster Dep. at 123:22 through 124:12.) According to Foster, with the shavings, there was "a lot more" work involved in cleaning the barn–what used to take "maybe" fifteen minutes, took thirty five to forty minutes per stall (with ten to twelve stalls) with the shavings. (Foster Dep. at 124:14 through 125:19.) Foster contends that the addition of cedar shavings, which made his job arduous, was racially discriminatory. (Foster Dep. at 123:11 through 126:12.) Although Foster's Complaint characterizes Foster's "terms and conditions" claim as one for disparate treatment, Foster denies that any white employees were impermissibly excused from cleaning responsibilities.[9] (Foster Dep.

---

[9] Other than David Carroll, the property manager, Mr. Norman, the quail operations manager, and Denise Pierce, the office manager, there were no other white employees at Sedgefields in late September or early October 2005 when the horses were brought back to the barn–except, possibly Beckwith, who had been hired as a general laborer and night watchman on July 25 and was terminated on September 27, 2005. (Carroll Aff. II ¶ 2.) Plaintiff Harris testified that Beckwith was fired around the time that the horses were brought back to the barn and did not have an opportunity to clean out the barn. (Harris Dep. at 117:7-17.) The other two white laborers, employed during the time Foster worked at Mid State in 2005, would have been May and Hubbard. May and Hubbard were hired in late November 2005, after the hunting season began and almost two months after

at 126:22 through 127:2.)  From March 2005 until September 2005, Foster did not have any complaints about his job duties.  (Foster Dep. at 104:3-11.)

As to Foster's wage claim, on his application for employment, Foster told Mid State that he expected a starting pay of $7.00 per hour.[10]  (Foster Dep. at 74:17 through 75:2 and Foster Application, ("Foster App."), attached hereto as Exhibit H.) Plaintiff Lee was responsible for hiring Foster.  (Deposition of Roy Lee ("Lee Dep."), attached hereto as Exhibit I, at 55:8 through 64:1.)  Lee told Mid State that Foster would not work for less than $8.00 per hour and testified that he (Lee) had received permission from Mid State to pay Foster $8.00 per hour initially and then move him to $9.00 per hour after a month.  (Lee Dep. at 60:11-20.)  However, Foster then submitted an application wherein he listed his expected starting wage as $7.00 per hour.  (Lee Dep. at 64:2-12.)  As a result of Foster's application, Mid State decided to pay Foster $7.00 per hour rather than $8.00 per hour.  (Lee Dep. at 62:9 through 64:1.)  Plaintiff Lee hired Foster at $7.00 per hour.  (Foster Dep. 90:17 through 91:1.) After he was hired as plantation manager, Carroll offered to increase Foster's pay to $8.00 per hour if Foster would get a valid driver's license.  (Carroll Dep. at 147:2-12.)

---

Foster assumed the barn cleaning responsibilities.

[10]  Foster claims, after the fact, that although he signed the application certifying that everything contained in his application was true and correct, his girlfriend actually completed the application and mistakenly put $7.00 rather than $8.00 per hour for his expected starting wage. (Foster Dep. at 74:12 through 75:11.)

Carroll gave Foster $150 to cover any expenses associated with acquiring a valid license. (Carroll Dep. at 147:2-6.) According to Foster, he kept the money but never got a license because he was just "too lazy." (Foster Dep. at 144:3-22.)

Although Foster admittedly refused an opportunity to make $8.00 per hour, Foster claims that it was racially discriminatory for Mid State to later hire Beckwith, Hubbard, May, and Hamm, all of whom are "younger" white males, and pay them $8.00 per hour.[11] (Foster Dep. at 105:4 through 107:1.) Foster's comparison of himself to these individuals is flawed because he fails to take into account the skills and experience of the supposed comparators, the duties they performed for Mid State, and the needs they met of Mid State at the time they were hired. Beckwith, Hubbard, May, and Hamm were paid $8.00 per hour because they all possessed skills and/or were able to meet Mid State's needs at the time they were hired to work at Sedgefields. (Carroll Dep. at 137:15-19; 141:18 through 142:6.) May had experience trapping predatory animals that could endanger the bird population as well as previous work experience as a mechanic.[12] (Foster Dep. 110:20 through 111:10; Carroll Dep.

---

[11] Hubbard, May, and Hamm, in contrast to Foster, all had valid driver's licenses that allowed them to drive from place to place on the plantation and, if needed, to run errands off the plantation. (Foster Dep. at 110:15-19; 111:11-13; Application of Chance Hamm ("Hamm App."), attached hereto as Exhibit J.) At the time he was hired, Beckwith also represented to Mid State that he had a valid driver's license; when Mid State later learned that he did not have a valid driver's license, Beckwith was fired. (Carroll Dep. at 111:2-22; 144:23 through 145:7.)

[12] Foster has no experience working as a mechanic. (Foster Dep. at 83:17-19.)

at 137:15 through 138:17.)  At the time May was hired, Mid State did not have an employee on staff knowledgeable in trapping or with experience as a mechanic. (Carroll Dep. at 138:8-17.)  When Hubbard was hired, Mid State had recently purchased a skidder, and Hubbard was a proficient skidder operator.[13]  (Carroll Dep. at 138:18 through 139:18.) Hamm was an experienced welder and could make repairs to "just about any type of equipment."[14]  (Carroll Dep. at 139:22 through 141:17.) Beckwith was hired to work not only as a laborer but also as a night watchman, which required him to work after hours and remain "on call" if needed by Mid State. (Carroll Dep. at 109: 6-23; 145:8 through 146:17.)

Foster is also dissatisfied with the amount of tips he received while working for Mid State.  While he was working at Mid State, Foster complained about the amount of tips he received, approached guests about tips, and told guests that any tip should be given directly to him otherwise he "wasn't going to get it."[15]  (Foster Dep. at

---

[13] There is no evidence that Foster possessed similar skill as a skidder operator or, if he did, that Carroll was aware of this ability in this regard.

[14] Foster has no experience working as a welder.  (Foster Dep. at 83:14-16.)

[15] Foster testified that he would approach clients directly about tips:

> Q:    Did anyone ever talk with you about the fact that you were asking customers or suggesting to customers that they tip you?
>
> A:    No.  I said – I said it to the clients myself, that if they had something to give me, give it to me in my hand, because if they didn't, I wasn't going to get it.
>
> Q:    Okay.  And you said that to the customers.

132:14-22; 157:21 through 158:10.) Foster's behavior violated the written directives set out in a memorandum provided to all employees about the importance of a positive attitude and the policy and procedure concerning tips. (Foster Dep. at 157:3-16; Exhibit 1 to Foster Dep., labeled Def.'s Prod. No. 0022; Foster Dep. at 134:20 through 135:16 (noting memo went out to all employees and he is not aware of white employees being provided tips when black employees were not).) According to Foster, he continued to violate the written directives set forth in the memorandum up to the day his employment was terminated. (Foster Dep. at 132:14 through 133:1 (explaining that he "kept on complaining" about tips and had "complained" about tips on the day he was fired).)

In addition to approaching clients about tips, telling clients that tips were being withheld from him, and continuously complaining about the tipping procedure, Foster made derogatory comments about hunting operations in front of coworkers and clients, failed to perform his job assignments in a timely manner, and failed to follow directions concerning the procedure for proper roller chopping without clipping trees.[16] (Carroll Dep. at 45:4 through 47:21; Foster Dep. at 116:22 through 117:16;

---

A:    Yes. I said it to a couple of clients.

(Foster Dep. at 157:21 through 158:10.)

[16] Mack, one of Foster's black coworkers and a current plaintiff in the *Harris* lawsuit that is pending against Mid State, also testified that Foster (and Harris) repeatedly hit and nicked trees after being told repeatedly not to do so. (Deposition of Willie Mack ("Mack Dep."), attached hereto

132:14 through 133:1; 155:21 through 157:2; 153:8 through 155:3; 157:17 through 158:10.) Based upon his performance problems, failure to abide by the terms of the written directives set forth in the memorandum concerning tipping policies, and his poor attitude, Carroll made the decision to terminate Foster's employment. (Defendant's Answers to Plaintiff's Interrogatories, attached hereto as Exhibit L, Nos. 1 and 3; January 3, 2006 Memorandum from David Carroll, attached hereto as Exhibit M.)

Although Foster alleges in his Complaint that he was terminated because of his race, Foster testified under oath that Carroll "wouldn't ever" discriminate against him because of his race.[17] (Foster Dep. at 130:8-13.) There is no evidence that Mid State has ever retained another employee who failed to perform assigned tasks, failed to follow directives about performance, ignored the warnings contained in the memorandum concerning tipping procedure, and displayed a negative attitude similar to Foster's. (Carroll Aff. II ¶ 5; Defendant's Answers to Plaintiff's Interrogatories No. 8.) After Foster's employment was terminated, his duties were assumed by one black

_____

as Exhibit K, at 79:12-23; 85:13-20; 86:16 through 87:11.)

[17] Although Foster claims that Mr. Norman "changed" Carroll, Foster admits that he does not have any first hand knowledge of any specific conversation between Mr. Norman and Carroll concerning his termination. (Foster Dep. at 131:1-5.) The undisputed evidence establishes that Carroll personally observed performance issues concerning Foster, investigated the reports made by Mr. Norman, and independently made the decision to terminate Foster's employment with Mid State. (Defendant's Answers to Plaintiff's Interrogatories No. 1 and Carroll Dep. at 44:7 through 46:4.)

employee (Mack) and two white employees (Hamm and Hubbard).  (Defendant's

Answers to Plaintiff's Interrogatories No. 7.)

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  Even though claims

of employment discrimination often present fact-intensive issues, "the summary

judgment rule applies in job discrimination cases just as in other cases." *Chapman v.*

*AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc).

## IV. ARGUMENT

A.    Foster's termination claim fails as a matter of law.

1.    Foster cannot establish a prima facie case of discrimination.[18]

Where, as here, there is no direct evidence of discrimination, a plaintiff

---

[18] In his deposition, Foster mentioned three discriminatory remarks allegedly made by Mr. Norman over the course of Foster's employment.  (Foster Dep. at 96:4-17; 97:10-19; 99:55-22.) Although Mr. Norman denies ever making these statements, even accepting Foster's allegations as true, the statements do not qualify as direct evidence under the law of this Circuit. Mr. Norman was not the decisionmaker with regard to any of the employment decisions concerning Foster.  As a matter of law, "remarks by non-decision makers or remarks unrelated to the decision-making process itself are not direct evidence of discrimination." *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1105 (11th Cir. 2001).

claiming discrimination must rely upon the familiar burden-shifting framework set forth in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To survive summary judgment, Foster must establish a prima facie case of discrimination and present sufficient evidence from which to infer that the reasons proffered by Mid State are pretext for discrimination. If Foster fails to establish a prima facie case or to rebut each and every proffered reason, summary judgment is mandatory. *See Chapman*, 229 F.3d at 1037; *see also Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1180 (7th Cir. 1997) (Posner, C.J.) (failure to establish a prima facie case "is the end of your case if *McDonnell Douglas* is all that you have to go on.").

To establish a prima facie case in discipline or discharge cases, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the job he held; (3) he was discharged or disciplined; and (4) his former position was filled by someone outside his protected class or a similarly-situated employee not in plaintiff's protected class engaged in nearly identical conduct but avoided plaintiff's fate. *See Holifeld v. Reno*, 115 F.3d 1555,1561-62 (11th Cir. 1997). In this case, Foster's claim fails as a matter of law because he cannot establish the fourth element of his prima facie case.

Although the prima facie requirements are not to be rigidly construed, the

Eleventh Circuit has warned that courts cannot "ignore the failure to present evidence of discrimination." *Hawkins v. Ceco Corp.*, 883 F.2d 977, 984 (11th Cir. 1989). The purpose of the prima facie case, particularly the fourth element, "is to identify 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion.'" *Hawkins*, 883 F.2d at 984 (quoting *Byrd v. Roadway Express, Inc.*, 687 F.2d 85, 86 (5th Cir. 1982)). Mid State's actions do not raise any inference of discrimination because Foster was terminated for legitimate reasons and his duties were assumed by one black employee and two white employee. *See, e.g., Minton v. Am. Bankers Ins. Group, Inc.*, No. 02-12942, 2003 WL 21303330, *1 (11th Cir. Feb.6, 2003) (affirming summary judgment for employer on ADEA claim that found employee was not replaced when coworker merely absorbed some of plaintiff's duties); *Juniel v. Park Forest-Chicago Heights*, 46 Fed. Appx. 853, 856 (7th Cir. 2002) (concluding black employee could not establish prima facie case of discrimination because his responsibilities were spread among a number of individuals, including one black and two white employees). *See also Coaker v. Home Nursing Services, Inc.*, No. 95-0120, 1996 WL 316739, at *17 (S.D. Ala. Feb. 5, 1996) ("If an incumbent employee assumes no additional benefits by performing another employee's duties, there is no indication of preferential treatment."). "Without the underlying suggestion

17

of an illegal preference for a nonminority, there can be no inference of discrimination." *Hawkins*, 883 F.2d. at 984.

Nor is there any evidence that a similarly-situated employee engaged in nearly identical conduct but was not terminated. The Eleventh Circuit Court of Appeals has explained that "the comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples and oranges.'" *See Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999)). The Eleventh Circuit's *Silvera* decision exemplifies the stringency of the "nearly identical" standard.

In *Silvera*, the school board terminated a black employee after learning that he had been arrested for lewd assault on a child some fifteen years earlier. 244 F.3d at 1259. At the same time, the school board retained a white employee who had been arrested for the same offense during the same time period. *Id.* The Eleventh Circuit concluded that, although both employees were convicted child molesters, they were not similarly situated because Silvera, the black employee, also had three additional arrests for violent assaults and Silvera's last arrest was more recent than his supposed comparator. *Id.* Because Silvera's number of arrests exceeded the white employee's, and at least one arrest was more recent, the Court held that Silvera failed to show

18

himself "similarly situated in all relevant respects to the non-minority employee." *Id.* Thus, the Court concluded that the employer's differing treatment of the two employees did not raise an inference of discrimination and reversed a jury verdict in favor of Silvera.

In its Answers to Plaintiff's Interrogatories, Mid State identified every individual accused of any of the conduct that collectively formed the basis for Foster's termination. (Defendant's Answers to Plaintiff's Interrogatories No. 8.) No employee is similarly situated to Foster in terms of the type, frequency, and severity of misconduct.[19] Because Foster cannot identify a proper comparator under the law of this Circuit, he cannot establish a prima facie case of discrimination and his termination claim fails as a matter of law.

> 2. Even assuming Foster could establish a prima facie case with regard to his discharge claim (and he cannot), he cannot rebut the legitimate, nondiscriminatory reasons for his termination.

Mid State has proffered numerous nondiscriminatory reasons for its termination decision. Specifically, Carroll made the decision to terminate Foster's employment because: (1) Foster displayed a negative attitude about his employment;[20] (2) Foster

---

[19]   In fact, the closest comparator for Foster is Harris. Because Harris is also a black male, even if he were similarly situated to Foster in all relevant respects, Mid State's more favorable treatment of Harris would not raise an inference of race discrimination.

[20]   It is legitimate for an employer to base its termination decision upon an employee's perceived dissatisfaction with his job. *See Wolf v. Buss (America) Inc.*, 77 F.3d 914, 920-21 (7th Cir.) (approving employer's decision to choose to terminate employee it believed to be dissatisfied

criticized his supervisor's hunting skills among his coworkers and in front of customers; (3) Foster failed to comply with Mid State's policy as to customer tips; (4) Foster failed to follow instructions; (5) Foster failed to timely complete assigned duties; and (6) Foster failed to perform assigned tasks. (Carroll Dep. at 45:4 through 47:21; Defendant's Answers to Plaintiff's Interrogatories Nos. 1 and 3; January 3, 2006 Memorandum from David Carroll.) "In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that *each* of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman*, 229 F.3d at 1037 (emphasis added). Foster cannot meet his burden.

As an initial matter, pretext means more than an inconsistency or mistake; pretext is "a lie, specifically a phony reason for some action." *Silvera*, 244 F.3d at 1261. Foster himself concedes that he (1) criticized his supervisor's hunting techniques to his coworkers (Foster Dep. at 116:22 through 117:16; 155:21 through 157:2); (2) failed to clear the fields as he was instructed (Foster Dep. at 153:8 through 155:3); (3) hounded clients about tips (Foster Dep. at 157:17 through 158:10); (4) told clients that if they failed to put the tip money in his hand, he "wasn't going to get it" (Foster Dep. at 157:17 through 158:10); and (5) "kept on complaining" about tips

---

with his job based on his prior complaints), *cert. denied*, 519 U.S. 866, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996).

(Foster Dep. at 132:14 through 133:1) even after he admittedly had been instructed on the procedure concerning tip disbursement and told to stop demanding tips. Based upon these admissions alone, it is clear that Mid State honestly and reasonably believed that Foster criticized his supervisor among co-workers, failed to comply with Mid State's policy as to customer tips, failed to complete assigned tasks, and failed to follow instructions. Moreover, an employer could reasonably conclude, based upon Foster's constant complaints, criticisms to clients, and expressions of dissatisfaction, that Foster had a bad attitude concerning his employment with Mid State.

In sum, Foster has confirmed under oath nearly every reason for his termination. As a matter of law, Foster cannot demonstrate that each and every reason proffered by Mid State is pretext for discrimination. Accordingly, summary judgment must be granted as to Foster's termination claim. *Chapman*, 229 F.3d at 1037.

B.    Foster's wage disparity claim fails as a matter of law.[21]

1.    Foster cannot establish a prima facie case of wage discrimination.

"To state a prima facie case of intentional discrimination in compensation, a plaintiff must establish that (1) [he] belongs to a [protected class]; (2) [he] received

---

[21] To the extent Foster asserts a race discrimination claim based on the distribution of tips, that claim also fails as a matter of law. Foster testified that the written memorandum concerning tips was distributed to <u>all</u> employees regardless of race. (Foster Dep. at 135:1-6.) Foster also testified that he was not aware of any instance when white employees were paid tips when black employees were not. (Foster Dep. at 135:11-16.) Because black and white employees were treated the same with regard to the tip policy and tip distribution, Foster cannot establish a claim of disparate treatment based on tips.

lower wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) [he] was qualified to receive the higher wage." *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004). As the court in *Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250, 1273 (11th Cir. 2004), made clear, "[w]hen comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides the [protected trait], since different treatment of *dissimilarly* situated persons does not violate civil rights laws." (Emphasis original). Summary judgment for the employer is appropriate when a plaintiff fails to identify a comparator whose experience is substantially similar to his own. *See, e.g., Cooper*, 390 F.3d at 745 (affirming summary judgment for employer on plaintiff's compensation claim because "[Plaintiff] has not established that the proposed comparators had similar levels of experience or education"); *Beard v. 84 Lumber Co.*, No. 06-12220, 2006 WL 2946883, *4 (11th Cir. Oct. 17, 2006) (affirming summary judgment in wage disparity case based on plaintiff's failure to identify a similarly-situated comparator) (table); *Mack v. ST Mobile Aerospace Engineering, Inc.*, No. 05-14695, 2006 WL 2129661 (11th Cir. July 31, 2006) (affirming summary judgment for employer because employee's comparators possessed specialized training and experience that employee did not, and thus employee was not similarly situated to his alleged comparators). In

22

addition to possessing the same skills and experience, to be considered valid comparators, the individuals identified must perform the "same type of tasks." *Cooper*, 390 F.3d at 735.

In this case, Foster claims that he is similarly situated to Beckwith, Hubbard, May, and Hamm, all of whom are white males. (Foster Dep. at 105:4 through 107:1.) As set out in detail below, there are clear and distinct differences between Foster and his supposed comparators.[22] Accordingly, the individuals identified are not proper comparators under the law of this Circuit.

Unlike Foster, Beckwith worked not only as a laborer during the day but also as a night watchman.[23] As a night watchman, Beckwith worked after hours and

---

[22] As an initial matter, unlike Foster, Hubbard, May, and Hamm all had valid driver's licenses that allowed them to drive from place to place on the plantation and, if needed, to run errands off the plantation. (Foster Dep. at 110,15-19; 111:11-13.) At the time he was hired, Beckwith also represented to Mid State that he had a valid driver's license; when Mid State later learned that he did not have a valid driver's license, Beckwith was fired. (Carroll Dep. at 111:2-22; 144:23 through 145:7.) Because Foster did not have a valid driver's license, other employees had to chauffeur Foster when his duties required him to use the public roads. (Foster Dep. at 145:23 through 146:11.)

[23] Beckwith was also a friend of Mr. Carroll and Mr. Caroll's father. (Mack Dep. at 116:17-23.) To the extent this personal relationship benefitted Beckwith, discrimination based upon personal relationships is not actionable. *See Phillips v. Hibbett Sporting Goods, Inc.*, 329 F. Supp. 2d 1280, 1291 n. 8 (M.D. Ala. 2004) ("If [Plaintiff's] speculation is correct, then her case challenges the "fairness" of employment decisions based on friendship rather than the legality of employment decisions motivated by racial preference. . . . Put another way, even if a jury believed [Plaintiff's] speculation, Bundrick's decision to promote his friends would not support a claim of race or sex discrimination."); *Darden v. Housing Authority of Baltimore*, No. PWG-06-216, 2006 WL 3231964, *5 (D. Md. Nov. 7, 2006) (rejecting plaintiff's wage discrimination claim and holding that "these 'isms' [nepotism and favoritism] are not prohibited by Title VII or §1981 to the extent they are unrelated to race, color, religion, sex, or national origin").

remained "on call" if needed by Mid State. (Carroll Dep. at 109: 6-23; 145:8 through 146:17.) Beckwith's after hours duties included making sure the facility was locked up and insuring there was no one on the property. (Carroll Dep. at 109: 6-23; 145:8 through 146:17.) Foster did not have night watchman responsibilities, was not required to work after hours, and did not have to remain on call for Mid State. Because Foster and Beckwith did not perform the same tasks, Beckwith is not a proper comparator.

Hubbard, May, and Hamm also all differ from Foster in the skills they possess, the work they performed for Mid State, and the needs of Mid State they were able to meet at the time they were hired. (Carroll Dep. at 137:15-19; 141:18 through 142:6.) May possessed trapping skills and had previous experience as a mechanic.[24] (Foster Dep. 110:20 through 111:10; Carroll Dep. at 137:15 through 138:17.) Hubbard is a proficient skidder operator.[25] (Carroll Dep. at 138:18 through 139:18.) Hamm is an experienced welder who could make repairs to "just about any type of equipment."[26] (Carroll Dep. at 139:22 through 141:17.) Because Hubbard, May, and Hamm possessed these different skills, performed different duties uniquely tailored to those

---

[24] Foster has no experience working as a mechanic. (Foster Dep. at 83:17-19.)

[25] There is no evidence that Foster possessed similar skill as a skidder operator or, if he did, that Carroll was aware of his skill in this regard.

[26] Foster has no experience working as a welder. (Foster Dep. at 83:14-16.)

24

skills, and met existing needs of Mid State that Foster was unable to meet, they are not proper comparators. Without evidence that he was paid less than a similarly situated white comparator, Foster cannot establish a prima facie case and his claim of discrimination fails as a matter of law.

2.    Even if Foster could establish a prima facie case with regard to his compensation (and he cannot), he cannot rebut the legitimate nondiscriminatory reasons for the differences in pay between himself and his supposed comparators.

Carroll testified that he determined compensation based upon the needs of the plantation at the time and an individual's ability to meet those needs. (Carroll Dep. at 137:15-19.) At the time May was hired, Mid State did not have an employee on staff knowledgeable in trapping or with experience as a mechanic, and May had experience in both of those areas.[27] (Carroll Dep. at 138:8-17.) When Hubbard was hired, Mid State had recently purchased a skidder, and Hubbard was a proficient skidder operator. (Carroll Dep. at 138:18 through 139:18.) Hamm had experience in welding that enabled him to repair equipment on the plantation and build items that Mid State needed for its operations. (Carroll Dep. at 139:22 through 141:9.) Beckwith was willing to work after hours as a night watchman. (Carroll Dep. at 109:6-23; 145:8 through 146:17.) It is reasonable and legitimate to base compensation

---

[27] An experienced trapper can capture and remove nuisance predators that could endanger the quail program. (Carroll Dep. at 138:2-7.)

upon the contributions an employee makes to the employer and the skills the employee possesses. Foster cannot demonstrate that Carroll's reasons for his compensation decisions are pretext for discriminatory motive.

C.    To the extent Foster alleges a claim of discrimination based on his cleaning assignment, the claim fails as a matter of law.[28]

Foster does not claim that he was impermissibly assigned the cleaning responsibilities over similarly-situated white counterparts. To the contrary, he admits that he was given the responsibility of cleaning the barn when he was rehired in early 2005 and concedes that there were not any white employees to whom his duties should have been reassigned. (Foster Dep. at 124:23 through 125:19; 126: 13-18; 126:22 through 127:2.) Foster testified that he had no complaints about this assignment until Mr. Norman came in September 2005 and began lining the stalls with

---

[28] Although Foster's Complaint asserts claims of "disparate treatment," he denies that any white employees were impermissibly excused from cleaning. (Foster Dep. at 126:22 through 127:2.) Even if Foster had made this allegation, and he specifically denied it, a work assignment complaint would nonetheless fail as a matter of law because Foster accepted the task at the time he was hired and requiring Foster to clean the barn is not an "adverse employment action" under the law of this Circuit as it did not impact the terms and conditions of his employment in a "real and demonstrable" way. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1244 (11th Cir. 2001) ("[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities"). *See also Wallace v. Georgia Department of Transportation*, No. 06-13345, 2007 WL 3626967 (11th Cir. Dec. 13, 2006) ("We reject Wallace's argument that *Burlington Northern* applies to his substantive disparate treatment claim. The Supreme Court made clear in that case that the standard defining an adverse employment action in the context of retaliation claim does not apply to a core Title VII discrimination claim. *See* --- U.S. at ----, 126 S.Ct. at 2414. Therefore, with regard to what constitutes an adverse employment action in the context of a disparate treatment claim, *Davis* still controls.") (table).

wood chips. (Foster Dep. at 104:3-11; 123:18 through 124:22.) According to Foster,

the addition of wood chips made the task more time consuming, required him to spend

all his time cleaning the stalls,[29] and amounted to "discrimination" based on race:

Q:    You were telling me when we came back from the break that you
      felt like you were discriminated against because of your race
      because by the end of your employment, you felt like all you were
      doing was shoveling manure; is that right?

A:    Yeah.

Q:    Okay. What was – I mean, someone had to clean the barn, did
      they not?

A:    Yeah. But I say it like this. [Mr. Norman] just did things a little
      different. Before he came, you know, during the hunting season
      or whatever, we didn't put shavings, they would be putting
      shavings in there in the stalls on the concrete.
      The way we did it, it was just naked concrete there. And once
      they leave out, we let out in the morning time, we cleaned up
      every stall. Every morning, whatever waste they had in there from
      that night, we cleaned it out.
      And, see, with the shavings in there, it's that high (indicating).
      And urine and, you know, the other, too, is in it.

Q:    Yeah.

A:    And it's just – The shaving, he got it like that thick (indicating),
      and it's like ten or twelve stalls, whatever it was we had to clean
      out. Because sometimes he changed one horse from stall to the

---

[29] Regardless of Mr. Norman's presence or the addition of wood chips, the time Foster spent
cleaning stalls was scheduled to increase exponentially in late September 2005 as it is undisputed
that the horses were brought in from the field and kept in the stalls everyday once hunting season
began in late September. (Foster Dep. at 119:18-29 and 22:10-23; Lee Dep. II at 83:21 through
86:18.)

other.

Q:    So, with the shavings, there was more work?

A:    A lot more.

(Foster Dep. at 123:11 through 124:22.)

The Eleventh Circuit has explained that federal courts were not created to sit as "super-personnel department[s] that re-examine[ ] an entity's business decisions." *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991) (internal quotations and citations omitted). Accordingly, to prevent courts from assuming this role, to sustain a claim of discrimination, the alleged employment action must impact the "terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way." *Davis v. Towne of Lake Park, Florida*, 245 F.3d 1232, 1239 (11th Cir. 2001). The addition of wood chips is not an adverse employment action, and it is not the job of this Court, or any other, to decide whether wood chips can or should be added to Mid State's horse stalls and, if so, in what amount. Foster's claim based on his job assignment is simply not cognizable under the law.

Furthermore, there were legitimate, nondiscriminatory reasons for the increased use of the barn beginning in September 2005 and the addition of wood chips. As discussed herein, *supra* at 7-9, horses were returned to the barn full time in late September to prepare for hunting season and Mr. Norman, the new quail operations

28

supervisor, preferred to have the horses rest on wood chips rather than bare concrete. Foster cannot demonstrate that the reasons for the increased utilization of the barn in late September or the addition of wood chips are pretextual and that the real reason for increased use of the barn and the addition of wood chips was discriminatory animus. Accordingly, this "terms and conditions" claim fails as matter of law.

## V. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendant Mid State Land & Timber Company, Inc. respectfully requests this Court enter summary judgment in favor of Mid State and against Plaintiff Norris Foster as to all claims asserted in Foster's Complaint.

Respectfully submitted,

Carter H. Dukes
Kimberly W. Geisler
Attorneys for Defendant
Mid State Land & Timber Company, Inc.

**OF COUNSEL:**
HUCKABY SCOTT & DUKES, P.C.
2100 Third Avenue North
Suite 700
Birmingham, Alabama 35203
(205) 251-2300

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon counsel of record by placing a copy of same in the United States mail, first class postage prepaid and addressed as follows:

Jerry D. Roberson, Esq.
Roberson & Roberson
8 Office Park Circle
Suite 150
Birmingham, Alabama 35223

Albert H. Adams, Jr., Esq.
Irby Law Firm, LLC
Post Office Box 910
Eufaula, Alabama 36072

DONE this the 4th day of April, 2007.

_____
Of Counsel

39384.1