

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06-CV-00405-ID-SRW


NORRIS FOSTER,

    Plaintiff,

vs.

MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

    Defendant.


THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

DAVID CARROLL

1:29    September 8, 2006

    p.m.


COURT REPORTER:

Gwendolyn P. Timbie, CSR



**American Court Reporting**
**toll-free (877) 320-1050**

Page 8

1    EXAMINATION BY MR. ROBERSON:

2          Q      Mr. Carroll, my name is Jerry

3    Roberson, and I represent Norris Foster.

4    Do you understand we're here today about

5    his race discrimination claim?

6          A      Yes.

7          Q      And are you employed -- or

8    were you formerly employed with Mid States

9    Land and Timber?

10         A      Yes.

11         Q      In what capacity?

12         A      I was hired as the general

13   manager.

14         Q      When were you hired, sir?

15         A      I was hired during the month

16   of March -- uh -- or early April of 2005.

17         Q      Do you know who you replaced,

18   who was the former manager?

19         A      I'm told a lady named Donna

20   Davidson was general manager before I was

21   hired.

22         Q      And do you know where

23   Ms. Davidson is?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 18

1        A      No.  Actually, it probably

2    would -- it would be a benefit to them,

3    because the type of clients that I have

4    would -- may be people that would

5    eventually sell them wood.

6        Q      Okay.  And so the time I want

7    to talk to you about is from when you

8    worked -- worked at -- at Mid State Land

9    and Timber Company until it was

10   purchased.  Okay.

11       And we're talking about at the

12   plantation here in -- in Union Springs,

13   Alabama; correct?

14       A      Yes, sir.

15       Q      Now, I don't hunt, so you've

16   got to help me out, if you will.

17       How many acres was Sedgefields

18   Plantation here?

19       A      I believe it called for twelve

20   thousand seven hundred and eighty-seven

21   acres.

22       Q      So it's almost thirteen

23   thousand acres?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 19

1        A        Close.

2        Q        When you -- when you were

3    working there, when --

4        A        That --

5        Q        -- Mid State had it?

6        A        That is correct.

7        Q        And what kind of operation is

8    it; that is, besides -- they do hunting

9    there; correct?

10        A        That is correct.

11        Q        Do they also raise or grow

12    timber on the property?

13        A        That would be a -- a natural

14    benefit of owning the property, yes.  They

15    grow timber.

16        Q        Okay.  Did you have any duties

17    associated with the timber management of

18    -- of -- at Sedgefields?

19        A        I do.

20        Q        What are those?

21        A        It just -- a general manager.

22    My duties would be not only to look after

23    the wildlife portion and the hunting

Page 20

1    portion of it, but oversee any of the

2    timber management aspects of it -- whether

3    we would be thinning wood, whether we

4    would be planting trees, marking lines.

5    Anything of that nature.

6         Q      So by owning that much

7    property, there are trees on it; right?

8         A      That is correct.

9         Q      And what kind of trees?

10        A      Predominantly, in certain

11   areas, it's planted pines, which you're

12   saying that they grow for, basically, a

13   product --

14        Q      To harvest?

15        A      To harvest.  There are pine

16   hardwood stands, and there are hardwood

17   stands on the property.

18        Q      Okay.  And it's your job to

19   make sure that that -- to optimize the

20   recovery from having those resources;

21   correct?

22        A      My job, when I was interviewed

23   and hired by Mid State Land and Timber,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1  was to not only see about timber and --

2  and -- I wasn't really given the

3  instructions to maximize timber production

4  on every square acre of the property,

5  because, obviously, some of that property

6  we use for --

7       Q    Hunting?

8       A    Hunting.

9       Q    Sure.

10      A    And other aspects.  But a

11 common-sense answer would be, where --

12 where timber was a priority, we would grow

13 as much timber as possible.  Where hunting

14 was a priority, we would make that the

15 most -- the most available.

16      Q    Okay.  And -- and I may -- I

17 don't want to misstate anything, but,

18 approximately, how many acres did you hunt

19 on at -- at -- at Mid States?

20      A    Well, it depends on what type

21 of hunting you describe.

22      Q    Okay.

23      A    If -- if we're deer hunting,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 22

1    we can cover, basically, the whole

2    thirteen thousand acres.  We may not hunt

3    every square foot, but there would be

4    hunters in each parcel.

5        Q    Yeah.  Okay.

6        A    If we're -- if we're up and

7    bird hunting, quail hunting, about half

8    that, about sixty-five hundred acres.

9        Q    Okay.  And -- and I take it

10   from your answer that you don't deer hunt

11   in the same areas that bird hunts are

12   going on, at the same time --

13       A    That is correct.

14       Q    -- correct?

15       A    That is correct.

16       Q    That -- that wouldn't be a --

17   from a common sense standpoint, very safe

18   to do, would it?

19       A    Exactly.

20       Q    Okay.  But -- but you can deer

21   hunt on the entire property; right?

22       A    Yes.

23       Q    As long as you're not doing

**www.AmericanCourtReporting.com**
**September 8, 2006**

Page 23

1    the bird hunting on any part of it --

2        A    Yes.

3        Q    -- correct?

4        A    That's correct.

5        Q    And then a portion -- the more

6    open lands, you can bird hunt on; correct?

7        A    Yes.

8        Q    I mean, they probably have

9    some thickets and stuff where you can't

10   bird hunt; isn't that fair?

11       A    Yes.

12       Q    Okay.  Now -- and the -- the

13   -- do you have any job responsibilities

14   in -- insofar as the revenue stream from

15   the operations?

16       A    In my initial interview with

17   Ms. Howell, I was asked to be as

18   productive as possible, given the current

19   circumstances of the plantation.

20       Q    Okay.  What are the current

21   circumstances?

22       A    The circumstances were that

23   the property was not groomed the way

**American Court Reporting**
**toll-free (877) 320-1050**

Page 24

1   it want -- they wanted it to be -- the

2   home office wanted it to be.  So it was --

3   it -- for a phrase that I would use, it

4   was a "diamond in the rough."

5       Q     Okay.  Well, I'm going to show

6   you what we previously -- and you were

7   here for Mr. Norman's deposition; correct?

8       A     I was.

9       Q     You actually were here for

10  Mr. Foster's deposition yesterday;

11  correct?

12      A     I was, yes.

13      Q     So you've heard all the

14  testimony in this case; correct?

15      A     Yes.

16      Q     All right.  And, then, I'm

17  going to show you what we marked as

18  Plaintiff's Exhibit 3 to Mr. Norman's

19  deposition.

20      Is that the organizational chart for

21  Sedgefields as of March of 2006?

22      A     I believe that would be

23  correct, yes.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1        A       That's a fair question.

2               MR. DUKES:  Object to the

3       form.

4        Q       Okay.  Tell me every reason

5       that you fired Norris Foster.

6        A       One reason would be lack of

7       timely performance.  As was mentioned

8       earlier by Joel Norman, Norris had been

9       assigned to do some duties, whether it be

10      cleaning out the barn or roller chopping.

11      And based on my visiting the sites and

12      seeing the performance that was done

13      there, I concurred with Joel's assumption

14      that those things were not getting done on

15      time.  I personally viewed some of the

16      activities in the woods that Norris was

17      doing and came to the same conclusion.

18              Besides completing things in a

19      timely manner, I would say also part of

20      the reason would be that -- when asked to

21      not do something that continued, a lack

22      of -- of responding to directions such as

23      in the roller chopping and clipping the

**American Court Reporting**
**toll-free (877) 320-1050**

Page 46

1    bark on trees.  I observed personally his

2    doing those things and stopped him and

3    talked to him about it, and it continued

4    to happen.

5        Q    Okay.  Excuse me.  I -- I

6    interrupted you, and I apologize for

7    that.

8        But when you say "clipping the

9    trees," is that the same thing as scraping

10   trees with the equipment?

11       A    That is correct.

12       Q    Okay.

13       A    Knocking the bark off and

14   exposing the cambium layer underneath.

15       Q    Okay.  And that harms the

16   trees; right?

17       A    It can.  Certainly.

18       Q    And that's important to a

19   timber operation, that you don't hurt the

20   trees; right?

21       A    Not ti -- just timber, but

22   also the aesthetic quality of the property

23   as well.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 47

1          Q     Okay.  All right, sir.

2   Anything else?

3          A     Uh.

4          Q     I interrupted you.  I --

5          A     Yeah.

6          Q     I'll give you a chance to

7   finish.

8          A     Thank you.  Uh.  Uh.  So we

9   would say job performance, not finishing

10  things in a timely manner.  I would also

11  say failure to respond to -- to

12  directions.  I would say also making

13  comments in front of clients that were

14  derogatory to our quail operation.  The

15  issue of being unsatisfied with our

16  tipping policy.

17         Q     I don't want to cut you off.

18  You paused.

19         A     No.  In general, those are

20  the -- the main categories, the reasons --

21  the reasons why.

22         Q     Okay.  So have you told me now

23  all the reasons why you made the decision

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1      A      Well, I hired -- Jeffrey

2  Harris would have been before him, and --

3      Q      Okay.

4      A      -- William Beckwith would have

5  been before him.

6      Q      Okay.  You hired William

7  Beckwith?

8      A      I did.

9      Q      As a night watchman?

10      A      I hired him for -- to be a

11  general laborer, as the rest of the crew

12  was.  In addition to that, he was to be a

13  night watchman.

14      Q      Did he work during the day,

15  then?

16      A      He did.

17      Q      Okay.  I'm sorry.  I'm --

18  looking at his personnel file, I thought

19  he was hired to be the night watchman.

20      A      No.  He was a -- he was a

21  laborer during the day, like everybody

22  else, and he was a night watchman during

23  -- after hours.

Page 111

1    during the season, I'm told.

2         Q    All right.  But Mr. Beckwith

3    didn't quite work out, did he?

4         A    No, he didn't.

5         Q    He -- he stole some gas?

6         A    He did.

7         Q    Did y'all see him?  Did y'all

8    have evidence of him?

9         A    I confronted him about it, and

10   he admitted it to me.

11        Q    Okay.  So he was let go?

12        A    He was.

13        Q    He also didn't have a driver's

14   license, did he?

15        A    Turned out, he didn't.  And

16   that's another one of the reasons he was

17   let go.

18        Q    Okay.  Well, turned out.  Did

19   he show you one?

20        A    He provided me with a license

21   upon being hired there, but it turned out

22   it was not a current and/or valid license.

23        Q    All right.  You hired

Page 113

1          Q      Okay.  In November; correct?

2          A      I think that's correct.  In

3     November.

4          Q      And -- and Chance Ham was

5     hired in January?

6          A      Later on in January, yes.

7          Q      Okay.  Now, have you hired

8     anybody since then?

9          A      No.

10         Q      Well, when did Henry Tarver

11    start work there?

12         A      Oh, I'm sorry.  You are --

13    you're correct about that.  I'm not sure

14    exactly what day Henry was hired.  It was

15    some time during the fall.

16         Q      Was he a general laborer?

17         A      No.  No.  I take that back.

18    It might have been early or late summer.

19         Q      2006?  2006?

20         A      No.  '05.

21         Q      Oh, okay.

22         A      I'm sorry.

23         Q      Well, how did -- how did Henry

Page 137

1    years -- eight to ten years, okay, as a --

2    as a laborer -- general laborer, driving a

3    tractor, being in the -- part of the

4    hunting crew.  Before Mid States owned it,

5    you know -- and they bought it in '99 --

6    he -- he worked on the property.  Okay.

7         Assuming that to be true, how can

8    you hire a white male, who doesn't have

9    any hunting experience, at a higher hourly

10   rate than Norris Foster, who's had six

11   years of military service, years of

12   experience around dogs and in hunting --

13   hunting camps?  How can you do that and be

14   fair to Norris Foster?

15        A    If I hired an individual and

16   paid him a higher wage than somebody else,

17   the wage I paid him was -- was based on

18   his proficiency in doing something that we

19   needed done here at the plantation.

20        Q    Okay.  What was that?

21        A    For instance, Adam May was

22   somebody who -- who was good at trapping

23   and a mechanic.  I didn't have either one

Page 138

1    of those at that time.

2    Q    What is "trapping"?

3    A    Trapping?

4    Q    Uh-huh.

5    A    Is trapping and removing

6    nuisance predators to a quail program:

7    bobcats, fox, things of that nature.

8    Q    Okay.  Okay.  So you say you

9    paid Adam -- I mean, Joseph Mays more

10   money than Norris Foster because he could

11   trap and he was a mechanic?

12   A    I didn't pay him, not in

13   reference to Norris, anything.  I paid him

14   a rate that I thought was fair for what

15   his specialties were and what he could do

16   for the plantation that I didn't have at

17   that time.

18   Q    Okay.  Why did you pay Will

19   Hubbard eight dollars an hour?

20   A    Will Hubbard was paid what he

21   was paid because he had specialties in

22   working heavy equipment.  My understanding

23   is, he worked at McDonald Construction

**American Court Reporting**
**toll-free (877) 320-1050**

Page 139

1    before he came to work here and that he

2    was working with skidders and large

3    equipment.  We had just purchased a

4    skidder.  I needed somebody that could

5    operate that piece of equipment

6    proficiently, and he was the one that I

7    hired.

8        Q    You -- you bought a skidder?

9        A    I did.

10       Q    And Will Hubbard drove it?

11       A    He drove it a lot.

12       Q    Okay.  Could anybody else

13   drive it?

14       A    Joel drives it some.

15       Q    Is any -- who -- Will Hubbard

16   doesn't work there now.  Is -- who's

17   driving it now?

18       A    Joel.

19       Q    Anybody else?

20       A    For all I know, Chance may get

21   on it every now and then.

22       Q    Okay.  What about Chance Ham?

23       A    Chance had specialties in

**www.AmericanCourtReporting.com**
**September 8, 2006**

Page 140

1  welding.  And that's -- we needed that.

2  We had pieces of equipment that we needed

3  repairing, and I had pieces of equipment

4  such as Joel mentioned -- the drag that I

5  needed built.  And he brought to the -- to

6  the plantation skills that I didn't have

7  in anybody else.

8      Q    What kind of welding does

9  Chance do?

10     A    Well, as Joel described, he

11  repairs just about any type of equipment.

12  I'm sorry.

13     Q    What kind of welding do you

14  call it?

15     A    Wire welding is what Joel

16  mentioned.

17     Q    Okay.  Do you have to have any

18  kind of training to do wire welding?

19     A    Training?  Certainly.

20     Q    Can you -- have you ever --

21     A    As far --

22     Q    -- wire welded?

23     A    I have.  Only because --

Page 141

1       Q       Anybody can do it, can't

2    they?

3       A       No.  Only because Chance

4    stayed there with me and showed me how to

5    do it.

6       Q       Oh, okay.

7       A       It's not something you'll pick

8    up and just do at the drop of a hat and do

9    a good job of it.

10      Q       All right.  Has Norris Foster

11   welded pieces of equipment before?

12      A       Not to my knowledge.

13      Q       Made repairs using a welder?

14   Has he done that?

15      A       Who?

16      Q       Norris.

17      A       Not to my knowledge.

18      Q       Okay.  Okay.  So -- so you

19   claim that all these three guys had

20   specialties?

21      A       They had things that they were

22   proficient at that I needed, if you want

23   to call it a "specialty."  Some --

Page 142

1  something that they could do that I didn't

2  have a person here that was good at doing

3  it, and I needed to add people to my

4  staff.  And -- so I chose those people at

5  that time because they had those qualities

6  that I needed.

7        Q     Did you list every reason --

8  have we discussed every reason that they

9  were paid more than Norris Foster?

10        A     I mean, I -- I didn't set

11  Norris' pay rate.

12        Q     Well, who repaired the

13  equipment before Chance was hired?

14        A     Well, most all of it was done

15  by Roy Lee, with the help of his folks.

16  But Roy Lee was the one that was in charge

17  of it.  As a matter of fact, we mentioned

18  operating heavy equipment.  To my

19  knowledge, the only person here that

20  operated any heavy equipment was Roy Lee.

21  His crew was with him, but he was always

22  running -- running the equipment.

23        Q     Could -- have you ever seen

**American Court Reporting**
**toll-free (877) 320-1050**

Page 144

1    hour.  I offered him an -- an opportunity

2    to try to make eight dollars an hour if

3    he -- if he could.  Norris came to me one

4    day and claimed, when I hired Brother Man,

5    that I was being unfair in paying Brother

6    Man more than I was paying him.

7            Q        You mean Norris made a

8    complaint to you about his pay?

9            A        He did.

10           Q        When Brother Man was hired?

11           A        He did.

12           Q        Did he say it was because of

13   discrimination?

14           A        He did.

15           Q        You're kidding me.

16           A        No, I'm not.

17           Q        That Norris complained that

18   you were paying Brother Man eight

19   dollars -- now, Brother Man was white;

20   right?

21           A        He was making -- he was white,

22   yeah.

23           Q        And he was -- he was the guy

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1    we were talking about that didn't have a

2    driver's license?

3        A    Turned out he didn't have a

4    driver's license.

5        Q    And he was stealing gas?

6        A    That's correct.  He was fired

7    for it.

8        Q    He was hired as a general

9    laborer, wasn't he?

10       A    And a night watchman.

11       Q    And a night watchman.  Okay.

12   You were going to pay him more; that is,

13   you were going to provide him with a place

14   to live, weren't you?

15       A    I was going to compensate him

16   for the extra work that he was going to do

17   for me.

18       Q    What special skills did he

19   have, Brother Man?

20       A    For being a night watchman and

21   being available to do those things for me.

22       Q    Okay.  Does that require a

23   special skill?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 146

1          A      It requires being here after

2     hours.

3          Q      Okay.  So he didn't have any

4     special skills, did he?  And you paid him

5     eight dollars an hour as a general

6     laborer; correct?

7               MR. DUKES:  Object to the

8     form.

9          A      I didn't pay him eight dollars

10    an hour for general labor.  I paid him

11    compensation for general labor and for

12    being a night watchman.

13         Q      Oh, you're saying you're

14    paying him more because he was a night

15    watchman?

16         A      I was paying him a different

17    rate because of what he was doing for me.

18         Q      Okay.  Did you ever give

19    Norris -- after you fired Mr. Beckwith,

20    Brother Man, did you ever give Norris an

21    opportunity to make eight dollars an hour

22    as a night watchman?

23         A      No, I didn't.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 147

1          Q      Why not?

2          A      But I did -- I did offer him

3     eight dollars an hour if he could provide

4     me with a valid driver's license, for

5     which I loaned him the money to go get,

6     and he never provided for me.

7          Q      You said you'd pay him eight

8     dollars an hour --

9          A      Yes.

10          Q      -- if he had a driver's

11     license?

12          A      I did.

13          Q      Is that in writing anywhere?

14          A      No, it's not.

15          Q      Do you type?

16          A      I can type, yes, sir.

17          Q      And you're thirty-five feet

18     from Norris Foster's personnel file,

19     aren't you?  Correct?

20          A      That's correct.

21          Q      And you were for eight months,

22     weren't you?

23          A      Sure.  From everybody's file.

Page 154

1    raise; right?  For 2006; correct?

2          A      Correct.

3          Q      At the time, he was making

4    seven dollars an hour; right?

5          A      Correct, yes.

6          Q      And he got a raise before he

7    got fired, didn't he?

8          A      He did.

9          Q      Fifty cents.  Just what you

10   recommended; correct?

11         A      Correct.

12         Q      He got a raise on his last

13   check, didn't he?

14         A      If you say that's when it took

15   effect, then that -- that would be

16   correct.

17         Q      So he got a raise on the check

18   that he got fired; correct?

19         A      I would assume that's the

20   case, then.

21         Q      You think that's kind of a

22   mixed message?  We're giving you a raise,

23   but we're letting you go.