

# FREEDOM COURT REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06cv405-ID    **COPY**

NORRIS FOSTER,

          Plaintiff,

          vs.

MID STATE LAND & TIMBER COMPANY,

INC., d/b/a SEDGEFIELDS PLANTATION,

          Defendant.


          S T I P U L A T I O N

          IT IS STIPULATED AND AGREED by and

between the parties through their respective

counsel, that the deposition of Norris

Foster may be taken before Angela Smith,

RPR, CRR, at the offices of John W. Waters,

at 214 North Prairie St., Union Springs,

Alabama 36089, on the 7th day of September,

2006.


          DEPOSITION OF NORRIS FOSTER

## FREEDOM COURT REPORTING

Page 51

1   at that time.

2        Q.     Who was the boss man out at

3   Turf's -- Mr. Turf's when you were out

4   there?

5        A.     Guy that owned the place?

6        Q.     Sure.

7        A.     Al Vann, James Vann -- I think

8   his real name is James Vann.  I know they

9   called him Al.

10       Q.     Is he still alive, still

11  around?

12       A.     Yeah.

13       Q.     Were you ever disciplined or

14  reprimanded when you were at Mr. Turf's?

15       A.     (Witness shakes head in the

16  negative.)

17              MR. ROBERSON:  You have to

18  answer out loud.

19       A.     No.

20       Q.     Where did you go after

21  Mr. Turf's Sod Farm?

22       A.     I started working at

23  Sedgefields.

# FREEDOM COURT REPORTING

Page 52

1      Q.      And when -- What year would
2  this have been?
3      A.      '93.
4      Q.      Do you know who owned
5  Sedgefields at that time?
6      A.      Tommy McArthur.
7      Q.      And were you hired on as a
8  general laborer?
9      A.      Yeah.
10     Q.      And do you know what your rate
11 of pay was?
12     A.      He paid us, you know,
13 basically like I did at Midway Plantation,
14 just a salary.
15     Q.      Okay.  Do you recall what that
16 salary was?
17     A.      Three hundred dollars a week.
18     Q.      And what kind of work did you
19 do for Sedgefields when you were hired on in
20 '93?
21     A.      Just operate a tractor.  Same
22 thing.  Bulldozer, horses, dogs,
23     Q.      And who worked with you out at

## FREEDOM COURT REPORTING

Page 53

1  Sedgefields during this time?

2      A.      There's a lot of different

3  people that worked there.  Some of the guys

4  ain't even living now.  Guy named -- His

5  real name -- I don't even know what Bo

6  Jack's real name was.  His last name was

7  Cooper.  Tommy Molton, he was the -- He was

8  the plantation manager.

9      Q.      Tommy who?

10      A.      Molton.  Tony Fitzpatrick.

11  Another old guy named Bochie Davis.  Let's

12  see.  John Molton.  Richard Calloway.  And

13  they had one of the cooks named Miss Hattie.

14  I don't remember what the other lady was

15  named.  There was a another cook, but I

16  don't know what her name was.

17      Q.      How long did you work at

18  Sedgefields during this time?

19      A.      I think it was from '93 to --

20  I can't remember whether it was '97 or '98.

21  Whichever year that Broadhead bought it.

22      Q.      And when Broadhead bought it,

23  what happened?

# FREEDOM COURT REPORTING

Page 54

1      A.      I'm still working there.

2      Q.      Okay.  When did you stop

3  working at Sedgefields?

4      A.      In 2001.

5      Q.      Okay.  Did your duties ever

6  change from 1993 to 2001, or were you still

7  doing some of the same work that you told me

8  earlier?

9      A.      Yeah.  Basically the same

10 thing.  Basically the same thing all the

11 time.  You do -- There's always different

12 stuff that you do.

13     Q.      When you were working the

14 tractor, what were you doing?

15     A.      Sometime I be Bush Hogging

16 roads or fields.  Sometimes plant fire

17 breaks, plant deer plots.  Plant deer plots.

18 You know, just different things.

19     Q.      And with the dozer, what kind

20 of work were you doing with the dozer?

21     A.      Mostly the same.  Like I said,

22 pushing up piles.

23     Q.      Okay.

## FREEDOM COURT REPORTING

Page 57

1  before Mr. Broadhead bought Sedgefields, did

2  you have any write-ups or disciplinary

3  action taken against you?

4         A.    No.

5         Q.    Did you have any performance

6  issues that management talked to you about?

7         A.    I don't understand what you're

8  saying.

9         Q.    Well, did anybody criticize

10 your work during that period of time, from

11 1993 to 1997?

12        A.    No.  They never came to me

13 with it, if they did.

14        Q.    Okay.  And then you said you

15 left Sedgefields in 2001.  To your

16 knowledge, why did you leave Sedgefields?

17        A.    They told us they was cutting

18 back on the help.

19        Q.    Okay.

20        A.    And they laid off, I don't

21 know, about six or seven of us.

22        Q.    Okay.  Where did you work

23 after that, after you were laid off in 2001?

# FREEDOM COURT REPORTING

Page 64

1    Q.      Okay.  How did you get hired

2  on back at Sedgefields in January of 2005?

3    A.      I had talked with -- Roy had

4  came by and talked with me.

5    Q.      Roy Lee?

6    A.      Yes.  And he had told me

7  Suzanne asked him would he think that I'd be

8  willing to come back to work there.  And I

9  told them I would, I would come back.  But I

10  did go back to work out there.

11    Q.      Did Mr. Lee, did he come by

12  your house or give you a call?

13    A.      Yeah.  Came by my house and

14  talked to me.

15    Q.      Okay.  And who is Suzanne?

16    A.      Suzanne was a Broadhead at the

17  time.  But I don't know what her last name

18  is now.

19    Q.      Okay.  And to the best of your

20  recollection, what did Mr. Lee tell you when

21  he stopped by your house and offered you a

22  job?

23    A.      He asked me was I interested

# FREEDOM COURT REPORTING

Page 65

1    in coming back to work there.  And like I

2    said, at the time I was still working at

3    Frog Pond.  And I asked him was they going

4    to pay me the same thing I was making.  And

5    he told me he'd get back with me in a day or

6    two.  Which he did.  In a day or two, he

7    told me that they would start me out -- back

8    out with eight dollars an hour, and in

9    ninety days, they would give me a dollar

10   raise.

11        Q.    Okay.  All right.  Did

12   Mr. Lee, at any time during that

13   conversation, or before you started working

14   at Sedgefields Plantation for the second

15   time, did he say anything to you about you

16   stealing birds?

17        A.    I never knew nothing about

18   that.

19        Q.    Okay.  So, he didn't say

20   anything about you stealing birds the first

21   time you worked there?

22        A.    No.

23        Q.    Okay.  He didn't make any

## FREEDOM COURT REPORTING

Page 66

1   warning to you that if he caught you

2   stealing again he would fire you?

3        A.      Yeah.  He said that, but he

4   didn't say no birds.

5        Q.      Well, what did you think he

6   meant by stealing again?  What did you think

7   that he was referring to?

8        A.      I don't know.

9        Q.      Well, the man accused you of

10  stealing, did he not?

11       A.      He didn't accuse me.

12       Q.      Well, he said, "If I catch you

13  stealing again, I'm going to fire you;" is

14  that right?

15       A.      Yeah.

16       Q.      And you didn't ask him what he

17  meant by stealing again?

18       A.      Yeah.

19       Q.      Okay.  What did you say to

20  him?

21       A.      He told me when I was fired --

22  Let me see.  When we got laid off last time

23  -- the first time, the other guy that was

# FREEDOM COURT REPORTING

Page 67

1  the plantation manager, he told me that he

2  had put that on my record, that I had stole

3  something.  But other than that, I never

4  knew anything about that, until he said

5  something to me about that then.

6       Q.      Okay.  And what did you tell

7  him when he told you that?

8       A.      I said, "Okay".

9       Q.      Okay.  You didn't say, "I

10 didn't steal those birds back then?"

11      A.      None of that even came up.

12              MR. DUKES:  We've been going

13 for about an hour.  Let's take a little

14 break.

15              (Recess taken.)

16      Q.      Now, why, again, did you leave

17 Four Way Plant Farms?

18      A.      Why I leave Four Way?

19      Q.      Yes, sir.

20      A.      I got another job.  Like I

21 said, it was a seasonal job.  You know, you

22 just work so many months and then you draw

23 unemployment or go to work somewhere else

# FREEDOM COURT REPORTING

Page 69

1   working back again at Sedgefields in March

2   or January of 2005?

3        A.      Like I said, when I went out

4   there, I worked there a few days, and my

5   Social Security -- I didn't have it.  My

6   Social Security card.  And I didn't have my

7   ID card.  And they told me I couldn't work

8   until I got those items.  And once I got

9   those, I went back to work.

10       Q.      Okay.  And that would have

11  been somewhere around March of 2005?

12       A.      I believe it was either March

13  or last of February.

14       Q.      Okay.  And I think your lawyer

15  is showing you something.  Does that help

16  you refresh your memory?

17       A.      Yes.  It's the second month,

18  8th day, '05.

19       Q.      Okay.  And were you hired back

20  at Sedgefields in 2005 as a general laborer?

21       A.      Yeah.

22       Q.      Okay.  And what were your

23  duties when you started back working at

## FREEDOM COURT REPORTING

Page 70

1  Sedgefields in March of 2005?

2      A.      Basically the same.  I worked

3  with the dogs, horses, I did tractor work, I

4  did a little dozer work, I did a little work

5  on the backhoe.  I mostly did tractor,

6  tractor driver.

7      Q.      And who was your immediate

8  supervisor?

9      A.      When I first went back?

10     Q.      Yes, sir.

11     A.      Roy Lee.

12     Q.      Okay.  And when Mr. Lee was

13  your supervisor, who would do most of the

14  dozer work and backhoe work?

15     A.      Sometimes he would and

16  sometimes I did.

17     Q.      Okay.  Is it fair to say that

18  he did most of the backhoe work and dozer

19  work?

20     A.      Yeah.

21     Q.      And at what point did Mr. Lee

22  no longer become your -- At what point did

23  Mr. Lee no longer -- At what point was he no

# FREEDOM COURT REPORTING

Page 71

1    longer your supervisor?

2         A.      When -- When they hired Joel

3    Norman.

4         Q.      Okay.  So, from March,

5    sometime in March of 2005, until when they

6    hired Mr. Norman, you worked under Mr. Lee?

7         A.      Right.

8         Q.      And I think Mr. Norman started

9    work at Sedgefields sometime in the middle

10   of September 2005.  Does that sound right to

11   you?

12        A.      Yeah, sounds about right.

13        Q.      Did your job duties ever

14   change from March 2005 through September of

15   2005?

16        A.      No.  I basically did the same

17   thing.  Mostly -- You know, I mostly did --

18   I mostly did all the Bush Hogging, but it's

19   a lot -- big place.  I had to Bush Hog every

20   day.

21        Q.      What was your starting salary

22   at -- when you came to work in March 2005?

23        A.      Well, they told me one thing

# FREEDOM COURT REPORTING

Page 74

1    Q.    Does that look right to you?

2    A.    Yeah.

3    Q.    Okay.  Can you read and write,

4    Mr. Foster?

5    A.    Yeah.

6    Q.    Okay.  Is this your

7    handwriting on Defendant's Exhibit 1?

8    A.    This right here (indicating)?

9    Q.    Yes, sir.  All the handwriting

10   on Defendant's Exhibit 1.

11   A.    No, I didn't fill that out, my

12   girlfriend did.

13   Q.    Okay.  Did you look at it

14   after she filled it out?

15   A.    Not really.  I see a couple of

16   things on there that she ain't got on there.

17   Q.    Is that your signature on page

18   three?

19   A.    Yeah.

20   Q.    Okay.  Did you understand by

21   signing page three, that you were saying

22   that your application for employment is true

23   and correct, to the best of your knowledge

# FREEDOM COURT REPORTING

Page 75

1  and belief?

2         A.      Yeah.  I know it now.

3         Q.      Okay.  What do you see that's

4  not correct, or you believe is not correct

5  at this time, on Defendant's Exhibit 1?

6         A.      Where she got seven, it should

7  have been an eight.  And down here where --

8  That's on the front page, it should have

9  been eight dollars an hour instead of seven.

10 And down at the bottom where it got E-1, it

11 should have been an E-5.

12        Q.      I think that may be E-4, but

13 you're saying it should be E-5?

14        A.      Yeah.  Right.

15        Q.      I also see here that as your

16 duties, when you were with Sedgefields

17 before, was training dogs and tractor

18 driver; is that right?

19        A.      That's right.

20        Q.      And I'm on page two of

21 Defendant's Exhibit 1, if you'll follow

22 along with me.

23        A.      (Witness complies.)

# FREEDOM COURT REPORTING

Page 76

1    Q.    Do you see under employment

2  data, it asks you to, "Please list all jobs

3  beginning with your present or last employer

4  and working backwards?"

5    A.    Yeah.

6    Q.    Frog Pond Turf was not your

7  last employer, was it?

8    A.    Before I went back to work?

9    Q.    Yes, sir.

10    A.    Yeah.  You right.  Because I

11  should have been put C&W, but it was only

12  about a week, a couple of weeks, two or

13  three weeks.

14    Q.    Okay.  You didn't put that

15  employer down, did you?

16    A.    No.

17    Q.    And you also didn't put down

18  Mr. Turf Sod Farm, Midway Plantation, or

19  Four Way Plant Farm or Beaulieu, did you?

20    A.    No, I didn't put none of those

21  down there.

22    MR. ROBERSON:  Have you got

23  his first application, Carter?

# FREEDOM COURT REPORTING

Page 78

1          A.      He's ninety-two years old.

2          Q.      Okay.  And Brenda Turner, who

3    is that?

4          A.      My aunt.

5          Q.      Okay.  Is she still alive?

6          A.      Yeah.  She teach school down

7    at the elementary school.

8          Q.      Okay.  How many aunts and

9    uncles do you have that live around the

10   area?

11         A.      Well, on my father's side,

12   there was fifteen children, eleven of them

13   still living.  And most of them -- Well,

14   it's only three that's still live here, the

15   rest of them live in Georgia, Atlanta,

16   different places.

17         Q.      Okay.  Give me the names of

18   those -- aunts and uncles that live in

19   Alabama.

20         A.      Brenda Turner, Terry Jordan,

21   and Annie Watkins.  And I have one aunt on

22   my mother's side, her name is Julia Reese.

23         Q.      Let me direct your attention

# FREEDOM COURT REPORTING

Page 79

1    to the fourth page of Defendant's Exhibit 1,

2    under General Information.  The question is,

3    "Have you ever been convicted of a crime?"

4    How did you answer that question?

5              A.      I answered no.

6              Q.      That's not true, is it?

7              A.      No.

8              Q.      At the time that you completed

9    this application and signed that everything

10   was true and correct on February 8, 2005,

11   you had been convicted of a crime; is that

12   correct?

13             A.      Yes.

14             Q.      What had you been convicted of

15   at that time?

16             A.      Assault in the third degree.

17             Q.      Okay.  Any other convictions

18   at that time?

19             A.      No.  I've had a bunch of

20   tickets, but that's the only thing that I

21   ever been convicted of.

22             Q.      Okay.  Have you ever been

23   arrested for anything?

## FREEDOM COURT REPORTING

Page 81

1      Q.      Okay.  And where was that

2   fight?

3      A.      At a club.

4      Q.      And did you -- Was it just

5   fists or did you stab him or shoot him?

6      A.      No.  I whooped him with a hole

7   digger handle.

8      Q.      You whooped him with a what?

9      A.      A hole digger.  You know a

10  hole digger?

11     Q.      Yeah.

12              MR. ROBERSON:  Post hole

13  diggers?

14              THE WITNESS:  Yeah.  Post hole

15  digger.  I broke a handle out of one of

16  them.

17     Q.      Okay.  And hit him with that?

18     A.      Yeah.

19     Q.      The next question under

20  General Information is, have you ever been

21  discharged from a job?  How did you answer

22  that question?

23     A.      I said no.

## FREEDOM COURT REPORTING

Page 82

1     Q.     That's not true, is it?

2     A.     No.

3     Q.     So, you had been discharged

4   from a job at the time that you completed

5   this application, which is Defendant's

6   Exhibit 1?

7     A.     Yes, I had.

8     Q.     Okay.  What job had you been

9   terminated from?

10    A.     The one in Atlanta.  I got

11  fired off a construction job up there.

12    Q.     All right.  Any other jobs

13  that you had been terminated from?

14    A.     Nope.  None other that I know

15  of.

16    Q.     In your previous employment,

17  did you ever supervise any other employees?

18    A.     Yeah.  At Sedgefields.

19    Q.     Okay.  When at Sedgefields did

20  you supervise other employees?

21    A.     Well, it was back when -- I

22  wasn't no, say, a supervisor, just a lead

23  person.  You know, I had been there a little

# FREEDOM COURT REPORTING

Page 83

1  longer than they had, and things that they

2  wanted done that the other guys didn't know

3  how to do, I showed them.

4          Q.      Okay.

5          A.      So I wouldn't say it was a

6  supervisor, just somebody that knew a little

7  bit more than the other persons.

8          Q.      Okay.  So, you didn't -- You

9  never had a title as a supervisor, did you?

10         A.      No.

11         Q.      In any of your previous

12 employment?

13         A.      No.

14         Q.      Did you do any -- Were you

15 ever hired as a welder with any job?

16         A.      No.

17         Q.      Have you ever been hired as a

18 mechanic for any job?

19         A.      No.

20         Q.      Okay.  You said you worked

21 under Mr. Lee until Mr. Norman came to work

22 at Sedgefields?

23         A.      Yes.

## FREEDOM COURT REPORTING

Page 84

1    Q.      When Mr. Norman came to work,

2    how did -- Who did you report to?

3    A.      Well, I didn't start off

4    working with him.  I was still working with

5    Roy.  And they came up with -- He had two

6    other guys working with him.  And --

7    Q.      Who were the two other guys

8    working with him?

9    A.      Jeff Harris and Demetrius

10   Parham.

11   Q.      Okay.  And then what happened?

12   A.      They really didn't know the

13   way to go.  They didn't know the plantation

14   that well.  And they had a meeting.  I guess

15   Dave or George knew I knew the place pretty

16   good as I had been working there for a

17   while.  And he suggested that since I knew

18   which way to go, knew the places where they

19   wanted to chop at, that I work with him.

20   Q.      Okay.  And so, was that in

21   September, you think, or was that in

22   October?

23   A.      I don't know.  It might have

## FREEDOM COURT REPORTING

Page 85

1   been maybe the last of September, around the

2   first of October, something like that, where

3   they had a meeting between him and Roy and

4   David and that's what they came up with.

5           Q.     All right.  And at that time

6   did you, Jeff, and Demetrius work with

7   Mr. Norman?

8           A.     No.  Just me and Jeff.  They

9   took Demetrius, he started back to working

10  under Roy.

11          Q.     Okay.  And what kind of work

12  did you do when you were working with

13  Mr. Norman?

14          A.     Basically, just chopping.

15          Q.     What is chopping?  Explain

16  that to the jury.

17          A.     All it is is cutting pathways

18  for the dogs.  Let's say a hunter get down

19  for the hunt, and it's something like a

20  checkerboard, you go one way and come back

21  another.

22                 Let's say if the dog point a

23  covey of birds and he's in the grass, you

## FREEDOM COURT REPORTING

1    know, where we have chopped at, the riders

2    -- the hunters can get off the horses and

3    stand in that clearing while you walk in the

4    thick part.  They flush the birds.  It's

5    just chopping, you know, chopping.

6         Q.    In other words, you're just

7    knocking down the brush where people can

8    walk inside the fields?

9         A.    Right.  And see your dogs.

10        Q.    Okay.  Before Mr. Norman had

11   gotten there, did y'all have any chopping

12   equipment?

13        A.    No.  We didn't chop, but we

14   Bush Hogged.

15        Q.    Okay.  And he changed it to

16   where you were chopping instead of Bush

17   Hogging?

18        A.    Right.

19        Q.    And is that what you primarily

20   did for Mr. Norman?

21        A.    That, and when we went bird

22   hunting.

23        Q.    Okay.  And then when you would

# FREEDOM COURT REPORTING

Page 90

1    let me know.

2                        (Off-the-Record discussion

3                            was held.)

4                MR. ROBERSON:  You got the

5    wrong pay rate in there, Norris.

6                THE WITNESS:  Okay.

7                MR. ROBERSON:  Is there a

8    particular section you want him to look at

9    or is it the whole thing?

10                MR. DUKES:  Whole thing.

11                MR. ROBERSON:  Okay.

12        A.      Okay.

13        Q.      Is Defendant's Exhibit 2, is

14   it complete and accurate, to the best of

15   your knowledge and belief?

16        A.      Yeah.  Couple of things.

17        Q.      All right.  What couple things

18   may be wrong?  I think your lawyer said

19   something about the pay.  I think it says

20   eight dollars an hour.  What was your pay

21   when you were working at --

22        A.      When I started?

23        Q.      Yes, sir.

**FREEDOM COURT REPORTING**

Page 91

1          A.      Seven dollars.

2          Q.      Okay.  And what was it when

3    you ended?

4          A.      Well, seven-fifty.

5          Q.      Okay.  When did you get a

6    fifty cent pay raise?

7          A.      They had already fired me

8    then.  When the raise came, that was my last

9    check.

10         Q.      Okay.  Other than the amount

11   that you were being paid, is there anything

12   else inaccurate in Defendant's Exhibit 2?

13         A.      Yeah.  The years what -- It's

14   more like ten years instead of twelve.

15         Q.      Okay.  Anything else

16   inaccurate or wrong?

17         A.      Not that I see.

18         Q.      Have you ever seen Defendant's

19   Exhibit 2 before today?

20         A.      No.

21         Q.      This is the first time you've

22   seen it?

23         A.      This here?

# FREEDOM COURT REPORTING

1    Q.    He never told you he spoke to

2    anybody about your complaints?

3    A.    No.

4    Q.    Okay.  What were some of the

5    things that Joel would say that you believe

6    serve as the basis for your complaint that

7    you were discriminated against on the basis

8    of your race?

9    A.    He used to always ask me were

10   we going hunting, before we got there who

11   took the guests out?  And I told him either

12   me or Roy.  He said he had never worked on a

13   plantation or been on a plantation where

14   black guys -- they had black guides.

15   Q.    And did he make that comment

16   before your first hunt?

17   A.    Yeah.

18   Q.    Did he make that comment any

19   other time?

20   A.    He said -- Not that comment,

21   but he said other things.

22   Q.    Okay.  Well, I'm just -- I'm

23   going to let you tell me about the other

# FREEDOM COURT REPORTING

Page 97

1    comments.  But on this thing about his

2    comment, "He's never worked at a place where

3    they had black guides," he said that on how

4    many occasions?

5         A.       Two, maybe three times I've

6    heard him say it.

7         Q.       Okay.  And what did you say in

8    response to that?

9         A.       Nothing.  Just looked at him.

10        Q.       Okay.  All right.  What was

11   another comment that he made that you

12   believe serves as the basis of your

13   complaint that you were discriminated

14   against because of your race?

15        A.       Well, he asked about who ran

16   the place before David took over as manager.

17   And I told him, "Roy".  He said, "That's

18   unbelievable, a black man running a

19   plantation."

20        Q.       When did he make that comment?

21        A.       When he first started working

22   there sometime.  I can't remember no dates

23   -- the dates.

# FREEDOM COURT REPORTING

Page 99

1  comments serve as the basis for your belief

2  that you were discriminated against because

3  of your race?

4          A.      Nah.

5          Q.      Did you ever hear Mr. Norman

6  talk about wanting to replace black

7  employees?

8          A.      Yeah.

9          Q.      Okay.  Would that be a comment

10 that would serve as the basis for your

11 belief that you were discriminated against

12 because of your race?

13         A.      Yeah.

14         Q.      Okay.  What exactly did

15 Mr. Norman say in that regard?

16         A.      He said, "By January, first of

17 the year, it going to be an all white crew,

18 like it should be."

19         Q.      And when did he make that

20 comment?

21         A.      I don't know.  Maybe after the

22 first hunt or two we had.

23         Q.      And how many times did he make

## FREEDOM COURT REPORTING

Page 104

1    discriminated against because of your race?

2         A.      No.  Nobody else.

3         Q.      Okay.  Other than Mr. Norman,

4    do you believe you were treated fairly by

5    Sedgefields or Mid State?

6         A.      Everything was fine until he

7    started working there.

8         Q.      Okay.  So, other than

9    Mr. Norman's conduct, you believe you were

10   treated fairly by Mid State?

11        A.      Sure.  Except for the pay.

12        Q.      Okay.  That's what I'm about

13   to get to.  I asked you earlier, "What

14   served as the basis for your complaint that

15   you were discriminated against because of

16   your race?"  You said, "The pay, that

17   younger guys were paid more than you, and

18   things that Joel would say."

19        A.      Right.

20        Q.      Have I accurately summarized

21   your deposition testimony?

22        A.      Yes.

23        Q.      All right.  And I think you've

# FREEDOM COURT REPORTING

Page 105

1  told me everything about what Joel would

2  say; is that right?

3          A.      Right.

4          Q.      Now I want to go into the

5  issue that you have with pay.  What is your

6  complaint about the pay, Mr. Foster?

7          A.      Because they promised me one

8  thing, and paid me another.

9          Q.      Okay.  What other complaints

10 do you have about your pay?

11         A.      Wasn't getting paid enough.

12 That's it.

13         Q.      Okay.  Well, do you believe

14 that other employees were paid more than you

15 for similar work?

16         A.      Yeah.  Most of the -- All the

17 black guys, all of us was making the same

18 amount of money.  I think Willie might have

19 been -- Willie Mack might have been making

20 thirty-five or forty cents more, but the

21 rest of us were making seven dollars an

22 hour, and the white guys that they hired was

23 making eight.

**FREEDOM COURT REPORTING**

Page 106

1    Q.    Okay.  And what white guys do

2    you compare yourself to?

3    A.    I know Will Hubbard and the

4    other young guy, he's a Mayes.  I can't

5    think of his first name.

6    Q.    Joseph Mayes?

7    A.    Yeah.

8    Q.    Anybody else?

9    MR. ROBERSON:  The Ham boy?

10   A.    Yeah.  He had started working

11   there, maybe a week or two after I was

12   fired.

13   MR. ROBERSON:  Okay.

14   A.    And there was another guy that

15   was working there previous, before he got

16   fired, and he was making eight dollars an

17   hour.

18   Q.    Brotherman?

19   A.    Yeah.

20   Q.    That's Beckwith, Brotherman

21   Beckwith, William Beckwith?  They called him

22   Brotherman?

23   A.    Yeah, Brotherman.  I don't

## FREEDOM COURT REPORTING

1    know what his real name was.

2           Q.      Okay.   Do you know anything

3    about Will Hubbard's prior work experience?

4           A.      He told me he was training,

5    working with me, that since he had got out

6    of school, only thing he had did was help

7    his dad haul chickens.   I think his daddy

8    hauled chickens from one place to another.

9    I think he bought them from, like, Wayne

10   Poultry and they take them to different

11   stores and stuff.   And he said that's the

12   only thing he had did prior to that.

13          Q.      Do you know his experience

14   with heavy equipment, with dozers and

15   skidders?

16          A.      He told me he had never messed

17   with none before he came out there.

18                  MR. DUKES:  Can we go off the

19   Record?

20                          (Off-the-Record discussion

21                           was held.)

22                          (Recess taken.)

23          Q.      Mr. Foster, we just took a

# FREEDOM COURT REPORTING

Page 110

1  chickens from one supermarket to another.

2         Q.      Okay.  And do you know when he

3  was hired on at Mid State?

4         A.      It was either the last of

5  November or around the first of December,

6  something like that.

7         Q.      Okay.  I've got November 21,

8  2005, do you have any reason to dispute

9  that?

10        A.      Should be something like that.

11        Q.      Okay.  So, you worked around

12  him for about a month, little over a month;

13  is that right?

14        A.      Right.

15        Q.      Do you know if Mr. Hubbard had

16  a driver's license?

17        A.      Yes.

18        Q.      Okay.  He could drive?

19        A.      Yeah.

20        Q.      Okay.  Joseph Mayes is another

21  fellow you mentioned.  Do you know anything

22  about his work experience?

23        A.      I never even met the guy

# FREEDOM COURT REPORTING

Page 111

1    before he started working there.  I never

2    even knew him or seen him.

3         Q.    Okay.  Do you know what his

4    hunting experience was?

5         A.    I know he told me he liked to

6    deer hunt.

7         Q.    Okay.  What about trapping, do

8    you know if he could trap?

9         A.    He said he -- I think -- Yeah,

10    he used to trap while he was out there.

11         Q.    Okay.  Did he have a driver's

12    license, Mr. Mayes?

13         A.    I'm pretty sure he did.

14         Q.    Okay.  Brotherman, who, by the

15    way, is Mr. Beckwith --

16         A.    Yeah.

17         Q.    Do you know anything about his

18    work experience before coming to Mid State?

19         A.    No.  No more than he told me

20    he used to work on a big golf course, and he

21    did clean up barbecues and stuff like that.

22    Other than that, no.

23         Q.    And do you know what his job

# FREEDOM COURT REPORTING

Page 116

1  of shooting in.  Every now and then we run

2  across a wild bird.

3       Q.      How did Mr. Norman change the

4  way y'all did bird hunts, or quail hunts?

5       A.        They just strictly said they

6  was going to turn it around to just straight

7  wild birds.  Wasn't going to be no put and

8  take.  Like, in the morning, you put them

9  out there and then you go hunt them maybe an

10 hour or two later.  What they did was

11 release some birds into the wild,

12 prerelease, you know, maybe a month or two

13 before hunting season start.

14      Q.      Okay.  Was Mr. Norman, to your

15 knowledge, was he trying to reestablish the

16 wild quail population at Sedgefields?

17      A.        That's what he said.  That's

18 why they were going to change it to just --

19 There wasn't going to be no more putting no

20 birds out, it was just going to be strictly,

21 you know, wild birds.

22      Q.        Did you have any criticisms of

23 the way Mr. Norman handled the quail hunts?

# FREEDOM COURT REPORTING

Page 117

1    A.    Well, I didn't say it to him,

2  I said it to other guys, the way he -- Like,

3  lot of times we said, "We can't find no

4  birds."  And I might be talking to Willie

5  Mack or I might have told Russ, some of

6  them, that the birds be there because a lot

7  of times after we done hunted through that

8  area, I might ride on the bottom hill or

9  something and I been flushed the birds up,

10  but they wouldn't know it.

11          Only thing I said, "If he was

12  to hunt the dogs a little harder in that

13  area, that he would find the birds."  He

14  just always pushing through.  You know,

15  everybody got different styles how to do

16  things.

17    Q.    Did you ever tell anybody that

18  you would not tell Mr. Norman where the

19  birds were?

20    A.    No.

21    Q.    Did you ever refuse to tell

22  Mr. Norman where you knew wild coveys were?

23    A.    No.  He never -- If he ever

# FREEDOM COURT REPORTING

1    A.    No.

2    Q.    Okay.  When did you start

3  keeping them in the barn?

4    A.    I'm going to get -- Let me

5  understand what you're talking about first.

6    Q.    Okay.

7    A.    You saying -- Okay.  You know,

8  you let them in and out every day.

9    Q.    I understand that.  But during

10  the summertime, in the pasture --

11    A.    Oh, they be out in the

12  pasture.  We may keep two or three up there

13  at the barn, you know, because Suzanne and

14  her husband, they like to come down and

15  ride.  And we basically kept two or three

16  horses up at the barn at all times.  The

17  rest of them be out in the pastures.

18    Q.    Okay.  And so, at some time

19  during the year, you would take them out of

20  the pasture and keep them in the barn;

21  right?

22    A.    Yeah.  When hunting season

23  about to start, they'll come up and they'll

## FREEDOM COURT REPORTING

Page 120

1   get them in and shear them up and put shoes

2   on them and stuff like that.

3           Q.      Okay.  So, that would be

4   September?

5           A.      September, yeah, last of

6   September, something like that.

7           Q.      And then, when would you --

8           A.      Maybe October.  Week or two,

9   couple weeks before hunting season.

10          Q.      Okay.  So -- And then when

11  would you let them back out in the fields?

12          A.      After hunting season over.

13          Q.      When is the hunting season

14  over?

15          A.      If I'm not mistaken, I think

16  wild bird season goes out in the last of

17  February.  But you could put birds out until

18  the end of March, if they haven't changed

19  it.

20          Q.      Okay.  And so, when would

21  y'all put the horses out to pasture?

22          A.      After March.

23          Q.      Okay.  So, from September to

# FREEDOM COURT REPORTING

Page 122

1      A.      Right.

2      Q.      And you would prepare the

3  fields; correct?

4      A.      Right.

5      Q.      Now, was preparing the fields,

6  did you do that all the way through the

7  hunting season?

8      A.      Yeah, we were -- we -- All the

9  way through.

10     Q.      Okay.  And when the horses are

11 out in the field, you don't have to clean

12 the barn as much; correct?

13     A.      What you mean, like, in the

14 summertime?

15     Q.      Yes, sir.

16     A.      We don't have to clean them at

17 all because we didn't even feed them on the

18 inside in the summertime.  They've got a big

19 trough out there.  There's only three horses

20 out there.  Just take it and fill it all the

21 way down where they don't be bumping into

22 each other.  You didn't have to clean it in

23 the summertime.

# FREEDOM COURT REPORTING

Page 123

1    Q.    Okay.  How many horses were

2  out at Sedgefields when you were working

3  there the last time?  And I'll add mules to

4  that, too.

5    A.    Okay.  I think it was eight

6  horses and two mules, if I'm not mistaken.

7    Q.    Okay.

8    A.    I think that's the way it was.

9  Eight or nine horses, I think it was eight,

10  and two mules.

11    Q.    You were telling me when we

12  came back from the break that you felt like

13  you were discriminated against because of

14  your race because by the end of your

15  employment, you felt like all you were doing

16  was shoveling manure; is that right?

17    A.    Yeah.

18    Q.    Okay.  What was -- I mean,

19  someone had to clean the barn, did they not?

20    A.    Yeah.  But I say it like this.

21  He just did things a little different.

22  Before he came, you know, during the hunting

23  season or whatever, we didn't put shavings,

# FREEDOM COURT REPORTING

Page 124

1  they would be putting shavings in there in

2  the stalls on the concrete.

3           The way we did it, it was just

4  naked concrete there.  And once they leave

5  out, we let them out in the morning time, we

6  cleaned up every stall.  Every morning,

7  whatever waste they had in there from that

8  night, we cleaned it out.

9           And, see, with the shavings in

10  there, it's that high (indicating).  And

11  it's urine and, you know, the other, too, is

12  in it.

13      Q.      Yeah.

14      A.      And it's just -- The shaving,

15  he got it like that thick (indicating), and

16  it's like ten or twelve stalls, whatever it

17  was we had to clean out.  Because sometimes

18  he changed one horse from one stall to the

19  other.

20      Q.      So, with the shavings, there

21  was more work?

22      A.      A lot more.

23      Q.      Okay.  When you came to work

# FREEDOM COURT REPORTING

Page 125

1  in March of 2005, were the horses already

2  out to pasture?

3      A.    No.

4      Q.    Okay.  There was just a bare,

5  concrete floor in the barn?

6      A.    Yes.

7      Q.    And did you have to clean out

8  the barn then?

9      A.    (Witness nods head in the

10  affirmative.)

11      Q.    Okay.

12          MR. ROBERSON:  You have to

13  answer out.

14      A.    Yes, sir.  Like I said, it was

15  so much easier, you could take one scoop to

16  each stall and you're finished with it.  But

17  the way he had it, it would take you

18  thirty-five or forty minutes to clean one

19  stall.

20      Q.    Okay.  And when you first

21  started back at Sedgefields in March of

22  2005, who helped you clean the stalls then?

23      A.    Well, all of us did it.

# FREEDOM COURT REPORTING

Page 126

1    Q.      Who is all of us?

2    A.      Demetrius, Willie Mack, me and

3    Roy.  Where most of the time, it would be

4    Demetrius, Willie and me.  We go -- Okay.

5    There's one side we had down so far where

6    the water was, and all you got to do is just

7    shovel it out the window.  And the other

8    side, where the mules was, we had a

9    wheelbarrow and dump it in.  And I'm telling

10   you, it would take maybe fifteen minutes to

11   do the whole thing where we had it just

12   naked concrete.

13   Q.      All right.  And then when you

14   put the horses back in the stall in the fall

15   of 2005, who helped clean out the stalls?

16   A.      Mostly it was just me and

17   Jeff, and sometimes Willie Mack would help

18   us.

19   Q.      Okay.

20   A.      When he wasn't working down at

21   the lodge.

22   Q.      Okay.  Were there any white

23   employees during that time that you think

## FREEDOM COURT REPORTING

Page 127

1    should have been helping you?

2          A.     No.  There wasn't none.

3          Q.     All right.  Is shoveling

4    manure the only -- Let me strike that and

5    start over again.

6                 I asked you, and I hate to

7    keep on repeating it, but I want to make

8    sure the Record is clear.  I asked you

9    earlier, "Tell me everything that serves as

10   the basis of your complaint that you were

11   discriminated against because of your race."

12   You told me about the pay, and I think we've

13   gone over all of that.  Is there anything

14   you'd you want to add about pay?

15         A.     Yeah.  More money, I wanted

16   more money.

17         Q.     Okay.  Anything other than

18   that?

19         A.     Huh-uh.

20         Q.     Okay.  Things that Joel would

21   say.  And then a third category, which I've

22   listed as terms and conditions of

23   employment, and you told me about you felt

## FREEDOM COURT REPORTING

Page 130

1  about this statement?

2        A.      At one time I probably could

3  have went to David and talked to him about

4  it.  But after Joel changed, yeah, he

5  changed too.

6        Q.      How did Mr. Carroll change?

7        A.      From a good guy to a devil.

8        Q.      Okay.  Did Mr. Carroll do

9  anything that would lead you to believe that

10  he was discriminating against you on the

11  basis of your race?

12        A.      No.  He wouldn't ever do

13  anything like that.  Just Joel, when he went

14  against him, he did whatever he would want

15  him to do.  Because before Joel got there,

16  he was a nice guy.  You could go to him and

17  talk to him about anything.

18        Q.      Do you have any knowledge of

19  any conversations or communications between

20  Mr. Norman and Mr. Carroll?

21        A.      No more than he was my

22  supervisor and Joel -- Mr. David was the

23  plantation manager.

# FREEDOM COURT REPORTING

Page 131

```
1        Q.      But you don't have any
2   knowledge of any specific conversation
3   between Mr. Norman and Mr. Carroll, with
4   regards to the treatment of you?
5        A.      No.
6        Q.      Okay.  All right.  Then,
7   again, I'm going back.  I'm just trying to
8   make sure I've got it right for the Record.
9   I asked you to tell me everything that
10  serves as a basis for your belief that you
11  were discriminated against because of your
12  race while you worked for Mid State.  You
13  told me about pay.  You told me about things
14  that Joel would say.  Now, have you told me
15  everything that Joel would say that serves
16  as the basis of your complaint?
17       A.      I tried to.
18       Q.      Is that yes?
19       A.      Yes.
20       Q.      Then we talked about terms and
21  conditions of employment, and you said you
22  had to shovel a lot of manure.
23       A.      Right.
```

## FREEDOM COURT REPORTING

Page 132

1    Q.    Is there anything else about

2    the terms and conditions of your employment

3    that would lead you to believe that you were

4    discriminated against because of your race?

5    A.    No.  I told you everything.

6    Q.    Okay.  The last thing I have

7    is tip money.

8    A.    Right.

9    Q.    I think you said they kept the

10   tip money.

11   A.    Right.

12   Q.    Who is they?

13   A.    Joel and David.

14   Q.    Okay.  Is it your allegation

15   that when a customer would come and give tip

16   money to Joel or David after a hunt, that

17   they would keep it and not give it to the

18   employees?

19   A.    He gave us some twice.

20   Q.    Okay.

21   A.    And only reason why then

22   because we kept on complaining.  And I got

23   fired that same day that I complained about

## FREEDOM COURT REPORTING

Page 133

1   it.  Which he -- I remember at one time,

2   after a hunt, this guy had told us, I think

3   his name was Calloway or whatever it was, he

4   told us he left us a hundred and fifty

5   dollars apiece, and we didn't get not one

6   dime of it.  And we worked --

7        Q.     How did you know that -- Is it

8   Mr. Calloway?

9        A.     Yes, sir.  I think that was

10  his name.

11       Q.     How do you know Mr. Calloway

12  left that kind of money for tips?

13       A.     He told us.

14       Q.     When did he tell you?

15       A.     Right before -- When they was

16  going in for that day -- because they was

17  there for two days.  When they was going in

18  that afternoon -- Well, he left at lunchtime

19  and he said, "I'm going to leave y'all a

20  hundred and fifty dollar tip."

21       Q.     And when was this, do you

22  recall?

23       A.     That was -- I don't know

# FREEDOM COURT REPORTING

Page 134

1  whether it was the first, second, third.  I

2  can't remember what hunt it was.

3       Q.    Well, we know the first hunt

4  was in, I think, October 14, 2005.

5       A.    I can't remember what hunt it

6  was.

7       Q.    Okay.  Do you recall when the

8  last hunt was before you were fired?

9       A.    Maybe a day or two before I

10  was fired.

11       Q.    Okay.  Was -- Mr. Calloway we

12  know wasn't the first hunt, was he?

13       A.    No.

14       Q.    He wasn't the last hunt, was

15  he?

16       A.    No.

17       Q.    Okay.  Was he near the end or

18  near the first?

19       A.    Near the first.

20       Q.    Okay.  All right.  Anything

21  else about tip money that you believe serves

22  as the basis for your claim that you were

23  discriminated against because of your race?

## FREEDOM COURT REPORTING

Page 135

1       A.     Yeah.  Because they told us if

2  we asked about it or said anything about it,

3  we would be fired.

4       Q.     Okay.  And that memo went out

5  to all employees?

6       A.     Right.

7       Q.     Okay.

8       A.     It give him the right to take

9  it as much as he want to if you can't say

10  nothing about it.

11       Q.     Okay.  Do you know if

12  Mr. Norman, Mr. Carroll, or anyone at

13  Sedgefields took in some tip money, gave it

14  to some white employees but didn't give it

15  to any black employees?

16       A.     I don't -- I don't know that.

17       Q.     Okay.  All right.  Now, have

18  you told me now everything, because this is

19  -- This will most likely be the last and

20  only opportunity I get to ask you questions

21  in this case.  Have you told me everything

22  that serves as the basis for your belief

23  that you were discriminated against because

# FREEDOM COURT REPORTING

Page 144

1  I didn't go over?

2       A.     No, sir.

3       Q.     Why don't you have a driver's

4  license?

5       A.     Well, when I was -- When I

6  went to Germany, my license got expired.

7  When I came back home, I just never went

8  back and got them.  David lent me the money

9  to go and get them reinstated.  Ain't

10  nothing but I just have been too lazy to go

11  and get them.  Not that I can't, because I

12  don't have no tickets or nothing.

13       Q.     When is the last time you've

14  had a driver's -- a valid driver's license?

15       A.     In the '80s, sometime, '83,

16  '84, somewhere like that.

17       Q.     How much money did Mr. Carroll

18  loan you to get a driver's license?

19       A.     A hundred and fifty dollars.

20       Q.     Did you ever pay him back that

21  money?

22       A.     No.

23       Q.     Has Mr. Carroll ever loaned

# FREEDOM COURT REPORTING

Page 145

1  you any other money?

2         A.       Not to my knowledge.  That was

3  it.

4         Q.       Have you ever, from time to

5  time, asked him for twenty dollars or saying

6  you need a little cash, you're short, and

7  Mr. Carroll gave you money?

8         A.       Yeah.  I did ask him, you're

9  right, it was twice.  I got twenty dollars

10  from him one time and a hundred fifty

11  dollars one time.

12         Q.       Any other times that you asked

13  for money and he gave you money?

14         A.       Nope.

15         Q.       Did you ever give him any of

16  that money back?

17         A.       Nothing but the twenty.

18         Q.       You did give him twenty

19  dollars back?

20         A.       That's it.

21                  (Off-the-Record discussion

22                   was held.)

23         Q.       Sedgefields Plantation is a

**FREEDOM COURT REPORTING**

Page 146

1 pretty big place, isn't it?

2        A.     Right.

3        Q.     Sometimes you have to get on

4 public roads to go from one place to the

5 other place; is that right?

6        A.     Right.

7        Q.     Because you didn't have a

8 driver's license, did employees sometimes

9 have to drive you to one place or another

10 place?

11       A.     Yeah, they have.

12       Q.     Okay.  Back in the first time

13 that you worked for Mid State, do you recall

14 doing some plumbing work on the barn?

15       A.     Yes, sir.

16       Q.     Okay.  Did you represent to

17 the folks at Mid State that you had

18 completed that plumbing work, when you

19 actually had not?

20       A.     I wasn't doing the plumbing

21 work, Roy and another guy was doing it.

22       Q.     Okay.  Did you tell Roy that

23 you had finished the plumbing work?

## FREEDOM COURT REPORTING

Page 153

1    A.    I been doing it a long time.

2    He know who was doing it, Jeff.

3    Q.    You're saying it wasn't you

4    that was scraping the trees, it was Jeff

5    Harris?

6    A.    Yeah.  That's who he went and

7    complained to with David.

8    Q.    Did you -- Did anybody ever

9    complain about the fact that you were told

10   to chop a field and then you didn't complete

11   chopping the whole field?

12   A.    That's a real big place.

13   What's your name?

14   Q.    My name is Carter Dukes.

15   A.    Mr. Carter, that's a real big

16   place.  Ain't nobody perfect.  Ain't no way

17   in the world you going to go over that whole

18   place and not miss a spot somewhere.

19   Q.    Did anybody complain about you

20   missing a spot?

21   A.    Joel said something to me

22   about a couple of spots I had missed, but it

23   was so far down up under the hill until I

## FREEDOM COURT REPORTING

Page 154

1    didn't bother because it was such a strain

2    on the tractor, pulling it back up the hill.

3         Q.     Do you know whether

4    Mr. Carroll ever looked over the work that

5    you had done chopping the fields?

6         A.     He always would come through

7    riding, never stopped or said anything.

8         Q.     It was customary for

9    Mr. Carroll to sort of check on how you were

10   doing, check on your work?

11        A.     I guess so, yeah.

12        Q.     Well, I mean, don't guess so.

13   But, I mean, would you often see Mr. Carroll

14   out looking --

15        A.     Not often.

16        Q.     Well, from time to time?

17        A.     From time to time, I would see

18   him.  According to where you was working, if

19   it was somewhere close by a road where we

20   was working at, every now and then I would

21   see him.  When you down on a bottom

22   somewhere, no, I didn't see him.

23        Q.     From time to time, though, you

## FREEDOM COURT REPORTING

Page 155

1    would observe Mr. Carroll checking up on

2    your work?

3            A.      Right.

4            Q.      Okay.  Did Mr. Norman teach

5    Mr. Mack how to drive a tractor?

6            A.      Who?

7            Q.      B.B., did he teach B.B. how to

8    drive a tractor?

9            A.      I taught him how.  I showed

10   him the basics on how to drive it.  And

11   after he took me off my tractor and he put

12   me on a different tractor chopping, he

13   showed him, you know, basic fundamentals,

14   same things that I had showed him.

15           Q.      Okay.  And did you ever

16   complain to anybody about the fact that Mack

17   was getting to drive the tractor?

18           A.      I said it to him, to B.B.

19           Q.      What did you say to B.B.?

20           A.      I told him, "You got it made."

21           Q.      Okay.  I think I've asked you

22   this question.  I apologize for asking it

23   again.  Did you ever complain about the way

## FREEDOM COURT REPORTING

Page 156

1  that Mr. Norman was conducting the quail

2  hunts?

3         A.      Nope.  I told you that one

4  time, the only thing -- I didn't say it to

5  him, I said it to Jeff and said it to Willie

6  Mack, that if he was to let the dogs hunt,

7  the area where we was hunting at, he would

8  find some birds.  I said it to them, not to

9  him.

10         Q.      So, you said it to

11  coemployees?

12         A.      Right.

13         Q.      Didn't say it to Mr. Norman?

14         A.      Never.

15         Q.      Did you ever say it within

16  earshot of any customers?

17         A.      No.  Because I mostly be

18  riding off from them because I'm scouting

19  dogs, keeping my eyes on them.

20         Q.      Mr. Carroll was on some of

21  those hunts, was he not, when you would have

22  explained about the way that Mr. Norman was

23  conducting the hunt?

# FREEDOM COURT REPORTING

Page 157

1    A.    He might have been.  I can't

2    recall.  I don't know.

3    Q.    Okay.  We talked earlier about

4    a memo that Mr. Carroll sent out about tips.

5    A.    Right.

6    Q.    Do you recall -- I'm not

7    testing your memory.  Do you recall

8    generally what that memo said about tips?

9    A.    Basically, that if they didn't

10   walk up to us and give it to us in our hand,

11   if they left a tip with them, within two or

12   three days, they would give it to us.

13          And if we complained about it,

14   we would be terminated and either they'll

15   stop the tipping, period.  Something similar

16   to that.

17   Q.    Did anyone ever talk to you or

18   with you about you asking or suggesting to

19   customers that they give you a tip?

20   A.    Say that again.

21   Q.    Did anyone ever talk with you

22   about the fact that you were asking

23   customers or suggesting to customers that

# FREEDOM COURT REPORTING

Page 158

1  they tip you?

2      A.    No.  I said -- I said it to

3  the clients myself, that if they had

4  something to give me, give it to me in my

5  hand, because if they didn't, I wasn't going

6  to get it.

7      Q.    Okay.  And you said that to

8  the customers?

9      A.    Yes.  I said it to a couple of

10 clients.

11     Q.    Okay.  And that would have

12 been in violation of that policy, would it

13 not have?

14     A.    What you mean?

15     Q.    If you said that to a

16 customer, you would have been violating this

17 tip policy, which is document number 22?

18          MR. ROBERSON:  I'm going to

19 object to that.  I don't think it violates

20 it.  I object to the form.  I think that

21 mischaracterizes the policy.

22          MR. DUKES:  Okay.

23     A.    We weren't standing around

# The Peble Corp.

## EMPLOYMENT APPLICATION

**PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNATURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.**

NAME _Norris Foster_    TELEPHONE NUMBER

ADDRESS _P.O. Box 253_    Home # _(334) 366-8505_

CITY _Midway_  STATE _Ala._  ZIP _36053_    Daytime # _(334) 529-3260_

SOCIAL SECURITY NUMBER _417 - 86 - 0387_

## EMPLOYMENT INTERESTS:

Type of work desired _Anything Available_

Full Time _7:00-7:00 Pm_  Part Time _____  Temporary _____

Starting pay expected _$7 hour_    Date Available to start _Today_

**IF APPLICABLE:**

Are you willing to travel? _Yes_  If yes, what percentage of the time _Whenever_

Would you be willing to relocate? _Yes_

Would you object to:  Irregular work hours  ☒ YES  ☐ NO    Night work  ☒ YES  ☐ NO

Swing or fluctuating shift work  ☐ YES  ☐ NO

## SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill _Tractor driver_    Experience _20 yrs._

Skill _Training dog_    Experience _20 yrs_

Skill _Bulldoze cozen_    Experience _20 yrs_

Please discuss other specialized skills you feel are pertinent to the job for which you are applying _____

## UNITED STATES MILITARY SERVICE STATUS:

Past Military Service - FROM _77_  TO _83_

Branch _Army_  Rank on discharge _E-6_    Present Status _____

List duties and special training

**DEFENDANT'S EXHIBIT**

_1_

CONFIDENTIAL
— DEFENDANT'S PROD.    00(

Do you have a valid, active driver's license?  ☐ YES  ☑ NO  Issuing State ~~_____~~

Drivers License #_____ Class of License_____

How long have you been a resident of this City _4 yrs_____ State _Alabama_

How long at your present address? _3 yrs,_____ Give previous address if less than one year at present

address _P.O. Box 253 - Midway_____

Are you over the age of 18?  ☑ YES  ☐ NO  If hired can you provide proof of age?  ☑ YES  ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before?  ☑ YES  ☐ NO  If yes, please give dates of

employment, position employed, and reason for leaving _Training dog, Tractor drive_

_lay-off_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions. Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From_____ to _____

  Company Name, City, and State _Frog Pond Turf_____

  Supervisor's Name/Title _Al Davis_____ SALARY - Start _$7.50_ End _$9.5_

  Phone #_____ May we contact?_____ Final position with the company _Tractor driver_

  Reason for leaving? _Work got to slow - lay off_____

#2 DATES - From_____ to _____

  Company Name, City, and State_____

  Supervisor's Name/Title_____ SALARY - Start_____ End_____

  Phone #_____ May we contact?_____ Final position with the company_____

  Reason for leaving?_____

#3 DATES - From_____ to _____

  Company Name, City, and State_____

  Supervisor's Name/Title_____ SALARY - Start_____ End_____

  Phone #_____ May we contact?_____ Final position with the company_____

  Reason for leaving?_____

CONFIDENTIAL
DEFENDANT'S PROD.

**#4 DATES - From**_____ to _____

**Company Name, City, and State**_____

**Supervisor's Name/Title** _____ **SALARY - Start** _____ **End** _____

**Phone #**_____ **May we contact?**_____ **Final position with the company**_____

**Reason for leaving?**_____

**#5 DATES - From**_____ to _____

**Company Name, City, and State**_____

**Supervisor's Name/Title** _____ **SALARY - Start** _____ **End** _____

**Phone #**_____ **May we contact?**_____ **Final position with the company**_____

**Reason for leaving?**_____

## PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Ben Jordan | | 529-3260 |
| Brenda Turner | | 529-3887 |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_____
Applicant's Signature

_____
Date Signed
2 / 8 / 05

CONFIDENTIAL
DEFENDANT'S PROD.          0003

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | 12th Bullock Co. High | |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.) High School _12th_____ College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States?  ☑ YES  ☐ NO If not, what is your present status and

do you have a work visa? _____

Have you ever been convicted of a crime?  ☐ YES  ☑ NO If yes, please explain. Give dates, charge, penalty assessed or disposition. Conviction will not necessarily bar employment. Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job?  ☐ YES  ☑ NO If yes, please explain _____

_____

_____

Have you ever been bonded?  ☐ Yes  ☑ NO   If yes, when and in what job. _____

_____

_____

CONFIDENTIAL
DEFENDANT'S PROD.   000

November 3, 2005

To all Sedgefields Employees

# ATTITUDE IS IMPORTANT

The goal of Sedgefields Plantation is to provide our guests with a first class experience. It does not matter whether guests are here for deer, turkey, quail or just lodging. We are a service business and our reputation is based on the effort we put forth here at work. This effort not only applies to when we have guests but to the days when we are preparing the woods and fields for hunters or the lodge and other buildings for our guests stay. The weed-eating, mowing, chopping and cleaning are all important. In order to be first class, we have to take pride in the work we do.

Tips are not a standard part of your pay when we have guests. However, some of our guests will want to tip for the great service you provide. You may receive a tip in one of two ways: (1) cash or (2) it may be included with an upcoming paycheck. I will not have employees standing around waiting for a tip at the end of the day. If I see this behavior you will be dismissed from employment at the Plantation. **If tipping continues to be a problem at the Plantation, it will be stopped.** Take pride in what you do.

Sedgefields will have a staff that is committed to seeing the Plantation move forward and be known for providing great service. Employees present/future who are here just for a paycheck, disrupt the work of others and are only concerned with self will find there employment time at the Plantation to be a short one. I expect every employee to work hard each day and receive a fair wage for the work they do, anything less in not acceptable. Take pride in what you do.

If you are sick and can not come to work, I expect you to notify **your** manager. Take pride in what you do.

CONFIDENTIAL
DEFENDANT'S PROD.    0