IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JEFFREY HARRIS, WILLIE BERNARD MACK, DEMETRIUS PARHAM and HENRY TARVER,<br><br>**Plaintiffs**<br><br>v.<br><br>MID-STATE LAND & TIMBER COMPANY, INC., d/b/a SEDGEFIELDS PLANTATION,<br><br>Defendant. | Civil Action No.:<br><br>2:06-cv-875-ID-CSC |
| NORRIS FOSTER,<br><br>**Plaintiff,**<br><br>v.<br><br>MID-STATE LAND & TIMBER COMPANY, INC., d/b/a SEDGEFIELDS PLANTATION,<br><br>Defendant. | Civil Action No.:<br><br>2:06-CV-00405-ID-SRW |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COME NOW Norris Foster, Jeffrey Harris, Willie Bernard Mack, Demetrius Parham and Henry Tarver, Plaintiffs in the above styled action, and file this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.

**STATEMENT OF FACTS**

The Defendant Mid-State, Plaintiffs' former employer, purchased a 13,000 acre parcel of property in Bullock County in approximately 1999 for $14 million dollars. (Pl's Ex. 5, pp. 73-74). Mid-State owned this parcel until it was sold to Tolleson's in May 2006 for $32 million dollars. (Pl's Ex. 5, p. 74). Mid-State operated this property as a hunting lodge during this time period. (Pl's Ex. 5, pp. 9-10). Plaintiffs' worked for Defendant as outside laborers. (Pl's Ex. 7; 23; 26).

Foster went to work at the property known as Sedgefields in the year 1993. (Pl's Ex. 1, p. 52). Foster's job duties before the property was acquired by Mid-State included general labor such as driving a tractor, operating a bush hog, planting deer plots, creating fire breaks with a bull dozier, operating backhoes, etc. (Pl's Ex. 1, pp. 53-54). According to Mid-State documents, Foster was initially paid $5.15 per hour in 1999 but he received raises prior to his lay-off in 2001. (Pl's Ex. 8).

Foster was laid off in 2001, according to Mid-States' own records, as part of a reduction in force, and was eligible for rehire. (Pl's Ex. 9). Foster drew unemployment after his lay-off. (Pl's Ex. 12). Foster was later rehired in February 2005 at $7.00 per hour. (Pl's Ex. 7). Roy Lee rehired Foster when he became Plantation manager. (Pl's Ex. 3, pp. 49-50). Lee had previously worked with Foster and knew that he had numerous skills, had knowledge of the Defendant's plantation, and was a good hunting crew member. (Pl's Ex.3, pp. 49-55). Lee approached management at Mid-States and obtained approval to rehire Foster, because he needed help in maintaining the plantation. (Pl's Ex. 3, pp. 49-50). Lee talked with Bob Rea and received permission to hire Foster at $8.00 and give him a raise to $9.00 per hour after a month. (Pl's Ex.3, pp. 59-60). Lee talked to Foster

and told him of his salary, but Foster's girlfriend completed his job application stating that he would work for $7.00 per hour. (Pl's Ex. 3, pp. 62-65). Foster was hired at $7.00 per hour and never received a raise until his final paycheck at the end of December, after he had been fired. (Pl's Ex.8). Foster received a $.50 cent raise after his dismissal. (Pl's Ex. 8, p-0006).

Foster worked under the supervision of Lee from February 2005 until September 2005. (Pl's Ex. 3, pp. 65-66). Foster had no difficulties working for Lee, and he completed his job assignments in a timely manner. (Pl's Ex. 3, pp. 65-66). Lee had no complaints about Foster's job performance. (Pl's Ex. 3, pp. 65-66). After Norman was hired on September 19, 2005, Foster was assigned to work under his supervision. (Pl's Ex. 3, pp. 83-85).

Norman made numerous derogatory comments about blacks while working with Foster. (Pl's Ex. 1, pp. 96-97, 99, 128-129). Norman made the statement "he had never worked anywhere before where they had black guides." (Pl's Ex. 1r, pp. 96-97). When Norman found out that Lee had previously been over the whole plantation, he said "imagine that, a black man running a plantation." (Pl's Ex. 1, p. 97). Norman threatened Foster's job, indicating to him that "by January he was going to have an all white hunting crew." (Pl's Ex. 1, p. 99). When the black crew suggested that they get off early on homecoming weekend, a Bullock County tradition, Norman stated that he was going to "hire some white boys and Mexicans who wanted to work." (Pl's Ex. 1, pp. 128-129). Lee let his crew off work early as he has a son who plays on the Bullock County football team. (Pl's Ex. 3, p. 123). Foster also had a son who played football for Bullock County. (Pl's Ex. 3, p. 123).

Foster also had difficulty in receiving his tip money from guests. (Pl's Ex. 1, p. 108-109). Norman, who made $70,000.00 a year in salary, would retain all the tips unless he was specifically told by the guests to share them. (Pl's Ex. 2, pp. 159-160). Foster and the other members of the black hunting crew each made $7.00 per hour. (Pl's Ex. 8; 26; 34; 35).

Foster was only disciplined for work performance on one occasion. (Pl's Ex. 10). Norman arrived at the barn and Norris and Harris were riding horses. (Pl's Ex. 10). Foster maintains that the clippers for the horses were broken, that he tried to contact Norman who failed to answer his radio, and that he Harris were riding the horses as part of their job duties. (Pl's Ex. 3, pp. 99-100). Foster still received a written reprimand. (Pl's Ex. 10).

Foster did complain to both Lee and David Carroll of discriminatory treatment by Norman. (Pl's Ex. 1, p. 93). He complained to Lee a bunch of times about statements Norman made. (Pl's Ex. 1, p. 93). Foster complained to Carroll two times. (Pl's Ex. 1, p. 93). Carroll told him he had to work his problem out with Norman. (Pl's Ex. 1, p. 93).

Foster was fired on December 29th. (Pl's Ex. 11). Prior to Foster's termination, Norman was attempting to repair a tree cutter. (Pl's Ex. 1, pp. 163-165). Foster had worked with the tree cutter on numerous occasions, and he told Norman in order for the cutter to work properly, it had to be leveled up. (Pl's Ex. 1, pp. 163-165). Norman disregarded Foster's instructions, and while operating the tree cutter, it broke after only a short period of operation. (Pl's Ex. 1, pp. 163-165). Foster laughed at Norman. (Pl's Ex.1, pp. 163-165). Shortly after this incident, Norman got mad and fired Foster. (Pl's Ex. 1, pp. 163-165).

Foster asked why he was fired, and was told it was because he had stolen some

birds in October. (Pl's Ex. 1, pp. 166-167). In fact, Foster never removed any birds. (Pl's Ex. 1, p. 167). The birds had spoiled while in the refrigerator and they were thrown out. (Pl's Ex. 14). Norman claims that Harris told him that Foster took the birds, but Harris denies this. (Pl's Ex. 2, pp. 79-80; Pl's Ex. 14).

Before working for Mid-State, Foster plead guilty to a third degree misdemeanor assault. (Pl's Ex. 1, pp. 139-140). This information is not on his job application. (Pl's Ex. 1, pp. 138). Sedgefields hired him twice after his conviction. (Pl's Ex. 7; Ex. 8).

Additionally, when Foster was rehired at Sedgefields in 2005, he did not have a social security card. (Pl's Ex. 1, pp. 68-69). He worked for a short time at another employer before he obtained his new card. (Pl's Ex. 1, pp. 59-60). This prior employer is likewise not on his job application. (Pl's Ex. 1, p. 138).

Norris Foster was hired in February 2005. (Pl's Ex. 7). He was paid $7.00 per hour. (Pl's Ex. 7). All the blacks hired in 2004 or 2005, Willie Mack, Demetrius Parham, Henry Tarver, and Jeffrey Harris were all paid $7.00 per hour or less. (Pl's Ex. 23; 26. Dep.  ). They were all hired as general laborers. (Pl's Ex. 23; 26). Mid-State hired four white employees in 2005 or early 2006, "Brotherman Beckwith", William Hubbard, Adam May and Chance Hamm. (Pl's Ex. 16; 18; 19; 21). All the whites were employed at $8.00 per hour. (Pl's Ex. 16; 18; 19; 21). Mid-State claims that each of these employees had special skills that entitled them to additional pay. (Pl's Ex. 4, pp.138-146). "Brotherman" Beckwith was hired as a night watchmen in addition to general laborer. (Pl's Ex. 4, pp. 145-146). Mid-State claims it was paying him $8.00 per hour for his additional duties. (Pl's Ex. 4, pp. 145-146). Roy Lee had recommended Henry Tarver for the night watchman job in June, but Tarver was hired at $7.00 per hour and was never allowed to

5

live on the property. (Pl's Ex. 36). No black man has ever lived on the property at Sedgefields. (Pl's Ex. 36).

Chance Hamm was paid $8.00 per hour because he could weld. (Pl's Ex. 4, pp. 139-140). Hamm replaced Foster according to Norman. (Pl's Ex. 2, p. 184). Carroll hired Cory Balkcom in April 2005, a black male who had eight years in the military, was a twenty year diesel mechanic, and also listed that he could weld on his application. (Pl's Ex. 33). Balkcom was paid $7.00 per hour. (Pl's Ex.34). He only worked two weeks before taking a higher paying job at Hyundai. (Pl's Ex. 5, p. 36).

William Hubbard was paid $8.00 per hour because he could allegedly operate a skidder. (Pl's Ex. 4, pp. 138-139). Norris Foster also operated a skidder (Pl's Ex. 1, p. 55) and other heavy equipment, but he had ten years experience as hunting crew member and was only paid $7.00 per hour. (Pl's Ex. 37 ). Mays was paid $8.00 per hour because he allegedly could trap predatory animals. (Pl's Ex. 4, pp. 137-138).

## SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.

"As the moving party, [the defendant] has the burden of showing the absence of a genuine issue of material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398

U.S. 144, 157 (1970); *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir. 1993). The district court cannot weigh conflicting evidence or make credibility determinations; instead, "'[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Hairston*, 9 F.3d.

The substantive law defines which facts are "material." A factual dispute is "genuine" if "a reasonable jury could return a verdict for the non-movant," and there is "a real basis in the record" for the factual dispute. *Hairston,* 9 F.3d at 919.

**ARGUMENT**

The Supreme Court has emphasized that a plaintiff''s burden in establishing a prima facie case "is not onerous;" it serves only to "eliminate] the most common nondiscriminatory reasons" for the challenged action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981); *see also Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir 1997) ("demonstrating a prima facie case requires only that the plaintiff establish facts adequate to permit an inference of discrimination"). The Eleventh Circuit has "generally eschew[ed] an overly strict formulation of the elements of a prima facie case." *Maddow v. Proctor & Gamble Co.*, 107 F.3d 846, 851 (11th Cir. 1997); *see also Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 440 (11th Cir. 1996) (emphasizing that "any prima facie case test must be flexible").

The Eleventh Circuit stated:

> We have repeatedly emphasized that the requisite showings that make up a prima facie case are not meant to be rigid or inflexible. In cases where the evidence does not fit neatly into the classic prima facie case formula, for example, we have stated that "[a] prima facie case of disparate treatment can be established by any 'proof of actions taken by

7

> the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations."

*Schoenfield v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999).

Foster and the other Plaintiffs have clearly established a prima facie case of discrimination.

It is both interesting and ironic that Mid-State has insurance for employment practices, but it has no written policy prohibiting racial discrimination or retaliation. (Pl's Ex. 4, pp. 131-132). Thus Mid-State is aware of the exposure, insures against a loss, but does not take any action to prevent discrimination from occurring. If you have no written policy, you cannot train your employees not to discriminate. When you have a completely subjective hiring process, giving the general manager carte blanche discretion in pay and discipline decisions, you virtually assure yourself that his decisions can later be challenged as discriminatory. That is precisely what happened here.

Norris Foster's life forever changed the day Joel Norman was hired in September 2005. Foster, who had worked on the plantation for 10 years before Norman was hired, and who had never been disciplined or even criticized, now could do nothing right. (Pl's Ex. 1, p. 152). Norman was his supervisor. Norman made statements suggesting that he was going to hire an all white crew. He not only made the statement, he said out on a course of conduct to do just that. Norman recommended and Carroll hired three people to work in his hunting crew, Chance Hamm, Will Hubbard and Joseph Mays. All were whites, age 24 and younger, and all were paid $8.00 per hour. In a small, predominately black community, these hirings were not inadvertent. The jobs were not posted, they were

8

hired by word of mouth. (Pl's ex. 2, p. 139). Only whites were extended an invitation to apply.

However, Norman's attempts to retain an all white crew were thwarted because even the white people couldn't work with him. Hubbard and Mays resigned shortly after they were hired. Only Chance Hamm remained employed. Hamm replaced Foster. (Pl's Ex. Dep 2, p. 184).

Norman's numerous derogatory statements are circumstantial evidence of race discrimination. *Beaver v. Rayonier*, 200 F. 3d 723, at 729-730 (11th Cir. 1999). The fact that he considered it "amazing" that blacks had been in charge of the plantation only shows his attitude towards minorities. That people other than Foster heard these statements is not surprising. (Pl's Ex. 14 ). Foster's alleged sudden decline in performance can only be attributed to Norman's prejudice. Norman even admits that he retained customer's tips, stating that he would share tips only if the guests explicitly told him. (Pl's Ex. 2, pp. 159-160). This had never before occurred on the history of Sedgefields Plantation. At $7.00 per hour, the hunting crews depend on the tips to supplement their income. Norman retained tips even though he had a salary of $70,000.00, lived on the property, had a truck furnished to him, and had his insurance paid. How greedy can a single person be? How prejudiced could Norman be if he won't share the tips he received with his black hunting crew members?

Foster made $7.00 per hour. He had 10 years experience working in a hunting crew, had operated heavy equipment all his adult life, and had six years prior military service. Despite these facts, the Defendant claims that Foster cannot properly compare himself to William Beckwith, Chance Hamm, Joseph Mays and Will Hubbard. The whites

were about 24 years old, some had GED's, none had prior military experience and no one had Foster's experience working as a hunting crew member. The truth is that Foster was more qualified than the other applicants. Foster should have made more money per hour than any of the whites hired.

Mid-State claims that it paid Hamm $8.00 per hour because he could weld. However, Cory Balkcom, a black male, advised on his application that the was a welder and he received pay of $7.00 per hour. (Pl's Ex. 33; 34). Balkcom was also an eight year military instructor and had 20 years as a diesel mechanic. (Pl's Ex. 33). Most of the equipment on Sedgefields Plantation was diesel. The fact that Carroll hired Balkcom (and established his pay rate) demonstrates that his articulated reason for the higher pay rate for whites is pretextual. Balkcom left after two weeks because he took a higher paying job with Hyundai.

Jeffrey Harris was hired at $7.00 per hour. He had prior military service, had worked previously as a mechanic, and listed on his application that he had two prior back surgeries and a marijuana conviction. Harris had previously worked on a sod farm maintaining their equipment, which is information contained on his application.(Pl's Ex. 24). Yet Mid-State claims that Anthony Dickey, a white male who worked part-time while going to college, was paid $8.50 per hour because he could maintain weed-eaters. (Def's Ex. L).

Tarver was hired as a general laborer. Roy Lee had recommended him as a night watchman. (Pl's Ex. 36). Tarver was an older gentleman and could have lived on the property. He was hired in June 2005. Carroll did not hire him as a night watchman, preferring William Beckwith, who was hired in July. (Pl's Ex. 16). Beckwith stole gas and never had a driver's license. (Pl's Ex. 16). He was fired in September. However, the time

that he worked as a general laborer, he was paid $8.00 per hour for cutting grass. These are the same duties that Parham, Tarver, etc. were paid $7.00 or less per hour. Beckwith possessed no special skills. He lived on the property (rent free) and had extra duties as the night watchman. Carroll claims that he was paying him more because of these extra duties. It violates the law (FLSA) for someone to not be compensated for hours worked, (working off the clock). Surely Carroll is not claiming that he violated the FLSA. It should be noted that no black has ever lived on the property at Sedgefields. (Pl's Ex. Dec. Lee).

Mid-State belittles Foster's claim that the job assignments were discriminatory. There was more than one tractor at Mid-State. One had a cab and was air conditioned, the other did not. After the whites were hired, Foster never worked in the cab that was air conditioned. When asked by counsel for information that he thought showed discrimination, he listed this as evidence. Foster also complained about having to shovel manure in the barn while whites drove tractors. Again, the blacks were assigned the most onerous tasks, which is also evidence of racial discrimination.

Foster denies that he ever criticized Norman in front of guests. (Pl's Ex. 1, pp. 117-118). He likewise denies that he violated the memo regarding the tipping policy. (Pl's Ex. 1, pp. 158-159). He did tell guests that if they did not give him tips, he would not receive them. (Pl's Ex. 1, pp. 157-158). That did not violate the policy. That was, according to Norman, the truth. The policy only says that employees are not to stand around at the end of the day waiting on a tip. (Pl's Ex. 13).

Hubbard was allegedly hired for $8.00 per hour because he could operate a skidder. Foster had previously operated a skidder, and he was paid $7.00 per hour. (Pl's Ex. 1, P. 55).
11

This case is simple. All black employees allege discrimination in their pay. They all allege Mid-State had a two tiered compensation scheme, and blacks were on the bottom tier. This is clearly shown. (Pl's Ex. 34; 35).

Every white hired made more money. Every white had less experience and every white was paid more than Foster. It is hard to hire three consecutive white employees in Bullock County, which is predominately black. Mid-State had to hire by word of mouth, to keep from hiring blacks. (Pl's Ex. 2, p. 139). Mid-State would have this Court believe that it was only a coincidence that Norman made statements that he was going to hire an all white crew, before Norman recommended the hiring of May Hubbard, and Hamm. (Pl's Ex. 2, p. 76).

As concerns Foster's discharge claim, four people all testified that the firing was related to a theft of birds. (PL's Ex. 2, p. 117; Pl's Ex. 1, pp. 166-167; Pl's Ex. 3, pp. 101-102; Pl's Ex. 14). Foster denies stealing birds. (Pl's Ex. 1, p. 167). Harris claims the birds spoiled and were thrown away. (Pl's Ex. 14). Surely a Plaintiff shows pretext when he shows he was fired for a rule violation which did not occur.

Additionally, Mid-State claims Foster was complaining of racial discrimination. After Beckwith was hired at $8.00 per hour, Foster complained to Carroll that the hiring and pay were racially discriminatory. (Pl's Ex. 4, pp. 144). Obviously, if you complain about discrimination, then you have a bad "attitude".

Mid-State also claims Carroll made the decision to fire Foster in an effort to insulate them from Norman's derogatory remarks. This fails for two reasons. First, Carroll fired Foster because of information he received from Norman. Thus, Norman tainted this decision under the cat's paw theory. *Llampallas v. Mini-Circuits Inc.*, 163 F. 3d, 1236 (11th

12

Cir. 1998). Second, Carroll himself set employee wages and he paid blacks less, so he was equally guilty of discrimination.

The burden on the Plaintiffs is only to show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that reasonable fact finder could find them "unworthy of credence." *Combs v. Plantation Patterns*, 106 F. 3d 1519, 1528 (11th Cir. 1997). The Plaintiff's have met this burden of proving pretext.

Foster has shown that there are many genuine issues of material fact surrounding his discharge. The other Plaintiff's have proven they are black, were paid less for the same duties, and that the Defendant's articulated reasons for the pay differential are pretextual. They likewise are entitled to a jury trial on these issues.

Wherefore, the Plaintiffs respectfully request that the Defendant's Motion for Summary Judgment be denied.

Respectfully submitted,

s/Jerry Roberson
Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238-0487
Phone Number:   205.981.3906
Fax Number:   205.981.3908
E-mail: jdratty@charter.net

**OF COUNSEL:**
Albert H. Adams, Jr., Esq.  (ADA-058)
IRBY LAW FIRM, LLC
P.O. Box 910
Eufaula, Al. 36072

## CERTIFICATE OF SERVICE

      I hereby certify that on the 18th day of April 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Carter H. Dukes, Esq.
Kimberly W. Geisler, Esq.
HUCKABY SCOTT & DUKES, P.C.
2100 Third Avenue North, Suite 700
Birmingham, Alabama 35203

                                                s/Jerry Roberson
                                                _____
                                                OF COUNSEL