# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4
5    CASE NUMBER:  2:06cv405-ID
6    NORRIS FOSTER,
7         Plaintiff,
8         vs.
9    MID STATE LAND & TIMBER COMPANY,
10   INC., d/b/a SEDGEFIELDS PLANTATION,
11        Defendant.
12
13        S T I P U L A T I O N
14        IT IS STIPULATED AND AGREED by and
15   between the parties through their respective
16   counsel, that the deposition of Norris
17   Foster may be taken before Angela Smith,
18   RPR, CRR, at the offices of John W. Waters,
19   at 214 North Prairie St., Union Springs,
20   Alabama 36089, on the 7th day of September,
21   2006.
22
23        DEPOSITION OF NORRIS FOSTER

Page 2

1         IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8         IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17         IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21        * * * * * * * * * * * * *
22
23

Page 3

1         * * * * * * * * * * * * *
2              I N D E X
3            EXAMINATION
4                   PAGE
5    By Mr. Dukes ........................ 6
6         DEFENDANT'S EXHIBITS
7                   PAGE
8    Ex. 1 - Application for
9         employment ............... 72
10   Ex. 2 - The complaint .............. 89
11   Ex. 3 - Mr. Norris' personnel
12        file ................... 136
13        * * * * * * * * * * * * *
14
15
16
17
18
19
20
21
22
23

Page 4

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4
5    CASE NUMBER:  2:06cv405-ID
6    NORRIS FOSTER,
7         Plaintiff,
8         vs.
9    MID STATE LAND & TIMBER COMPANY,
10   INC., d/b/a SEDGEFIELDS PLANTATION,
11        Defendant.
12
13   BEFORE:
14        ANGELA SMITH, Commissioner.
15
16   APPEARANCES:
17        JERRY D. ROBERSON, ESQUIRE, of
18   ROBERSON & ROBERSON, 8 Office Park Circle,
19   Ste: 150, Birmingham, Alabama 35223,
20   appearing on behalf of the Plaintiff.
21        ALBERT H. ADAMS, JR., ESQUIRE,
22   P.O. Box 910, Eufaula, Alabama 36027,
23   appearing on behalf of the Plaintiff.

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1  APPEARANCES (continued):
2         CARTER H. DUKES, ESQUIRE, of
3  HUCKABY, SCOTT & DUKES, 2100 Third Avenue
4  N., Ste: 700, Birmingham, Alabama 35203,
5  appearing on behalf of the Defendant.
6         ALSO PRESENT: David Carroll
7             * * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 7

1         Q.    Mr. Foster, have you ever had
2  your deposition taken before?
3         A.    No.
4         Q.    Okay. Let me go over a few
5  things with you. Do you understand, first
6  of all, that your testimony here today is
7  under oath and has the same force and effect
8  as if you were before a Judge and a jury?
9         A.    Yes, I understand.
10        Q.    Okay. If I ask you a question
11 that you don't understand, I'll ask you to
12 tell me to rephrase it. If you answer the
13 question, it will be my understanding that
14 you understood the question. Does that make
15 sense to you?
16        A.    Yes.
17        Q.    Okay. If I ask you a question
18 that calls for a yes or no answer, you'll
19 need to answer out loud. Don't nod your
20 head or say uh-huh or huh-uh because the
21 court reporter will have a hard time
22 understanding what you mean by that. Is
23 that okay with you?

Page 6

1         I, ANGELA SMITH, RPR, CRR, a Court
2  Reporter of Wetumpka, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of John W. Waters, 214 North Prairie St.,
8  Union Springs, Alabama 36089, beginning at
9  9:07 a.m., Norris Foster, witness in the
10 above cause, for oral examination, whereupon
11 the following proceedings were had:
12        NORRIS FOSTER,
13 being first duly sworn, was examined and
14 testified as follows:
15        COURT REPORTER: Usual
16 stipulations?
17        MR. ROBERSON: Yes, ma'am.
18        MR. DUKES: Please.
19        EXAMINATION
20 BY MR. DUKES:
21        Q.    Can you state your full name
22 for the Record?
23        A.    Norris Foster.

Page 8

1         A.    Yeah.
2         Q.    Okay. Also, and you're doing
3  a very good job of it, let me complete my
4  question before you try to answer it, just
5  so the court reporter can clearly take down
6  what we're saying. Is that okay with you?
7         A.    That's okay.
8         Q.    Okay. What is your Social
9  Security number, Mr. Foster?
10        A.    ██████████
11        Q.    Okay. And what is your date
12 of birth?
13        A.    ██████████
14        Q.    And where were you born,
15 Mr. Foster?
16        A.    In Bullock County.
17        Q.    Okay. Now, have you gone by
18 any other names, other than Norris Foster?
19        A.    Nicknames.
20        Q.    Okay. What kind of nicknames?
21        A.    Some people call me Bull, some
22 call me Bull Hog, and some call me Nod.
23        Q.    Call you what?

2 (Pages 5 to 8)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1    A.    Nod.
2    Q.    Nard?
3    A.    Nod.
4         MR. ROBERSON: N-O-D.
5    Q.    Nod, N-O-D. Okay. What about
6  last names? You changed your name not too
7  long ago, didn't you?
8    A.    Yeah. But it was -- I never
9  knew it was like that until I had got a
10  ticket one time, and I had to go and get my
11  birth certificate and it had Norris Jordan
12  on it. And I didn't know that until I was
13  an adult.
14    Q.    Okay. When did you realize
15  that your name was legally Norris Jordan?
16    A.    I don't know. About '96, '97,
17  somewhere around in there.
18    Q.    Okay.
19    A.    I had got a traffic ticket.
20    Q.    Okay. So, all your life
21  you've been going by Norris Foster?
22    A.    Yes.
23    Q.    Okay. And the reason why I'm

Page 10

1  going to ask these questions, in case this
2  case goes to a jury, I want to know if any
3  of your family members might be on the jury
4  pool or anybody you work with or anybody
5  that your family members have worked with,
6  if they're on the jury pool. So I'm going
7  to ask you some questions about your family
8  and where they may work. Are your mother
9  and father still alive?
10    A.    My father.
11    Q.    Where does your father reside?
12    A.    Columbus, Georgia.
13    Q.    What is his name?
14    A.    Willie Hugh Jordan.
15    Q.    Are you a junior, by any
16  chance?
17    A.    No.
18    Q.    It's just Norris Foster?
19    A.    Uh-huh.
20    Q.    Okay. And do you have any
21  brothers and sisters?
22    A.    Yeah.
23    Q.    Okay. Tell me their names.

Page 11

1    A.    My oldest sister's name is
2  Annie Foster.
3    Q.    Okay.
4    A.    The next one is Carolyn
5  Foster. Patricia Jordan, Talisa Ellison.
6  Let me see. They be twins. I can't -- It's
7  -- They got funny names. We call them Tree
8  and Tee, but it's Trenesha and Tenisha,
9  they're twins.
10    Q.    What are their last names?
11    A.    Jordan.
12    Q.    Any other brothers and
13  sisters?
14    A.    I got one brother that's named
15  Reginald Jordan.
16    Q.    Any other brothers and
17  sisters?
18    A.    No.
19    Q.    Where does Annie Foster live?
20    A.    Midway, here in Bullock
21  County.
22    Q.    Okay. Is she employed?
23    A.    Yeah.

Page 12

1    Q.    Where does she work?
2    A.    I think the name is Beaulieu,
3  it's a place down in Eufaula, Beaulieu,
4  something like that.
5    Q.    Beaulieu. What kind of
6  business is it?
7    A.    Textile.
8    Q.    Oh, Beaulieu. Okay. I know
9  what you're talking about. Used to be
10  Columbus Mills?
11    A.    Right.
12    Q.    And is she married?
13    A.    Yeah.
14    Q.    And what's her husband's name?
15    A.    James Foster.
16    Q.    Just out of curiosity, is
17  James any relation, a distant cousin, to
18  you?
19    A.    No. It's a whole different
20  city. He's from a different state.
21    Q.    Okay. Does James work?
22    A.    Yeah.
23    Q.    Where does he work?

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1    A.    He works in Columbus, at -- I
2  don't know which one of those jails he works
3  with. He's a correctional officer.
4    Q.    All right. Do Annie and James
5  have any children over the age of nineteen?
6    A.    Well, Annie does, but James
7  don't.
8    Q.    Okay. What's Annie's child
9  over the age of eighteen?
10    A.    Terrence Foster and LaToya
11  Foster.
12    Q.    Where do they live?
13    A.    Terrence, he's in the service.
14  He's stationed out in Texas. And LaToya,
15  she lives right by her mother in Midway.
16    Q.    Okay. Does she work?
17    A.    Yes, sir.
18    Q.    Where does she work?
19    A.    Victoryland.
20    Q.    Okay. Carolyn Foster, is she
21  married?
22    A.    Well, her husband passed.
23    Q.    Okay. Does she have any

Page 14

1  children?
2    A.    Yeah. She have a daughter.
3    Q.    Over the age of nineteen?
4    A.    Yeah.
5    Q.    What's her name?
6    A.    Makita.
7    Q.    Where does Makita live?
8    A.    Here in Union Springs.
9    Q.    Does she work?
10    A.    Yeah. But I'm not for sure
11  whereabouts, though. I don't really know --
12  I don't know.
13    Q.    What's Makita's last name?
14    A.    Jordan.
15    Q.    Okay. You said Carolyn was
16  Carolyn Foster. Is she a Carolyn Jordan?
17    A.    That's what I should have
18  said, Jordan.
19    Q.    Does Carolyn work?
20    A.    Yeah. Same place, Beaulieu.
21    Q.    At Beaulieu?
22    A.    Yeah.
23    Q.    Okay. In Eufaula?

Page 15

1    A.    Right.
2    Q.    Okay. Patricia Jordan, where
3  does she live?
4    A.    In Columbus.
5    Q.    Okay.
6    A.    She's deceased.
7    Q.    Okay. Does Patricia have any
8  children that live in Alabama?
9    A.    No.
10    Q.    I've got Talisa Ellison.
11  Where does she live?
12    A.    In Midway, here in Bullock
13  County.
14    Q.    Does she work?
15    A.    Yeah. She works out at the
16  prison. She ain't no corrections officer.
17  I don't know exactly what she does, but
18  that's where she's working.
19    Q.    Does she have any children
20  over the age of nineteen?
21    A.    No.
22    Q.    Is she married?
23    A.    No.

Page 16

1    Q.    Okay. I've go Trenesha
2  Jordan.
3    A.    Yeah. They live in Columbus,
4  both of them.
5    Q.    Okay. Do they have any
6  children that live in Alabama?
7    A.    No. Their kid is small, he's
8  four or five years old.
9    Q.    Reginald Jordan?
10    A.    He live in Columbus.
11    Q.    Okay. Any children by
12  Reginald that live in Alabama?
13    A.    No. He ain't got none.
14    Q.    Okay. Where do you live,
15  Mr. Foster?
16    A.    Midway.
17    Q.    What's your physical address?
18    A.    It's Route -- Let me see --
19  3282 County Road 47, Midway, Alabama.
20    Q.    Is Midway in Bullock County or
21  Barbour County?
22    A.    Bullock.
23    Q.    Bullock. And how long have

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1  you lived at that address?
2      A.    About six months.
3      Q.    Where did you live before
4  then?
5      A.    I lived up here in Union
6  Springs, around -- Well, it's out -- was out
7  on 29, Henley Trailer Park.
8      Q.    And how long did you live
9  there?
10      A.    About a year and a half.
11      Q.    All right.  Where did you live
12  prior to that time?
13      A.    Down in Midway.
14      Q.    What was the address there?
15      A.    I believe it was P.O. Box 383
16  -- P.O. Box 3 --
17      Q.    Let me stop you there.  Did
18  you have a physical address for that address
19  -- for that residence in Midway?
20      A.    No.  Not really.  Well, I was
21  staying with a friend.
22      Q.    Oh, okay.  Who were you
23  staying with?

Page 18

1      A.    My girlfriend.
2      Q.    Okay.  What was her name?
3      A.    Sharon McElroy.
4      Q.    Are you still with Sharon?
5      A.    Yeah.
6      Q.    Does Sharon work?
7      A.    No.
8      Q.    Okay.  Has she ever worked?
9      A.    Not to my knowing.
10      Q.    Okay.  Do you have any
11  children?
12      A.    By her?
13      Q.    Okay.  We'll start with her.
14      A.    No.
15      Q.    Okay.  Do you have any -- Tell
16  me about your children.
17      A.    What you want to know?
18      Q.    Well, give me their names.
19      A.    My oldest one, her name is
20  Shaquita, Shaquinta, Dezwan.
21      Q.    Oh, Dezwan.  Okay.
22      A.    DeLacory.  I have to give them
23  in order.  LaNorris, Veronica, Norzell,

Page 19

1  Fallon, Cornelius, Terrell, Norris,
2  Quanisha, Cadeidre.
3      Q.    Is that all of them?
4      A.    Yeah.
5      Q.    Thirteen children?
6      A.    (Witness nods head in the
7  affirmative.)
8      Q.    How old is Shaquita?
9      A.    Thirty-two.
10      Q.    And what's Shaquita's last
11  name?
12      A.    Turner.
13      Q.    And what's her mother's name?
14      A.    Diane.
15      Q.    Diane Turner?
16      A.    Well, it's Murray, now.
17      Q.    And where does Shaquita live?
18      A.    Atlanta.
19      Q.    Okay.  And she's thirty-one,
20  did you say?
21      A.    Two.
22      Q.    Thirty-two.  Shaquinta?
23      A.    Yeah.

Page 20

1      Q.    What's her last name?
2      A.    Turner.
3      Q.    Where does she live?
4      A.    Montgomery.
5      Q.    Does she work?
6      A.    Yeah.
7      Q.    Where does she work?
8      A.    I think it's -- What is it?
9  Pony Express, I think that's the name of it.
10      Q.    Pony Express Magazine?
11      A.    No.
12          MR. ROBERSON:  Courier
13  service?
14          THE WITNESS:  Yeah.  It's a
15  courier service.
16      Q.    Is she married?
17      A.    No.
18      Q.    Does she have any children?
19      A.    Yeah.
20      Q.    Any over the age of nineteen?
21      A.    No.
22      Q.    Okay.  And is Diane her
23  mother?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    A.    Right.
2    Q.    All right.  Dezwan, how old is
3    Dezwan?
4    A.    He'll be twenty-nine in
5    December.
6    Q.    Where does he live?
7    A.    Columbus.
8    Q.    What's his last name?
9    A.    Manuel.
10   Q.    Manuel?
11   A.    Yeah.
12   Q.    How do you spell that, do you
13   know?
14   A.    No.
15   Q.    Okay.  All right.  And how old
16   is Shaquinta?
17   A.    Thirty.
18   Q.    All right.
19   A.    DeLacory.
20   Q.    No.  Next -- Yeah, that's
21   right, DeLacory.
22   A.    His last name Manuel, too.
23   Q.    How do you spell DeLacory, do

Page 22

1    you know?
2    A.    Huh-uh.
3    Q.    Is that a no?
4    MR. ROBERSON:  You need to
5    answer out, no.
6    A.    No.
7    Q.    Okay.  How old is DeLacory?
8    A.    Twenty-seven.
9    Q.    And where does he live?
10   A.    Columbus.
11   Q.    LaNorris, how old is LaNorris?
12   A.    She's twenty-three --
13   twenty-four.
14   Q.    What's her last name?
15   A.    Foster.
16   Q.    Where does she live?
17   A.    Tennessee.
18   Q.    Whereabouts in Tennessee?
19   A.    Clarksville.
20   Q.    And who is her mother?
21   A.    Her mother's name is Linda
22   Williams.
23   Q.    And who is the mother for

Page 23

1    Dezwan and DeLacory?
2    A.    Their mama's name is Yolanda.
3    Q.    Yolanda what?
4    A.    Yolanda Manuel.
5    Q.    And where does she live?
6    A.    Columbus.
7    Q.    And where does Linda Williams
8    live?
9    A.    Tennessee, Clarksville.
10   Q.    Okay.  All right.  Next I have
11   Veronica.
12   A.    Lee.
13   Q.    Lee is her last name?
14   A.    Yeah.
15   Q.    And where does she live?
16   A.    She live here in Bullock
17   County.
18   Q.    And how old is she?
19   A.    Twenty-three.
20   Q.    And does she work?
21   A.    Yeah.
22   Q.    Where does she work?
23   A.    Wayne Farms.

Page 24

1    Q.    Where does she live?
2    A.    Here in Union Springs?
3    Q.    Yes, sir.  What's the street
4    address?
5    A.    I don't know the name of the
6    street.
7    Q.    Okay.
8    A.    She in Union Springs.
9    Q.    And is she married?
10   A.    No.
11   Q.    And who was her mother?
12   A.    Mother named Agnes.
13   Q.    Agnes Lee?
14   A.    Right.
15   Q.    Is Agnes -- Where does she
16   live?
17   A.    She's here in Bullock County,
18   a little community called Sardis.
19   Q.    Uh-huh.  And does she work?
20   A.    I don't know.
21   Q.    Next I have Norzell.
22   A.    Yeah.
23   Q.    Do you know how to spell that?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    A.    N-O-R-Z-E-L-L.
2    Q.    And how old is Norzell?
3    A.    Twenty-two.
4    Q.    And what's Norzell's first
5    name?
6    A.    That is the first name.  His
7    last name is Lee.
8    Q.    Excuse me.  His last name is
9    what?
10    A.    Lee.
11    Q.    Okay.  And how old is Norzell,
12    again?
13    A.    Twenty-two.
14    Q.    And Norzell, is that a
15    daughter or a son?
16    A.    Son.
17    Q.    Son.  And his mother is Agnes
18    Lee as well?
19    A.    Right.
20    Q.    Does Norzell live here in
21    Bullock County?
22    A.    Yeah.
23    Q.    And does he work?

Page 26

1    A.    I think so.
2    Q.    Do you know where he works?
3    A.    I think it's C&W.
4    Q.    You used to work at C&W,
5    didn't you?
6    A.    Yeah.
7    Q.    All right.  Next I have
8    Fallon; is that right?
9    A.    Yeah.
10    Q.    What's Fallon's last name?
11    A.    Streeter.
12    Q.    How old is Fallon?
13    A.    Twenty-two.
14    Q.    And where does he live?
15    A.    She.
16    Q.    She.  Excuse me.
17    A.    She live in Midway.
18    Q.    And does she work?
19    A.    Yeah.
20    Q.    Where does she work?
21    A.    Cooper Lighting.
22    Q.    Okay.
23         (Off-the-Record discussion

Page 27

1         was held.)
2    Q.    And who is Fallon's mother?
3    A.    Her name is Dorothy.
4    Q.    Dorothy Streeter?
5    A.    Right.
6    Q.    And where does Dorothy
7    Streeter live?
8    A.    In Midway.
9    Q.    Does she work?
10    A.    I don't think so, no.
11    Q.    Okay.
12    A.    I think she got disability,
13    something like that.
14    Q.    Okay.  Is Fallon married?
15    A.    No.
16    Q.    All right.  Next I have
17    Cornelius.
18    A.    Cornelius.
19    Q.    What's Cornelius's last name?
20    A.    Lee.
21    Q.    Is that Agnes's son?
22    A.    Yeah.
23    Q.    Where does Cornelius live?

Page 28

1    A.    He's in prison right now.
2    Q.    Okay.  Where is he in prison?
3    A.    In Birmingham somewhere, West
4    Jefferson, I think, something like that.
5    Q.    What's he in prison for?
6    A.    Drugs.
7    Q.    Okay.  How old is he?
8    A.    Twenty-one.
9    Q.    All right.  Next I have
10    Terrell.
11    A.    Anthony.
12    Q.    Anthony is Terrell's last
13    name?
14    A.    Yeah.
15    Q.    What's his mother's name?
16    A.    Josilyn.
17    Q.    Josilyn Anthony?
18    A.    Right.
19    Q.    And where does Terrell live?
20    A.    He go to school in Huntsville.
21    Q.    How old is he?
22    A.    He'll be nineteen in November.
23    Q.    Where does Josilyn live?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1  Don't know?
2      A.   No.  I know she and her
3  husband split up.  I don't know where she
4  live at.
5      Q.    Okay.  The next child I have
6  is Norris.
7      A.   Yeah.
8      Q.   What's Norris's last name?
9      A.   Lee.
10      Q.   And is that Agnes's child?
11      A.   Right.
12      Q.   How old is Norris?
13      A.   Eighteen.
14      Q.   And where does he live?
15      A.   Here in Union Springs.
16      Q.   Does he work?
17      A.   He's in high school.
18      Q.   Okay.  Then I've got Quanisha.
19      A.   Quanisha.
20      Q.   Quanisha.  What's Quanisha's
21  last name?
22      A.   Foster.
23      Q.   And who is Quanisha's mother?

Page 30

1      A.   Mary Dell Jenkins.
2      Q.   How old is Quanisha?
3      A.   She'll be thirteen on the 15th
4  of this month.
5      Q.   Where does Mary Dell live?
6      A.   Here in Union Springs.
7      Q.   Does she work?
8      A.   Seasonal job out at Bonnie
9  Plant Farm.
10      Q.   Bonnie Plant?
11      A.   Yeah.
12      Q.   And then I have Cadeidre.
13      A.   Yeah.
14      Q.   What's Cadeidre's last name?
15      A.   Borders.
16      Q.   And who is her mother?
17      A.   Her name is Diane Borders.
18      Q.   And how old is Cadeidre?
19      A.   She'll be thirteen in
20  November.
21      Q.   And where does Diane Borders
22  live?
23      A.   Here in Union Springs.

Page 31

1      Q.    And does she work?
2      A.   I don't know.
3      Q.    Okay.  Have you told me all
4  your children?
5      A.   Yeah.
6      Q.    Okay.  And who currently --
7  Who do you currently live with?
8      A.   Me?
9      Q.   Yes, sir.
10      A.   I stay by myself, me and my
11  girlfriend.
12      Q.    Okay.  Does your girlfriend
13  live with you?
14      A.   Yeah.
15      Q.   What's her name?
16      A.   Sharon McElroy.
17      Q.   Does Sharon have any children?
18      A.   She got a little girl.
19      Q.   Does her little girl live with
20  y'all?
21      A.   No.
22      Q.   Okay.  Does Sharon work?
23      A.   No.

Page 32

1      Q.    Okay.  How long have you and
2  Sharon been living together?
3      A.   Seven years.
4      Q.    Okay.  Do you attend any
5  church regularly?
6      A.    I go sometimes.  I don't go
7  regular.
8      Q.    Okay.  Where do you go
9  sometimes?
10      A.   My church is Hayes Hill
11  Baptist.
12      Q.   Where is that?
13      A.   That's in Midway.
14      Q.    Are you a member of any club
15  or organization, such as the Masons or
16  anything like that?
17      A.   No.
18      Q.    Okay.  Where did you go to
19  school, Mr. Foster?
20      A.    I went to elementary and
21  junior high in Midway, at Marion Junior High
22  School.
23      Q.   What is the last grade that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 33

1  you completed?
2      A.    Twelfth.  I finished high
3  school.
4      Q.    Did you graduate from high
5  school?
6      A.    Yeah.  I graduated.
7      Q.    And where did you graduate
8  from high school, again?
9      A.    Here in Bullock County High
10  School.
11     Q.    Okay.  And that would have
12  been about '76 or so?
13     A.    '77.
14     Q.    '77.
15     A.    That was the year, '76/'77.
16     Q.    Okay.  Tell me about your
17  employment.  Did you work during high
18  school?
19     A.    A little bit.  No.  Like -- I
20  don't know if they still have them or not.
21  But they used to have jobs after school,
22  work a couple hours, I did that.
23     Q.    Okay.  What was your first job

Page 34

1  after high school?
2      A.    I went in the military.
3      Q.    Okay.  And what branch of the
4  Armed Services did you go into?
5      A.    Army.
6      Q.    And what unit were you with in
7  the Army?
8      A.    I was -- My MOS, my job?
9      Q.    Yes, sir.
10     A.    I was Latin Bravo.  That was
11  inventory, combat service.
12     Q.    And where were you stationed?
13     A.    I took my basic at Fort
14  Jackson.  Took my AIT, and I went to jump
15  school at Fort Benning.  And from Fort
16  Benning, I went to Fort Campbell in
17  Kentucky.  And from Kentucky, I reenlist for
18  three more years and I went to Germany.  I
19  stayed over there for eighteen months and I
20  came back to Fort Campbell, and that's where
21  I ETS from.
22     Q.    Okay.  And did you have an
23  honorable discharge?

Page 35

1      A.    Yeah.
2      Q.    What was your -- I'm sorry, I
3  don't know the correct terminology.
4      A.    Rank?
5      Q.    But what was your grade or
6  rank when you were discharged?
7      A.    I was an E-5, buck sergeant.
8      Q.    So you entered the Army in
9  1977?
10     A.    Yeah.
11     Q.    And you were discharged out of
12  Fort Campbell in --
13     A.    '83.
14     Q.    -- '83?  All right.  After you
15  left the Army in 1983, what was your first
16  job?
17     A.    I did a little work,
18  construction work, in Atlanta.
19     Q.    Let me go back to when you
20  were in the Army.  What kind of -- You're an
21  infantryman, so what would you do during
22  those six years you were in the Army?
23     A.    I was a combat soldier.

Page 36

1      Q.    Okay.
2      A.    You know, played war games.
3  You know, just if there was a war or
4  whatever.
5      Q.    Okay.  You were an
6  infantryman.  You didn't drive a tank or
7  drive any heavy equipment?
8      A.    Yeah.  We drove heavy
9  equipment, but it basically, you know, had
10  to do with infantry, you know, like building
11  bridges, different stuff like that.
12     Q.    Okay.  What kind of training
13  did you get in the Army?
14     A.    That was all.
15     Q.    Like, job training?
16     A.    That was it.  And I went in
17  supplies, supply clerk.
18     Q.    Okay.  All right.  And then
19  you did construction work in Atlanta; is
20  that correct?
21     A.    Right.
22     Q.    And who did you work for in
23  Atlanta?

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1   A.   That was so long ago. I don't
2   even remember the name. It's been a long
3   time ago. It was a construction company.
4   They was pouring concrete. You know, like,
5   pouring floors in big buildings, but I don't
6   even remember what the name of the company
7   was.
8   Q.   Okay. How long were you in
9   Atlanta, working?
10   A.   I stayed about seven or eight
11   months. I really didn't like the city.
12   Q.   Okay. And then what did you
13   do?
14   A.   I moved back home, back here
15   to Bullock County.
16   Q.   Okay. To Bullock County?
17   A.   Yeah.
18   Q.   What was your next job when
19   you returned from Atlanta?
20   A.   I worked at Columbus Mills.
21   Q.   Here in Union Springs?
22   A.   No.
23   Q.   Or in Eufaula?

Page 38

1   A.   Eufaula. Well, both. I
2   worked down there, then I got a transfer
3   back here to Union Springs.
4   Q.   Okay. How long did you work
5   for Columbus Mills?
6   A.   Maybe about two years,
7   something like that.
8   Q.   Are we talking '83 to '85,
9   approximately?
10   A.   No. It was, like, in -- I
11   don't know, maybe '84, '85, somewhere around
12   there. Something like that.
13   Q.   You said you worked there for
14   two years, so it would have been from --
15   A.   I'd just say from '84, maybe
16   to about '86, something like that.
17   Q.   Okay. Why did you leave
18   Columbus Mills?
19   A.   I didn't like working on the
20   inside.
21   Q.   Okay. What was your job there
22   at Columbus Mills?
23   A.   I operated a machine.

Page 39

1   Q.   What kind of machine?
2   A.   Call it a twister.
3   Q.   Okay. You were operating a
4   twister?
5   A.   Yeah.
6   Q.   Did you do anything else while
7   you were working for Columbus Mills?
8   A.   No.
9   Q.   Okay. What did you do after
10   -- Did you voluntarily leave Columbus Mills?
11   A.   Yeah. I quit.
12   Q.   Okay. Who was your supervisor
13   at Columbus Mills?
14   A.   I know him. He was from
15   Eufaula. I remember the guy from Union
16   Springs. His name was Jimmy Padgette. Bob
17   Newsome, something like that, Robert
18   Newsome. I think that was his name. That
19   was the one from Eufaula.
20   Q.   Do you recall what your pay
21   was when you quit?
22   A.   Five dollars and something.
23   Q.   What was your next job after

Page 40

1   Columbus Mills?
2   A.   I worked around Four Way Plant
3   Farm, maybe just to plant seed, maybe a year
4   or so.
5   Q.   What was the name of the plant
6   farm?
7   A.   Four Way Plant Farm.
8   Q.   Okay. Where is that located?
9   A.   In Union Springs. On the
10   outskirts of Union Springs.
11   Q.   Is it still in existence
12   today?
13   A.   Yeah. But Bonnie Plant Farm
14   owns it now.
15   Q.   Okay. And how long did you
16   work at Four Way Plant Farms?
17   A.   Off and on, maybe a couple of
18   years, off and on.
19   Q.   From '86 to '89 or so?
20   A.   It might have been something
21   like that.
22   Q.   And you just worked part time?
23   A.   Yeah. Because it's just a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1   seasonal job.
2       Q.    What do you mean it's a
3   seasonal job?  What are you doing at the
4   Four Way Plant Farm?
5       A.    They haul plants, you know,
6   all types of vegetables, flowers.
7       Q.    I have no idea what Four Way
8   Plant Farm does.  They're growing plants?
9       A.    Plants and vegetables.  They
10  haul them and sell them and take them to
11  K-Mart, Wal-Mart, places like that.
12      Q.    And so, you'd work during the
13  summer?
14      A.    Well, it started, like, in
15  maybe about December until maybe last of
16  April, May, something like that.
17      Q.    And what kind of work did you
18  do for Four Way Plant Farm?
19      A.    I used to water, water
20  flowers, mostly.
21      Q.    Anything else that you would
22  do for them?
23      A.    It's a lot of different things

Page 42

1   you did.  You know, you might be doing
2   something different every day.  You might be
3   loading trucks, putting plants in the
4   houses.  They call it a dirt bin, where they
5   make the trays the flowers go in.  It was
6   always something different you be doing all
7   the time.
8       Q.    Do you know what I mean by
9   manual when I say manual labor?
10      A.    Yeah.
11      Q.    So, what you were doing for
12  them was manual labor?
13      A.    Manual labor, right.
14      Q.    Okay.  You weren't operating
15  any machinery?
16      A.    No.
17      Q.    All right.  And were you paid
18  with a paycheck, were you paid cash?  How
19  were you paid?
20      A.    Paycheck.
21      Q.    Okay.  And what was your next
22  job after Four Way?
23      A.    I went to work at Midway

Page 43

1   Plantation after that.
2       Q.    And when did you start working
3   for Midway Plantation?
4       A.    I think it was, like, in about
5   '89, I believe, '89, '90, one of those
6   years.
7       Q.    Were you off work some from
8   when you last worked at Four Way to when you
9   started working at Midway Plantation?
10      A.    Yeah.
11      Q.    How long were you off work, do
12  you think?
13      A.    It been a long time ago.  I
14  can't remember.  It's been awhile.
15      Q.    I mean, were you off work for
16  a year, six months?
17      A.    I don't know.  I guess six
18  months.
19      Q.    Okay.  Why did you leave Four
20  Way?  Why did you stop working for Four Way?
21      A.    I found another job.
22      Q.    Okay.  And that was at Midway
23  Plantation?

Page 44

1       A.    Yeah.
2       Q.    And what were you hired on at
3   Midway Plantation to do?
4       A.    Well, I drove tractors,
5   backhoe, bulldozers, helped train dogs.
6       Q.    And did you have a job title
7   at Midway?
8       A.    Just --
9       Q.    General laborer?
10      A.    General labor, yeah.
11      Q.    And were you full-time
12  employment, or was it seasonal again?
13      A.    Yeah.  Full time.
14      Q.    Okay.  And how long did you
15  work at Midway?
16      A.    About three years, give or
17  take a few.  You know, about three years.
18      Q.    Who was your -- Who was the
19  boss man out at Midway when you working
20  there?
21      A.    Nathan Smith.
22      Q.    And did they pay you cash or
23  were you paid by a check?

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1    A.    By check.
2    Q.    Okay.  And why did you leave
3  Midway?
4    A.    Well, it was -- They cut back
5  on help.  There was four of us that worked
6  there.  And I was the last one that was
7  hired.  And they cut back from four to three
8  people.  And I was the last one hired, so I
9  got laid off.
10   Q.    Okay.  What kind of -- Is
11  Midway Plantation, is that a hunting camp?
12   A.    Yeah.
13   Q.    Is it open to the public or is
14  it private?
15   A.    No.  It's private.
16   Q.    Okay.
17   A.    They don't commercial hunt,
18  they just mostly a family thing.
19   Q.    Okay.  Who owns Midway, if you
20  know?
21   A.    It's Taylor.  I think her name
22  is Catherine Taylor, I believe that's her
23  first name.  I know her last name is Taylor.

Page 46

1    Q.    Okay.  And what kind of
2  hunting did they do at Midway?
3    A.    Quail hunting.  They did a
4  little deer hunting, but like I said, it was
5  mostly just a family thing.
6    Q.    And how many hours a week
7  would you work at Midway?
8    A.    Forty, fifty hours.
9    Q.    And what was your rate of pay?
10   A.    When I first started, they was
11  paying two-twenty-five a week, straight
12  time.  And by the time I left, I think I was
13  making two-seventy-five, straight time.
14   Q.    What do you mean straight
15  time?  What do you mean by that?
16   A.    If I work one day or five, I
17  still get paid the same thing.
18   Q.    Okay.  And as a general
19  laborer, you said you would drive tractors.
20  What kind of work would you -- What kind of
21  tractor would you drive?
22   A.    John Deere tractors.
23   Q.    Okay.  And what were you doing

Page 47

1  with these tractors?
2    A.    Sometimes I'd be Bush Hogging,
3  sometimes harrowing, planting fire lanes,
4  different stuff, sometimes planting.
5    Q.    You said you worked with
6  dozers; is that right?
7    A.    Yeah.
8    Q.    What kind of work did you do
9  with dozers?
10   A.    Nothing.  Mostly just pushing
11  up piles for to burn.  You know, old stumps.
12  And we'd be hauling timber, pushing up
13  piles.
14   Q.    Okay.  What about backhoes,
15  what kind of work were you doing with
16  backhoes?
17   A.    Different things, you know,
18  like fixing -- Well, crossing bridges,
19  putting pipes in, different stuff like that.
20   Q.    Who worked with you out at
21  Midway?
22   A.    Robert -- What was his last
23  name?  Robert Youngblood and Eddie Streeter

Page 48

1  and Nathan Smith, and his son would help
2  sometimes.  But he's the manager of it now.
3  His son would help him out sometimes, his
4  name is Dale Smith.
5    Q.    Is Nathan still out there?
6    A.    No.  The son.
7    Q.    Dale?
8    A.    Yeah.
9    Q.    But Dale was working while you
10  were out there?
11   A.    Part time.  You know,
12  sometimes.
13   Q.    Is Nathan still alive?
14   A.    Yeah.  I guess.
15   Q.    Is Nathan a white guy or a
16  black guy?
17   A.    White.
18   Q.    By the way, it makes no
19  difference to me, whatever you're
20  comfortable with, would you --
21  African-American or black?
22   A.    Don't make no difference.
23   Q.    Does it make any difference to

Page 49

1  you?
2      A.    No.
3      Q.    And so, you left Midway about
4  '92 or so, 1992?
5      A.    Yeah.  Something like that.
6      Q.    And that was because they had
7  a reduction in force, and you were the last
8  man?
9      A.    Right.
10     Q.    Were you ever disciplined for
11 any work-performance issues while you were
12 out there?
13     A.    No.
14     Q.    No write-ups or anything like
15 that, to your knowledge?
16     A.    No.
17     Q.    All right.  After Midway,
18 where did you work?
19     A.    Mr. Turf Sod Farm.
20     Q.    Where is that?
21     A.    It's here in Bullock County.
22 But it's -- They call it Smut Eye, something
23 like that, Smut Eye.

Page 50

1          MR. ROBERSON:  Smut Eye,
2  S-M-U-T, E-Y-E?
3          THE WITNESS:  Yeah.
4      Q.    What did you do at Mr. Turf
5  Sod Farm?
6      A.    Drove a tractor and forklift.
7      Q.    And when did you start working
8  at Mr. Turf Sod Farm?
9      A.    I don't know.  Some -- '91,
10 '92, something like that.
11     Q.    And were you working there
12 full time?
13     A.    Yeah.
14     Q.    And how long did you work at
15 Mr. Turf's?
16     A.    I don't know.  Maybe -- It
17 might have been a year.
18     Q.    And why did you leave
19 Mr. Turf's?
20     A.    I got another job.
21     Q.    What was your pay at
22 Mr. Turf's, do you recall?
23     A.    Minimum wages, whatever it was

Page 51

1  at that time.
2      Q.    Who was the boss man out at
3  Turf's -- Mr. Turf's when you were out
4  there?
5      A.    Guy that owned the place?
6      Q.    Sure.
7      A.    Al Vann, James Vann -- I think
8  his real name is James Vann.  I know they
9  called him Al.
10     Q.    Is he still alive, still
11 around?
12     A.    Yeah.
13     Q.    Were you ever disciplined or
14 reprimanded when you were at Mr. Turf's?
15     A.    (Witness shakes head in the
16 negative.)
17          MR. ROBERSON:  You have to
18 answer out loud.
19     A.    No.
20     Q.    Where did you go after
21 Mr. Turf's Sod Farm?
22     A.    I started working at
23 Sedgefields.

Page 52

1      Q.    And when -- What year would
2  this have been?
3      A.    '93.
4      Q.    Do you know who owned
5  Sedgefields at that time?
6      A.    Tommy McArthur.
7      Q.    And were you hired on as a
8  general laborer?
9      A.    Yeah.
10     Q.    And do you know what your rate
11 of pay was?
12     A.    He paid us, you know,
13 basically like I did at Midway Plantation,
14 just a salary.
15     Q.    Okay.  Do you recall what that
16 salary was?
17     A.    Three hundred dollars a week.
18     Q.    And what kind of work did you
19 do for Sedgefields when you were hired on in
20 '93?
21     A.    Just operate a tractor.  Same
22 thing.  Bulldozer, horses, dogs,
23     Q.    And who worked with you out at

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  Sedgefields during this time?
2      A.    There's a lot of different
3  people that worked there.  Some of the guys
4  ain't even living now.  Guy named -- His
5  real name -- I don't even know what Bo
6  Jack's real name was.  His last name was
7  Cooper.  Tommy Molton, he was the -- He was
8  the plantation manager.
9      Q.    Tommy who?
10     A.    Molton.  Tony Fitzpatrick.
11 Another old guy named Bochie Davis.  Let's
12 see.  John Molton.  Richard Calloway.  And
13 they had one of the cooks named Miss Hattie.
14 I don't remember what the other lady was
15 named.  There was a another cook, but I
16 don't know what her name was.
17     Q.    How long did you work at
18 Sedgefields during this time?
19     A.    I think it was from '93 to --
20 I can't remember whether it was '97 or '98.
21 Whichever year that Broadhead bought it.
22     Q.    And when Broadhead bought it,
23 what happened?

Page 54

1      A.    I'm still working there.
2      Q.    Okay.  When did you stop
3  working at Sedgefields?
4      A.    In 2001.
5      Q.    Okay.  Did your duties ever
6  change from 1993 to 2001, or were you still
7  doing some of the same work that you told me
8  earlier?
9      A.    Yeah.  Basically the same
10 thing.  Basically the same thing all the
11 time.  You do -- There's always different
12 stuff that you do.
13     Q.    When you were working the
14 tractor, what were you doing?
15     A.    Sometime I be Bush Hogging
16 roads or fields.  Sometimes plant fire
17 breaks, plant deer plots.  Plant deer plots.
18 You know, just different things.
19     Q.    And with the dozer, what kind
20 of work were you doing with the dozer?
21     A.    Mostly the same.  Like I said,
22 pushing up piles.
23     Q.    Okay.

Page 55

1      A.    That's basically what you'd be
2  doing with the dozers.
3      Q.    Did you work any skidders or
4  anything like that?
5      A.    Sometimes.
6      Q.    Did they have any skidders
7  back then?
8      A.    No.  They would rent one.
9  Every now and then we would need it, then
10 they would rent one.
11     Q.    And who would operate the
12 skidder when they would rent one?
13     A.    This old guy, his name was Bo
14 Jack, he'd mostly just operate it.
15     Q.    But he was the one who would
16 operate it most of the time?
17     A.    Yeah.
18     Q.    What about on the dozer work,
19 who would do most of the dozer work?
20     A.    It would be different ones,
21 you know, different guys.  Sometimes I'd be
22 on it, sometimes Bo Jack would be on it,
23 sometimes Richard would be on it, whoever

Page 56

1  the supervisor tell, you know, whatever he
2  would want us to do.
3      Q.    What about -- Did you operate
4  a backhoe during that time?
5      A.    Sometimes.
6      Q.    Who would operate the backhoe
7  most of the time when you were working
8  during this period of time?
9      A.    Well, John he used to do it a
10 lot, John Molton.
11     Q.    Okay.  He would work the
12 backhoe most of the time?
13     A.    Well, you know, different
14 people would be on it.  Sometimes it would
15 be me.  Like I said, sometimes it would be
16 John.  Sometimes it would be Richard,
17 sometimes Bo Jack, you know, whoever the
18 supervisor told, "I need you to go here and
19 do that, go and do this or that."  Whichever
20 one he told.  It just wasn't no same person
21 that did it.  That was their job, just
22 operated it.
23     Q.    Okay.  From 1993 to 1997,

14  (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1  before Mr. Broadhead bought Sedgefields, did
2  you have any write-ups or disciplinary
3  action taken against you?
4      A.    No.
5      Q.    Did you have any performance
6  issues that management talked to you about?
7      A.    I don't understand what you're
8  saying.
9      Q.    Well, did anybody criticize
10 your work during that period of time, from
11 1993 to 1997?
12     A.    No.  They never came to me
13 with it, if they did.
14     Q.    Okay.  And then you said you
15 left Sedgefields in 2001.  To your
16 knowledge, why did you leave Sedgefields?
17     A.    They told us they was cutting
18 back on the help.
19     Q.    Okay.
20     A.    And they laid off, I don't
21 know, about six or seven of us.
22     Q.    Okay.  Where did you work
23 after that, after you were laid off in 2001?

Page 58

1      A.    I went to work at Frog Pond
2  Turf.
3      Q.    When did you start working at
4  Frog Pond Turf?
5      A.    2002.
6      Q.    How long were you off work
7  from Sedgefields to when you started working
8  at Frog Pond Turf?
9      A.    I think it was, like, from
10 April to December.  I drawed unemployment.
11     Q.    Did you try to look for work
12 during that time?
13     A.    Yes.
14     Q.    None available?
15     A.    No.
16     Q.    And when did your unemployment
17 run out?
18     A.    I think it was October,
19 something like that.
20     Q.    Okay.  What did you do with
21 Frog Pond Turf, what kind of work did you
22 do?
23     A.    Drove a tractor and forklift.

Page 59

1  Operated a tractor and forklift.
2      Q.    How long did you work at Frog
3  Pond Turf?
4      A.    From 2000 to the last of 2000
5  -- To December 2004 -- 2002 to 2004,
6  December 2004.
7      Q.    So, about two years?
8      A.    Yeah.
9      Q.    Why did you leave Frog Pond?
10     A.    I went back to work at
11 Sedgefields.
12     Q.    I didn't think you started
13 working at Sedgefields again until March of
14 2005; is that right?
15     A.    I went back to work there in
16 January.  I started and my ID wasn't right.
17 And they told me I couldn't start to work
18 until I got that straightened out, and
19 that's what I did.
20     Q.    Okay.  Did you ever have any
21 write-ups or disciplinary action taken
22 against you at Frog Pond Turf?
23     A.    No.

Page 60

1      Q.    And you left voluntarily?
2      A.    Right.
3      Q.    Who was your supervisor at
4  Frog Pond Turf?
5      A.    Al Davis.
6      Q.    Who was the owner or manager
7  of Frog Pond Turf?
8      A.    William Baker.
9      Q.    And what kind of pay were you
10 getting at Frog Pond Turf?
11     A.    I was making
12 eight-seventy-five when I left there.
13     Q.    What about C&W?  I thought you
14 said you worked at C&W.
15     A.    Yeah.  That was during the
16 time when I was trying to get my ID
17 straightened out, I worked there for about,
18 I don't know, a couple of weeks.  Maybe --
19 About three weeks.  About three weeks.
20     Q.    What did you do for C&W?
21     A.    I was working on a line, you
22 know, hanging different parts.
23     Q.    Working on an assembly line?

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1    A.    Assembly line, yeah.
2    Q.    What kind of pay did you get
3  there?
4    A.    Six dollars an hour.
5    Q.    Were you ever disciplined or
6  reprimanded when you worked there?
7    A.    No.
8    Q.    Why did you leave C&W?
9    A.    That's when I went back at
10  Sedgefields, when I got my ID and Social
11  Security cards. I had lost them all. I was
12  going to go to work. I had to have that
13  before they'd let me start working. I had
14  to wait until they got back.
15    Q.    Okay. Have you -- Other than
16  the termination at Mid State Land and
17  Timber, have you ever been fired from a job?
18    A.    One time.
19    Q.    Okay. When was that?
20    A.    I think it was in -- When I
21  was in Atlanta. I got fired off that job
22  and that's when I moved back on.
23    Q.    Why did you get fired from

Page 62

1  that job?
2    A.    Came to work late a couple of
3  times. I didn't have a ride. And I worked
4  out real far. And the bus only ran so far,
5  and then I had to walk the rest of the way.
6    Q.    Were you not fired from C&W?
7    A.    No.
8    Q.    Okay.
9    A.    I quit at C&W.
10    Q.    Okay. And you didn't -- No
11  one talked to you about performance issues
12  at C&W?
13    A.    Yeah. Me and one guy,
14  supervisor, got in -- We had a few words
15  about the job. He had told me that I was
16  going to start, and he gave the job to
17  somebody else, so we had a few words.
18    Q.    Who was that?
19    A.    His name was Jody. I don't
20  know what his last name.
21    Q.    And what did Jody say to you?
22    A.    We just had a few words. You
23  know, different opinion about things.

Page 63

1    Q.    Did you accuse him of
2  discriminating against you on the basis of
3  your race?
4    A.    No, I didn't. Because only
5  black guys worked there, mostly.
6    Q.    Well, what did you say to him?
7    A.    I told him he had asked me --
8  He had told me that he was going to give me
9  the forklifting job -- driving job, and they
10  hired another guy and gave it to him.
11    Q.    Okay. And what -- Did you --
12  You didn't tell him that you felt like you
13  were being discriminated against?
14    A.    No. I didn't tell him I was
15  discriminated against. I just told him he
16  had offered me the job and he gave it to
17  somebody else.
18    Q.    And is that when you quit?
19    A.    Yeah.
20    Q.    But you don't recall anybody
21  at C&W talking to you about any performance
22  issues?
23    A.    No.

Page 64

1    Q.    Okay. How did you get hired
2  on back at Sedgefields in January of 2005?
3    A.    I had talked with -- Roy had
4  came by and talked with me.
5    Q.    Roy Lee?
6    A.    Yes. And he had told me
7  Suzanne asked him would he think that I'd be
8  willing to come back to work there. And I
9  told them I would, I would come back. But I
10  did go back to work out there.
11    Q.    Did Mr. Lee, did he come by
12  your house or give you a call?
13    A.    Yeah. Came by my house and
14  talked to me.
15    Q.    Okay. And who is Suzanne?
16    A.    Suzanne was a Broadhead at the
17  time. But I don't know what her last name
18  is now.
19    Q.    Okay. And to the best of your
20  recollection, what did Mr. Lee tell you when
21  he stopped by your house and offered you a
22  job?
23    A.    He asked me was I interested

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  in coming back to work there. And like I
2  said, at the time I was still working at
3  Frog Pond. And I asked him was they going
4  to pay me the same thing I was making. And
5  he told me he'd get back with me in a day or
6  two. Which he did. In a day or two, he
7  told me that they would start me out -- back
8  out with eight dollars an hour, and in
9  ninety days, they would give me a dollar
10  raise.
11      Q.    Okay. All right. Did
12  Mr. Lee, at any time during that
13  conversation, or before you started working
14  at Sedgefields Plantation for the second
15  time, did he say anything to you about you
16  stealing birds?
17      A.    I never knew nothing about
18  that.
19      Q.    Okay. So, he didn't say
20  anything about you stealing birds the first
21  time you worked there?
22      A.    No.
23      Q.    Okay. He didn't make any

Page 66

1  warning to you that if he caught you
2  stealing again he would fire you?
3      A.    Yeah. He said that, but he
4  didn't say no birds.
5      Q.    Well, what did you think he
6  meant by stealing again? What did you think
7  that he was referring to?
8      A.    I don't know.
9      Q.    Well, the man accused you of
10  stealing, did he not?
11      A.    He didn't accuse me.
12      Q.    Well, he said, "If I catch you
13  stealing again, I'm going to fire you;" is
14  that right?
15      A.    Yeah.
16      Q.    And you didn't ask him what he
17  meant by stealing again?
18      A.    Yeah.
19      Q.    Okay. What did you say to
20  him?
21      A.    He told me when I was fired --
22  Let me see. When we got laid off last time
23  -- the first time, the other guy that was

Page 67

1  the plantation manager, he told me that he
2  had put that on my record, that I had stole
3  something. But other than that, I never
4  knew anything about that, until he said
5  something to me about that then.
6      Q.    Okay. And what did you tell
7  him when he told you that?
8      A.    I said, "Okay".
9      Q.    Okay. You didn't say, "I
10  didn't steal those birds back then?"
11      A.    None of that even came up.
12          MR. DUKES: We've been going
13  for about an hour. Let's take a little
14  break.
15          (Recess taken.)
16      Q.    Now, why, again, did you leave
17  Four Way Plant Farms?
18      A.    Why I leave Four Way?
19      Q.    Yes, sir.
20      A.    I got another job. Like I
21  said, it was a seasonal job. You know, you
22  just work so many months and then you draw
23  unemployment or go to work somewhere else

Page 68

1  until they come back around again.
2      Q.    Okay. All right. And when
3  did you start working at Midway? What time
4  of year did you start working at Midway?
5      A.    Midway Plantation?
6      Q.    Yes, sir.
7      A.    It was, like, about September,
8  August, September, something like that.
9  August, September, something like that.
10      Q.    So, instead of waiting until
11  Four Way had more work in December, you went
12  to Midway, is that what you're saying?
13      A.    Yeah. A guy that was working
14  there told me they was looking for some
15  help, and he knew I knew how to operate
16  tractors, and he helped me got on out there.
17      Q.    What was Roy Lee's title, if
18  you know, when he came by your house and
19  offered you a job at Sedgefields, back in
20  2005?
21      A.    I think he was, like,
22  plantation foreman, something like that.
23      Q.    Okay. And so, you started

17  (Pages 65 to 68)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1  working back again at Sedgefields in March
2  or January of 2005?
3      A.    Like I said, when I went out
4  there, I worked there a few days, and my
5  Social Security -- I didn't have it.  My
6  Social Security card.  And I didn't have my
7  ID card.  And they told me I couldn't work
8  until I got those items.  And once I got
9  those, I went back to work.
10     Q.    Okay.  And that would have
11  been somewhere around March of 2005?
12     A.    I believe it was either March
13  or last of February.
14     Q.    Okay.  And I think your lawyer
15  is showing you something.  Does that help
16  you refresh your memory?
17     A.    Yes.  It's the second month,
18  8th day, '05.
19     Q.    Okay.  And were you hired back
20  at Sedgefields in 2005 as a general laborer?
21     A.    Yeah.
22     Q.    Okay.  And what were your
23  duties when you started back working at

Page 70

1  Sedgefields in March of 2005?
2      A.    Basically the same.  I worked
3  with the dogs, horses, I did tractor work, I
4  did a little dozer work, I did a little work
5  on the backhoe.  I mostly did tractor,
6  tractor driver.
7      Q.    And who was your immediate
8  supervisor?
9      A.    When I first went back?
10     Q.    Yes, sir.
11     A.    Roy Lee.
12     Q.    Okay.  And when Mr. Lee was
13  your supervisor, who would do most of the
14  dozer work and backhoe work?
15     A.    Sometimes he would and
16  sometimes I did.
17     Q.    Okay.  Is it fair to say that
18  he did most of the backhoe work and dozer
19  work?
20     A.    Yeah.
21     Q.    And at what point did Mr. Lee
22  no longer become your -- At what point did
23  Mr. Lee no longer -- At what point was he no

Page 71

1  longer your supervisor?
2      A.    When -- When they hired Joel
3  Norman.
4      Q.    Okay.  So, from March,
5  sometime in March of 2005, until when they
6  hired Mr. Norman, you worked under Mr. Lee?
7      A.    Right.
8      Q.    And I think Mr. Norman started
9  work at Sedgefields sometime in the middle
10  of September 2005.  Does that sound right to
11  you?
12     A.    Yeah, sounds about right.
13     Q.    Did your job duties ever
14  change from March 2005 through September of
15  2005?
16     A.    No.  I basically did the same
17  thing.  Mostly -- You know, I mostly did --
18  I mostly did all the Bush Hogging, but it's
19  a lot -- big place.  I had to Bush Hog every
20  day.
21     Q.    What was your starting salary
22  at -- when you came to work in March 2005?
23     A.    Well, they told me one thing

Page 72

1  but they paid me another.
2      Q.    Okay.  What did they tell you
3  -- I think you may have told me a little bit
4  about it.  But what did they tell you your
5  starting salary would be?
6      A.    They told me when I started
7  back there, because I quit a job that was
8  paying me more than what they was paying me
9  from the beginning.  When I went back to
10  work there, they told me I would be making
11  eight dollars an hour, and in ninety days, I
12  would get a dollar raise.
13     Q.    And who made that
14  representation to you?
15     A.    Roy had told me that.  I can't
16  think of his name.  Bob Ray had told him
17  that.
18     Q.    Mr. Lee told you that Bob Ray
19  told him that?
20     A.    Yeah.
21          (Defendant's Exhibit 1 was
22           marked for identification
23           purposes.)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 73

1    Q.    Okay. I'm going to show you a
2  document I will identify as Defendant's
3  Exhibit 1. And it is labeled, "Document
4  Numbers One Through Four."
5          MR. ROBERSON: I've seen that.
6  That's part of what you produced to us?
7          MR. DUKES: Uh-huh.
8          MR. ROBERSON: Take a look at
9  that, Norris.
10    Q.    I think I may have the pages
11  out of order, looking at it a little bit.
12  Looks like maybe page four really should be
13  page three and page three should be page
14  four. Does that look right to you? Do you
15  see what I mean by that, Mr. Foster?
16    A.    Now, what am I supposed to be
17  looking for?
18    Q.    I think I've got page three
19  and page four turned around. I think page
20  four should really be page three, and page
21  three should be page four, and I'm asking
22  you if you agree with me.
23    A.    Yeah.

Page 74

1    Q.    Does that look right to you?
2    A.    Yeah.
3    Q.    Okay. Can you read and write,
4  Mr. Foster?
5    A.    Yeah.
6    Q.    Okay. Is this your
7  handwriting on Defendant's Exhibit 1?
8    A.    This right here (indicating)?
9    Q.    Yes, sir. All the handwriting
10  on Defendant's Exhibit 1.
11    A.    No, I didn't fill that out, my
12  girlfriend did.
13    Q.    Okay. Did you look at it
14  after she filled it out?
15    A.    Not really. I see a couple of
16  things on there that she ain't got on there.
17    Q.    Is that your signature on page
18  three?
19    A.    Yeah.
20    Q.    Okay. Did you understand by
21  signing page three, that you were saying
22  that your application for employment is true
23  and correct, to the best of your knowledge

Page 75

1  and belief?
2    A.    Yeah. I know it now.
3    Q.    Okay. What do you see that's
4  not correct, or you believe is not correct
5  at this time, on Defendant's Exhibit 1?
6    A.    Where she got seven, it should
7  have been an eight. And down here where --
8  That's on the front page, it should have
9  been eight dollars an hour instead of seven.
10  And down at the bottom where it got E-1, it
11  should have been an E-5.
12    Q.    I think that may be E-4, but
13  you're saying it should be E-5?
14    A.    Yeah. Right.
15    Q.    I also see here that as your
16  duties, when you were with Sedgefields
17  before, was training dogs and tractor
18  driver; is that right?
19    A.    That's right.
20    Q.    And I'm on page two of
21  Defendant's Exhibit 1, if you'll follow
22  along with me.
23    A.    (Witness complies.)

Page 76

1    Q.    Do you see under employment
2  data, it asks you to, "Please list all jobs
3  beginning with your present or last employer
4  and working backwards?"
5    A.    Yeah.
6    Q.    Frog Pond Turf was not your
7  last employer, was it?
8    A.    Before I went back to work?
9    Q.    Yes, sir.
10    A.    Yeah. You right. Because I
11  should have been put C&W, but it was only
12  about a week, a couple of weeks, two or
13  three weeks.
14    Q.    Okay. You didn't put that
15  employer down, did you?
16    A.    No.
17    Q.    And you also didn't put down
18  Mr. Turf Sod Farm, Midway Plantation, or
19  Four Way Plant Farm or Beaulieu, did you?
20    A.    No, I didn't put none of those
21  down there.
22          MR. ROBERSON: Have you got
23  his first application, Carter?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 77

1    MR. DUKES: I might.
2    MR. ROBERSON: I mean, they
3  had that -- I mean, I've got it, if you
4  don't have it.
5    MR. DUKES: No. But let me
6  take the deposition.
7    MR. ROBERSON: I'm trying to.
8  But I don't want you to mislead anybody, you
9  know.
10    MR. DUKES: You can ask him
11  anything you want to after I get through,
12  but don't interrupt my deposition.
13    MR. ROBERSON: Okay.
14    Q.  Who is Ben -- Is this Ben
15  Jordan?
16    A.  My grandfather.
17    Q.  That's who?
18    A.  My grandfather.
19    Q.  Okay. Where does he live?
20    A.  Midway.
21    Q.  Is he still alive?
22    A.  Yeah.
23    Q.  Okay. Does he work?

Page 78

1    A.  He's ninety-two years old.
2    Q.  Okay. And Brenda Turner, who
3  is that?
4    A.  My aunt.
5    Q.  Okay. Is she still alive?
6    A.  Yeah. She teach school down
7  at the elementary school.
8    Q.  Okay. How many aunts and
9  uncles do you have that live around the
10  area?
11    A.  Well, on my father's side,
12  there was fifteen children, eleven of them
13  still living. And most of them -- Well,
14  it's only three that's still live here, the
15  rest of them live in Georgia, Atlanta,
16  different places.
17    Q.  Okay. Give me the names of
18  those -- aunts and uncles that live in
19  Alabama.
20    A.  Brenda Turner, Terry Jordan,
21  and Annie Watkins. And I have one aunt on
22  my mother's side, her name is Julia Reese.
23    Q.  Let me direct your attention

Page 79

1  to the fourth page of Defendant's Exhibit 1,
2  under General Information. The question is,
3  "Have you ever been convicted of a crime?"
4  How did you answer that question?
5    A.  I answered no.
6    Q.  That's not true, is it?
7    A.  No.
8    Q.  At the time that you completed
9  this application and signed that everything
10  was true and correct on February 8, 2005,
11  you had been convicted of a crime; is that
12  correct?
13    A.  Yes.
14    Q.  What had you been convicted of
15  at that time?
16    A.  Assault in the third degree.
17    Q.  Okay. Any other convictions
18  at that time?
19    A.  No. I've had a bunch of
20  tickets, but that's the only thing that I
21  ever been convicted of.
22    Q.  Okay. Have you ever been
23  arrested for anything?

Page 80

1    A.  Tickets.
2    Q.  Other than tickets, have you
3  been arrested for anything other than
4  tickets?
5    A.  Yeah. Assault, but no -- A
6  couple of times I got arrested for fighting,
7  domestic violence.
8    Q.  But you just say you haven't
9  been convicted of those things?
10    A.  I never been. That's the only
11  thing.
12    Q.  Okay. When were you convicted
13  of assault?
14    A.  That was back in '89, '88,
15  '89, somewhere in there.
16    Q.  And did you spend any time in
17  jail for that?
18    A.  No.
19    Q.  Okay. What led up to your
20  arrest and conviction for assault?
21    A.  What I got --
22    Q.  What did you do? Yes, sir.
23    A.  Me and a guy got in a fight.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1    Q.    Okay.  And where was that
2  fight?
3    A.    At a club.
4    Q.    And did you -- Was it just
5  fists or did you stab him or shoot him?
6    A.    No.  I whooped him with a hole
7  digger handle.
8    Q.    You whooped him with a what?
9    A.    A hole digger.  You know a
10  hole digger?
11    Q.    Yeah.
12        MR. ROBERSON:  Post hole
13  diggers?
14        THE WITNESS:  Yeah.  Post hole
15  digger.  I broke a handle out of one of
16  them.
17    Q.    Okay.  And hit him with that?
18    A.    Yeah.
19    Q.    The next question under
20  General Information is, have you ever been
21  discharged from a job?  How did you answer
22  that question?
23    A.    I said no.

Page 82

1    Q.    That's not true, is it?
2    A.    No.
3    Q.    So, you had been discharged
4  from a job at the time that you completed
5  this application, which is Defendant's
6  Exhibit 1?
7    A.    Yes, I had.
8    Q.    Okay.  What job had you been
9  terminated from?
10    A.    The one in Atlanta.  I got
11  fired off a construction job up there.
12    Q.    All right.  Any other jobs
13  that you had been terminated from?
14    A.    Nope.  None other that I know
15  of.
16    Q.    In your previous employment,
17  did you ever supervise any other employees?
18    A.    Yeah.  At Sedgefields.
19    Q.    Okay.  When at Sedgefields did
20  you supervise other employees?
21    A.    Well, it was back when -- I
22  wasn't no, say, a supervisor, just a lead
23  person.  You know, I had been there a little

Page 83

1  longer than they had, and things that they
2  wanted done that the other guys didn't know
3  how to do, I showed them.
4    Q.    Okay.
5    A.    So I wouldn't say it was a
6  supervisor, just somebody that knew a little
7  bit more than the other persons.
8    Q.    Okay.  So, you didn't -- You
9  never had a title as a supervisor, did you?
10    A.    No.
11    Q.    In any of your previous
12  employment?
13    A.    No.
14    Q.    Did you do any -- Were you
15  ever hired as a welder with any job?
16    A.    No.
17    Q.    Have you ever been hired as a
18  mechanic for any job?
19    A.    No.
20    Q.    Okay.  You said you worked
21  under Mr. Lee until Mr. Norman came to work
22  at Sedgefields?
23    A.    Yes.

Page 84

1    Q.    When Mr. Norman came to work,
2  how did -- Who did you report to?
3    A.    Well, I didn't start off
4  working with him.  I was still working with
5  Roy.  And they came up with -- He had two
6  other guys working with him.  And --
7    Q.    Who were the two other guys
8  working with him?
9    A.    Jeff Harris and Demetrius
10  Parham.
11    Q.    Okay.  And then what happened?
12    A.    They really didn't know the
13  way to go.  They didn't know the plantation
14  that well.  And they had a meeting.  I guess
15  Dave or George knew I knew the place pretty
16  good as I had been working there for a
17  while.  And he suggested that since I knew
18  which way to go, knew the places where they
19  wanted to chop at, that I work with him.
20    Q.    Okay.  And so, was that in
21  September, you think, or was that in
22  October?
23    A.    I don't know.  It might have

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 85

1   been maybe the last of September, around the
2   first of October, something like that, where
3   they had a meeting between him and Roy and
4   David and that's what they came up with.
5       Q.    All right.  And at that time
6   did you, Jeff, and Demetrius work with
7   Mr. Norman?
8       A.    No.  Just me and Jeff.  They
9   took Demetrius, he started back to working
10  under Roy.
11      Q.    Okay.  And what kind of work
12  did you do when you were working with
13  Mr. Norman?
14      A.    Basically, just chopping.
15      Q.    What is chopping?  Explain
16  that to the jury.
17      A.    All it is is cutting pathways
18  for the dogs.  Let's say a hunter get down
19  for the hunt, and it's something like a
20  checkerboard, you go one way and come back
21  another.
22          Let's say if the dog point a
23  covey of birds and he's in the grass, you

Page 86

1   know, where we have chopped at, the riders
2   -- the hunters can get off the horses and
3   stand in that clearing while you walk in the
4   thick part.  They flush the birds.  It's
5   just chopping, you know, chopping.
6       Q.    In other words, you're just
7   knocking down the brush where people can
8   walk inside the fields?
9       A.    Right.  And see your dogs.
10      Q.    Okay.  Before Mr. Norman had
11  gotten there, did y'all have any chopping
12  equipment?
13      A.    No.  We didn't chop, but we
14  Bush Hogged.
15      Q.    Okay.  And he changed it to
16  where you were chopping instead of Bush
17  Hogging?
18      A.    Right.
19      Q.    And is that what you primarily
20  did for Mr. Norman?
21      A.    That, and when we went bird
22  hunting.
23      Q.    Okay.  And then when you would

Page 87

1   have -- When was your first bird hunt that
2   season, if you recall?
3       A.    October the 14th, I believe it
4   was.
5       Q.    Okay.  How do you know that
6   date, just out of curiosity?
7       A.    Because when I was fired,
8   that's when he told me I stole some birds on
9   that day.
10      Q.    Okay.  And who all went with
11  you -- How many hunts did you have from
12  October 14, 2005, until the day that you
13  were terminated in I think December 28 or 29
14  of 2005?
15      A.    I'm not going to tell you a
16  lie.  I can't remember how many.  I just --
17  Maybe nine or ten, something like that.
18      Q.    Okay.
19      A.    I don't know.
20      Q.    Okay.  But nine or ten would
21  be a pretty good approximation?
22      A.    I don't know.  I'm not going
23  to say because I don't remember.  I'm going

Page 88

1   to be honest again.
2       Q.    And on those nine or ten
3   hunts, who would go out on the hunt with
4   Mr. Norman?
5       A.    It would be Joel, myself,
6   Willie Mack and Jeff Harris, sometimes
7   David.
8       Q.    Sometimes David Carroll?
9       A.    Yeah.
10      Q.    How many hunts do you think
11  David Carroll went on out of those nine or
12  ten?
13      A.    I don't know.
14      Q.    More than five?
15      A.    I really don't know.  Maybe
16  half.  I don't know.
17      Q.    Okay.  And on these hunts,
18  what was your job?
19      A.    Scout dogs and help Joel with
20  the dogs, make sure I kept up with -- help
21  him keep up with the dogs.
22      Q.    Okay.  And what do you mean by
23  scouting dogs?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1    A.    Well, just say you got two
2  dogs out there running, one of them might
3  get away, and the person that working the
4  dog, he -- he can't keep his eyes on both
5  dogs -- most of the time he can, but just
6  say if one get away, and he's still got to
7  keep the hunting party going, and,
8  therefore, I'll go and get the dog and bring
9  him back to them.
10    Q.    Okay.  And is that part of
11 just helping Joel with the dogs?
12    A.    Right.
13    Q.    Okay.  Did your job duties on
14 these hunts ever change from October the
15 14th until the date that you were
16 terminated?
17    A.    No.
18        (Defendant's Exhibit 2 was
19        marked for identification
20        purposes.)
21    Q.    Okay.  I'm going to show you a
22 document that I will identify as Defendant's
23 Exhibit 2.  And after you've read that, just

Page 90

1  let me know.
2        (Off-the-Record discussion
3        was held.)
4    MR. ROBERSON:  You got the
5  wrong pay rate in there, Norris.
6    THE WITNESS:  Okay.
7    MR. ROBERSON:  Is there a
8  particular section you want him to look at
9  or is it the whole thing?
10    MR. DUKES:  Whole thing.
11    MR. ROBERSON:  Okay.
12    A.    Okay.
13    Q.    Is Defendant's Exhibit 2, is
14 it complete and accurate, to the best of
15 your knowledge and belief?
16    A.    Yeah.  Couple of things.
17    Q.    All right.  What couple things
18 may be wrong?  I think your lawyer said
19 something about the pay.  I think it says
20 eight dollars an hour.  What was your pay
21 when you were working at --
22    A.    When I started?
23    Q.    Yes, sir.

Page 91

1    A.    Seven dollars.
2    Q.    Okay.  And what was it when
3  you ended?
4    A.    Well, seven-fifty.
5    Q.    Okay.  When did you get a
6  fifty cent pay raise?
7    A.    They had already fired me
8  then.  When the raise came, that was my last
9  check.
10    Q.    Okay.  Other than the amount
11 that you were being paid, is there anything
12 else inaccurate in Defendant's Exhibit 2?
13    A.    Yeah.  The years what -- It's
14 more like ten years instead of twelve.
15    Q.    Okay.  Anything else
16 inaccurate or wrong?
17    A.    Not that I see.
18    Q.    Have you ever seen Defendant's
19 Exhibit 2 before today?
20    A.    No.
21    Q.    This is the first time you've
22 seen it?
23    A.    This here?

Page 92

1    Q.    Yes, sir.
2    A.    Yeah.
3    Q.    Tell me everything that serves
4  as the basis for your belief that you were
5  discriminated against because of your race.
6    A.    For one thing, the time I had
7  worked there, then some younger guys came to
8  work there and they got paid more.
9    Q.    Okay.
10    A.    Things that Joel would say.
11    Q.    Anything else?
12    A.    No.
13    Q.    Did you ever complain to
14 anybody about the way you were being
15 treated?
16    A.    Yeah.
17    Q.    Who did you complain to?
18    A.    Roy.
19    Q.    What did you tell Roy?
20    A.    The things that he would say.
21    Q.    He, being Joel Norman?
22    A.    Yes.
23    Q.    When did you first complain to

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 93

1  Joel, Mr. Lee?
2      A.     Maybe a couple of days after I
3  started working with him.
4      Q.     How many times did you
5  complain to him?
6      A.     I don't know.  A bunch of
7  times.
8      Q.     Less than five?
9      A.     Yeah.  I even tried to talk to
10 David about it, but he said they were my
11 boss and he didn't have nothing to do with
12 it.
13     Q.     How many times did you say
14 something to David Carroll about the way you
15 were being treated?
16     A.     I tried to talk to him twice.
17     Q.     Okay.  What did you say to him
18 on the first time?
19     A.     I asked him could I talk to
20 him.  And he told me if I had any problems,
21 talk to Joel, he my supervisor.
22     Q.     Did you tell him what your
23 problem was?

Page 94

1      A.     He didn't want to hear it.  He
2  told me to talk to Joel.
3      Q.     The second -- When was that?
4      A.     I can't remember the dates.
5  Just say sometime in October, when he first
6  -- around the first week or two in October.
7      Q.     Okay.  And when was the next
8  time you approached David Carroll?
9      A.     A couple of days.  I didn't
10 approach him.  I talked to him over the
11 radio.
12     Q.     Okay.  Called him on the
13 radio?
14     A.     Yeah.
15     Q.     And what did you say to him
16 that time?
17     A.     Same thing.  I need to talk
18 with him, and he told me the same thing.
19     Q.     So, you never told Mr. Carroll
20 what your issues were with Mr. Norman?
21     A.     No.
22     Q.     Okay.  You did tell Mr. Lee
23 what your issues were with Mr. Norman,

Page 95

1  didn't you?
2      A.     Yeah.
3      Q.     What did Mr. Lee tell you?
4      A.     That he was my supervisor, no
5  matter what he said, do.  He your
6  supervisor, and you going to have to -- You
7  know, he kept asking me had I talked to I
8  David.  And I had told him that I tried to
9  talk to David a couple times about it, and
10 he told me the same thing, talk to Joel.
11 But I could talk to Roy, you know, tell him,
12 probably, and wasn't nothing he could do
13 because I didn't work with him no more.
14     Q.     Okay.  What did you complain
15 to Roy about specifically?
16     A.     The way he talk to us.
17     Q.     Anything else?
18     A.     That's basically it.
19     Q.     Okay.  Do you know if Mr. Lee
20 ever told anybody else at Sedgefields or Mid
21 State about the complaints that you made to
22 him?
23     A.     I don't know.

Page 96

1      Q.     He never told you he spoke to
2  anybody about your complaints?
3      A.     No.
4      Q.     Okay.  What were some of the
5  things that Joel would say that you believe
6  serve as the basis for your complaint that
7  you were discriminated against on the basis
8  of your race?
9      A.     He used to always ask me were
10 we going hunting, before we got there who
11 took the guests out?  And I told him either
12 me or Roy.  He said he had never worked on a
13 plantation or been on a plantation where
14 black guys -- they had black guides.
15     Q.     And did he make that comment
16 before your first hunt?
17     A.     Yeah.
18     Q.     Did he make that comment any
19 other time?
20     A.     He said -- Not that comment,
21 but he said other things.
22     Q.     Okay.  Well, I'm just -- I'm
23 going to let you tell me about the other

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1  comments. But on this thing about his
2  comment, "He's never worked at a place where
3  they had black guides," he said that on how
4  many occasions?
5      A.    Two, maybe three times I've
6  heard him say it.
7      Q.    Okay. And what did you say in
8  response to that?
9      A.    Nothing. Just looked at him.
10     Q.    Okay. All right. What was
11  another comment that he made that you
12  believe serves as the basis of your
13  complaint that you were discriminated
14  against because of your race?
15     A.    Well, he asked about who ran
16  the place before David took over as manager.
17  And I told him, "Roy". He said, "That's
18  unbelievable, a black man running a
19  plantation."
20     Q.    When did he make that comment?
21     A.    When he first started working
22  there sometime. I can't remember no dates
23  -- the dates.

Page 98

1      Q.    How many times did he make
2  that comment?
3      A.    I only heard him say that a
4  couple of times.
5      Q.    Anybody else overhear that
6  comment?
7      A.    Jeff Harris. He was standing
8  right there when he said it.
9      Q.    All right. Anybody else?
10     A.    Willie Mack was standing
11  around one time when he said it.
12     Q.    Anybody else?
13     A.    That's it, because we was the
14  only ones working around him.
15     Q.    What about the comment, "Never
16  worked on a plantation where they had black
17  guides," anybody else, to your knowledge,
18  overhear that comment?
19     A.    I told you, Jeff Harris.
20     Q.    Anybody else?
21     A.    That was it. Because it was
22  just us three standing there.
23     Q.    Okay. All right. Any other

Page 99

1  comments serve as the basis for your belief
2  that you were discriminated against because
3  of your race?
4      A.    Nah.
5      Q.    Did you ever hear Mr. Norman
6  talk about wanting to replace black
7  employees?
8      A.    Yeah.
9      Q.    Okay. Would that be a comment
10  that would serve as the basis for your
11  belief that you were discriminated against
12  because of your race?
13     A.    Yeah.
14     Q.    Okay. What exactly did
15  Mr. Norman say in that regard?
16     A.    He said, "By January, first of
17  the year, it going to be an all white crew,
18  like it should be."
19     Q.    And when did he make that
20  comment?
21     A.    I don't know. Maybe after the
22  first hunt or two we had.
23     Q.    And how many times did he make

Page 100

1  that statement?
2      A.    I heard him say it a couple of
3  times, maybe three. About three times I've
4  heard him say that.
5      Q.    When was the last time he said
6  it?
7      A.    I don't know. Maybe a couple
8  of weeks before I got fired.
9      Q.    What prompted him to say that,
10  if you know?
11     A.    Nothing but a racist. That's
12  the only thing I can come up with.
13     Q.    Was anybody around when he
14  made those comments?
15     A.    Me and Jeff always worked
16  together.
17     Q.    What did you say in response
18  to those -- to that comment?
19     A.    I never said anything to Joel,
20  because he -- All he wanted was any kind of
21  reason for me to say anything to him for me
22  to fire -- for to get fired.
23     Q.    Any other comments by

25  (Pages 97 to 100)

## FREEDOM COURT REPORTING

Page 101

1   Mr. Norman that serve as the basis of your
2   belief that you were discriminated against
3   because of your race?
4       A.    No.  No more than I tell him,
5   "Whenever I saw Suzanne or somebody from the
6   big office, I was going to tell them about
7   what was going on and how we were being
8   treated."  And Mr. Carroll told me if I said
9   anything to anybody about it, that he would
10  fire me.
11      THE WITNESS:  Do you remember
12  that?  I know you don't, but two other
13  people do.
14      Q.    I'm a little confused.  I
15  asked you earlier about your conversations
16  with Mr. Carroll and you said you never were
17  able to tell him anything.  Is your
18  testimony changed now that you were able to
19  talk --
20      A.    When he said -- When that
21  comment was made, was one day that we got
22  wrote up and he was up there to verify what
23  Joel had wrote -- wrote us up.  And that's

Page 102

1   when I said something and made that comment.
2       Q.    Okay.  All right.  So, you
3   were written up on one occasion, I think,
4   for -- you were supposed to be taking care
5   of the horses and Mr. Norman said that y'all
6   were out riding the horses instead of taking
7   care of the horses.
8       A.    But he didn't put the reason
9   why we was out there riding horses.
10      Q.    Okay.  Well, we can get to
11  that later.  But it was on that occasion
12  when you were written up for that?
13      A.    Right.
14      Q.    And Mr. Carroll was present.
15  You told Mr. Carroll that you were going to
16  complain to the big office?
17      A.    Right.  I said, "If any of
18  them, Suzanne or Mr. Ray came down there,
19  that I was going to tell them what was going
20  on."
21      Q.    Did you say -- Did you say
22  exactly or explain yourself as to what was
23  going on?

Page 103

1       A.    No.
2       Q.    You just said, "I'm going to
3   tell them what's going on?"
4       A.    They already knew what was
5   going on.
6       Q.    But you didn't tell them that
7   you were going to complain about race
8   discrimination, did you?
9       A.    No.
10      Q.    And that write-up, I think,
11  was sometime in the middle of December; is
12  that right?
13      A.    I can't remember what month it
14  was.  It might have been sometime in
15  December, somewhere around in there.
16      MR. ROBERSON:  I think it's
17  12/6.
18      Q.    All right.  Any other
19  comments --
20      A.    No.
21      Q.    -- made by anybody at
22  Sedgefields that you believe serves as the
23  basis for your belief that you were

Page 104

1   discriminated against because of your race?
2       A.    No.  Nobody else.
3       Q.    Okay.  Other than Mr. Norman,
4   do you believe you were treated fairly by
5   Sedgefields or Mid State?
6       A.    Everything was fine until he
7   started working there.
8       Q.    Okay.  So, other than
9   Mr. Norman's conduct, you believe you were
10  treated fairly by Mid State?
11      A.    Sure.  Except for the pay.
12      Q.    Okay.  That's what I'm about
13  to get to.  I asked you earlier, "What
14  served as the basis for your complaint that
15  you were discriminated against because of
16  your race?"  You said, "The pay, that
17  younger guys were paid more than you, and
18  things that Joel would say."
19      A.    Right.
20      Q.    Have I accurately summarized
21  your deposition testimony?
22      A.    Yes.
23      Q.    All right.  And I think you've

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1  told me everything about what Joel would
2  say; is that right?
3      A.    Right.
4      Q.    Now I want to go into the
5  issue that you have with pay. What is your
6  complaint about the pay, Mr. Foster?
7      A.    Because they promised me one
8  thing, and paid me another.
9      Q.    Okay. What other complaints
10 do you have about your pay?
11     A.    Wasn't getting paid enough.
12 That's it.
13     Q.    Okay. Well, do you believe
14 that other employees were paid more than you
15 for similar work?
16     A.    Yeah. Most of the -- All the
17 black guys, all of us was making the same
18 amount of money. I think Willie might have
19 been -- Willie Mack might have been making
20 thirty-five or forty cents more, but the
21 rest of us were making seven dollars an
22 hour, and the white guys that they hired was
23 making eight.

Page 106

1      Q.    Okay. And what white guys do
2  you compare yourself to?
3      A.    I know Will Hubbard and the
4  other young guy, he's a Mayes. I can't
5  think of his first name.
6      Q.    Joseph Mayes?
7      A.    Yeah.
8      Q.    Anybody else?
9      MR. ROBERSON: The Ham boy?
10     A.    Yeah. He had started working
11 there, maybe a week or two after I was
12 fired.
13     MR. ROBERSON: Okay.
14     A.    And there was another guy that
15 was working there previous, before he got
16 fired, and he was making eight dollars an
17 hour.
18     Q.    Brotherman?
19     A.    Yeah.
20     Q.    That's Beckwith, Brotherman
21 Beckwith, William Beckwith? They called him
22 Brotherman?
23     A.    Yeah, Brotherman. I don't

Page 107

1  know what his real name was.
2      Q.    Okay. Do you know anything
3  about Will Hubbard's prior work experience?
4      A.    He told me he was training,
5  working with me, that since he had got out
6  of school, only thing he had did was help
7  his dad haul chickens. I think his daddy
8  hauled chickens from one place to another.
9  I think he bought them from, like, Wayne
10 Poultry and they take them to different
11 stores and stuff. And he said that's the
12 only thing he had did prior to that.
13     Q.    Do you know his experience
14 with heavy equipment, with dozers and
15 skidders?
16     A.    He told me he had never messed
17 with none before he came out there.
18     MR. DUKES: Can we go off the
19 Record?
20         (Off-the-Record discussion
21           was held.)
22         (Recess taken.)
23     Q.    Mr. Foster, we just took a

Page 108

1  break. Is there anything about your
2  previous testimony that you want to change
3  or add to?
4      A.    Yeah.
5      Q.    What do you want to change or
6  add to your testimony?
7      A.    I don't want to change
8  nothing.
9      Q.    Okay.
10     A.    Like you saying about some of
11 the things about the discrimination part.
12 Like, for example, when I started working at
13 Sedgefields, I was operating tractors,
14 bulldozers, backhoe, working horses, dogs.
15 And the day I got fired, I was shoveling
16 manure.
17         Plus, another way they would
18 discriminate against us, they was taking all
19 our tip money.
20     Q.    All right. So I asked you
21 earlier what served as the basis for your
22 belief that you were discriminated against
23 at Mid State because of your race, you told

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 109

1  me pay and things that Joel would say. Now
2  that we've come back from a break, are you
3  saying that some other things lead you to
4  believe that you were discriminated against
5  because of your race?
6      A.   Yes.
7      Q.   And those two other things
8  would be tip money?
9      A.   Right.
10      Q.   And the other, I'll just
11  generalize and say terms and conditions of
12  your employment; is that fair enough?
13      A.   Right.
14      Q.   Okay. We'll go back into that
15  a little bit later. And I think before we
16  took a break, we were talking about Will
17  Hubbard. Do you know what his education
18  background was?
19      A.   Like I said, he told me he had
20  just finished high school. He had been out
21  of school about -- Well, he had just
22  finished high school. And the only job he
23  had did was working with his father, hauling

Page 110

1  chickens from one supermarket to another.
2      Q.   Okay. And do you know when he
3  was hired on at Mid State?
4      A.   It was either the last of
5  November or around the first of December,
6  something like that.
7      Q.   Okay. I've got November 21,
8  2005, do you have any reason to dispute
9  that?
10      A.   Should be something like that.
11      Q.   Okay. So, you worked around
12  him for about a month, little over a month;
13  is that right?
14      A.   Right.
15      Q.   Do you know if Mr. Hubbard had
16  a driver's license?
17      A.   Yes.
18      Q.   Okay. He could drive?
19      A.   Yeah.
20      Q.   Okay. Joseph Mayes is another
21  fellow you mentioned. Do you know anything
22  about his work experience?
23      A.   I never even met the guy

Page 111

1  before he started working there. I never
2  even knew him or seen him.
3      Q.   Okay. Do you know what his
4  hunting experience was?
5      A.   I know he told me he liked to
6  deer hunt.
7      Q.   Okay. What about trapping, do
8  you know if he could trap?
9      A.   He said he -- I think -- Yeah,
10  he used to trap while he was out there.
11      Q.   Okay. Did he have a driver's
12  license, Mr. Mayes?
13      A.   I'm pretty sure he did.
14      Q.   Okay. Brotherman, who, by the
15  way, is Mr. Beckwith --
16      A.   Yeah.
17      Q.   Do you know anything about his
18  work experience before coming to Mid State?
19      A.   No. No more than he told me
20  he used to work on a big golf course, and he
21  did clean up barbecues and stuff like that.
22  Other than that, no.
23      Q.   And do you know what his job

Page 112

1  duties were out at Mid State, when he worked
2  there?
3      A.   He Bush Hogged mostly with me,
4  when he first started. He was doing a lot
5  of Bush Hogging and everybody.
6      Q.   I've got him being hired July
7  25, and then being fired on September 27,
8  2005. Does that sound about right to you?
9      A.   Yeah.
10      Q.   Was he also -- Did he work as
11  a night watchman for Mid State?
12      A.   Yeah. That's what he said.
13      Q.   Do you have any reason to
14  dispute that?
15      A.   No.
16      Q.   What about Chance Ham, do you
17  know anything about his work -- previous
18  work experience?
19      A.   No.
20      Q.   Do you know anything about his
21  education?
22      A.   No.
23      Q.   Do you know what kind of work

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 113

1 he's been doing out at Mid State?
2    A.    No.
3    Q.    Okay. Do you know any black
4 employees at Mid State, during the time you
5 worked there, that were being paid more than
6 you?
7    A.    Nobody except for Roy, I don't
8 think. Like I said, Roy, and I think Willie
9 Mack, I think he was making a little bit
10 more.
11    Q.    Are there any other white
12 employees that you compare yourself to,
13 other than Will Hubbard, Joseph Mayes,
14 Chance Ham and Brotherman?
15    A.    What you mean by that?
16    Q.    Was there anybody else that
17 you believe that was similarly situated to
18 you that was paid more than you?
19    A.    Well, I know I can't compare
20 with Joel because he -- I know he got a
21 college degree or whatever, but I got a CS
22 degree in the job.
23    Q.    You got a what degree?

Page 114

1    A.    CS.
2    Q.    What is that?
3    A.    Commonsense.
4    Q.    Do you know anything about
5 Joel Norman's background?
6    A.    No.
7    Q.    Do you know anything about
8 Mr. Lee's background in bird hunting?
9    A.    I taught him.
10    Q.    Okay. When did he start
11 working out at Sedgefields?
12    A.    The last of 2000 -- I think
13 about -- I don't know, maybe it was October,
14 November, something like that, of 2000.
15    Q.    Okay. Did he have any
16 previous bird experience before he came to
17 Sedgefields?
18    A.    No. He worked at Beaulieu,
19 Columbus Mills, he had worked there about
20 twenty-five years.
21    Q.    So, to your knowledge, he
22 didn't have any previous bird experience
23 before he came out to Sedgefields?

Page 115

1    A.    No more than what I showed
2 him.
3    Q.    Okay. How did y'all do bird
4 hunts before Mr. Norman came out there?
5    A.    Well, just according to --
6    Q.    And let me say quail hunts.
7    A.    It was according to the
8 clients, what kind of hunting that they
9 wanted to do. If they wanted to wild bird
10 hunt, we go different places, you know,
11 where we knew where wild birds was, where we
12 had seen them at and where we had been
13 feeding the wild birds.
14    And if they wanted to hunt
15 liberated birds, they call it put and take.
16 You put the birds out there and hunt them.
17 It's according to whatever the client is
18 wanting to do, if it's wild bird hunting, we
19 go wild bird hunting.
20    If they want to, you know,
21 just do a lot of shooting, the liberated
22 hunting, that's what we do. We put the
23 birds out there to make sure they got a lot

Page 116

1 of shooting in. Every now and then we run
2 across a wild bird.
3    Q.    How did Mr. Norman change the
4 way y'all did bird hunts, or quail hunts?
5    A.    They just strictly said they
6 was going to turn it around to just straight
7 wild birds. Wasn't going to be no put and
8 take. Like, in the morning, you put them
9 out there and then you go hunt them maybe an
10 hour or two later. What they did was
11 release some birds into the wild,
12 prerelease, you know, maybe a month or two
13 before hunting season start.
14    Q.    Okay. Was Mr. Norman, to your
15 knowledge, was he trying to reestablish the
16 wild quail population at Sedgefields?
17    A.    That's what he said. That's
18 why they were going to change it to just --
19 There wasn't going to be no more putting no
20 birds out, it was just going to be strictly,
21 you know, wild birds.
22    Q.    Did you have any criticisms of
23 the way Mr. Norman handled the quail hunts?

29  (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1    A.    Well, I didn't say it to him,
2  I said it to other guys, the way he -- Like,
3  lot of times we said, "We can't find no
4  birds." And I might be talking to Willie
5  Mack or I might have told Russ, some of
6  them, that the birds be there because a lot
7  of times after we done hunted through that
8  area, I might ride on the bottom hill or
9  something and I been flushed the birds up,
10  but they wouldn't know it.
11        Only thing I said, "If he was
12  to hunt the dogs a little harder in that
13  area, that he would find the birds." He
14  just always pushing through. You know,
15  everybody got different styles how to do
16  things.
17    Q.    Did you ever tell anybody that
18  you would not tell Mr. Norman where the
19  birds were?
20    A.    No.
21    Q.    Did you ever refuse to tell
22  Mr. Norman where you knew wild coveys were?
23    A.    No. He never -- If he ever

Page 118

1  asked me have I seen any, I would tell him
2  if I saw them.
3    Q.    You never told another
4  employee out at Mid State that you wouldn't
5  tell Mr. Norman where the wild coveys were?
6    A.    No. I have told him, "I have
7  passed by a lot of birds while we was
8  hunting, but once you go through that area,
9  ain't not going to turn back and come back
10  to them, you're going to keep going
11  straight." I've said that.
12    Q.    Would you ever criticize the
13  way Mr. Norman was handling the hunt in
14  front of customers and other employees?
15    A.    No.
16    Q.    Based on your experience in
17  working out at Sedgefields, when were the
18  horses put in the barn?
19    A.    Talking about when we start
20  hunting, before we start hunting?
21    Q.    Well, let me ask the question
22  a different way. Were the horses always
23  kept in the barn?

Page 119

1    A.    No.
2    Q.    Okay. When did you start
3  keeping them in the barn?
4    A.    I'm going to get -- Let me
5  understand what you're talking about first.
6    Q.    Okay.
7    A.    You saying -- Okay. You know,
8  you let them in and out every day.
9    Q.    I understand that. But during
10  the summertime, in the pasture --
11    A.    Oh, they be out in the
12  pasture. We may keep two or three up there
13  at the barn, you know, because Suzanne and
14  her husband, they like to come down and
15  ride. And we basically kept two or three
16  horses up at the barn at all times. The
17  rest of them be out in the pastures.
18    Q.    Okay. And so, at some time
19  during the year, you would take them out of
20  the pasture and keep them in the barn;
21  right?
22    A.    Yeah. When hunting season
23  about to start, they'll come up and they'll

Page 120

1  get them in and shear them up and put shoes
2  on them and stuff like that.
3    Q.    Okay. So, that would be
4  September?
5    A.    September, yeah, last of
6  September, something like that.
7    Q.    And then, when would you --
8    A.    Maybe October. Week or two,
9  couple weeks before hunting season.
10    Q.    Okay. So -- And then when
11  would you let them back out in the fields?
12    A.    After hunting season over.
13    Q.    When is the hunting season
14  over?
15    A.    If I'm not mistaken, I think
16  wild bird season goes out in the last of
17  February. But you could put birds out until
18  the end of March, if they haven't changed
19  it.
20    Q.    Okay. And so, when would
21  y'all put the horses out to pasture?
22    A.    After March.
23    Q.    Okay. So, from September to

30 (Pages 117 to 120)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 121

1  October -- September or October through
2  March, you'd keep the horses in the barn?
3      A.    Right.
4      Q.    And I think what you're
5  saying, also, is that throughout the year,
6  you'd keep one or two horses in the barn for
7  the Broadheads to ride; is that right?
8      A.    Well, they don't basically be
9  in the barn, they'd be out in the pasture.
10  But in case they wanted to ride, they would
11  be there for them and we could let them in
12  the barn.
13     Q.    Oh, okay.
14     A.    You might have fed them, you
15  know, once or twice a week, something like
16  that.
17     Q.    Okay.  And part of your
18  duties, in working on the quail team, was to
19  take care of those horses, wasn't it?
20     A.    Right.
21     Q.    Okay.  And then you'd go out
22  on a hunt when there was a quail hunt;
23  correct?

Page 122

1      A.    Right.
2      Q.    And you would prepare the
3  fields; correct?
4      A.    Right.
5      Q.    Now, was preparing the fields,
6  did you do that all the way through the
7  hunting season?
8      A.    Yeah, we were -- we -- All the
9  way through.
10     Q.    Okay.  And when the horses are
11  out in the field, you don't have to clean
12  the barn as much; correct?
13     A.    What you mean, like, in the
14  summertime?
15     Q.    Yes, sir.
16     A.    We don't have to clean them at
17  all because we didn't even feed them on the
18  inside in the summertime.  They've got a big
19  trough out there.  There's only three horses
20  out there.  Just take it and fill it all the
21  way down where they don't be bumping into
22  each other.  You didn't have to clean it in
23  the summertime.

Page 123

1      Q.    Okay.  How many horses were
2  out at Sedgefields when you were working
3  there the last time?  And I'll add mules to
4  that, too.
5      A.    Okay.  I think it was eight
6  horses and two mules, if I'm not mistaken.
7      Q.    Okay.
8      A.    I think that's the way it was.
9  Eight or nine horses, I think it was eight,
10  and two mules.
11     Q.    You were telling me when we
12  came back from the break that you felt like
13  you were discriminated against because of
14  your race because by the end of your
15  employment, you felt like all you were doing
16  was shoveling manure; is that right?
17     A.    Yeah.
18     Q.    Okay.  What was -- I mean,
19  someone had to clean the barn, did they not?
20     A.    Yeah.  But I say it like this.
21  He just did things a little different.
22  Before he came, you know, during the hunting
23  season or whatever, we didn't put shavings,

Page 124

1  they would be putting shavings in there in
2  the stalls on the concrete.
3          The way we did it, it was just
4  naked concrete there.  And once they leave
5  out, we let them out in the morning time, we
6  cleaned up every stall.  Every morning,
7  whatever waste they had in there from that
8  night, we cleaned it out.
9          And, see, with the shavings in
10  there, it's that high (indicating).  And
11  it's urine and, you know, the other, too, is
12  in it.
13     Q.    Yeah.
14     A.    And it's just -- The shaving,
15  he got it like that thick (indicating), and
16  it's like ten or twelve stalls, whatever it
17  was we had to clean out.  Because sometimes
18  he changed one horse from one stall to the
19  other.
20     Q.    So, with the shavings, there
21  was more work?
22     A.    A lot more.
23     Q.    Okay.  When you came to work

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1　in March of 2005, were the horses already
2　out to pasture?
3　　A.　No.
4　　Q.　Okay. There was just a bare,
5　concrete floor in the barn?
6　　A.　Yes.
7　　Q.　And did you have to clean out
8　the barn then?
9　　A.　(Witness nods head in the
10　affirmative.)
11　　Q.　Okay.
12　　　MR. ROBERSON: You have to
13　answer out.
14　　A.　Yes, sir. Like I said, it was
15　so much easier, you could take one scoop to
16　each stall and you're finished with it. But
17　the way he had it, it would take you
18　thirty-five or forty minutes to clean one
19　stall.
20　　Q.　Okay. And when you first
21　started back at Sedgefields in March of
22　2005, who helped you clean the stalls then?
23　　A.　Well, all of us did it.

Page 126

1　　Q.　Who is all of us?
2　　A.　Demetrius, Willie Mack, me and
3　Roy. Where most of the time, it would be
4　Demetrius, Willie and me. We go -- Okay.
5　There's one side we had down so far where
6　the water was, and all you got to do is just
7　shovel it out the window. And the other
8　side, where the mules was, we had a
9　wheelbarrow and dump it in. And I'm telling
10　you, it would take maybe fifteen minutes to
11　do the whole thing where we had it just
12　naked concrete.
13　　Q.　All right. And then when you
14　put the horses back in the stall in the fall
15　of 2005, who helped clean out the stalls?
16　　A.　Mostly it was just me and
17　Jeff, and sometimes Willie Mack would help
18　us.
19　　Q.　Okay.
20　　A.　When he wasn't working down at
21　the lodge.
22　　Q.　Okay. Were there any white
23　employees during that time that you think

Page 127

1　should have been helping you?
2　　A.　No. There wasn't none.
3　　Q.　All right. Is shoveling
4　manure the only -- Let me strike that and
5　start over again.
6　　I asked you, and I hate to
7　keep on repeating it, but I want to make
8　sure the Record is clear. I asked you
9　earlier, "Tell me everything that serves as
10　the basis of your complaint that you were
11　discriminated against because of your race."
12　You told me about the pay, and I think we've
13　gone over all of that. Is there anything
14　you'd you want to add about pay?
15　　A.　Yeah. More money, I wanted
16　more money.
17　　Q.　Okay. Anything other than
18　that?
19　　A.　Huh-uh.
20　　Q.　Okay. Things that Joel would
21　say. And then a third category, which I've
22　listed as terms and conditions of
23　employment, and you told me about you felt

Page 128

1　like you were having to shovel manure all
2　the time.
3　　Is there anything else, other
4　than the tips, that you believe serves as a
5　basis for your belief that you were
6　discriminated against because of your race?
7　　A.　Yeah. Couple more. Like I
8　use, for instance, he said -- Okay. Like
9　around here, homecoming, it's a tradition.
10　You know, they mostly close down everything
11　in town that day whenever homecoming is
12　here in Bullock County.
13　　Q.　Let me stop you. Are you
14　talking about high school homecoming?
15　　A.　Right. And David had told all
16　of us we could get off at twelve o'clock.
17　　Q.　Okay.
18　　A.　And Joel raise so much sin
19　about, "We need to be working, we need to be
20　working." Which we wasn't behind on
21　nothing. We needed to be working. So we
22　worked on -- We told him that we would work
23　on until two o'clock. And he told us that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 129

1  if we couldn't work all day, he's going to
2  get him some white boys and Mexicans to do
3  the job if we don't want to do it.
4      Q.    How many times did he make
5  that statement?
6      A.    I only heard him say it that
7  one time, about he go get him some white
8  boys and Mexicans.
9      Q.    Okay.  And who heard that
10  statement, to your knowledge?
11      A.    Me and Jeffrey Harris.
12      Q.    All right.  Did you complain
13  to anybody about Mr. Norman making that
14  statement?
15      A.    I told Roy, and I told --
16  Well, they was all sitting around together,
17  Roy, Henry and Demetrius, I told them what
18  he had said.
19      Q.    And what did Roy say?
20      A.    Nothing.  Just laughed and
21  shook his head.
22      Q.    Did you try to tell
23  Mr. Carroll or anyone else at Mid State

Page 130

1  about this statement?
2      A.    At one time I probably could
3  have went to David and talked to him about
4  it.  But after Joel changed, yeah, he
5  changed too.
6      Q.    How did Mr. Carroll change?
7      A.    From a good guy to a devil.
8      Q.    Okay.  Did Mr. Carroll do
9  anything that would lead you to believe that
10  he was discriminating against you on the
11  basis of your race?
12      A.    No.  He wouldn't ever do
13  anything like that.  Just Joel, when he went
14  against him, he did whatever he would want
15  him to do.  Because before Joel got there,
16  he was a nice guy.  You could go to him and
17  talk to him about anything.
18      Q.    Do you have any knowledge of
19  any conversations or communications between
20  Mr. Norman and Mr. Carroll?
21      A.    No more than he was my
22  supervisor and Joel -- Mr. David was the
23  plantation manager.

Page 131

1      Q.    But you don't have any
2  knowledge of any specific conversation
3  between Mr. Norman and Mr. Carroll, with
4  regards to the treatment of you?
5      A.    No.
6      Q.    Okay.  All right.  Then,
7  again, I'm going back.  I'm just trying to
8  make sure I've got it right for the Record.
9  I asked you to tell me everything that
10  serves as a basis for your belief that you
11  were discriminated against because of your
12  race while you worked for Mid State.  You
13  told me about pay.  You told me about things
14  that Joel would say.  Now, have you told me
15  everything that Joel would say that serves
16  as the basis of your complaint?
17      A.    I tried to.
18      Q.    Is that yes?
19      A.    Yes.
20      Q.    Then we talked about terms and
21  conditions of employment, and you said you
22  had to shovel a lot of manure.
23      A.    Right.

Page 132

1      Q.    Is there anything else about
2  the terms and conditions of your employment
3  that would lead you to believe that you were
4  discriminated against because of your race?
5      A.    No.  I told you everything.
6      Q.    Okay.  The last thing I have
7  is tip money.
8      A.    Right.
9      Q.    I think you said they kept the
10  tip money.
11      A.    Right.
12      Q.    Who is they?
13      A.    Joel and David.
14      Q.    Okay.  Is it your allegation
15  that when a customer would come and give tip
16  money to Joel or David after a hunt, that
17  they would keep it and not give it to the
18  employees?
19      A.    He gave us some twice.
20      Q.    Okay.
21      A.    And only reason why then
22  because we kept on complaining.  And I got
23  fired that same day that I complained about

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

1 it. Which he -- I remember at one time,
2 after a hunt, this guy had told us, I think
3 his name was Calloway or whatever it was, he
4 told us he left us a hundred and fifty
5 dollars apiece, and we didn't get not one
6 dime of it. And we worked --
7     Q.    How did you know that -- Is it
8 Mr. Calloway?
9     A.    Yes, sir. I think that was
10 his name.
11     Q.    How do you know Mr. Calloway
12 left that kind of money for tips?
13     A.    He told us.
14     Q.    When did he tell you?
15     A.    Right before -- When they was
16 going in for that day -- because they was
17 there for two days. When they was going in
18 that afternoon -- Well, he left at lunchtime
19 and he said, "I'm going to leave y'all a
20 hundred and fifty dollar tip."
21     Q.    And when was this, do you
22 recall?
23     A.    That was -- I don't know

1     A.    Yeah. Because they told us if
2 we asked about it or said anything about it,
3 we would be fired.
4     Q.    Okay. And that memo went out
5 to all employees?
6     A.    Right.
7     Q.    Okay.
8     A.    It give him the right to take
9 it as much as he want to if you can't say
10 nothing about it.
11     Q.    Okay. Do you know if
12 Mr. Norman, Mr. Carroll, or anyone at
13 Sedgefields took in some tip money, gave it
14 to some white employees but didn't give it
15 to any black employees?
16     A.    I don't -- I don't know that.
17     Q.    Okay. All right. Now, have
18 you told me now everything, because this is
19 -- This will most likely be the last and
20 only opportunity I get to ask you questions
21 in this case. Have you told me everything
22 that serves as the basis for your belief
23 that you were discriminated against because

1 whether it was the first, second, third. I
2 can't remember what hunt it was.
3     Q.    Well, we know the first hunt
4 was in, I think, October 14, 2005.
5     A.    I can't remember what hunt it
6 was.
7     Q.    Okay. Do you recall when the
8 last hunt was before you were fired?
9     A.    Maybe a day or two before I
10 was fired.
11     Q.    Okay. Was -- Mr. Calloway we
12 know wasn't the first hunt, was he?
13     A.    No.
14     Q.    He wasn't the last hunt, was
15 he?
16     A.    No.
17     Q.    Okay. Was he near the end or
18 near the first?
19     A.    Near the first.
20     Q.    Okay. All right. Anything
21 else about tip money that you believe serves
22 as the basis for your claim that you were
23 discriminated against because of your race?

1 of your race?
2     A.    Yes, sir.
3         MR. DUKES: This is probably a
4 good stopping point to go to lunch.
5         (Recess taken.)
6         (Defendant's Exhibit 3 was
7         marked for identification
8         purposes.)
9     Q.    I'm going to show you,
10 Mr. Foster, a document that I will identify
11 as Defendant's Exhibit 3. And it contains
12 some of the same documents that were in
13 Defendant's Exhibit 1, but it's Defendant's
14 Production Numbers 1 through 56. And I'll
15 represent to you it's a personnel file for
16 you.
17         And I'm going to ask you some
18 questions about some of the documents
19 contained in your personnel file. First, if
20 I can direct your attention to document
21 number -- starting at document number 37,
22 you'll see at the bottom, right-hand corner
23 of the page, there are document numbers. So

# FREEDOM COURT REPORTING

Page 137

```
1   if you could turn to document number 37, and
2   look through 37, 38, 39, and 40.
3           Do document numbers 37 through
4   40, do they represent your application for
5   employment with Mid State back in 1999?
6       A.   Okay.
7           MR. ROBERSON:  Is that your
8   application?
9           THE WITNESS:  Yeah.
10      Q.   And whose handwriting -- Am I
11  correct to say that document numbers 37
12  through 40 are your application -- together,
13  comprise of your application -- Let me start
14  over again.
15          Documents number 37 through
16  40, is that your first application for
17  employment with Mid State?
18      A.   No.  It should have been
19  another one when they changed over in --
20  like I said, it should have been '97, '98,
21  somewhere around there.  I remember doing
22  this one (indicating).
23      Q.   Do you recall filling out this
```

Page 138

```
1   application in 1999?
2       A.   Yes.  Yes, sir.
3       Q.   Okay.  And is everything true
4   and correct, to the best of your knowledge,
5   on this application?
6       A.   Except for a couple of things.
7       Q.   Okay.  What's wrong?
8           MR. ROBERSON:  That one does
9   say '85 there.
10      A.   Where it says, "Have you ever
11  been fired from a job?"  I put no, I should
12  have put yes.
13      Q.   Okay.  And what about, "Have
14  you ever been convicted of a crime?"
15      A.   I should have put yes.
16      Q.   Okay.  And you didn't list all
17  your employers either, did you, on this
18  application?
19      A.   No.
20      Q.   I'm sorry, did you say no?
21      A.   Yeah.
22      Q.   Okay.  And is that your
23  signature there on page number 40?
```

Page 139

```
1       A.   Yes.
2       Q.   And whose handwriting is it
3   on --
4       A.   My girlfriend's.
5       Q.   The same one who --
6       A.   No.
7       Q.   Different girlfriend?
8       A.   Yeah.
9       Q.   Okay.  Anything else incorrect
10  on this application, which is represented by
11  document numbers 37 through 40?
12      A.   Yeah.  It's basically right.
13      Q.   While I'm thinking about it,
14  I've got that you were arrested back in 1989
15  for assault, first degree, do you know what
16  that was regarding?
17      A.   It's third degree.
18      Q.   Well, I've got assault with
19  third degree as well.
20      A.   That's the same -- It's got to
21  be the same case, where they dropped it from
22  the first to third.
23      Q.   Okay.  What happened to the
```

Page 140

```
1   guy that you assaulted?
2       A.   What you mean, what happened?
3       Q.   Was he -- Did he have to go to
4   the hospital?
5       A.   Yeah.
6       Q.   What kind of injuries did he
7   sustain?
8       A.   A broken jaw bone.
9       Q.   Okay.  I've got you were
10  arrested for disorderly conduct in 2001; is
11  that right?
12      A.   Yeah.
13      Q.   Tell me about that arrest.
14  What was that for?
15      A.   Me and my girlfriend got to
16  arguing.
17      Q.   Okay.  I've got in 1998 you
18  were arrested for giving a false name to a
19  law enforcement official; is that correct?
20      A.   Yeah.
21      Q.   What name did you give them?
22      A.   Norris Jordan.
23      Q.   Okay.  Is that about the time
```

35 (Pages 137 to 140)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 141

1  you found out that you should have been --
2  you thought your name was Norris Foster the
3  whole time?
4      A.    Yeah.  Well, I was trying to
5  get out of going to jail that night because
6  I had some previous tickets.  I knew if I'd
7  have said Norris Foster, I was going to
8  jail.  So I gave him my father's last name.
9      Q.    Norris Jordan?
10     A.    Yeah.
11     Q.    Okay.  I've got being arrested
12  for burglary in the second degree back in
13  1998 what was that about?
14     A.    Wasn't no burglary.  Me and my
15  girlfriend had got to arguing and I kicked
16  my own door in and she called the police on
17  me.
18     Q.    Okay.
19     A.    The charges were dropped.
20     Q.    Does that have to do with the
21  assault and --
22     A.    All that.
23     Q.    I've got assault in the third

Page 142

1  degree in 1998, was that a fight with your
2  girlfriend?
3      A.    The same thing.
4      Q.    All right.  Disorderly conduct
5  in 1998, is that related to a fight you had
6  with your girlfriend, too?
7      A.    You said another year before
8  you said that one.
9      Q.    Yeah.  I've got that you've
10  got a disorderly conduct in 2001, and I
11  think you said that was a fight with your
12  girlfriend.  Then I also show a disorderly
13  conduct in 1998.
14         MR. ROBERSON:  Arrested, not a
15  conviction?
16         MR. DUKES:  To be honest with
17  you, I don't know.  I'm going to have to
18  find out.
19         MR. ROBERSON:  Okay.
20     A.    I just told you, me and my
21  girlfriend got to arguing.
22     Q.    Okay.  And then in 2005, I
23  have an arrest for domestic violence, third

Page 143

1  degree assault.
2      A.    I never been arrested for
3  that.  I wasn't arrested at that -- He came
4  and talked to me about it.  The charges were
5  dropped.  Me and my girlfriend, like you,
6  I'd be out cheating, and they get mad and
7  call the police and tell them a lie.
8      Q.    Okay.  Is that the same thing
9  with reckless endangerment in 2005?
10     A.    Same thing.  All the charges
11  were dropped because once they get
12  satisfied, they go and drop the charges.
13     Q.    Have you ever had any charges
14  brought against you or any lawsuit brought
15  against you with not paying child support?
16     A.    Yes, I pay child support.
17     Q.    Have you ever had any charges
18  brought against you for failing to pay your
19  child support?
20     A.    No.  Because they always take
21  -- If I go to work, they take it out of my
22  checks.
23     Q.    Okay.  Any other arrests that

Page 144

1  I didn't go over?
2      A.    No, sir.
3      Q.    Why don't you have a driver's
4  license?
5      A.    Well, when I was -- When I
6  went to Germany, my license got expired.
7  When I came back home, I just never went
8  back and got them.  David lent me the money
9  to go and get them reinstated.  Ain't
10  nothing but I just have been too lazy to go
11  and get them.  Not that I can't, because I
12  don't have no tickets or nothing.
13     Q.    When is the last time you've
14  had a driver's -- a valid driver's license?
15     A.    In the '80s, sometime, '83,
16  '84, somewhere like that.
17     Q.    How much money did Mr. Carroll
18  loan you to get a driver's license?
19     A.    A hundred and fifty dollars.
20     Q.    Did you ever pay him back that
21  money?
22     A.    No.
23     Q.    Has Mr. Carroll ever loaned

# FREEDOM COURT REPORTING

Page 145

1  you any other money?
2       A.   Not to my knowledge.  That was
3  it.
4       Q.   Have you ever, from time to
5  time, asked him for twenty dollars or saying
6  you need a little cash, you're short, and
7  Mr. Carroll gave you money?
8       A.   Yeah.  I did ask him, you're
9  right, it was twice.  I got twenty dollars
10  from him one time and a hundred fifty
11  dollars one time.
12       Q.   Any other times that you asked
13  for money and he gave you money?
14       A.   Nope.
15       Q.   Did you ever give him any of
16  that money back?
17       A.   Nothing but the twenty.
18       Q.   You did give him twenty
19  dollars back?
20       A.   That's it.
21            (Off-the-Record discussion
22              was held.)
23       Q.   Sedgefields Plantation is a

Page 146

1  pretty big place, isn't it?
2       A.   Right.
3       Q.   Sometimes you have to get on
4  public roads to go from one place to the
5  other place; is that right?
6       A.   Right.
7       Q.   Because you didn't have a
8  driver's license, did employees sometimes
9  have to drive you to one place or another
10  place?
11       A.   Yeah, they have.
12       Q.   Okay.  Back in the first time
13  that you worked for Mid State, do you recall
14  doing some plumbing work on the barn?
15       A.   Yes, sir.
16       Q.   Okay.  Did you represent to
17  the folks at Mid State that you had
18  completed that plumbing work, when you
19  actually had not?
20       A.   I wasn't doing the plumbing
21  work, Roy and another guy was doing it.
22       Q.   Okay.  Did you tell Roy that
23  you had finished the plumbing work?

Page 147

1       A.   Tell Roy?  He the one that was
2  doing it, him and -- Who was that?  I think
3  a guy named Kevin.
4       Q.   Okay.  So, if Roy says that
5  you were the one supposed to be helping with
6  the plumbing work, and you said that you had
7  done it and hadn't, he just wouldn't be
8  telling the truth?
9       A.   Repeat that again.
10            MR. DUKES:  Can you repeat
11  that?
12            (Requested portion of the
13              Record was read by the
14              Reporter.)
15       A.   Yeah, yeah.
16       Q.   Okay.
17       A.   Because I wasn't the one doing
18  it.  Him and Kevin was the one doing it.  I
19  was working down at the kennel, doing
20  something else.
21       Q.   What were you doing?
22       A.   I had left them in charge -- I
23  had left them to do that.

Page 148

1       Q.   Did you ever get reprimanded
2  or counseled about not clocking out when you
3  were supposed to, or, you know, having
4  someone else clock out for you?  Do you know
5  what I mean by that?
6       A.   Yeah.  I'm talking about when
7  you talking about?
8       Q.   When you worked at Mid State
9  at any time.
10       A.   No.
11       Q.   Okay.
12       A.   Well, they said something to
13  all of us about it.  Just say all three of
14  us was sitting here, and it's time to go
15  back to work, one person would go back and
16  clock all of us in and then we go to work.
17       Q.   Okay.  Did anyone ever accuse
18  you of stealing any dog food during the
19  first time you worked at Mid State?
20       A.   Not to my knowledge.
21       Q.   Have you ever heard of that
22  allegation, that you stole some dog food?
23       A.   After I went back to work the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 149

1  second time, Roy mentioned, said that --
2  mentioned it to me.
3      Q.    What did Roy tell you?
4      A.    He said -- Asked me did I know
5  what they had on my record when I got --
6  when I left there? I told him no. He said
7  that Hunter McDuffie had put on there, I had
8  stole some birds that we had. He never said
9  nothing about no dog food.
10     Q.    Okay. You don't know anything
11 about stealing dog food?
12     A.    No.
13     Q.    What about stealing -- Did you
14 ever steal any dog food from Mid State?
15     A.    Nope.
16     Q.    What about traps, did you
17 steal any traps from Mid State that first
18 time you were employed there?
19     A.    No.
20     Q.    Have you ever heard anybody
21 say anything about you stealing traps?
22     A.    Nope.
23            (Off-the-Record discussion

Page 150

1            was held.)
2      Q.    Do you know any other
3  employees at Mid State that didn't have a
4  valid driver's license?
5      A.    No, I don't.
6      Q.    Were you ever reprimanded
7  about complaining about where your paycheck
8  was?
9      A.    Yes.
10     Q.    Okay. When did that occur?
11     A.    When we got our first check,
12 when -- when Joel started working there.
13 Normally, Roy would always have our checks
14 and he just put them in the mail, where I
15 would clock in and out. And we would always
16 get them on a Thursday.
17            And when he started working
18 there, that first time we got a paycheck,
19 and he took them with him back off in the
20 woods, where he was at back there riding or
21 whatever.
22            And we called him -- Because
23 everybody fixing to knock off, and we called

Page 151

1  him and asked him where our check was, and
2  he said he didn't have to give them to us
3  until that Friday, but David told him to
4  give them to us.
5      Q.    But David said -- Did you
6  complain to David about it?
7      A.    No, I complained to him about
8  it, Joel.
9      Q.    And Joel said what?
10     A.    That we -- The check was dated
11 for that Friday, and that's when we supposed
12 to been got them.
13     Q.    Right. And you said something
14 about David said you were supposed to get
15 them. Who told you that?
16     A.    I didn't say David said we was
17 supposed to get them, if I did I was
18 mistaken. I said, "David told him to give
19 us our checks."
20     Q.    Okay. Well, how did David
21 know to tell him that if no one complained
22 about it?
23     A.    Because I called him and asked

Page 152

1  him.
2      Q.    What did you ask David?
3      A.    I asked him, "Where was Joel,
4  and we needed our checks."
5      Q.    Okay. And to your knowledge,
6  David told Joel to go ahead and give them to
7  you a day early?
8      A.    We always got them on that
9  Thursday. Yes, he did tell him to give them
10 to us, yes.
11     Q.    Okay. Did you ever -- Did
12 anyone ever complain about the way that you
13 were chopping on the fields?
14     A.    Well, Joel would say
15 something, no matter what I did, he always
16 going to have -- It wasn't going to be right
17 unless he was doing it.
18     Q.    When you were chopping the
19 fields, did you ever scrape any of the
20 trees?
21     A.    No.
22     Q.    Never scraped a tree when you
23 were chopping the field?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1    A.    I been doing it a long time.
2  He know who was doing it, Jeff.
3    Q.    You're saying it wasn't you
4  that was scraping the trees, it was Jeff
5  Harris?
6    A.    Yeah.  That's who he went and
7  complained to with David.
8    Q.    Did you -- Did anybody ever
9  complain about the fact that you were told
10  to chop a field and then you didn't complete
11  chopping the whole field?
12    A.    That's a real big place.
13  What's your name?
14    Q.    My name is Carter Dukes.
15    A.    Mr. Carter, that's a real big
16  place.  Ain't nobody perfect.  Ain't no way
17  in the world you going to go over that whole
18  place and not miss a spot somewhere.
19    Q.    Did anybody complain about you
20  missing a spot?
21    A.    Joel said something to me
22  about a couple of spots I had missed, but it
23  was so far down up under the hill until I

Page 154

1  didn't bother because it was such a strain
2  on the tractor, pulling it back up the hill.
3    Q.    Do you know whether
4  Mr. Carroll ever looked over the work that
5  you had done chopping the fields?
6    A.    He always would come through
7  riding, never stopped or said anything.
8    Q.    It was customary for
9  Mr. Carroll to sort of check on how you were
10  doing, check on your work?
11    A.    I guess so, yeah.
12    Q.    Well, I mean, don't guess so.
13  But, I mean, would you often see Mr. Carroll
14  out looking --
15    A.    Not often.
16    Q.    Well, from time to time?
17    A.    From time to time, I would see
18  him.  According to where you was working, if
19  it was somewhere close by a road where we
20  was working at, every now and then I would
21  see him.  When you down on a bottom
22  somewhere, no, I didn't see him.
23    Q.    From time to time, though, you

Page 155

1  would observe Mr. Carroll checking up on
2  your work?
3    A.    Right.
4    Q.    Okay.  Did Mr. Norman teach
5  Mr. Mack how to drive a tractor?
6    A.    Who?
7    Q.    B.B., did he teach B.B. how to
8  drive a tractor?
9    A.    I taught him how.  I showed
10  him the basics on how to drive it.  And
11  after he took me off my tractor and he put
12  me on a different tractor chopping, he
13  showed him, you know, basic fundamentals,
14  same things that I had showed him.
15    Q.    Okay.  And did you ever
16  complain to anybody about the fact that Mack
17  was getting to drive the tractor?
18    A.    I said it to him, to B.B.
19    Q.    What did you say to B.B.?
20    A.    I told him, "You got it made."
21    Q.    Okay.  I think I've asked you
22  this question.  I apologize for asking it
23  again.  Did you ever complain about the way

Page 156

1  that Mr. Norman was conducting the quail
2  hunts?
3    A.    Nope.  I told you that one
4  time, the only thing -- I didn't say it to
5  him, I said it to Jeff and said it to Willie
6  Mack, that if he was to let the dogs hunt,
7  the area where we was hunting at, he would
8  find some birds.  I said it to them, not to
9  him.
10    Q.    So, you said it to
11  coemployees?
12    A.    Right.
13    Q.    Didn't say it to Mr. Norman?
14    A.    Never.
15    Q.    Did you ever say it within
16  earshot of any customers?
17    A.    No.  Because I mostly be
18  riding off from them because I'm scouting
19  dogs, keeping my eyes on them.
20    Q.    Mr. Carroll was on some of
21  those hunts, was he not, when you would have
22  explained about the way that Mr. Norman was
23  conducting the hunt?

39  (Pages 153 to 156)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

1    A.    He might have been. I can't
2  recall. I don't know.
3    Q.    Okay. We talked earlier about
4  a memo that Mr. Carroll sent out about tips.
5    A.    Right.
6    Q.    Do you recall -- I'm not
7  testing your memory. Do you recall
8  generally what that memo said about tips?
9    A.    Basically, that if they didn't
10  walk up to us and give it to us in our hand,
11  if they left a tip with them, within two or
12  three days, they would give it to us.
13        And if we complained about it,
14  we would be terminated and either they'll
15  stop the tipping, period. Something similar
16  to that.
17    Q.    Did anyone ever talk to you or
18  with you about you asking or suggesting to
19  customers that they give you a tip?
20    A.    Say that again.
21    Q.    Did anyone ever talk with you
22  about the fact that you were asking
23  customers or suggesting to customers that

1  they tip you?
2    A.    No. I said -- I said it to
3  the clients myself, that if they had
4  something to give me, give it to me in my
5  hand, because if they didn't, I wasn't going
6  to get it.
7    Q.    Okay. And you said that to
8  the customers?
9    A.    Yes. I said it to a couple of
10  clients.
11    Q.    Okay. And that would have
12  been in violation of that policy, would it
13  not have?
14    A.    What you mean?
15    Q.    If you said that to a
16  customer, you would have been violating this
17  tip policy, which is document number 22?
18        MR. ROBERSON: I'm going to
19  object to that. I don't think it violates
20  it. I object to the form. I think that
21  mischaracterizes the policy.
22        MR. DUKES: Okay.
23    A.    We weren't standing around

1  waiting on no tip. When I said that to
2  them, we would be out in the field hunting
3  or something.
4    Q.    Okay.
5    A.    We couldn't have been standing
6  around waiting on no customers, because by
7  the time we got back to the barn, they would
8  already be gone.
9    Q.    Okay. And you did that after
10  that policy was published?
11    A.    I don't remember.
12    Q.    Okay. What about -- Did
13  anybody ever complain about the way you
14  treated the equipment at Sedgefields?
15    A.    No.
16    Q.    Did you blow up the engine of
17  a tractor at Sedgefields?
18    A.    No.
19    Q.    You didn't operate a tractor
20  after it was running hot and blowed the
21  engine?
22    A.    No.
23    Q.    Did you use any heavy

1  equipment at C&W?
2    A.    No.
3    Q.    Did you ever ask, after a
4  hunt, ask Mr. Norman or Mr. Carroll for tip
5  money?
6    A.    I asked them the time when
7  Mr. Calloway was there, when he specifically
8  told us he had left us some money. I asked
9  that time. That was the only time.
10    Q.    Okay. Could that be
11  Mr. Hardaway?
12    A.    Hardaway. That's his name.
13  Mr. Hardaway.
14    Q.    All right. And you never made
15  any gesture with your hands, sort of like
16  rubbing your thumb and your first finger
17  together in front of Mr. Norman or
18  Mr. Carroll, suggesting you wanted your tip
19  money?
20    A.    Nope.
21    Q.    Did you ever call Mr. Carroll
22  or Mr. Norman at home asking about your tip
23  money?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1    A.    No. I called Mr. Carroll one
2  time, like I told you that once before, I
3  called him when Mr. Hardaway had left us
4  that money and I asked about it, and he told
5  us it would be on our check and it never
6  was.
7    Q.    Okay. Did you ever use the
8  "N" word at Sedgefields? Do you know what I
9  mean by that?
10   A.    Yeah.
11   Q.    Did you ever use that?
12   A.    Man, you know, when black guys
13 sitting around talking, we always did.
14 That's a common thing.
15   Q.    Anybody ever complain about
16 you not completing an assigned task in a
17 timely fashion?
18   A.    No more than that day that I
19 was fired.
20   Q.    Any time prior to the day that
21 you were fired?
22   A.    Nope.
23   Q.    Did you ever smoke marijuana

Page 162

1  while you were working at Sedgefields?
2    A.    I smoke marijuana, but not at
3  Sedgefields. I smoked it when I was off
4  work.
5    Q.    Okay. Do you still smoke
6  marijuana?
7    A.    Yeah.
8    Q.    Are you under the influence of
9  marijuana right now, as we speak?
10   A.    No, I'm not.
11   Q.    Okay. What about cocaine?
12   A.    No, I don't smoke or snort no
13 cocaine.
14   Q.    Even crack cocaine, talking
15 about powder or crack?
16   A.    I don't do neither one of
17 them.
18   Q.    Do you think you were a team
19 player during the time you were working at
20 Sedgefields?
21   A.    I always have been, because
22 the guys that I was working with, they --
23 neither one of them even really knew what

Page 163

1  was going on because they -- I was -- I was
2  basically showing them what to do. They was
3  following my lead.
4    Q.    Tell me about the day that
5  your employment was terminated. What
6  happened? If you can just sort of take me
7  through step by step.
8    A.    That morning, we got to work,
9  it was raining. And Joel told us -- Me and
10 Jeff started cleaning the stalls out. And
11 him and two young white guys, they was over
12 in the barn working on a Bush Hog, well,
13 it's a tree cutter.
14        And we had been -- did what he
15 told us. Like I said, it's about twelve,
16 thirteen stalls, and it's going to take
17 anywhere from thirty-five to forty minutes,
18 fifty minutes to clean out one stall.
19        And we had cleaned all of them
20 out. And maybe it was around about maybe
21 one or two, two-thirty, something like that.
22 They had put back together a tree cutter.
23 And me and Roy had worked on that same

Page 164

1  cutter before. And I knew if you didn't set
2  it level, both sides, when he make a turn,
3  it was going to do the same thing and tear
4  right back up.
5        I told Joel that. I said, "If
6  you don't put those two braces off of there,
7  as soon as you make the first turn it was
8  going to tear up." He told me he knew what
9  he was doing, you just keep working in the
10 barn.
11        So I went back out there and I
12 was standing right there in the barn door
13 when he went out there and start cutting
14 grass. As soon as he made that turn, it
15 tore up. And he drove back up on the hill,
16 I looked at him and started laughing, and
17 started back to work. I went back to work.
18   Q.    Did he see you laughing?
19   A.    Yeah, he saw me laughing.
20   Q.    Okay.
21   A.    And I went back to work. And
22 I went to dump a load of that shaving, Jeff
23 was in the barn. And as soon as I left to

# FREEDOM COURT REPORTING

Page 165

1  go dump that, he took Jeff away from the
2  barn. And maybe fifteen to twenty minutes
3  later, that's when him and David came up
4  there and fired me.
5      Q.    Okay. And David and Joel were
6  there together?
7      A.    Right.
8      Q.    Who did the speaking?
9      A.    Both of them was talking.
10     Q.    All right. Who spoke first,
11 if you recall?
12     A.    David.
13     Q.    What did David say?
14     A.    That I wasn't doing my job.
15 He wasn't satisfied with my work, but I been
16 working there all -- Like I told him, I been
17 working there all this time --
18     Q.    Okay. Wait a minute. Either
19 I'll let you talk about that or your
20 attorney will, but tell me exactly what
21 David told you right there at the --
22     A.    That he wasn't -- They wasn't
23 satisfied with my work and that would be my

Page 166

1  last day at work.
2      Q.    Okay. Is that the sum and
3  substance of what he told you?
4      A.    Yeah.
5      Q.    Okay. Then what did -- Who
6  spoke next?
7      A.    Joel said that, "Really, your
8  work ain't about nothing no way, we can get
9  by without you."
10     Q.    Okay. Is that the sum and
11 substance of what Joel said?
12     A.    Right.
13     Q.    Okay. What did you say?
14     A.    When I got -- After he had
15 fired me?
16     Q.    Well, did anybody say anything
17 -- Did David speak after Joel spoke?
18     A.    Yeah. I think when I -- When
19 I asked him what I'm being fired for.
20     Q.    Okay. So, after Joel said
21 that, you said, "What am I being fired for?"
22     A.    Right.
23     Q.    And then who spoke?

Page 167

1      A.    David. Well, they sit over
2  there -- Joel called David to the side, and
3  they talked, and then he came back and told
4  me what I was fired for.
5      Q.    Okay. What did David say?
6      A.    He said on October the 14th I
7  stole fourteen birds.
8      Q.    Okay. Did he say anything
9  else?
10     A.    I just started laughing and
11 walked out the door.
12     Q.    Okay. And you left?
13     A.    No, I didn't left -- Yeah, I
14 left, after I said a few more things.
15     Q.    Okay. What did you say?
16     A.    I told him that they were
17 firing me for nothing, for no reason, and he
18 know that I hadn't stole no birds. I told
19 him things like this, the way y'all doing,
20 they got lawyers for that. That's what I
21 said.
22     Q.    Okay. And then what did they
23 say?

Page 168

1      A.    Nothing.
2      Q.    And what did you do then?
3      A.    Got in my truck and left.
4      Q.    You were driving, even though
5  you don't have a driver's license?
6      A.    Yeah.
7      Q.    How did you get here today?
8      A.    With my attorneys.
9              (Off-the-Record discussion
10             was held.)
11     Q.    Have you told me the sum and
12 substance of conversations between you, Joel
13 Norman and David Carroll at the barn at the
14 time that your employment was terminated?
15     A.    Yeah. That's it, what
16 happened.
17     Q.    Okay.
18             MR. DUKES: I need to take a
19 break.
20             (Recess taken.)
21     Q.    All right. You left
22 Sedgefields on the day that Mr. Carroll
23 terminated your employment. Did you return

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660.**

## FREEDOM COURT REPORTING

Page 169

```
1    back to Sedgefields at any time thereafter?
2       A.    One time.
3       Q.    Okay.  And how soon after did
4    you return?
5       A.    I came and picked up my last
6    check.
7       Q.    Okay.  And who did you meet
8    with?
9       A.    Well, I went down to the
10   office, checks always come on Thursday.  And
11   I went to the office and asked the secretary
12   for my check and she wouldn't give it to me.
13   And about that time, David pulled up and I
14   told him and he went in and got my check.
15   And I haven't been back out there since
16   then.
17      Q.    Okay.  Did she say why she
18   wouldn't give you the check?
19      A.    She said we got paid on
20   Fridays now.
21      Q.    Okay.  Did she ask you to turn
22   in your keys before you could get the check?
23      A.    She got my keys the day I
```

Page 170

```
1    left.
2       Q.    Okay.
3       A.    Well, David did.
4       Q.    Did you say anything to the
5    secretary, when you were in there, about
6    suing Mid State or suing somebody?
7       A.    Nope.
8       Q.    Did you make any kind of
9    disparaging remarks about Sedgefields or any
10   of its employees with the secretary?
11      A.    You finished?
12      Q.    Yes, sir.
13      A.    Only thing that I said to her:
14   is, "I don't work here anymore.  I done got
15   fired for nothing.  Why won't you give me my
16   check?"  And I walked out of the office.
17   And that's when David pulled up and he went
18   in the office and got my check and I left.
19      Q.    Okay.  You know, I asked you
20   earlier in the deposition about what you
21   believe serves as the basis for your
22   complaint that you were discriminated
23   against because of your race.  Who witnessed
```

Page 171

```
1    any of the -- witnessed or observed any of
2    the incidences about which you complained?
3       A.    What I said -- Or what was
4    said?
5       Q.    What was said or what was
6    done, you know.  Who -- What witnesses do
7    you have or do you believe can support your
8    claims that you were discriminated against
9    on the basis of your race?  To put it
10   another way.
11      A.    Same two people that I worked
12   around, that was Jeff Harris and Willie
13   Mack.  And I think I said that four or five
14   times today.
15      Q.    Okay.  And I know you've
16   spoken with Jeff Harris about your claims;
17   right?
18      A.    Yeah.
19      Q.    All right.  When's the last
20   time you've spoken with Mr. Harris?
21      A.    I talk -- I see him all the
22   time.
23      Q.    Why do you see him all the
```

Page 172

```
1    time?
2       A.    We -- Well, by blood, we not
3    cousin, but my first cousin raised him from
4    a baby.  And I just say we are cousins
5    because his -- Well, that's just like his
6    father.
7       Q.    Okay.
8       A.    He's my first cousin.  And me
9    and my first cousin see each other all the
10   time and he be down to his dad's house.
11      Q.    Who is that first cousin that
12   you're referring to?
13      A.    His name is Robert Smith.
14      Q.    Where does he live?
15      A.    It's here in Bullock County,
16   but there's a little community called
17   Ponderosa.
18      Q.    Okay.
19      A.    If I come to town, any time,
20   most of the time I see him.
21      Q.    Okay.  What has Jeff Harris
22   told you about -- Does Jeff believe that he
23   was discriminated against on the basis of
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 173

1  his race?
2      A.    I don't know.
3      Q.    You just told Jeff that you
4  thought you were?
5      A.    Right.
6      Q.    What about Willie Mack, what
7  have you said -- What have you and Willie
8  Mack talked about?
9      A.    Nothing.
10     Q.    Have you told Willie Mack that
11 you felt like you were discriminated
12 against?
13     A.    Since I stopped working at
14 Sedgefields, I have not seen him.
15     Q.    Okay. Do you know if any of
16 your lawyers have spoken to any employees or
17 former employees of Mid State?
18     A.    I don't know.
19     Q.    Have you spoken to any --
20 Since you -- your employment was terminated,
21 other than Jeff Harris, have you spoken to
22 anyone who works -- who used to work for Mid
23 State?

Page 174

1      A.    Yeah. Because some of them --
2  Three of them are my neighbors.
3      Q.    Okay. Who was that?
4      A.    Roy Lee, Demetrius Parham and
5  Henry Tarver. All of us live, like, right
6  in a circle from each other.
7      Q.    Okay.
8      A.    I could walk to either one of
9  them house is five minutes.
10     Q.    Roy Lee, Demetrius Parham and
11 who else?
12     A.    Henry Tarver.
13     Q.    Okay. Why isn't Henry Tarver
14 still employed down at Sedgefields, if you
15 know?
16     A.    I don't know.
17     Q.    You haven't talked to him why
18 he's no longer working there?
19     A.    I never asked him.
20     Q.    Well, did he ever tell you?
21     A.    No.
22     Q.    Has anyone ever told you why
23 he's no longer working out at Sedgefields?

Page 175

1      A.    Nope.
2      MR. ROBERSON:  Sedgefields
3  sold the business, didn't they?
4      MR. DUKES:  Yeah. And, look,
5  I hope I'm not confusing anything.
6  Sedgefields is the -- and I've used it
7  different ways. Sedgefields is the
8  geographic location, in fact, it's a little
9  point on the map.
10     Q.    Mid State was your employer?
11     A.    Right.
12     Q.    And Mr. Tarver had an
13 opportunity to continue working with the new
14 people that now own Sedgefields, is that
15 correct, to your knowledge?
16     A.    I guess, yeah.
17     Q.    Okay. And do you know why he
18 is not working with the folks who now own
19 Sedgefields?
20     A.    I just answered that question,
21 no, I don't.
22     Q.    Okay. Have you talked to --
23 Since your termination, have you talked to

Page 176

1  Mr. Lee about your claims in this lawsuit?
2      A.    No, I haven't. I see them all
3  the time. Sometimes I go by his house, he
4  come by mine, we ride horses together. But
5  as far as this here, the conversation don't
6  come up.
7      Q.    Okay. Y'all don't talk about
8  it at all?
9      A.    Nope.
10     Q.    Same thing with Demetrius
11 Parham?
12     A.    That's right.
13     Q.    Is there anyone else, other
14 than Jeff Harris or Willie Mack, that may
15 have witnessed or observed any act or
16 comment that you believe was racist in
17 nature?
18     A.    No.
19     MR. ROBERSON:  Other than Joel
20 Norman and David Carroll? I mean, are you
21 including them? They would have witnessed
22 these, since they made them.
23     MR. DUKES:  Allegedly.

44  (Pages 173 to 176)

## FREEDOM COURT REPORTING

Page 177

1    Q.    I'll include those people.
2  Other than Joel Norman, David Carroll, Jeff
3  Harris and Willie Mack, is there anyone else
4  at Mid State who you believe may have
5  witnessed or observed any act or comment of
6  a racist nature?
7    A.    No.
8    Q.    What efforts have you made,
9  since December 28 or 29, 2005, to gain
10  employment?
11    A.    I went to several plantations
12  seeking work, but none of them was hiring.
13    Q.    Okay.  What plantations did
14  you go to?
15    A.    I went to Enon Plantation.  I
16  went to Sehoy Plantation.  I went to Panther
17  Creek Plantation.  I went to Cornerstone
18  Plantation.  I went to White Oak Plantation.
19  And I went to Southern Outdoors Plantation.
20  Those are basically the biggest plantations
21  that's in the county.  Well, White Oak
22  Plantation is in Macon County.
23    Q.    Okay.  Have you ever worked at

Page 178

1  Enon before?
2    A.    Just -- It wasn't what you
3  would say -- Well, I was working with them.
4  It was like during hunting season.  Just say
5  like from October to maybe March.  They was
6  paying me cash money because I wasn't on a
7  payroll.
8    Q.    What kind of work did you do
9  for Enon?
10    A.    Same thing I did at -- Helped
11  with the hunting, did a little Bush Hogging
12  -- well, not Bush Hogging, blocking -- some
13  people call it blocking off and some of them
14  say chopping.  Basically, it's the same
15  thing.
16    Q.    When did you do that work?
17    A.    Back in the '90s.  And then it
18  was -- It was during the time when I was
19  working at Sedgefields.  When I wasn't
20  working, I would go and help them work, you
21  know, like some days that we wasn't hunting
22  or wasn't doing nothing, and I'd get off and
23  go and help them.

Page 179

1  If I know I can go make me a
2  hundred dollars going helping them hunt, and
3  I wasn't going to make it at work, I'd tell
4  a lie to get off work and go and help them.
5    Q.    Okay.  Who did you talk to at
6  Enon about trying to get hired on there
7  after your employment was terminated by
8  Sedgefields, or by Mid State?
9    A.    I only talked to one somebody.
10  Well, I briefly talked to him because he was
11  in a hurry, and that was Cam -- Little Cam
12  Lanier, Junior.  He said -- All he said is
13  they wasn't hiring and he kept riding.
14    Q.    Little Cam?
15    A.    Yeah, Lanier.
16    Q.    Okay.  Let me make sure.  We
17  talked about it just a second ago.  And I
18  want to make sure we've got it right for the
19  Record.  I've used the term "Sedgefields,"
20  and I've also used the name "Mid State."
21  Have you understood who I was talking about
22  when I used those different names?
23    A.    Yes, I did.

Page 180

1    Q.    Okay.  And I don't know how
2  you pronounce this.  Sehoy.
3    A.    Sehoy.
4    Q.    Sehoy, S-E-H-O-Y.  And who did
5  you talk with at Sehoy?
6    A.    I didn't know the guy.  The
7  same man own both places.
8    Q.    Okay.  And did you complete an
9  application, or turn in an application?
10    A.    Said that they wasn't taking
11  no applications.
12    Q.    Okay.  So, when you talked to
13  Little Cam, you were really talking about
14  Enon and Sehoy?
15    A.    Yeah.  It's the one man --
16  It's two different places, but one man own
17  both places.
18    Q.    Okay.  I understand.  Panther
19  Creek.  Who did you talk with at Panther
20  Creek?
21    A.    I think he a Rutledge.  Frank
22  Rutledge, I think that was his name.
23    Q.    And what did you tell you?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 181

```
1       A.    He wasn't hiring.
2       Q.    What about Cornerstone?
3       A.    The guy that worked there, his
4  name is Mark.  I didn't go out to the place.
5  I saw him in town.  But I think he's the
6  plantation manager, I saw him in town.
7             MR. ROBERSON:  Griggs, Mark
8  Griggs?
9             THE WITNESS:  Mark Griggs.
10 Yeah.
11      A.    And he told me that he wasn't
12 doing any hiring.
13      Q.    What about White Oak?  Who did
14 you see at White Oak?
15      A.    I don't know those people.
16 I'm saying I don't know them.
17      Q.    Did you turn in an
18 application?
19      A.    No.  He told me if he give an
20 application out or you put an application
21 in, he would consider hiring you, or he said
22 that he was going to be hiring.
23      Q.    And so, did you turn in an
```

Page 182

```
1  application?
2       A.    No.
3       Q.    Why not?
4       A.    I just told you why.  He said
5  if he accept an application, he fixing to
6  hire you or you going to be hired in a few
7  days, that's it, like that.
8       Q.    I think I understand what you
9  mean.
10      A.    Nobody really was hiring at
11 that time because it was during full time --
12 hunting season in full bloom, and they
13 mostly have their whole crew, what they're
14 going to use.
15      Q.    Okay.  What about Southern
16 Oak, who did you --
17      A.    Southern Outdoors?
18      Q.    Yeah.  Southern Outdoors.  I'm
19 sorry.
20      A.    It was a colored guy there.
21 He said --
22            MR. ROBERSON:  Tony Gibson?
23            THE WITNESS:  Yeah.
```

Page 183

```
1       A.    That's who own the place, I
2  think, Tony Gibson.  And he -- This black
3  guy told me that he wasn't -- they wasn't
4  doing any hiring.
5       Q.    Have you applied for
6  employment anywhere else?
7       A.    No.
8       Q.    Did you apply for unemployment
9  compensation?
10      A.    Yes, sir, I did.
11      Q.    After you were -- After your
12 employment was terminated?
13      A.    Yes, sir.
14            MR. DUKES:  Okay.  I don't
15 have any of that paperwork.
16            MR. ROBERSON:  I don't either.
17            MR. DUKES:  Okay.  He doesn't
18 have it?
19            MR. ROBERSON:  He doesn't
20 either.  He can't find any.  I'd give it to
21 you if I had it.
22            MR. DUKES:  Okay.  The only
23 reason I was asking is in your Rule 26
```

Page 184

```
1  disclosures, you referenced it.
2             MR. ROBERSON:  I assumed we
3  could get it from unemployment, but
4  apparently they said they don't have it.
5             MR. DUKES:  That's right.
6             MR. ROBERSON:  So I don't know
7  where we are on that.  He says he applied,
8  they say he didn't, or they don't have any
9  record of it.
10      Q.    Did you get any unemployment
11 compensation benefits?
12      A.    No.
13      Q.    And did they tell you why you
14 weren't getting any unemployment
15 compensation benefits?
16      A.    Well, when I signed up -- When
17 you sign up for unemployment, you have to do
18 it over the phone, and you talk to a
19 computer.  And after the computer finishes
20 talking, then you talk to a person.
21            And she told me, "Expect a
22 letter in two to three days," which it came,
23 and it said I would get a hundred and
```

46 (Pages 181 to 184)

# FREEDOM COURT REPORTING

Page 185

1  thirty-one dollars a week.
2      And she told me could -- She
3  said once I got the paper, you know, let me
4  know what I was going to be getting, I could
5  start from that Sunday to that Friday, for
6  my unemployment. So that Monday when I
7  called in and punched all my numbers in and
8  everything, they told me I had been denied
9  unemployment.
10     Q.    Okay. And you didn't make any
11 further inquiry?
12     A.    No.
13     Q.    Okay. When is the last time
14 you've looked for a job?
15     A.    Well, I been, you know,
16 piddling around, helping a guy every now and
17 then, you know, work sometimes one, two days
18 out of the week, and he paying me cash
19 money. And sometime, you know, finding odds
20 and ends, that's how I've been paying my
21 bills.
22     Q.    Who have you been working with
23 a day or two at a time that's been paying

Page 186

1  you cash money?
2      A.    This guy named Jerry Hill.
3  He's a painter.
4      Q.    Does he have a company?
5      A.    Nope.
6      Q.    Where does Jerry live?
7      A.    Midway.
8      Q.    So, you've been doing some
9  painting?
10     A.    Sometimes when he have a
11 little something for me to do, yeah.
12     Q.    How much money have you made
13 from him, or doing painting since -- since
14 January 1, 2006?
15     A.    Well, this here is -- Well, I
16 had a little money saved up I used from most
17 of it, the money that I have been using is
18 my girlfriend's. She's been -- She's on
19 disability, and she been helping me with my
20 bills.
21     Q.    Okay. How much money have you
22 made painting or working for Jerry Hill
23 since January 1, 2006?

Page 187

1      A.    I only worked with him just --
2  This here just started, like, in June, I'd
3  say over the -- from June up until now,
4  maybe about six, seven hundred dollars,
5  something like that.
6      Q.    Okay. Have you worked
7  anywhere else?
8      A.    No.
9      Q.    Have you applied for
10 employment anywhere else?
11     A.    No.
12     Q.    Have you applied for
13 employment at C&W?
14     A.    No.
15     Q.    How many times have you worked
16 at C&W?
17     A.    Twice.
18     Q.    Okay. I think you only told
19 me one time. When was the other time? You
20 told me about working there right before you
21 started working at -- working for Mid State
22 the second time. When was the other time
23 you worked for C&W?

Page 188

1      A.    It was in 2003, I believe it
2  was, 2003, 2002, something like that.
3      Q.    How long did you work there
4  during that time?
5      A.    About -- I don't know, maybe
6  about three months.
7      Q.    This was during the time you
8  were employed at --
9      A.    No. I wasn't employed at
10 Sedgefields then.
11     Q.    Okay. And how long were you
12 working, about three months at C&W that
13 time?
14     A.    Yes.
15     Q.    And why did you leave their
16 employment at that time?
17     A.    I went back to where I usually
18 work at -- where I had been working at Frog
19 Pond Turf. In the wintertime, you've got a
20 choice out there, because the work is real
21 slow. You might work two or three hours a
22 day, you either draw your unemployment, or
23 you can take a chance on getting a good

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 189

1  week.
2      And when that job -- Before I
3  signed up for unemployment, I went and
4  applied for that job there and I got on
5  there and I never did have to sign up for my
6  unemployment. Well, I had signed up for it,
7  but by the time a check came, I had started
8  working.
9      Q.   So, you've drawn unemployment
10 compensation benefits in the past?
11     A.   Yeah.
12     Q.   On how many occasions do you
13 think you've drawn unemployment compensation
14 benefits?
15     A.   I don't know. A couple of
16 times.
17     Q.   More than five?
18     A.   No.
19     Q.   Less than five?
20     A.   Yeah. Less than five.
21     Q.   When is the last time you've
22 talked with someone at Enon, Sehoy, Panther
23 Creek, Cornerstone, White Oak, or Southern

Page 190

1  Outdoors about a job?
2      A.   Not since I applied for one.
3      Q.   When was the last time you
4  applied for a job with one of those
5  companies?
6      A.   I don't know. Probably been
7  February.
8      Q.   Okay. Where have you sought
9  employment since February of 2006?
10     A.   Nowhere. See, I didn't
11 understand that.
12     Q.   Where have you sought
13 employment since February of 2006?
14     A.   That was it. Besides no --
15 You know, like I said, little piddling
16 around work.
17     Q.   And the only piddling around
18 work is this with Jerry Hill in Midway,
19 painting; is that right?
20     A.   This another guy, Albert
21 Perry, he do vegetables and stuff. I go by
22 there sometime and he might have, you know,
23 something for me to do that day, sometimes

Page 191

1  two days, you know.
2      Q.   I think you said you got six
3  or seven hundred dollars from Jerry Hill
4  doing painting work.
5      A.   Yeah.
6      Q.   How much money have you been
7  paid since January 1, 2006, just doing
8  piddling around work?
9      A.   I don't know. Maybe a
10 thousand dollars.
11     Q.   Who have you done piddling
12 around work for, other than Albert Perry?
13     A.   Jerry Hill.
14     Q.   What work have you done for
15 Jerry Hill?
16     A.   Painting.
17     Q.   I'm sorry. Other than for
18 Albert Perry and Jerry Hill, what other work
19 have you -- Have you worked for anybody
20 else?
21     A.   No. Like I said, my
22 granddaddy might call me and say, "I got
23 some pipes that need fixing or a tire or

Page 192

1  something needs changing or something need
2  fixing," I go and do that for him and he
3  give me five, ten, fifteen dollars,
4  something like that.
5      Q.   Okay. Do you intend to try to
6  get on with Enon, Sehoy, Panther Creek,
7  Cornerstone, White Oak or Southern Outdoors
8  this fall?
9      A.   Yes. If they hire me, I
10 definitely am.
11         (Off-the-Record discussion
12          was held.)
13     Q.   In your complaint that I
14 showed you earlier, you allege that you have
15 suffered damages as a result of the -- as a
16 result of Mid State's conduct. What damages
17 have you sustained?
18     A.   Lights done been cut off,
19 water done been cut off, I had to moved
20 twice. If I was working, it would never
21 happen.
22     Q.   Anything else? Do you claim
23 that you've suffered mental anguish or

48  (Pages 189 to 192)

# FREEDOM COURT REPORTING

Page 193

1  emotional distress?
2      A.    Of course, I have.  If I was
3  working, it wouldn't be like that.
4      Q.    What sources of income do you
5  have currently?
6      A.    None.
7      Q.    Okay.  And you live off your
8  girlfriend's disability?
9      A.    I ain't said I live off her
10  disability, I said she helps me out from
11  time to time.  I live from day to day, the
12  best way I can.
13      Q.    And y'all live together?
14      A.    Right.
15      Q.    How much disability does she
16  get a month?
17      A.    I don't know.  I don't know.
18      Q.    Have you been to -- When is
19  the last time you've been to a doctor?
20      A.    It's been a few years, besides
21  going to a dentist last year.  I don't have
22  no reason to go, because I'm not sick and
23  nothing ever wrong with me.

Page 194

1      Q.    Okay.  Who was the last doctor
2  you went to?
3      A.    Dr. Rumph.
4      MR. ROBERSON:  R-U-M-P-H; is
5  that right?
6      THE WITNESS:  Uh-huh.
7      Q.    Where is he?
8      A.    Right here on this corner, in
9  Union Springs.
10      Q.    What did you see him for?
11      A.    I was doing Bush Hogging -- I
12  was doing some Bush Hogging one weekend for
13  this guy, and a limb got hung behind a pipe
14  of the tractor and I was looking back, and
15  by the time I turned around, it hit me right
16  across here (indicating).
17      Q.    Have you ever -- When is the
18  last time you've been to a hospital?
19      A.    I ain't never been in a
20  hospital but once in my life.
21      Q.    When was that?
22      A.    I don't even remember.  It had
23  to been around in the '80s sometimes.

Page 195

1      Q.    Which hospital would that have
2  been?
3      A.    It was here in Union Springs.
4      Q.    What about the VA Hospital in
5  Tuskegee?
6      A.    Nah.
7      Q.    Have you ever been there?
8      A.    Yeah, I've been there.
9      Q.    What were you --
10      A.    A physical.
11      Q.    Anything else?
12      A.    That's it.
13      Q.    Has there been anything else
14  that's happened in your life that's caused
15  you mental anguish and emotional distress,
16  other than your work at Mid State?
17      A.    No.  No more than one time
18  when my mother passed, you know, I got a
19  little depressed and stuff about that, but
20  other than that, no.
21      Q.    When did your mother pass?
22      A.    '89.
23      Q.    Has it caused you any mental

Page 196

1  anguish or emotional distress about --
2      A.    No.
3      MR. ROBERSON:  Let him finish
4  his question.
5      Q.    If I was smart enough, I could
6  change my question midway through, but I'm
7  not smart enough.  Has it caused you any
8  mental anguish or emotional distress, the
9  fact that you've had these, and I'll just
10  say actions, asserted against you for child
11  support?
12      A.    No.  Because I knew they were
13  my children, and that's what I was used to,
14  they taking my money out of my check.
15  That's reason I got to always work two jobs
16  most of the time.
17      Q.    Okay.  But if you're getting
18  paid in cash, nothing is being taken out of
19  your pay, is it?
20      A.    No.  But that don't stop me
21  from taking care of my children.
22      Q.    Well, do you make the child
23  support payments, even though you're getting

49 (Pages 193 to 196)

# FREEDOM COURT REPORTING

Page 197

1  paid in cash?
2      A.    Yeah. No, no. I give money
3  to my kids, well, their mothers.
4      Q.    Have you tape-recorded any
5  conversation with any employee or former
6  employee of Mid State?
7      A.    No.
8      Q.    Do you have any notes or
9  diaries or calendars that would record any
10 -- any of your reflections about your
11 employment at Mid State?
12     A.    No.
13     Q.    Have you ever sued anybody
14 before?
15     A.    No. Never had a reason.
16     Q.    Have you ever been sued
17 before?
18     A.    No.
19     Q.    What did you do to prepare for
20 your deposition today?
21     A.    I don't understand.
22     Q.    What did you do to prepare for
23 your deposition today?

Page 198

1      A.    Nothing.
2      Q.    Did you review any documents?
3      A.    No. I didn't have any to
4  review.
5      Q.    You've never filed for
6  bankruptcy, correct?
7      A.    Right.
8      Q.    Who have you spoken to
9  concerning the claims that you make in this
10 lawsuit?
11     A.    My lawyers.
12     Q.    Anybody else?
13     A.    Nope. I talked to my
14 grandfather.
15     Q.    What does he have to say about
16 it?
17     A.    Do what you got to do.
18     Q.    I'm always curious about this.
19 How did you find your lawyers? I don't want
20 to know anything that you've said to your
21 lawyers or anything that they've said to
22 you. I'm just curious how you found your
23 lawyers.

Page 199

1      A.    They was referred to me from a
2  friend.
3      Q.    Okay. Who referred them to
4  you?
5      A.    A friend of mine.
6      Q.    What was his name or her name?
7      A.    His name is Sammy Rogers.
8      Q.    Did they represent Sammy in
9  another case?
10     A.    I think he did years ago.
11     Q.    Okay. When is the last time
12 you have filed State or Federal tax returns?
13     A.    This year, this past year.
14         MR. ROBERSON: You filed a tax
15 return?
16         THE WITNESS: This past year.
17         MR. ROBERSON: You did?
18         THE WITNESS: Yeah.
19         MR. ROBERSON: Where is it?
20         THE WITNESS: Talking about
21 the money?
22         MR. ROBERSON: Where is a copy
23 of your tax return, yeah?

Page 200

1          THE WITNESS: At home, I
2  guess.
3      Q.    When was the last time -- Are
4  you talking about you filed a tax return for
5  your income that you earned in 2005?
6      A.    Yeah.
7          MR. ROBERSON: Did you prepare
8  it or who did?
9          THE WITNESS: No. My aunt
10 did.
11         MR. ROBERSON: Can you get us
12 a copy?
13         THE WITNESS: Yeah. I can go
14 and see.
15     Q.    Is that State and Federal tax
16 returns for 2005?
17     A.    Yeah.
18     Q.    Before 2005, when was the last
19 time you filed a State or a Federal tax
20 return?
21     A.    I don't remember. It's been
22 some years.
23     Q.    Well, have you filed any tax

50 (Pages 197 to 200)

# FREEDOM COURT REPORTING

Page 201

1  returns within the ten years preceding that?
2      A.    Yeah.  Maybe once, one time.
3          MR. DUKES:  Let me just say
4  for the Record that, you know, I'll conclude
5  this deposition at the end, regardless of
6  what I say, with the opportunity to reopen
7  the deposition as to any tax returns.
8          MR. ROBERSON:  I agree.
9          MR. DUKES:  Yeah.  I mean, I
10 don't anticipate that being an issue, but
11 just to protect myself.
12         MR. ROBERSON:  Well, I agree,
13 if he's filed tax returns, you're entitled
14 to examine him about it.  I agree with that.
15 I apologize.  I thought we had plowed this
16 ground.
17     Q.    The fact that Mary Jenkins
18 filed a child support action against you,
19 did that cause you any mental anguish or
20 emotional distress?
21     A.    No.
22     Q.    Have any of your arrests
23 caused you any mental anguish or emotional

Page 202

1  distress?
2      A.    I didn't understand.
3      Q.    Have any of your arrests
4  caused you any mental anguish or emotional
5  distress?
6      A.    No, sir.
7      Q.    Have you ever applied for
8  Social Security Disability benefits?
9      A.    No.
10     Q.    You know something, I didn't
11 -- I failed to talk to you about.  I
12 apologize.  On Defendant's Exhibit 3, page
13 25, is this formal reprimand.  Is this the
14 occasion that we were talking about where
15 Mr. Norman saw you and Jeff Harris riding
16 the horses, and he thought you should have
17 been in the barn working?
18     A.    Yeah.  I tried calling him, I
19 don't know five, six times over the radio,
20 and he didn't answer, because the clippers
21 had tore up, what we were shaving the horses
22 with.
23         And I told Jeff, "He come back

Page 203

1  to the barn and see us standing around,
2  ain't shaving, even though he know the
3  clippers is tore up, it going to be a bunch
4  of mess."
5          I said, "We got these new
6  horses."  I said, "Let's just ride around
7  the block, around the circle, just try them
8  out, see how they was," which that is a part
9  of the job.
10     Q.    Uh-huh.
11     A.    And when I got back, he said
12 we didn't -- that -- Well, he had already
13 went and wrote this up by the time we had
14 went and came back from where we had went
15 to.  He had already went and got this.  Then
16 he told us if we didn't sign it, that we
17 were going to be determinated (sic) that
18 day.
19         He ain't got nothing about
20 that down there about the clippers, towards
21 the reason why we did that.
22     Q.    Did you and Mr. Harris go and
23 smoke marijuana when you went off to ride

Page 204

1  the horses that day?
2      A.    I told you one time, I don't
3  smoke marijuana at work, I do it off work.
4      Q.    Okay.  Other than the pay that
5  you've received for, I think that you
6  described it as piddling here and there, and
7  the money that your girlfriend has given
8  you, have you received any welfare or public
9  assistance or charitable gifts?
10     A.    No.
11     Q.    Are you on any prescription
12 medication?
13     A.    No.
14     Q.    When is the last time you've
15 used any prescription medication?
16     A.    I don't know.  It's been some
17 years.
18     Q.    What pharmacy did you use?
19     A.    Main Drug Store.
20     Q.    Main Drug Store?
21     A.    Right.
22     Q.    Is that here in Union Springs?
23     A.    Right.

51 (Pages 201 to 204)

# FREEDOM COURT REPORTING

Page 205

1    Q.    You know, have you ever heard
2  of the phrase or the saying, "Hindsight is
3  20/20?"
4    A.    I didn't understand you.
5    Q.    Have you ever heard people
6  say, "Hindsight is 20/20?"
7    A.    What's hindsight?
8    Q.    That means looking back on
9  things that have happened, you can always
10  see things more clearly, looking back than
11  as they're happening.  Do you see what I
12  mean by that?
13        Like looking back at my life,
14  I can see situations where I wish I would
15  have done things differently or I wish I
16  would have taken a different fork in the
17  road or I'm glad I took a certain fork in
18  the road.
19        Looking back at your
20  employment at Mid State, is there anything
21  that you wish you would have done
22  differently?
23    A.    No.  Because I did my job the

Page 206

1  whole while I was working at Mid State.  I
2  don't have no regrets, because I know I did
3  my job.
4    Q.    In my deposition notice, I
5  asked you to provide me with all documents
6  that were responsive to the interrogatories
7  -- that were identified in your
8  interrogatory answers or that were
9  responsive to your request for production.
10  Other than the 2005 tax returns, are there
11  any other documents that you have not
12  produced to me that would comply with that
13  request?
14    A.    No.
15    Q.    What's the longest time you've
16  been unemployed for?
17    A.    Like I am now.  This job --
18  This last job.
19    Q.    Why haven't you applied for
20  employment at C&W or Frog Turf or any of
21  those other places?
22    A.    Because it's been slow, the
23  work we doing because it's been so dry.

Page 207

1  This has been one of the driest years
2  there's been and they ain't been selling
3  that much grass.  Mexicans got all them
4  jobs.
5    Q.    Okay.
6    A.    They've mostly got Mexicans
7  working for them now, very few.
8    Q.    What about, like, at the
9  McDonald's or anything like that, have you
10  applied for employment there?
11    A.    No.
12    Q.    Why not?
13    A.    That's a lady's job.
14    Q.    Okay.
15    A.    I always worked outside all my
16  life.  That's the kind of work I like doing,
17  on the outside, hot or cold.
18    Q.    So, you haven't applied for
19  any inside jobs?
20    A.    No, sir.
21    Q.    Because you don't like inside
22  jobs?
23    A.    I didn't say I wouldn't work

Page 208

1  on the inside, I said I would prefer to work
2  on the outside because that's what I like
3  doing, outdoors.
4    Q.    Have you gone to the
5  Department of Industrial Relations and seen
6  if they could have helped you find a job?
7    A.    What's that?
8    Q.    Have you gone anywhere to see
9  if someone could help you try to find a job?
10    A.    No.
11    Q.    Why not?
12    A.    I always find a job on my own.
13        MR. DUKES:  I think that's all
14  I've got, but let me take a break.
15        MR. ROBERSON:  Sure.
16        (Recess taken.)
17  (The deposition was concluded at 2:55 p.m.,
18  September 7, 2006.)
19
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 209

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4      I, Angela Smith, Registered
5  Professional Reporter and Commissioner for
6  the State of Alabama at Large, do hereby
7  certify that the above and foregoing
8  proceeding was taken down by me by
9  stenographic means, and that the content
10  herein was produced in transcript form by
11  computer aid under my supervision, and
12  that the foregoing represents, to the best
13  of my ability, a true and correct
14  transcript of the proceedings occurring on
15  said date and at said time.
16      I further certify that I am neither
17  of kin nor of counsel to the parties to the
18  action; nor in any manner interested in the
19  result of said case.
20
21

22      _____
        Angela Smith, RPR, CRR,
        for the State of
23      Alabama at Large.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**