# American Court Reporting
## toll-free (877) 320-1050

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06-CV-00405-ID-SRW

NORRIS FOSTER,
    Plaintiff,
vs.
MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

    Defendant.


THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

JOEL NORMAN


9:11    September 8, 2006

    a.m.


COURT REPORTER:

Gwendolyn P. Timbie, CSR

---

Page 3

1  leading questions, and that counsel for
2  the parties may make objections and assign
3  grounds at the time of trial or at the
4  time said deposition is offered in
5  evidence, or prior thereto.
6      Please be advised that this is the
7  same and not retained by the Court
8  Reporter, nor filed with the Court.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

Page 2

1      STIPULATIONS
2      IT IS STIPULATED AND AGREED by and
3  between the parties through their
4  respective counsel that the videotaped
5  deposition of JOEL NORMAN, may be taken
6  before Gwendolyn P. Timbie, Certified
7  Shorthand Reporter and Notary Public,
8  State at Large, at the law office of John
9  Waters, Union Springs, Alabama, on
10  September 8, 2006, commencing at
11  approximately 9:11 a.m.
12      IT IS FURTHER STIPULATED AND
13  AGREED that the signature to and the
14  reading of the deposition by the witness
15  is not waived, the deposition to have the
16  same force and effect as if full
17  compliance had been had with all laws and
18  rules of Court relating to the taking of
19  depositions.
20      IT IS FURTHER STIPULATED AND
21  AGREED that it shall not be necessary for
22  any objections to be made by counsel to
23  any questions, except as to form or

---

Page 4

1          INDEX
2  EXAMINATION BY:          PAGE NO:
3  Mr. Roberson             9
4  Mr. Dukes                203
5  Certificate              206
6  Instructions to Witness  207
7  Signature Page           209
8  Errata Sheet             210
9
10      LIST OF EXHIBITS
11  EXHIBITS:                PAGE NO:
12  Plaintiff's 1            15
13  Plaintiff's 2            64
14  Plaintiff's 3            65
15  Plaintiff's 4            82
16  Plaintiff's 5            89
17  Plaintiff's 6            97
18  Plaintiff's 7            101
19  Plaintiff's 8            120
20  Plaintiff's 9            121
21  Plaintiff's 10           123
22  Plaintiff's 11           126
23  Plaintiff's 12           133

## www.AmericanCourtReporting.com
### September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

1    INDEX OF EXHIBITS (Continued)
2
3    EXHIBITS:          PAGE NO:
4    Plaintiff's 13        135
5    Plaintiff's 14        146
6    Plaintiff's 15        164
7    Plaintiff's 16        168
8    Plaintiff's 17        169
9    Plaintiff's 18        202
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

1
2
3
4    A P P E A R A N C E S
5
6    FOR THE PLAINTIFF:
7    JERRY ROBERSON, Esquire
       Roberson & Roberson
8    8 Office Park Circle
       Suite 150
9    Birmingham, Alabama 35223
10   ALBERT H. ADAMS, JR., Esquire
       Irby Law Firm, LLC
11   Post Office Box 910
       Eufaula, Alabama 36072
12
13
      FOR THE DEFENDANT:
14
       CARTER H. DUKES, Esquire
15    Huckaby, Scott & Dukes, P.C.
       2100 Third Avenue North
16    Suite 700
       Birmingham, Alabama 35203
17
18
      ALSO PRESENT:
19
       DAVID CARROLL
20
21
      VIDEOGRAPHER:
22
       CHRISTI MAZE
23

Page 7

1
2
3
4         I, Gwendolyn P. Timbie, Certified
5    Shorthand Reporter and Notary Public for
6    the State of Alabama at Large, acting as
7    Commissioner, certify that on this date,
8    pursuant to the Federal Rules of Civil
9    Procedure, and the foregoing stipulation
10   of counsel, there came before me at the
11   law office of John Waters, Union Springs,
12   Alabama, commencing at approximately
13   9:11 a.m., on September 8, 2006, Joel
14   Norman, witness in the above cause, for
15   oral examination, whereupon the following
16   proceedings were had:
17
18         THE VIDEOGRAPHER:  This
19   deposition is being taken of Joel Norman
20   on this, the 8th day of September 2006, in
21   the case of Norris Foster versus Mid State
22   Land and Timber Company, Inc., d/b/a
23   Sedgefields Plantation.  This case is set

Page 8

1    in the United States District Court for
2    the Middle District of Alabama, Northern
3    Division; Civil Action Number
4    2:06-CV-00405-ID-SRW.
5         Would Counsel please state
6    their names and who they represent?
7         MR. ROBERSON:  My name is
8    Jerry Roberson.  I represent the
9    plaintiff, Norris Foster.
10        MR. DUKES:  My name is Carter
11   Dukes, and I represent Mid State.
12        MR. ADAMS:  My name -- my name
13   is Albert Adams.  I represent Norris
14   Foster, the plaintiff.
15        THE VIDEOGRAPHER:  Court
16   Reporter, please swear the witness.
17
18        JOEL NORMAN,
19   Having been first duly sworn, was examined
20   and testified as follows:
21
22        THE REPORTER:  And will these
23   be usual stipulations?

2  (Pages 5 to 8)

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 9

1    MR. ROBERSON: They will.
2    MR. DUKES: Please.
3    MR. ROBERSON: Is he going to
4  waive signature, Carter?
5    MR. DUKES: No. He'll read
6  and sign.
7    MR. ROBERSON: All right.
8
9  EXAMINATION BY MR. ROBERSON:
10    Q    Mr. Norman, my name is Jerry
11  Roberson. We met before the deposition.
12  But I represent Norris Foster.
13    You know Norris?
14    A    Yes, sir.
15    Q    Okay. And are you -- did you
16  work formerly -- until the -- Sedgefields
17  was sold in May of 2006. Did you work for
18  Sedgefields, Mid State Land and Timber
19  Company?
20    A    Yes, sir.
21    Q    Okay. And you're still
22  working out there; right?
23    A    I'm still on the property.

Page 10

1    Q    For the new owner; correct?
2    A    Yes, sir.
3    Q    Tolleson --
4    A    That's right.
5    Q    -- bought -- bought the
6  property in May; isn't that right?
7    A    Right around in there.
8    Q    All right. Have you ever
9  given a deposition before?
10    A    No, sir.
11    Q    Okay. Well, it's not hard.
12    A    No.
13    Q    You just need to listen to my
14  question and answer it truthfully.
15    A    Right.
16    Q    Is that fair?
17    A    Yes, sir.
18    Q    And you need to make sure you
19  understand what I'm asking you because, if
20  you answer, I'll assume that you
21  understood me.
22    A    Right.
23    Q    Is that fair enough?

Page 11

1    A    Yes, sir.
2    Q    So if you don't understand it,
3  tell me.
4    A    Okay.
5    Q    And I'll try to rephrase it.
6  And you know that today you're under
7  oath --
8    A    Yes, sir.
9    Q    -- right? And you have to
10  tell the truth.
11    Tell me, what is your age, please,
12  sir.
13    A    Forty-seven.
14    Q    And are you married?
15    A    Yes, sir.
16    Q    Who are you married to?
17    A    Tina.
18    Q    Tina Norman?
19    A    That's right.
20    Q    Have you ever been married
21  before?
22    A    Yes, sir.
23    Q    What -- did that marriage end

Page 12

1  in divorce?
2    A    It did.
3    Q    When did you and Tina get
4  married?
5    A    September the 17th.
6    Q    Of 2005?
7    A    Yes, sir.
8    Q    Okay. Now, when did -- who
9  were you married to before Tina?
10    A    Melanie.
11    Q    Melanie? And what's her last
12  name now?
13    A    I assume it's still Norman.
14    Q    How long were you married to
15  Melodie?
16    A    Probably nineteen years.
17    Q    Is that --
18    A    Somewhere around -- about
19  nineteen years. I'm not going --
20    Q    Yes, sir.
21    A    Eighteen, nineteen.
22    Q    Is that -- how do you spell
23  her first name?

3 (Pages 9 to 12)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1    A    M-E-L-A-N-I-E.
2    Q    And that marriage ended in
3  divorce where?  What county?
4    A    Thomas County, Georgia.
5    Q    Did you and Melanie have any
6  children?
7    A    Yes, sir.
8    Q    Who -- how many, and what are
9  their names and ages?
10    A    We've got four.  The oldest is
11  twenty-one, and his name is Joel Samuel
12  Norman, III.  Everybody -- I mean --
13  yeah.  They call him Trey.  Better known
14  as Trey.
15    Q    Okay.
16    A    Jason Lamar Norman, age
17  nineteen; Sarah Elizabeth Norman,
18  seventeen; and Joshua James Norman, age
19  twelve.
20    Q    Now, where do those children
21  live?
22    A    Three of them are with me, and
23  the -- the three younger are with me, at

Page 14

1  this point, and the oldest one is in
2  Mooresville, North Carolina, working and
3  living on his own.
4    Q    Are your three children that
5  live -- do they live with you and
6  Melanie?
7    A    They live with me.
8    Q    Okay.  They don't live with
9  Melanie?
10    A    They -- she had -- I have
11  custody.  She has visitation that she does
12  not exercise.
13    Q    Okay.  Do they live with you
14  and Tina, then?
15    A    Yes.  Yes.
16    Q    Okay.  You and Tina don't have
17  any children?
18    A    No.
19    Q    Okay.  Now, had you ever been
20  married before?
21    A    No, sir.
22    Q    So you've just been married
23  twice?

Page 15

1    A    That's right.
2    Q    Okay.  Now, do any of your
3  children go to school?
4    A    The two younger ones go to
5  school.
6    Q    Where do they go to school?
7    A    They go to Macon East
8  Montgomery Academy.
9    Q    Is that a private school?
10    A    It is.
11    Q    How do they get to that
12  school?
13    A    They drive this year.  She --
14  my daughter drives this year.
15    Q    So she can drive both of them
16  to that school?
17    A    That's right.  And she car --
18  takes some more with her.  Carpooling.
19        (WHEREUPON, a document was
20  marked as Plaintiff's Exhibit Number 1 and
21  is attached to the original transcript.)
22    Q    Now, I want to show you what
23  I'll mark as Exhibit 1 to your deposition,

Page 16

1  and ask you if this is the application
2  that you completed before you went to work
3  at -- for Mid States, at Sedgefields.  All
4  right, sir.
5    Mr. Norman, did you complete an
6  application before you went to work there?
7    A    I completed a bunch of
8  paperwork.  I -- I'm sure -- I'm sure an
9  application was in there.
10    Q    Okay.  Well, take a minute to
11  look at that.  But I've asked for your
12  personnel file, and Mr. Dukes has provided
13  some documents to me in response to that
14  request, and that's a portion of those
15  records.
16    A    Yes, sir.  That's my signature
17  there.
18    Q    Okay.
19    A    I filled -- I filled that out.
20    Q    Okay.  And that -- that
21  includes information about your education,
22  your previous work experience, that type
23  thing; correct?

4  (Pages 13 to 16)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1    A    Most of it.  There's -- I
2    mean, that's as far as was necessary
3    on the -- I -- I -- I worked for other
4    places.
5         Q    Oh, you mean you didn't put
6    all the places that you've worked?
7    A    I put what was necessary.
8         Q    I see.
9    A    But --
10        Q    Well, maybe you had a job that
11   you only worked for two or three weeks and
12   maybe didn't put that?
13   A    Never.  I've never worked
14   anywhere two or three weeks.
15        Q    Oh, okay.  Well, you didn't
16   list all your employment; is that right?
17   A    No, sir.
18        Q    Okay.
19   A    It don't look -- I didn't -- I
20   didn't see them on there, now.
21        Q    All right.  Well, you've
22   been -- it says on here you've been bird
23   dog training and handling for twenty-seven

Page 18

1    years.  Is that a true statement?
2    A    It's right at approximately
3    twenty-seven years.
4         Q    Okay.  And you were a
5    plantation manager for seven years?
6    A    Yes, sir.
7         Q    Okay.  And when you filled
8    this out -- looks like you applied on
9    September 1st of '05.
10   A    That -- that's about --
11        Q    Does that sound right?
12   A    Yeah.  Somewhere right along
13   in there.
14        Q    Okay.  And did you attend high
15   school in Thomasville, Georgia?
16   A    I did.  Thomas County --
17   Thomas County schools.
18        Q    Okay.  And you graduated --
19   A    Yes.
20        Q    -- at Thomas County schools?
21   And then did you further your education
22   after that?
23   A    Yes, sir.

Page 19

1         Q    Where did you attend college?
2    A    Abraham Baldwin Agriculture
3    College, Tifton.
4         Q    Okay.  And did you -- is that
5    a junior college?
6    A    It -- it is, yes.  About the
7    same thing.
8         Q    I mean, it -- they have
9    two-year degrees?
10   A    Two-year degrees.  And you --
11   or you can take your first two years there
12   and move on, you know.
13        Q    Okay.
14   A    It's also -- transfer.
15        Q    And so you got an associate
16   degree, a two-year degree --
17   A    That's right.
18        Q    -- in wildlife technology --
19   A    That's right.
20        Q    -- is that correct?  When did
21   you finish that college?
22   A    I think my -- I actually may
23   have received my diploma in '86, but I had

Page 20

1    finished all my core -- all my classes
2    probably in, just guessing, '82 or three.
3    I'm -- I'm not sure.  But I had to
4    finish -- I had to take a remedial English
5    class, and I did that several years after
6    I had completed all my stuff.  And I got
7    my degree several years after I had quit
8    attending ABAC.
9         Q    And when did you graduate high
10   school, please, sir?
11   A    '77.
12        Q    Okay.  So you think you got
13   your degree -- your two-year degree about
14   nine years after you completed high
15   school.  Would that be fair?
16   A    That probably -- I've got a
17   diploma at home I could look at, but I did
18   -- it was not relevant, you know, to me.
19        Q    Okay.  Well, after you
20   finished high school, where did you work,
21   please, sir?
22   A    After I finished high school,
23   I worked for -- let me see.  After I

5  (Pages 17 to 20)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1  finished high school, I probably worked
2  for my wife's family, farming.
3      Q    Your fir -- first wife?
4      A    Yes.
5      Q    And did they have a -- the
6  name to that farm or --
7      A    Hurst Farms.
8      Q    Hurst?
9      A    Hurst Farms.
10     Q    Can you spell that for me?
11     A    H-U-R-S-T.
12     Q    Where were they located?
13     A    In Ochlocknee, Georgia.
14     Q    I'm really not familiar with
15  where that is.
16     A    That's North Thomas County.
17     Q    Okay.  And what did you do for
18  them?
19     A    I run farm equipment.
20     Q    Drove a tractor?
21     A    Just worked on the farm.  They
22  had --
23     Q    Did you get paid?

Page 22

1      A    Yes, sir.
2      Q    Did you file tax returns?
3      A    I think so, but I'm not for
4  sure.  I mean, that's -- I think it was --
5  it was farm labor.  I don't remember.
6  Seems to me like I -- I can't remember, to
7  tell you the truth.
8      Q    Huh.
9      A    You know, it was --
10     Q    Well, did you get a W2?
11     A    At some point, I know I -- I
12  probably did.  But to begin with, it was
13  part time.  You know, I had school on the
14  weekends and that sort of stuff.  I might
15  not have been required to.  I'm not -- you
16  know, at that point.
17     Q    Did you get a W2 from him?
18     A    I can't remember.  It was so
19  far back.
20     Q    Yeah.  Well, how -- how long
21  did you work on the farm there for the
22  Hurst family?
23     A    Till -- till I started to

Page 23

1  college.
2      Q    Okay.  And what was your next
3  job?
4      A    When I -- while I was going to
5  college, I took a job with the Riverview
6  Plantation in Camilla, a seasonal job, as
7  a hunting guide.
8      Q    Okay.  Now, before you started
9  working with -- at the -- what did you
10  call it?  The plantation?
11     A    Riverview Plantation.
12     Q    Riverview.  Before you started
13  working at Riverview, had you ever had any
14  work experience in the gui -- as a guide
15  or on a plantation?
16     A    No, sir.
17     Q    All you had done was farm
18  work.
19     A    Farm work.
20     Q    Is that fair?
21     A    Farm work.
22     Q    Okay.  And, then, when did you
23  begin at the Riverview Plantation?

Page 24

1      A    I -- seems like '81, but I'm
2  -- I'm not -- I'm not -- I'm not sure.
3  I'd have to go back and do a little
4  digging up.  It may have been before
5  then.  It was three years.  It was three
6  years.  I think I started college in
7  probably seventy -- I don't know if I -- I
8  -- I'm -- it's about -- I'm not real sure,
9  but it was probably after I had been in
10  college for about a year.  And they
11  offered this summertime program.  And
12  during the summer, they offered a program
13  where they'd come over and interview
14  people for guides -- seasonal guides.  And
15  I started doing that every season.
16     Q    Okay.
17     A    For three years.
18     Q    Now, you didn't list that on
19  your resume here.
20     A    I probably didn't.  I probably
21  discussed it with David.
22     Q    Okay.
23     A    You know, I -- I didn't even

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1    do a formal resume, as far as that goes.
2        Q    All right.  So you worked for,
3    you think, about three years, doing
4    seasonal work?
5        A    Well, two years was seasonal;
6    the last one, I worked there for about a
7    year solid.  I -- I -- after the hunting
8    season, I got on the farm crew and worked
9    there for probably another six months.
10       Q    And what kind of work were you
11   doing there as a guide and -- and -- on
12   the plantation?
13       A    We would put quail out for
14   paying guests, take the dog -- take the --
15   go pick the guests up and take them out
16   with the dogs.  And they would find the
17   birds, shoot the birds.  Just entertain
18   them, you know, on a quail hunt.
19       Q    How much did you charge folks
20   for doing something like that?
21       A    Well, I -- I didn't charge.  I
22   was paid a --
23       Q    Well, Riverview charged.

Page 26

1        A    I was paid a salary and a --
2    you know, and -- and a tip, which was a --
3    was a standard tip.  They -- I don't
4    remember.  It seems like then it was,
5    like, two fifty a day, and that -- and
6    that was, you know, a long time ago.  It
7    was a lot of money.
8        Q    Okay.  And -- but you were
9    paid a salary.  A weekly salary?
10       A    I was paid a salary, yes.
11       Q    Or was it by the trip?
12       A    No.  It was -- it was a set
13   salary.  It seemed like it was twice a
14   month, if I'm not mistaken.
15       Q    And there's a lot of work that
16   goes into the preparation of those hunting
17   trips; correct?  You have to get your
18   property ready to hunt; right?
19       A    Sure.
20       Q    Okay.  So you're working even
21   when you're not doing guide work.
22       A    That's right.
23       Q    Is that fair?

Page 27

1        A    That's right.
2        Q    Because you've got to get
3    everything ready for the hunt.
4        A    That's right.
5        Q    Correct?
6        A    That's right.
7        Q    And that takes a lot of time
8    and effort, doesn't it?
9        A    Yes, sir.
10       Q    And you got paid a salary, as
11   a hunting guide; correct?
12       A    Yes.
13       Q    And you got paid a tip?
14       A    That's right.
15       Q    Correct?  And did -- did you
16   depend on those tips?
17       A    It was -- it was -- yes.  But
18   it was upfront.  We knew what it was --
19   how it was going to be, you know.  It
20   was --
21       Q    How was it going to be?
22       A    We got paid at that point.  It
23   was a set rate.  It was twenty-five

Page 28

1    dollars per day that you hunted.  You
2    didn't -- if you didn't hunt that day, you
3    didn't get that -- that deal.  It was --
4    it was factored in when they hired us.
5    They told us, you know, exactly what it
6    was going to be, so we could consider that
7    as part of the -- taking the job.
8        Q    Yeah.  Well, does -- the
9    hunting guide and the crew, is that an
10   important part of their compensation, is
11   the tip?
12       A    These guys that were guiding,
13   most of them were college students.  Yes.
14   It was -- it was -- it was part of their
15   living expenses.
16       Q    Okay.
17       A    Part of the contract.
18       Q    So after Riverview -- did you
19   handle any dogs there?
20       A    Yes.
21       Q    Okay.  Tell me about your
22   training with dogs.  How -- do you go to
23   school to get training with quail dogs --

7  (Pages 25 to 28)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1  bird dogs?
2     A    We -- there at Riverview, they
3  had somewhat of a -- kind of a little
4  orientation deal with older guides, for
5  some of the guys that had never been
6  around bird dogs.  I grew up with dogs.  I
7  was not a dog trainer, but I grew up with
8  dogs.  I love dogs.  I probably learned
9  more from the dogs than any -- anybody.
10 Just --
11    Q    So is it fair to say that you
12 don't -- you haven't had any formal
13 training?
14    A    At Riverview, no.  Not from --
15    Q    Or anywhere.
16    A    Yes.
17    Q    Oh.  Well, I'm sorry.  Tell me
18 about your formal training with bird
19 dogs.
20    A    I would -- I would say the --
21 the -- when you say "formal," explain.
22 What do you mean by "formal training"?
23    Q    Well, do you go to a school?

Page 30

1     A    No.  But I've worked for a
2  professional -- under a professional.
3     Q    Well, who was that?
4     A    William Pierce.
5     Q    What -- what was the name of
6  his business?
7     A    He worked for -- we worked for
8  Rollings Ranch in Okeechobee, Florida.
9     Q    You know, that's another one
10 of those places that's not on your
11 application, isn't it?
12    A    It wasn't necessary.
13    Q    Okay.  Well, when -- after
14 Riverview, what was the next job you had?
15    A    Rollings Ranch.
16    Q    In Florida?
17    A    Okeechobee, Florida.
18    Q    How long did you work there?
19    A    Approximately two years.
20    Q    Did you voluntarily quit at
21 Riverview?
22    A    I did.  I did.
23    Q    Okay.  Did -- how -- and did

Page 31

1  you voluntarily quit Rollings Ranch?
2     A    I did.
3     Q    Who was your supervisor there,
4  at Rollings Ranch?
5     A    William Pierce.
6     Q    Who was it at Riverview?
7     A    I'd probably just say the
8  owner, Cader Cox.  C-A-D-E-R C-O-X.
9     Q    Okay.
10    A    There were several people that
11 I worked under while there, but he was the
12 owner and the --
13    Q    All right.  What -- when you
14 worked at Rollings Ranch for Mr. Pierce,
15 what was your job title?
16    A    Assistant dog trainer and
17 assistant manager.
18    Q    How -- how many people worked
19 there?
20    A    On the whole ranch?
21    Q    Yes, sir.
22    A    I -- I'm not sure, but it
23 would probably be -- I -- I wasn't

Page 32

1  associated with all the departments of the
2  ranch.  But probably, guessing, fifteen to
3  thirty.  I don't know.  It just -- it was
4  a big ranch.
5     Q    What did they do on it besides
6  hunt?
7     A    Cattle and -- and farming.
8     Q    You didn't do any of that, did
9  you?
10    A    No, sir.
11    Q    You were just a hunter; right?
12    A    Well, we -- we managed the
13 quail woods.  We managed -- we did that.
14    Q    Okay.  So, again, you charged
15 guests?
16    A    No, sir.
17    Q    No?
18    A    Private.
19    Q    It's only private there?
20    A    (Witness nodded head in the
21 affirmative.)
22    Q    What does that mean, when you
23 say a private quail ranch?

8  (Pages 29 to 32)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1    A   It's not commercial.
2  Non-commercial.
3    Q   Well, does that mean they just
4  bring their family members on there?  Or
5  what does it mean?
6    A   Family, friends, business
7  partners.  Whoever, you know.
8    Q   Did they have a lodge?
9    A   Yes.
10    Q   So you could stay there;
11  correct?
12    A   I didn't stay in the lodge.
13    Q   Okay.  But guests could stay
14  overnight; right?
15    A   Yes.
16    Q   Were they charged for that?
17    A   No.  As far as I know, no.
18    Q   How were you paid?
19    A   Out of Mr. Rollings' bank
20  account.
21    Q   Well, was it a salary or an
22  hourly rate?
23    A   It was a salary.

Page 34

1    Q   What was your salary?
2    A   I don't remember.
3    Q   Did you file tax returns
4  during this period of time?
5    A   Yes, sir.
6    Q   Were you married?
7    A   Yes, sir.
8    Q   Did you live -- where did you
9  live dur --
10    A   I lived on the property.
11    Q   So was that part of your
12  compensation too?
13    A   It was.  I...
14    Q   What was your next employment,
15  please, sir, after Rollings Ranch?
16    A   It would be -- I -- when I
17  came back and worked a little while with
18  the -- Hurst Farms again, temporarily.
19    Q   Why did you leave Rollings
20  Ranch?
21    A   My wife was pregnant, and we
22  was homesick.
23    Q   All right.  So you came back

Page 35

1  and worked on the farm for a period of
2  time.  And then what was your next job?
3    A   Gillionville Plantation.
4    Q   Okay.  And this application
5  has listed Gillionville, and says you
6  worked there from '82 to '84, in Albany,
7  Georgia.
8    A   That's -- that's pretty --
9  that's the way -- that seems right.
10    Q   Okay.  What was your job
11  there, please, sir?
12    A   I was the -- a dog
13  trainer/handler and looked after the quail
14  woods.
15    Q   Is that commercial or private?
16    A   It was commercial.
17    Q   So you charged guests to hunt
18  quail?
19    A   That's right.
20    Q   Did they stay on the property?
21    A   Yes, sir.
22    Q   How many employees did they
23  have?

Page 36

1    A   Ten -- ten to fifteen.  It
2  probably varied.  Some were seasonal.
3    Q   When they're hunting --
4    A   Yes.
5    Q   In the hunting season, they
6  have more?
7    A   That's right.
8    Q   Okay.  And did they do
9  anything besides hunting, you know?  Is it
10  any other kind --
11    A   They had a farming operation.
12    Q   All right.  And your job there
13  was what?
14    A   I was a dog trainer, and I
15  assumed a lot of responsibilities in the
16  quail -- over the quail habitat.
17    Q   Were you any kind of manager
18  or supervisor?
19    A   I did not have a title, I
20  don't -- I don't guess, other than a
21  dog -- I was a dog trainer, and I did what
22  they typically do.
23    Q   Were you on a -- paid a

9  (Pages 33 to 36)

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

### Page 37

1  salary?
2      A    Yes, sir.
3      Q    How much was the salary?
4      A    I don't remember.
5      Q    Do they have any black
6  employees there?
7      A    Yes, sir.
8      Q    All right.  And who -- who
9  would you say would have been in charge of
10  that?
11      A    A guy by the name of Jesse
12  Jackson.
13      Q    Was he white or black?
14      A    He was white.
15      Q    Is he still living?  Do you
16  know?
17      A    I think so.
18      Q    Do you ever talk to him?
19      A    Not in the last couple of
20  years.
21      Q    All right.  Why did you leave
22  there in '84?
23      A    I had an opportunity to work

### Page 38

1  in my hometown, on a -- on a plantation
2  there.
3      Q    At Millpond?
4      A    At Millpond.
5      Q    Who owns Millpond Plantation?
6      A    It's now owned by the
7  Sedgewick -- Sedgewick family.
8      Q    Well, when you worked there,
9  who owned it?
10      A    The Sedgewick family owned it
11  for the last year.  The Perry family owned
12  it for the years prior to that.  They're
13  all first cousins.  I mean, it's all in
14  the same family, basically.  But...
15      Q    Okay.  Now, what was your job
16  at Millpond?
17      A    Well, for the first -- I don't
18  know.  First period, it was just a dog
19  trainer.  Title was a dog trainer, but I
20  did have a -- the responsibility of
21  looking after the quail woods.  In the --
22  the last, approximately, six years, I was
23  the manager and the dog trainer.

### Page 39

1      Q    Last six years, you were
2  manager?
3      A    Manager and dog trainer, with
4  the exception of -- the last year, I
5  brought in a -- a guy to -- to take the
6  dog -- the actual hunts out, and started
7  training him and getting him ready to do
8  that.  I had too much responsibility.
9      Q    Okay.  Well, as -- as a
10  manager at Millpond, did you hire and fire
11  employees?
12      A    Yes, sir.
13      Q    And you -- you worked there as
14  a manager for six or seven years; right?
15      A    That's right.
16      Q    So I -- how many employees did
17  you have?
18      A    It -- it varied from -- from
19  eight to twenty.  Seasonal.  We had some
20  seasonal help, and it fluctuated some.
21      Q    Did -- did they have any other
22  aspect to their operation other than the
23  quail hunting?  Did they farm or

### Page 40

1  anything?
2      A    We -- just a little bit.  Not
3  a lot.  Just -- we -- we did a little bit
4  once or twice.
5      Q    How many acres did they have?
6      A    The property that I was
7  responsible for was thirty-three hundred,
8  plus another -- approximately a thousand
9  that was neighbor's property -- family
10  property that we managed quail on.
11      Q    Did y'all set birds out?
12      A    No, sir.
13      Q    It was a -- it was a wild
14  quail?
15      A    All wild quail.
16      Q    Okay.  So you have to manage
17  that population --
18      A    Yes, sir.
19      Q    -- is that right?  Is that
20  what you're talking about, managing the
21  quail woods?
22      A    Yes, sir.
23      Q    How do you do that?

10  (Pages 37 to 40)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 41

1    A    Well, it's -- that's not
2  easy. That's not a question I can answer
3  just in a few minutes. Do you want to
4  hear it?
5    Q    Well, I -- do you -- do you
6  feed them?
7    A    We do feed them.
8    Q    Okay.
9    A    You do feed them.
10   Q    Okay.
11   A    You feed them. You burn
12  properly. You -- you manicure the woods.
13  You trap -- you have it trapped.
14   Q    Do you provide cover for them?
15   A    We do.
16   Q    And --
17   A    That's -- that's included in
18  burning properly.
19   Q    Okay. And -- and so it's a
20  year-round process --
21   A    Yes, sir.
22   Q    -- of making conditions
23  optimum for their population.

Page 42

1    A    That's right.
2    Q    Is that fair?
3    A    Yes, sir.
4    Q    Did they teach you how to do
5  that at junior college?
6    A    No, sir.
7    Q    When you got an associate's
8  degree in wildlife technologies, they
9  didn't teach you that?
10   A    They teach me the basic
11  principles of wildlife technology. They
12  weren't -- it was not -- I did not special
13  -- specialize in quail management.
14   Q    Could you have?
15   A    No, sir.
16   Q    Okay. All right. Well --
17   A    I learned more from
18  experience.
19   Q    While you were over there
20  at -- at Millpond, were there any lawsuits
21  against that plantation?
22   A    Not that I'm aware of. Other
23  than maybe a workers' comp claim or

Page 43

1  something like that.
2    Q    Okay. Did you have any blacks
3  working for you?
4    A    Yes, sir.
5    Q    Did you have any black guides?
6    A    I was the only guide.
7    Q    Okay. What did the -- what
8  did the blacks do as -- in their jobs at
9  Millpond?
10   A    To drive equipment, a hunting
11  wagon. Drive a hunting wagon, worked in
12  the main house, worked on the grounds.
13   Q    How much did you pay, an hour,
14  to them?
15   A    It varied, based on their --
16  their experience and what they could
17  contribute to the -- to the place. And it
18  were -- you know --
19   Q    Give me the range.
20   A    Uh, starting when? Ten years
21  ago? Twenty years ago?
22   Q    No. You only managed for six
23  years.

Page 44

1    A    Well, I was -- I was having --
2    Q    So from 1999 on.
3    A    It would probably start at
4  minimum wage and go to eight fifty, nine
5  dollars an hour, just based on how long
6  they had been there and what their needs
7  were. If they come to me and asked for a
8  raise, we'd evaluate them, you know.
9    Q    Did you have written job --
10  job evaluations?
11   A    No, sir.
12   Q    Did you have a progressive
13  disciplinary policy?
14       MR. DUKES: Object to the
15  form.
16   A    Didn't --
17       MR. DUKES: Go ahead.
18   Q    You can answer.
19   A    Didn't really ever have a
20  problem with disciplinary -- with
21  discipline.
22   Q    Well, did you ever write
23  anybody up?

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1    A    I can't remember.
2    Q    Did you ever fire anybody?
3    A    Yes, sir.
4    Q    Why?
5    A    Not showing up for work,
6    basically.
7    Q    Yeah. But --
8    A    More of that than anything.
9    Q    Yeah.
10   A    Stealing.
11   Q    Oh, my goodness. People were
12   stealing from you?
13   A    Yes, sir.
14   Q    What did they steal?
15   A    Well, there was a lot of
16   things that were -- we suspected. But a
17   -- but a camera -- video camera from -- a
18   personal video camera.
19   Q    Was that from a guest, or was
20   that --
21   A    No. It was from me. But they
22   was stealing from the guests. I had
23   complaints. And -- and -- and then it

Page 46

1    happened -- when it happened and I knew
2    who was doing it.
3    Q    Who stole that camera from
4    you?
5    A    A Mexican lady that worked
6    there.
7    Q    How did you find out?
8    A    Well, the camera went missing,
9    but the case weren't with it. And I found
10   a situation when she was the only one
11   around. And I set the case and the
12   charger down, and I observed her take it.
13   And I confronted her with it.
14   Q    She admitted it?
15   A    Basically.
16   Q    Okay. Did you press charges?
17   A    No.
18   Q    Did you lock her up?
19   A    No.
20   Q    Just fired her?
21   A    Got her off the property.
22   Q    Okay. Now, why did you leave
23   Millpond? If you were the manager and it

Page 47

1    was your hometown and your wife is from
2    there, why would you leave Millpond
3    Plantation?
4    A    Money.
5    Q    Well, how much money were you
6    making as a manager at Millpond?
7    A    Fifty thousand dollars a year.
8    Q    And somebody -- how did you
9    get in touch with Mid State Land and
10   Timber?
11   A    There was an ad in the paper,
12   and --
13   Q    What paper?
14   A    Thomasville Times-Enterprise.
15   Q    What did it say?
16   A    His -- something along the
17   lines of historical Sedgefields Plantation
18   is looking for someone with experience
19   with quail -- with equine -- equine and --
20   and dogs. I don't remember exactly. But
21   responsible for the dogs and the horses
22   and the hunting.
23   Q    Did it list a salary?

Page 48

1    A    No, sir.
2    Q    Did -- who did you call?
3    A    I think I called and might
4    have spoke with David.
5    Q    David Carroll?
6    A    But I'm not sure. I may have
7    got Denise first. I don't remember, but I
8    eventually talked to David.
9    Q    Okay. And what did he tell
10   you about it?
11   A    He just kind of -- I don't
12   remember exactly. But he did tell me that
13   he would like for me -- I told -- but he
14   asked me some questions. And I told him
15   what I was doing and a little bit about my
16   experience. And he asked me to come over
17   and -- and talk to him.
18   Q    Come over for an interview;
19   right?
20   A    Yes, sir.
21   Q    Did you do that?
22   A    I did.
23   Q    Did you know how much the job

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1  paid?
2      A   No.
3      Q   Okay.
4      A   Didn't even know what the
5  place looked like.
6      Q   All right.  You came over.
7  Was it -- when would you have come over?
8  In September when you filled out this
9  application?
10     A   I'm pretty sure it was -- it
11 may have been -- no.  It was probably in
12 August.  No.  Actually, it was in July,
13 wasn't it?  I was fixing to go to South
14 Dakota.  It was in July.
15     Q   Okay.  And who did you meet
16 with?
17     A   David.
18     Q   Anybody else?
19     A   Not that I recall.
20     Q   Did you ever talk to
21 Mr. Broadhead?
22     A   No, sir.
23     Q   So who hired you?

Page 50

1      A   David.
2      Q   And how much were you
3  making -- take to lure you away from your
4  hometown in Thomasville, Georgia?
5      A   Seventy thousand dollars.
6      Q   Seventy thousand dollars.
7  Plus what?  A truck?
8      A   All the benefits that I was
9  receiving, basically, in Thomasville.
10 Truck.
11     Q   Okay.  Does --
12     A   Insurance, house.
13     Q   Does Mid States provide you
14 with a vehicle?
15     A   They do.
16     Q   What kind of vehicle?
17     A   It's a Chevrolet -- four-wheel
18 drive, Chevrolet truck.
19     Q   What year?
20     A   I'm not -- I'm not for sure.
21 I would probably say an '04 or somewhere
22 along in there.  I'm not sure.
23     Q   Air conditioned?

Page 51

1      A   Yes, sir.
2      Q   Power steering?
3      A   Yes, sir.
4      Q   Got an AM/FM, CD player?
5      A   No CD player.
6      Q   Okay.  Three-quarter ton?
7      A   Yes, sir.
8      Q   Now, in addition, do they
9  provide for all your gasoline?
10     A   They do when I'm on the --
11 when I'm -- job-related.
12     Q   Any -- any maintenance --
13     A   Yes, sir.
14     Q   -- they pay for?
15     A   Yes, sir.
16     Q   Insurance for your truck?
17     A   Yes, sir.
18     Q   Tires?
19     A   Yes, sir.
20     Q   Everything?
21     A   It's their truck.
22     Q   You get to drive it, though;
23 right?

Page 52

1      A   That's right.
2      Q   You get to drive it on
3  personal business, too, don't you?
4      A   I do.
5      Q   Okay.  Have you ever taken
6  your kids to school in it?
7      A   Yes, sir.
8      Q   Now, is that reflected as
9  compensation on your income tax return?
10     A   No, sir.  Not that I know of.
11     Q   Hum.  Okay.  Then you're also
12 provided with housing, aren't you?
13     A   Yes, sir.
14     Q   Where do you live?
15     A   On Sedgefields Plantation.
16     Q   In -- in what -- in what type
17 housing?
18     A   It's a --
19     Q   Is it a house?
20     A   Yes, sir.
21     Q   Okay.  Does anybody else live
22 there besides you and your family?
23     A   No, sir.

13  (Pages 49 to 52)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1  Q    Okay.  So where is it located
2  on Sedgefields' property?
3  A    Right next to the -- the
4  equipment barns and the horse stables.
5  Q    Okay.  So in addition to
6  having transportation and everything
7  associated with it, you're provided with
8  housing.  And that means you don't pay an
9  electric bill, doesn't it?
10  A    That's right.
11  Q    Don't pay for cable or
12  satellite TV; right?
13  A    That's right.
14  Q    Telephone; correct?
15  A    That's right.  That's right.
16  Q    You don't have any expenses,
17  do you?
18  A    I do.
19  Q    For housing?
20  A    No.
21  Q    For transportation?
22  A    Yes.
23  Q    What?

Page 54

1  A    I own another vehicle.
2  Q    Okay.  Well, your wife wants
3  to drive a car, I suspect, doesn't she?
4  A    That's right.
5  Q    Okay.  So --
6  A    Actually, I own several other
7  vehicles.  But...
8  Q    Okay.  So you have to keep the
9  insurance on them; right?
10  A    That's right.
11  Q    And one for your daughter to
12  drive back and forth --
13  A    That's right.
14  Q    -- to school; correct?
15  A    Yes, sir.
16  Q    Okay.  Well, does anybody else
17  in your family work at Mid States, or did
18  work at Mid States --
19  A    No, sir.
20  Q    -- before they were sold?
21  Anybody in your family work on any
22  plantation?
23  A    Yes.

Page 55

1  Q    Who?
2  A    Jason just went to work for
3  Sehoy.  Been there about three or four
4  weeks.
5  Q    What does he do there?
6  A    Anything they need done.
7  Q    Did he ever work at
8  Sedgefields?
9  A    No.
10  Q    Do they have any kind of
11  policy that prohibits him from working
12  there?
13  A    I -- I'm -- I'm not aware of
14  one.
15  Q    I mean, you know how some
16  places have --
17  A    Sure.
18  Q    -- a nepotism policy?
19  A    Yes, sir.  I've experienced
20  that.
21  Q    Yeah.  Okay.  So they don't
22  want people supervising their family
23  members; correct?

Page 56

1  A    That's right.
2  Q    Have you ever had a discussion
3  with anybody at -- at Mid State about
4  that?
5  A    No.
6  Q    You just didn't want Jason
7  working there.
8  A    No.
9  Q    Right?
10  A    That's right.  It's not -- not
11  best -- in his best interest to work for
12  me.
13  Q    Okay.  Mr. Norman, I'm not
14  asking you this to embarrass you, but it's
15  a little unusual for the husband, the
16  male, to get custody of his children.  Do
17  you agree with that?
18  A    Yes, sir.
19  Q    Do you want to tell me why you
20  got custody of your children?
21  MR. DUKES:  Object to the
22  form.
23  Q    You can answer.

**www.AmericanCourtReporting.com**
**September 8, 2006**

Page 57

1    A   I requested custody -- custody
2  of them.
3    Q   Okay.  Well, does your wife
4  have any kind of problem?  Your ex-wife.
5    A   Yes, sir.
6        MR. DUKES:  Let's -- hold on
7  one second.  Let's stop and go off the
8  record for a second.
9        MR. ROBERSON:  Okay.  Let's go
10  off the record.  Tell me what time it is.
11        THE VIDEOGRAPHER:  At this
12  time, we're going off the record.  The
13  approximate time is 9:47 a.m.
14        (Recess taken.)
15        THE VIDEOGRAPHER:  At this
16  time, we're going back on the record.  The
17  approximate time is 9:49 a.m.
18    Q   (BY MR. ROBERSON)  Where does
19  your ex-wife live?
20    A   Somewhere in South Carolina.
21    Q   Somewhere?
22    A   (Witness nodded head in the
23  affirmative.)

Page 58

1    Q   Is that a town or --
2    A   It's -- it's in South
3  Carolina, is all I can tell you.
4    Q   Do you have to pay her any
5  alimony?
6    A   No.
7    Q   You don't have any contact
8  with her?
9    A   No.
10    Q   And she doesn't visit her own
11  children?
12    A   No.  They occasionally visit
13  her, and I -- I pay for them going over
14  there because it's in the kids' best
15  interest to visit their mother.
16    Q   In -- in South Carolina?
17    A   That's right.
18    Q   So you know where she lives,
19  then, don't you?
20    A   Somewhere -- approximately,
21  but I don't know what her address is.
22    Q   Well, how do your kids get
23  there to visit?

Page 59

1    A   They get in the car that I
2  furnish, and they drive over there.  They
3  know where she lives.
4    Q   And you don't?
5    A   I've never been there.
6    Q   You don't know what city it
7  is?
8    A   No.  She's moved.  I mean, I
9  knew at one time it was somewhere around
10  Elloree.  But I know she's moved, and I'm
11  not for sure if she's still in that same
12  community or somewhere close.  I don't
13  know.
14    Q   Why did your -- why did you
15  get a divorce from her?
16        MR. DUKES:  Object to the
17  form.
18    A   It was -- you'd have to know a
19  little history.  And the fact is, she was
20  trying everything she could to destroy
21  me -- my job.  She was undermining -- she
22  actually worked for me --
23    Q   On the --

Page 60

1    A   -- at --
2    Q   -- plantation?
3    A   She did.
4    Q   What -- what was her job?
5    A   She ran the house.  She was --
6  she was a house manager.  But she --
7    Q   Like the --
8    A   She was also an alc -- severe
9  alcoholic, and she had mental problems
10  that were starting to compound.
11    Q   And --
12    A   It was a real delicate
13  situation, and it had just reached a point
14  where somebody had to -- I mean, my --
15  my -- my bosses was coming to me with it,
16  and something had to be done.  And it was
17  just -- I just -- I did whatever I thought
18  was in the best interest of my kids, you
19  know.
20        I knew that she was potentially
21  going to grab my kids and run with them,
22  and it was not going to be a stable home.
23  And I did -- I just took preventive

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

```
 1   measures, when the timing was right, to
 2   just go ahead and file for divorce, file
 3   for custody, and -- so I could raise my
 4   kids properly.
 5      Q   Have you ever told --
 6      A   She had already moved out.
 7      Q   Have you ever told anybody
 8   that your ex-wife was dating a black man?
 9      A   No, sir.
10      Q   Was she?
11      A   I don't know.
12      Q   Was the -- Tina, did she also
13   work on the plantation?
14      A   She did.
15      Q   What was her job there?
16      A   She was a gardener.  She was a
17   gardener and looked after all the
18   grounds.  She had the responsibility of
19   all the grounds.
20      Q   When did your relationship
21   with Tina start?  Before or after your
22   marriage ended?
23      A   After.
```

Page 62

```
 1      Q   Hum.  When did your marriage
 2   end?
 3      A   I married, I believe, on
 4   September the 17th of last year.
 5      Q   No.  When did your first
 6   marriage end?
 7      A   Oh, the marriage ended a long
 8   time ago.
 9      Q   What -- when was the divorce
10   final?
11      A   I'd have to pull it up and
12   see.  It's been -- it's just a lot of --
13   been a lot of water under bridge, and it's
14   just -- it wasn't a -- it's just
15   something -- not something that I -- that
16   I mentally log.  It wasn't -- it's not a
17   pleasant experience.
18      Q   All right.  So did you have to
19   get married to Tina before they would let
20   you live at Sedgefields?
21      A   It --
22      MR. DUKES:  Object to the
23   form.
```

Page 63

```
 1      A   It -- we -- I'll say that
 2   we -- we planned to be married -- we had
 3   planned to get married, and it -- the -- I
 4   -- we did not want to live together.  We
 5   lived in separate houses before we came
 6   here.  And we had discussed getting
 7   married.
 8      It was a comment that was made to
 9   me, that they did not want us living
10   together, you know, shacking up.  And I --
11   and I appreciate and respect that
12   comment.  And we talked about it, and we
13   decided that we should -- if we were going
14   to move over here together, we should --
15   we should go ahead and get married.
16      Q   Did you get married before you
17   moved on the property?
18      A   I sure did.
19      Q   Okay.
20      A   The day before -- two days
21   before.
22      Q   All right.  Where did you get
23   married?
```

Page 64

```
 1      A   Thomasville, Georgia.
 2      Q   Did -- now --
 3      MR. DUKES:  And let's go off
 4   the record again.  Stop.
 5      MR. ROBERSON:  Why?
 6      MR. DUKES:  I need to talk to
 7   him.
 8      MR. ROBERSON:  Okay.  Let's go
 9   off the record.
10      THE VIDEOGRAPHER:  At this
11   time, we're going off the record.  The
12   approximate time is 9:54 a.m.
13      (Recess taken.)
14      THE VIDEOGRAPHER:  At this
15   time, we're going back on the record.  The
16   approximate time is 10:04 a.m.
17      Q   (BY MR. ROBERSON)  Mr. Norman,
18   are you the quail operations manager?
19      A   I -- I think that's on my
20   card, yes, sir.
21      (WHEREUPON, a document was
22   marked as Plaintiff's Exhibit Number 2 and
23   is attached to the original transcript.)
```

16 (Pages 61 to 64)

**www.AmericanCourtReporting.com**
**September 8, 2006**

## American Court Reporting
## toll-free (877) 320-1050

Page 65

1    Q    Okay. Let me show you what
2  I'll mark as Plaintiff's Exhibit 2 to your
3  deposition, and ask you -- and you may not
4  have seen this before. But ask you --
5  that indicates that you are the quail
6  operations manager and make a salary of
7  seventy thousand dollars a year.
8    A    That looks right to me.
9    Q    Okay. Is that your current
10  salary for Tolleson's?
11    A    Yes, sir.
12    Q    Do you have the same job with
13  the new owner?
14    A    Yes, sir.
15    Q    I mean, in other words --
16    A    Nothing -- nothing has
17  changed. David --
18    Q    Okay. Same job, same truck,
19  same housing; right?
20    A    Yes, sir.
21    Q    And David Carroll hired you;
22  correct?
23    A    That's -- that's right.

Page 66

1         (WHEREUPON, a document was
2  marked as Plaintiff's Exhibit Number 3 and
3  is attached to the original transcript.)
4    Q    I'm going to show you what
5  I've marked as Plaintiff's Exhibit 3 to
6  your deposition, and that -- this is a
7  Sedgefield Plantation employee
8  organization chart, dated March 24, 2006.
9  It's been provided by Sedgefields'
10  lawyer -- Mid State's lawyer.
11       Have you ever seen that document
12  before, Exhibit 3?
13    A    No, sir.
14    Q    Well, would you take a minute
15  to look at it, and tell me if that's an
16  accurate depiction of the organizational
17  chart as of March of '06.
18    A    March of '06?
19    Q    Yeah.
20    A    Yeah. That's -- that's -- I'd
21  say so.
22    Q    And does it show who the
23  manager of Sedgefields was?

Page 67

1    A    Yes, it does.
2    Q    Who was that, please, sir?
3    A    David Carroll was the general
4  manager.
5    Q    He's sitting here today, isn't
6  he?
7    A    Yes.
8    Q    In fact, while you're being
9  deposed, your manager is sitting here at
10  your deposition; correct?
11    A    That's right.
12    Q    Okay. And he's a white male;
13  correct?
14    A    Yes, sir.
15    Q    You're a white male --
16    A    That's right.
17    Q    -- correct?
18    A    Yes, sir.
19    Q    Roy Lee. What is Roy Lee's
20  title?
21    A    Deer operations manager and
22  head of grounds crew.
23    Q    Do you know Roy?

Page 68

1    A    Yes, sir.
2    Q    Have you worked with him since
3  September of '05?
4    A    Yes, sir.
5    Q    Is he a capable employee?
6    A    Yes, sir.
7    Q    Is he honest?
8    A    I don't know that, but I --
9  but I -- but if he's never been -- that I
10  can say -- right off the top of my head, I
11  can't say he's been dishonest to me.
12    Q    Has he been honest in his
13  dealings with you?
14    A    I believe he has.
15    Q    Do you have any reservations
16  about Roy Lee?
17         MR. DUKES: Object to the
18  form.
19    Q    His job performance or
20  anything.
21    A    No, sir. Other than may --
22  you know, no. Not really. Not -- not --
23  he's -- he's capable of doing what -- what

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1   these people have him assigned to do.
2        Q    In fact, Roy Lee was doing
3   your job before you were hired, wasn't he?
4        A    No, sir.
5        Q    He wasn't?
6        A    No, sir.
7        Q    He wasn't taking people on
8   quail hunts?
9        A    He was putting birds out and
10  going and getting them and taking them
11  right back and shooting them, but he
12  wasn't doing what I do.
13       Q    Oh.  What is it that you do
14  that Roy wasn't doing?
15       A    Well, I'm not totally familiar
16  with everything Roy did.  But we have a
17  wild -- we have a wild quail recovery
18  program in place.  That wasn't being
19  done.
20       Q    What does that mean?  Tell me
21  what you mean about a "wild quail recovery
22  program."
23       A    Well, we're -- we're managing

Page 70

1   for wild quail on some of the property,
2   and we -- and we initiate an early release
3   program -- quail program on -- on another
4   portion of the property.
5        Q    What is an "early release
6   program"?  Is that where you set --
7        A    Set them out --
8        Q    -- your birds out?
9        A    -- a couple of months before
10  hunting season and try to carry them
11  through the hunting season.  Basically,
12  just trying to manage that population of
13  released birds.
14       Q    Now, that ain't setting them
15  out to shoot them, is it?
16       A    It is releasing them --
17  pre-releasing them months prior to hunting
18  them, to -- to simulate wild-bird type
19  hunting.  Different kind of dog.  Dog
20  steady to winging shot, not -- not dogs
21  flushing birds for you.
22       Q    Anything else you say you're
23  doing that Roy Lee didn't do?

Page 71

1        A    Like I said, I'm not familiar
2   with everything -- all -- all of his
3   responsibilities, what they were before I
4   went there.  I don't -- I don't know.
5        Q    Have you ever told anybody
6   that you've never worked on a plantation
7   where they used black guides?
8        A    No.  I worked with black
9   guides.
10       Q    Is Roy Lee a black guide?
11       A    Yes.
12       Q    Do you know any other black
13  guides at Mid States?
14       A    I don't know if you would --
15  would consider the guys that put people on
16  deer stands guides or not.  But if they
17  are, they're guides too.  Whoever helped
18  Roy what -- if you're considering them
19  guides.
20       Q    Okay.  What about quail
21  hunting?  Did you have any black guides?
22       A    I was the guide.
23       Q    Oh.  You were the only person

Page 72

1   that was a guide?
2        A    I was the only person that was
3   a guide.
4        Q    Okay.  So when Norris
5   Foster -- and you worked with Norris from
6   the time of your hiring in September until
7   he was fired on December the 29th;
8   correct?
9        A    Pretty much.  The -- the first
10  few weeks was sort of a -- trying to
11  figure out who-could-help-who deal.  So I
12  can't remember exactly when he became
13  strictly to my crew, you know.
14       Q    Okay.  Well, what I'm saying
15  is, your time there at Sedgefields only
16  overlapped from September to the end of
17  December; isn't that fair?  From the time
18  of your hiring --
19       A    That's right, yes.  Yes.  Yes.
20       Q    -- until December?
21       A    That's right.
22       Q    So that's four months, isn't
23  it?  September, October, November, and

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1  December; correct?
2      A    It sounds like it, yes, sir.
3      Q    Okay.  And Norris Foster is a
4  black man, isn't he?
5      A    Yes, sir.
6      Q    He's forty-seven years old,
7  isn't he?
8      A    I don't know.
9      Q    You don't know how old the
10  people are in your crew?
11      A    Nope.  He's a mature adult.
12      Q    All right.  He's a man, isn't
13  he?
14      A    Yes, sir.
15      Q    Do you believe that to
16  discriminate against someone because of
17  their race is wrong?
18      A    Yes, sir.
19      Q    Do you know that it's
20  unlawful?
21      A    Yes, sir.
22      Q    It's against the law, isn't
23  it?

Page 74

1      A    Yes, sir.
2      Q    We agree about that, don't we?
3      A    It's -- it's unethical.
4      Q    It's unethical.  And you also
5  agree that people that do discriminate
6  against people because of their race
7  should be punished.
8      A    Yes, sir.
9      Q    Don't you?
10      A    Yes, sir.
11      Q    That's wrongful conduct, and
12  we ought to punish it, shouldn't we?
13      A    Yes, sir.
14      Q    So if we show that somebody is
15  intentionally discriminated against
16  because of their race, the people who did
17  the discriminating ought to be punished.
18      A    That's right.
19      Q    You agree with that?
20      A    Yes, sir.
21      Q    What should we do to them?
22      A    Whatever --
23      Q    Give them a fine?

Page 75

1      MR. DUKES:  Object to the
2  form.
3      A    Whatever the law -- whatever
4  the law requires.
5      Q    Okay.
6      A    Leave that up to a judge.
7      Q    Now -- and do you agree with
8  me that you ought to pay people based on
9  their experience and their qualifications?
10      A    Yes.
11      Q    You've -- you've been a
12  plantation manager; right?
13      A    Yes.
14      Q    You've hired people and set
15  their salary; correct?
16      A    Yes.  I've -- I've made
17  suggestions to their salary.  I've always
18  run it past whoever was above me before
19  I --
20      Q    Okay.  Have you hired anybody
21  at Mid State Land and Timber?
22      A    No.
23      Q    Have you recommended anybody

Page 76

1  for hire?
2      A    Yes.
3      Q    Who?
4      A    Adam May, Will Hubbard, Chance
5  Ham.
6      Q    Anybody else?
7      A    Not that I -- comes to mind.
8      Q    Are all those white boys?
9      A    Yes, sir.
10      Q    Did you recommend that they be
11  hired at eight dollars an hour?
12      A    It depended on which one
13  you're talking about.  As I recall, these
14  guys filled out applications.  Some of
15  them already had applications on file.
16      In talking to them -- I interviewed
17  them before David.  I asked them what it
18  would take.  They would make suggestions,
19  and I would take it to David.  And I --
20  and then we -- we discussed it.  And then
21  David made the ultimate decision on
22  whether or not we could pay whatever they
23  were asking, or either we made a

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 77

1  counteroffer. David -- David made the
2  offer.
3      Q    Okay.
4      A    I had no authority as to
5  who -- as to what anybody made.
6      Q    Now, do you have any military
7  experience?
8      A    No, sir.
9      Q    Do you think that's valuable
10 when you're looking to hire somebody, that
11 they have military experience?
12     A    I don't. Not necessarily.
13     Q    Yeah. Well, I see all these
14 ads on TV about, you know, be all you can
15 be, and we teach you everything within the
16 military. That just -- is that just
17 recruiting crap? Doesn't mean anything?
18         MR. DUKES: Object to the
19 form.
20     A    We ain't fighting, you know.
21 I mean, we're -- it's just an organization
22 that doesn't require military experience.
23     Q    Well, you give orders, don't

Page 78

1  you?
2      A    No, sir. We -- we -- we
3  give duty -- we assign duties to people,
4  and -- and I wouldn't necessarily call it
5  an order. But we assign duties, and it's
6  all normally taken in good faith. And
7  somebody does their job, what their
8  assignment is.
9      Q    You don't give orders to
10 people that work for you?
11     A    I don't think "order" is an
12 appropriate word. We just -- everybody
13 knows what their respon -- we tell people
14 what their job is for that day, but it's
15 not like you're ordered to do something.
16 It's -- we're all grown. We're all
17 adults. I think that -- when we discuss
18 the duties -- we know what the duties for
19 the day is. It's done -- should be done.
20     Q    Do you know if Mid State Land
21 and Timber gives somebody a preference
22 for -- to -- consideration for employment
23 if they have military experience?

Page 79

1      A    I don't know. I don't know.
2  That's never come up.
3      Q    Well, you know Norris Foster,
4  don't you?
5      A    Yes, sir.
6      Q    Is Norris a thief?
7          MR. DUKES: Object to the
8  form.
9      Q    You can answer.
10     A    I have reason to believe
11 that -- that he's not -- that he's -- that
12 he's -- has taken things in the past.
13     Q    Have you ever seen him,
14 observed him, take anything that didn't
15 belong to him?
16     A    Not with my eyes, no, sir.
17     Q    Well, what reason do you have
18 to believe that Norris Foster is a thief?
19         MR. DUKES: Object to the
20 form.
21     Q    You can answer.
22     A    One of the -- one of his
23 employ -- co-employees told me he did,

Page 80

1  not -- not knowing that he was telling me
2  that he was stealing.
3      Q    Who is that?
4      A    Jeff Harris.
5      Q    Jeff Harris told you that
6  Norris Foster was a thief?
7      A    No.
8          MR. DUKES: Object to the
9  form.
10     A    He did not.
11     Q    What did he tell you?
12     A    He told me that Norris
13 took the -- I asked where the quail --
14 what happened to the quail, and he told me
15 Norris took them home with him.
16     Q    When was that?
17     A    It was after the first hunt
18 that we had. It was somewhere, I think,
19 in October. And Nor -- Jeff did not
20 realize -- Jeff was new to the program.
21 He didn't realize that he was -- that what
22 Norris -- I don't think Jeff realized he
23 had told on Norris. And I did not know

20  (Pages 77 to 80)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1    that Norris had already been accused of
2    taking things in a previous employment
3    there, so I give Norris the benefit of the
4    doubt. And I said, I'll just handle this
5    on the next hunt. I'll be sure that the
6    bird -- that we discuss, you know, getting
7    the birds in the right place and where
8    they're supposed to be.
9        I give everybody the benefit of the
10   doubt and never -- and never confronted
11   Norris with it because I said, well, maybe
12   -- because we were pushed for time, got in
13   late, that -- that somebody just grabbed
14   them to keep them from spoiling or
15   whatever. There wasn't but a handful of
16   birds, you know.
17       But he -- when I asked Jeff -- I
18   said, Jeff, what happened with -- where's
19   the birds? What happened to the birds?
20   Because I looked for them the next
21   morning -- no. I looked for them that
22   night and couldn't find them. Me and
23   David talked. David said, be sure them

Page 82

1    birds get in the refrigerator. I went and
2    looked for them and couldn't find them.
3    Asked Jeff the next morning where the
4    birds was. He said, Norris took them home
5    with him.
6        Q    Okay. Would this be the same
7    Jeffrey Harris who lives at 242 Orchid
8    Lane, in Fitzpatrick, Alabama?
9        A    I don't know where he lives.
10       Q    He began working at
11   Sedgefields in -- or -- in two thou --
12   September 2005?
13       A    I think he was there when I
14   started.
15       Q    Okay.
16       (WHEREUPON, a document was
17   marked as Plaintiff's Exhibit Number 4 and
18   is attached to the original transcript.)
19       Q    I'm going to show you what
20   I've marked as Exhibit Number 4 to your
21   deposition, and that's the affidavit of
22   Jeffrey Harris.
23       Have you ever seen that before

Page 83

1    today?
2        A    No, sir.
3        Q    Why don't we go off the record
4    and let you read that.
5        A    Okay.
6        Q    Okay?
7        A    All right.
8        MR. ROBERSON:  Let's go off
9    the record.
10       THE VIDEOGRAPHER:  At this
11   time, we're going off the record. The
12   approximate time is 10:19 a.m.
13       (Recess taken.)
14       THE VIDEOGRAPHER:  At this
15   time, we're going back on the record. The
16   approximate time is 10:23 a.m.
17       Q    (BY MR. ROBERSON) Mr. Norman,
18   have you had an opportunity to read --
19       A    Yes, sir.
20       Q    -- this affidavit, Exhibit
21   4 --
22       A    Yes.
23       Q    -- during our break? Okay.

Page 84

1    And you hadn't seen it before today?
2        A    No, sir.
3        Q    Well, you know what an
4    affidavit is, don't you?
5        A    I think so, yes, sir.
6        Q    It's a sworn statement.
7        A    Yes, sir.
8        Q    Correct?
9        A    Yes, sir.
10       Q    And Jeffrey Harris, in this
11   affidavit -- read what he says, starting
12   right there, on December 29th.
13       A    28th or 29th?
14       Q    Well, whatever it says.
15       A    On December 28th, I spoke with
16   Joel Norman about Norris Foster. He
17   claimed that I had told him that Norris
18   took dead birds out of the refrigerator.
19   I told him that Norris didn't take the
20   birds, but, rather, the birds were thrown
21   out of the refrigerator because they were
22   rotten. Joel fired Norris Foster that
23   same day.

21  (Pages 81 to 84)

www.AmericanCourtReporting.com
September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 85

1    Q    Okay.  Now, do you -- have you
2    never seen that before?
3    A    Just -- just while ago I saw
4    it.
5    Q    Okay.  Is Jeffrey Harris
6    lying?
7    A    Yes, sir.
8    Q    Okay.  So he's --
9    A    He's lying about me firing Nor
10   -- Norris.  I didn't fire Norris.
11   Q    Oh, you didn't?
12   A    No.
13   Q    David Carroll did?
14   A    David did.
15   Q    I see.  Well, did you
16   recommend to David Carroll that Norris be
17   fired?
18   A    No, sir.  I told him that --
19   that things had just got to the point
20   where we had some -- something had to be
21   done, that we weren't making -- we were
22   going backwards.
23   Q    Something had to be done.

Page 86

1    Well, you weren't leaving, were you?
2    A    No, sir.
3    Q    So Norris had to be fired,
4    didn't he?
5         MR. DUKES:  Object to the
6    form.
7    A    I don't know.
8    Q    Okay.
9    A    I don't know what other
10   options there were.
11   Q    Now, did anybody hear Jeffrey
12   Harris tell you that Norris Foster took
13   some birds?
14   A    I don't think so.
15   Q    So he was alone with you when
16   he told you that?
17   A    Probably so.
18   Q    Okay.  Did you ever make any
19   document of any kind, any writing
20   whatsoever, about the theft of property at
21   Mid State Land and Timber by Norris
22   Foster?
23        MR. DUKES:  Jerry, can you

Page 87

1    lower your voice a little bit?  We can --
2    we can hear you okay.
3    A    No, sir.  No -- nothing formal
4    was written.
5    Q    Well, is it against the policy
6    of Mid State Land and Timber for employees
7    to steal their property?
8    A    It is.  But I did not
9    realize -- I give -- I did not realize
10   that he stole them.  I knew they were
11   taken, but I -- I did not deem it as
12   stolen until I found out that he had
13   already been fired for stealing one -- one
14   time before.
15   Q    Oh.  Norris had been fired for
16   stealing?
17   A    Well, that's -- I heard --
18   that's what was told to me.
19   Q    Well, who told you that?
20   A    Denise.
21   Q    Denise who?
22   A    Pierce.
23   Q    Is she on that chart?

Page 88

1    A    She is.
2    Q    What is Denise Pierce?
3    A    She's the lodge manager and
4    bookkeeper.
5    Q    Is she white?
6    A    She is.
7    Q    So you -- you claim that
8    Denise told you that Norris was previously
9    fired from Sedgefields -- or from Mid
10   State Land and Timber for stealing; is
11   that correct?
12   A    She told me that he had stole
13   from them before, in a previous
14   employment, and I assumed that's why he
15   was fired.
16   Q    Okay.  Did you create any
17   document, during any time that Norris
18   Foster worked at Mid State Land and
19   Timber, to show that Norris Foster was
20   stealing from them?
21   A    No, sir.  We -- I discussed
22   it -- I just discussed it with David, what
23   -- what I felt had happened.

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 89

1    Q    Okay. Now, Norris Foster,
2    from -- in the -- he -- how -- how many
3    years, to your knowledge, had Norris
4    Foster worked at what was Sedgefields
5    Plantation? Do you know?
6    A    I don't know.
7    Q    Hum. You -- there was one
8    reprimand in Norris Foster's personnel
9    file.
10    A    That's right. One --
11    Q    And you wrote it?
12    A    That's right.
13    Q    And you wrote it. Does
14    Sedgefields -- Mid State Land and
15    Timber/Sedgefields have a progressive
16    disciplinary policy?
17    A    Not that I'm aware of.
18    Q    Well, they've got --
19         (WHEREUPON, a document was
20    marked as Plaintiff's Exhibit Number 5 and
21    is attached to the original transcript.)
22    Q    Let me show you what I'll mark
23    as Plaintiff's Exhibit 5. And this is the

Page 90

1    formal reprimand that you wrote up for --
2    for Norris Foster; right?
3    A    Yes, sir.
4    Q    And it's dated December 6,
5    2005; correct?
6    A    That's right.
7    Q    And Norris signed it, didn't
8    he?
9    A    Yes, sir. That's right.
10    Q    And you signed it?
11    A    Yes, sir.
12    Q    And it says that -- says
13    "formal reprimand"; right?
14    A    Right.
15    Q    So they've got a form there.
16    This is a form.
17    A    No. I made that. I -- David
18    told me we need to document something. We
19    were having so many problems that we
20    decided we -- well, we knew we were
21    headed -- headed down the road of trouble,
22    so we started documenting things.
23         And that's something I had done on

Page 91

1    the spur of the moment. David said, write
2    something up, have him sign it. And I
3    just went and threw something together in
4    the best of my ability that -- just to --
5    to show that we had had that conversation
6    and he had been reprimanded.
7    Q    Okay.
8    A    In the event that it came up
9    again.
10    Q    All right. Well, you see here
11    where it says, at the bottom, "strike
12    one"?
13    A    That's right.
14    Q    So this was the first and only
15    time that Norris was ever the recipient of
16    a formal reprimand; correct?
17    A    Other than --
18    MR. DUKES: Object to the
19    form.
20         Go ahead.
21    A    Other than verbally. We had
22    had conversations about things that he had
23    been -- I -- you could call it

Page 92

1    reprimands. We had had conversations
2    about things that weren't going right and
3    things that were -- had been doing wrong.
4    We just realized we needed to start
5    documenting it in -- on paper.
6    Q    So you had never before
7    documented any problems --
8    A    Just verb --
9    Q    -- with Norris Foster;
10    correct?
11    A    Verbally -- verbally with
12    David.
13    Q    No, sir. You understand that
14    document --
15    A    No document.
16    Q    -- means writing?
17    A    No document. Right.
18    Q    So never before December 6th
19    did you ever document any problem with
20    Norris Foster; correct?
21    A    Not that I can recall.
22    Q    And never after November 6th
23    did you document any problem with Norris

23 (Pages 89 to 92)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1  Foster?
2      A    Not that I can recall.
3      Q    And this thing -- this
4  reprimand has three strikes on it, doesn't
5  it?
6      A    That's right.
7      Q    Well, wouldn't that imply that
8  an employee gets three strikes before he's
9  fired?
10     A    I -- we -- I really felt like
11 they were all used up by the time he got
12 fired.
13     Q    Okay.
14     A    They -- they -- we weren't
15 getting anywhere with continually -- we
16 weren't getting anywhere with that.
17     Q    I see.
18     A    Norris was not happy -- I
19 mean, he was happy, and he was causing
20 discord with other employees.  And it had
21 just got to the breaking point that, to
22 prevent further damage with other
23 employees and to -- to continue to try to

Page 94

1  build a team, something -- something had
2  to happen.
3      Q    You didn't want Norris working
4  for you, did you?
5      A    I asked for Nor --
6          MR. DUKES:  Object to the
7  form.
8      A    I requested Norris work for
9  me.
10     Q    On December 29, 2005, you no
11 longer wanted Norris Foster to work for
12 you, did you?
13     A    I would have loved for him to
14 continued working for me and being a
15 member of the team, but he had shown that
16 he was not willing to do that.  He was
17 capable of doing what I needed done.
18     Q    Mr. Norman, did Mid State Land
19 and Timber have any kind of a written
20 policy about race discrimination?
21     A    I don't know.  I would think
22 they would, but I don't know.  I never --
23     Q    You've never seen one, have

Page 95

1  you?
2      A    No, sir.  Not that I can
3  recall.  I -- they may have had a handbook
4  or something, but I don't -- I don't
5  recall reading that.
6      Q    Hum.
7      A    It would --
8      Q    Well --
9      A    If they had one, I'm sure it
10 included it.
11     Q    I see.  Well, they've got
12 insurance, though.  Did you know that?
13     A    I know now.
14     Q    Hum.  That covers them for
15 race discrimination claims; correct?
16     A    It appears that -- yes.
17     Q    Well, Mr. -- Mr. Carter -- you
18 didn't know him.  You didn't hire him, did
19 you?
20     A    No, sir.  He's a lawyer, is
21 all I know.
22     Q    Yeah.  Okay.  So the only
23 evidence you have that Norris Foster is a

Page 96

1  thief and that he has stolen things from
2  Mid State Land and Timber is a statement
3  that was made to you by Jeffrey Harris; is
4  that fair?
5      A    And De --
6          MR. DUKES:  Object to the
7  form.
8      A    And Denise Pierce.
9      Q    And Denise Pierce.  You're
10 right.  That's -- he -- you claim he had
11 stolen before, but during your -- while
12 you worked there, that was a statement by
13 Jeff Harris; right?
14     A    I -- the statement was made by
15 Denise.  I don't know how it came about.
16 It was in discussing Norris' job
17 performance, me asking a little bit about
18 his history, that that came up.  That's
19 when I realized that -- when the birds
20 went missing, that they were stolen
21 instead of just taken to keep them from
22 going to waste.  I knew then he knew the
23 protocol and that he shouldn't have took

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1    them.
2        Q    Now, when -- when people are
3    hired at Mid States, do they ever get a
4    written job evaluation?
5        A    Not that I'm aware of.
6        Q    Okay.
7        A    Possibly. I don't know. I
8    never -- I think they have an evaluation
9    at six months with David. I think they
10    had a job evaluation, confirmation, or
11    whatever. And I don't think I ever quite
12    made it to the six-month point before it
13    sold. Somewhere about there.
14        Q    All right.
15        (WHEREUPON, a document was
16    marked as Plaintiff's Exhibit Number 6 and
17    is attached to the original transcript.)
18        Q    I'm going to show you what
19    I've marked as Plaintiff's Exhibit 6 to
20    your deposition, and I'll represent to you
21    that these are a copy of the defendant's
22    answers to plaintiff's interrogatories.
23    And that means -- those are just

Page 98

1    questions. I asked questions and Mid
2    States, through their lawyers, answered
3    them.
4        A    Uh-huh.
5        Q    Okay. Are you familiar with
6    that, generally? Have you ever seen this
7    document before?
8        A    No.
9        Q    Okay. Well, look at that. Is
10    it fair to say that you and David Carroll
11    made the decision to fire Norris Foster?
12        MR. DUKES:  Object to the
13    form.
14        Q    You can answer.
15        A    David made the decision. I --
16    I told him what I -- what I was up against
17    and what the problems were. He made the
18    decision.
19        Q    Well, Norris Foster worked for
20    you; correct?
21        A    He worked -- he worked under
22    me, yes, sir.
23        Q    You were his immediate

Page 99

1    supervisor; correct?
2        A    Yes. Right.
3        Q    And David Carroll wouldn't
4    fire one of your employees without talking
5    to you and getting your approval for that,
6    would he?
7        MR. DUKES:  Object to the
8    form.
9        Q    Would he?
10        A    I wouldn't think he would.
11        Q    He didn't, did he?
12        MR. DUKES:  Object to the
13    form.
14        A    No. I talked to -- I went to
15    David, and we discussed the problems, and
16    we -- we had been discussing the whole
17    scenario from the get-go. Any time we had
18    a problem, I took it to David.
19        Q    And you agreed with David's
20    decision to fire Norris Foster, didn't
21    you?
22        A    That was the only recourse,
23    I guess, he felt like he had, and I agreed

Page 100

1    with it.
2        Q    Okay. You didn't object to
3    him firing him, did you?
4        A    No, sir. No.
5        Q    You didn't argue to try
6    to save Norris' job, did you?
7        A    No, sir.
8        Q    Okay. That's all I'm asking.
9    You approved it.
10        MR. NORRIS:  Object to the
11    form.
12        Q    Correct? I don't mean that --
13        MR. DUKES:  Misstates his
14    prior testimony.
15        A    I took --
16        MR. DUKES:  Been asked and
17    answered.
18        A    I took it to David, and David
19    made the decision. And I -- and I support
20    whatever decision David made.
21        Q    Okay. Well, good. How
22    much did Sedgefields -- when it was sold,
23    how much was the price of Sedgefields? Do

25  (Pages 97 to 100)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 101

1  you know?
2      A    All I know is what I've
3  heard. I don't -- I haven't seen any
4  documents. I just -- I've heard
5  thirty-two million dollars, but I don't
6  know if it's -- I've heard -- I've heard
7  thirty-six. I've heard forty-five. I've
8  heard eighteen too.
9      Q    Have you ever -- have you ever
10 heard of American Field, The Sportsman's
11 Journal?
12     A    Yes, sir.
13     Q    What is that?
14     A    That's a -- that's a bird dog
15 magazine.
16         (WHEREUPON, a document was
17 marked as Plaintiff's Exhibit Number 7 and
18 is attached to the original transcript.)
19     Q    Let me show you Plaintiff's
20 Exhibit 7. Is it a legitimate
21 publication?
22     A    Yes, sir. Well, I assume so.
23     Q    I mean, will you get it?

Page 102

1      A    Yes, sir.
2      Q    Do you read it?
3      A    Yes, sir.
4      Q    Do you rely on it?
5      A    It's got some opinions in it.
6      Q    Sure.
7      A    You know.
8      Q    But it's fairly accurate,
9  wouldn't you think?
10     A    As far as the facts go,
11 normally --
12     Q    Okay.
13     A    -- of reporting field trials
14 and such, yes. I read this. Sure did.
15     Q    And in that -- in Exhibit 7,
16 it says that Sedgefields was sold for
17 thirty-two million, doesn't it?
18     A    It also says it was -- let's
19 see. But I -- but I question some of the
20 things about Orvis, Cushman, and
21 Wakefield. I don't know who -- who -- I
22 don't know who sold it to who. I mean, I
23 knew they were showing it. I read that.

Page 103

1      Q    All right. I want to go back
2  to the day that Norris Foster was fired.
3  And I don't know. Was it December 28th or
4  29th?
5      A    I don't know.
6      Q    Okay. Well, do you remember
7  that you had done some work on some farm
8  equipment? I believe a -- some kind of
9  mower, a grass cutter.
10     A    Probably so. I worked on
11 every -- probably most everything out
12 here.
13     Q    And you spent eight hundred
14 dollars at the tractor place getting some
15 parts. Does that sound about right?
16     A    On which piece of equipment?
17     Q    And --
18     A    Which piece of equipment are
19 you talking -- are you referring to?
20     Q    The tree cutter.
21     A    No, sir.
22         MR. ROBERSON:  Is that what it
23 was?

Page 104

1      A    No, sir.
2      Q    Okay. Well, did -- were you
3  working on a tree cutter in December?
4      A    I have worked on a tree
5  cutter.
6      Q    And did you take it out and
7  make one -- one circle with it, and it
8  broke again?
9      A    No, sir. Not that I'm aware
10 of. I can't remember. I mean, it -- I'm
11 not saying I didn't. I've had -- took a
12 bunch of stuff out before and it broke and
13 be back at the bottom with it.
14     Q    Well, did Norris, while you
15 were working on it, tell you that you
16 needed to get the bars level before you
17 went out there?
18     A    Now, I don't recall that.
19     Q    Yeah. And if you didn't get
20 them level, that the thing was going to
21 break, and it would be right back where
22 you were. Did he tell you that?
23     A    I don't remember that.

26 (Pages 101 to 104)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 105

1    Q    And then --
2    A    I don't even know what -- what
3  bars you're talking about on a tree
4  cutter.
5    Q    And then you went out there
6  and made one pass, and it broke again.
7  And Norris was laughing at you, wasn't
8  he?
9    A    I don't know.
10    Q    You didn't see him laughing?
11    A    No, sir. I don't recall that.
12    Q    Would that -- would that hurt
13  your feelings, if he laughed at you after
14  he told you what you were about to do?
15    MR. DUKES:  Object to the
16  form.
17    A    I -- I don't necessarily think
18  it would hurt my feelings.
19    Q    Okay. Well --
20    A    I'll say I, you know --
21    Q    Do you think you can learn
22  from Norris Foster? Do you think he --
23    A    No, sir.

Page 106

1    Q    No? Do you think he might
2  know more than you about some things?
3    A    It's possible, but not
4  anything I'm interested in.
5    Q    Okay. Like equipment -- farm
6  equipment?
7    A    Definitely not.
8    Q    So you can't learn anything
9  from Norris Foster, can you?
10    A    I don't --
11    MR. DUKES:  Object to the
12  form.
13    Q    Well, you can answer.
14    A    Not that -- not that I feel
15  valuable.
16    Q    Did you -- do you remember
17  anything Norris said the day he was fired?
18    A    Yes, sir.
19    Q    What did he say?
20    A    He said -- he said something
21  to the effect, so I guess that means I'm
22  fired. And I think David might have
23  replied yes or whatever. And he said

Page 107

1  that -- that it wouldn't be the last we
2  heard from him.
3    Q    Okay. Anything else?
4    A    He said something to the
5  effect of, that's what lawyers are made
6  for. And then, as he walked to his truck
7  out there, he made a statement of -- which
8  I don't like really repeating because I
9  don't like to hear the word. He referred
10  to his self as a no good, sorry nigger.
11    Q    Norris said that?
12    A    He said that.
13    Q    Exactly what did he say?
14    A    He said, I guess I'm just a
15  worthless, no good, sorry nigger, when he
16  was walking to his car. And I -- I
17  thought that was -- I really -- I thought
18  that was an improper statement for him --
19  even him to make, you know.
20    Q    Okay. Did you ever use that
21  word before?
22    A    If -- if I did, it would be in
23  maybe telling my kids or -- or -- or

Page 108

1  sharing that it's not an appropriate
2  word. It just not is an appropriate word
3  to use.
4    Q    So you've never referred to
5  black people as niggers, ever in your
6  life?
7    A    I -- the only time I would
8  ever use that word is in maybe telling my
9  kids -- trying to settle a dispute or
10  something where -- showing them it's not a
11  proper word. Only in reference. Never as
12  to being improper. It's not a proper
13  word.
14    Q    You -- you grew up in
15  Thomasville, Georgia?
16    A    I did.
17    Q    Did you go to public schools?
18    A    I did. Went to school with
19  black people. I've worked with black
20  people all my life.
21    Q    And you've never called a
22  black person a nigger?
23    A    I cannot recall doing that.

27 (Pages 105 to 108)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1    Q    Even when maybe a black person
2    cut in front of you on the interstate or
3    something?  You never even said it in
4    anger?
5    A    Not that I can recall.  I
6    don't -- I don't -- like I said, I don't
7    feel like that's a proper word.  And if I
8    ever used it in that -- in that demeanor,
9    it -- you know, it would have been wrong.
10   And I don't recall doing that.
11   Q    What church do you go to?
12   A    I don't -- I'm not going to
13   church right now.
14   Q    Have you ever gone to church?
15   A    Yes, sir.
16   Q    Well, are you a member of any
17   clubs, any country clubs?
18   A    No, sir.
19   Q    Are you a member of any
20   organizations like the, you know, Chamber
21   of Commerce or --
22   A    I'm a member --
23   Q    -- Kiwanis Club or anything?

Page 110

1    A    Georgia/Florida Invitational
2    Field Trial Club.  I'm a member of that.
3    Q    Is that a hunting dog club?
4    A    It's a field trial club.
5    Q    Okay.  Anything else?
6    A    That's all I can think of.
7    Q    Now, there's been some
8    questions raised in this case about Norris
9    Foster.  And you've told me the basis --
10   about stealing birds.  Has Norris Foster,
11   to your knowledge, ever stolen any dog
12   food from Mid State Land and Timber?
13   A    I don't know.
14   Q    Do you have any information?
15   A    I heard --
16   Q    Have you heard from any
17   source?
18   A    I have heard that -- I have
19   heard that he did.
20   Q    Well, who did you hear it
21   from?
22   A    I think it come up yesterday.
23   I think -- I think I heard maybe --

Page 111

1    Q    You didn't hear about it until
2    yesterday?
3    A    It seemed like -- yeah.  That
4    he -- but that's not why Norris Foster was
5    fired from -- from -- from here this
6    go-round.  That was --
7    Q    Well, what did you hear
8    yesterday?
9    MR. DUKES:  You don't need to
10   tell him any conversations that we've
11   had.
12   A    Yeah.  I -- I don't remember
13   where -- I've heard something along the
14   lines of -- it may have been -- well,
15   then -- I'm not going to answer that,
16   then.
17   Q    Well, have you heard from any
18   source, other than Sedgefields' lawyer,
19   that Norris Foster stole dog food?
20   A    I'd have to think about that.
21   I can't remember exactly what -- who --
22   who -- who -- who I heard say it.  But it
23   seems like I heard that in discussing

Page 112

1    Norris with somebody several -- several
2    months before he -- you know, back before
3    he was fired, in asking about him or
4    something, you know.  Asking -- I can't
5    remember.
6    It seems like I heard that, but I
7    didn't really -- that was in a prior
8    employment there, you know.  And I knew
9    about the -- that some -- he had been
10   accused of taking food or birds or
11   something out of the cooler.  It seems
12   like dog food might have been said too.  I
13   can't remember, you know, exactly.
14   Q    Well, Mr. Norman --
15   A    But it -- but it answered some
16   questions for me, where I had questions.
17   When I found out he had already been
18   accused of that, it kind of -- but that's
19   not why Norris Foster was fired.
20   Q    Mr. Norman, I'm just a country
21   lawyer, and I only get to talk to you one
22   time --
23   A    Yes, sir.

28  (Pages 109 to 112)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1    Q    -- before there's a trial --
2    A    Right.
3    Q    -- in this case.
4    A    Right.
5    Q    So I'm just asking you, sir,
6    to tell me who told you that Norris
7    Foster -- other than your lawyer.  I don't
8    want to know about conversations --
9    A    Yeah.  That's right.
10    Q    -- with your lawyer.  But who
11    told you?  And I'm entitled to that
12    information.
13    A    I can't -- I can't remember
14    exactly because -- who told me.  I'm
15    not going to -- I can tell you that Denise
16    told me that he had -- that Roy had hired
17    him back and that she basically was
18    against it because he had already been
19    terminated one time for what she
20    thought -- what she said, he had been
21    accused of stealing, you know.
22    As far as I knew, that was the
23    reason he was terminated, for stealing

Page 114

1    birds.  And I don't remember if that's
2    where the dog food word come in or not.
3    But I -- it seems like dog food is a
4    familiar part of it.
5    Q    Now, you know, you're a
6    manager of a -- you formerly were a
7    manager of a plantation, weren't you?
8    A    Yes, sir.
9    Q    And everybody has a personnel
10    file that works at the plantation, don't
11    they?
12    A    Not necessarily.
13    MR. DUKES:  Object to the
14    form.
15    Q    No?
16    A    No.  I mean, they may have a
17    file regarding their wages or whatever,
18    but that's, you know --
19    Q    Well, if somebody was fired
20    for stealing birds, wouldn't you expect
21    that there would be a document somewhere
22    that would show that?  Wouldn't you expect
23    that?

Page 115

1    A    It's possible, yeah.
2    Q    Well, it's not just possible.
3    It would be there, wouldn't it?
4    A    I guess if there was a reason
5    for firing him.
6    Q    And let me tell you
7    something.  Have you ever opposed
8    anybody's unemployment?
9    MR. DUKES:  Object to the
10    form.  Do you know what he's talking
11    about?
12    Q    You can answer.  Anybody?
13    A    Yeah.  I'm sitting here
14    thinking.  Yeah, I did.  And I'm trying to
15    remember why.
16    Q    Well, I can tell you why.
17    A    It seems like it -- it seems
18    like it was -- it was for --
19    Q    Well, if that lady stole a
20    camera from you and she filed for
21    unemployment, she can't get it if you
22    tell -- tell them that she stole from you
23    and that's why she was fired.

Page 116

1    A    I don't know.  I objected one
2    time for -- I can't remember for what, and
3    it didn't seem to matter.  It just -- in
4    Georgia.  They just got it anyway, you
5    know.
6    Q    Hum.
7    A    I don't have a lot of faith in
8    that system.
9    Q    I see.  Well, have you ever --
10    and Norris Foster has sued Mid State Land
11    and Timber for discrimination.  You're
12    aware of that, aren't you?
13    A    Yes, sir.
14    Q    That's why you're here today,
15    isn't it?
16    A    It seems so, yes, sir.
17    Q    So to your knowledge, is there
18    any document, in the history of the world,
19    that shows that Norris Foster was ever
20    fired for stealing from Mid States?  Have
21    you seen any kind of document like that?
22    A    No, sir.
23    Q    Well, that seems like the kind