**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06-CV-00405-ID-SRW

NORRIS FOSTER,
        Plaintiff,
vs.
MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

        Defendant.

THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

JOEL NORMAN

September 8, 2006

9:11        a.m.

COURT REPORTER:

Gwendolyn P. Timbie, CSR

Page 2

1    STIPULATIONS
2        IT IS STIPULATED AND AGREED by and
3    between the parties through their
4    respective counsel that the videotaped
5    deposition of JOEL NORMAN, may be taken
6    before Gwendolyn P. Timbie, Certified
7    Shorthand Reporter and Notary Public,
8    State at Large, at the law office of John
9    Waters, Union Springs, Alabama, on
10   September 8, 2006, commencing at
11   approximately 9:11 a.m.
12       IT IS FURTHER STIPULATED AND
13   AGREED that the signature to and the
14   reading of the deposition by the witness
15   is not waived, the deposition to have the
16   same force and effect as if full
17   compliance had been had with all laws and
18   rules of Court relating to the taking of
19   depositions.
20       IT IS FURTHER STIPULATED AND
21   AGREED that it shall not be necessary for
22   any objections to be made by counsel to
23   any questions, except as to form or

Page 3

1    leading questions, and that counsel for
2    the parties may make objections and assign
3    grounds at the time of trial or at the
4    time said deposition is offered in
5    evidence, or prior thereto.
6        Please be advised that this is the
7    same and not retained by the Court
8    Reporter, nor filed with the Court.

Page 4

1        INDEX
2    EXAMINATION BY:                    PAGE NO:
3    Mr. Roberson                        9
4    Mr. Dukes                          203
5    Certificate                        206
6    Instructions to Witness            207
7    Signature Page                     209
8    Errata Sheet                       210
9
10       LIST OF EXHIBITS
11   EXHIBITS:                          PAGE NO:
12   Plaintiff's 1                       15
13   Plaintiff's 2                       64
14   Plaintiff's 3                       65
15   Plaintiff's 4                       82
16   Plaintiff's 5                       89
17   Plaintiff's 6                       97
18   Plaintiff's 7                      101
19   Plaintiff's 8                      120
20   Plaintiff's 9                      121
21   Plaintiff's 10                     123
22   Plaintiff's 11                     126
23   Plaintiff's 12                     133

1 (Pages 1 to 4)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1 of document you ought to have if you're
2 making that claim, isn't it?
3     MR. DUKES: Object to the
4 form.
5     A    If you were going to fire him
6 for that, it -- it needed to be
7 documented.
8     Q    You told me he got fired for
9 stealing.
10    A    That's what I heard.
11    MR. DUKES: Object to the
12 form.
13    Q    Are you saying that might not
14 be true?
15    A    No, sir. I believe that's why
16 he got fired.
17    Q    You do?
18    MR. DUKES: Object to the
19 form.
20    A    The first time.
21    Q    Well, why do you believe that?
22    A    Because he -- because he stole
23 while I was there. I believe that's that's

Page 118

1 the legitimate reason. And the reason
2 that I didn't suggest he be fired when he
3 stole from me is because I had just went
4 to work there. I was coming in. I was
5 the underdog, and I was trying to build
6 positive relationships. And I give him
7 the benefit of the doubt at that point.
8 And farther -- later on, I realized that I
9 had been taken advantage of.
10    Q    I see.
11    A    But I did not make an issue
12 out of it. I did not want to make an
13 issue out of it. I was trying to build a
14 team, and it got to a point where the team
15 was not -- was going the other direction.
16    Q    I see. Well, did you ever
17 have a discussion with Norris Foster about
18 him stealing some birds?
19    A    I don't think so.
20    Q    Did you ever ask him if he
21 stole some birds before you fired him?
22    A    No. I didn't fire him.
23    Q    Well, before he was fired.

Page 119

1 Did you ever discuss with him the fact
2 that you claim that Jeffrey Harris told
3 you he stole some birds?
4     A    No. I don't believe so.
5     Q    Was that the reason Norris was
6 fired, is because he stole some birds?
7     A    From -- the second time he was
8 fired?
9     Q    Yes.
10    A    No, sir. It was -- it may
11 have been part of the compounding of the
12 reasons. It didn't help his cause.
13    Q    Now, you hired -- or you
14 recommended Joseph Mays and William
15 Hubbard be hired in -- in September of
16 '05; isn't that correct?
17    A    It seems somewhere -- when,
18 now? September?
19    Q    Yes, sir.
20    A    Of '05? I don't --
21    Q    I'm sorry. November of '05.
22    A    That's -- that's -- that's
23 probably close to it. I can't -- I'm not

Page 120

1 good with dates.
2     Q    All right.
3         (WHEREUPON, a document was
4 marked as Plaintiff's Exhibit Number 8 and
5 is attached to the original transcript.)
6     Q    I'm going to show you Exhibit
7 8, and ask you if you've ever seen that
8 document.
9     A    I haven't read this one yet
10 because you ain't give me time.
11 Have I ever seen this?
12    Q    Yes.
13    A    This is -- this is when David
14 terminated him. No. I haven't seen this.
15    Q    Okay. Let's go off the
16 record. We're about out of tape. And
17 let's go off the record and let her change
18 tapes if we can.
19    THE VIDEOGRAPHER: At this
20 time, we're going off the record. The
21 approximate time is 10:52 a.m., and this
22 will be the end of tape one.
23    (Recess taken.)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 121

1  THE VIDEOGRAPHER: At this
2  time, we're going back on the record. The
3  approximate time is 11:04 a.m., and this
4  will be the beginning of tape two.
5  (WHEREUPON, a document was
6  marked as Plaintiff's Exhibit Number 9 and
7  is attached to the original transcript.)
8  Q  (BY MR. ROBERSON) Mr. Norman,
9  I'm going to show you what I've marked as
10  Exhibit 9 to your deposition, and ask you
11  if this is related to the first time
12  Norris Foster wor -- worked at Mid State
13  Land and Timber Company.
14  Have you ever seen that document
15  before?
16  A  It don't look familiar. I
17  don't -- I don't think I've had access to
18  that.
19  Q  Well, read -- why don't you
20  read that. It is about Norris Foster,
21  isn't it?
22  A  This is pertaining to his
23  first employment?

Page 122

1  Q  Yeah. Well, did they give a
2  reason why his employment was terminated
3  in nine -- in 2001?
4  A  Reduction in staffing for
5  plantation work.
6  Q  That doesn't say anything
7  about stealing, does it?
8  A  No.
9  Q  Does it say Norris Foster is
10  eligible for rehire?
11  A  That's what it says.
12  Q  Now, why would they make a
13  document like that if he had been stealing
14  from them?
15  A  It may be to --
16  MR. DUKES: Object to the
17  form.
18  A  -- give him a break, get him
19  on down the road, get him -- wouldn't hurt
20  his next -- get him -- get him -- you
21  know, not to hurt him.
22  Q  Why would they hire him back
23  if he had been stealing from them?

Page 123

1  A  I don't know the answer to
2  that. Poor judgment.
3  Q  That would be stupid, wouldn't
4  it?
5  A  Yep.
6  Q  That would be stupid. That
7  would be -- you'd deserve to get sued
8  then, would you?
9  MR. DUKES: Object to the
10  form.
11  A  I don't know about that.
12  But...
13  (WHEREUPON, a document was
14  marked as Plaintiff's Exhibit Number 10
15  and is attached to the original
16  transcript.)
17  Q  I'm going to -- I'm going to
18  show you Exhibit 10. And is this an
19  unemployment application for Norris
20  Foster?
21  A  It looks like it.
22  Q  It looks like --
23  A  Well, I've never seen one

Page 124

1  before, but this looks like that's what
2  that is.
3  Q  And, in fact, Norris Foster
4  drew unemployment after he got laid off
5  for a reduction in staffing at Mid State
6  Land and Timber in 2001, didn't he?
7  A  Looks like they did.
8  Q  He should have, if that's the
9  reason he got laid off, correct?
10  MR. DUKES: Object to the
11  form.
12  Q  He should draw unemployment,
13  shouldn't he?
14  MR. DUKES: Same objection.
15  A  That's up -- that's between
16  him and employment. I don't have any --
17  any say-so over that.
18  Q  Okay. Well, wouldn't you
19  expect an employee to draw unemployment if
20  they were laid off as a result of staffing
21  reduction?
22  A  I'd expect him to get out and
23  hunt another job.

31 (Pages 121 to 124)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1    Q    Oh, okay.  Let me show you
2    this -- this exhibit we didn't finish
3    going over about -- Exhibit 3.
4         Now, if you would -- this indicates
5    the people who worked under you in the
6    quail operations part; correct?
7    A    In March?
8    Q    Yes, sir.
9    A    That -- that looks right.
10   Q    Okay.  Who are those
11   individuals listed there?
12   A    Chance Ham.
13   Q    Is he a white male?
14   A    He is.
15   Q    Okay.  Who else?
16   A    Will Hubbard.
17   Q    Is he a white male?
18   A    He is.
19   Q    Who else?
20   A    Willie Mack.
21   Q    Is he a white male?
22   A    No.
23   Q    He's black, isn't he?

Page 126

1    A    Yes, sir.
2    Q    Now, do you know how much each
3    one of those people made in March of '06?
4    A    I can't -- I can't -- I can't
5    sit here and say that and be -- and be
6    sure.
7    Q    Well, I'll help you.  Did
8    you -- tell me -- Chance Ham was hired in
9    January of '06; isn't that correct?
10   A    I can't -- I can't remember
11   the date.  It was -- it was before hunting
12   season was over.  I remember that.
13   Q    All right.  Now, is Chance
14   Ham -- would that be Forest Chance Ham?
15   A    I believe that's his full
16   name.
17   Q    Okay.
18       (WHEREUPON, a document was
19   marked as Plaintiff's Exhibit Number 11
20   and is attached to the original
21   transcript.)
22   Q    Well, I'm going to show you
23   what I'm going to mark as Exhibit 11.  And

Page 127

1    this is Chance Ham's application for
2    employment with Mid State Land and Timber
3    Company.
4         Have you ever seen that before?
5    A    I believe I did.  But if this
6    was filled out -- he filled out an
7    application way back, early on.  I don't
8    know if this is the original.  Let's see.
9    I don't -- I don't see a date on here.
10   Q    How old is Chance?  He's got
11   his driver's license there.
12   A    11/22.  I don't think --
13   this -- this was on file before we
14   ever inter -- before I ever interviewed
15   Chance, for several months.
16   Q    Okay.  Well --
17   A    I -- I was referred to that
18   file when we were -- when we started
19   looking for some more help.
20   Q    And this is such a bad copy.
21   You probably can't read his date of birth
22   on his driver's license.  But is -- would
23   you say Chance was in his early twenties?

Page 128

1    A    I think he would be, yes, sir.
2    Q    He didn't have any military
3    service, did he?
4    A    No, sir.
5    Q    He had a high school
6    education, didn't he?
7    A    I assume so, yes, sir.
8    Q    And he had worked at Bonnie
9    Plant Farm as a helper; correct?
10   A    He -- that's what's on his
11   application.
12   Q    And he -- and do you -- do
13   y'all check references when -- when
14   somebody applies for a job there?
15   A    I had -- I -- I've talked with
16   Denise about him.  She knew of him and
17   knew a little bit about him.  And I -- she
18   -- I used her as a -- as a reference.
19   Q    Well, that doesn't answer my
20   question.  Do y'all check references on
21   applications?
22   A    I'm sure that they're -- that
23   it has been done.  And David checked on

32 (Pages 125 to 128)

Page 129

```
 1   me.  And I...
 2       Q   Well, Chance was born in
 3   1984.  And so in 2005, he would have been
 4   twenty-one years old, wouldn't he?
 5       A   I assume so.  I haven't done
 6   my math on it.
 7       Q   And he claimed on his
 8   application that he had been dri -- using
 9   heavy equipment -- had a skill of heavy
10   equipment for five years, didn't he?
11       A   If that's what's on there.
12   That -- I have -- like I said, I haven't
13   got that in front of me.  You do.
14       Q   Okay.  Well, Norris Foster,
15   when he worked there, did he drive
16   tractors?
17       A   He did.
18       Q   Did he drive backhoes?
19       A   I -- I -- I -- I imagine he
20   did if it needed driving.
21       Q   Could he operate one,
22   backhoe?
23       A   I would think he could.  I
```

Page 130

```
 1   have confidence in him to believe he
 2   could.
 3       Q   What about bulldozers?  Could
 4   he drive bulldozers, push up piles?
 5       A   He -- I have -- I have not put
 6   him on a bulldozer, but he has convinced
 7   me that he can.  I haven't had the need to
 8   put him on there at this point.
 9       Q   Okay.
10       MR. DUKES:  Wait a minute.
11   Who are we talking about?  Chance Ham or
12   Norris Foster?
13       MR. ROBERSON:  Norris Foster.
14       A   Oh, Norris?
15       Q   Yeah.
16       A   Well, wait.  How did you get
17   to him?  We talked -- you're telling me
18   about -- you were asking me questions
19   about Chance Ham's resume.
20       Q   You need to -- you need to
21   listen to my question.
22       A   Application.
23       MR. DUKES:  Yeah.  I think you
```

Page 131

```
 1   misunderstood him.
 2       Q   We'll -- we'll do it again.
 3       A   Okay.
 4       Q   I'm sorry if you misunderstood
 5   it.
 6       A   Sure.
 7       Q   Do you know Norris Foster?
 8       A   Yes, sir.
 9       Q   Did he drive a tractor when he
10   worked at Mid State?
11       A   He did.
12       Q   Did he drive a bulldozer when
13   he worked at --
14       A   No.
15       Q   -- Mid State?
16       A   Now, I've never witnessed
17   that.
18       Q   Did he drive a -- operate a
19   backhoe?
20       A   I -- I can't specifically say
21   he did, but I would -- I would not -- he
22   probably put some hay in the horse pasture
23   with one, which doesn't require a lot of
```

Page 132

```
 1   backhoe skills.
 2       Q   On the day he was fired, was
 3   he shoveling manure out of the barn?
 4   Norris Foster.
 5       A   They had been cleaning the
 6   stalls in the horse barn.
 7       Q   "They" being Jeffrey Harris
 8   and Norris Foster; correct?
 9       A   On that particular day.
10       Q   Will Hubbard and Joseph May
11   weren't shoveling stalls, were they?
12       A   I don't know if Joseph May
13   even worked there at that time.
14       MR. DUKES:  Object to the
15   form.
16       Q   Well, this says, starting pay
17   expected, negotiable; correct?
18       MR. DUKES:  You're referring
19   to?
20       MR. ROBERSON:  Number 11.
21       A   Yes.  That's what it says.
22       Q   Did you pay him eight dollars
23   an hour?
```

33 (Pages 129 to 132)

Page 133

1   A   It says that he -- this was
2 the application that was put in on
3 11/22/05. I did not interview him until
4 just before we hired him.
5   Q   Okay. And you hired him after
6 Norris Foster was fired; correct?
7   A   I'm not sure. I'm not sure as
8 to the dates of that.
9       (WHEREUPON, a document was
10 marked as Plaintiff's Exhibit Number 12
11 and is attached to the original
12 transcript.)
13   Q   I'm going to show you what I'm
14 going to mark as Exhibit 12, which is
15 William Hubbard's personnel file.
16       Do you know Will Hubbard?
17   A   I do.
18   Q   Does he still work out at
19 Sedgefields?
20   A   No, sir.
21   Q   Did he quit?
22   A   He did.
23   Q   Did you interview him and

Page 134

1 recommend that he be hired in November of
2 2005, as a laborer, at eight dollars per
3 hour?
4   A   After talking with him and
5 interviewing him, I discussed with David
6 did I -- did I feel he -- like he met the
7 qualifications we were looking for. And I
8 suggested that they pay him eight dollars,
9 if that's what it took to get him.
10   Q   Okay. Why did you hire Will
11 Hubbard in November of 2005?
12   A   Needed him.
13   Q   To do what?
14   A   To run equipment.
15   Q   So you recommended that you
16 hire additional staff --
17   A   Yes, sir.
18   Q   -- in November of '05.
19   A   That's right.
20   Q   Is that correct?
21   A   That's right.
22   Q   And David agreed with you;
23 correct?

Page 135

1   A   That's right.
2       MR. ROBERSON: I'm sorry,
3 Carter. What's that number?
4       MR. DUKES: The last exhibit?
5       MR. ROBERSON: Yes, sir. Is
6 it 12?
7       MR. DUKES: 12.
8       MR. ROBERSON: Yeah.
9       (WHEREUPON, a document was
10 marked as Plaintiff's Exhibit Number 13
11 and is attached to the original
12 transcript.)
13   Q   Let me show you Exhibit 13.
14 And this is the personnel file of Joseph
15 May. And it's actually Exhibits 092
16 through 106.
17       Ask you if Joseph May was hired as a
18 laborer in November of '05, at the rate of
19 eight dollars per hour.
20   A   He was -- he asked for nine.
21   Q   Sir, was he hired at -- is he
22 a white male?
23   A   Yes, sir.

Page 136

1   Q   Was he hired at an hourly rate
2 of eight dollars per hour?
3   A   I -- I believe that's right.
4 I haven't -- I haven't --
5   Q   Well, look right there on
6 Exhibit 13.
7   A   Yes, he was.
8   Q   He was, wasn't he?
9   A   That's right.
10   Q   And Will Hubbard doesn't even
11 have a high school education, does he?
12   A   No.
13   Q   How old is Will Hubbard?
14   A   I don't know. Probably about
15 the same age as these other boys.
16   Q   About half Norris Foster's
17 age?
18   A   Probably so.
19   Q   None of those boys have
20 military experience, do they?
21   A   They've got a driver's
22 license.
23       MR. DUKES: Just answer his

American Court Reporting
toll-free (877) 320-1050

Page 137

```
 1   questions.
 2        Q    Are you saying that's why they
 3   were paid eight dollars and Norris
 4   Foster --
 5        A    I --
 6        Q    -- was paid --
 7        A    No.
 8        Q    -- less than that?
 9        A    No.  But I think it was
10   something we considered.  We did not
11   consider military experience.  We
12   considered what they could do for
13   Sedgefields.
14        Q    Do you need a driver's license
15   to drive a tractor?
16        A    No, sir.
17        Q    Do you need a driver's license
18   to drive a backhoe or a bulldozer?
19        A    No, sir.
20        Q    Do you need a driver's license
21   to perform general labor?
22        A    You need one to go to town to
23   get parts or to transport horses to and
```

Page 138

```
 1   from the hunt, to drive a company vehicle.
 2        Q    Okay.  Are you telling me that
 3   the only reason that these boys were paid
 4   eight dollars per hour --
 5        A    No, sir.
 6        Q    -- and Norris Foster made
 7   seven dollars per hour was because he
 8   didn't have a driver's license?
 9        A    No, sir.
10        MR. DUKES:  Object to the
11   form.
12        A    That's not the only reason.
13        Q    Okay.  What's the other
14   reason?
15        A    I had no input on what Norris
16   Foster made.  Norris Foster was hired
17   before I came there.  I only had input on
18   these guys.  These guys could drive
19   equipment.  They could trap.  They could
20   mechanic.  They could fix ma -- machinery
21   that had been broke down that we couldn't
22   use until they got there, till we could
23   hire somebody to help put it back
```

Page 139

```
 1   together.  These were the duties that I
 2   needed fulfilled.
 3        Q    What --
 4        A    And we also needed additional
 5   help.  We were building up.  Building up.
 6   There were -- no magic number.  We needed
 7   more.  I didn't -- we -- I didn't hire any
 8   of them to replace anybody.  It was
 9   building a staff.
10        Q    Well, did you advertise these
11   positions?
12        A    Word of mouth.
13        Q    Did you advertise these
14   positions?
15        A    Just through word of mouth.
16        Q    Is there anything in writing
17   where you posted that jobs were available?
18        A    I don't think so.
19        Q    Because black people could
20   respond to written postings, couldn't
21   they?
22        A    All word of mouth.
23        MR. DUKES:  Object to the
```

Page 140

```
 1   form.
 2        Q    Well, they can't respond to
 3   word of mouth if they don't know about
 4   it?  Do they?
 5        MR. DUKES:  Object to the
 6   form.
 7        A    No, sir.
 8        Q    What's the percentage of black
 9   people in Bullock County?  Do you know?
10        A    No, sir.
11        Q    Is it heavy majority black?
12        MR. DUKES:  Object to the
13   form.
14        A    It appears so.
15        Q    And did you hire three white
16   people, beginning in November of '05, to
17   work -- or David Carroll hire them to
18   work as laborers --
19        A    I did.
20        Q    -- on your plantation?
21        A    I did.
22        Q    Did you have any black
23   applicants --
```

35 (Pages 137 to 140)

www.AmericanCourtReporting.com
September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

```
 1      A    I don't --
 2      Q    -- for those positions?
 3      A    I don't recall any qualified
 4  applicants.
 5      Q    Do you recall any black
 6  applicants?
 7      A    No, sir.
 8      Q    So the only three applicants
 9  were white, and they got hired by word of
10  mouth; correct?
11      A    Well, actually, there were
12  four applicants, but --
13      Q    Who was that other one?
14      A    A guy that worked for David's
15  father.
16      Q    Who was he?
17      A    I can't remember his name.  I
18  can --
19      Q    Was he white?
20      A    He was.
21      Q    So the only four applicants
22  were white; correct?
23      A    That's all I had an -- had an
```

Page 142

```
 1  interview with.  That's all that I was
 2  supposed to.
 3      Q    I see.  Well, why wasn't that
 4  fourth one hired?
 5      A    I think he wanted too much
 6  money.  He couldn't afford to work for
 7  what we were willing to pay.
 8      Q    Did he fill out an
 9  application?
10      A    I don't know if he did or we
11  just inter -- may have just interviewed
12  him and -- and -- and just talked about
13  it.  I don't remember for sure.
14      Q    So would it be fair to say,
15  Mr. Norman, that you handpicked these
16  people who were going to work as laborers
17  at Mid State Land and Timber Company?
18      A    No, sir.
19          MR. DUKES:  Object to the
20  form.
21      A    I didn't handpick them.  I
22  took the first qualified applicants that
23  come along to fill a position that was an
```

Page 143

```
 1  -- position that needed immediately
 2  filling, just as quick as we could.
 3      Q    Okay.  Well, how did the word
 4  get out by word of mouth?
 5      A    I --
 6      Q    Did you tell anybody?
 7      A    I would ask Denise did she
 8  know anybody around town that's -- that's
 9  got some experience.  She -- and I think
10  somehow -- I don't know where the word got
11  out.  But I had -- Will, I think, was the
12  first guy that come by or called me.  No.
13  I take it back.  It was -- I don't
14  remember if it was Adam or Will.  But one
15  of them suggested the other one.  He knew
16  him and told me about his capabilities.
17  And so we decided to hire them both.
18          Chance's application was already on
19  file, and I didn't know it.  I think Will
20  told me, after Adam left, that -- look,
21  said, there's a guy down there that's got
22  experience welding.  His file is already
23  on -- already with the thing.  So I asked
```

Page 144

```
 1  Denise about it, and she said, yeah.  So
 2  we give him a call.  We interviewed him.
 3  I wasn't aware of that until they made me
 4  aware of that, or I would have done hired
 5  him.
 6      Q    So was it generally known?
 7  Did you go to the unemployment office?
 8      A    No, sir.
 9      Q    Did you go post any posters
10  down on Main Street?
11      A    Didn't have to.
12      Q    Just word of mouth?
13      A    Yes, sir.
14      Q    Is Sedgefields an equal
15  opportunity employer?
16      A    I don't know.  I don't know.
17          MR. DUKES:  Object to the
18  form.
19          Do you know what that means?
20      A    I -- I would think that they
21  wouldn't -- they wouldn't discriminate, I
22  mean.
23      Q    Well, wouldn't they post --
```

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1  wouldn't they want to fill positions by
2  posting their jobs, so they could get a
3  diverse and broad experience of -- of
4  applicants for their labor pool?
5      MR. DUKES: Object to the
6  form.
7      A  You know, I don't know if that
8  -- if they -- I don't know.
9      Q  Can you think of any reason --
10     A  I -- I never --
11     Q  -- why they wouldn't post the
12 job? Can you think of any reason?
13     A  We had people that were
14 available. If it were to become necessary
15 to post a job, we -- we probably would
16 have.
17     Q  Since you've been the -- the
18 quail operations manager, have you ever
19 posted any position for -- for work at --
20 at Sedgefields?
21     A  No, sir.
22     Q  Do you know if they have ever
23 posted any job at Sedgefields?

Page 146

1      A  Yes.
2      Q  When was that?
3      A  When they -- the one I
4  responded to.
5      Q  Do you know if there were any
6  other applicants for the position when you
7  were hired?
8      A  I hear there were, but I don't
9  know who they were.
10     (WHEREUPON, a document was
11 marked as Plaintiff's Exhibit Number 14
12 and is attached to the original
13 transcript.)
14     Q  Now, I'm going to show you
15 what I'm going to mark as Exhibit 14, I
16 believe it is.
17 Is Jeffrey Harris a black male?
18     A  Yes, sir.
19     Q  Does he have a driver's
20 license?
21     A  I think he has a driver's
22 license.
23     Q  And he was hired in September

Page 147

1  of '05, the same month you were hired?
2      A  Before I was hired, yes, sir.
3      Q  Okay. Well, he got a raise in
4  January of '06, didn't he?
5      A  Probably his three-month
6  evaluation period, I think. Probably
7  right along -- I think I remember that.
8      Q  Well, why would he get a raise
9  when he was hired before all these white
10 guys and he has a driver's license? And
11 he must have been doing a satisfactory job
12 because he got a raise.
13     A  That's right.
14     MR. DUKES: Object to the
15 form.
16     Q  Why would he get a raise to
17 seven fifty an hour, where he is still
18 making less than the white employees,
19 please, sir?
20     MR. DUKES: Object to the
21 form.
22     Q  I'll show you Exhibit 14.
23 Will you please explain that to me?

Page 148

1      MR. DUKES: Object to the
2  form.
3      A  Well, because he was -- he was
4  making seven, and seven fifty is better
5  than seven.
6      Q  Yeah. Can't argue with that.
7      A  But he still can't weld, still
8  can't drive a bulldozer. He's still in a
9  learning process. He -- he -- he still
10 has a ways to go as far as his value to me
11 on -- on equipment goes and repairing
12 equipment, welding.
13     Do you think a welder should make
14 more than a tractor driver, you know?
15 That's how I evaluate it.
16     Q  Tell me all the people that
17 were white that could weld.
18     A  Before when?
19     Q  Tell me all the people that
20 were white that could weld.
21     A  Now or before I hired any of
22 those guys?
23     Q  Sir, you hired three people --

37 (Pages 145 to 148)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

```
1    A    That's right.
2    Q    -- that were white; correct?
3         MR. DUKES:  Object to the
4    form.
5    A    Right.
6    Q    Of those three people, which
7    ones could weld?
8    A    Chance.  Will could do some
9    welding, not as good as Chance.  And Adam.
10   All three of them.
11        MR. ROBERSON:  Let me have
12   those exhibits, please.
13   Q    Had any of them ever worked
14   anywhere as a welder?
15   A    Chance.
16   Q    Where?
17   A    I think it's C&W, or whatever
18   this place is down the street here that
19   builds these --
20   Q    Had Will Hubbard or Joseph May
21   ever worked as a welder?
22   A    I don't think they were --
23   worked as a, quote, welder, but they had
```

Page 150

```
1    welding experience.
2    Q    Did they ever have any
3    certifications as a welder?
4    A    I don't know about that.
5    Q    Did they list as skills that
6    they held that they could weld?
7    A    We -- they told me they could
8    weld.
9    Q    Oh.
10   A    And I took...
11   Q    Well, wasn't it --
12   A    And they showed me they could
13   weld.
14   Q    Wasn't it important enough to
15   write down?
16   A    I didn't fill out that.
17   Q    I see.
18        MR. ROBERSON:  Can you weld?
19   Q    What do you weld over there at
20   Sedgefields?
21   A    Anything that -- that breaks,
22   you know, on machinery that -- that --
23   that -- to keep it going.  Anything that
```

Page 151

```
1    breaks.
2    Q    And tell me everything that
3    Chance Ham has welded for you.
4    A    Well, he's -- did a bunch of
5    welding on the roller choppers, welded --
6    did some welding on a roam bed and plow.
7    On -- did some welding on some bulldozer
8    tracks that we use.  It's called a -- it's
9    called a Herschel drag, that drags through
10   the woods.  Totally built that.  And I
11   couldn't name all the stuff he's welded
12   up, just, you know, put back together.
13   Good wire welder.
14   Q    Has --
15   A    Could make a lot more money
16   doing something else.
17   Q    Did Will Hubbard ever weld
18   anything for you?
19   A    Yes.
20   Q    What did he weld?
21   A    He welded on the roller
22   choppers.  That's all I can remember.
23   That's basically what his job was, roller
```

Page 152

```
1    chopping.  And that's where his -- we
2    would have been exposed to having to weld.
3    Q    Did Joseph Mays ever weld for
4    you?
5    A    I'm pretty sure he did.  Joe
6    -- Joseph wasn't there very long, and he
7    --
8    Q    Can you name one thing he
9    welded?
10   A    I can't -- I can't remember.
11   He did a bunch of mechanic'ing work,
12   and -- and I'm sure he tacked some stuff
13   together.  But I can't -- I can't -- I
14   can't -- he wasn't there long enough to --
15   to really --
16   Q    Were they hired full time or
17   part time?
18   A    I think they may have been
19   considered part time until their
20   evaluation terms of three months, before
21   they were considered full time, I believe.
22   Q    After three months, is there
23   any written evaluation of anybody's job
```

38  (Pages 149 to 152)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1  performance?
2      A   I'm not -- I'm not sure. They
3  -- that's something that -- I'm not sure
4  about it being written.
5      Q   So it's kind of a subjective
6  evaluation? Do you know what that means,
7  "subjective"?
8      A   I would -- I would -- no,
9  sir. Explain it.
10         MR. DUKES: Object to the
11  form.
12     Q   Excuse me?
13     A   It's subject to what?
14     Q   Well, basically, it's Dave
15  Carroll's opinion of their work
16  performance.
17     A   I'm -- based on -- sure. I'm
18  -- he would ask someone else's opinion,
19  I'm sure, if he didn't have a chance to
20  observe them.
21     Q   Okay. Now, let me ask you,
22  Mr. Norman -- I -- I've never been to a --
23  I don't hunt, so I've never been to a

Page 154

1  quail hunting place. But I hear that at
2  Sedgefields, they charge guests five
3  thousand dollars to hunt on their
4  property. Is that true?
5         MR. DUKES: Object to the
6  form.
7      A   I -- I think so. I think that
8  sounds right.
9      Q   Five thousand dollars for one
10  person to hunt?
11     A   No, sir. I think that's for a
12  party of four.
13     Q   Party of four?
14     A   I believe that's right.
15     Q   Twelve hundred and fifty
16  dollars a piece. And how many --
17     A   That if --
18     Q   -- days of hunting does that
19  get you?
20     A   I think -- I think it's a day.
21     Q   A day?
22     A   Yes.
23     Q   Five thousand dollars a day if

Page 155

1  you -- do -- what if you spend the night?
2      A   I think that probably includes
3  a night's lodging.
4      Q   Oh. So it -- are there people
5  who can pay that?
6      A   Oh, yeah.
7         MR. DUKES: Object to the
8  form.
9      A   Obviously.
10     Q   Well, surely those people have
11  to pay with a credit card or something,
12  don't they?
13     A   Some, yeah.
14     Q   I mean, you don't bring five
15  thousand dollars in a wad of bills out
16  there, do you?
17     A   Some people -- I have seen
18  people come with money, but they didn't --
19  they don't normally pay their bill with
20  cash.
21     Q   Yeah. I mean, of course not.
22  And so there's probably a record of the
23  guests and the amount paid for everyone

Page 156

1  who's visited the lodge, isn't there?
2      A   Should be.
3      Q   And who would have that
4  record?
5      A   Probably somebody in
6  Mississippi, for sure.
7      Q   Okay. Now, if you're paying
8  five thousand dollars a day to hunt, would
9  you give somebody a tip?
10     A   If I was a gracious person, I
11  probably would.
12     Q   Have you ever had a guest at
13  Sedgefields leave a tip?
14     A   Yes, sir.
15     Q   Do they do that also on their
16  credit card?
17     A   I don't know.
18     Q   Well --
19     A   I don't take -- I don't -- I
20  don't collect the money. I just take them
21  hunting.
22     Q   Well, have -- do -- do you
23  know if some people leave money --

39 (Pages 153 to 156)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 157

1    A    Yes.
2    Q    -- and some people leave it on
3  their credit card?
4    A    I know that people leave money
5  from time to time, and I have people walk
6  up and hand you money from time to time.
7  But I don't know how they pay when -- I
8  don't know how they -- other than somebody
9  giving me a cash tip, I don't know how
10  they pay Sedgefields. It's not my
11  business.
12    Q    Oh, I -- I understand that.
13  But it's sort of the custom, in the
14  hunting industry, that if it's a
15  successful hunt, that you'd leave a tip,
16  isn't it?
17    A    Not necessarily, no.
18    Q    No?
19    A    I know places that -- that
20  won't let people tip.
21    Q    Well, at Sedgefields, is it
22  sort of customary to leave a tip?
23    A    Not -- I don't know. I

Page 158

1  haven't been at Sedgefields long enough
2  to -- to know what the customs are. This
3  -- I mean, this is a new thing that we
4  just kind of got kicked off. I don't
5  think there's a written rule.
6    Q    You've been there since
7  September.
8    A    Yes, sir.
9    Q    How many hunts have you been
10  on?
11    A    Probably twenty, twenty-five,
12  something like that. Half-a-day hunts.
13    Q    How many tips have you gotten?
14    A    I don't know. I didn't count
15  them.
16    Q    Well, is there a record of the
17  tips that hunting crews get at
18  Sedgefields?
19    A    There would be a record of
20  those that went through the office. I'm
21  sure that -- that was required.
22    Q    What -- what about those that
23  didn't go through the office?

Page 159

1    A    No. There's not a record of
2  that.
3    Q    That's just cash, isn't it?
4    A    (Witness nodded head in the
5  affirmative.)
6    Q    Is that yes?
7    A    That's yes.
8    Q    And if they give that cash to
9  you, what happens to it?
10    A    If -- if they give it to me?
11      MR. DUKES: Object to the
12  form.
13    Q    Yes.
14    A    If they give it to me -- give
15  it to me, I spend it.
16    Q    Do you share it with the
17  people in your crew?
18    A    Yeah. If -- if it's given --
19  if it's given to me and I'm directed to
20  share it, I will.
21    Q    What if they just give it to
22  you?
23    A    I walk -- I walk and give it

Page 160

1  to Dave -- I give it to David and have
2  David disburse it. If it's given to me
3  to -- to divide, I give it to David and
4  let David divide it. If it's given to me
5  as my gift, I put it in my pocket.
6    Q    Well, what you're saying, as I
7  understand it, is if you get cash, unless
8  the guest directs you to divide it to --
9  with the hunting crew and the other people
10  that have -- went out on the hunt, you
11  keep it?
12    A    Absolutely. I ain't that
13  free-hearted. Something that's give --
14  you said "give" -- to me, is mine.
15    Q    So you make seventy thousand
16  dollars. You are provided with a car and
17  housing. And these guys that are working
18  alongside you for, in Norris' case, seven
19  dollars an hour -- are they part of the
20  hunt?
21    A    Yes, sir.
22      MR. DUKES: Object to the
23  form.

40 (Pages 157 to 160)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 161

```
 1      Q    Are they an important part --
 2      A    Yes, sir.
 3      Q    -- of the successful hunting
 4  experience?
 5      A    Absolutely.
 6      Q    Do they provide customer
 7  service?
 8      A    Yes.
 9      Q    Do they assist the guests?
10      A    Yes.
11      Q    Do they make sure that the
12  guests at Sedgefields has a pleasurable
13  experience?
14      A    It's -- it's their job to.
15      Q    It is their job to.
16      A    But I'm not saying they always
17  make sure of it. It's their job, their
18  description.
19      Q    Okay. Well, they're supposed
20  to. Is that fair?
21      A    Supposed to. There you go.
22  Yes, sir.
23      Q    Okay. Did you ever give
```

Page 162

```
 1  Norris Foster any tips?
 2      A    I can't -- I can't recall. If
 3  I was instructed to, if -- if -- I did.
 4  But I realized there was a problem with
 5  it. Became -- it became an issue. So I
 6  started giving it to David and said,
 7  David, here, disburse this. I don't want
 8  -- I want you to handle this. The tips
 9  were becoming an issue.
10      Q    Okay. Well, do you file an
11  income tax return?
12      A    Yes, sir.
13      Q    How much did you report as
14  income from tips you received?
15      A    None.
16      Q    None?
17      A    None.
18      Q    Didn't you get some tips?
19      A    Yes, sir.
20      Q    You just didn't report them?
21      A    Just didn't report them.
22      Q    Well, isn't that a crime?
23      A    Possibly.
```

Page 163

```
 1      Q    So you didn't share them, and
 2  you didn't report them as income, and you
 3  didn't give them to Norris Foster or the
 4  other hunting -- hunting member -- crew
 5  members?
 6      A    I give --
 7          MR. DUKES: Object to the
 8  form.
 9      A    I did not give what was give
10  -- given to me from -- to anybody. If it
11  was given to me -- if it was handed to me
12  and asked to disburse, I disbursed it.
13      Q    Okay. But you sent a memo
14  there, didn't you?
15      A    I -- I talked with David, and
16  David sent a memo out.
17      Q    Okay. And you sent a memo
18  about the tips, didn't you?
19      A    Yes, sir.
20      Q    In fact, you sent that memo on
21  November 3rd. So it had already become a
22  problem from September to November;
23  correct?
```

Page 164

```
 1      A    Yes, sir. Well, hunting --
 2  hunting started in October. From October
 3  to November, it become an issue.
 4          (WHEREUPON, a document was
 5  marked as Plaintiff's Exhibit Number 15
 6  and is attached to the original
 7  transcript.)
 8      Q    I'll show you what I've marked
 9  as Exhibit 15, and ask you if that's a
10  copy of the memo that was sent to
11  Sedgefield employees about tipping. Is
12  it?
13      A    Oh, yeah. That was sent out.
14      Q    And that's what you talked
15  about with David, and then he -- he sent
16  out that memo; correct?
17      A    Right.
18      Q    All right. Now, did Norris
19  Foster ever blow up a tractor?
20      A    I don't know.
21      Q    Did he ever while you were out
22  there working?
23      A    I don't know.
```

41 (Pages 161 to 164)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

```
1      Q    Do you have any information,
2  from any source whatsoever, other than
3  your lawyer or Mid State's lawyer, that he
4  did?
5      A    Well, we -- we have one that
6  we just had some work done on it that we
7  assumed the engine was good in that he was
8  driving that's giving us problems now.  So
9  I -- I don't know.  I -- I don't know what
10 happened to it.  It's been sitting there
11 since -- basically since he left.  So I
12 don't know, you know.
13     Q    Okay.  And what -- which
14 tractor is that?
15     A    It's a Kubota 9000 that the --
16 the lift in the -- we just had to work --
17 the lift worked on and come back.  Now the
18 engine is no good.
19     Q    All right.  Norris Foster was
20 fired on December the 29th of 2005.  Are
21 you telling me that Sedgefields hadn't had
22 anybody drive that tractor since he was
23 fired?
```

Page 166

```
1      A    What was the date?  December?
2      Q    December 29th.
3      A    I can't -- I can't say to that
4  because we had some other equipment, you
5  know, we were using.  I can't -- I can't
6  be specific about that.  But we have -- we
7  had not discovered a -- a problem with it
8  until we had it sent to the shop.  It's
9  been -- both of them -- we've got two of
10 them.  Both of them have been sitting up
11 for a long period of time.
12     Q    So you're just blaming Norris
13 for that?
14     A    No.  I didn't blame nobody.
15         MR. DUKES:  Object to the
16 form.
17     A    You asked me, and I said I
18 didn't know.
19     Q    Okay.  Well -- now, you know,
20 I go to the restaurant.  And let's say I
21 have a ten dollar check.  And I'm going
22 to -- usually, I leave twenty percent as a
23 tip.  Is that the usual tip in -- on the
```

Page 167

```
1  hunting industry?
2      A    No, sir.
3      Q    Twenty percent?
4      A    No, sir.  I don't know if it
5  --
6      Q    That would be high, wouldn't
7  it?
8      A    I don't know if there is a set
9  thing for it.
10     Q    Yeah.  I don't know either.  I
11 don't hunt.
12         But would -- would you ever get as
13 much as a thousand-dollar tip from
14 somebody?
15     A    No.
16     Q    That -- that would just be --
17 that would be twenty percent, wouldn't
18 it?  Of a five-thousand-dollar bill, that
19 would be twenty percent?
20     A    Yeah.  Yeah.
21     Q    What about five hundred
22 dollars?  Would you get ten percent?
23     A    I'm -- I would never -- not --
```

Page 168

```
1  not at Sedgefields.  I don't think I've --
2  I've seen that.  But -- but I can't -- I
3  don't know.  I don't think I've seen that
4  much.  Not in cash, especially.  I think
5  -- I don't know what was disbursed through
6  the office, you know.
7      Q    Well, when -- when somebody
8  left a tip on their credit card, would
9  their -- they ever -- would the employees
10 ever -- their paychecks show that they got
11 a tip?  In other words --
12     A    Not --
13     Q    -- would part of their
14 compensation be tips that they received?
15     A    I think so.  I think so.
16     Q    Did you -- have you ever
17 gotten a tip on -- on your paycheck?
18     A    I think so.  Yes, sir.
19     Q    How much was it?
20     A    I don't remember.
21         (WHEREUPON, a document was
22 marked as Plaintiff's Exhibit Number 16
23 and is attached to the original
```

42 (Pages 165 to 168)

Page 169

1  transcript.)
2      Q    Let me show you Exhibit 16.
3  Is that Norris Foster's 2005 W2 from Mid
4  State?
5          MR. DUKES:  Let me look at
6  it.
7          If you know.
8      A    Looks like it is.
9      Q    Okay.  Now, how many hunts
10  would you say Norris Foster went on
11  between the time you were employed there
12  until he was fired in December?  Do you
13  have a ballpark?  Just a best judgment?
14     A    I'd just guess at twenty, you
15  know.
16     Q    Most every weekend?  I mean,
17  is it --
18     A    No.  Sometimes it was during
19  the week.  It just varied.  It's --
20     Q    Okay.
21          (WHEREUPON, a document was
22  marked as Plaintiff's Exhibit Number 17
23  and is attached to the original

Page 170

1  transcript.)
2      Q    Well, I'm going to show you
3  Exhibit 17.  And these are copies of pay
4  stubs for Norris Foster.  Now, I
5  don't have every week of pay stubs.  I
6  want you to know that.  Okay?
7      A    Okay.
8      Q    But these are the ones that he
9  still has.  Fair enough?
10     A    Yeah.
11     Q    And I've only seen where -- on
12  one of the pay stubs that he's provided --
13  and there are three, six, nine, eleven.
14  Eleven weeks.  That he got a tip one time.
15     A    I don't see the tip.
16          MR. DUKES:  What was your
17  response?
18          THE WITNESS:  I don't see the
19  tip.
20     Q    (BY MR. ROBERSON)  Here.  All
21  right.  On the first page of Exhibit 17 --
22     A    Okay.
23     Q    I've circled it now.

Page 171

1      A    All right.
2      Q    Do you see it now?
3      A    Yeah.  I see it.
4      Q    Okay.  And what is the amount
5  of the tip?
6      A    Thirty-three dollars and
7  thirty-three cents.
8      Q    So what that means to me, if
9  -- is if there were three people on the
10  hunt, that somebody tipped a hundred
11  dollars.
12     A    There was four people on the
13  hunt.
14     Q    Okay.
15     A    Most of the time.  Sometimes
16  it was three.  It's according.
17     Q    Well, I'm trying to do it --
18  make it easy.
19     A    They may not always work like
20  that.  It varied to how many people was
21  there, who was there, and if they needed
22  horses or not.
23     Q    Well, do we agree that's

Page 172

1  the only tip on those checks?
2      A    That's all I see on there.
3      Q    Yeah.  So from September to
4  December, the only thing that's reflected
5  on those checks that Norris got in tips is
6  thirty-three dollars?
7          MR. DUKES:  Objection to
8  form.  I mean, you -- you've said that
9  this isn't all the -- the check stubs
10  out.
11          MR. ROBERSON:  That's the only
12  ones I have.  If you've got some more,
13  I'll be glad to --
14          MR. DUKES:  I don't need --
15          MR. ROBERSON:  Be glad to look
16  at them.  Y'all paid him.
17          MR. DUKES:  Object to the
18  form.
19     A    I see some September pay
20  periods here -- that are in here that we
21  -- that we didn't even -- we weren't even
22  hunting.  These -- this -- this is
23  September paychecks right there.  There

Page 173

1  were no tips in September or in May. May
2  and September was out of the hunting
3  season.
4      Q    Did you give Norris any cash
5  tips?
6      A    If I was told to, I did.
7      Q    Can you remember any?
8      A    I -- I cannot specifically,
9  but I can -- I do -- I don't remember
10 anything specific.
11     Q    Do you remember a guest by the
12 name of Hardaway?
13     A    Yes, sir.
14     Q    Hardwick, Hardaway, something.
15     A    Right.  Sure do.
16     Q    Did he leave Norris a tip?
17     A    He could have.  He could have.
18     Q    What's his name?
19     A    We've had Hardaway there more
20 than one time, so I can't -- I can't tell
21 you.
22     Q    Where is he from?
23     A    I believe Columbus.

Page 174

1      Q    Georgia; is that correct?
2      A    I think so.
3      Q    And would he have -- you know,
4  I would think -- I don't know, but I would
5  think that if somebody is paying you five
6  thousand dollars to go hunting, that you'd
7  have their name and address; right?
8      A    I don't have it.
9          MR. DUKES:  Object to the
10 form.
11     Q    Well, I -- no.  I meant -- I
12 don't mean you.  I apologize.  I mean Mid
13 State.  They know who their customers
14 are.
15     A    Sure.
16     Q    Right?  They might try to
17 market to them; that is, send them a
18 brochure.
19     A    Uh-huh.
20     Q    Whatever.
21     A    That's right.
22     Q    Things like that.  Direct
23 marketing.

Page 175

1      A    Yes, sir.
2      Q    Maybe even call them.  Say,
3  we've got space this weekend --
4      A    That's right.
5      Q    -- if you -- if you want to
6  come.  Do you think they might do that?
7      A    Probably so.
8      Q    Yeah.  Because there probably
9  ain't a lot of people that pay five
10 thousand dollars.
11         MR. DUKES:  Object to the
12 form.
13     Q    Are there?
14     A    Not enough.
15     Q    Yeah.  Well, how many guests
16 can you have hunting?
17     A    At one time?
18     Q    Yes, sir.
19     A    We try --
20     Q    What's your capacity?
21     A    We try to -- we try to limit
22 to just four people.  Four shooters.
23     Q    Four shooters?

Page 176

1      A    Try to.
2      Q    Is that for safety reasons?
3      A    Yes.
4      Q    Okay.  You don't want, like,
5  Vice-President Cheney.  You don't want
6  them shooting each other; right?
7      A    I'd love to have
8  Vice-President Cheney down here.
9      Q    Okay.  Well -- but can you
10 have a hunt every day?
11     A    No.
12     Q    Why not?
13     A    Well, we didn't have -- we
14 didn't have the grounds available for
15 that, with birds on it.  We just put out
16 enough to accommodate two to three days a
17 week.
18     Q    Would that be about how much
19 traffic you have?
20     A    No.
21     Q    Who kind of -- is there
22 somebody there in the office that keeps up
23 with guests and how much they spend and

**American Court Reporting**
**toll-free (877) 320-1050**

Page 177

```
 1  stuff?
 2      A   Yes.
 3      Q   Who is that?
 4      A   I would assume it to be David
 5  and Denise, both.
 6      Q   Okay.  They're more in the
 7  financial part of it?
 8      A   That's right.
 9      Q   All right.
10          MR. ROBERSON:  Let's take a
11  break.  And I'm getting close to wrapping
12  up, Carter.  Can we go off the record for
13  a few minutes?
14          MR. DUKES:  Sure.
15          THE VIDEOGRAPHER:  At this
16  time, we're going off the record.  The
17  approximate time is 11:55 a.m.
18          (Recess taken.)
19          THE VIDEOGRAPHER:  At this
20  time, we're going back on the record.  The
21  approximate time is 12:03 p.m.
22      Q   (BY MR. ROBERSON)  If you
23  would, Mr. Norman, would you look at
```

Page 178

```
 1  Jeffrey Harris' affidavit?  And -- now,
 2  Jeffrey is a black male; correct?
 3      A   Yes, sir.
 4      Q   And Jeffrey was working with
 5  Norris before Norris was fired; isn't that
 6  true?
 7      A   Yes, sir.
 8      Q   Okay.  Is Jeff an honest
 9  person?
10          MR. DUKES:  Object to the
11  form.
12      A   I think he is, but I'm not a
13  hundred percent positive.
14      Q   Okay.  Well, if you'll look on
15  the second page of Jeffrey Harris'
16  affidavit, it says, I heard Joel Norman
17  make several statements about his
18  intention to replace the black crew with a
19  white crew.  About a month after he
20  arrived, he stated, in my presence, that
21  he was going to get rid of all the blacks
22  in his crew.
23          Did you ever say that?
```

Page 179

```
 1      A   No, sir.
 2      Q   So he's lying about that,
 3  isn't he?
 4      A   If he said that, he's lying.
 5      Q   Well, he swore falsely is what
 6  you're saying?
 7      A   I'm saying he -- that's
 8  absolute.
 9      Q   Okay.  When we had homecoming
10  in Bullock County, he threatened my job
11  and stated he was going to, quote, get
12  some white boys and Mexicans who wanted to
13  work, closed quote.  Because we wanted to
14  get off early for homecoming.
15          Now, did -- did your crew want to
16  get off early for homecoming?
17      A   I -- there was an issue at
18  homecoming.  I can't remember all the --
19  it seems like get off early or get off
20  period.  I don't remember which it was,
21  you know, but I remember homecoming being
22  an issue.
23      Q   And that's the football game.
```

Page 180

```
 1  Homecoming for the high school football
 2  team; right?
 3      A   I guess.
 4      Q   They have a parade here in
 5  Bullock County, don't they?
 6      A   I think so.
 7      Q   In fact, a number of
 8  industries close all day on that day,
 9  don't they?
10      A   I wouldn't doubt it.
11      Q   Did you know that?
12      A   They close around here on --
13  one day a week for -- I don't know what,
14  anyway.  I don't know.  I don't know why
15  they close around here -- you know, why
16  they close up.
17      Q   Did you know it was a
18  tradition to get off early on homecoming?
19      A   Not where I'm from.  It's not
20  a tradition.
21      Q   So you didn't know?
22      A   No.
23          MR. DUKES:  Hey, Jerry, I can
```

45  (Pages 177 to 180)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 181

1  hear you. You need to tone it down a
2  little bit.
3      A   Not -- not grown -- grownups,
4  forty-seven years old, don't take off for
5  homecoming where I'm from.
6      Q   Joel told me had, quote,
7  never worked with black people who were so
8  concerned about their money, closed quote,
9  referring to tips for the crew that he
10 kept.
11     Did you ever make that statement?
12     A   I've told them -- I made the
13 statement that they didn't need to let
14 tips continue to be an issue; that we
15 were -- that David had addressed that, and
16 there was still some static about it. And
17 I told them that tips shouldn't become an
18 issue because we -- that's something that
19 we -- we're going to lose if we continue
20 to make it an issue.
21     Q   So you didn't want anybody
22 complaining when they didn't get a tip and
23 you did?

Page 182

1      A   And I didn't com --
2          MR. DUKES: Object to the
3  form.
4      A   I didn't complain when I
5  didn't get a tip.
6      Q   But when you got a tip, they
7  didn't, unless the guests directed you to
8  give it to them; correct?
9      A   I don't know. I don't know.
10 I don't know what somebody may have handed
11 them.
12     Q   Did Norris train Joseph Mays
13 and Will Hubbard on how to drive a
14 tractor?
15     A   No.
16     Q   Is -- what's -- what's Jeffrey
17 Harris' current status? Is he still
18 employed with --
19     A   No.
20     Q   Was he fired?
21     A   No.
22     Q   Well, why isn't he working
23 there?

Page 183

1      A   He -- he was -- he supposedly
2  fell down and hurt his back. He's on
3  workers' comp, I assume.
4      Q   You don't believe him? I
5  mean, "supposedly."
6      A   I don't know. I don't have --
7  I don't have no way of knowing that, you
8  know. I don't know. I assume -- I assume
9  he's hurt. If he's been to the doctor and
10 they -- and they -- he's drawing
11 unemployment, I assume he's hurt.
12     Q   Do you mean workers' comp?
13     A   Workers' comp, yeah.
14     Q   Is he -- did you fire him?
15     A   No, sir.
16     Q   Did you replace him?
17     A   I did.
18     Q   With who?
19     A   With somebody already on the
20 payroll.
21     Q   Who?
22     A   Will Hubbard.
23     Q   Okay. Did -- has Norris

Page 184

1  Foster been replaced?
2      A   No. Well, I have --
3          MR. DUKES: Object to the
4  form.
5      A   I have one employee at this
6  point. So there are several people that
7  need replacing. I wouldn't --
8      Q   I guess my question to you
9  is --
10     A   Yes. Yes.
11     Q   -- has Norris Foster been
12 replaced?
13         MR. DUKES: Object to the
14 form.
15     A   We replaced him.
16     Q   With who?
17     A   Chance Harn.
18     Q   A white male?
19     A   Yes.
20     Q   Okay. And Chance works --
21 what is his job on the hunting crew?
22     A   He scouted. Basically the
23 same that Norris had.

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 185

1    Q    What did Norris do on the
2  hunting crew?  What role did he play in --
3    A    He was the scout.
4    Q    What does that mean?  We -- I
5  don't hunt, so help me out with that.
6    A    It means if -- if -- out -- if
7  a dog is out of pocket, so to speak, he
8  goes and looks for that dog, calls point,
9  or helps get the dog back in the gallery
10  -- back with us.
11    Q    Okay.
12    A    He holds horses.  He holds the
13  dog.  He does not handle the dogs, which
14  is -- which --
15    Q    You do that, don't you?
16    A    I handle the dogs.
17    Q    Okay.  And so you're the,
18  quote, guide; is that true?
19    A    I'm the dog -- I'm the dog
20  handler.  I'm the guide.
21    Q    Okay.
22    A    Yes, sir.
23    Q    All right.  And so would you

Page 186

1  say you're the most important part of the
2  hunt?  I --
3    A    Not really the --
4    Q    This is no time to be modest.
5    A    Other than the dogs and the
6  quail, yes.
7    Q    Well, person involved with
8  providing the hunting experience.
9    A    Yes.
10    Q    Would you be the most
11  important?
12    A    Right.
13    Q    And that's because you've got
14  to put the people on the birds; right?
15    A    That's right.
16    Q    I mean, you and the dogs --
17    A    Sure.
18    Q    -- correct?  Okay.  And these
19  other guys, they're just there to assist
20  you and the guests --
21    A    That's right.
22    Q    -- is that fair?
23    A    That's right, yes, sir.

Page 187

1    Q    Okay.  And -- and, like, you
2  use more than one dog in the hunt; right?
3    A    That's right.
4    Q    And sometimes a dog will stray
5  or get away from where you are --
6    A    Right.
7    Q    -- right?  And you can't stop
8  the dog that's working.  You don't want
9  to, I guess maybe is a --
10    A    Right.
11    Q    -- better way to say it.  You
12  could, but you don't want to because that
13  would be interrupting the hunt --
14    A    That's right.
15    Q    -- right?
16    A    Yes, sir.
17    Q    So you continue hunting with a
18  dog that's working, and then Norris, or
19  now Will -- Forest -- Will --
20  Mr. Chance -- Chance Ham will go get that
21  stray dog; is that fair?
22    A    Yes, sir.
23    Q    And he'll bring him back to

Page 188

1  you and -- so --
2    A    That's right.
3    Q    -- they can both work?
4    A    That's right.
5    Q    Okay.  And that's just part of
6  his job; right?
7    A    Yes.
8    Q    Does Chance get tips?
9    A    If -- if there's a tip left
10  for him, he does.
11    Q    Okay.  The same as Norris?
12    A    Yes.
13    Q    Now, since this is the only
14  time I get to talk to you before trial, I
15  want to know every reason why Norris
16  Foster was fired.
17    MR. DUKES:  Object to the
18  form.
19    Go ahead.
20    Q    That you know about.
21    A    Well, he failed to complete a
22  task.
23    Q    What was that?  What task did

47 (Pages 185 to 188)

Page 189

1  he fail to complete?
2     A  He -- he was asked to roller
3  chop the entire place. They would get --
4  they would turn around on top of the hill,
5  and they wouldn't go over the hill and
6  chop down in the roughest area that needed
7  it the worst. And I would discover that
8  on a hunt, with my guests on my -- with
9  me, going down into there on foot to
10  follow up birds. And I'd find out they --
11  they hadn't even been in there with the
12  equipment. And I assumed it had been done
13  because they were on into another area.
14     Q  Hold on. When did you
15  discover that?
16     A  While out hunting. I don't --
17  I don't -- it was probably early -- pretty
18  early on in the hunting season. Fairly
19  early.
20     Q  Was there -- was there
21  anything to keep you from making any
22  written documentation about that problem?
23     A  No, sir.

Page 190

1     Q  Did you document it?
2     A  Except for the fact that I
3  took them to the spot and I explained it
4  to them and we went over it. After they
5  denied it, I went to them and took them to
6  the spot, walked them down into the
7  briars, and they admitted and confessed to
8  it, that they wouldn't do it to that.
9     Q  Did you document it?
10     A  Other than -- no more than
11  telling my super -- my supervisor.
12     Q  Is there any writing anywhere
13  about that?
14     A  I don't think so.
15     Q  Okay. So it wasn't important
16  enough to put it down on paper?
17       MR. DUKES: Object to the
18  form.
19     Q  You didn't put it down, did
20  you?
21     A  I -- I don't know if I would
22  say it in those terms. I thought that
23  speaking with them -- I wanted to give

Page 191

1  them an opportunity to talk about it. I
2  really feel like putting things on paper
3  sometimes adds a little extra stress. I
4  feel like talking to somebody should be
5  enough.
6     Q  Okay. Any other criticisms of
7  Norris Foster's job performance while he
8  worked there with you before his
9  termination?
10     A  Well, there's criticism in the
11  hunt around guests.
12     Q  Do you mean -- what do you
13  mean by that, please, sir?
14     A  Say -- make negative comments.
15     Q  About you?
16     A  Yes.
17     Q  What did he say?
18     A  Well, most of these are things
19  that -- that David observed and shared
20  with me. Just -- just -- just derogatory
21  remarks about this or that. He'd come up
22  from behind with a dog and holler and
23  scream, here's your dog. Make a big scene

Page 192

1  out of bringing a lost dog back.
2     One time as --
3     Q  That -- well, excuse me.
4  That's -- you say that's derogatory?
5     A  Whenever you -- these guests
6  are out there for a positive experience,
7  not to have negative things. There's a
8  lost dog advertised in front of the whole
9  crowd, you know.
10     Bring the -- he -- he did not do his
11  job properly. His job is to get the dog
12  back up there, not holler at me and tell
13  me, here's -- there's the dog.
14     Another instance, we release birds.
15  We released them early. We had one area
16  we had to go back and put bird -- more
17  birds out. For whatever reason, the birds
18  weren't there. One of the boxes that the
19  birds were released in was accidentally
20  left in the -- in the field. The dog
21  pointed right at the box. I took the
22  guests in. Some birds got up and flew off
23  in a different direction. I saw the box.

48 (Pages 189 to 192)

Page 193

1  We did not want to see -- the guests to
2  see the box. I mean, that's something
3  that you just -- you don't do. You want
4  it --
5      Q   You don't want the guests to
6  know that you put the birds out?
7      A   They know we put them out, but
8  they don't -- it don't need to look like
9  we put them out a few minutes before. The
10  box had been there a couple of weeks. The
11  box got left. It had already been rained
12  on.
13      I diverted the guests to where the
14  other birds had flown. Diverted the whole
15  party and asked Norris to hold the dog.
16  The dog was standing by the box, with some
17  more birds still walking around in the
18  patch. And he hollered three or four
19  times at me, here's some more birds over
20  here, trying to get our attention. I
21  said, I know about it. I said, we're
22  going over here. He intentionally tried
23  to get me to have to come back into that

Page 194

1  patch -- feed patch where the birds were,
2  walking around in the same area where the
3  box was, you know.
4      Something that you never anticipate
5  on happening, but it did. I did the best
6  I could with the situation. He did what
7  he could to expose what you don't need
8  exposing.
9      Q   Did you write him up?
10      A   No.
11      Q   Did you make any document
12  about it?
13      A   No, sir.
14      Q   Did you ever explain to Norris
15  that you -- why you wouldn't want him to
16  bring hunting guests back by this box?
17      A   Sure.
18      Q   You explained that to him?
19      A   Yes, sir.
20      Q   Okay. Anything else?
21      A   Tip issue.
22      Q   Yeah. We talked about that.
23      A   Because the tip continued to

Page 195

1  be an issue after it was supposed to be
2  resolved.
3      And, like I say, failure to complete
4  tasks on a timely manner. There was a lot
5  of things taking three times longer than
6  it should. As -- for instance, the roller
7  chopping, along with the -- cleaning out
8  the barn. Cleaning up the horse barn.
9      I would observe Norris. I'd go in
10  to check, just to see how things were
11  coming along because there's other things
12  that need to be done. It shouldn't take
13  all day. Norris would usually be standing
14  in the doorway of one of the stalls, with
15  his hands in his pockets while whoever
16  else was in there would be working.
17  Usually Willie Mack or -- or Jeff or
18  whoever. He'd stand there with his door
19  -- with his hands in his pockets. And
20  this was all observed.
21      Q   No writing --
22      A   No, sir.
23      Q   -- correct?

Page 196

1      A   No, sir.
2      Q   Now, on this date that you
3  wrote him up, the formal reprimand, had
4  the clippers broken?
5      A   The clippers weren't in that
6  good of shape. That --
7      Q   Were the clippers broken on
8  that day --
9      A   The clippers --
10      Q   -- when he was riding horses?
11      A   The clippers were -- had a
12  crack in them before they ever started
13  clipping horses, but they -- but it didn't
14  prevent them from clipping the horses.
15      Q   So you're saying the clippers
16  were operational?
17      A   Yes, sir.
18      Q   They weren't broken?
19      A   No. I said they had a crack
20  in them. They were -- they did have a
21  crack, but they were operational.
22      Q   Do y'all have horses out
23  there?

49 (Pages 193 to 196)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 197

1    A    Yes, sir.
2    Q    Do you have to take care of
3  the horses?
4    A    Yes, sir.
5    Q    In fact, did y'all have some
6  new horses?
7    A    Yes.
8    Q    Is it important, before guests
9  ride new horses, that you know something
10 about the temperament of those horses?
11   A    Yes.
12   Q    In fact, if you put a guest on
13 a wild horse and he gets injured, you
14 could be liable, couldn't you?
15   A    That's right.
16   Q    So wouldn't it be important to
17 know something about the temperament of
18 those horses?
19   A    Yes.
20   Q    How long had y'all had these
21 horses?
22   A    I don't remember exactly.
23   Q    Huh. Well, wouldn't part of

Page 198

1  Norris' job be to know the temperament of
2  these horses?
3    A    Which horses?
4    Q    The ones that he was riding.
5    A    He wasn't riding the new
6  horses.
7    Q    What was he riding?
8    A    He was riding, probably, that
9  black horse he rode. Jerry and -- I don't
10 know what Jeff was riding, but Jeff wasn't
11 even -- wasn't even qualified to ride a
12 horse, didn't have permission to ride a
13 horse. His job wasn't to ride a horse.
14   Q    Well, did Norris -- did part
15 of his job duties ever involve riding
16 horses?
17   A    Yes.
18   Q    And --
19   A    During the hunts or during
20 when we were out working dogs. Not -- not
21 -- he was not -- he was not to go on his
22 own and just ride horses.
23   Q    Well, of course not.

Page 199

1    A    But he did.
2    Q    Of course not. He wasn't just
3  supposed to show up for work and ride a
4  horse all day, was he?
5    A    No.
6    Q    Was he smoking marijuana on
7  the job?
8    A    I feel like he was.
9    Q    What information do you have
10 about that?
11   A    Just by observations. I've
12 been around it, and I know what it smells
13 like. I know when somebody -- I can --
14 you can tell things -- a lot of it, I
15 don't have the proof of it. But I do feel
16 like he was.
17   Q    Why do you feel that way? I
18 wasn't there, sir.
19   A    I would -- you could smell it
20 on them. You go -- they -- I feel like
21 they actually smoked it in the horse barn.
22 I'd come back and smell the aroma in the
23 barn.

Page 200

1    Q    Did you ever order a drug
2  test?
3    A    I asked David if there was a
4  drug test procedure, and there was not.
5  And I re -- I said it would be great if we
6  had one.
7    Q    Did you ever call the law?
8    A    No.
9    Q    That's illegal, to smoke
10 marijuana, isn't it?
11   A    Sure.
12   Q    Well -- so you're saying that
13 there's no document about smoking
14 marijuana -- even though you felt like
15 your employees were smoking marijuana --
16 on the job, at work; correct?
17   A    That's right. Sure do.
18   Q    If Norris was such a bad
19 employee, why did it take you till
20 December to fire him?
21       MR. DUKES: Object to the
22 form.
23   A    I thought Norris had a lot of

50 (Pages 197 to 200)

Page 201

1　things he could have added to our team. I
2　chose Norris because Norris could -- after
3　talking with Roy, Norris knew his way
4　around. He had experience and -- but
5　there was some friction from the
6　beginning. I don't know where all the
7　friction stemmed from.
8　　　　But I continued to try to make
9　things work. I overlooked a lot of
10　things. Some of the things I took to
11　David, just so that David knew -- if it
12　ever got to a point, he was informed. I
13　tried, as long as I could, to make the
14　team work.
15　　　　When it got to the point where
16　Norris' attitude was rubbing off on
17　Jeff and Norris would have a fit or a rage
18　or whatever and then I would see the same
19　thing exemplified in Jeff, I knew right
20　then something had to be done. I mean, it
21　just -- it was tearing the team apart. We
22　weren't -- we were not going forward
23　any -- any longer.

Page 202

1　　Q　So you hired these two white
2　guys to take Norris' and Jeff's place?
3　　A　No.
4　　　　MR. DUKES: Object to the
5　form.
6　　A　I hired them because we needed
7　more help.
8　　Q　Oh.
9　　A　They -- because they were
10　available, they took the place. I still
11　need help.
12　　Q　You -- you -- you know -- you
13　knew in November, when they were hired,
14　that you needed some help to work as a
15　team; right?
16　　A　I -- we were building a team.
17　　Q　You were? It was a white
18　team, though, wasn't it?
19　　　　MR. DUKES: Object to the
20　form.
21　　A　No, sir. We already -- we --
22　we had members of the team that weren't
23　white.

Page 203

1　　Q　Okay.
2　　　　(WHEREUPON, a document was
3　marked as Plaintiff's Exhibit Number 18
4　and is attached to the original
5　transcript.)
6　　Q　I'm going to show you what's
7　been marked as Exhibit 18. Do you
8　recognize this document? It's just been
9　produced today, on today's date. But...
10　　A　No. I haven't seen it before.
11　　Q　Okay. Well, why would you
12　give Norris Foster a raise -- a fifty cent
13　raise for 2006 if he was such a bad
14　worker?
15　　A　I didn't suggest that.
16　　Q　Did you agree with it?
17　　A　I never seen it. Never --
18　never was -- never was consulted on it.
19　　Q　Thank you, Mr. Norman. I
20　don't have any further questions.
21　　　　MR. ROBERSON: Have you got
22　any questions, Carter?
23　　　　MR. DUKES: Yeah. I've got

Page 204

1　one follow-up question.
2
3　EXAMINATION BY MR. DUKES:
4　　Q　You testified earlier about
5　the employment history that you provided
6　Mid State when you were applying for
7　employment with Mid State.
8　　A　Sure.
9　　Q　How many years of work
10　experience did you provide Mid State in
11　that application?
12　　A　On paper?
13　　Q　Yes, sir.
14　　A　Probably about twenty-one.
15　Twenty -- twenty -- twenty or twenty-one
16　years' experience.
17　　Q　And did -- were there any gaps
18　in your employment that you did not
19　provide Mid State in that twenty-one,
20　twenty-two years of employment history?
21　　A　No.
22　　Q　There were no other jobs
23　during that twenty-two years of employment

51 (Pages 201 to 204)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 205

1  history that you failed to --
2      A    No.
3      Q    -- tell Mid State about?
4      A    No.
5      Q    That's all I have.
6          MR. ROBERSON:  That's all.
7  That's all.  Thank you, Mr. Norman.
8          THE WITNESS:  Yes, sir.
9          MR. ROBERSON:  Appreciate your
10  help.
11          THE VIDEOGRAPHER:  This
12  concludes the deposition of Joel Norman.
13  This is the 8th day of September 2006, and
14  the time is approximately 12:23 p.m.  At
15  this time, we're off the record.
16
17      FURTHER DEPONENT SAITH NOT
18
19
20
21
22
23

Page 206

1          C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  MONTGOMERY COUNTY )
5      I hereby certify that the above
6  and foregoing deposition was taken down by
7  me in stenotype, and the questions and
8  answers thereto were transcribed by means
9  of computer-aided transcription, and that
10  the foregoing represents a true and
11  correct transcript of the deposition given
12  by said witness upon said hearing.
13      I further certify that I am
14  neither of counsel nor of kin to the
15  parties to the action, nor am I in anywise
16  interested in the result of said cause.
17
18
          GWENDOLYN P. TIMBIE, CSR
          Certificate No:  AL-CSR-569
19
20
21  My Commission Expires
    March 4, 2009
22
23

Page 207

1      INSTRUCTIONS TO THE WITNESS
2
3      PLEASE READ YOUR DEPOSITION OVER
4  CAREFULLY BEFORE YOU SIGN IT.  YOU SHOULD
5  MAKE ALL OF YOUR CHANGES ON THE ATTACHED
6  ERRATA SHEET.  PLEASE DO NOT MARK ON THE
7  ORIGINAL DEPOSITION.
8      AFTER MAKING ANY CHANGES WHICH YOU
9  HAVE NOTED ON THE ATTACHED ERRATA SHEET,
10  SIGN YOUR NAME ON THE ERRATA SHEET AND
11  DATE IT.
12      THEN SIGN YOUR DEPOSITION AT THE
13  END OF YOUR TESTIMONY IN THE SPACE
14  PROVIDED.  YOU ARE SIGNING IT SUBJECT TO
15  THE CHANGES YOU HAVE MADE ON THE ERRATA
16  SHEET, WHICH WILL BE ATTACHED TO THE
17  DEPOSITION.
18      RETURN THE ORIGINAL ERRATA SHEET
19  AND TRANSCRIPT TO AMERICAN COURT REPORTING
20  SERVICE, 2100-A SOUTHBRIDGE PARKWAY, SUITE
21  375, BIRMINGHAM, ALABAMA 35209.
22      ACCORDING TO RULES OF CIVIL
23  PROCEDURE, YOU WILL HAVE THIRTY (30) DAYS

Page 208

1  FROM THE DATE YOU RECEIVED THIS DEPOSITION
2  IN WHICH TO READ, SIGN AND RETURN YOUR
3  DEPOSITION TO THE ABOVE OFFICE.  IF YOU
4  FAIL TO DO SO, YOU AUTOMATICALLY WAIVE
5  YOUR RIGHT TO MAKE ANY CORRECTIONS TO YOUR
6  DEPOSITION.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

52 (Pages 205 to 208)

American Court Reporting
toll-free (877) 320-1050

```
                                    Page 209
 1      SIGNATURE PAGE
 2          OF
 3       JOEL NORMAN
 4
 5
 6       I HEREBY ACKNOWLEDGE THAT I
 7   HAVE READ THE FOREGOING DEPOSITION AND
 8   THAT THE SAME IS A TRUE AND CORRECT
 9   TRANSCRIPTION OF THE ANSWERS GIVEN BY ME
10   TO THE QUESTIONS PROPOUNDED, EXCEPT FOR
11   THE CHANGES, IF ANY, NOTED ON THE ATTACHED
12   ERRATA SHEET.
13
14
15
16
17
18
19
20
21   SIGNATURE: _____
22
23   DATE: _____
```

```
                                    Page 210
 1   PAGE   LINE       EXPLANATION
 2   _____
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   DEPONENT'S SIGNATURE      DATE
22
23   _____      _____
```

www.AmericanCourtReporting.com
September 8, 2006