EXHIBIT 1

# Condensed Transcript

# Deposition of
# Roy Lee

### taken on
### October 11, 2006

### Norris Foster
### v.
### Mid State Land and Timber Company, Incorporated,
### d/b/a Sedgefields Plantation

### Case No. 206-cv-00405-IDSRW



**Certified Court Reporters and Certified Legal Video Specialists**
334.262.3332  1.888.253.DEPS
Email: depo@baker-baker.com
www.baker-baker.com

**1**

```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF ALABAMA
                   NORTHERN DIVISION


     NORRIS FOSTER,
            Plaintiff,
          vs.            CASE NO. 206-cv-00405-IDSRW
     MID STATE LAND AND TIMBER
     COMPANY, INCORPORATED,
     d/b/a SEDGEFIELDS PLANTATION,
            Defendant.

       *   *   *   *   *   *   *   *   *
          The videotaped deposition of ROY LEE
     was taken before Cornelia J. Baker,
     Certified Court Reporter and Certified
     Shorthand Reporter, as Commissioner, on
     Wednesday, October 11, 2006, commencing at
     approximately 12:33 p.m., in the law
     office of John Waters, Union Springs,
     Alabama, pursuant to the stipulations set
     forth herein.
```

**2**

```
 1   *   *   *   *   *   *   *
 2            APPEARANCES
 3
 4  Representing the Plaintiff:
 5     MR. JERRY D. ROBERSON
        Attorney at Law
 6     Roberson & Roberson
        8 Office Park Circle, Suite 150
 7     Birmingham, Alabama 35223
 8     MR. ALBERT ADAMS
        Attorney at Law
 9     Irby Law Firm, L.L.C.
        257 West Broad Street
10     Eufaula, Alabama 36027
11
12  Representing the Defendant:
13     MR. CARTER H. DUKES
        Attorney at Law
14     Concord Center, Suite 700
        2100 Third Avenue North
15     Birmingham, Alabama 35203
16
17
18  Also present:
19     Mr. Jeff Baker, CLVS
20     Mr. Norris Foster
21     Mr. David Carroll
22
23
```

**3**

```
 1   *   *   *   *   *   *   *   *
 2
 3            STIPULATIONS
 4
 5     It is hereby stipulated and agreed by
 6  and between counsel representing the
 7  parties that the videotaped deposition of
 8  ROY LEE is taken pursuant to the Rules of
 9  Civil Procedure, and that said deposition
10  may be taken before Cornelia J. Baker,
11  Certified Court Reporter, as Commissioner,
12  without the formality of a commission;
13  that objections to questions, other than
14  objections as to the form of the
15  questions, need not be made at this time,
16  but may be reserved for a ruling at such
17  time as the deposition may be offered into
18  evidence, or used for any other purpose by
19  either party hereto, provided by the
20  Statute.
21     It is further stipulated and agreed by
22  and between counsel representing the
23  parties in this case, that the filing of
```

**4**

```
 1  the deposition of ROY LEE is hereby
 2  waived, and that said deposition may be
 3  introduced at the trial of this case or
 4  used in any other manner by either party
 5  hereto provided for by the Statute,
 6  regardless of the waiving of the filing of
 7  same.
 8     It is further stipulated and agreed by
 9  and between counsel and the witness that
10  the reading and signing of the deposition
11  by the witness is hereby not waived.
12
13   *   *   *   *   *   *   *   *
14
15
16
17
18
19
20
21
22
23
```

Pages 1 to 4

5

1      * * * * * * * *
2         I N D E X
3
4  EXAMINATION                    PAGE
5  BY MR. ROBERSON:                10
6  EXHIBIT                        PAGE
7  Plaintiff's Exhibit No. 1 .......... 25
      3/23/01 Employee Termination form
8     on Norris Foster
9  Plaintiff's Exhibit No. 2 .......... 27
      4/04/01 Unemployment Compensation
10    form on Norris Foster
11 Plaintiff's Exhibit No. 3 .......... 31
      Mid State Land and Timber New
12    Management Structure
13 Plaintiff's Exhibit No. 4 .......... 37
      3/24/06 Employment Organizational
14    Chart for Sedgefields Plantation
15 Plaintiff's Exhibit No. 5 .......... 74
      Employee Records Jacket on Joel
16    Norman
17 Plaintiff's Exhibit No. 6 .......... 82
      9/01/05 Employment Application on
18    Joel S. Norman, Jr.
19 Plaintiff's Exhibit No. 7 .......... 91
      3/08/05 Mid State Land and Timber
20    Employee Information on Norman
      Foster
21
   Plaintiff's Exhibit No. 8 .......... 92
22    Employee Records Jacket on Norris
      Foster
23

7

1  Plaintiff's Exhibit No. 21 .......... 142
      Employment Records Jacket of Chance
2     Hamm
3  Plaintiff's Exhibit No. 22 .......... 142
      11/22/05 Employment Application of
4     Forest Chance Hamm
5  Plaintiff's Exhibit No. 23 .......... 146
      Employee Records Jacket on Jeffrey
6     Harris
7  Plaintiff's Exhibit No. 24 .......... 147
      8/30/05 Employment Application of
8     Jeffrey Harris
9  Plaintiff's Exhibit No. 25 .......... 148
      Certificate of Birth for Jeffrey
10    Noel Harris
11 Plaintiff's Exhibit No. 26 .......... 149
      Employee Records Jacket for Willie
12    Mack
13 Plaintiff's Exhibit No. 27 .......... 150
      3/16/04 Employment Application of
14    Willie B. Mack
15
16
17
18
19
20
21
22
23

6

1
   Plaintiff's Exhibit No. 9 .......... 94
2     5/01/05 Payroll Status Change Form
      for Norris Foster
3
   Plaintiff's Exhibit No. 10 .......... 96
4     12/16/05 Sedgefields Plantation
      Formal Reprimand for Norris Foster
5
   Plaintiff's Exhibit No. 11 .......... 107
6     12/29/05 Payroll Status Change Form
      on Norris Harris
7
   Plaintiff's Exhibit No. 12 .......... 114
8     Employee Records Jacket on Roy Lee
9  Plaintiff's Exhibit No. 13 .......... 115
      8/10/00 Employment Application on
10    Roy Lee
11 Plaintiff's Exhibit No. 14 .......... 116
      3/04/02 Mid State Land and Timber
12    Employee Information on Roy Lee
13 Plaintiff's Exhibit No. 15 .......... 118
      Affidavit of Jeffrey Harris
14
   Plaintiff's Exhibit No. 16 .......... 125
15    9/30/05 Employee Termination Form
      on William Beckwith, Jr.
16
   Plaintiff's Exhibit No. 17 .......... 131
17    11/17/05 Employee Application of
      William Rogers Hubbard
18
   Plaintiff's Exhibit No. 18 .......... 132
19 Employee Records Jacket of Will
      Hubbard
20
   Plaintiff's Exhibit No. 19 .......... 137
21 Employee Records Jacket of Joseph
      Adam May
22
   Plaintiff's Exhibit No. 20 .......... 138
23    11/17/05 Employment Application of

8

1      THE VIDEOGRAPHER:  We are now on
2      the Record.  Today is
3      October 11th, 2006.  The
4      time is 12:33 p.m.
5          My name is Jeff Baker,
6      Certified Legal Video
7      Specialist for Advanced
8      Video Services.  And this
9      is the videotaped
10     deposition of Mr. Roy Lee
11     taken in the law office of
12     John Waters in Union
13     Springs, Alabama.
14         This deposition is
15     being taken in the matter
16     of Norris Foster,
17     Plaintiff, vs. Mid State
18     Land and Timber Company,
19     Incorporated, doing
20     business as Sedgefields
21     Plantation, Civil Action
22     No. 206-cv-00405-IGSRW, in
23     the U.S. District Court for

                                                Pages 5 to 8

334.262.3332        Baker & Baker Reporting and Video Services, Inc.        334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

Roy Lee
October 11, 2006

---

9

1    the Middle District of
2    Alabama, Northern Division.
3         At this time all
4    persons present will state
5    their name and affiliation
6    with this case, and
7    immediately following we'll
8    have the swearing-in of the
9    Witness.
10    MR. ROBERSON:  My name is Jerry
11    Roberson.  I'm an attorney,
12    and I represent the
13    Plaintiff, Norris Foster.
14    MR. ADAMS:  Albert Adams,
15    representing Norris Foster,
16    the Plaintiff.
17    MR. FOSTER:  Norris Foster, the
18    Plaintiff.
19    MR. DUKES:  I'm Carter Dukes,
20    representing Mid State.
21         Say your name.
22    MR. LEE:  Roy Lee.
23    MR. CARROLL:  David Carroll,

---

10

1         Sedgefields Plantation.
2    COURT REPORTER:  Usual
3         stipulations?
4    (Whereupon all parties agreed
5    to usual stipulations.)
6         ROY LEE,
7    The Witness, having first been duly sworn
8    or affirmed to speak the truth, the whole
9    truth, and nothing but the truth,
10    testified as follows:
11         EXAMINATION
12    BY MR. ROBERSON:
13    Q. Mr. Lee, my name is Jerry Roberson.  I
14    represent Norris Foster in this case.  And
15    he has filed a lawsuit alleging race
16    discrimination as concerns his employment
17    with the former owner of Sedgefields, Mid
18    State Land and Timber Company.  Do you
19    understand that?
20    A. I understand.
21    Q. Okay.  And do you -- did you, up until the
22    sale of Mid States in May of this year,
23    did you work for Mid States prior?

---

11

1    A. Yes.
2    Q. Okay.  And what period of time did you
3    begin your employment with Mid States?
4    A. I can't recall what time I started.
5    Q. Okay.  Well, I've got your personnel file.
6    And if I suggest to you that it was in the
7    year 2000, would that sound about right?
8    A. I think so, about right.
9    Q. Okay.  Now, Mr. Lee, what position do you
10    hold at Mid -- at what was Mid States?
11    A. Farm manager.
12    Q. So you're in management at Mid States?
13    A. Right.
14    Q. And do you know when you were assigned to
15    work in management at Mid States?  Do you
16    know what year it was?
17    A. Not right off.
18    Q. Okay.  Well, Mr. Dukes is the lawyer that
19    represents Mid States.
20    A. Uh-huh (affirmative response).
21    Q. Do you understand that?
22    A. Right.
23    Q. Have you ever given a deposition before

---

12

1    today?
2    A. No.
3    Q. Okay.  There are some rules when I'm
4    talking to you.  And one rule is she's got
5    to take down everything we say.  So you
6    and I shouldn't try to talk at the same
7    time.
8    A. I understand.
9    Q. Okay?
10    A. I understand.
11    Q. And another rule, you're sworn, so you
12    understand you're supposed to tell the
13    truth?
14    A. Right.
15    Q. Okay.  And today, since we're trying to
16    make a record of what's said, I need you
17    to answer out.  That is, don't nod your
18    head or say uh-huh or huh-uh, okay?
19    A. Okay.
20    Q. So we can have a clear record about what
21    was said, okay?
22    A. Okay.
23    Q. And if I ask you a question that you don't

---

13

1    understand the question, you don't
2    understand what I'm asking you, you need
3    to tell me so that I -- otherwise, I'll
4    think you understood it, and I'll accept
5    your answer, okay?
6    A. Okay.
7    Q. So if I ask you something and you don't
8    understand what I'm asking, let me know,
9    okay?
10   A. Okay.
11   Q. And today, if you need to stop and go to
12   the bathroom or get a drink or, you know,
13   just take a break, let us know, because we
14   need to go off the Record --
15   A. Okay.
16   Q. -- and do that, okay?
17   A. Okay.
18   Q. All right.  Now, where do you live, Roy?
19   A. Midway, Alabama.
20   Q. And are you from this area originally?
21   A. Yes.
22   Q. Have you lived here all your life?
23   A. All my life.

15

1    A. No, I don't.  It's more black, I know,
2    than white, so . . .
3    Q. Okay.
4    A. I wouldn't know how many.
5    Q. All right.  Now, you started working at
6    Mid States in the year 2000.  And now, do
7    you work for Tollison's?
8    A. Yes, I do.
9    Q. In the same job you had at Mid States?
10   A. Yes.
11   Q. And that job is farm manager?
12   A. Yes.
13   Q. Okay.  Now, before you went to work at --
14   how old are you, Roy?
15   A. Forty-seven.
16   Q. Before you went to work at Mid States, did
17   you work?
18   A. Before I went to work?
19   Q. Yeah.
20   A. At Mid States?
21   Q. Yes.
22   A. Yes.
23   Q. Where did you work?

14

1    Q. Okay.  Now, Midway -- I'm not from Midway,
2    but Midway is kind of a small town, right?
3    A. Right.
4    Q. Do you know Norris Foster?
5    A. Yes, I do.
6    Q. Have you been knowing him really all your
7    life?
8    A. Yes.
9    Q. Because he lives in Midway, too, right?
10   A. Right.
11   Q. Okay.  And how -- just how many -- about
12   how many people live in Midway?
13   A. The City of Midway?
14   Q. Yeah.
15   A. I would like -- I would say -- I really
16   don't know how many.  It's a lot of them.
17   Q. Okay.  Well, Midway is in -- is it in
18   Bullock County?
19   A. Bullock County.
20   Q. And as far as the demographics, the
21   population of Bullock County, do you know
22   what percentage of black people live --
23   make up the population of Bullock County?

16

1    A. Beaulieu of America.
2    Q. What kind of business is that?
3    A. Yarn division.
4    Q. Yarn?
5    A. Uh-huh (affirmative response).
6    Q. Textile industry?
7    A. Right.
8    Q. How long did you work for Beaulieu?
9    A. Probably eighteen, nineteen years.
10   Q. And what position when you left there,
11   were you?
12   A. Supervisor.
13   Q. Is that also in management?
14   A. Right.
15   Q. How many people did you supervise?
16   A. Thirty-two.
17   Q. Did you work -- where was your job?  Where
18   did you work for them?
19   A. What you mean?
20   Q. At Beaulieu they've got -- don't they have
21   a plant or . . .
22   A. Yeah, they have a plant.
23   Q. In Eufaula?

Pages 13 to 16

Roy Lee
October 11, 2006

17

1    A. Union Springs.
2    Q. In Union Springs?
3    A. Right.
4    Q. Do they have one in Eufaula?
5    A. Yeah, Eufaula.
6    Q. Okay. But you worked in Union Springs?
7    A. Right.
8    Q. Okay. Now, why did you leave Beaulieu?
9    A. The mill shut down. A new company come in
10      and bought us out.
11   Q. Okay.
12   A. And they wanted to transport me to
13      Columbus. They had a plant in Columbus.
14      I went over there for --
15   Q. Columbus, Georgia?
16   A. Right.
17   Q. Okay.
18   A. So I went a couple of weeks, and I didn't
19      like it. So they transferred me to
20      Eufaula, and I didn't like it. So I took
21      the layoff.
22   Q. Okay. So they were relocating you?
23   A. Right.

18

1    Q. And you didn't like where they reassigned
2       you?
3    A. Right.
4    Q. Is that fair?
5    A. That's right.
6    Q. Okay. And so how did you get a job at Mid
7       States?
8    A. When I first -- Norris.
9    Q. Norris Foster?
10   A. Norris told me about it. And Bow Jack
11      (phonetic), a guy named Bow Jack.
12   Q. Was he just a laborer, too?
13   A. Bow Jack?
14   Q. Bow Jack.
15   A. Yes.
16   Q. And did they both work at Mid States?
17   A. Right.
18   Q. Now, are you a hunter? I mean, that is
19      before you started working at Mid States,
20      were you a hunter?
21      MR. DUKES: Object to the form.
22   Q. That is, did you hunt deer or quail or
23      anything?

19

1    A. Deer hunter, yes. Coon hunter, yeah.
2    Q. Okay. And do you -- do you like, enjoy
3       being -- working outside or being outside?
4    A. Yes. I love it, yeah.
5    Q. Okay. So that appealed to you to work on
6       a plantation?
7    A. Right.
8    Q. Work outside on a plantation?
9    A. Right.
10   Q. And did you start working at Mid States as
11      a laborer?
12   A. Yes, I did.
13   Q. Who -- do you know who hired you?
14   A. Hunter McDuffie.
15   Q. Okay. And was he the plantation manager
16      when you started?
17   A. Right.
18   Q. And was he a white man?
19   A. Yes.
20   Q. Okay. And were you assigned to a crew
21      initially?
22   A. Yes.
23   Q. Who was in your crew, if you recall?

20

1    A. Kevin Terrell (phonetic).
2    Q. Kevin?
3    A. Kevin.
4    Q. Yes. All right.
5    A. Norris Foster.
6    Q. Okay.
7    A. Myself.
8    Q. All right. Anybody else?
9    A. Mr. Hunter McDuffie.
10   Q. Okay. Now, was Hunter the guide, so to
11      speak, of the crew?
12   A. Of the crew?
13   Q. Yeah.
14   A. Hunter was the manager of the plantation.
15   Q. Right.
16   A. Norris was the guide.
17   Q. Oh, Norris. What kind of hunting did
18      y'all do initially?
19   A. Quail hunt.
20   Q. Okay. So did Norris take the dogs out and
21      handle the dogs?
22   A. Yes.
23   Q. Okay. And what was your job on the crew?

Pages 17 to 20

21

1  A. I was a backup man.
2  Q. Backup?
3  A. Backup man.
4  Q. What were your responsibilities?
5  A. Pick up birds.  Hold horses when the
6     client get off the horses.
7  Q. They hunt from a horse?
8  A. Right.
9  Q. Do they --
10 A. And a wagon.
11 Q. Do they actually shoot from a horse or do
12    they get down to shoot?
13 A. No.  They get down to shoot.
14 Q. They just ride the horses in the field --
15 A. Right.
16 Q. -- from one place to another?
17 A. To the dog points, uh-huh.
18 Q. Okay.  I apologize to you --
19 A. That's okay.
20 Q. -- but I'm not a hunter.
21 A. That's okay.
22 Q. And some of the people that are hunting
23    ride in a wagon?

22

1  A. Right.
2  Q. Okay.  And what pulls the wagon; is it
3     horses or mules?
4  A. They had mules at that time pulling the
5     wagon.
6  Q. Okay.  And that's just, again, to
7     transport the people?
8  A. Right.
9  Q. And they get out of the wagon and shoot?
10 A. Right.
11 Q. When the dog points?
12 A. Right.
13 Q. Okay.  Now, what was Kevin's job?
14 A. Kevin's job was the same thing.  Kevin was
15    running the wagon.
16 Q. Okay.
17 A. He was holding the mules.  Because you
18    couldn't get down off of the wagon.
19 Q. Okay.
20 A. Somebody had to be there all the time.
21 Q. Right.
22 A. That was Kevin Terrell's job.
23 Q. Okay.  Now, when y'all took people on

23

1     hunts and Roy -- and Norris was the
2     handler, the guide --
3  A. Uh-huh (affirmative response).
4  Q. -- when you had a successful hunt, that is
5     they killed a lot of birds, did sometimes
6     the guests leave a tip for y'all?
7  A. Yes.
8  Q. How did y'all divide up the tips?
9  A. That would go up under Hunter McDuffie.
10 Q. Okay.
11 A. Hunter McDuffie would divide it up with
12    us.
13 Q. Okay.  And did you, from time to time,
14    receive tips?
15 A. Yes.
16 Q. I mean, would they pay you in cash or
17    would it be something that would be put on
18    your check?
19 A. Sometimes cash.  Sometimes it would have
20    to go through the office on payroll
21    deduction.
22 Q. Okay.  All right.  Now, Norris was laid
23    off -- before I get to that, would you say

24

1     that initially Norris was your supervisor?
2  A. Huh?
3  Q. Was Norris ever your supervisor?
4  A. No.  Hunter had Norris by -- Norris been
5     there longer than I have --
6  Q. Yes, sir.
7  A. -- and Kevin was there longer than I have.
8     I was the last man came.
9  Q. Okay.
10 A. Norris was there all the time.  So they
11    had Norris showing us what to do.
12 Q. Okay.  So Norris helped, for lack of a
13    belter word?  You hadn't worked on a
14    plantation before, right?
15 A. No, no.
16 Q. So he trained you?
17 A. Right.
18 Q. That is he showed you what the work was
19    that had to be done before the hunts --
20 A. Right.
21 Q. -- and how to hunt?  I mean, what --
22    correct?
23 A. Right.

Pages 21 to 24

25

1  Q. Okay. Now, in 2001, Norris -- in March of
2     2001, Norris was laid off?
3  A. Uh-huh (affirmative response).
4  Q. Do you recall that?
5        MR. DUKES: Object to the form.
6  A. Yes.
7  Q. Okay. Were there a lot of people, not
8     just Norris? That is it wasn't a one-man
9     layoff, it was several people were laid
10    off; is that correct?
11       MR. DUKES: Object to the form.
12 A. That's correct.
13 Q. Okay. I'm going to show you what I've
14    already marked as Plaintiff's Exhibit 1 to
15    your deposition. And this is a piece of
16    paper that's marked 0055. It's from
17    Norris' personnel file. And I will tell
18    you we've got a protective order in this
19    case. That is, you're not supposed to
20    discuss how much people make and things
21    like that.
22       (Whereupon Plaintiff's Exhibit
23        No. 1 was marked for

26

1        identification and attached
2        hereto.)
3  A. Right.
4  Q. It's not supposed to leave this room,
5     okay?
6  A. Okay.
7  Q. Do you agree with that?
8  A. I understand that.
9  Q. Okay. I'm going to show you Norris' --
10    part of his personnel file, and ask you to
11    read what Mid States Land and Timber said
12    was the reason he was let go.
13       MR. DUKES: Object to the form.
14       Document speaks for itself.
15 Q. You can answer. Does it have a reason for
16    his termination? Do you see that about
17    the middle of the page?
18 A. Right here?
19 Q. Yes.
20 A. From my understanding, what I see down
21    here, it looks like --
22 Q. Reduction in staff?
23 A. Reduction in staff.

27

1  Q. Yeah.
2  A. From plantation work.
3  Q. Okay. So, it looks -- and does it -- on
4     the document, does it say whether or not
5     he's eligible for rehire?
6        MR. DUKES: Object to the form.
7  A. Yeah. Say he is.
8  Q. He is eligible --
9  A. Right.
10 Q. -- on that document?
11 A. Uh-huh (affirmative response).
12 Q. Okay. Then I'm going to show you what
13    I've marked as Exhibit 2 to your
14    deposition. And this is a document that
15    Mid State sent to the Department of
16    Unemployment, Alabama Industrial
17    Relations, for Norris Foster. And they
18    indicated the reason why he separated.
19    Would you read at the bottom of the page
20    what that reason that they -- as they
21    reported to the unemployment office?
22       (Whereupon Plaintiff's Exhibit
23        No. 2 was marked for

28

1        identification and attached
2        hereto.)
3        MR. DUKES: Object to the form.
4  A. Reduction of staff.
5  Q. Okay. Now, do you see the signature at
6     the bottom of that page?
7  A. On the left-hand corner?
8  Q. Yes, sir.
9  A. Uh-huh, yes.
10 Q. Who is that?
11 A. Charlie -- looks like Charlie Phillips
12    (phonetic).
13 Q. Was he ever at the -- was he ever
14    a work -- somebody that worked at
15    Sedgefields?
16 A. Charlie was the CEO.
17 Q. Was he ever on the property?
18 A. He come in like once a month with
19    Mr. Broadhead.
20 Q. Okay. Was he in Meridian?
21 A. Right.
22 Q. Okay. But he was the -- the employee of
23    Mid States who would be responsible for

Pages 25 to 28

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

29

1    signing a form like that?
2        MR. DUKES: Object to the form.
3  A. Right.
4  Q. Right?
5  A. Right.
6  Q. Okay. And he indicated that Norris was
7    let go for reduction in staffing?
8        MR. DUKES: Object to the form.
9  A. Right.
10 Q. And that -- does that show that Norris
11   received a severance, two weeks paid
12   severance?
13       MR. DUKES: Object to the form.
14 Q. I mean, about the middle of the page
15   again. I know you're not familiar with
16   that form.
17 A. I see where it says, Paid for period
18   3/19/2000. Right here.
19       MR. DUKES: Right here is what
20         he's asking you about.
21       THE WITNESS: Okay.
22 BY MR. ROBERSON:
23 Q. Did he get a severance? Does that

30

1    document indicate that he got a severance?
2        MR. DUKES: It says he got a --
3        what does it say?
4  Q. He got paid after he left work; is that
5    correct?
6  A. No. I mean, I don't --
7        THE WITNESS: What is that?
8        MR. DUKES: He got -- well, the
9          document says, does it not,
10         that he got a separation
11         pay of $520 as a courtesy,
12         slash, gift?
13 A. Okay.
14 Q. Okay. So they gave him $500 --
15 A. $500.
16 Q. -- after he stopped working there?
17 A. Right.
18 Q. And then he drew his unemployment?
19 A. Right.
20 Q. It shows that?
21 A. Right.
22 Q. All right. Now, Roy, you were in
23   management at Beaulieu, right?

31

1  A. Beaulieu.
2  Q. Beaulieu.
3  A. Uh-huh (affirmative response).
4  Q. And if somebody stole from you and you
5    fired them, they can't draw their
6    unemployment, can they?
7        MR. DUKES: Object to the form.
8  A. No. No, they can't.
9  Q. But Norris drew his unemployment there,
10   didn't he?
11 A. Right. According to this form, right.
12 Q. Okay. Now, I'm going to show you Exhibit
13   3, which is a document that was provided
14   to me from Mid States, and it lists some
15   people, an organizational chart. Have you
16   ever seen that document before today?
17       (Whereupon Plaintiff's Exhibit
18         No. 3 was marked for
19         identification and attached
20         hereto.)
21 A. I know these names and these peoples, but
22   I've never seen this form right here.
23 Q. Okay. Well, and it lists on there -- will

32

1    you just list the people that are in
2    management there?
3  A. Donna.
4  Q. Donna Davidson?
5  A. Yeah. It's just got Donna wrote on here.
6  Q. Okay.
7  A. But her last name was Davidson.
8  Q. All right. Who else?
9  A. It's got Donna Davidson again for
10   follow-up manager.
11 Q. All right.
12 A. It's got Byron Davidson. That was her
13   husband.
14 Q. Now, are they related to the Broadheads,
15   if you know?
16 A. Well, they used to be. Donna used to be
17   married to his brother before he passed.
18 Q. Okay.
19 A. But after he passed, she remarried Byron
20   Davidson.
21 Q. Okay.
22 A. And you got Roy for farm manager.
23 Q. Now, farm manager, what does that mean?

Pages 29 to 32

33

1    **What were your duties as a farm manager?**
2    A. Everything on the outside that wasn't
3    involved in office work.
4    **Q. There's about 13,000 acres at Sedgefields,**
5    **right?**
6    A. Yes, sir, 14.
7    **Q. Okay.  So you were responsible for the**
8    **13,000 acres?**
9    A. Right.
10   **Q. Not the office and the lodge --**
11   A. No.
12   **Q. -- but everything else?**
13   A. Right.
14   **Q. Okay.  All right.  Did that -- does that**
15   **include the hunting?**
16   A. That included everything, hunting, the
17   peoples that worked under me.
18   **Q. Okay.  Now, when that document was made,**
19   **how were you paid?  Do you recall?**
20   A. I haven't ever seen this paper before.
21   **Q. Okay.  Well, when you were the farm**
22   **manager, how were you paid?  Were you paid**
23   **a salary or were you paid by the hour?**

34

1         MR. DUKES:  Object to the form.
2    A. I was paid weekly.
3    **Q. By the hour?**
4    A. Yeah, by the hour.
5    **Q. How much did you make an hour?**
6    A. When I become farm manager, I think they
7    raised me up to $10.
8    **Q. Okay.  And I guess you got paid $15 an**
9    **hour overtime, right?**
10   A. Right.  Because I did a lot of overtime,
11   yeah.
12   **Q. Okay.  All right.  Who else is on that**
13   **list?**
14   A. Chuck.  His last name is Sikes.  It would
15   be Chuck Sikes, wildlife manager.
16   **Q. All right.  Now, what was his job?**
17   A. Wildlife manager.  He would come in there
18   and determine where to plant food plots,
19   how your stands located, stuff like that
20   there.
21   **Q. Okay.  Was he black or white?**
22   A. He's a white guy.
23   **Q. Was he -- does he still work there?**

35

1    A. No.
2    **Q. Do you know why he doesn't?  Did anybody**
3    **ever tell you why he doesn't?**
4    A. Yeah -- well, I heard rumors.  I don't
5    know for sure.
6    **Q. What did you hear?**
7    A. They fired Chuck Sikes.
8    **Q. Why?**
9    A. Because he told some things about Byron
10   Davidson to Mr. Broadhead.  And they fired
11   Byron first.  So I heard they did a
12   background on Chuck Sikes.  And then they
13   went and they fired Chuck Sikes.  But I
14   don't know if that's true or not.
15   **Q. Okay.  Well, all I can ask you is what you**
16   **heard.**
17   A. Okay.
18   **Q. You haven't seen any documents about that?**
19   A. No, huh-uh.
20   **Q. Okay.  And do you know why they fired**
21   **Byron Davidson?**
22   A. I -- I heard why they fired him.  He told
23   me why they fired him.  But I don't

36

1    know --
2    **Q. What did he tell you?**
3    A. He told me -- said that Chuck Sikes told
4    Mr. Broadhead that he was drinking on the
5    job.  He left some client in the woods who
6    was deer hunting, and he didn't go back to
7    get them, that I had to go get them.
8    **Q. And was that true?  Did you have to go get**
9    **some folks?**
10   A. I mean, we -- we was understaffed, and we
11   was booked up.  He wasn't drinking when I
12   was around him.
13   **Q. Okay.**
14   A. I did when it got more mens than what I
15   normally pick up.  Just because, you know,
16   we check in and find out who was still in
17   and who was out.  If there ain't no man
18   there, then I'm going back out to the
19   office first, then I'll go back and get
20   the next man.
21   **Q. Okay.  All right.  So it's not that you're**
22   **saying he was drinking on the job, you**
23   **never saw him?**

Pages 33 to 36

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

Roy Lee
October 11, 2006

37

1   A. I never saw that.
2   Q. But you did have to go get some people --
3   A. Right.
4   Q. -- that he had left in the woods?
5   A. One.
6   Q. Okay.
7   A. Yeah.
8   Q. All right. Anything else that you know
9       about with Mr. Davidson?
10  A. No.
11  Q. Okay. Now, I'm going to show you what's
12      been marked as Exhibit 4 to a previous
13      deposition. And this is an organizational
14      chart from March of 2006. Have you ever
15      seen that document before?
16          (Whereupon Plaintiff's Exhibit
17          No. 4 was marked for
18          identification and attached
19          hereto.)
20          (Witness reviewed document.)
21  A. I had never seen this paper. But I know
22      my position, what I was in out there to
23      the job. I know what Denise's position

39

1       about deer hunting, what y'all -- if
2       somebody -- you have a customer at
3       Sedgefields who pays for a hunt, a deer
4       hunt --
5   A. Okay.
6   Q. -- do you bow hunt?
7   A. We had a couple of hunters -- do I bow
8       hunt personally?
9   Q. Do you take people on bow hunts?
10  A. Yes, sir, I have.
11  Q. Okay. How do you do that? I mean --
12  A. I go out and start and determine where the
13      deer crossing.
14  Q. Kind of a scout?
15  A. Right.
16  Q. You scout out ahead of time?
17  A. Right.
18  Q. Where they're -- where they're gathered or
19      where they're passing?
20  A. Right.
21  Q. Okay.
22  A. And then I show my bow hunters. My bow
23      hunters will come a couple of hours early.

38

1       was, David and Joel.
2   Q. Okay. So is it fair that's an accurate
3       organizational chart as of March of 2006?
4   A. Say that again.
5   Q. That's an accurate depiction of the
6       organizational chart as of March of 2006?
7   A. As of March 2006, yes.
8   Q. Okay. Now, what is your position that's
9       listed on there?
10  A. Roy Lee, deer operations manager.
11  Q. Okay. And then --
12  A. Head of ground crew.
13  Q. Okay. So what are your duties as the deer
14      operations manager and the head of the
15      ground crew?
16  A. It's a lot of different things. One in
17      particular is cleaning deers. Making sure
18      my hunters are out, deer hunters. Put
19      them out on time. Picking them up on
20      time. Making sure my crew do the same
21      thing.
22  Q. Now, you told me about quail hunting.
23      Now, I don't hunt, so can you tell me

40

1       We'll go in and look and be thinking it's
2       a good place. He'll put his own stand in
3       there.
4   Q. So they hunt from a stand?
5   A. Yeah.
6   Q. And do you -- with a truck or --
7   A. No, no.
8   Q. How do y'all get around in there?
9   A. We get around in a truck. We ride so far
10      and then we'll walk.
11  Q. Okay.
12  A. To keep from disturbing the animals.
13  Q. Okay. Y'all don't have four-wheelers and
14      stuff like that?
15  A. Yeah, we got that.
16  Q. You do, but you don't drive them? You
17      don't take them, because they're loud?
18  A. Right.
19  Q. Okay. All right. Then do they stay in
20      a stand? Y'all don't -- what I'm getting
21      to is y'all don't use dogs to drive the
22      deer?
23  A. No, we don't do that.

Pages 37 to 40

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

41

1  **Q. Don't, okay. You just -- they get out in**
2  **the woods ahead of time and get in the**
3  **stand and be real quiet --**
4  A. Right.
5  **Q. -- and hope they show up, and that's it?**
6  A. Right. My job is been to went out there
7  and looked and scouted already to see what
8  I see.
9  **Q. Okay.**
10 A. And then I would tell my bow hunters what
11 I think would be the best place for them
12 to go. Then I take them out early to let
13 them look to see if they like the signs.
14 They'll put -- they'll come back in there
15 and put their stands up.
16 **Q. Okay. And then you go back and get**
17 **them at --**
18 A. Right. First dark. First dark. We'll
19 put them out after lunch, about 12:30 or
20 1:00, and go back and get them. It'll be
21 dark about 6:00.
22 **Q. Now, is there any difference when it's gun**
23 **season? I mean, do you do the same thing**

42

1  **when they have a gun instead of a bow?**
2  A. Right. Well, gun season is different, a
3  lot different from bow season.
4  **Q. Okay. Tell me about that.**
5  A. A lot different. In gun season, I would
6  take my hunters out. I'd already be done
7  sought out and scouted and looked for the
8  deer, setting the deer stands. I had some
9  of my peoples setting the deer stands,
10 some of my crew.
11 **Q. You actually set the stands up ahead of**
12 **time?**
13 A. Yeah. They be already -- some of them are
14 there permanently. We don't ever move
15 them.
16 **Q. Okay.**
17 A. We've got food plots we never move. Some
18 new food plots we have to move.
19 **Q. Okay. So you've got plots where there's**
20 **grass growing --**
21 A. Right. Stuff we plant.
22 **Q. -- that you hope will attract the deer?**
23 A. Right.

43

1  **Q. And then you put a permanent stand close**
2  **to that plot so that --**
3  A. That's right.
4  **Q. Okay.**
5  A. Right.
6  **Q. That's one way you do it?**
7  A. Right.
8  **Q. And then what else do you do?**
9  A. And then I go back and tell my deer
10 hunters when they come in what we seen.
11 And then the weather, we check the weather
12 and all that.
13 **Q. All right.**
14 A. If the weather is right, we can put them
15 on that stand. If it's not, we can't.
16 **Q. You mean, which way the wind is blowing**
17 **and that kind of stuff?**
18 A. Right. If it's out of the -- if you've
19 got a stand out there in the west, where a
20 west wind, and it's blowing out of the
21 north, you wouldn't want to put them in
22 there.
23 **Q. Okay. Because the deer can smell you?**

44

1  A. Right.
2  **Q. Okay. Anything -- and how many hunters do**
3  **you take when you're deer hunting? I**
4  **mean, I'm sure it varies, but what's the**
5  **range?**
6  A. The range, no more than ten. Maybe nine.
7  No more than nine. For three days.
8  You've got three days to kill.
9  **Q. Okay. And then they come back and spend**
10 **the night at the lodge?**
11 A. Right.
12 **Q. And get fed --**
13 A. Right.
14 **Q. -- and then they go out again the next**
15 **day?**
16 A. Right.
17 **Q. Okay. And it sounds to me, though, like**
18 **there's a whole lot of work that goes into**
19 **a successful hunt before you hunt?**
20 A. It is.
21 **Q. I mean, most of the work is preparing the**
22 **place to be hunted --**
23 A. Right.

Pages 41 to 44

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

45

1  Q. -- is that right?
2  A. That's right.
3  Q. And what do you have to do besides plant
4     food plots and things?
5  A. Well, see, there's a lot of man hours.
6     You have to bushhog. You have to go in
7     there and bushhog. You have to trim
8     limbs, check your stands, then come back
9     and plant. You have a whole lot of stuff
10    to do.
11 Q. It's a -- is it a year-round --
12 A. Right.
13 Q. -- job to get ready to hunt for just a
14    very limited season?
15 A. Right. You've got certain times to plant.
16    You've got to know when to plant and what
17    time to plant --
18 Q. Right.
19 A. -- before bow season comes in. At least
20    you want your grass that tall before bow
21    season comes in.
22 Q. Okay. All right. Now, was there ever a
23    period of time where you were over -- you

46

1     were the -- where y'all didn't have a
2     general manager?
3  A. Yes.
4  Q. Do you know how long that was, that period
5     of time was?
6  A. Donna Davidson was the manager after they
7     fired Byron Davidson.
8  Q. Okay.
9  A. Donna stayed there until the last day --
10    if I'm not mistaken, she stayed there
11    until the last day of deer season. The
12    last day, yeah.
13 Q. Which year?
14 A. That would be in -- which year?
15 Q. Yes, sir. Is that '05?
16 A. I believe -- I don't think it was '05.
17 Q. Okay.
18 A. I can't recall what year that was, but I
19    do know it's before David came.
20 Q. Okay. There was a gap, and you don't know
21    the date, but there was a gap from Donna
22    leaving --
23 A. Uh-huh (affirmative response).

47

1  Q. -- until David was hired --
2  A. Right.
3  Q. -- is that -- is that right?
4  A. That's right.
5  Q. Y'all didn't have a manager?
6  A. Right.
7  Q. Was that for a year or more? Or do you
8     know?
9  A. It wasn't quite a year, I don't think. I
10    don't think it was quite a year. No, it
11    wasn't quite a year.
12 Q. Okay.
13 A. It was close, but not quite a year.
14 Q. Well, my question that I'm trying to ask
15    is: Was there ever a period of time where
16    you were doing both jobs, that is running
17    both the deer hunting and the quail
18    hunting?
19 A. Well, I did the deers and quails when
20    Donna was there.
21 Q. Okay.
22 A. So I did it after she left. I did the
23    deers while she was there, because Byron

48

1     was gone.
2  Q. Okay.
3  A. But see, when Byron was there, Byron was
4     helping me. I trained Byron myself.
5  Q. What did he do? What kind of --
6  A. He used to go out and help me plant food
7     plots. He'd help me put out hunters,
8     stuff like that.
9  Q. But did he ever go on the hunts, Byron?
10 A. Deer hunts?
11 Q. Deer hunts or quail?
12 A. Yeah. We had certain deer hunters -- I
13    mean, we had a certain amount of deers we
14    had to harvest. And quail hunts, Byron,
15    yeah, he'd go. He'd ride sometimes.
16 Q. Okay. Have you ever worked as a guide?
17    I'm going to use the term "guide," that
18    person that handles the dogs. Have you
19    ever taken hunters out on a quail hunt
20    where you were handling the dogs?
21 A. Lots of times, yeah.
22 Q. Okay. Do you call it a guide, that --
23 A. That particular word?

Pages 45 to 48

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

49

1 Q. Yeah. What do you call that position
2    where you're handling --
3 A. I call that -- well, if I'm handling the
4    dogs, I call that a handler.
5 Q. Okay. You're the handler?
6 A. Right.
7 Q. Are you in charge of the hunt as the
8    handler?
9 A. Right.
10 Q. Okay. And then . . . so Norris was laid
11    off in 2001?
12        MR. DUKES: Object to the form.
13 Q. Correct?
14 A. Correct.
15 Q. We've discussed that document. And then
16    he was hired -- rehired in 2005; is that
17    correct?
18 A. That's correct.
19 Q. And who hired him?
20 A. I hired him.
21 Q. Okay. And why did you hire him?
22 A. Why did I hire him? Because I needed some
23    help.

50

1 Q. Okay.
2 A. I needed -- I was low in staff, and I
3    needed some help. And I got approval from
4    the main office to find some help.
5 Q. Okay. And who were you talking to at the
6    main office?
7 A. Sherry Howell. Bob Rea.
8 Q. Okay. Now, and you knew Norris --
9 A. Yes.
10 Q. -- because he had worked -- you had worked
11    with him before?
12 A. Right.
13 Q. And you knew he knew about hunting?
14 A. Right.
15 Q. I mean --
16 A. I know he knowed the place.
17 Q. Yeah. He knows the place, and he's
18    experienced?
19 A. Right.
20 Q. Okay. Now, I want -- do you know how to
21    handle -- operate heavy equipment?
22 A. Yes, I do.
23 Q. Have you ever operated a backhoe?

51

1 A. Yes, I have.
2 Q. Have you ever operated a bulldozer?
3 A. Yes.
4 Q. What do y'all use that kind of equipment
5    for there on the farm?
6 A. Well, it depends. On putting in covers.
7    What I'm calling the cover, a pipe like --
8 Q. Drain?
9 A. Yeah, stuff like that.
10 Q. Drainpipe?
11 A. Yeah. You've got a septic tank backed up.
12    We might have to re-dig a field line,
13    stuff like that with the backhoe.
14 Q. Okay.
15 A. The dozer, if we're building a new road or
16    pushing firebreaks or anything like that.
17    If the tractor's stuck or something, we
18    pull it out.
19 Q. Pushing firebreaks, what do you mean by
20    that?
21 A. You know, like on the line there. Like
22    you got -- like this is your property on
23    this side --

52

1 Q. Right.
2 A. -- this is another man's property on this
3    side, you're going to separate. If you're
4    burning off, you want to separate in
5    between there. So you want to make a
6    firebreak around it to keep the fire from
7    jumping over on his side.
8 Q. You push -- you put your blade down and
9    push --
10 A. Right.
11 Q. -- and make a barrier kind of?
12 A. Right, make a clean path.
13 Q. Okay.
14 A. Just keep the fire from burning across.
15 Q. Keep the fire from spreading?
16 A. Right. That's right.
17 Q. You take the fuel away from the fire --
18 A. That's right.
19 Q. -- basically?
20 A. Right.
21 Q. Okay. And you do that. And why do you
22    burn off?
23 A. For habitat reason, quails. You know,

Pages 49 to 52

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

53

1    you've got a certain place to circle
2    around in the area for the quails or
3    deers, just anything.  You know, the
4    wildlife biologists go out and tell you
5    what -- the wildlife biologists go out and
6    determine it.  That's what we used to do.
7    **Q. Okay.**
8    A. Determine what is what.
9    **Q. And so you burn off to thin out the brush?**
10   A. Make a new growth, yeah.
11   **Q. Okay.**
12   A. A lot of wildlife like that scratching out
13    there when it's burnt, turkeys.
14   **Q. All right.  When you worked with Norris,**
15    **before he got laid off, did you have an**
16    **opportunity to watch him work?**
17   A. Yes.  Before?
18   **Q. Yes, before he got laid off --**
19   A. Yes, I did.
20   **Q. -- from the time you were hired until he**
21    **got laid off?**
22   A. Right.
23   **Q. Was he a good worker?**

54

1    A. Yeah.
2    **Q. I mean --**
3    A. I would think so.
4    **Q. -- was he knowledgeable about bird**
5    **hunting?**
6    A. Yeah.  He knowed about bird hunting,
7     because that was his job before I came.
8    **Q. All right.**
9    A. I mean, he was working with Hunter
10    McDuffie.
11   **Q. And did he know how to operate a tractor?**
12   A. Yes.
13   **Q. And did he train you or show you how to**
14    **operate one?**
15   A. Yeah.
16   **Q. Or I guess you knew, but I mean . . .**
17   A. Yeah, he gave me a lot of tips.
18   **Q. But I mean, about how you prepare the**
19    **fields and stuff?**
20   A. Right, yeah.
21   **Q. Okay.  And so when you were back as a**
22    **foreman after he got laid off --**
23   A. Uh-huh (affirmative response).

55

1    **Q. -- and they put you in charge, did you**
2    **seek him out to hire?  Do you know what**
3    **I'm saying?**
4    A. No, I don't.
5    **Q. Okay.  In other words, you needed some**
6    **help, right?**
7    A. Right.
8    **Q. So did you go to him and ask him if he**
9    **would work for you?**
10   A. No.  I went to Sherry Howell --
11   **Q. Okay.**
12   A. -- and Bob Rea first.
13   **Q. Right.**
14   A. I told them they had a lot of work on me,
15    and I was putting in a lot of hours.  I
16    needed some help.
17   **Q. Okay.  You got permission to hire**
18    **somebody?**
19   A. Permission from Bob Rea and Sherry Howell
20    to find somebody that -- to help me that
21    knew how to drive a tractor real good that
22    knowed the place.
23   **Q. Okay.  And did you talk to Norris?**

56

1    A. No.  I talked to Damon Duncan first.
2    **Q. Okay.  Did you hire him?  Did he ever work**
3    **for you?**
4    A. No.  I didn't hire him, because he
5     wouldn't come.
6    **Q. Okay.  All right.  And then did you go to**
7    **Norris?**
8    A. I went -- I sent my brother-in-law,
9     Demetrius Parham, to go tell Norris I
10    needed to see him about a job.
11   **Q. Okay.  And did he?**
12   A. Yes, he did.
13   **Q. And then Norris --**
14   A. Norris came to my house.
15   **Q. Okay.**
16   A. The next -- the first day I sent
17    Demetrius, Norris wasn't at home.  The
18    next day I sent Demetrius, he found
19    Norris.  Norris come to my house.
20   **Q. Now, Demetrius Parham, I represent him.**
21    **He's also suing.  Did you know that?**
22   A. No.
23   **Q. Well, he's a black male, you know that?**

Pages 53 to 56

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

57

1  A. Right.
2  Q. And he works at Sedge -- or worked at Mid
3     States, correct?
4  A. Uh-huh (affirmative response).
5  Q. What did he do?  Was he a laborer, too?
6  A. He was a labor worker.
7  Q. Okay.  Did he ever work -- did he work
8     under you?
9  A. Yeah.
10 Q. Demetrius Parham?
11 A. Yeah.
12 Q. Now, if he's your -- you say in-law?
13 A. He's married to my sister.
14 Q. Okay.
15 A. Brother-in-law.
16 Q. Is it -- as far as you know, is there any
17    prohibition for you supervising your
18    brother-in-law?
19 A. No.  Because like this, if he messes up,
20    he -- I mean, no favors.
21 Q. Okay.  Well, I'm not implying --
22 A. Okay.
23 Q. -- that you give him a favor.

58

1  A. Okay.
2  Q. I'm just asking about the work.  That's
3     never been a problem --
4  A. No.
5  Q. -- that anybody's discussed with you?
6  A. No, No.
7  Q. Okay.  All right.  Well, then, did you and
8     Norris have some discussions about the job
9     and about how much he would make?
10 A. When I sent for Norris?
11 Q. Yes.
12 A. Okay, when I sent for Norris -- I don't
13    know.  I believe that was on a Thursday.
14    I sent for Norris on a Tuesday or a
15    Wednesday.  He wasn't at home.  The next
16    day Demetrius found him.  He came to me on
17    Thursday.  I say, Norris, I say, I'm
18    looking for some help.  I need some help.
19    Ms. Sherry Howell and Mr. Bob Rea told me
20    to find somebody that could drive a
21    tractor real good and could take the
22    pressure off of me, that know the place,
23    to help me bird hunt.

59

1  Q. Right.
2  A. I said, Well, are you interested in the
3     job?  He said, When can I start?  I said,
4     Hold on a minute.  I said, Now, you
5     know -- I'm going to let you know now,
6     you'd be working under me.  He said, I
7     ain't got a problem.  I said, You know, me
8     and you ain't been talking lately.  I
9     said, But now, if you have a problem
10    working for me, you tell me now.  He said,
11    No, I don't; when can I start?  I said,
12    Norris, let me tell you something like
13    this here.  I said, You know why you left
14    before.  I said, You know what they say
15    you left before.  He said, Okay, yeah.  I
16    said, All right, I'm going to tell you
17    like this here now, if you come up with
18    anything missing, a can of oil or anything
19    missing, I'm going to have to let you go.
20    I ain't got to see you, I'll let the boys
21    see you.  If they tell me, you're gone.
22    He said, Fine.
23        All right.  So I said, You just

60

1  wait till Monday and come down there and
2  meet me at the barn at 7:00.  That was on
3  a Thursday.  I called Sherry Howell back
4  and Bob Rea.  I told them, I said, I
5  talked with Damon.  Damon said he wasn't
6  coming for under $10 an hour.  He said,
7  Okay.  I talked to Norris.  I said, you
8  know, Norris used to work here.  I said,
9  He knows about the dogs; he knows how to
10 bushhog.  He knows where to go.
11     He said, What did he say?  I
12 said, He said he'd come back.  I said, But
13 he's making $8 now.  He ain't working --
14 he ain't working no less.  He said, Well,
15 we'll give him $9.  I said, Okay.  I said,
16 Okay.  But he said, Start him off with 8.
17 And then you keep him there a month, and
18 if you like -- he's doing what you need
19 him to do, then move him up to $9, as far
20 as me and Bob Rea talking on the phone.
21     I said, Okay.  I said, Well, now,
22 you make sure you run this by Ms. Sherry.
23 He said, I will.  All right.  So I left

Pages 57 to 60

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

61

1    that alone.
2        I still was thinking about
3    whether to hire Norris or whether or not
4    to hire Norris. So I called
5    Mr. Broadhead's daughter, Suzanne. And
6    she stay in Atlanta. I called Suzanne and
7    Matt Garver.
8    **Q. Does she have some job with --**
9    A. She had a lot of input in the place.
10   **Q. Okay.**
11   A. Yeah. And so I said, I've talked to them.
12   I said, Look here, I need some help down
13   there. I said, I need to hire somebody,
14   and I got Norris. I've already talked
15   with Sherry Howell and Bob. Bob said
16   whatever I do, I'm behind you 100 percent.
17   So Suzanne said, Well, you know what
18   happened before with Norris. I said,
19   Yeah. I said, Well, I know that, but any
20   man can be changed. I said, I see him all
21   of the time. I said, Anybody can be
22   changed, give him a second chance. She
23   said, Okay, whatever you decide, I'm 100

62

1    percent with you. She said, I appreciate
2    you calling us and letting us know that
3    you were thinking about us when you did
4    that. She said, Whatever your decision
5    is, I'm with you 100 percent. I said,
6    Thank you. So when Norris got there that
7    Monday, I put Norris to work.
8    **Q. Did you know how much he was making?**
9    A. Not at the time. Norris supposed to have
10   been making $8. Supposed to start him off
11   at 8, but stay here a month, he'd move him
12   up to 9.
13       All right. So when Norris came
14   to me after Norris got his first check, I
15   think -- you've got to put two weeks in a
16   hole, I think. After he got his first
17   check, he said, Roy -- he said, I thought
18   you said I'd make $8. I said, Yeah,
19   that's what you supposed to be. I said, I
20   ran that by Denise, though. Denise was
21   with Bob. Rea said start you off with $8
22   I said, But let me go down here and check.
23   So I went down there. I called Bob. Bob

63

1    said, Well, Roy -- he said, look here. He
2    said, On Norris's application, he's got
3    down there I work for $7. I said, Well --
4    I said, he told me he wasn't working under
5    that. I said, Okay, then, well, I'll tell
6    him that's his fault. So I went back and
7    told Norris, Norris, you know what
8    happened, you put on your application $7.
9    I said, Now, I done told you I'd start you
10   off with $8, and you'd make up to $9. I
11   said, but -- he said, Well, my girlfriend
12   filled that out, and I didn't even check
13   it. That's what he said. I said, Okay.
14       I said, Well, then, maybe you
15   stay here a month, then you get up -- you
16   get back up where you supposed to be if
17   you're doing a good job. A month went by,
18   two months went by, they didn't never say
19   nothing. Then David came. And then
20   Norris was asking me again. I said, Well,
21   you need to take that up with David.
22   David is the manager. You need to go talk
23   to David about that. And then, after

64

1    then, I don't know what happened.
2    **Q. All right. But you understood and you got**
3    **permission to hire him at $8 an hour**
4    **before --**
5    A. Correct.
6    **Q. -- he was hired?**
7    A. Correct.
8    **Q. And then he put -- or somebody put $7 --**
9    A. On his application, uh-huh.
10   **Q. -- on his application, and that's what**
11   **they paid him?**
12   A. Right.
13   **Q. And they never -- to your knowledge, while**
14   **Norris worked at Mid States, he never did**
15   **make $8 an hour, did he?**
16   A. To my knowledge, he never did. He said he
17   didn't. I never did -- I didn't have -- I
18   was going by what he said he never did.
19   **Q. Okay. All right. Now, after you hired**
20   **Norris back -- and we've had some**
21   **discussions with some other people -- do**
22   **you have any personal knowledge that**
23   **Norris ever stole any birds before the**

Pages 61 to 64

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

Roy Lee
October 11, 2006

65

1    2001 --
2    A. Before I hired him back?
3    Q. Yes. Do you know -- in other words, did
4       you ever see --
5    A. I don't know that for a fact.
6    Q. Okay. You heard that he had?
7    A. I heard he did.
8    Q. And you heard from Hunter McDuffie?
9    A. Right.
10   Q. I mean, that's who --
11   A. That's my manager.
12   Q. Yeah. Denise said Hunter McDuffie said
13      it?
14   A. I heard that Hunter McDuffie said that.
15   Q. Okay.
16   A. That's what I heard, but I don't know that
17      for a fact.
18   Q. And you never seen a document that says
19      that he stole?
20   A. I never seen that.
21   Q. Okay. Now, at least during the period of
22      time when Norris worked for you before
23      David Carroll was hired as manager --

66

1    A. Yes.
2    Q. -- did he do his job?
3    A. Very good job.
4    Q. Did you have any criticism of his job
5       performance?
6    A. I didn't have any problem out of Norris or
7       none of the guys. When Sherry Broadhead
8       and them come down, they said the place
9       looked real good, Roy. I appreciate the
10      hard work y'all doing. Norris kept the
11      road mowed. When I'd tell him actually to
12      do something, he'd go do it. Now,
13      whatever happened after then when he left
14      my department, I don't know.
15   Q. Okay. But at least during the time when
16      you were supervising him --
17   A. He did what he was supposed to do.
18   Q. Okay.
19   A. Right.
20   Q. Then at some point, did they hire Joel
21      Norman, Mid States?
22   A. My understanding -- this is my
23      understanding.

67

1    Q. Okay.
2    A. When they hired Joel Norman, David told
3       me, said, I'm going to get somebody in
4       here to do the birds to take the pressure
5       off of you.
6    Q. Because -- were you doing both?
7    A. Huh?
8    Q. Were you having to do both?
9    A. I was doing both. We didn't have bird
10      hunting when David came. I was doing both
11      before David came.
12   Q. Right.
13   A. I was doing both when Donna -- before
14      Donna came, I was doing it when Mark Gregg
15      was there. So Mark Gregg was the manager,
16      too.
17   Q. Mark Gregg?
18   A. Mark Gregg.
19   Q. Before --
20   A. Before Donna Davidson.
21   Q. He was the general manager before Donna?
22   A. Right, right.
23   Q. Okay.

68

1    A. They had --
2    Q. Well, wait a minute. Wait a minute. I
3       thought Byron was the manager?
4    A. Huh-uh (negative response).
5    Q. Okay.
6    A. No.
7    Q. He was before --
8    A. Mark Gregg was there after they fired
9       Hunter McDuffie. Hunter McDuffie and Mark
10      Gregg was there together. Both of them
11      was a manager.
12   Q. Where is Mark Gregg now?
13   A. He work for Cornerstone Plantation.
14   Q. Do you know why he doesn't work for
15      Sedgefields?
16   A. Well, I heard rumors. He told me a few
17      things. Then, one thing --
18   Q. What did -- what did he tell you?
19   A. Do I really have to say that?
20   Q. Yes, sir.
21   A. He told me that Donna put some stuff in
22      the game and got him fired.
23   Q. Put some stuff in the game?

Pages 65 to 68

69

1  A. I wouldn't repeat the cussing words he
2     used, but he said that Donna put some
3     things in the game to tell Mr. Broadhead,
4     what got him fired.
5           What I'm saying is, we had Mark
6     Gregg. We had Mark. We had Greg Wallace.
7     All of these were -- all of these were
8     managers.
9  Q. How many managers have you --
10 A. It was --
11 Q. -- had at --
12 A. Whew, a lot of them.
13 Q. Since 2000?
14 A. Yeah, yeah. Okay. See, all of them guys
15    was -- all of us was working together. We
16    had a team. Each man had their own crew.
17    Okay. After this happened, after they
18    fired Paul, Jr., Paul, Jr. --
19 Q. Paul Broadhead, Jr.?
20 A. Yeah. They come down and fired Hunter
21    McDuffie.
22 Q. You mean, Mr. Broadhead fired his own son?
23 A. Right.

70

1  Q. Why?
2  A. I don't know. I don't know.
3           Okay. After then, Greg, Greg
4     Wallace -- Greg Wallace and Mark was
5     there. They fired Hunter McDuffie after
6     Paul, Jr.
7  Q. Do you know why they fired Hunter?
8  A. No -- well, I heard a few rumors. He was
9     more interested in birds than picking
10    Mr. Broadhead up at the airport. That's
11    what I heard. Now, I don't know.
12 Q. All right.
13 A. Okay. After they got rid of Hunter, that
14    left Mark in charge -- no. Let me back
15    that up. That left Mark and Greg Wallace.
16    Greg Wallace was messing around and went
17    up to Montgomery to work for Paul, Jr.
18    Carried some of the crew to Montgomery and
19    worked there for Paul, Jr., at his house.
20    It got back to Mr. Broadhead -- got back
21    to Sherry Howell, and they fired Greg the
22    next week.
23 Q. To do personal work at his house?

71

1  A. Right, right.
2  Q. Like landscaping or . . .
3  A. Right. Cutting grass, stuff like that.
4     He had a crew that he took up there to do
5     that. They told them Paul, Jr., don't
6     work for Sedgefields Plantation anymore.
7     So Greg got upset. So they fired Greg.
8     That left Mark in charge of everybody.
9     Okay. So that leaves me -- there was
10    Mark, Damon Duncan, a guy named Tom Cat,
11    and me. And Joseph, I think. Joseph and
12    Chris, a guy named Chris. We was the only
13    shakers that were left.
14 Q. Okay. And these other people you've
15    described were laborers?
16 A. Laborers, labor workers, yeah.
17 Q. All right. So you've had numerous
18    managers at Sedgefields?
19 A. Well, I done left out one, but he didn't
20    stay long enough to tie his shoe.
21 Q. Who was he?
22 A. That was Joe McFerrin. He out of
23    Fort Davis, right up above Sedgefield. He

72

1     might have stayed six months.
2  Q. Why did they fire him? Or did they fire
3     him?
4  A. Well, he baited the dove field the wrong
5     way. And the CEO came down and found it,
6     and then they got rid of him. He was
7     raising sand anyway.
8  Q. Okay. Now, this is a race discrimination
9     case. So other than you, has there ever
10    been anybody in management at Sedgefields
11    that's been black that you're aware of?
12 A. No, huh-uh, no.
13 Q. Now -- and then David hired Joel Norman?
14 A. Right.
15 Q. To run the quail operations?
16 A. Right.
17 Q. I gave you that one. All right. Now --
18       MR. ROBERSON: Where is Joel
19          Norman's stuff?
20 Q. Mr. Roy Lee, are you on a salary now?
21 A. Yes.
22 Q. How much do you make as the deer
23    operations manager?

Pages 69 to 72

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists   888.253.3377

Roy Lee
October 11, 2006

73

1 A. I think I make $20 and a quarter, I
2    believe, an hour.
3 Q. Do you know what that is annually?
4 A. That's something like $600 -- before
5    takeout? Before taxes?
6 Q. No. After -- yeah, before taxes, what
7    that is annually.
8 A. That's about $800 every two weeks.
9 Q. Is it about $41,000 a year?
10 A. It's close, yeah.
11 Q. And do you live on the property at
12    Sedgefields?
13 A. No.
14 Q. But they do provide you with a vehicle, a
15    truck?
16 A. Right.
17 Q. And the gas, too?
18 A. Right.
19 Q. Do they have a gas pump on the property?
20 A. Yes.
21 Q. And a tank, and you can just fill up when
22    you're out there?
23 A. Yeah, you can, yeah.

74

1 Q. Now, I'm going to show you -- and again,
2    I'll caution you that we have a protective
3    order, and so you can't discuss this, but
4    I'm going to show you what I'll mark as
5    Exhibit 5 to your deposition. And this is
6    a part of the personnel file of Joel
7    Norman. And I'll ask you if you know what
8    he makes after looking at that document.
9         (Whereupon Plaintiff's Exhibit
10            No. 5 was marked for
11            identification and attached
12            hereto.)
13         (Witness reviewed document.)
14 Q. Do you see where he makes $70,000 a year?
15 A. Uh-huh (affirmative response).
16 Q. Now, he has -- now, you need to know this.
17    He has a two-year Associates degree in
18    Wildlife Technology or Wildlife
19    Management; are you aware of that?
20 A. No, I wasn't -- well, I didn't know.
21 Q. Did you do the job that he's doing before
22    he was hired to do it?
23         MR. DUKES: Object to the form.

75

1 A. Yes, I did.
2 Q. Did they ever pay you anything approaching
3    $70,000?
4 A. No, they haven't.
5 Q. Is Joel Norman white?
6 A. Yes.
7 Q. Now, I have asked the people at
8    Sedgefields, David Carroll, why he makes
9    so much more than you. And one of the
10    reasons they gave was that he had a
11    degree, a two-year degree?
12 A. Uh-huh (affirmative response).
13 Q. And another reason they gave is saying you
14    had never been a supervisor before you
15    worked at Sedgefields.
16 A. Uh-huh (affirmative response).
17         MR. DUKES: Object to the form.
18 Q. That's not true, is it? You had been a
19    supervisor.
20 A. That's not true. At Beaulieu of America,
21    yeah.
22 Q. You were a supervisor?
23 A. Right.

76

1 Q. You supervised thirty-two people?
2 A. Thirty-two peoples, yeah.
3 Q. Okay. Did you put that on your
4    application?
5 A. Yeah. I'm going to change that. I don't
6    know. That's been a long time.
7 Q. Okay. Well -- now, Mr. Dukes takes the
8    position that I can't talk to you without
9    him being present, because you're in
10    management. And you are in management,
11    right?
12 A. Right.
13 Q. I'm going to tell you that the same law
14    that protects Norris Foster protects you.
15    You see what I was saying?
16 A. Uh-huh (affirmative response).
17 Q. That if they can -- if they discriminate
18    against Norris Foster on account of his
19    race, they can also discriminate against
20    you on account of your race, okay?
21 A. Okay.
22 Q. And I'll also tell you, and I don't know
23    if anybody has told you this --

Pages 73 to 76

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

77

1   A. Uh-huh (affirmative response).
2   Q. Have you met with Mr. Dukes before today?
3      I'm not entitled to know what you talked
4      about, but have you met with him?
5   A. Yes.
6   Q. How many times?
7   A. I think today will be -- today will be
8      three times.
9   Q. Okay. Has anybody ever told you that
10     where you work now, they cannot take any
11     action against you because of testimony
12     you give in this case?
13  A. No.
14  Q. Nobody's told you that?
15  A. Huh-uh (negative response).
16  Q. Well, I'm telling you that.
17  A. Okay.
18  Q. The same law that protects you -- protects
19     him, protects you. And you were asked to
20     come here and testify, correct?
21  A. Correct.
22  Q. They asked you to come?
23  A. Correct.

78

1   Q. You're not volunteering to be here?
2   A. No, I'm not.
3   Q. Okay. I suspect you don't want to be
4      here?
5   A. I really don't.
6        MR. DUKES: You noticed the
7           deposition, did you not?
8        MR. ROBERSON: I did.
9        MR. DUKES: Okay.
10       BY MR. ROBERSON:
11  Q. Well, Mr. Lee, do you know any reason why
12     they are paying Joel Norman $70,000 to do
13     what you were doing for $10 an hour?
14       MR. DUKES: Object to the form.
15  Q. You can answer.
16  A. No, I don't. I don't know any reason why.
17     I mean, I didn't know what he was making.
18     And I mean, like, I done birds a long
19     time. It don't take a genius to figure
20     out how to prepare for birds --
21  Q. Well --
22  A. -- quails, or whatever.
23  Q. Mr. Norman says that he's doing things now

79

1      that you weren't doing, that is he claims
2      that he's initiated a wild bird program,
3      wild bird recovery program, and that he
4      puts birds out a month ahead of time.
5        MR. DUKES: Object to the form.
6           Mischaracterizes his
7           testimony.
8   Q. Do you understand that?
9   A. I understand what you're saying.
10  Q. Yeah. He says he ain't just putting them
11     out in the morning before the hunt and
12     then shooting them, he's putting them out
13     in order to build up the birds.
14  A. Okay.
15  Q. Okay. Was that something you could have
16     done if they'd have asked you to?
17  A. I mean, we -- I did that.
18  Q. You did it?
19  A. All of that before Donna Davidson got
20     there. The only reason why we stopped
21     doing that is because Donna Davidson
22     didn't want to do it. And she was the
23     manager.

80

1   Q. All right. Well, do you feel like it's
2      fair for them to pay Joel Norman so much
3      more than you to do half the job you were
4      doing?
5        MR. DUKES: Object to the form.
6   Q. You can answer.
7   A. I don't feel like it --
8        MR. DUKES: Hey, I'll tell him
9           when to answer. You don't
10          tell him when to answer,
11          okay? You've done that to
12          every single deponent down
13          here. I've objected to the
14          form. And he can surely
15          answer it. But you don't
16          instruct him when to
17          answer, okay?
18          You can answer his
19          question.
20  A. Say -- repeat the question.
21  Q. Do you feel like it's fair how they pay
22     you as opposed to Joel Norman?
23       MR. DUKES: Object to the form.

81

1  A. I don't think it's fair.  Personally, I
2  don't, from the job that I know I know
3  what to do.  But I don't know what he
4  makes from looking at this form here.
5  Q. Now, after Joel was hired, did Norris
6  start -- he had been working under you,
7  right?
8  A. Right.
9  Q. Norris had?
10 A. Right.
11 Q. Then he -- was he reassigned to work under
12 Joel?
13 A. Yes.  David came to me and told me that we
14 couldn't do no more hiring right now, so
15 Joel going to have to have some men to
16 help him to prepare for -- they wanted to
17 turn that thing around and get the bird --
18 get the bird thing more than what we'd
19 been having.
20 Q. Right.
21 A. So he said, We have to have some of your
22 guys.  So I went to Norris.  I said, Well,
23 Norris, you know you're good on birds.

82

1  You know, I said, dogs, too.  I said, You
2  want to work with Joel?  Norris said,
3  Yeah, I'll go.  I said, Now, once you go
4  over there, you can't come back.  I said,
5  you'll be with Joel.  So he went with
6  Joel.
7  Q. Now, and Joel was hired, I think --
8        MR. ROBERSON:  Let me mark this.
9  Q. I'm going to show you Exhibit 6.  This is
10 really just Joel's -- Joel's application.
11 But it shows that he was -- he filled out
12 the application in September of '05, and
13 he was hired in September of '05, correct?
14 It looks like 9/19.
15       (Whereupon Plaintiff's Exhibit
16         No. 6 was marked for
17         identification and attached
18         hereto.)
19 A. Nine --
20 Q. See this one on Exhibit 5?
21 A. Oh, 9/19/05.
22 Q. 9/19/05.
23 A. Okay.

83

1  Q. And then, shortly after he was hired,
2  Norris went to work for him?
3  A. Right.  Maybe a couple of weeks after, I
4  think.
5  Q. Okay.  Now -- and Norris was hired back by
6  you in February of '05, right?
7  A. Right.
8  Q. So from February until September or
9  October, Norris worked for you?
10 A. Right.
11 Q. And you didn't have any problems with him?
12 A. At all.
13 Q. Okay.  And then beginning in October --
14 about, I'm saying about -- he worked for
15 Joel; is that right?
16 A. Yes.
17 Q. Who else worked for Joel?
18 A. Brother Man.  We had a guy out there they
19 called Brother Man.  I don't know his real
20 name.  Then we had Willie Mack.  Demetrius
21 was -- Demetrius started with him, but
22 then he ended up back with B.B. -- I mean,
23 with Willie Mack.  And Demetrius came back

84

1  with me.  And Jeffrey --
2  Q. Harris?
3  A. Yeah.  That's his name, Jeffrey Harris.
4  Q. Okay.  He worked with Norris and Joel?
5  A. Norris and Joel, uh-huh.
6  Q. Okay.  Was that a crew, Jeffrey, Norris --
7  A. Jeffrey, Norris --
8  Q. And Joel?
9  A. -- Brother Man and Joel.
10 Q. All right.  Was Brother Man white?
11 A. Right.
12 Q. And was he the guy that was hired and only
13 worked a short -- I say a few months?  Or
14 did he work longer than that?  I think he
15 was hired in July, and then he was -- he's
16 the guy that was fired for stealing gas;
17 is that --
18 A. That's correct.
19 Q. Okay.  But he lived on the property?
20 A. Correct.
21 Q. And he was paid $8 an hour; did you know
22 that?
23 A. No, I didn't.

Pages 81 to 84

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

85

1  **Q. Okay. Well, I want you to assume that he**
2   **was paid $8 an hour. What kind of work**
3   **did he do, Brother Man do?**
4  A. With me?
5  **Q. Yeah. Did he ever work for you?**
6  A. Yeah, he worked for me.
7  **Q. What did he do?**
8  A. Bushhogging, cut grass, weed eat.
9  **Q. Labor?**
10 A. Labor work.
11 **Q. Just general labor?**
12 A. Yeah, labor work.
13 **Q. To your knowledge, did he have any special**
14  **skills? I mean --**
15 A. Not to my -- only knowledge that I know,
16  that he told me, that was catering,
17  but . . .
18 **Q. Okay. All right. Well, I mean, like he**
19  **wasn't -- to your knowledge, he didn't**
20  **know how to run a bulldozer or a backhoe**
21  **or anything like that?**
22 A. I never seen him on none of that, huh-uh.
23 **Q. Okay. And he lived on the property. Who**

86

1   **hired Brother Man?**
2  A. David.
3  **Q. David Carroll?**
4  A. Uh-huh (affirmative response).
5  **Q. The manager. And he's sitting here today,**
6   **right?**
7  A. Right.
8  **Q. All right. The guy worked for you. Did**
9   **you have anything to do with how much he**
10  **was paid?**
11 A. Which guy, Brother Man?
12 **Q. Brother Man, yeah.**
13 A. No, I didn't.
14 **Q. Okay. And so you didn't hire him, so you**
15  **weren't even involved in that?**
16 A. I wasn't involved. The only thing I know
17  he was -- he was hired.
18 **Q. Well, do you know how he was hired? That**
19  **is, how did they select him or . . .**
20 A. I -- the only thing I know about that is
21  David said he was looking for somebody, an
22  older guy, to stay on the place, a night
23  watchman to help out; night watch a little

87

1  bit. Because I was coming back and
2  forewards checking. That was before Joel
3  moved -- that was before Joel came.
4  **Q. Okay.**
5  A. Other than that, I don't know.
6  **Q. All right. Then, after Norris went to**
7   **work for Joel and his crew, did Norris**
8   **ever come to you with any complaint about**
9   **Joel or how he was being treated?**
10 A. Yes, he did.
11 **Q. What was his complaint?**
12 A. Norris complained. Came to me saying that
13  Joel was doing him wrong; Joel was racial.
14  I said, What you mean? He said, Man,
15  everything we do just ain't satisfying
16  Joel. He's always on us. He didn't want
17  us smoking. On any tract that we park for
18  three or four minutes, he'll be peeking
19  behind trees looking at him, watching him.
20  I said, Well, Norris, I said, Well, you
21  need to tell David that then. I said, You
22  know you went over there to work for Joel.
23  Now, you left me. I said, But I hear what

88

1  you're saying. He said, Man, he ain't
2  right. Roy, he stays on us for something.
3  He's just picking, picking, picking. I
4  said, Okay. I said, Well, tough it out,
5  Norris, and see what he do. Just wait,
6  you just got over there. He's just
7  getting there. Maybe he'll blend in.
8      A couple of weeks went by, it was
9  the same ole' thing. What I mean by the
10  same ole' thing, Norris complaining again
11  about how Joel was, how he was treating
12  him.
13 **Q. Did you ever talk to Joel or David**
14  **Carroll about --**
15 A. I talked to both.
16 **Q. -- about those complaints?**
17 A. Both.
18 **Q. Okay. Tell me what you talked to Joel**
19  **about.**
20 A. I talked to Joel. I said, Joel, I said,
21  Look here. I said, Your guys coming to me
22  complaining. I said, They're doing that
23  because they used to work for me. I said,

Pages 85 to 88

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

89

1    Look here, if you respect them guys, them
2    guys will respect you. I said, But if you
3    don't respect them guys, them guys ain't
4    going to respect you. I said, I know you
5    the boss; I ain't telling you to --
6    **Q. How to run his job?**
7    A. How to run his crew. But respect them
8    guys. I said, because them guys, you've
9    gots a good team. I said, Don't tear down
10   what we already got. Well, well, they got
11   to work. They got to work. I said, Well,
12   you told me. I'll find out where they'll
13   work. Don't want them to stay long if
14   they won't work. That's exactly his exact
15   words. I said, Well, I don't know. I
16   said, But your guys, something's wrong.
17   They keep complaining and complaining.
18   They got to work, Roy. I said, Well --
19   well, that's true. So that's the words me
20   and him had.
21   **Q. Did you talk to David?**
22   A. Yep, I also talked to David. If it wasn't
23   at that same time, it was later on down in

90

1    the month when Norris came back to me and
2    Jeffrey Harris. They said, Man --
3    **Q. Jeff Harris came, too?**
4    A. Yeah.
5    **Q. Okay. What did he --**
6    A. They said, Man -- they said, Joel ain't
7    right, man. Joel ain't right, man. He
8    complain. He complain. He expects us to
9    get out there and run them tractors when
10   they overheat. He said, We cut them off
11   when they overheat. Said, Joel said run
12   them; let them overheat. I said, Well,
13   man, he tell you that, that's going to
14   tear the equipment up. I said, But I'll
15   tell you what, why don't y'all tell David.
16   These were Norris' words. Norris said, I
17   talked to David. David said you have to
18   take that up with Joel. Joel is your
19   boss.
20       So when Norris came back and told
21   me what David said -- so I went to David.
22   I said, David, there's something wrong,
23   that them guys was doing their job before

91

1    Joel got here. Maybe all of them need to
2    get together and come to talk to you at
3    the same time, and then you find out what
4    the problem is. I said, But I ain't
5    trying to tell you how to do your job,
6    because I know you know how to do a job.
7    I said, But now, that's my -- that's what
8    I'm saying. I don't know what the problem
9    was. We hadn't been having problems. So
10   maybe -- I don't know. I really don't
11   know. I don't know did they talk or not.
12   **Q. But you relayed the complaint that the men**
13   **had to both Joel and David?**
14   A. Right, yeah.
15   **Q. Okay.**
16       MR. ROBERSON: Give me that.
17   **Q. I'm going to show you a document that's**
18   **from Mid States about Norris Foster. Have**
19   **you ever seen that? Do you know what that**
20   **is, Exhibit 7?**
21       (Whereupon Plaintiff's Exhibit
22       No. 7 was marked for
23       identification and attached

92

1       hereto.)
2       (Witness reviewed document.)
3    **Q. It shows that he was hired in February of**
4    **'05, at $7 an hour?**
5    A. Uh-huh, yes.
6    **Q. And who signed that at the bottom, Denise**
7    **Pierce?**
8    A. Denise Pierce.
9    **Q. Okay. Now I'm going to show you another**
10   **document, and this is also from Norris'**
11   **personnel file. But this has to deal with**
12   **the period of time before when he worked**
13   **there, okay?**
14   A. Okay.
15   **Q. And I understand that you didn't work**
16   **there then. That's -- this is before --**
17   **well, I guess you did. I guess you did if**
18   **you started in 2000. But I'll show you**
19   **what's been marked as Exhibit 8.**
20       (Whereupon Plaintiff's Exhibit
21       No. 8 was marked for
22       identification and attached
23       hereto.)

Pages 89 to 92

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

93

1        (Witness reviewed document.)
2    Q. Do you see where Norris was hired in '99?
3       And actually he worked out there before
4       '99, but that's when Mid States bought
5       it --
6    A. Okay.
7    Q. -- isn't it?  I think.
8    A. 9/14/99.
9    Q. Yeah, uh-huh.
10   A. Yes.
11   Q. Okay.  And so what were they paying him to
12      begin with?  Does it say on there?
13   A. 5.15 an hour.
14   Q. Minimum wage?
15   A. Right, yes.
16   Q. And then tell me what he got a raise to
17      and when.
18   A. That looks like the first of 2000, he got
19      a 5 -- he got 5.50 an hour now.
20   Q. Okay.  Did he get another raise?
21   A. Six month, 11 of 2000, he got up to $6.25
22      an hour.
23   Q. Okay.  Did he get any further raises?

94

1        MR. DUKES:  Object to the form.
2           The document speaks for
3           itself.
4    A. The 2nd of 8 of 2005, he got up to $7.
5    Q. Okay.  Now I'm going to show you Exhibit
6       9.  When you hired Norris in February of
7       '05 --
8    A. Uh-huh (affirmative response).
9    Q. -- was he full-time or part-time?
10   A. Full-time.
11   Q. Did he ever work part-time for you?
12   A. No.
13   Q. I'll show you Exhibit 9.  Have you ever
14      seen that before?
15        (Whereupon Plaintiff's Exhibit
16         No. 9 was marked for
17         identification and attached
18         hereto.)
19        (Witness reviewed document.)
20   A. No.
21   Q. It says changed from part-time to
22      full-time.  And in what month is that?
23   A. 5th, the 1st, '05.

95

1    Q. Did anybody sign that?
2    A. No.  Approval by.
3    Q. Does it say -- has it got a signature on
4       it?
5        THE WITNESS:  What's that?
6    A. I don't know.  I don't know.  I don't
7       understand that.
8    Q. You don't recognize that signature?
9    A. No, I don't.
10   Q. Okay.  Do you need a driver's license to
11      operate a tractor?
12        MR. DUKES:  Object to the form.
13           Calls for a legal
14           conclusion.
15   Q. You can answer if you know.  Do you know?
16   A. Not to my knowing, you don't.  Not to my
17      knowing, you don't need a driver's
18      license.  Unless you're going to get on
19      that road, you're supposed to have a tag,
20      owner's tag on it.
21   Q. Now let me show you Exhibit 10.  And this
22      is a document that's been provided to me
23      that says Formal Reprimand, and it's got a

96

1    date.  Have you ever seen this document
2    before today?
3        MR. DUKES:  Talking about
4         Plaintiff's Exhibit 10?
5        MR. ROBERSON:  Yeah.
6        (Whereupon Plaintiff's Exhibit
7         No. 10 was marked for
8         identification and attached
9         hereto.)
10        (Witness reviewed document.)
11   A. No, I haven't seen this.
12   Q. Now, you've been a supervisor at
13      Sedgefields for years?
14   A. Uh-huh (affirmative response).
15   Q. The last several years, correct?
16   A. Correct.  Last four.
17   Q. Four.  Have you ever written anybody up?
18   A. Yes.
19   Q. Okay.  Do they have forms for you to write
20      people up?
21   A. Right.
22   Q. Is that a form that you can use to write
23      people up?  Have you ever seen one like

97

1    that?
2    A. For Beaulieu or for . . .
3    Q. For Sedgefields.
4    A. I've never seen a form like this.
5    Q. At Sedgefields?
6    A. Yeah, at Sedgefields. I've never seen one
7        like this.
8    Q. Have you ever written anybody up at
9        Sedgefields?
10   A. No, I haven't.
11   Q. I'm going to show you -- well, do you
12       know -- do you have any personal knowledge
13       about this incident that's described in
14       Exhibit 10?
15   A. This right here?
16   Q. Yes, sir.
17   A. No, I don't.
18   Q. You weren't there when Norris was written
19       up, you weren't at the barn or wherever
20       they were?
21   A. No, I wasn't at the barn -- let me read
22       this again.
23           I wasn't at the barn when this

98

1    took place. I heard about it, but I
2    wasn't there.
3    Q. Okay. Well, do you know what the clippers
4        are?
5    A. Yes.
6    Q. I mean, how you clip horses?
7    A. Yes, I do.
8    Q. Is it clippers like that you clip their
9        mane or their -- you -- you groom the
10       horses or is it clippers like you --
11       toenail clippers? I don't know.
12   A. No. It's clippers like you cut your hair
13       with. You've got different blades.
14   Q. Okay.
15   A. Different size clippers depending on what
16       part you're clipping.
17   Q. How you groom the horses?
18   A. Right.
19   Q. And that's -- is that part of Norris' job,
20       to groom the horses?
21   A. Yes.
22   Q. And do you know if in December of '05, if
23       there was a problem or the clippers were

99

1    broken?
2    A. No, I don't know that. I know Norris and
3        them said they was broken.
4    Q. Okay.
5    A. I didn't check to see whether it was broke
6        or not. I don't know that.
7    Q. Okay.
8    A. I know they told me that it was broken.
9    Q. Okay. And so they -- Norris told you the
10       clippers were broken and that he'd been
11       written up for riding the horses; is
12       that --
13   A. Before he got wrote up, Norris and Jeffrey
14       told me the clippers was broken. We tried
15       to get up with Joel. He didn't answer his
16       radio, and so we just rode the horses.
17           To me, personally, I would have
18       wrote them up if they had left there
19       riding the horses and I told them to clip
20       them. Now, if the clippers were broke and
21       he didn't answer his radio, I would have
22       stayed at that barn . . . to me. But I
23       hadn't never seen this before.

100

1    Q. All right. Other than Norris and -- and
2        Jeff Harris was also written up?
3    A. Uh-huh (affirmative response).
4    Q. Do you know anybody that's ever been
5        written up at Sedgefields? Do you know --
6        have personal knowledge of it?
7            MR. DUKES: Object to the form.
8    Q. You can answer.
9            MR. ROBERSON: I'm sorry.
10               It's a habit.
11           MR. DUKES: Go ahead.
12   A. Not to my knowledge.
13   Q. Now, were you -- Norris was fired at the
14       end of December of '05. Were you -- were
15       you ever told -- were you present when
16       Norris was fired?
17   A. I was on the plantation, yes. Was I up
18       there when they fired Norris? No, I
19       wasn't.
20   Q. Okay. You weren't part of the discussion
21       about Norris being fired?
22   A. No, I wasn't, no.
23   Q. But you found out after the fact that he

Pages 97 to 100

334.262.3332              Baker & Baker Reporting and Video Services, Inc.              334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

Roy Lee
October 11, 2006

101

1   had been fired?
2   A. Right, correct.
3   Q. How did you find out?
4   A. David called me on the cell phone, said I
5     had to let Norris go. I said, Who? He
6     said, Norris. I said, Okay, then. He
7     said, well, we'll talk about it later. So
8     then me and Henry was together, Henry
9     Tolliver. I said, Man, I just saw Norris
10    in the barn.
11  Q. You guess Norris --
12  A. I said, I just saw Norris at the barn when
13    we left, because we was feeding the deer.
14    But I didn't know he was fired. David
15    called me and told me he was fired. He
16    had let him go.
17  Q. Did anyone ever tell you why Norris was
18    fired?
19  A. Yes. A month went by --
20    THE WITNESS: Can I answer that?
21    MR. ROBERSON: Was it me telling
22      you?
23    THE WITNESS: No, no.

102

1     MR. ROBERSON: I'm not talking
2       about Mr. Dukes.
3     THE WITNESS: I said, Can I
4       answer that?
5     MR. ROBERSON: Yeah.
6     MR. DUKES: If you know, go
7       ahead.
8   A. I was at -- a month -- maybe a month went
9     by, and I asked David. I said, David --
10    it might not quite been a month. I said,
11    Norris was fired, he said, because of the
12    birds. David comments -- David said,
13    Yeah, the birds and his attitude. He had
14    an attitude. He didn't want to be part of
15    the team. He said Norris kept the
16    attitude all the time. I said, Yeah. I
17    said, Well, he stayed angry a whole lot,
18    didn't he? He said, Yep. He said, Well,
19    he kept pulling the crew down. He had an
20    attitude problem. He just wouldn't do the
21    jobs I asked him to do. So I had to let
22    him go, Roy. I said, Well, in that case,
23    he fired hisself. That was my exact

103

1     words. So I left it like that.
2   Q. Okay. Well, did David -- did David
3     Carroll or Joel Norman ever tell you that
4     Norris was fired because he stole birds?
5   A. No. Joel didn't tell me that. But in --
6     a conversation come up when I was talking
7     to David. David said it was about the
8     birds and his attitude. I didn't hear
9     that from Joel.
10  Q. Well, do you know, have any personal
11    knowledge, as to whether Norris ever stole
12    any birds?
13  A. No. No. I heard that, but I haven't seen
14    it.
15  Q. Okay. Well, the -- and my understanding
16    is that there were some birds that were
17    removed in October. Do you know anything
18    about that? It was right after the first
19    hunt or one of the -- one of the early
20    hunts that they had. Do you know anything
21    about that?
22  A. My understanding about the birds, when we
23    come in, we have -- I think, if I'm not

104

1     mistaken, I don't know did I have some
2     hunters up there and we was looking over
3     the place -- my understanding, when I came
4     in, I saw birds sitting on the wagon. And
5     everybody was gone. They hadn't put the
6     birds up.
7   Q. What are you supposed to do with the
8     birds?
9   A. You supposed to put the birds in the
10    walk-in cooler to keep them cool.
11  Q. Is that a freezer?
12  A. A freezer unit.
13  Q. A freezer?
14  A. Uh-huh (affirmative response). But it's
15    more like a --
16  Q. But you can't walk in --
17  A. You can walk in.
18  Q. Okay.
19  A. One's a freezing unit and one's a cooling
20    unit. The cooling unit is to keep the
21    temperature right on the birds where they
22    won't spoil.
23    The first two hunts, I know them

Pages 101 to 104

105

1  birds was spoiled, because one set of
2  birds sat in the refrigerator, I know, a
3  week. And I asked Joel, I said, Joel,
4  look here, ain't nobody going to clean
5  them birds? He said, I thought B.B. -- I
6  said, No, he didn't. Them birds still
7  sitting there, man, they ain't going to be
8  no good. They had them in the
9  refrigerator setting there, the birds, at
10 the green barn, our workshop.
11 **Q. Okay. So I understand it, if -- if -- if**
12 **you shoot the -- do they ever shoot the**
13 **birds, and clean them, and then cook them**
14 **there the same day?**
15 A. No, no, not the same day.
16 **Q. Okay. Is there a process whereby maybe**
17 **they -- they already have birds that are**
18 **cleaned and everything -- do they -- do**
19 **they cook quail there at the plantation?**
20 A. Sometime.
21 **Q. Okay. And -- and so what I'm saying is,**
22 **do they -- maybe they have some birds**
23 **that's already ready? In other words,**

106

1  **they can cook them while they're out**
2  **hunting; would that be right? There's --**
3  A. Yeah, we have some --
4  **Q. -- quail that's already dressed --**
5  A. Right.
6  **Q. -- and they're ready, and the cooks**
7  **prepare them while they're out hunting,**
8  **and they serve them for dinner --**
9  A. Right.
10 **Q. -- even before they -- they get them ready**
11 **before they get back?**
12 A. Right.
13 **Q. Okay. And then -- but the birds that they**
14 **kill, then they may go into the -- get**
15 **cleaned and go into the cooler or the**
16 **freezer, and then they have them later; is**
17 **that -- would that be right?**
18 A. The birds that was shot, they clean them
19 birds, put them in the freezer for the
20 next crew that's going to come in, what
21 shoots birds.
22 **Q. Right.**
23 A. But we already have birds already cleaned

107

1  in the freezer.
2  **Q. Okay.**
3  A. But the ones that they kill their birds
4  and they leave back the same day, you have
5  to give them the amount what they kill.
6  We have them in the freezer.
7  **Q. Okay. So you just swap them out?**
8  A. Swap them out, that's right.
9  **Q. Okay. You've got some already dressed,**
10 **and if they're already going --**
11 A. Right.
12 **Q. -- you just give them to them?**
13 A. That's right.
14 **Q. I mean, you --**
15 A. We try not to feed a shot bird down at the
16 lodge.
17 **Q. Okay.**
18 A. See, they have dressed birds that's never
19 been shot that they cook at the lodge.
20 **Q. Okay. All right. I'm going to show you**
21 **Exhibit 11, and ask you if you've ever**
22 **seen that?**
23 **(Whereupon Plaintiff's Exhibit**

108

1  **No. 11 was marked for**
2  **identification and attached**
3  **hereto.)**
4  **(Witness reviewed document.**
5  MR. DUKES: Do you need to take
6  a break or anything?
7  MR. ROBERSON: Yeah, we -- if
8  you ever want to take a
9  break, just let us know.
10 We're going to have to take
11 a break in a few minutes,
12 because he's got to change
13 his tape.
14 A. No, I ain't never seen this.
15 **Q. Okay. Now, when Norris worked for you,**
16 **did he ever have an attitude problem that**
17 **you -- that you observed?**
18 A. No.
19 **Q. Well, was he angry? I think that's the**
20 **word you used.**
21 A. Was he upset?
22 **Q. Well --**
23 A. With me?

Pages 105 to 108

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

Roy Lee
October 11, 2006

109

1  Q. Yeah.
2  A. No.
3  Q. Okay.  Did he ever criticize you for the
4     way you were doing things, running the
5     show?
6  A. Never, not to my -- not that I know of.
7  Q. I mean -- okay.  Now, did Norris or
8     Jeffrey or anybody that was in Joel's crew
9     ever complain to you about their tip
10    money?
11 A. All of them.
12 Q. Everybody complained?
13 A. Everybody that was in the crew.
14 Q. B.B. -- was B.B. in the crew?
15 A. B.B., Norris, and Jeffrey.
16 Q. All complained about --
17 A. And Will didn't complain, because Will was
18    out there.  He didn't complain.
19 Q. What -- what was the nature of their
20    complaint?
21 A. On a couple of incidents after the quail
22    hunt was over, the guys come in.  I said,
23    Man, how did y'all do?  Yeah, we found a

110

1  few birds.  We found a few birds.  We had
2  did good.  So then Norris said, Well,
3  yeah.  He said, The clients come up to me,
4  man, patted me on the shoulder and said
5  job well done.  Said I took care of you, I
6  left your tip money with Joel.  And so
7  Norris said, Oh, well, that's fine, that's
8  fine.  Said Joel told me to put everything
9  up and he'd see them later.  So Norris, he
10 did him like that.  And Joel walked up to
11 him and told him, said, Look here, don't
12 let me see you do that no more.
13 Q. On the deer hunts that you take folks
14    on --
15 A. Uh-huh (affirmative response).
16 Q. -- do sometimes you get tips?
17 A. Right.
18 Q. You and your crew?
19 A. Right.
20 Q. How do you do the tips, Roy?
21 A. If we get a tip -- it ain't necessary that
22    you get a tip.
23 Q. I understand that.

111

1  A. But if a man feels free to want to give
2     you a tip -- but like if I've got -- just
3     say I got Demetrius and Henry Tolliver
4     working under me putting out, then I give
5     them three guys -- each one of them three
6     guys, whatever tip money they want to give
7     them, I tell them, Leave it with them.  If
8     Demetrius has got three guys and the three
9     guys, they want to tip him, that's fine.
10    If they do, they do.  If they don't, they
11    don't.  Same thing about Henry.  If the
12    guys -- if I take five or six guys out,
13    whatever they tip me, that would be my
14    tip.  I never had to split the deer hunter
15    tip money, and luck, didn't no deer
16    hunters leave them a tip.  Then I turn
17    around and I'll split my money with
18    them -- for them, where each one of us
19    will have some money.
20 Q. Okay.  Did you ever take people on quail
21    hunts?
22 A. Uh-huh (affirmative response).
23 Q. And when -- when you were over the quail

112

1  hunting and you got a tip, what did you do
2  with the tips?
3  A. The tip money I got, when we come in, if
4     the guys tip us -- plenty of times they
5     didn't -- if they tip us, they'd come to
6     me and give me the money.  I would take
7     time when everything was put up, before
8     we'd go, lay my tailgate down, and count
9     the money out right there in front of all
10    my guys and split it up.
11 Q. Equally?
12 A. Equally.  No matter what.  Even though --
13 Q. You didn't take more because you were the
14    guide?
15 A. No.  Even though I was the guide, the
16    handler.  The handler is always supposed
17    to get more money.  That's what I thought
18    ever since I've been out there.  But I
19    wasn't even going with that.  I just -- if
20    my guys didn't get no money, I would give
21    them -- split them up straight down the
22    middle.
23 Q. Well, if -- if somebody gave you a tip --

113

1  A. Uh-huh (affirmative response).
2  Q. -- would you always divide it up as
3    opposed to keeping that tip yourself?  I
4    mean, when you're quail hunting, would you
5    give everybody in the crew money or would
6    you keep the money?
7  A. No.  I would give every -- make sure if
8    the other guys didn't get a tip -- I would
9    ask them.  I'd say, Did the guy leave
10   y'all a tip?  And they'd say no.  If they
11   say no, I split the money up with them.
12       MR. ROBERSON:  Okay.  Let's go
13         off the Record and take a
14         break and change tapes.
15       THE VIDEOGRAPHER:  We're going
16         off the Record at 1:56 p.m.
17       (Whereupon a brief recess was
18         taken.)
19       THE VIDEOGRAPHER:  We're back on
20         the Record at 2:14 p.m.
21  BY MR. ROBERSON:
22  Q. Mr. Lee, we took a break, but now we're
23    back on the Record.  I'm going to show you

114

1    what I've marked as Exhibit 12.  And this
2    is actually from your personnel file, and
3    it shows that you were hired in September
4    of 2000 as a laborer.  Were you making $6
5    an hour when you were hired?
6       (Whereupon Plaintiff's Exhibit
7         No. 12 was marked for
8         identification and attached
9         hereto.)
10       (Witness reviewed document.)
11  A. Yes, I started with $6.
12  Q. Okay.  And then it progresses to show what
13    you made; is that correct?
14       (Witness reviewed document.)
15  A. That's correct.
16  Q. Okay.  What does it show you making now?
17  A. Now?
18  Q. Now, yes, sir.
19  A. Forty hours -- well, looks like -- well,
20    $12.
21       MR. DUKES:  No.  Right here.
22  A. $41,623.40 a year.
23  Q. Annual salary?

115

1  A. Uh-huh (affirmative response).
2  Q. Is that yes?
3  A. Yes.
4  Q. Okay.  And I'm going to show you what I've
5    marked as Exhibit 13, and ask you is this
6    is a copy of the application that you
7    filled out before you went to work at
8    Sedgefields?
9       (Whereupon Plaintiff's Exhibit
10         No. 13 was marked for
11         identification and attached
12         hereto.)
13       (Witness reviewed document.)
14       MR. DUKES:  Let me see that one.
15  BY MR. ROBERSON:
16  Q. Is that your application, Roy?
17  A. It's a copy.
18  Q. Okay.
19  A. I'm pretty sure it's the same thing,
20    because back then they had an application,
21    you know, like this.  So I'm pretty sure
22    it's the same thing.  It's about right.
23  Q. Is it dated on the last page when you

116

1    filled it out?
2  A. August the 10th, 2000.
3  Q. Okay.  And you started, according to this
4    sheet, on --
5  A. The ninth month, the 8th, 2000.
6  Q. Yeah.  Okay.  Maybe that's when you got
7    your first check.  I don't know.
8  A. Probably.  I mean, it's been awhile.
9  Q. Right.  All right.  And I'm going to show
10    you what I'll mark as Exhibit 14 to your
11    deposition.  And this is a document that
12    says for you, Roy Lee -- Roy Lee Chester?
13       (Whereupon Plaintiff's Exhibit
14         No. 14 was marked for
15         identification and attached
16         hereto.)
17  A. That's my middle name, Chester.
18  Q. Oh, okay.  Day of hire, 9/8/01.  New rate
19    of pay $10 an hour.  Do you -- is that --
20  A. What do you mean by date of hiring?
21  Q. Well, that's just what it says.
22       Is that when they promoted -- if
23    you recall, is that when they promoted

Pages  113 to 116

334.262.3332                    Baker & Baker Reporting and Video Services, Inc.                    334.262.3332
888.253.3377              Certified Court Reporters and Certified Legal Video Specialists           888.253.3377

117

1    you?
2    A. This was Donna Davidson. After they got
3    rid of Mark Gregg, that's when Donna
4    Davidson called me in the office and gave
5    me up to $10.
6    Q. And they make you a manager then?
7    A. Huh?
8    Q. Did they make you a manager then?
9    A. No, no. She didn't make me a manager at
10   that time. Not that day. About a month
11   later.
12   Q. Okay, okay. Roy, I -- do you know what an
13   affidavit is?
14   A. Uh-huh, yes, I do.
15   Q. Okay. It's a sworn statement?
16   A. Right.
17   Q. And this is an affidavit from Jeffrey
18   Harris. And I'm going to ask you to look
19   at this. I'll mark this as Exhibit 15 to
20   your deposition. It's a couple of pages,
21   so I'll just ask you to read that to
22   yourself first. And you can have -- I've
23   given that to Mr. Dukes.

118

1    (Whereupon Plaintiff's Exhibit
2    No. 15 was marked for
3    identification and attached
4    hereto.)
5    (Witness reviewed document.)
6    A. Okay.
7    Q. Do you know Jeffrey Harris?
8    A. Yes, I know him.
9    Q. Did he ever work for you and your crew?
10   A. Jeffrey Harris. I'm trying to see.
11   Jeffrey Harris worked for me a couple of
12   weeks, I think. If I'm not mistaken, I
13   think Jeffrey Harris worked under me a
14   couple of weeks. Because I think Jeffrey
15   Harris came -- I don't know was Charles
16   there when Jeffrey came or not.
17   Q. Okay. Well, did -- you didn't hire him?
18   A. No.
19   Q. Okay. Do you know who did?
20   A. David.
21   Q. David Carroll?
22   A. Yes.
23   Q. Okay. And in the time that he worked for

119

1    you, that is Jeffrey Harris, did you have
2    any problem with his work?
3    A. No. At the time Jeffrey Harris was
4    working for me, the only thing he was
5    doing then was cutting grass. Norris told
6    him he could drive a tractor, so . . . he
7    could fix anything.
8    Q. He's a mechanic or something?
9    A. That's what Norris told me he was, a
10   mechanic. But we didn't have nothing
11   broke down at the time. But I had him
12   cutting grass. And I think -- I'm trying
13   to see. I don't know. I don't think he
14   worked for me that long.
15   Q. Okay. Now, but in the short time that he
16   worked for you, did you have any problem
17   with him or his work or attitude or
18   anything?
19   A. No.
20   Q. Now, I'm going to show you what I've
21   marked as exhibit -- well, first of all,
22   let me ask you: He makes some statements
23   in there about things that he heard Joel

120

1    Norman say.
2    A. Uh-huh (affirmative response).
3    Q. Did you see that? Did you read it?
4    A. I saw that.
5    Q. Did you ever hear Joel Norman make any
6    statement about blacks or about that he
7    was going to replace the blacks in his
8    crew?
9    A. No, I haven't. I have never heard that.
10   I heard rumors, but I haven't never heard
11   that.
12   Q. Okay.
13   A. I mean, he hadn't never said that around
14   me that I could hear.
15   Q. You've never personally heard it?
16   A. Right.
17   Q. Before Norris Foster was fired in December
18   of '05 --
19   A. Uh-huh (affirmative response).
20   Q. -- did they complain to you about any
21   statement he had made -- Joel Norman had
22   made?
23   A. Yes. They come to me and told me some

Pages 117 to 120

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

121

1  things he said.  But I don't know for
2  sure.
3  **Q. You -- I know you don't know that he said**
4  **them.**
5  A. Right.
6  **Q. I understand that.**
7  A. Okay.
8  **Q. But they did complain to you about**
9  **statements they claim that he made prior**
10 **to Norris being fired; is that fair?**
11 A. Repeat that.
12 **Q. Okay.  Before Norris got fired --**
13 A. Right.
14 **Q. -- Jeff and Norris had been to you and**
15 **said that Joel said these things, like he**
16 **was going to get a white crew or something**
17 **like that?**
18 A. No.  When they come to me and told me
19   before, they told me that Joel was
20   telling -- Will was telling them things.
21   B.B. was telling me.  Norris and them was
22   saying that that's what Will -- when Will
23   got mad with Joel, Will was going to come

122

1  around and tell them everything.  Will was
2  telling them everything that Joel was
3  saying.
4  **Q. Will told them?**
5  A. Will told them.  To my understanding, Will
6   told them.
7  **Q. Okay.**
8  A. I never heard Joel saying nothing.
9  **Q. Okay.  Then -- and Will was a white guy --**
10 A. Right.
11 **Q. -- that was hired.  And we'll get to that.**
12 **But do y'all have a tradition**
13 **there at the plantation that when you have**
14 **homecoming, Bullock County homecoming, the**
15 **high school football game, that you let**
16 **off early?**
17 A. Yes, we used to.
18 **Q. And, in fact, it's not just Sedgefields, I**
19 **mean, it's a lot of businesses --**
20 A. Yeah.
21 **Q. -- that they give --**
22 A. Right.
23 **Q. -- employees off early?**

123

1  A. Right.
2  **Q. Because they have a parade, right?**
3  A. Right, right.
4  **Q. And so they give people time off so they**
5  **can go to the parade and do the**
6  **activities?**
7  A. Right.
8  **Q. Do you have a son that plays on the**
9  **football team?**
10 A. Yes, I do.
11 **Q. And Norris has a son, right?**
12 A. Yes, he do.
13 **Q. Tailback?**
14 A. Tailback, yes.
15 **Q. Is he pretty good?**
16 A. Oh, yeah.
17 **Q. What about your son?**
18 A. He's very good.
19 **Q. What does he play?**
20 A. Defensive end, linebacker -- no, defensive
21   end, tight end.
22 **Q. What year is he?**
23 A. He's in the ninth grade.

124

1  **Q. And he plays?**
2  A. Oh, yeah.  He's good.
3  **Q. Okay.  Well, and did you let your crew off**
4  **early on homecoming?**
5  A. Yes.  Depends.
6  **Q. What time is -- what time is early?**
7  A. Early depends on -- if we ain't got
8   nothing going on at the job, I would let
9   them come in and clean the equipment up.
10   Because the game always have been on
11   Friday.  Parade is on Friday.  Let them
12   come in early, clean the equipment up, and
13   they leave.
14 **Q. Okay.**
15 A. The quicker you can get through with that
16   equipment, the quicker you can leave.
17 **Q. Now, did the guys in Joel's crew complain**
18 **to you or did you find out that they had a**
19 **complaint because Joel wouldn't let them**
20 **leave early on homecoming?**
21 A. No.  I never --
22 **Q. Do you remember anything about that?**
23 A. I don't remember that, no.

334.262.3332
888.253.3377
Baker & Baker Reporting and Video Services, Inc.
Certified Court Reporters and Certified Legal Video Specialists
334.262.3332
888.253.3377

---

**125**

1  Q. I'm going to show you Plaintiffs' Exhibit
2    16. And there's a guy that you referred
3    to as Brother Man?
4  A. Right.
5  Q. That's what y'all called him?
6  A. Right.
7  Q. Is this the same guy, William Beckwith,
8    Jr.? Do you know? This is a form from
9    Beckwith's --
10        (Whereupon Plaintiff's Exhibit
11         No. 16 was marked for
12         identification and attached
13         hereto.)
14  A. I don't know Brother Man's full name. The
15    only thing I've ever known, his name was
16    Brother Man.
17  Q. Okay.
18  A. I mean, I really don't know his name.
19  Q. Well, that document shows that he worked
20    until the end of September and that he
21    was -- Mr. Beckwith was fired for stealing
22    gas and not having a driver's license. Do
23    you see that?

---

**126**

1  A. Right, yes.
2  Q. Does that describe anybody else that you
3    know about?
4  A. For stealing gas?
5  Q. Yeah. Was anybody else stealing gas and
6    didn't have a driver's license that you
7    know about?
8        MR. DUKES: That was terminated?
9        MR. ROBERSON: Yeah.
10  A. No.
11  Q. Okay. And was that about when Beckwith
12    left or was fired, in -- around the end of
13    September, right after Joel got there?
14  A. I can't recall what month it was. But I
15    do know he was fired.
16  Q. After Joel got there?
17  A. After Joel got there.
18  Q. Now, did he -- did -- what vehicle
19    did Brother Man use when he was a night
20    watchman? Did he have a vehicle?
21  A. Yes. We had a red Ford F150. And we let
22    Brother --
23  Q. On the farm?

---

**127**

1  A. On the farm. And we let Brother Man keep
2    that on the weekends.
3  Q. But he didn't have a driver's license,
4    correct?
5  A. Yeah. I didn't know he didn't have a
6    driver's license at that time.
7  Q. Okay. Well, what I'm saying is, he
8    couldn't drive that off the property
9    legally, right?
10  A. No, he couldn't.
11  Q. Okay. Do you know whether he ever did
12    take it off of the property?
13  A. Well, he went down the highway. I mean,
14    that was off the property.
15  Q. Okay.
16  A. But as far as me knowing if he went to
17    town or not, I don't know.
18  Q. Okay. Now, this -- did you ever tell
19    anybody that Brother Man was taking gas?
20    Did you ever report him for stealing gas?
21  A. Yes. I assumed that Brother Man was
22    taking gas.
23  Q. All right. Why did you assume that?

---

**128**

1  A. Because I filled the truck up on a Tuesday
2    or a Wednesday. I come back the next --
3  Q. Your truck?
4  A. No, no. The burgundy truck that he's
5    supposed to been done drove.
6  Q. The red truck?
7  A. Right.
8  Q. Okay.
9  A. And it was empty the next day. And a six
10    cylinder, you can't put that kind of miles
11    on it right around the farm off a full
12    tank of gas and then empty the next day.
13  Q. What was he doing with the gas? Do you
14    know?
15  A. I assumed that he was siphoning it out.
16  Q. And selling it or something?
17  A. No. Putting it in his personal truck.
18    That's what I assumed. Because we keep
19    the gas tanks locked up.
20  Q. Okay. So do you have to have a key to
21    pump gas --
22  A. Right.
23  Q. -- at Sedgefields?

---

Pages 125 to 128

334.262.3332         Baker & Baker Reporting and Video Services, Inc.        334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

129

1  A. Right.
2  Q. I mean, at their -- for their pump, you
3     have to have a key in order to get gas; is
4     that right?
5  A. In order to get gas, yes.
6  Q. And he didn't have a key?
7  A. No, he didn't.
8  Q. So you, because if he was filling --
9     having to fill up the truck so often, you
10    assumed he wasn't just burning the gas --
11 A. Right.
12 Q. -- in the truck?
13 A. Yes.
14 Q. Who did you report that to?
15 A. David Carroll.
16 Q. Okay.  Did they act on that, that you know
17    of?
18       MR. DUKES: Object to the form.
19 A. Not that I know of.
20 Q. All right.  What happened that Brother Man
21    got fired for stealing gas?  Was there
22    something that happened?
23 A. My recall, as far as I know of, I don't

130

1     know what I was doing that day -- oh, I
2     went to get some fertilizer from Clayton
3     in a tag-along buggy.  And I came back.
4     David told me, said, Well, Joel caught
5     Brother Man taking gas.  Joel's wife seen
6     Brother Man taking some gas and --
7  Q. Did he say what he was taking it from or
8     where?
9  A. He took it in a jug and poured it in his
10    truck.  She was watching him.  She saw
11    him.
12 Q. Oh.
13 A. She reported it to Joel --
14 Q. She stays on the property, right?
15 A. Right.
16 Q. Okay.
17 A. She reported it to Joel.  Joel reported it
18    to David.  David told me about it.  I
19    said, Well, did you tell Brother Man?  I
20    said, How did Brother Man get it in the
21    gas tank with the top -- with it locked?
22    He said he had a jug.  I said, Whoa.  I
23    said, Well he knowed better than that.  I

131

1     said, Well, I been told you he been
2     getting that gas.  Okay.  So David said,
3     Well, I'll let him work the rest of the
4     day, and I'll let him know we can't have
5     nobody out here stealing.
6        MR. ROBERSON:  Now, give me Will
7           Hubbard's, please.
8  Q. Do you know Will Hubbard?
9  A. Do I know of him?
10 Q. Yeah.
11 A. Yes.  I know his -- I just know his name.
12    Nothing about him, but I know his name.
13 Q. Okay.  Well, he worked out there for a
14    while, a short time, correct?
15 A. Yes, correct.
16 Q. And he's a white?
17 A. Correct.
18 Q. Is he young, fairly young?
19 A. Real young.
20 Q. Okay.  I'm going to show you what I've
21    marked as Exhibit 17 which is his
22    application.  Take a look at that.
23       (Whereupon Plaintiff's Exhibit

132

1        No. 17 was marked for
2        identification and attached
3        hereto.)
4     (Witness reviewed document.)
5     MR. ROBERSON:  Do you have the
6        sheet that shows how much
7        he made?
8     MR. DUKES:  I'll stipulate, if
9        it moves things along, that
10       he was paid $8 an hour.
11    MR. ROBERSON:  Okay.  Well, I --
12 BY MR. ROBERSON:
13 Q. Will worked for Joel, right?
14 A. Right.
15 Q. Do you know who hired him?  Did David hire
16    him or do you know?
17 A. I don't know.
18 Q. Okay.  I'm going to show you what's marked
19    as Exhibit 18.  And it shows that Will
20    Hubbard was paid $8 an hour.  Do you see
21    that, Mr. Lee?
22       (Whereupon Plaintiff's Exhibit
23        No. 18 was marked for

Pages 129 to 132

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

133

1           identification and attached
2           hereto.)
3           (Witness reviewed document.)
4 A. Right.
5 Q. When was he hired?
6 A. On this paper?
7 Q. Yes, sir.
8 A. 11 -- on this paper?
9 Q. On that paper, when did he start?
10 A. 11/21/05.
11 Q. About Thanksgiving of '05?
12 A. Right.
13 Q. Now, did y'all have some -- at that time,
14   you had Jeff Harris and Norris working for
15   Joel Norman, right?
16 A. Correct.
17 Q. How many people do you need in the quail
18   hunting?
19 A. How many people did he need, Joel need?
20 Q. Yeah.
21 A. It all depends on what -- what they have
22   going on at that time.  I think when he
23   had Norris and Jeffrey, he had Brother

134

1   Man.  Then he had Willie -- B.B., Willie
2   Mack sometimes.  I think Will come after
3   they got rid of Brother Man.
4 Q. That's correct.  Well, my question to you
5   is:  Do you know what Will did in the
6   crew, in Joel's crew?
7 A. I know what Will started off doing when he
8   got there.
9 Q. What?
10 A. Riding horses.
11 Q. What does that mean?
12 A. Getting horses in shape.  Knew he had to
13   get them ready before the clients get
14   there.  The clients ain't going to want
15   to --
16 Q. Exercising horses?
17 A. Right.
18 Q. Okay.
19 A. Going out getting them in shape.  I know
20   he did that for a while.
21 Q. What they disciplined Norris Foster for,
22   riding horses, is what Will Hubbard was
23   assigned to do?

135

1           MR. DUKES:  Object to the form.
2 Q. Is that right?
3 A. I don't understand that.
4 Q. Okay.  Well, I showed you that write-up
5   where Norris was written up for riding
6   horses, right?
7 A. Where Norris was written up for riding
8   horses, for leaving --
9 Q. The barn.
10 A. -- the barn, when they was supposed to
11   have been clipping them.
12 Q. Okay.  But the same horses that Norris was
13   riding, Will Hubbard was hired to ride; is
14   that your understanding?
15 A. No.
16 Q. Okay.  What --
17 A. My understanding is Will -- when Will
18   started.  But when I seen Will when he
19   started, he was riding horses.  Then they
20   was -- Norris and Jeffrey was chopping.
21 Q. Was riding the tractor --
22 A. Right.
23 Q. -- and cutting in the fields?

136

1 A. Right.
2 Q. Okay.
3 A. And Will and Joel was exercising the
4   horses and the dogs.  That's what I seen.
5 Q. Did you ever see -- in the time that Will
6   Hubbard worked there, did you ever see him
7   operating any heavy equipment?
8 A. Yes.
9 Q. What did he run?
10 A. Bulldozer.  He ran the tractor.  I never
11   seen him run the backhoe.  He run the
12   tractor and the bulldozer.  He run the
13   tractor, bulldozer, and skidder.
14 Q. All right.
15           MR. ROBERSON:  Give me Joseph
16           Mays' information.
17 Q. Okay.  Do you know a gentleman named
18   Joseph May?
19 A. Yes.
20 Q. And he's also a white man, correct?
21 A. Yes, correct.
22 Q. And he -- is he also young?
23 A. Correct.

Pages 133 to 136

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

137

1  Q. And Norris is forty-seven years old.  Did
2     you know that?
3  A. Correct.
4  Q. And he spent six years in the military?
5  A. Correct.
6  Q. Did you know that?
7  A. Yes.
8  Q. Do you think that military service is
9     valuable?
10  A. Yes.
11  Q. Did you ever serve in the military?
12  A. No.
13  Q. Okay.  Let me show you Exhibit 19 that
14     shows Joseph May was hired when -- on what
15     date?
16         (Whereupon Plaintiff's Exhibit
17          No. 19 was marked for
18          identification and attached
19          hereto.)
20  A. The 11th, the 21st, '05.
21  Q. Same day as Will Hubbard?
22  A. Same day.
23  Q. And where was he assigned to work?

138

1  A. With Joel Norman.
2  Q. So now he's got four people in his crew?
3  A. Right, correct.
4  Q. I'll show you Exhibit 20 which is -- and
5     Joseph May paid -- was paid $8 an hour?
6  A. Correct.
7  Q. All right.  This is Joseph Mays'
8     application.  I want you to look at that.
9         (Whereupon Plaintiff's Exhibit
10          No. 20 was marked for
11          identification and attached
12          hereto.)
13     (Witness reviewed document.)
14  Q. Do you have -- and I'm not trying to make
15     you into somebody that works at the
16     carnival --
17  A. Uh-huh (affirmative response).
18  Q. -- but do you know how old Joseph was or
19     have an estimate for how old he was?
20  A. Do I know how old is he now --
21  Q. Yeah.
22  A. -- or at that time?
23  Q. At that time.

139

1  A. No, I didn't.
2  Q. Okay.  Was he a young guy?
3  A. Yeah, he looked young.
4  Q. Now, what was Joseph May doing that you
5     saw?
6  A. Only thing I seen Joseph doing -- Joseph
7     May?
8  Q. Right.
9  A. -- doing was trapping.  They had --
10  Q. Trapping?
11  A. Traps, yeah.  Toe pad traps for trapping
12     predators.
13  Q. Trapping --
14  A. Predators.
15  Q. Predators like --
16  A. Racoons, possums, stuff that was eating
17     quail.
18  Q. Okay.
19  A. Coyotes.
20  Q. Okay.  So he was trapping the things that
21     would lower the bird population?
22  A. Correct.
23  Q. Is that right?

140

1  A. Correct.
2  Q. And predators of the birds?
3  A. Correct.
4  Q. Okay.  So if you can reduce the predators,
5     you can increase your bird population?
6  A. Correct.
7  Q. And have more -- better hunts, right?
8  A. Correct.
9  Q. Okay.  Now, how do you trap?  Do you know?
10  A. Well, when I -- I know what he say how he
11     do it.  I never did that myself.
12  Q. Right.
13  A. The only way I ever trapped before was a
14     live trap.  Sat a can of sardines in a
15     cage, in a live trap like that there.  In
16     a water ditch or a crossing in a road,
17     that side of the road.  But he had toe pad
18     traps with a flag.
19  Q. What kind of traps?
20  A. Toe pad.
21  Q. Toe pad?
22  A. Right.  Something -- a little small trap
23     with pads on them that close up to keep

141

1    from hurting the animal.
2    **Q. Uh-huh (affirmative response).**
3    A. And it will hold him till you get there.
4    He'll be alive when you get there.
5    **Q. Oh, it's live trapping, right?**
6    A. Well, yeah, you can say.
7    **Q. And then do you remove the animal? That**
8    **is, do you take it somewhere?**
9    A. No. You kill it.
10   **Q. Okay.**
11         MR. DUKES: Is it a leg trap?
12         THE WITNESS: Right. It just
13              traps his toes. He reach
14              in that trap, and you trap
15              his toes.
16   BY MR. ROBERSON:
17   **Q. Okay. All right. Now, do you know this**
18   **other guy, Chance Hamm?**
19   A. Yes, I know him.
20   **Q. He still -- he still works out there,**
21   **doesn't he?**
22   A. Yes.
23   **Q. And he's also a white guy, correct?**

142

1    A. Correct.
2    **Q. Let me show you what I'll mark as Exhibit**
3    **21.**
4         MR. DUKES: I'll stipulate as to
5              his pay if you want me to.
6         MR. ROBERSON: That's all right.
7              I'm having too much fun.
8    BY MR. ROBERSON:
9    **Q. I'll show you 21. Does that show that**
10   **Chance Hamm was paid $8 an hour when he**
11   **was hired in January of '06?**
12         **(Whereupon Plaintiff's Exhibit**
13              **No. 21 was marked for**
14              **identification and attached**
15              **hereto.)**
16   A. Correct.
17   **Q. Okay. And then I'll show you Exhibit 22**
18   **which is his application. And he was also**
19   **a young white male, correct?**
20         **(Whereupon Plaintiff's Exhibit**
21              **No. 22 was marked for**
22              **identification and attached**
23              **hereto.)**

143

1    A. Correct.
2    **Q. Now, Will Hubbard and Joseph May don't**
3    **work there anymore?**
4    A. No.
5    **Q. Why is that?**
6    A. My understanding, Will come to me and told
7    me to pick him up one day.
8    **Q. That they -- that they what?**
9    A. Will called me on the radio and told me,
10   he said, Roy, come get me. I said, Where
11   you at? He said, I'm down here by the big
12   lake. I said, Man, You need to call Joel.
13   He's your boss. He said, No, I'm tired of
14   Joel's Shit. I said, What? I said, I tired --
15   I said, Hold on a minute. I said, I'll be
16   there in a minute.
17        So I wanted to know what he was
18   talking about, so I gets down there and
19   pick him up. He said, Well, Roy, I'm just
20   sick of him. I'm tired of him. I said,
21   Man, you ain't going to quit your job, is
22   you? He said, Yeah, I'm tired of Joel.
23   He in love with Chance. Chance telling

144

1    him everything. He in love. Chance
2    watching the guys up there telling him
3    everything. I said, What? I said, Man, I
4    don't know nothing about that. I said,
5    Why don't you go talk to David before you
6    just quit and leave your job? I said,
7    Man, look, if you ain't got plenty of
8    money, don't leave your job. Well, no,
9    no, no.
10        I said, Well, you going to have
11   to turn that key in before you leave. You
12   might as well leave me your key if you're
13   fixin' to quit. I said, Better yet, take
14   it to David. He said, Well, I'll go down
15   there and take it to David. I said, You
16   really need to think about it before you
17   walk away from your job. So he said,
18   Well, no, I'm going to quit. I'm just
19   tired of it. I'm tired of Joel. He ain't
20   right. He ain't right. He's just crazy
21   as he can be whether y'all can see it or
22   not. I said, Hey, man, I don't know
23   nothing about that. I said, But you need

Pages 141 to 144

145

1    to tell David all of this.
2        So I dropped him off at his barn
3    at his truck. And I saw Joel. I said,
4    Joel, that man say he fixin' to quit. He
5    said, For real? I said, Yeah. He said,
6    Well, let him go then. I can't make him
7    stay. So I just pulled on off.
8        And as of -- what you say the
9    other guy's name is?
10   **Q. Joseph May or Brother Man, Beckwith?**
11   A. No. Joseph May.
12       MR. DUKES: Joseph May.
13   A. I don't know why Joseph May quit.
14   **Q. He quit, too?**
15   A. He quit, yeah. I do know I heard that he
16   went back to school, but I don't know the
17   reason why he quit.
18   **Q. He didn't talk to you?**
19   A. No, he didn't. He just --
20   **Q. He just left.**
21   A. Right. He didn't ever come back and pick
22   the traps up. He just left.
23   **Q. He didn't get his traps?**

147

1    A. He was hired -- I can't make out -- I
2    guess that's a one or a --
3    **Q. I think that's nine -- 9/6/05 --**
4    A. Okay.
5    **Q. -- he was hired. Does that sound about**
6    **right, September of '05?**
7    A. That sounds about right.
8    **Q. He was hired before Joel was hired; do you**
9    **remember that, right before --**
10   A. Correct.
11   **Q. -- Joel was hired?**
12   A. Yeah, correct.
13   **Q. Okay.**
14   A. Maybe a couple of weeks or maybe sooner.
15   **Q. Right.**
16   A. Three or four weeks maybe.
17   **Q. And he was hired at $7 an hour, correct?**
18   A. Correct.
19   **Q. Do you know how old Jeffrey is?**
20   A. No, I don't.
21   **Q. Let me show you Exhibit 24. This is**
22   **Jeffrey Harris' application.**
23       **(Whereupon Plaintiff's Exhibit**

146

1    A. No. He just left.
2    **Q. All right. Well, I've showed you four**
3    **documents of four white males who were**
4    **hired, correct?**
5    A. Correct.
6    **Q. And each one of them were paid $8 an hour,**
7    **correct?**
8    A. Correct.
9    **Q. Norris Foster was paid $7 an hour, and I**
10   **showed you that document?**
11   A. Correct.
12   **Q. Jeffrey Harris --**
13       MR. ROBERSON: Have you
14       got . . .
15   **Q. Jeffrey Harris is black, isn't he?**
16   A. Correct.
17   **Q. Does it show that he was hired -- when was**
18   **he hired, what date?**
19       **(Whereupon Plaintiff's Exhibit**
20       **No. 23 was marked for**
21       **identification and attached**
22       **hereto.)**
23       **(Witness reviewed document.)**

148

1        **No. 24 was marked for**
2        **identification and attached**
3        **hereto.)**
4        **(Witness reviewed document.)**
5    **Q. You see where he had military service?**
6    A. Correct.
7    **Q. Okay. And I'm going to show you Exhibit**
8    **25 which is Jeffrey Harris' birth**
9    **certificate. Shows he was born**
10   **December 4, 1967. So that would have made**
11   **him in 2005, what, thirty-eight?**
12       **(Whereupon Plaintiff's Exhibit**
13       **No. 25 was marked for**
14       **identification and attached**
15       **hereto.)**
16       **(Witness reviewed document.)**
17   A. Correct. '67?
18   **Q. Right, '67.**
19   A. He was born in '67?
20   **Q. That's what it says, yeah. Makes him**
21   **about thirty-eight, doesn't it?**
22   A. Yeah. He was born the 4th, 1967.
23   **Q. All right. And I'm also going to show you**

Pages 145 to 148

149

1    the deposition -- I mean, Willie Mack's
2    personnel file.  Willie Mack, do y'all
3    call him B.B.?
4         (Whereupon Plaintiff's Exhibit
5         No. 26 was marked for
6         identification and attached
7         hereto.)
8    A. We call him B.B., that's correct.
9    Q. Okay.  What does he do in the crew?
10   A. B.B. used to -- in my crew now?
11   Q. Does he work for you?
12   A. Now, yeah.
13   Q. Is he a good employee?
14   A. Oh, yeah.
15   Q. I mean, does he do his job?
16   A. Yeah.
17   Q. Have you ever had any problems out of B.B.
18      not coming to work or whatever?
19   A. A couple of times, yeah.
20   Q. Says this is the application.  He didn't
21      complete any of it, but here's his
22      application, Exhibit 27, for Willie
23      Bernard Mack.

150

1         (Whereupon Plaintiff's Exhibit
2         No. 27 was marked for
3         identification and attached
4         hereto.)
5         (Witness reviewed document.)
6    Q. What did Willie Mack make an hour when he
7       was hired?
8    A. When he was hired?  6.50 when he started.
9    Q. What date did he start?
10   A. Third month, the 16th of '04.
11   Q. Okay.  And then how much did he get?
12   A. He got a raise the first month, the first
13      of '05, to 7.80 it looks like.
14   Q. $7 an hour, I think it is.
15        MR. DUKES:  I don't know.
16   A. I can't make out what that is.
17   Q. Okay.
18   A. And then on the first -- the first month,
19      the first of '06, he got a raise to $8.
20   Q. Okay.  Now, I don't have the documents,
21      but I'm asking you to assume -- do you
22      know Henry Tolliver?
23   A. Yes, I know him.

151

1    Q. Did he work for you?
2    A. Correct.
3    Q. Was he a good worker?
4    A. Correct.
5    Q. And Demetrius Parham, do you --
6    A. Correct.
7    Q. Do you know him?
8    A. Correct.
9    Q. I know he's related to you.  But is he a
10      good worker?
11   A. Correct, yes.
12   Q. I mean, he does his job?
13   A. He does his job.
14   Q. And he knows how to take people deer
15      hunting, right?
16   A. Some places.  Some places.  Not all the
17      places.
18   Q. Well, I want you to --
19   A. Majority.
20   Q. I want you to assume that every -- that
21      Henry and Demetrius both made less than $8
22      an hour, okay?
23   A. Correct.

152

1    Q. Do you know any explanation other than
2       their race -- they're black men -- why
3       they were paid less?
4         MR. DUKES:  Than?
5         MR. ROBERSON:  The Plaintiffs.
6         MR. DUKES:  I object to the
7           form.
8    Q. You want me to ask you again?  You may not
9       understand that.
10   A. Yeah.  Ask me again.
11   Q. Norris Foster, Jeff Harris, Willie Mack,
12      Henry Tolliver, and Demetrius Parham, all
13      black men; do you agree?
14   A. Correct.
15   Q. All of them paid less than $8 an hour; do
16      you agree?
17        MR. DUKES:  Object to the form.
18   A. Correct.
19   Q. Do you know any reason why they were paid
20      less than these four white people who were
21      hired in 2005 and 2006 at $8 an hour?  Do
22      you know any reason for it?
23   A. No, I don't.  I don't know any reason why.

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

153

1　I mean, I didn't know what nobody was
2　making but the black guys.  I didn't know
3　what the white guys was making.
4　**Q. Well, does it appear to you that Mid**
5　**States was discriminating against those**
6　**people as to their pay?**
7　　　MR. DUKES:  Object to the form.
8　**Q. You can answer.**
9　A. When you saying Mid States, you talking
10　about the peoples in the main office?
11　**Q. Yeah.**
12　A. Like Meridian, the main office?
13　**Q. Right.**
14　A. Yeah, I think they was.  As far as I'm
15　concerned, I think they was.  If they was
16　making more, $8, and them guys been there,
17　that ain't right.
18　**Q. Norris had been there ten years, hadn't**
19　**he?**
20　　　MR. DUKES:  Object to the form.
21　A. Yeah.
22　**Q. About ten -- I mean, working on the**
23　**plantation.  I don't mean for Mid States,**

154

1　**but working at Sedgefields for about ten**
2　**years, different periods of time, right?**
3　A. Correct.
4　**Q. I mean, he'd been running a tractor out**
5　**there, and he knew every hill and hollow**
6　**out there, didn't he?**
7　　　MR. DUKES:  Object to the form.
8　**Q. You can answer.**
9　A. Correct.
10　**Q. And -- and I know when you were a**
11　**supervisor, Norris probably didn't operate**
12　**the heavy equipment because you probably**
13　**did?**
14　A. I did.  He operated tractors.
15　**Q. He did tractors.  Did he ever run a**
16　**backhoe?**
17　A. Every now and then.
18　**Q. Okay.  Did you ever see him on a bulldozer**
19　**doing a firebreak or anything like that?**
20　A. I never seen him on a bulldozer.
21　**Q. He said he pushed up piles.  Do you know**
22　**what I'm talking about?**
23　A. That might have been before my time.  I

155

1　never seen that.
2　**Q. Okay.  Fair enough.  When -- when you were**
3　**working out there with Norris, if anybody**
4　**was on a bulldozer, it was you?**
5　A. Correct.
6　**Q. Okay.  Have you ever seen Joel Norman on a**
7　**bulldozer?**
8　A. Yes.
9　**Q. Have you ever seen him on a backhoe?**
10　A. Yes.
11　**Q. Well, and after today, you know that**
12　**they're paying Joel Norman $70,000,**
13　**providing him a place to live, and they're**
14　**paying you $41,000, and you don't live on**
15　**the property, do you?**
16　A. Correct.
17　**Q. Do you think that's fair?**
18　　　MR. DUKES:  Object to the form.
19　**Q. You can answer.**
20　　　MR. DUKES:  You can go ahead.
21　A. No, I don't think that's fair.
22　**Q. Do you think that they may be**
23　**discriminating against you and your pay?**

156

1　A. I thought about it.  It's on my mind now
2　when I see them forms.  It ain't right.
3　It don't matter about a man got a degree,
4　to me, if I'm doing the same job just as
5　good as he's doing it -- I mean, you know.
6　**Q. I do know.**
7　A. I don't understand that.  It ain't right.
8　I don't care if you're a Mexican, because
9　Hispanic don't matter.  If you can do that
10　job, you ought to be getting paid right.
11　　　MR. ROBERSON:  Let's go off the
12　　　Record.  And I think I'm
13　　　about through.
14　　　THE VIDEOGRAPHER:  Off the
15　　　Record at 2:54 p.m.
16　　　(Whereupon a brief recess was
17　　　taken.)
18　　　MR. ROBERSON:  Let's go back on
19　　　the Record.
20　　　THE VIDEOGRAPHER:  Back on the
21　　　Record at 3:07 p.m.
22　　　BY MR. ROBERSON:
23　**Q. Mr. Lee, I showed you a document at one**

Pages 153 to 156

334.262.3332　　　　Baker & Baker Reporting and Video Services, Inc.　　　　334.262.3332
888.253.3377　　　Certified Court Reporters and Certified Legal Video Specialists　　　888.253.3377

157

1 time about when Norris was written up for
2 clipping -- riding the horses when he was
3 supposed to have been clipping them; do
4 you remember that?
5 A. Correct.
6 Q. Norris says that he came and talked to
7 you, after that date, about that. On the
8 day he was written up, he told Joel Norman
9 and David Carroll that he was going to go
10 report them to -- I think it's Suzanne and
11 Matt. Do you know who that is?
12 A. Yeah, correct.
13 Q. Who are those people?
14 A. Suzanne is Paul Broadhead's daughter.
15 Q. Okay.
16 A. And Matt is his son-in-law.
17 Q. And are they out of state?
18 A. They stay in Atlanta.
19 Q. Okay. Do you recall anything about
20 what -- Norris claims that he threatened
21 to talk to them, and he was told something
22 by David Carroll. Do you know what I'm
23 talking about?

158

1 A. Correct. I know what Norris told me.
2 Q. Well, and all I'm asking you is what
3 Norris told you. This is before he was
4 fired?
5 A. Correct.
6 Q. What did he tell you?
7 A. We was at the skinning shed down there at
8 the dog kennel. And Norris come to me and
9 told me, he said, Well, I told David. I
10 went to David about what was going on.
11 And said David told him, said you had to
12 take that up with Joel. And said that
13 Norris told him, said, Well, I'm going to
14 tell them peoples. I'm going to tell
15 Suzanne and Matt. I'm going to talk to
16 them and let them know. And then Norris
17 said David say, If you tell anything what
18 goes on out here, you're automatically
19 fired. What goes on out here stays out
20 here. That's what Norris -- Norris' exact
21 words Norris told me. I didn't hear David
22 say --
23 Q. You didn't -- that's -- my point is: You

159

1 didn't hear David say that?
2 A. I didn't hear that, no.
3 Q. That's -- but -- but --
4 A. I got it from Norris.
5 Q. But Norris was still working there --
6 A. Correct.
7 Q. -- when he said that, right?
8 A. Yeah.
9 Q. And it was right after he had been written
10 up about the --
11 A. With the clippers, correct.
12 Q. Okay. All right. Now, I'm going to tell
13 you again. I want -- I want to try to
14 make myself clear. You now work for
15 Tollison's, right?
16 A. Correct.
17 Q. But the guy that's your boss at Tollison's
18 is David Carroll --
19 A. Correct.
20 Q. -- do you understand that?
21 A. Correct.
22 Q. And Joel Norman works for Tollison's,
23 right?

160

1 A. Correct.
2 Q. And David Carroll's been sitting in here
3 while you've been testifying?
4 A. Correct.
5 Q. And he's your boss?
6 A. Correct.
7 Q. And he can take action against you; do you
8 understand that? As your boss, he can.
9 A. Correct.
10 Q. I'm telling you that if he does take some
11 action against you, and you feel like it's
12 because of your testimony, that you need
13 to have legal representation, okay?
14 A. Okay, correct.
15 Q. And you can -- you're free to contact any
16 lawyer you want to about that.
17 A. Correct.
18 Q. Okay. And I'm not saying he's going to
19 take any action against you. I'm just
20 telling you if he does.
21 A. Correct.
22 Q. Now, you've been working out there for --
23 A. Quite some time.

Pages 157 to 160

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

161

1  Q. Six years?
2  A. Yeah, correct -- longer.
3  Q. Okay.  And I ain't heard anybody say
4     anything bad about you.
5  A. Good.
6  Q. To be honest with you, I've asked
7     everybody, and everybody says you're a
8     good worker and you do your job.
9  A. Correct.
10 Q. All right.  And I don't expect that to
11    change, do you?
12 A. I don't expect it to.
13 Q. But I'm going to be honest with you, Roy,
14    you make $41,000 a year, right?
15 A. Correct.
16 Q. That's a pretty good job in Bullock
17    County, isn't it?
18 A. Correct.
19 Q. I mean, there ain't a lot of jobs that pay
20    that?
21 A. No, it isn't.
22 Q. Okay.  And you'd like to keep that job, I
23    assume?

162

1  A. Correct.
2  Q. Okay.  Well, if anybody does anything to
3     affect that, I think you ought to be
4     represented, okay?
5  A. Correct.
6  Q. And I'm going to tell you, I do that --
7        MR. DUKES:  Wait a minute.
8  Q. -- kind of work.
9        MR. DUKES:  Let me -- let me
10          stop you here, Jerry.
11       MR. ROBERSON:  Okay.
12       MR. DUKES:  I think you need to
13          reconsider doing what
14          you're doing for ethical
15          reasons.  You don't need to
16          do what you're about to do.
17          I'm giving you an
18          opportunity not to do it.
19       MR. ROBERSON:  Not to do what?
20       MR. DUKES:  This -- it has a
21          taint of barratry to it.
22          And I think under the
23          ethical guidelines that we

163

1        both go by, I don't think
2        you need to --
3     MR. ROBERSON:  Okay.
4     MR. DUKES:  -- give him a card.
5     MR. ROBERSON:  Okay.
6  BY MR. ROBERSON:
7  Q. Well, I'll just tell you that I cannot
8     contact you.  I agree with Mr. Dukes that
9     I -- I'm not permitted to contact you,
10    because you're in management at Mid
11    States.  Do you understand that?
12 A. Correct, correct.
13 Q. But you can contact anybody you want to
14    contact if you want legal advice or legal
15    representation.  You understand that?
16 A. I understand.
17       MR. ROBERSON:  Okay.  Thank you.
18          You may answer his
19          questions.
20       MR. DUKES:  I don't have any
21          questions.
22       THE VIDEOGRAPHER:  This
23          concludes the deposition of

164

1        the Witness.  And we're
2        going off the Record at
3        3:12 p.m.
4     (The deposition of ROY LEE
5        concluded at 3:12 p.m.)
6
7  * * * * * * * * * *
8     FURTHER DEPONENT SAITH NOT
9  * * * * * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Pages  161 to 164

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

```
                                                    165
 1        * * * * * * * * * * *
 2            REPORTER'S CERTIFICATE
 3        * * * * * * * * * * *
 4
 5    STATE OF ALABAMA)
 6    COUNTY OF MONTGOMERY)
 7
 8      I, Cornelia J. Baker, Certified Court
 9    Reporter, Certified Shorthand Reporter,
10    and Notary Public in and for the State of
11    Alabama at Large, do hereby certify that
12    on Wednesday, October 11, 2006, pursuant
13    to notice and stipulation on behalf of the
14    Plaintiff, I reported the deposition of
15    ROY LEE, who was first duly sworn by me to
16    speak the truth, the whole truth, and
17    nothing but the truth, in the matter of
18    NORRIS FOSTER, Plaintiff, versus MID STATE
19    LAND AND TIMBER COMPANY, INCORPORATED,
20    d/b/a SEDGEFIELDS PLANTATION, Defendant,
21    Case Number 206-CV-00405-IDSRW, now
22    pending in the UNITED STATES DISTRICT
23    COURT FOR THE MIDDLE DISTRICT OF ALABAMA,
```

```
                                                    166
 1    NORTHERN DIVISION; that the foregoing
 2    pages contain a true and accurate
 3    transcription of the examination of said
 4    witness by counsel for the parties set out
 5    herein; that the reading and signing of
 6    said deposition was waived by witness and
 7    counsel for the parties.
 8      I further certify that I am neither of
 9    kin nor of counsel to the parties to said
10    cause, nor in any manner interested in the
11    results thereof.
12      This the 17th day of October, 2006.
13
14
15
          Cornelia J. Baker
16        Certified Shorthand Reporter,
          Certified Court Reporter and
17        Notary Public for the
          State of Alabama
18
19        My Commission expires 6/9/08.
20
21
22
23
```

Pages 165 to 166

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists       888.253.3377