EXHIBIT

# American Court Reporting
## toll-free (877) 320-1050

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06-CV-00405-ID-SRW

NORRIS FOSTER,
    Plaintiff,
vs.
MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

    Defendant.

THE VIDEOTAPED

DEPOSITION TESTIMONY OF

DAVID CARROLL

September 8, 2006

1:29    p.m.

COURT REPORTER:

Gwendolyn P. Timbie, CSR

---

**Page 2**

STIPULATIONS

1    STIPULATIONS
2        IT IS STIPULATED AND AGREED by and
3    between the parties through their
4    respective counsel that the videotaped
5    deposition of DAVID CARROLL, may be taken
6    before Gwendolyn P. Timbie, Certified
7    Shorthand Reporter and Notary Public,
8    State at Large, at the law office of John
9    Waters, Union Springs, Alabama, on
10   September 8, 2006, commencing at
11   approximately 1:29 p.m.
12       IT IS FURTHER STIPULATED AND
13   AGREED that the signature to and the
14   reading of the deposition by the witness
15   is not waived, the deposition to have the
16   same force and effect as if full
17   compliance had been had with all laws and
18   rules of Court relating to the taking of
19   depositions.
20       IT IS FURTHER STIPULATED AND
21   AGREED that it shall not be necessary for
22   any objections to be made by counsel to
23   any questions, except as to form or

---

**Page 3**

1   leading questions, and that counsel for
2   the parties may make objections and assign
3   grounds at the time of trial or at the
4   time said deposition is offered in
5   evidence, or prior thereto.
6       Please be advised that this is the
7   same and not retained by the Court
8   Reporter, nor filed with the Court.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

**Page 4**

INDEX

1        INDEX
2   EXAMINATION BY:              PAGE NO:
3   Mr. Roberson                   8
4   Certificate                  176
5   Instructions to Witness      177
6   Signature Page               179
7   Errata Sheet                 180
8
9       LIST OF EXHIBITS
10  EXHIBITS:              PAGE NO:
11  Plaintiff's 19              48
12  Plaintiff's 20             156
13  Plaintiff's 21             157
14
15
16
17
18
19
20
21
22
23

---

1 (Pages 1 to 4)

# American Court Reporting
## toll-free (877) 320-1050

Page 5

```
 1
 2
 3
 4      A P P E A R A N C E S
 5
 6   FOR THE PLAINTIFF:
 7      JERRY ROBERSON, Esquire
        Roberson & Roberson
 8      8 Office Park Circle
        Suite 150
 9      Birmingham, Alabama 35223
10      ALBERT H. ADAMS, JR., Esquire
        Irby Law Firm, LLC
11      Post Office Box 910
        Eufaula, Alabama 36072
12
13
14   FOR THE DEFENDANT:
15      CARTER H. DUKES, Esquire
        Huckaby, Scott & Dukes, P.C.
        2100 Third Avenue North
16      Suite 700
        Birmingham, Alabama 35203
17
18
     VIDEOGRAPHER:
19
        CHRISTI MAZE
20
21
22
23
```

Page 6

```
 1      I, Gwendolyn P. Timbie, Certified
 2   Shorthand Reporter and Notary Public for
 3   the State of Alabama at Large, acting as
 4   Commissioner, certify that on this date,
 5   pursuant to the Federal Rules of Civil
 6   Procedure, and the foregoing stipulation
 7   of counsel, there came before me at the
 8   law office of John Waters, Union Springs,
 9   Alabama, commencing at approximately
10   1:29 p.m., on September 8, 2006, David
11   Carroll, witness in the above cause, for
12   oral examination, whereupon the following
13   proceedings were had:
14
15      THE VIDEOGRAPHER:  This
16   deposition is being taken of David --
17   David Carroll on this, the 8th day of
18   September 2006, in the case of Norris
19   Foster versus Mid State Land and Timber
20   Company, Inc., d/b/a Sedgefields Farm -- I
21   mean -- sorry -- Plantation.  This case is
22   set in the United States District Court,
23   for the Middle District of Alabama,
```

Page 7

```
 1   Northern Division; Civil Action Number 2:
 2   06-CV-00405-ID-SRW.
 3      Would Counsel please state
 4   their names and who they represent?
 5      MR. ROBERSON:  My name is
 6   Jerry Roberson, and I, along with Albert
 7   Adams, represent the plaintiff, Norris
 8   Foster.
 9      MR. DUKES:  Carter Dukes,
10   representing Mid State.
11      THE VIDEOGRAPHER:  Would the
12   court reporter please swear the witness?
13
14      DAVID CARROLL,
15   Having been first duly sworn, was examined
16   and testified as follows:
17
18      THE REPORTER:  And will these
19   be usual stipulations?
20      MR. ROBERSON:  Yes, ma'am.
21      MR. DUKES:  Yes.  But we'll
22   read and sign.
23
```

Page 8

```
 1   EXAMINATION BY MR. ROBERSON:
 2      Q   Mr. Carroll, my name is Jerry
 3   Roberson, and I represent Norris Foster.
 4   Do you understand we're here today about
 5   his race discrimination claim?
 6      A   Yes.
 7      Q   And are you employed -- or
 8   were you formerly employed with Mid States
 9   Land and Timber?
10      A   Yes.
11      Q   In what capacity?
12      A   I was hired as the general
13   manager.
14      Q   When were you hired, sir?
15      A   I was hired during the month
16   of March -- uh -- or early April of 2005.
17      Q   Do you know who you replaced,
18   who was the former manager?
19      A   I'm told a lady named Donna
20   Davidson was general manager before I was
21   hired.
22      Q   And do you know where
23   Ms. Davidson is?
```

2 (Pages 5 to 8)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1     A     I understand she lives on the
2   coast somewhere.
3     Q     Was she related at all to the
4   Broadheads?
5     A     I believe she was.
6     Q     Do you know how she was
7   related?
8     A     I would say through marriage.
9     Q     That is, she was -- she
10   married into the Broadhead family?
11     A     I -- I guess so.  In some
12   capacity.
13     Q     You didn't, did you?
14     A     No, sir.
15     Q     Okay.  How old are you, Mr. --
16     A     Forty-two.
17     Q     -- Carroll?  And where had you
18   worked prior to coming to work at
19   Sedgefields?
20     A     My work history would be that
21   I -- I grew up on a farm, farm labor,
22   working for my father and other
23   individuals around my hometown.

Page 10

1     Q     Where?
2     A     Hurtsboro, Alabama.
3     Q     Hurtsboro?
4     A     Uh-huh.  I attended high
5   school and -- and worked some my senior
6   year.  At the completion of my senior year
7   of high school, before I went to college
8   --
9     Q     What year did you graduate
10   high school, sir?
11     A     I graduated in 1982.
12     Q     From Hurtsboro High?
13     A     No.  I went to Glenwood High
14   School in Lee County.
15     Q     I'm sorry.  What high school?
16     A     Glenwood.
17     Q     Thank you.  And is -- is -- so
18   had you moved from Hurtsboro?
19     A     No, sir.
20     Q     That's just the -- the high
21   school you go to?
22     A     No, sir.  That -- Glenwood
23   High School is a private school.  I went

Page 11

1   to public school.
2     Q     Okay.  How many students did
3   they have?
4     A     Kindergarten through twelfth
5   grade would probably be in the
6   neighborhood of eight hundred students.
7     Q     All right, sir.  And then
8   after high school -- you graduated in 1982
9   -- where did you go to college?
10     A     I went to Auburn University.
11     Q     Did you graduate?
12     A     I did.
13     Q     What year?
14     A     1986.
15     Q     And in -- in what area did you
16   get your degree?
17     A     Bachelor of Science in forest
18   management.
19     Q     All right, sir.  And then what
20   was your employment after college?
21     A     After college, I went to work
22   for a family-owned business, A. B. Carroll
23   Lumber Company, located there in

Page 12

1   Hurtsboro.
2     Q     A. B. Carroll?
3     A     A -- A, period, B, period,
4   Carroll, C-A-R-R-O-L-L.
5     Q     Were they related to you?
6     A     Yes.
7     Q     How so?
8     A     My grandfather at one time
9   owned the mill.  My father at that time,
10   when I graduated school, was the --
11   general manager of the mill.  And I went
12   back to work for the company.
13     Q     And what was your job there?
14     A     My primary responsibilities
15   were timber procurement, timber inventory
16   for the saw mill, purchasing timber.  With
17   a family-owned business, before we sold
18   out -- or -- or sold the business, it was
19   everything, from A to Z.
20     Q     You -- how many employees at
21   A. B. Carroll, approximately?
22     A     Approximately eighty to
23   eighty-five employees.

3  (Pages 9 to 12)

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 13

1    Q    And where is that located?
2    A    It was in Hurtsboro, Alabama.
3    Q    Okay. And you sold -- your
4 family sold that business?
5    A    That's correct. Closed it
6 down and sold -- sold it.
7    Q    When was that?
8    A    That happened in the mid
9 '90s. Mid to late '90s.
10    Q    Who did they sell it to?
11    A    Well, they -- it was --
12 actually, took part in -- not in one
13 event, but in multiple events. The saw
14 mill itself was closed, and we auctioned
15 off some equipment. We kept the planer
16 mill treating facility for a few more
17 years and just ran those facilities until
18 we finally just closed the doors and sold
19 off that equipment.
20    Q    Okay. So no -- is anybody
21 operating --
22    A    No.
23    Q    -- that now?

Page 14

1    A    No.
2    Q    So since it's not operating,
3 you had to find another job, I take it?
4    A    Certainly.
5    Q    And where did you go to work?
6    A    Well, before the mill was
7 totally closed, I went back to school and
8 earned a Master's degree in wildlife
9 management. Along that time, that the
10 mill was closing and I was working on my
11 second degree, I opened my own private
12 consulting business and -- and, more or
13 less, still own it today. Do some things
14 from time to time, when I'm asked to.
15 It's called The Environmental Forestry
16 Company.
17    Q    Is that an LLC or --
18    A    No.
19    Q    -- just a company?
20    A    Just a -- just a company.
21    Q    Where is that business
22 located?
23    A    I just run it out of my home.

Page 15

1    Q    Where was your Master's degree
2 from?
3    A    Auburn University, as well.
4    Q    Okay. When did you get your
5 degree, the Master's?
6    A    Master's degree was completed,
7 I believe, in 1996.
8    Q    Okay. And --
9    A    I'm sorry. I went to school
10 back in '96. Finished up about '98 to
11 '99.
12    Q    All right. Well -- and are
13 there any other employees of this
14 environmental consulting business you're
15 operating?
16    A    No. I'm just self-employed.
17 If I had any other labor, it was just
18 contract labor.
19    Q    And what do -- how -- what
20 kind of work do you do as a consultant?
21    A    Well, I am a registered
22 forester in the state. So I provide
23 professional forestry services, such as

Page 16

1 timber sales, timber cruising, land
2 management, boundary line marking --
3 everything from start to finish there, I
4 guess.
5    Q    Okay. And are you -- you're
6 currently operating that business; right?
7    A    I do -- yeah. I mean, it's --
8 it's -- my doors are open, but I really
9 don't do anything right now because my
10 full-time employment basically is here.
11    Q    Okay. And the folks at
12 Tollesons -- Tollesons bought the property
13 in Union Springs, of Sedgefields
14 Plantation --
15    A    Yes, sir.
16    Q    -- from Mid States --
17    A    Yes, sir.
18    Q    -- is that correct?
19    A    That's correct.
20    Q    That was in May of 2006?
21    A    That's correct.
22    Q    And you're now employed with
23 Tollesons; is that correct?

4 (Pages 13 to 16)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1    A    Correct.
2    Q    As the manager, still?
3    A    That is correct.
4    Q    So there was sort of a -- a
5    continuation of the operations of that
6    facility.
7    A    Yes.
8    Q    Is that fair?
9    A    Yes.
10        MR. DUKES:  Object to the
11   form.
12    Q    And the people at Tollesons
13   know that you do environmental consulting
14   outside their employment; correct?
15    A    They are aware that I am a
16   registered forester and hold that license
17   and have performed those services for
18   people, yes.
19    Q    Do they object to you doing
20   that?
21    A    No.
22    Q    I mean, there's -- it's not a
23   problem for them, is it?

Page 18

1    A    No.  Actually, it probably
2    would -- it would be a benefit to them,
3    because the type of clients that I have
4    would -- may be people that would
5    eventually sell them wood.
6    Q    Okay.  And so the time I want
7    to talk to you about is from when you
8    worked -- worked at -- at Mid State Land
9    and Timber Company until it was
10   purchased.  Okay.
11        And we're talking about at the
12   plantation here in -- in Union Springs,
13   Alabama; correct?
14    A    Yes, sir.
15    Q    Now, I don't hunt, so you've
16   got to help me out, if you will.
17        How many acres was Sedgefields
18   Plantation here?
19    A    I believe it called for twelve
20   thousand seven hundred and eighty-seven
21   acres.
22    Q    So it's almost thirteen
23   thousand acres?

Page 19

1    A    Close.
2    Q    When you -- when you were
3    working there, when --
4    A    That --
5    Q    -- Mid State had it?
6    A    That is correct.
7    Q    And what kind of operation is
8    it; that is, besides -- they do hunting
9    there; correct?
10    A    That is correct.
11    Q    Do they also raise or grow
12   timber on the property?
13    A    That would be a -- a natural
14   benefit of owning the property, yes.  They
15   grow timber.
16    Q    Okay.  Did you have any duties
17   associated with the timber management of
18   -- of -- at Sedgefields?
19    A    I do.
20    Q    What are those?
21    A    It just -- a general manager.
22   My duties would be not only to look after
23   the wildlife portion and the hunting

Page 20

1    portion of it, but oversee any of the
2    timber management aspects of it -- whether
3    we would be thinning wood, whether we
4    would be planting trees, marking lines.
5    Anything of that nature.
6    Q    So by owning that much
7    property, there are trees on it; right?
8    A    That is correct.
9    Q    And what kind of trees?
10    A    Predominantly, in certain
11   areas, it's planted pines, which you're
12   saying that they grow for, basically, a
13   product --
14    Q    To harvest?
15    A    To harvest.  There are pine
16   hardwood stands, and there are hardwood
17   stands on the property.
18    Q    Okay.  And it's your job to
19   make sure that that -- to optimize the
20   recovery from having those resources;
21   correct?
22    A    My job, when I was interviewed
23   and hired by Mid State Land and Timber,

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1  was to not only see about timber and --
2  and -- I wasn't really given the
3  instructions to maximize timber production
4  on every square acre of the property,
5  because, obviously, some of that property
6  we use for --
7      Q   Hunting?
8      A   Hunting.
9      Q   Sure.
10     A   And other aspects. But a
11  common-sense answer would be, where --
12  where timber was a priority, we would grow
13  as much timber as possible. Where hunting
14  was a priority, we would make that the
15  most -- the most available.
16     Q   Okay. And -- and I may -- I
17  don't want to misstate anything, but,
18  approximately, how many acres did you hunt
19  on at -- at -- at Mid States?
20     A   Well, it depends on what type
21  of hunting you describe.
22     Q   Okay.
23     A   If -- if we're deer hunting,

Page 22

1  we can cover, basically, the whole
2  thirteen thousand acres. We may not hunt
3  every square foot, but there would be
4  hunters in each parcel.
5      Q   Yeah. Okay.
6      A   If we're -- if we're up and
7  bird hunting, quail hunting, about half
8  that, about sixty-five hundred acres.
9      Q   Okay. And -- and I take it
10  from your answer that you don't deer hunt
11  in the same areas that bird hunts are
12  going on, at the same time --
13     A   That is correct.
14     Q   -- correct?
15     A   That is correct.
16     Q   That -- that wouldn't be a --
17  from a common sense standpoint, very safe
18  to do, would it?
19     A   Exactly.
20     Q   Okay. But -- but you can deer
21  hunt on the entire property; right?
22     A   Yes.
23     Q   As long as you're not doing

Page 23

1  the bird hunting on any part of it --
2      A   Yes.
3      Q   -- correct?
4      A   That's correct.
5      Q   And then a portion -- the more
6  open lands, you can bird hunt on; correct?
7      A   Yes.
8      Q   I mean, they probably have
9  some thickets and stuff where you can't
10  bird hunt; isn't that fair?
11     A   Yes.
12     Q   Okay. Now -- and the -- the
13  -- do you have any job responsibilities
14  in -- insofar as the revenue stream from
15  the operations?
16     A   In my initial interview with
17  Ms. Howell, I was asked to be as
18  productive as possible, given the current
19  circumstances of the plantation.
20     Q   Okay. What are the current
21  circumstances?
22     A   The circumstances were that
23  the property was not groomed the way

Page 24

1  it want -- they wanted it to be -- the
2  home office wanted it to be. So it was --
3  it -- for a phrase that I would use, it
4  was a "diamond in the rough."
5      Q   Okay. Well, I'm going to show
6  you what we previously -- and you were
7  here for Mr. Norman's deposition; correct?
8      A   I was.
9      Q   You actually were here for
10  Mr. Foster's deposition yesterday;
11  correct?
12     A   I was, yes.
13     Q   So you've heard all the
14  testimony in this case; correct?
15     A   Yes.
16     Q   All right. And, then, I'm
17  going to show you what we marked as
18  Plaintiff's Exhibit 3 to Mr. Norman's
19  deposition.
20      Is that the organizational chart for
21  Sedgefields as of March of 2006?
22     A   I believe that would be
23  correct, yes.

6  (Pages 21 to 24)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1    Q    Now, other than the plantation
2  here in Union Springs, did y'all have any
3  other properties that you owned in
4  Alabama?
5    A    When you mean "y'all," what --
6    Q    Mid State.  Did Mid State own
7  any other property in Alabama?
8    A    Not in the state of Alabama.
9    Q    Okay.  So all the Alabama
10  operations were on these, roughly,
11  thirteen thousand acres; is that fair?
12    A    That -- to my knowledge, that
13  is accurate.
14    Q    And -- so all the employees
15  for Mid State in Alabama would be on that
16  property?
17    A    I do believe there was one
18  other employee.  I -- she would -- she
19  would work for maybe the home office, not
20  necessarily Mid State.  But she also lived
21  in -- in Alabama.
22    Q    Who is that?
23    A    I will try to recall her

Page 26

1  name.  But she lives in -- in Decatur, and
2  she is a reference for us for -- I'm
3  trying to think of the correct term --
4  issues that we might have concerning,
5  maybe, tax laws in the state or something
6  of that nature.
7    Q    Okay.
8    A    I don't -- I'm sorry.  I don't
9  recall her name at this time.
10    Q    All right.  Did Mid State have
11  to provide accounting information from its
12  operations here in Union Springs?
13    A    Ex -- rephrase that.  I don't
14  quite understand the question.
15    Q    Did you have any kind of
16  report that you sent off every month, how
17  much money you made from hunting or
18  anything like that?
19    A    All -- all of our
20  bookkeeping -- not -- all of our
21  accounting and bookkeeping work was done
22  in -- in Mississippi, at the home office.
23    Q    Okay.

Page 27

1    A    We would, basically -- for
2  example, if we had a hunt, we would
3  provide documentation to the home office
4  of who the customer was and what the
5  charges were per the rates that -- that
6  we used.  That was sent to the home
7  office, and the billing occurred in
8  Mississippi and sent to the clients.
9    Q    Okay.  So does that indicate
10  all the employees in Alabama in March of
11  2006?
12    A    It does.
13    Q    How many of them are there?
14    A    One, two, three, four, five,
15  six, seven, eight, nine, ten, eleven.
16  Counting myself.
17    Q    Do you think that's about how
18  many you had?
19    A    I believe so.
20    Q    Okay.  And, I mean, from -- of
21  course, from time to time, it might vary
22  slightly; correct?
23    A    Yes.

Page 28

1    Q    Did -- did -- how many are --
2  and how many employees have you had -- the
3  most employees that you had in Alabama?
4    A    Maybe thirteen, total, at --
5  at one time.
6    Q    Now --
7    MR. DUKES:  And you --
8  obviously, you're talking about during his
9  time --
10    A    Right.
11    MR. DUKES:  -- at Mid State?
12    Q    (BY MR. ROBERSON)  All right.
13  Now, Mr. Carroll, you told me about your
14  consulting business, and you told me you
15  started working here in two -- in 2005.
16  What -- what was your employment history
17  prior to -- to working here?
18    A    Upon receiving my Master's
19  degree at Auburn, I went and -- basically,
20  immediately to work for Five Star
21  Plantation, located in Kellyton, Alabama.
22    Q    Kellyton?
23    A    K-E-L-L-Y-T-O-N.

7  (Pages 25 to 28)

# American Court Reporting
## toll-free (877) 320-1050

Page 29

1    Q    Where is that?
2    A    It's Coosa County, right next
3    door to Alex City.
4    Q    Okay. That's a little farther
5    north, then, isn't it?
6    A    That's correct.
7    Q    All right. And what kind of
8    work did you do at the Five Star
9    Plantation?
10    A    I was -- it was a multipurpose
11    hunting plantation, much like Sedgefields,
12    other than it was not operated
13    commercially. It was privately owned by a
14    number of people. And I was --
15    Q    How many acres did they have
16    there?
17    A    The total acreage that was --
18    that was leased or used by the facility
19    was, approximately, six thousand.
20    Q    Okay. And did they -- did --
21    besides hunting, did they do anything
22    else? You know, farming or anything like
23    that.

Page 30

1    A    No agriculture. None -- none
2    of that, no.
3    Q    But timber?
4    A    The explanation would be that,
5    when I went to work there, it was a -- a
6    hunting lodge operation that rented
7    property from the landowner. And so,
8    other than the hunting and the fishing
9    that took place on the property, there
10    weren't any -- any forced land
11    or agricultural operations that we owned
12    on the property when I went to work there
13    initially.
14    Q    All right. How long did you
15    work at Five Star?
16    A    A little better than three
17    years.
18    Q    What was your position there?
19    A    General manager.
20    Q    How many employees did they
21    have?
22    A    Approximately, fifteen, but it
23    varied. It was -- some was seasonal. So

Page 31

1    it would vary a little bit.
2    Q    And they did fishing there
3    too?
4    A    They -- yes, they did.
5    Q    Is that bass fishing? Or what
6    kind of fishing is it?
7    A    Bass and brim.
8    Q    Okay. So would they have
9    guides and use boats or --
10    A    From time to time, some of our
11    staff may guide. Most of the time,
12    individuals that -- that were there would
13    just fish, themselves.
14    Q    From boats or --
15    A    Uh-huh.
16    Q    -- from banks?
17    A    Mostly boats.
18    Q    All right. And did they have
19    a lodge?
20    A    They did.
21    Q    So they -- you could keep
22    guests overnight?
23    A    Yes.

Page 32

1    Q    See, I'm -- I'm sorry, but I'm
2    just not that familiar with these
3    operations. But when you say "commercial"
4    -- and this wasn't commercial -- what does
5    that really mean?
6    A    It was -- to simplify things,
7    it was a hunting club. And people --
8    Q    You had to be a member or a
9    guest of a member?
10    A    That is correct.
11    Q    Okay.
12    A    And I --
13    Q    They all paid dues or
14    something? Or how --
15    A    Yes.
16    Q    -- does it work?
17    A    Yes. They paid dues.
18    Q    It's a private club. And
19    the -- the dues fund the club?
20    A    That's correct.
21    Q    Is that fair?
22    A    Yeah.
23    Q    And so, if you stay at the

8 (Pages 29 to 32)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1  lodge, you don't have to pay?
2      A    If you're a guest of somebody,
3  they would pay, but you would not have to
4  pay.
5      Q    Okay. All right. You worked
6  there for three years?
7      A    Yes, sir.
8      Q    And who -- who's the -- I
9  don't -- I want to say "the boss," but
10  that's probably not the right term. Who
11  did you report to?
12      A    I was hired by a gentleman
13  named William Ireland.
14      Q    Bill Ireland?
15      A    Yes, sir.
16      Q    In -- from Birmingham?
17      A    Yes, sir. My immediate boss
18  at the time was a gentleman named Tom
19  Clark.
20      Q    Where did he live?
21      A    In Birmingham also.
22      Q    Okay. Did you ever do any of
23  the guide work?

Page 34

1      A    I did from time to time.
2      Q    Do you handle dogs or anything
3  like that?
4      A    I do from time to time.
5      Q    Okay. Well, I'm not trying to
6  make you something you're not, but I --
7  this is no time to be modest. I mean,
8  are -- are you an experienced --
9      A    I'm an amateur. I'm not a
10  professional.
11      Q    Okay. And when you did that,
12  how many people would you take out and how
13  many people would be part of your crew?
14      A    It -- we were individual
15  guides, with groups of two. Occasionally,
16  maybe three hunters, but a standard rule
17  was one guide and two hunters.
18      Q    Okay. And so you -- you take
19  the dogs; correct?
20      A    Yes, sir.
21      Q    And this was unlike
22  Sedgefields, then. The people weren't on
23  a wagon or anything?

Page 35

1      A    That is correct. And we
2  hunted on foot.
3      Q    On foot and not on horseback;
4  correct?
5      A    That's correct, yes.
6      Q    And so when -- when you had
7  successful hunts, did you ever get tips?
8      A    As a general rule, with me
9  being the boss man, more or less, no, I
10  didn't.
11      Q    Okay. What about the other
12  people that took people on hunts?
13      A    Certainly, they -- from time
14  to time, they would get tips.
15      Q    Okay. And was that part of
16  their just compensation?
17      A    You know, it wasn't a standard
18  part of their compensation, but if it --
19  somebody wanted to give them a tip at the
20  end of the hunt, then they gladly received
21  it.
22      Q    Okay. All right. Then, after
23  you worked at Five Star -- did you leave

Page 36

1  there voluntarily?
2      A    I did.
3      Q    Where did you go?
4      A    I worked for myself for the
5  time that I left there and then began work
6  here, at Sedgefields.
7      Q    You worked as a consultant,
8  then?
9      A    That is correct.
10      Q    Okay. And how long would that
11  have been?
12      A    From about 2001 till 2005. So
13  three and a half to four years.
14      Q    How did you hear about the job
15  at Sedgefields?
16      A    I was contacted by one of the
17  family members.
18      Q    Who was that?
19      A    The gentleman's name is Matt
20  Garver.
21      Q    Matt?
22      A    Uh-huh.
23      Q    Garver?

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1    A    G-A-R-V-E-R.
2    Q    When you say "one of the
3  family members," what does that mean?
4    A    He is the son-in-law of
5  Mr. Broadhead.  I -- I had, unknowingly,
6  met him while I was at Five Star.
7    Q    And did he say how he tracked
8  you down or --
9    A    No.
10    Q    Well, he called you at -- in
11  your business?
12    A    He called me at home.
13    Q    And tell me what he said.
14    A    He said that they were looking
15  for a general manager to oversee
16  Sedgefields Plantation, and asked me was I
17  interested.  And I told him that I was,
18  that I would talk to him about it.  And I
19  had an interview.
20    Q    With just Mr. Garver?
21    A    No.  I didn't -- didn't meet
22  with Matt.  I met with Ms. Sherry Howell
23  and Mr. Bob Rea.

Page 38

1    Q    Who is Sherry Howell?
2    A    Corporate executive for Paul
3  Broadhead.
4    Q    Is she in Meridian?
5    A    She is.
6    Q    And you said Bob Rea?
7    A    Bob Rea, R-E-A.
8    Q    And what does he do?
9    A    He is accounting for the
10  company.
11    Q    For -- also for Mid State?
12    A    That is correct.  I don't --
13    Q    Does he also work in
14  Meridian?
15    A    Yes.
16    Q    Did you go to Meridian to
17  interview?
18    A    No, I didn't.
19    Q    Where did you go?
20    A    Interviewed at the plantation.
21    Q    Okay.  So they came here to
22  meet with you?
23    A    Yes, sir.

Page 39

1    Q    And y'all rode around the
2  property, I assume?
3    A    We did.
4    Q    And -- and they talked about
5  what they were looking for, generally?
6    A    They did.
7    Q    Did they offer you the job?
8    A    They did.
9    Q    At what salary?
10    A    It was negotiated.  The final
11  pay rate was seventy-five thousand dollars
12  a year.
13    Q    Did -- did you get to live on
14  the property?
15    A    If I choose to do so.  I could
16  have, but I -- I still live in Auburn.
17    Q    And is that where you've been
18  living?
19    A    Yes, sir.
20    Q    How far is that from here?
21    A    About forty minutes.
22    Q    How many miles?
23    A    No more than forty-five.

Page 40

1    Q    And are you married?
2    A    I am.
3    Q    What's your wife's name?
4    A    Rebecca.
5    Q    Does she work outside the
6  home?
7    A    No, sir.
8    Q    Okay.  And you've only been
9  married one time?
10    A    Yes, sir.
11    Q    Well, do you have any kids?
12    A    I do.
13    Q    What are their names and ages,
14  please?
15    A    I have a son named Patrick.
16  He's fourteen.
17    Q    He's about to start driving.
18    A    Unfortunately.
19    Q    Okay.
20    A    And a daughter, Mary Margaret.
21    Q    How old is she?
22    A    She's twelve.
23    Q    Is she on the phone all the

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 41

1    time?
2        A    No.  Thank goodness.
3        Q    Now, do they go -- where do
4    they go to school?
5        A    Auburn city school.
6        Q    Now, you're here in this case,
7    but you've had some involvement in this
8    lawsuit before today; is that fair?
9        A    As far as speaking with a
10   attorney, Carter Dukes, yes.
11       Q    Okay.  But, I mean, I sent
12   some questions, some interrogatories, to
13   Mid State, and I got some answers.  And
14   then you signed a verification as the
15   representative of Mid State, since you're
16   the general manager --
17       A    Yes, sir.
18       Q    -- saying that the, you
19   know -- essentially, the answers are
20   accurate.  And you've looked at the
21   business records; correct?
22       A    That is correct.
23       Q    So you provided the

Page 42

1    information, primarily, to respond to my
2    questions; is that fair?
3        A    I would think what I didn't
4    provide, the home office would have
5    provided to me to give to you.
6        Q    Okay.  And I asked, in those
7    interrogatories, who made the decision to
8    fire Norris Foster.  Do you understand
9    that?
10       A    Yes, sir, I do.
11       Q    And it says -- well, why don't
12   you just read what the interrogatory says
13   for an answer.  Exhibit 6.
14       I'll tell you, if you would -- do
15   you see my question, about who fired
16   Norris Foster?
17       A    It says, see answer inter --
18   interrogatory question number one, above.
19   So it would be --
20       Q    No.  Look.
21       A    This one?
22       Q    Number one.  Just read my
23   question, and then read you -- the answer

Page 43

1    you provided, if you would, please, sir.
2    Out loud.
3        A    Identify all persons --
4    providing their name, address, and job
5    title -- who had any role in the decision
6    to terminate the plaintiff.
7        Answer:  Defendants ob -- objects to
8    this interrogatory to the extent "any
9    role" is vague and ambiguous.  Subject to
10   and notwithstanding this objection, Joel
11   Norman, quail operations manager, reported
12   performance issues concerning plaintiff to
13   David Carroll, general manager.  David
14   Carroll personally observed performance
15   issues concerning plaintiff, investigated
16   reports made by Norman, and made the
17   decision to terminate the plaintiff's
18   employment with defendant.
19       Q    Okay.  Now, do you have any
20   problem understanding what it means when I
21   ask you to identify any person who had any
22   role in terminating Norris Foster?
23       MR. DUKES:  Object to the

Page 44

1    form.
2        Q    You can answer.
3        A    No, sir.
4        Q    That's a pretty clear
5    question, isn't it -- who fired him?
6        A    Yes, sir.
7        Q    Who fired Norris?
8        A    I did.
9        Q    And was it based on -- in
10   part, on reports you got from Joel Norman,
11   his immediate supervisor?
12       A    In part.
13       Q    Okay.  That's -- and I want
14   you to tell me -- because this is the only
15   time I get to talk to you before trial.
16   And I'm -- I'm plain-spoken, and I want
17   you to be plain-spoken.  Okay.  Fair
18   enough?
19       A    Yes, sir.
20       Q    I'm not trying to trick you.
21   I just want to know every reason you say
22   that you fired Norris Foster.  Is that a
23   fair question?  You understand it?

11  (Pages 41 to 44)

# American Court Reporting
## toll-free (877) 320-1050

Page 45

1    A    That's a fair question.
2         MR. DUKES:  Object to the
3    form.
4         Q    Okay.  Tell me every reason
5    that you fired Norris Foster.
6         A    One reason would be lack of
7    timely performance.  As was mentioned
8    earlier by Joel Norman, Norris had been
9    assigned to do some duties, whether it be
10   cleaning out the barn or roller chopping.
11   And based on my visiting the sites and
12   seeing the performance that was done
13   there, I concurred with Joel's assumption
14   that those things were not getting done on
15   time.  I personally viewed some of the
16   activities in the woods that Norris was
17   doing and came to the same conclusion.
18        Besides completing things in a
19   timely manner, I would say also part of
20   the reason would be that -- when asked to
21   not do something that continued, a lack
22   of -- of responding to directions such as
23   in the roller chopping and clipping the

Page 46

1    bark on trees.  I observed personally his
2    doing those things and stopped him and
3    talked to him about it, and it continued
4    to happen.
5         Q    Okay.  Excuse me.  I -- I
6    interrupted you, and I apologize for
7    that.
8         But when you say "clipping the
9    trees," is that the same thing as scraping
10   trees with the equipment?
11        A    That is correct.
12        Q    Okay.
13        A    Knocking the bark off and
14   exposing the cambium layer underneath.
15        Q    Okay.  And that harms the
16   trees; right?
17        A    It can.  Certainly.
18        Q    And that's important to a
19   timber operation, that you don't hurt the
20   trees; right?
21        A    Not ti -- just timber, but
22   also the aesthetic quality of the property
23   as well.

Page 47

1         Q    Okay.  All right, sir.
2    Anything else?
3         A    Uh.
4         Q    I interrupted you.  I --
5         A    Yeah.
6         Q    I'll give you a chance to
7    finish.
8         A    Thank you.  Uh.  Uh.  So we
9    would say job performance, not finishing
10   things in a timely manner.  I would also
11   say failure to respond to -- to
12   directions.  I would say also making
13   comments in front of clients that were
14   derogatory to our quail operation.  The
15   issue of being unsatisfied with our
16   tipping policy.
17        Q    I don't want to cut you off.
18   You paused.
19        A    No.  In general, those are
20   the -- the main categories, the reasons --
21   the reasons why.
22        Q    Okay.  So have you told me now
23   all the reasons why you made the decision

Page 48

1    to fire Norris?  I'm not --
2         A    That come to mind at this
3    time.  That's -- that's what I know.
4         Q    Okay.
5             (WHEREUPON, a document was and
6    marked as Plaintiff's Exhibit Number 19 is
7    attached to the original transcript.)
8         Q    I'm going to show you what
9    I've marked as Plaintiff's Exhibit 19,
10   which is a memo that you wrote that's
11   dated -- it says on here -- January 3rd,
12   '06, which would be about a week after
13   Norris was fired.
14        Is that your memo?
15        A    Yes, it is.
16        Q    And did you write that?
17        A    I did -- I did write it.  Yes.
18        Q    Now, do y'all have any kind of
19   forms out there and -- when you hire and
20   fire?
21        A    There are some forms, yes,
22   sir.
23        Q    Got an application, don't you?

12 (Pages 45 to 48)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

```
 1      A    We do use standard
 2  applications.
 3      Q    And you've got discharge
 4  documents, don't you?
 5      A    There are, I believe, some
 6  one-page discharge documents.
 7      Q    And, you know, in Norris
 8  Foster's file, there's a formal reprimand
 9  document.  Looks to me like a form.  Would
10  you agree with that?
11      A    I'm not sure which document
12  you're referring to.
13      Q    Okay.  I apologize.  Exhibit 5
14  to Mr. Norman's deposition.
15      A    Yes, sir.  I'm familiar with
16  this document.
17      Q    Doesn't it look to you like a
18  form?
19      A    It -- it was a -- a document
20  that was created for this instance.
21      Q    Okay.  Well, now, how long
22  have you been a manager?
23      A    Six -- five, six years, I
```

Page 50

```
 1  would say then.
 2      Q    And how -- how many people
 3  have you hired and fired, would you say?
 4      A    Probably hired anywhere from
 5  ten to fifteen, and fired anywhere from
 6  three to five.
 7      Q    Okay.  Have you had any
 8  training about hiring and firing?
 9      A    No formal training.
10      Q    Well, before you fire some --
11  it's expensive to hire and train people,
12  isn't it?
13      A    It can be.
14      Q    It's not a very efficient way
15  to do business, to constantly hire and
16  fire, is it?
17      A    I wouldn't think so, no, sir.
18      Q    Okay.  And employees are
19  valuable to a business, aren't they?
20      A    They can be.
21      Q    Well, if they do their jobs,
22  if they perform satisfactorily, they
23  should be; correct?
```

Page 51

```
 1      A    They should, yes.
 2      Q    They're part of a team, aren't
 3  they?
 4      A    Yes.
 5      Q    And it's important that you
 6  reward good performance; correct?
 7      A    Reward good performance.  It
 8  -- it should be, yes.
 9      Q    I -- I mean, it -- you've got
10  to give a "attaboy" every now and then,
11  don't you?
12      A    Certainly.
13      Q    Okay.  And sometimes you have
14  to give raises; right?
15      A    That's usually standard
16  procedure at most places.
17      Q    Okay.  So that's what I'm
18  saying.  You want people to be loyal to
19  you, don't you?
20      A    Certainly, I do.
21      Q    And you want -- uh -- uh -- in
22  order for them to be loyal to you, you
23  have to be loyal to them, don't you?
```

Page 52

```
 1      A    Certainly.
 2      Q    Okay.  That's just common
 3  sense, now, isn't it?
 4      A    Yes, it is.
 5      Q    All right.  And for an
 6  employee to do a satisfactory job, it's
 7  important that you communicate
 8  expectations, isn't it?
 9      A    It is.
10      Q    Because an employee may not
11  know that he's not meeting those
12  expectations you have; correct?
13      A    Correct.
14      Q    So it's important to document
15  performance issues.  Wouldn't you say
16  that?
17      A    Document it?  It's a
18  possibility.  Verbal communication is also
19  very important.
20      Q    Okay.  Other than Exhibit 5 --
21  are you familiar with Norris' personnel
22  file?
23      A    Somewhat, yes, sir.
```

13 (Pages 49 to 52)

# American Court Reporting
## toll-free (877) 320-1050

Page 53

1  Q   Where is it kept?
2  A   It would be in a filing
3  cabinet in the office.
4  Q   Where you are?
5  A   Yes, sir. I am there.
6  Q   How far from you?
7  A   Within thirty-five, forty
8  feet.
9  Q   Do you have access to it every
10 day?
11 A   Certainly.
12 Q   Do you have access to every
13 person's personnel file?
14 A   Every -- every personnel file
15 that's in that office, that worked for me
16 at the time.
17 MR. DUKES:  Hey, Jerry, I know
18 you like to pace, but what I'm concerned
19 about is, the deponent -- it doesn't show
20 you pacing on the camera, but it does show
21 him having to look in different
22 directions. That's my concern. So if you
23 could just stay in one place, I'd -- I

Page 54

1  would appreciate it.
2  MR. ADAMS:  Do you want me to
3  fence him in back here?
4  MR. DUKES:  If you will.
5  Q   (BY MR. ROBERSON)
6  Mr. Carroll, just let your eyes go back
7  and forth. Okay?
8  MR. DUKES:  Well, look, I'm
9  not trying to be difficult, but I just
10 want the record to be clear. I don't want
11 Mr. Carroll looking over here in one
12 direction, and if this is played in front
13 of a jury, for them not to understand why
14 he's having to look to his left and that
15 it's because of you walking from one side
16 of the table to the other.
17 Q   I apologize to you,
18 Mr. Carroll, if I'm distracting you.
19 In the -- in the -- Norris Foster
20 worked for you for -- from -- did you say
21 you were hired in March 2005? April?
22 A   Actually, I believe it was in
23 April --

Page 55

1  Q   Okay.
2  A   -- when I actually went to
3  work.
4  Q   So he worked for you in April,
5  didn't he?
6  A   Yes.
7  Q   Is there a write-up of any
8  performance issue for Norris Foster in
9  April?
10 A   Not to my knowledge.
11 Q   Did he work for you in May?
12 A   Well, when you say worked for
13 me, technically, he didn't work directly
14 for me. He worked for his supervisor.
15 That would be Roy Lee. When I went to
16 work -- when I came to work at
17 Sedgefields, he was working directly under
18 Roy Lee.
19 Q   Okay. Did you have the
20 authority to write up any employee at
21 Sedgefields?
22 A   Certainly.
23 Q   You're the manager; correct?

Page 56

1  A   That is correct.
2  Q   You can fire anybody there,
3  can't you?
4  A   Yes, sir.
5  Q   If you want to hire somebody,
6  you're authorized to do it, aren't you?
7  A   That's correct.
8  Q   Is there a write-up by you,
9  Roy Lee, or anybody else for any
10 performance issue for Norris Foster in May
11 2005?
12 A   Not that I'm aware of.
13 Q   Well, you would be aware of
14 it, wouldn't you, if there was one?
15 A   I should be, unless there was
16 something in his file that was written and
17 put there before I came to work at
18 Sedgefield.
19 But as far as written in May, during
20 the time of May, no.
21 Q   Okay. June, is there a
22 write-up?
23 A   No, sir.

14  (Pages 53 to 56)

# American Court Reporting
## toll-free (877) 320-1050

Page 57

1  Q   July?
2  A   No, sir.
3  Q   August?
4  A   No, sir.
5  Q   September?
6  A   No, sir.
7  Q   October?
8  A   No, sir.
9  Q   November?
10  A   No, sir.
11  Q   There's one write-up in
12 December; correct?
13  A   That is correct.
14  Q   Exhibit 5; correct?
15  A   Correct.
16  Q   And Norris Foster was supposed
17 to be clipping some horses, wasn't he?
18  A   That's correct.
19  Q   And the clippers were broken,
20 weren't they?
21  A   I --
22      MR. DUKES:  Object to the
23 form.

Page 58

1  A   I don't know that they were
2 broken.
3  Q   You didn't go up to the barn
4 when Norris Foster was written up in -- in
5 December of '06 -- oh, I'm sorry -- '05?
6  A   Certainly, I did.
7  Q   You were there, weren't you?
8  A   I was there.
9  Q   And the clippers were broken,
10 weren't they?
11  A   Nobody told me anything about
12 any clippers being broken.
13  Q   Was Norris Foster riding a
14 horse?
15  A   He was -- he was back at the
16 barn when I arrived there.
17  Q   Well, how -- why were you
18 summoned?
19  A   Joel called me and said that
20 he returned, from whatever activities he
21 was involved in, to check on the clipping
22 of the horses at the barn.  And nobody was
23 there, and so he waited.  And Norris and

Page 59

1 Jeffrey Harris arrived a few minutes later
2 on horseback, back to the barn.
3  Q   Okay.  Do y'all have radios
4 out there at Sedgefields?
5  A   We do have some radios.
6  Q   And I -- does every
7 employee --
8  A   No.
9  Q   -- get assigned a radio?
10  A   No.
11  Q   How many radios do you have?
12 Do you know?
13  A   Maybe five.
14  Q   Did Norris Foster have a
15 radio?
16  A   He might have at that time.
17  Q   Because I -- it's thirteen
18 thousand acres.  It's a big place, isn't
19 it?
20  A   It is.  It is.
21  Q   And -- and y'all work at
22 different locations; correct?
23  A   Yes, we do.

Page 60

1  Q   And so, if somebody wanted to
2 contact someone, that's how they'd do it
3 normally; correct?
4  A   Normally, yes.
5  Q   Okay.  Did you know -- and --
6 and listen.  When Norris is on his radio
7 calling Joel, is that something that you
8 can hear?
9  A   No.
10  Q   Okay.  Why not?  I mean, is it
11 a Linc?  Is it --
12  A   That's correct.  They're
13 Southern Linc radios.
14  Q   Okay.  So he -- he can -- he's
15 only calling the other person.  He's not
16 calling the whole --
17  A   Network.  That's correct.
18  Q   Network.  Okay.  All right.
19 So you don't know -- is it fair to say
20 that you don't know whether Norris had
21 tried to call Joel on that date?
22  A   I don't know.
23  Q   Okay.  And you don't know

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1  whether the clippers were broke; correct?
2      A    Correct.
3      Q    And you don't know whether
4  Norris tried to get Joel, to get some
5  instructions; correct?
6      A    Correct.
7      Q    And you don't know if -- do
8  you know what horse Norris was riding?
9      A    No, I don't.
10     Q    So you don't know what horse
11  he was riding.  You don't know a lot
12  about -- I -- and I'm not being critical
13  of you.  You just came up after the fact.
14     A    That is --
15     Q    Is that fair?
16     A    That is fair.
17     Q    All right.  And so you heard,
18  essentially, Joel's side of the story;
19  correct?
20     A    To begin with.
21     Q    He's the supervisor; correct?
22     A    Correct.
23     Q    And look.  I -- I don't fault

Page 62

1  you at all.  You've got to back your
2  supervisor, don't you?  I mean --
3          MR. DUKES:  Object to the
4  form.
5      A    I hear --
6      Q    Normally speaking.
7      A    I hear both sides of the
8  story.
9      Q    I agree.  But -- but what I'm
10  saying is, you'll undercut that guy, that
11  supervisor -- you'll diminish his
12  supervisory ability if you don't back him
13  up.
14     A    Well, not --
15         MR. DUKES:  Object to the
16  form.
17     A    Not necessarily.
18     Q    Okay.  Did you back him up?
19     A    After talking to everybody
20  involved, I did.
21     Q    Okay.  Did anybody tell you
22  the clippers were broke?
23     A    No.

Page 63

1      Q    What did they tell you?
2      A    My understanding was that the
3  employees that were there, supposed to be
4  clipping horses, had left, for whatever
5  reason.  And, obviously, now, because the
6  clippers weren't working, saddled two
7  horses and went riding across the
8  plantation.
9      Q    The clippers weren't working?
10     A    I don't know whether they were
11  working or not.  I know that I was told
12  that the employees were not at their
13  assigned tasks, doing what they were
14  supposed to be doing.  They were out doing
15  something totally different.
16     Q    Okay.  Is part of Norris' job
17  to care for the horses?
18     A    It would be part of anybody on
19  that team.  Yes.
20     Q    Oh, I --
21     A    Yes.  Yes.
22     Q    Okay.  He -- he shoveled out
23  the stalls; right?  Correct?

Page 64

1      A    Several people have, yes.
2  Yes.  Yes.  He has shoveled out stalls.
3      Q    And do you know if part of his
4  job was to ride the horses from time to
5  time?
6      A    Not -- not in any other
7  capacity other than while we were on hunts
8  or if maybe we had an organized group to
9  go out and work dogs or train dogs that
10  required horseback riding.  But we didn't
11  -- did not have a policy where, as a
12  matter of course of their employment, they
13  would just get on a horse and saddle it
14  and go ride it to exercise it.
15     Q    Who exercised the horses?
16     A    They would be exercised when
17  we would start practice hunting.  It's
18  about three weeks to a month before the
19  season.
20     Q    What -- this was December,
21  wasn't it?  This write-up was in December?
22     A    Yes, it was.
23     Q    Is that hunting season?

16  (Pages 61 to 64)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

```
 1    A    Yeah, it is.  Yes, sir.
 2    Q    Do y'all use the horses then?
 3    A    Yes, sir, we do.
 4    Q    On the hunts?
 5    A    On the hunts.
 6    Q    Did y'all get some new horses
 7   in?
 8    A    We did have two new horses
 9   purchased.
10    Q    Is it important that you know
11   about the temperament of those horses?
12    A    I knew about it before I
13   bought them.
14    Q    How is that?
15    A    Because I looked at those
16   horses.
17    Q    Did you ride them?
18    A    They were ridden.  That is
19   correct.
20    Q    You know, I -- I don't know
21   much about trading horses either.  But,
22   you know, you can drug a horse to calm him
23   down for a few days when you purchase him,
```

Page 66

```
 1   can't you?
 2    A    You can.
 3    Q    And have you ever bought any
 4   horses like that, that maybe they weren't
 5   really good horses?
 6    A    No, I haven't.
 7    Q    I mean -- or -- well, okay.
 8   Have you ever taken any of your horses
 9   back that you bought at Sedgefields?
10    A    Taken them back?
11    Q    Yeah.
12    A    No.  I was shown -- I was
13   shown five horses, and I selected two
14   horses out of those five that I chose to
15   keep.  And the rest -- I didn't need five,
16   so the rest went back.
17    Q    Okay.
18    A    If that's what you're asking.
19    Q    So you only bought two?
20    A    That is correct.
21    Q    And you had -- you had more
22   than you needed; correct?
23    A    I was brought five to try out,
```

Page 67

```
 1   and I kept two of those five.
 2    Q    Picked two out of five?
 3    A    That is correct.
 4    Q    Well, if all of them had been
 5   good, would you have kept them all?
 6    A    No, sir.
 7    Q    Okay.  Now -- so you're saying
 8   that there was no business need for Norris
 9   to be on that horse; is that -- that -- do
10   I understand that correctly?
11    A    That is correct, yes.
12    Q    Okay.  Now, did you -- did you
13   think that Norris Foster and Jeffrey
14   Harris had been out smoking marijuana that
15   day?
16    A    No.
17    Q    Did you smell marijuana?
18    A    No.
19    Q    Did Joel Norman tell you that
20   he smelled marijuana?
21    A    He probably has since then,
22   but not at that time.
23    Q    Oh.  Well, if you had known
```

Page 68

```
 1   that people in your employ were smoking
 2   marijuana on the job, you would have at
 3   least taken some action, wouldn't you?
 4    A    "Known," being if I had
 5   visually seen it?  Yes, I would have.
 6    Q    Okay.  Well, if you suspected
 7   it, you would have done something,
 8   wouldn't you?
 9    A    I -- I don't see how I can do
10   anything if I suspect something.  I have
11   to -- I'm going to have to witness it or
12   see it.
13    Q    Okay.  Well -- now, in all the
14   things that you mentioned about Norris
15   Foster, the reasons why he was fired, you
16   didn't say anything about stealing, did
17   you?
18    A    No, I didn't.
19    Q    Is Norris Foster a thief?
20         MR. DUKES:  Object to the
21   form.
22    A    Not to my knowledge.
23    Q    Do you know that Norris Fo --
```

17 (Pages 65 to 68)

# American Court Reporting
## toll-free (877) 320-1050

Page 69

1  whether Norris Foster has ever taken any
2  property from Mid States?
3      A    I don't have any kno --
4  firsthand knowledge of it, no.
5      Q    Has anybody ever told you that
6  he did?
7      A    I've heard a lot of things
8  about a lot of people.  That -- that's
9  part of it, yes.
10     Q    Well, who has told you Norris
11 Foster took something?
12     A    Oh, I've heard it from people,
13 such as Roy Lee, that worked there on the
14 plantation.
15     Q    Anybody else?
16     A    I've heard it from Denise
17 Pierce that works there at the plantation.
18     Q    Is she a female?
19     A    Yes, sir.
20     Q    And what did she tell you?
21     A    The only thing she indicated
22 to me was that the probable reason for his
23 dismissal the first time that he worked

Page 70

1  there was possibly because he had stolen
2  some stuff from the plantation.
3      Q    What did he steal -- alleged
4  to have stole?
5      A    Alleged to have, I guess,
6  taken some quail.
7      Q    Have you ever spoken with
8  anybody who has any firsthand information
9  that Norris Foster has taken anything from
10 Sedgefields?
11     A    No, I have not.
12     Q    What about dog food?  Have you
13 ever heard of that?
14     A    No, sir.
15     Q    Okay.  Did he blow up a
16 tractor?
17     A    Not aware of him, firsthand
18 knowledge, blowing up any equipment.
19     Q    Or tear it up.  Has he damaged
20 your -- your equipment, other than just
21 the normal operation?
22     A    Nothing that I would say,
23 specifically, Norris Foster tore up.  Just

Page 71

1  general use, yes.
2      Q    I mean, you know, farm
3  equipment wears out, doesn't it?
4      A    Yes, it does.
5      Q    What about the lift?  The
6  chopper or the lifter.  Did he damage
7  anything with respect to that, that you
8  know about?
9      A    Not other than common use.
10     Q    Okay.  I mean, sometimes it
11 just wears out, doesn't it?
12     A    Yes, it does.
13     Q    Now, you told me -- and I want
14 to go through each one of these things
15 individually.  But you told me about a
16 lack of timely performance.  And -- and in
17 that, you specifically referenced the
18 chopping of the fields; correct?
19     A    Correct.
20     Q    And that's where you prepare
21 them for bird hunting; right?
22     A    That is correct.
23     Q    You knock the -- and we -- we

Page 72

1  ought to tell the jury this.  Sedgefields
2  gets its name because of this --
3      A    Broom sedge.
4      Q    -- broom sedge, which is a --
5  tell -- tell us what that is.
6      A    It's called a bunch grass.
7  It's a -- it's a particular type of grass
8  that has benefit to quail, and it provides
9  nesting cover during the summer months.
10     Q    And when you walk through a
11 field of that, how high is it?
12     A    It can be anywhere from --
13 typically, waist high.
14     Q    Okay.  And when you chop a
15 sedgefield, you -- what do you do?
16     A    You're laying that -- you're
17 laying that debris down so that hunters,
18 dogs are more visible, have access to the
19 property while you're hunting.
20     Q    Okay.  And you don't do all
21 the field, do you?  You don't chop the
22 whole field?
23     A    No, sir.

## www.AmericanCourtReporting.com
## September 8, 2006

# American Court Reporting
## toll-free (877) 320-1050

Page 73

1      Q    You just chop a lane that you
2    can walk in; correct?
3      A    It's typically done in a
4    checkerboard pattern.
5      Q    And how wide would that be?
6      A    The width -- do you mean
7    between --
8      Q    Yes.
9      A    Anywhere from thirty to fifty
10   feet.
11     Q    Okay.  And so that -- that
12   provides the hunters with a -- a lane
13   where they can spot the quail; correct?
14   Walk and -- and shoot the quail?
15     A    Yes, it does.
16     Q    Okay.  But that -- you still
17   have the sedge up around that to provide
18   cover for the birds; correct?
19     A    We do, yes.
20     Q    And -- and Sedgefields --
21   where does the "plantation" come from?
22     A    I'm sorry?
23     Q    It's called -- the place is

Page 74

1    called Sedgefields Plantation.
2      A    Yes, it is.
3      Q    Okay.  You told me about the
4    Sedgefield.
5      A    Right.
6      Q    Where does the "plantation"
7    come from?
8      A    That -- that's a word that was
9    assigned to it from when Mr. Maytag
10   purchased the property, I guess, decades
11   ago.
12     Q    Back before black people got
13   their rights?
14          MR. DUKES:  Object to the
15   form.
16     A    Most probably, yes.
17     Q    And you just kept the name?
18     A    I didn't keep the name.
19          MR. DUKES:  Object to the
20   form.
21     Q    Well, I mean, the name
22   continued?
23     A    That is correct.

Page 75

1      Q    Okay.  But it's still being
2    used, is what I'm saying.
3      A    It is being used.
4      Q    Now, you also mentioned some
5    things about -- Norris said some things
6    that you -- you felt like were derogatory,
7    about his comments in front of the
8    guests.  Now, that would be bad.  I
9    agree.  That would be bad, wouldn't it?
10          MR. DUKES:  Object to the
11   form.
12     Q    Correct?
13     A    Correct, yes.
14     Q    I mean, you -- you don't want
15   your employees making derogatory
16   statements, do you?  That's not -- that
17   doesn't give a good impression to your
18   guests.
19     A    No, it doesn't.
20     Q    Okay.  I agree with you.
21   Okay.  But I don't understand what it is
22   you're saying that Norris said that you --
23   you feel like was derogatory.

Page 76

1      A    Right.
2      Q    Okay.
3      A    Right.
4      Q    I wasn't there.
5      A    Right.
6      Q    So tell me about those
7    comments that Norris made.
8      A    The comments that I observed
9    was when I was present on the wagon,
10   during a hunt.
11     Q    You went with -- with them on
12   some hunts.
13     A    Most of them, I did.
14     Q    What -- were you part of the
15   crew?
16     A    No, sir.
17     Q    All right.  Tell me what you
18   were doing --
19     A    I went --
20     Q    -- while you were there.
21     A    I went as an observer of my
22   employees of the plantation and how they
23   conducted themselves and ran the hunts, to

## www.AmericanCourtReporting.com
## September 8, 2006

# American Court Reporting
## toll-free (877) 320-1050

Page 77

1   make sure that they were -- performed as I
2   wanted them to be.
3       Q.   Okay.  So you rode in the
4   wagon?
5       A.   I did.
6       Q.   Did you -- did you hunt?  I
7   mean, did you --
8       A.   No.  I --
9       Q.   -- have a gun or anything?
10      A.   No.
11      Q.   Okay.  You were just an
12  observer, then?
13      A.   I was.
14      Q.   All right.  Most of the hunts
15  you think you went on?
16      A.   I did.
17      Q.   What did you observe Norris
18  doing?
19      A.   I observed him coming back
20  with a dog that he was holding, and have a
21  dog in his hand while Joel and the clients
22  were out -- customers were out shooting
23  birds in front of us.  And on different

Page 78

1   occasions, it would be -- in the -- in a
2   group of four or maybe six, if we had six,
3   only two of those people would be out
4   hunting at the same time.  The oth --
5   remainder of the clients would either be
6   on horseback and/or the wagon, back there
7   waiting with the wagon driver, who was
8   Jeffrey Harris at the time.
9       And Norris would typically -- a lot
10  of times, if it was hot, the dog that he
11  was holding, he would bring him back to
12  the wagon to give him some water or
13  something like that and there exchanges a
14  conversation -- were the comments that I
15  heard about Joel's performance, and he
16  didn't know what he was doing and this is
17  not the way we need to do it.  They were
18  not doing it right.  Things of that
19  nature.
20      Q.   So no -- you heard Norris
21  telling Jeffrey Harris comments that were
22  critical of Joel Norman.
23      A.   I did.

Page 79

1       Q.   Is that what you're saying?
2       A.   In front of clients.  I did.
3       Q.   Okay.  And anything -- any --
4   anything more than that, what you --
5       A.   In -- in effect, that was it.
6       Q.   Okay.  That Joel doesn't know
7   what he's doing or -- what about -- would
8   he say -- ever say anything like --
9   that's -- that's all right.  Nevermind.
10      Okay.  And you also mentioned the
11  tipping policy; right?
12      A.   That's correct.
13      Q.   Now, these guys that work on
14  the hunting crew, they get paid by the
15  hour, don't they?
16      A.   They do.
17      Q.   How much do they get paid?
18      A.   Depending on the pay rate and
19  what -- what raises they've gotten.  It
20  could be anywhere from seven to eight
21  dollars an hour.
22      Q.   You make seventy-five thousand
23  dollars a year?

Page 80

1       A.   I do.
2       Q.   Have you got a 401(k)?
3       A.   I do.
4       Q.   Do they -- what do they
5   contribute to that?
6       A.   Who is "they"?
7       Q.   Mid State.
8       A.   They match whatever I put in.
9       Q.   Up to how much?
10      A.   I think it's three percent.
11      Q.   Do they give you a car or
12  truck?
13      A.   I am provided with a vehicle
14  to drive back and forth, to use for work.
15      Q.   What's your -- what's your
16  truck?
17      A.   We have three vehicles that
18  are basically the same.  It's a
19  three-quarter ton Chevrolet four-wheel
20  drive.
21      Q.   What year?
22      A.   I think they were all
23  purchased at the same time.  I think

www.AmericanCourtReporting.com
September 8, 2006

# American Court Reporting
## toll-free (877) 320-1050

Page 81

1   they're all around 2001 models.
2       Q   Do you buy any gas?
3       A   Do I buy gas?
4       Q   Yeah.
5       A   Yeah.  I don't understand.
6   Certainly, I buy gas.
7       Q   Well, do they not have gas for
8   you at Sedgefields you've got to pump?
9       A   Oh, you mean am I -- am I
10  provided gas in the --
11      Q   Yeah.
12      A   For a company vehicle?
13      Q   Sure.
14      A   We have a gas tank on site for
15  the company vehicles, yes, sir.
16      Q   That you can -- you have
17  access to and you can pump?
18      A   Certainly, yes, sir.
19      Q   All right.  Now, have you ever
20  gotten tips -- you -- you've been provided
21  a tip on any of these hunts?
22      A   No, sir.
23      Q   Has anybody, to your

Page 82

1   knowledge, on any hunting trip, ever
2   received a tip?
3       A   Yes.
4       Q   How does -- how does that
5   work?  I'm not -- I don't work -- I'm not
6   in the hunting industry.  So tell me how
7   it works.
8       A   Typically, one of three things
9   will happen with our tipping policy.
10      Q   Okay.
11      A   At the end of a hunt, a client
12  may personally walk to each individual
13  that was part of the hunting party and
14  give them cash, or it could be that they
15  handed the entire tip to be disbursed to
16  the hunting party to Joel Norman.  He
17  would then give it to me.  I would make
18  change and re -- and re-distribute the
19  money, because, most often, I didn't get
20  exact change for those folks.
21      And the third way is, if they wanted
22  to, then they could put it on their bill.
23  And it would be billed to them with their

Page 83

1   bill, and then the employees would be paid
2   in their following paychecks.
3       Q   So if they used their credit
4   card, that would appear on the employee's
5   paycheck; is that right?
6       A   Yeah.  Or if they were sent a
7   bill and they paid by check or whatever,
8   then that -- that money that came back to
9   them would come from the home office.
10      Q   Well, y'all don't send them a
11  bill for a tip, though, do you?
12      A   If I -- if you -- if you come
13  and hunt and you ask for a gratuity to
14  be -- to be placed on your bill, then it
15  is included on the bill and sent to
16  Mississippi.  And then they, per our
17  instructions on the ticket, put the money
18  in -- in individuals that are awarded
19  those tips, and then the bill is sent to
20  the customer.
21      Q   Okay.  So for every hunting
22  party, there is a bill; is that fair?
23      A   Certainly.

Page 84

1       Q   And that would -- the bill
2   would identify who went on the hunt?
3       A   It would.
4       Q   I mean --
5       A   It would -- it would identify
6   who the --
7       Q   Payer was?
8       A   Yes.
9       Q   All right.  But it wouldn't
10  identify all the people that went on the
11  hunt?
12      A   As far as guests?
13      Q   Yes.
14      A   Not necessarily, no.
15      Q   Okay.  And do y'all maintain a
16  list of people that have been there?
17      A   I have -- I have bills and
18  things and -- that I have sent off and
19  collected.  So I do have it that way, yes.
20      Q   Do you have every bill from
21  the time you've been employed until
22  December 29th, when Norris was fired?
23      A   I would think that most should

21  (Pages 81 to 84)

## www.AmericanCourtReporting.com
## September 8, 2006

# American Court Reporting
## toll-free (877) 320-1050

Page 85

1   be there. Some could have originated in
2   Mississippi and not in our office.
3       Q   Do you have access to every
4   one of them?
5       A   I -- if I called and asked for
6   something, I'm sure I would receive it,
7   yes.
8       Q   Okay. And would that reflect
9   at least all the bills or credit cards on
10  which there was a tip?
11      A   Sure.
12      Q   Now, it wouldn't reflect if
13  they gave them a cash tip --
14      A   Certainly.
15      Q   -- right?
16      A   That's correct.
17      Q   Okay. And if Joel Norman got
18  a cash tip, it wouldn't be reflected on
19  there either, would it?
20      A   No, it wouldn't.
21      Q   Do you know if Joel Norman has
22  ever received any cash tips that he didn't
23  give to you or he didn't provide to his

Page 86

1   crew?
2       A   No. I'm not aware of any of
3   that.
4       Q   Well, you heard him testify;
5   right?
6       A   I did.
7       Q   If you work for eight dollars
8   an hour, seven dollars an hour -- and it's
9   hard work out there, isn't it?
10      A   It can --
11      Q   I mean, it's hot?
12      A   It can be, certainly.
13      Q   You're -- you're driving a
14  wagon or you're scouting people,
15  scouting -- going to get dogs, keeping up
16  with horses. I mean, it's hard work,
17  isn't it?
18      A   It can be, yes, sir.
19      Q   Wouldn't you want to get your
20  tip?
21      A   Certainly. If they pro --
22  wanted to provide you with a tip, I -- and
23  you were due the money, they wanted to be

Page 87

1   gracious enough to give it to you, I'd
2   certainly want it.
3       Q   It wouldn't be right to keep
4   an employee's tip, would it?
5       A   No, it wouldn't.
6       Q   And you wouldn't let that
7   happen, would you?
8       A   No, sir.
9       Q   You haven't let that happen;
10  right?
11      A   I have not let that happen,
12  no, sir.
13      Q   Tell me every time Norris
14  Foster got a tip. How many tips did he
15  get?
16      A   I can't recall every instance.
17      Q   Did you ever give him any
18  money?
19      A   Certainly.
20      Q   Tips?
21      A   Certainly.
22      Q   How many times?
23      A   I would have to go back and

Page 88

1   look at the number of hunts we had. But
2   any time that money was distributed and I
3   was there, it was always given to me
4   and -- and I re-distributed, unless it was
5   given directly to him by the customer.
6       Q   Do you remember this
7   Mr. Hardaway?
8       A   I certainly do.
9       Q   You heard Norris' testimony,
10  didn't you?
11      A   I did.
12      Q   Mr. Hardaway, is -- is he a
13  regular guest at your lodge?
14      A   He's not a regular guest. But
15  for -- the first time that he had been
16  there was this year.
17      Q   Okay. Well, has he been there
18  more than one time?
19      A   His group has only been in
20  once.
21      Q   Did Mr. Hardaway give every
22  member of the hunting group a
23  hundred-and-fifty-dollar tip?

## www.AmericanCourtReporting.com
### September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

```
1      A    No.
2      Q    What did he give them?
3      A    I -- I'd have to go back and
4    look at the statement.  He was one of
5    those who gave -- he gave cash to the two
6    ladies that were in the lodge because he
7    saw them.  He did not see the rest of the
8    guys before they left, so he asked that
9    the rest of the money be put on the
10   ticket.  And we wrote down what he wanted
11   to be placed on the ticket, and that was
12   turned in to Mississippi.  And those funds
13   were paid through their next paycheck.
14     Q    You just don't remember what
15   that was?
16     A    I don't remember.  I -- I do
17   remember thinking -- or not thinking, but
18   seeing that each of the individuals, like
19   Norris and the other two that were there,
20   got fifty dollars a piece and that -- I
21   think Joel received a hundred dollars,
22   instead of fifty dollars.
23     Q    Do y'all have copies of all of
```

Page 90

```
1    Norris' paychecks and pay stubs?
2      A    I would think the home office
3    has them.
4      Q    That's what -- that's what I
5    mean.
6      A    Yes, sir.
7      Q    Mid State --
8      A    Yes, sir.
9      Q    -- has them.  And you think
10   that it would be reflected on there
11   because this customer paid through -- paid
12   his bill?
13     A    Certainly.
14     Q    Those -- those tips would go
15   on the paychecks; right?
16     A    Certainly.
17     Q    And is that reported on your
18   W2 for compensation?  Do you know?
19     A    For -- on Norris' W2?
20     Q    Yes.  Yes.
21     A    Well, it certainly should be.
22     Q    Okay.  So y'all are actually
23   reporting to the IRS his tips?
```

Page 91

```
1      A    Anything that has to go
2    through -- that's not a cash tip that goes
3    through and he receives his payroll, he
4    had taken the necessary -- the deductions
5    are taken out of it before they're given
6    to the employee.
7      Q    Now, did you ever tell --
8    wait.  Did you ever talk to Roy Lee about
9    any problems in Norris' crew?
10     A    You mean when he worked
11   underneath Joel?
12     Q    Yes.  Exactly.  That's what I
13   mean.
14     A    All right.  It was mentioned
15   to me on one occasion that Norris was
16   not ha -- by Roy Lee that Norris was not
17   happy working under Joel?
18     Q    Did you have the ability to
19   move him?
20     A    Certainly, I did.
21     Q    Could you have moved him to
22   Roy Lee's crew?
23     A    I certainly could have.
```

Page 92

```
1      Q    Did you?
2      A    No, I didn't.
3      Q    Why not?
4      A    Because Norris had approached
5    me and said he wanted to be involved with
6    the quail hunting and working the dogs.
7    And that's where he best fit, and that's
8    where he wanted to be.
9      Q    Did you ever talk to Norris?
10     A    Certainly, I did.
11     Q    How many times?
12     A    I seen -- I seen Norris on and
13   off several times during the course of a
14   week.
15     Q    Before you fired him, did you
16   ever offer him the opportunity to work for
17   Roy Lee?
18     A    No, I didn't.
19     Q    Do you think that Roy Lee only
20   approached you one time about any problem?
21     A    To my knowledge, it was just
22   one incidence that he spoke to me and said
23   that Norris wasn't happy working under
```

23 (Pages 89 to 92)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1  Joel.
2      Q    Did he tell you why he wasn't
3  happy?
4      A    He just said they had a diff
5  -- difference in agreement about the way
6  things were being done.
7      Q    Now, when you wrote -- you
8  were there at the barn when Norris was
9  written up in December; correct?
10      A    I was.
11      Q    And did Norris tell you that
12  he was going to tell the people in -- in
13  the home office the -- the way things --
14  the men were being treated out there?  Did
15  he make a statement to that effect?
16      A    He made a statement that he
17  was going to call Matt or Suzanne and --
18  and say something to them about what was
19  going on.
20      Q    And who were those people?
21      A    That's the daughter and the
22  son-in-law of Mr. Broadhead.
23      Q    Okay.  Would he have their

Page 94

1  number?
2      A    I don't -- I don't -- I don't
3  know.
4      Q    What did you tell Norris?
5      A    I don't remember that I said
6  anything to him about it.
7      Q    Did you tell him that if he
8  called anybody, you were going to fire
9  him?
10      A    Certainly not.
11      Q    Would you?
12      A    Would I do what?
13      Q    If he -- would you fire him if
14  he called them?
15      A    No.  I wouldn't fire him for
16  that reason.
17      Q    You mean it would be okay if
18  he went over your head and reported that
19  there were problems at Sedgefields
20  Plantation?  You wouldn't take any action
21  against him?
22      A    No.  I don't think that I
23  would.  I mean, anybody that works out

Page 95

1  there, if they disagree with what I'm
2  doing, certainly would have to speak to
3  somebody about it.  It would be who hired
4  me.
5      Q    Now, did you hire Joel
6  Norman?
7      A    I did.
8      Q    And --
9      A    Well, let's -- I will say I
10  had input in hiring him.  Certainly.
11      Q    Okay.  Now --
12          MR. DUKES:  Jerry, we've been
13  going for an -- I've got over an hour.  Is
14  that right?  Are you at a good stopping
15  point?
16          MR. ROBERSON:  What -- well,
17  how much tape have we got?
18          THE VIDEOGRAPHER:  Twenty-four
19  minutes.
20          MR. ROBERSON:  Why don't we go
21  to the end of this tape.
22          MR. DUKES:  Are you okay?
23          MR. ROBERSON:  Are you okay,

Page 96

1  David?
2          THE WITNESS:  I'm fine, yes,
3  sir.
4      Q    (BY MR. ROBERSON)  All right.
5  Well, have you ever heard Joel Norman say
6  he was going to get rid of all the blacks
7  in his crew?
8      A    No, sir.
9      Q    Have you ever heard -- well,
10  homecoming is a tradition in Bullock
11  County, isn't it -- getting off early?
12      A    I was told that, yes.
13      Q    Who told you that?
14      A    Roy Lee.
15      Q    Okay.  Well, Roy is in -- how
16  long has he worked there?
17      A    A number of years.
18      Q    Is he a good worker?
19      A    He is a very good worker.
20      Q    I mean, Roy don't know
21  anything but hard work, does he?
22      A    That's just what it seems,
23  yes.

# American Court Reporting
## toll-free (877) 320-1050

Page 97

1    Q   Okay. And, in fact, Roy --
2  before Joel was hired, Roy was doing both
3  jobs. And when I say "both jobs," he was
4  running the deer and the quail, wasn't
5  he?
6    A   I will -- I would say this in
7  an answer: In that when I was hired, I
8  was told that Ms. Davidson, who was the
9  general manager, and her husband, who was
10  working there, was -- he and her husband
11  was, more or less, in charge of -- over
12  the deer hunting and stuff.
13    The time that, quote, unquote, Roy
14  was in charge of all of it was a time when
15  we weren't actively participating in all
16  -- in any of those activities that were
17  ongoing. Quail season was over with.
18  Deer season was over with. And for that
19  time frame that he was, quote, unquote, in
20  charge of the plantation, it was,
21  basically, summertime maintenance and
22  things of that nature. Not to discredit
23  his -- what Roy does for me. He's a very

Page 98

1  valuable employee.
2    Q   Okay. Well, that -- you're
3  saying that Roy was never over both of the
4  hunting operations during the season; is
5  that --
6    A   Not to my -- not to my
7  knowledge.
8    Q   I mean, that -- but in
9  fairness to that statement -- and I don't
10  disagree with what you say. But in
11  fairness, you weren't there during the
12  hunting season --
13    A   That's correct.
14    Q   -- prior to that?
15    A   That is correct.
16    Q   So --
17    A   Yeah.
18    Q   Is that fair?
19    A   That is fair.
20    Q   Okay. Now, did -- was there
21  ever any issue, that you were made aware
22  of, about the -- the employees getting off
23  early at homecoming?

Page 99

1    A   I was approached by Roy Lee
2  about the situation, and I told him that I
3  would leave it up to the supervisor of
4  those crews; that if they had the work
5  done that they needed to get done for that
6  day, then they could clock out and go
7  home. But it was up to their
8  supervisor -- Roy and his crew, Joel and
9  his crew -- as far as what they needed to
10  get done for that day.
11    Q   Okay. And -- and Roy has got
12  a son that plays on the high school
13  football team?
14    A   I believe he did at that time,
15  yes.
16    Q   Okay. And there is a parade
17  that day. You're aware of that, aren't
18  you?
19    A   I am told there was
20  festivities before the game.
21    Q   Okay.
22    A   You know, what time they start
23  and when they start and how long they go,

Page 100

1  I'm not aware of any of that.
2    Q   Okay. Well, I -- and -- and
3  that's because your home is in Auburn, and
4  your -- you don't -- you're not part of
5  this community from that aspect.
6    A   That's --
7    Q   Is that fair?
8    A   That's fair.
9    Q   Okay. But Roy is; correct? I
10  mean, Roy has a son going to this high
11  school, and he is part of those
12  festivities; right?
13    A   Yes.
14    Q   And Norris, at the time, had a
15  son that was in high school, playing
16  football; correct?
17    A   If you tell me he did, I
18  believe you.
19    Q   Okay. So they might have had
20  interest that you didn't have. Would that
21  be fair?
22    A   That would be fair.
23    Q   Okay. And they might have had

25 (Pages 97 to 100)

# American Court Reporting
## toll-free (877) 320-1050

Page 101

1  a reason for wanting to be off on
2  homecoming, even though they weren't no
3  longer in high school; correct?
4      A    Correct.
5      Q    Now, has Roy -- I mean --
6  excuse me. Has Joel ever told -- made any
7  statement to you about he'd never been --
8  worked with anybody -- never worked with
9  black people who were so concerned about
10 their money, referring to their tips?
11     A    No. He did not mention that
12 to me.
13     Q    Have you ever had any
14 discussions with him about tips?
15     A    Certainly.
16     Q    Tell me about those.
17     A    All right. The discussion
18 that I -- that I had with him was one that
19 I initiated, that I wanted the tipping
20 policy to be that we would run a class act
21 at Sedgefields. And I didn't want any
22 employees standing around at the end of
23 the hunt with their hands held out,

Page 102

1  waiting to receive gratuities; that if our
2  clients were so inclined to give them
3  something at the end of the day, then they
4  would either give it to them while they
5  were untacking the horses or -- or doing
6  what they were supposed to be doing or
7  would be given to me and I would
8  distribute it or be put in their check.
9      Q    Now, when you went to work at
10 Sedgefields, there were about eleven
11 employees?
12     A    Yes, sir.
13     Q    How many of them were black?
14     A    When I went to work there, the
15 majority of them were black.
16     Q    Well, how many?
17     A    But -- well --
18     Q    Name them.
19     A    Brenda and Katie, in the
20 kitchen.
21     Q    They -- they were cooks?
22     A    They were cooks.
23     Q    They worked at the lodge?

Page 103

1      A    They did.
2      Q    Black ladies?
3      A    They were, yes.
4      Q    How long had they worked at
5  Sedgefields?
6      A    Only from, I think, the
7  beginning of the year. Somewhere around
8  December -- before I came -- or January,
9  through the hunting season.
10     Q    All right.
11     A    Then you have --
12     Q    So that's two; right?
13     A    That's two. You have Roy Lee.
14     Q    All right. Roy is the foreman
15 over the deer operations; correct?
16     A    At this time, certainly.
17 Yes. That's his title.
18     Q    Did he --
19     A    Deer operations manager.
20     Q    Well, he was then, wasn't he?
21     A    I assume. He looked after a
22 lot of things. I don't know if he had a,
23 quote, unquote, title at that time.

Page 104

1      Q    All right. Roy Lee, he's a
2  black male?
3      A    Yes, sir.
4      Q    And he's in management, isn't
5  he?
6      A    He is now, yes, sir. For
7  sure.
8      Q    Well, hasn't he been for some
9  time?
10     A    Well, I -- I felt like I'm --
11 made sure I moved him to management. He
12 was an hourly employee at one time. And
13 so I wanted my management employees to be
14 salaried, so I -- I got him moved from
15 hourly to salary employee.
16     Q    When did that happen?
17     A    The middle of the summer.
18     Q    Mid summer of when?
19     A    Of 2005.
20     Q    What is his salary?
21     A    His salary is probably around
22 forty-four thousand dollars.
23     Q    What is Joel Norman's salary?

26 (Pages 101 to 104)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 105

```
 1      A    His salary is, approximately,
 2   seventy thousand dollars.
 3      Q    And Roy -- Roy doesn't live on
 4   the property, does he?
 5      A    No, he doesn't.  He lives in
 6   Midway.
 7      Q    Does he have that option, to
 8   live on the property?
 9      A    I never discussed that as an
10   option with him.  And he told me that he
11   was satisfied where he was and he'd drive
12   back and forth.
13      Q    Roy has got a truck, though,
14   doesn't he?
15      A    He does.
16      Q    Just like yours and Joel's?
17      A    He does.
18      Q    And anything else about Roy?
19      A    In what regard?
20      Q    Well, that's three.  Two black
21   cooks.
22      A    Oh, as far as people.  I'm
23   sorry.
```

Page 106

```
 1      Q    Yeah.
 2      A    All right.  Two cooks and
 3   Roy.  Of course, certainly, Norris.
 4      Q    All right.  That's four.
 5      A    Willie Mack.
 6      Q    What did Willie Mack do?
 7      A    Willie Mack was an outside
 8   laborer with the rest of the crew.  He
 9   works in the -- in the yard at the lodge
10   from time to time.  But you're -- at that
11   time, he was working on -- on Roy's crew
12   ninety percent of the time.
13      Q    Okay.  He --
14      A    And --
15      Q    That's --
16      A    Demetrius Parham.
17      Q    -- five.
18      A    I believe --
19      Q    Demetrius?
20      A    Demetrius.
21      Q    By the way, how much did --
22   did Willie Mack make in 2005?
23      A    I'd have to go back and look
```

Page 107

```
 1   at the records and see.
 2      Q    Was it six fifty, seven
 3   dollars an hour?
 4      A    Somewhere in there, I would
 5   assume.
 6      Q    Okay.  And Jeffrey Harris?
 7      A    Jeffrey Harris came, but he
 8   was not there when I was -- came to work
 9   there.  I hired Jeffrey.
10      Q    Okay.  And that would have
11   been in September of '05?
12      A    I believe that's correct.
13      Q    Okay.  All right.  All right.
14   You -- I -- I'm sorry.  We've got --
15   Norris Foster makes four, Willie Mack
16   makes five, Demetrius Parham makes six.
17   Six of the eleven.
18      Now, what did Demetrius do?
19   Laborer?
20      A    Yes.
21      Q    Was he in the hunting crew?
22      A    No.
23      Q    What did he do?
```

Page 108

```
 1      A    Demetrius is just a general
 2   laborer, and then he -- you mean when I
 3   first came to work there, or what his
 4   duties are now?
 5      Q    Yeah.  What -- what --
 6      A    Essentially, they were all --
 7   basically, they were all doing -- was weed
 8   eating and cutting grass during the
 9   summer.
10      Q    All right.  That's six.  Tell
11   me all the employees.
12      A    I'm trying to think.  Of
13   course, myself and Denise.
14      Q    All right.  That's eight.
15      A    I guess at that time, that was
16   probably it.  It must have just been
17   eight.  I'm -- not eleven.  Eleven must
18   have been later on during the year.
19      Q    Of eight, six were black; is
20   that fair?
21      A    Yeah.  That's accurate.
22      Q    Okay.  Then you hired Joel
23   Norman.  That made nine; right?
```

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1    A    Well, I hired -- Jeffrey
2  Harris would have been before him, and --
3    Q    Okay.
4    A    -- William Beckwith would have
5  been before him.
6    Q    Okay.  You hired William
7  Beckwith?
8    A    I did.
9    Q    As a night watchman?
10    A    I hired him for -- to be a
11  general laborer, as the rest of the crew
12  was.  In addition to that, he was to be a
13  night watchman.
14    Q    Did he work during the day,
15  then?
16    A    He did.
17    Q    Okay.  I'm sorry.  I'm --
18  looking at his personnel file, I thought
19  he was hired to be the night watchman.
20    A    No.  He was a -- he was a
21  laborer during the day, like everybody
22  else, and he was a night watchman during
23  -- after hours.

Page 110

1    Q    He was going to get a lot of
2  overtime, then, wasn't he?
3    A    Well, I provided him with a --
4  I had a mobile home on the place.  I
5  provided him with a simple place to stay.
6  And provided him with a little extra money
7  in his paycheck to offset the expenses for
8  what, you know, the reasonable fee would
9  be for somebody who would be putting in a
10  few hours during the evening, just making
11  sure everything was locked up and nobody
12  was on the place.
13    Q    So at the time that
14  Mr. Beckwith was working there, there
15  wasn't anybody living on the property; is
16  that fair?
17    A    That is correct.
18    Q    Okay.
19    A    From time to time before that,
20  Roy Lee had access to a -- a house during
21  the busy time of the season, and he could
22  stay there.  He didn't live there full
23  time, but he did stay there quite often

Page 111

1  during the season, I'm told.
2    Q    All right.  But Mr. Beckwith
3  didn't quite work out, did he?
4    A    No, he didn't.
5    Q    He -- he stole some gas?
6    A    He did.
7    Q    Did y'all see him?  Did y'all
8  have evidence of him?
9    A    I confronted him about it, and
10  he admitted it to me.
11    Q    Okay.  So he was let go?
12    A    He was.
13    Q    He also didn't have a driver's
14  license, did he?
15    A    Turned out, he didn't.  And
16  that's another one of the reasons he was
17  let go.
18    Q    Okay.  Well, turned out.  Did
19  he show you one?
20    A    He provided me with a license
21  upon being hired there, but it turned out
22  it was not a current and/or valid license.
23    Q    All right.  You hired

Page 112

1  Mr. Beckwith, but he only stayed a short
2  time.  Then you hired Jeffrey Harris, and
3  he's black.  Then you hired Joel Norman,
4  and he's white.
5    A    It was -- there was one other
6  individual.  I don't remember his name.
7  He worked for a couple of days.  He was a
8  black male.  He came in and -- and worked
9  for, like, two days and then never came
10  back -- and worked half a day and never
11  came back.  I don't remember his name.
12    Q    Okay.  And then we had kind of
13  a string of three guys that were hired
14  that were all white; correct?
15        MR. DUKES:  Object to the
16  form.
17    A    If -- if they were all white
18  that were hired, then yes.
19    Q    No.  I mean, Will Hubbard and
20  Joseph Mays were hired about the same
21  time; right?
22    A    Pretty close to the same time,
23  I think.

28  (Pages 109 to 112)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1    Q    Okay. In November; correct?
2    A    I think that's correct. In
3  November.
4    Q    And -- and Chance Ham was
5  hired in January?
6    A    Later on in January, yes.
7    Q    Okay. Now, have you hired
8  anybody since then?
9    A    No.
10    Q    Well, when did Henry Tarver
11  start work there?
12    A    Oh, I'm sorry. You are --
13  you're correct about that. I'm not sure
14  exactly what day Henry was hired. It was
15  some time during the fall.
16    Q    Was he a general laborer?
17    A    No. No. I take that back.
18  It might have been early or late summer.
19    Q    2006? 2006?
20    A    No. '05.
21    Q    Oh, okay.
22    A    I'm sorry.
23    Q    Well, how did -- how did Henry

Page 114

1  get hired? Did you hire him?
2    A    Yes, I did.
3    Q    Did you place an ad, or how
4  did you --
5    A    No. I had people from time to
6  time stop by the office, looking for
7  employment. He was one of them.
8    Q    Okay. And Jeffrey Harris, the
9  same way?
10    A    Yeah.
11    Q    Do y'all ever post jobs?
12    A    I haven't, no. The only --
13  the only time I've posted a job was for --
14  looking for somebody specific when I hired
15  Joel Norman.
16    Q    Well, did you need workers?
17    A    Oh, certainly.
18    Q    Is there any reason why you
19  didn't go to the unem -- the employment
20  office or Staffing Solutions or somewhere
21  like that?
22    A    Well, what I needed and what
23  the home office would give me were two

Page 115

1  different things.
2    Q    Oh.
3    A    I mean, I -- I needed, in my
4  estimation, upwards of twenty people to do
5  what needed to be done, but they -- they
6  weren't about to let me have that kind of
7  staff at this time.
8    Q    Was Sedgefields a profitable
9  place to work? I mean, are y'all making
10  more money than --
11    A    No.
12        MR. DUKES: Object to the
13  form. Are you talking about did Mid State
14  make money as Sedgefields?
15        MR. ROBERSON: Yeah. Yeah.
16    A    No. We didn't make -- we
17  didn't make profit.
18    Q    You didn't? Why was that?
19    A    More expenses than income.
20    Q    No. But -- I'm not trying to
21  be funny. I know you're not either. But,
22  I mean, are hunting operations just
23  inherently unprofitable or --

Page 116

1    A    Yeah. Yeah.
2    Q    So you make your money on the
3  land appreciation? Or how do you make
4  your money?
5    A    I -- most people that own
6  operations of this nature, it's -- it's --
7  for lack of a better term, it's almost
8  like a hobby. Instead of maybe having a
9  small hunting club, you own a big piece of
10  property and like to do it. I -- none
11  that I know of are profitable businesses
12  in the long-run.
13    Q    When did Mr. Broadhead buy
14  Sedgefields?
15    A    I believe it was in the early
16  '90s, mid '90s. Maybe around '96.
17    Q    How about 1999?
18    A    Okay.
19    Q    Do you know what he paid for
20  it?
21    A    No.
22    Q    Look at Exhibit 7. He paid
23  fourteen million, didn't he?

29 (Pages 113 to 116)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1    A  I don't have Exhibit 7 in
2  front of me.
3    Q  You do now.
4    A  Thank you. According to this
5  article, he did. Yes.
6    Q  Paid fourteen million;
7  correct?
8    A  According to the article.
9    Q  Okay. And in 2006, seven
10  years later, he sold the property for
11  thirty-two million; correct?
12    A  I wasn't at the closing,
13  but -- I don't know what it was.
14    Q  Well, do you have any
15  reason -- that's what it says in that
16  article.
17    A  If the article says that and
18  the article is accurate, then it should be
19  accurate. But I don't have any firsthand
20  knowledge of what it was purchased for or
21  what it was sold for.
22    Q  Did he come to the closing,
23  Mr. Broadhead?

Page 118

1    A  I've -- I wasn't involved in
2  any of that. I don't know.
3    Q  Have you ever met him?
4    A  I have.
5    Q  How many times has he been to
6  Sedgefields?
7    A  Probably three or four times.
8    Q  Does he hunt?
9    A  No.
10    Q  Well, what -- what did he do
11  when he came -- you -- he came there three
12  or four times while you were there?
13    A  Yes.
14    Q  For what reason?
15    A  Discuss with me the status of
16  the plantation, to hear what my goals were
17  for the place, what we were going to be
18  doing, and discussed those issues.
19    Q  Did you ever talk staffing to
20  him?
21    A  Excuse me?
22    Q  Staffing. You said -- you
23  know, you said you needed more.

Page 119

1    A  Oh. That -- certainly, that
2  was -- that was --
3    MR. DUKES: Object to the
4  form?
5    A  That was part of what we
6  talked about, yeah.
7    Q  Well, did you talk about how
8  you needed some help to properly groom, I
9  guess, the -- the place?
10    A  Not so -- inasmuch as our
11  individual needs at that particular time,
12  but that if -- if he wanted certain things
13  done, it would take necessary equipment
14  and personnel to do it.
15    Q  Did you have a budget?
16    A  I was required to give a
17  budget once I got here. They -- I -- they
18  didn't really give me an operating budget
19  they had been working on.
20    Q  What was your budget?
21    A  My budget was, approximately,
22  eight hundred thousand dollars.
23    Q  Now, was that for everything?

Page 120

1    A  Yes.
2    Q  I mean, like -- that's -- how
3  much was it for labor?
4    A  I would say labor would
5  probably be almost -- not a half, but
6  close to a half of that.
7    Q  And what kind of expenses
8  would make up the rest of that figure?
9    A  General overhead, gasoline,
10  diesel fuel, the cost of doing business --
11  such as electricity bills and gas bills,
12  buying food stuff for the lodge if we
13  needed it, general supplies, farming
14  implements needed to be repaired, deer
15  feed, dog feed. All of it.
16    Q  Birds?
17    A  All of it. Birds included.
18    Q  Is that a large part of the
19  expense, is buying birds?
20    A  Not necessarily. In the
21  scheme of the whole thing, it's not.
22    Q  Where do you get the birds?
23    A  We have various sources.

30 (Pages 117 to 120)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 121

1    Q    Do you buy them to let loose?
2  I mean, are they --
3    A    The pre-release bird program,
4  which we were -- was part of our goal at
5  the time, yeah.  We would buy birds that
6  were almost mature -- mature birds and
7  pre-release them a month, a month and a
8  half before the season started.
9    Q    Could they fly?
10   A    Certainly.
11   Q    Okay.  I mean, they --
12   A    They were that far along, yes.
13   Q    Yes.
14   A    Yeah.
15   Q    They were mature enough that
16  they could fly?
17   A    Yeah.
18   Q    And you -- did you hope they
19  stayed there at Sedgefields?
20   A    Certainly.
21   Q    All right.
22        MR. ADAMS:  Jerry, I think
23  she's got about five minutes left.

Page 122

1        MR. ROBERSON:  Why don't we go
2  ahead and take a break.
3        THE VIDEOGRAPHER:  At this
4  time, we're going off the record.  The
5  approximate time is 2:55 p.m., and this
6  will be the end of tape one.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  At this
9  time, we're going back on the record.
10  This will be the beginning of tape two.
11  The time is approximately 3:06 p.m.
12   Q    (BY MR. ROBERSON)
13  Mr. Carroll, there's been some talk here
14  about how Norris Foster didn't list every
15  employer that he had had on his
16  application.
17        Did you hear that talk?
18   A    I did.
19   Q    He didn't list C&W, and he
20  worked there for about three weeks.
21        MR. DUKES:  Object to the
22  form.
23   Q    Is that correct?  That's your

Page 123

1  understanding of the testimony?
2    A    I understood that he worked
3  there on two different occasions.
4    Q    Okay.  Have you ever talked to
5  anybody at C&W?
6    A    Yeah.
7    Q    Who?  About Norris Foster.
8    A    Oh, no.  Not -- not
9  particularly about Norris, no.
10   Q    Do you know any -- any
11  information from C&W about Norris Foster?
12   A    No.
13   Q    You weren't work -- working
14  at -- at Sedgefields in 1999, were you?
15   A    No, sir.
16   Q    Or in -- were you -- you
17  weren't working there in 2005, when Norris
18  was hired; correct?
19   A    That's correct.
20   Q    Well, are you telling me that
21  if Norris had listed that he had worked
22  there, that y'all wouldn't have hired him?
23   A    I don't -- I can't answer that

Page 124

1  because I'm not the one that had anything
2  to do with it.
3    Q    Okay.  But I'm telling you.
4  I'm telling you right now, Norris listed
5  that he worked at C&W and that he worked
6  there for three weeks.  Would y'all have
7  hired him?  Would that have made any
8  difference to you?
9    A    No.
10   Q    Okay.  Why do you think it
11  makes any difference to Carter Dukes?
12        MR. DUKES:  Object to the
13  form.
14   Q    Do you know?
15   A    No, I don't.
16   Q    Okay.  Now, also, on that
17  application, he didn't list that he had
18  been convicted of a crime, third-degree
19  assault.  He did not -- is not an accurate
20  application.  Okay.  Do you agree with
21  that?
22   A    I agree.
23   Q    He's -- he's got a misdemeanor

31 (Pages 121 to 124)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1  conviction for third-degree assault.
2  Okay. I want -- knowing that he does,
3  would you have hired him anyway in 2005?
4    A   No.
5    Q   You wouldn't have hired him
6  because he got an assault conviction; is
7  that right?
8    A   That's correct.
9    Q   Is it every crime you've
10 got to -- you wouldn't -- you wouldn't
11 hire? I mean -- what I'm asking you is,
12 if somebody lists that they've been
13 convicted of a crime, you won't -- you
14 won't hire them?
15   A   No.
16   Q   Won't -- you won't do it?
17   A   No. Not if you're convicted
18 of a crime, no.
19   Q   Any crime?
20   A   I don't know about any crime.
21 But if you're convicted and you put it on
22 there and it reflects bad of you, then,
23 most likely, you will not be hired.

Page 126

1    Q   Did you hire Jeffrey Harris?
2    A   I did.
3    Q   Let me show you Jeffrey
4  Harris' application. When you hired him,
5  did you know -- I can't remember which
6  number he is. Exhibit 14.
7    Look at Jeffrey Harris' application,
8  please, sir. Has Jeffrey Harris been
9  convicted of a crime?
10   A   Yes, he has.
11   Q   And you hired him, though,
12 didn't you?
13   A   That was my mistake.
14   Q   Mistake?
15   A   Yes, sir.
16   Q   So it's not true, is it, that
17 if you've been convicted of a crime, you
18 won't be hired at Sedgefields? Is it?
19   MR. DUKES: Object to the
20 form.
21   A   Not intentionally hired.
22   Q   Was he unintentionally hired?
23   A   No. But I'm -- obviously, I

Page 127

1  missed that part or didn't see it.
2    Q   You -- you can read, can't
3  you?
4    A   Certainly, I can.
5    Q   You graduated from Auburn.
6    A   Certainly, I did.
7    Q   Got a Master's degree;
8  correct?
9    MR. DUKES: Jerry, I can hear
10 you.
11   A   That's correct.
12   Q   Correct?
13   A   Yes, sir.
14   Q   He wrote it right there on his
15 application, didn't he?
16   A   I see it on the application in
17 front of me, yes.
18   Q   And you hired him. What does
19 it say he was convicted of?
20   A   Possession of marijuana.
21   Q   Okay. What else has he got
22 there?
23   A   Misdemeanor. Fine paid.

Page 128

1  Rehab, one year.
2    Q   Rehab, one year. You hired
3  him; correct?
4    A   Yes, I did.
5    Q   Okay. Does Sedgefields --
6  does Sedgefields -- Mid -- did Mid States
7  check references before they hired people?
8    A   Mid States, as far as the home
9  office? No.
10   Q   Did you?
11   A   Sedgefields, as far as me? If
12 I had the opportunity to check references,
13 as much as I could, I certainly did.
14   Q   Did you check Jeffrey Harris'?
15   A   I -- I spoke with his --
16 with -- with Roy and some other folks that
17 knew him, and they said that he would --
18 would work fine. So I hired him.
19   Q   Did you speak with any
20 previous employers of Jeffrey Harris?
21   A   I don't remember that I did at
22 this time.
23   Q   Did you send them anything in

32  (Pages 125 to 128)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1  writing?
2      A    No.  Not that I'm aware of.
3      Q    Did -- have you ever spoken to
4  any previous employer of any applicant for
5  work at Mid State Land and Timber Company?
6      A    I have.
7      Q    Who?
8      A    For -- about the hiring of
9  Joel Norman.
10      Q    Okay.  Other than Mr. Norman.
11      A    No.
12      Q    So you've never checked a
13  reference, have you, for a worker?
14      A    I have attempted to check
15  references.  But as far as other places of
16  employment, most of the folks that have
17  come through my door, no.
18      Q    Okay.
19          MR. ROBERSON:  Yeah.  Let's go
20  off the record.  Our court reporter needs
21  a break for a second.
22          THE VIDEOGRAPHER:  At this
23  time, we're going off the record.  The

Page 130

1  approximate time is 3:12 p.m.
2          (Recess taken.)
3          THE VIDEOGRAPHER:  At this
4  time, we're going back on the record.  The
5  approximate time is 3:13 p.m.
6      Q    (BY MR. ROBERSON)
7  Mr. Carroll, I identified three
8  employees -- Chance Ham, Joel -- I'm
9  sorry -- Joseph Mays and Will Hubbard.
10  And they're white guys; correct?
11      A    Yes.
12      Q    They're all under twenty-four
13  years of age, aren't they?
14      A    If you say so.  They're around
15  that age, yes.
16      Q    Some of them were twenty-one
17  when they were hired; right?
18      A    Yes.
19      Q    None of them had military
20  experience; correct?
21      A    Not to my knowledge.
22      Q    Norris has six years of
23  military experience, doesn't he?

Page 131

1      A    If that's what's on his
2  application, I would believe him, yes.
3      Q    And did you have any military
4  service?
5      A    No, sir, I don't.
6      Q    Do you think that that can be
7  a valuable experience in -- for a -- for a
8  maturing-type in somebody's life?
9      A    Certainly, it can be.
10      Q    Okay.  I mean, there are --
11  there are life lessons to be learned in
12  the military.  You'd agree with that,
13  wouldn't you?
14      A    I would agree with that.
15      Q    Okay.  And does Sedgefields --
16  and when I say "Sedgefields" -- does Mid
17  States have any preference in hiring that
18  they give to people that are Veterans or
19  have prior military experience?
20      A    Not that I'm aware of.
21      Q    Do y'all have any written race
22  discrimination policy?
23          MR. DUKES:  Object to the

Page 132

1  form.
2      A    The only thing that I'm aware
3  of is just a common-sense policy, and
4  that's don't discriminate against anybody.
5      Q    Okay.  But that ain't in
6  writing, is it?
7      A    I -- I haven't -- I haven't
8  seen anything placed in front of me, other
9  than the common sense aspect of it.
10      Q    Okay.  Well, do y'all have a
11  written sex discrimination policy -- I
12  mean, sexual harassment policy?
13      A    I was -- I was given several
14  papers when I was hired.  Everybody else
15  was.  And I'm -- I'm assuming that was
16  addressed in there as well, in the package
17  that was given to each perspective
18  employee or ap -- when the application was
19  filed.
20      Q    Have you ever seen the sexual
21  harassment policy from Mid States?
22      A    Have I seen -- I've seen,
23  maybe, a notice that says we don't

33 (Pages 129 to 132)

Page 133

1  tolerate it. But as far as a lengthy
2  policy, I'm not aware of that, no.
3      Q    Would it -- to your knowledge,
4  would it violate any written policy if you
5  were having sex with an employee, a female
6  employee?
7      A    Well, certainly, it would.
8      Q    It would?
9      A    Yeah.
10     Q    If you don't have one, it
11 would violate it?
12     A    It would violate my policy.
13     Q    Okay. Your common-sense
14 policy, again?
15     A    Absolutely.
16     Q    That -- that -- that would be
17 a bad thing, wouldn't it?
18     A    Yes, it would.
19     Q    Because you -- you don't need
20 to have sexual relations with an employee
21 of Mid States, do you?
22     A    Not only that, but I'm a
23 married man.

Page 134

1      Q    Oh. It would violate that
2  policy too?
3      A    Certainly, it would.
4      Q    All right. Well, I -- I
5  shouldn't say it -- couch it in terms of
6  "you." If any employee had sex with an
7  employee at Mid States, that would be a
8  violation of the policy, you think?
9      A    What two employees may do when
10 they're not working there and off and
11 on -- on their own somewhere else and I
12 don't know anything about, I can't judge
13 morality there.
14     Q    Yes, sir. Now, when you go
15 out checking on your employees, does --
16 you ever take anybody with you?
17     A    From time to time, I have.
18     Q    Who is that?
19     A    I've had Joel with me. I've
20 had Roy with me. And when I first started
21 there, I've had Denise go out with me a
22 few times.
23     Q    The -- what's -- what's her

Page 135

1  last name?
2      A    Pierce.
3      Q    And she normally works in the
4  office?
5      A    She normally works there. But
6  when I first came to work at Sedgefields
7  and Roy and his crew was out working, she
8  would take me and show me parts of the
9  facility, like this is where such and
10 such -- the field house is; you know,
11 these keys open this, and these keys open
12 that; this is the -- this is the cedar
13 house; this is how many bedrooms; and this
14 is the way we do things. Explaining to me
15 what her -- aspects of her job were as far
16 as maintaining those facilities.
17     Q    Okay. And showing you the
18 ropes, basically? Showing you around
19 Sedgefields?
20     A    That's correct.
21     Q    And is Denise married?
22     A    At -- I -- at this time, I
23 assume she is.

Page 136

1      Q    Okay. When you went to work
2  there, was she married?
3      A    Yes. Certainly.
4      Q    Okay. What does her husband
5  do?
6      A    I think he works for the
7  county commission.
8      Q    Do you know in what capacity?
9      A    I don't really know.
10     Q    Okay. Now, has Joel ever
11 mentioned anything to you about his first
12 wife?
13     A    No.
14     Q    Has he ever told you that he
15 had any indication that she was dating
16 anyone who was a black male?
17     A    No.
18     Q    Before today, did you know she
19 was a -- had a problem with alcohol abuse?
20     A    No, I didn't.
21     Q    Now, will you tell me -- I
22 want you to assume that Norris Foster has
23 worked on and off for Sedgefields for ten

34 (Pages 133 to 136)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1 years -- eight to ten years, okay, as a --
2 as a laborer -- general laborer, driving a
3 tractor, being in the -- part of the
4 hunting crew. Before Mid States owned it,
5 you know -- and they bought it in '99 --
6 he -- he worked on the property. Okay.
7     Assuming that to be true, how can
8 you hire a white male, who doesn't have
9 any hunting experience, at a higher hourly
10 rate than Norris Foster, who's had six
11 years of military service, years of
12 experience around dogs and in hunting --
13 hunting camps? How can you do that and be
14 fair to Norris Foster?
15     A    If I hired an individual and
16 paid him a higher wage than somebody else,
17 the wage I paid him was -- was based on
18 his proficiency in doing something that we
19 needed done here at the plantation.
20     Q    Okay. What was that?
21     A    For instance, Adam May was
22 somebody who -- who was good at trapping
23 and a mechanic. I didn't have either one

Page 138

1 of those at that time.
2     Q    What is "trapping"?
3     A    Trapping?
4     Q    Uh-huh.
5     A    Is trapping and removing
6 nuisance predators to a quail program:
7 bobcats, fox, things of that nature.
8     Q    Okay. Okay. So you say you
9 paid Adam -- I mean, Joseph Mays more
10 money than Norris Foster because he could
11 trap and he was a mechanic?
12     A    I didn't pay him, not in
13 reference to Norris, anything. I paid him
14 a rate that I thought was fair for what
15 his specialties were and what he could do
16 for the plantation that I didn't have at
17 that time.
18     Q    Okay. Why did you pay Will
19 Hubbard eight dollars an hour?
20     A    Will Hubbard was paid what he
21 was paid because he had specialties in
22 working heavy equipment. My understanding
23 is, he worked at McDonald Construction

Page 139

1 before he came to work here and that he
2 was working with skidders and large
3 equipment. We had just purchased a
4 skidder. I needed somebody that could
5 operate that piece of equipment
6 proficiently, and he was the one that I
7 hired.
8     Q    You -- you bought a skidder?
9     A    I did.
10     Q    And Will Hubbard drove it?
11     A    He drove it a lot.
12     Q    Okay. Could anybody else
13 drive it?
14     A    Joel drives it some.
15     Q    Is any -- who -- Will Hubbard
16 doesn't work there now. Is -- who's
17 driving it now?
18     A    Joel.
19     Q    Anybody else?
20     A    For all I know, Chance may get
21 on it every now and then.
22     Q    Okay. What about Chance Ham?
23     A    Chance had specialties in

Page 140

1 welding. And that's -- we needed that.
2 We had pieces of equipment that we needed
3 repairing, and I had pieces of equipment
4 such as Joel mentioned -- the drag that I
5 needed built. And he brought to the -- to
6 the plantation skills that I didn't have
7 in anybody else.
8     Q    What kind of welding does
9 Chance do?
10     A    Well, as Joel described, he
11 repairs just about any type of equipment.
12 I'm sorry.
13     Q    What kind of welding do you
14 call it?
15     A    Wire welding is what Joel
16 mentioned.
17     Q    Okay. Do you have to have any
18 kind of training to do wire welding?
19     A    Training? Certainly.
20     Q    Can you -- have you ever --
21     A    As far --
22     Q    -- wire welded?
23     A    I have. Only because --

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 141

1    Q    Anybody can do it, can't
2   they?
3    A    No.  Only because Chance
4   stayed there with me and showed me how to
5   do it.
6    Q    Oh, okay.
7    A    It's not something you'll pick
8   up and just do at the drop of a hat and do
9   a good job of it.
10    Q    All right.  Has Norris Foster
11   welded pieces of equipment before?
12    A    Not to my knowledge.
13    Q    Made repairs using a welder?
14   Has he done that?
15    A    Who?
16    Q    Norris.
17    A    Not to my knowledge.
18    Q    Okay.  Okay.  So -- so you
19   claim that all these three guys had
20   specialties?
21    A    They had things that they were
22   proficient at that I needed, if you want
23   to call it a "specialty."  Some --

Page 142

1   something that they could do that I didn't
2   have a person here that was good at doing
3   it, and I needed to add people to my
4   staff.  And -- so I chose those people at
5   that time because they had those qualities
6   that I needed.
7    Q    Did you list every reason --
8   have we discussed every reason that they
9   were paid more than Norris Foster?
10    A    I mean, I -- I didn't set
11   Norris' pay rate.
12    Q    Well, who repaired the
13   equipment before Chance was hired?
14    A    Well, most all of it was done
15   by Roy Lee, with the help of his folks.
16   But Roy Lee was the one that was in charge
17   of it.  As a matter of fact, we mentioned
18   operating heavy equipment.  To my
19   knowledge, the only person here that
20   operated any heavy equipment was Roy Lee.
21   His crew was with him, but he was always
22   running -- running the equipment.
23    Q    Could -- have you ever seen

Page 143

1   Norris Foster on a dozer?
2    A    No.
3    Q    Ever seen him on a backhoe?
4    A    I've seen him move the backhoe
5   from place to place, but I have not seen
6   him use a backhoe.
7    Q    Have you -- you've never seen
8   him operate it, to put in drainage pipe or
9   anything like that?
10    A    I've seen Roy do it, but not
11   Norris.
12    Q    Okay.  Well, I -- this is the
13   only time I -- like I say, I get to talk
14   to you.  All I want to know is what you
15   say about why they were paid eight dollars
16   an hour and why Norris -- Norris wasn't
17   paid eight dollars an hour, was he?
18    A    He -- I didn't hire Norris.
19   But he was not making eight dollars an
20   hour at the time that I came here.
21    Q    Or the time he was fired.  He
22   was making seven fifty an hour, wasn't he?
23    A    He was making seven fifty an

Page 144

1   hour.  I offered him an -- an opportunity
2   to try to make eight dollars an hour if
3   he -- if he could.  Norris came to me one
4   day and claimed, when I hired Brother Man,
5   that I was being unfair in paying Brother
6   Man more than I was paying him.
7    Q    You mean Norris made a
8   complaint to you about his pay?
9    A    He did.
10    Q    When Brother Man was hired?
11    A    He did.
12    Q    Did he say it was because of
13   discrimination?
14    A    He did.
15    Q    You're kidding me.
16    A    No, I'm not.
17    Q    That Norris complained that
18   you were paying Brother Man eight
19   dollars -- now, Brother Man was white;
20   right?
21    A    He was making -- he was white,
22   yeah.
23    Q    And he was -- he was the guy

36 (Pages 141 to 144)

# American Court Reporting
## toll-free (877) 320-1050

Page 145

1  we were talking about that didn't have a
2  driver's license?
3      A    Turned out he didn't have a
4  driver's license.
5      Q    And he was stealing gas?
6      A    That's correct.  He was fired
7  for it.
8      Q    He was hired as a general
9  laborer, wasn't he?
10     A    And a night watchman.
11     Q    And a night watchman.  Okay.
12 You were going to pay him more; that is,
13 you were going to provide him with a place
14 to live, weren't you?
15     A    I was going to compensate him
16 for the extra work that he was going to do
17 for me.
18     Q    What special skills did he
19 have, Brother Man?
20     A    For being a night watchman and
21 being available to do those things for me.
22     Q    Okay.  Does that require a
23 special skill?

Page 146

1      A    It requires being here after
2  hours.
3      Q    Okay.  So he didn't have any
4  special skills, did he?  And you paid him
5  eight dollars an hour as a general
6  laborer; correct?
7          MR. DUKES:  Object to the
8  form.
9      A    I didn't pay him eight dollars
10 an hour for general labor.  I paid him
11 compensation for general labor and for
12 being a night watchman.
13     Q    Oh, you're saying you're
14 paying him more because he was a night
15 watchman?
16     A    I was paying him a different
17 rate because of what he was doing for me.
18     Q    Okay.  Did you ever give
19 Norris -- after you fired Mr. Beckwith,
20 Brother Man, did you ever give Norris an
21 opportunity to make eight dollars an hour
22 as a night watchman?
23     A    No, I didn't.

Page 147

1      Q    Why not?
2      A    But I did -- I did offer him
3  eight dollars an hour if he could provide
4  me with a valid driver's license, for
5  which I loaned him the money to go get,
6  and he never provided for me.
7      Q    You said you'd pay him eight
8  dollars an hour --
9      A    Yes.
10     Q    -- if he had a driver's
11 license?
12     A    I did.
13     Q    Is that in writing anywhere?
14     A    No, it's not.
15     Q    Do you type?
16     A    I can type, yes, sir.
17     Q    And you're thirty-five feet
18 from Norris Foster's personnel file,
19 aren't you?  Correct?
20     A    That's correct.
21     Q    And you were for eight months,
22 weren't you?
23     A    Sure.  From everybody's file.

Page 148

1  Certainly.
2      Q    Okay.  Oh.  And you had a
3  complaint of discrimination by Norris
4  Foster in -- at the time that you hired
5  Brother Man; correct?
6      A    Not at the time I hired him,
7  but after.
8      Q    Shortly after that.
9      A    Yeah.
10     Q    Would that be fair?
11     A    Yeah.
12     Q    So when you fired Norris
13 Foster, it was after he had complained of
14 race discrimination, wasn't it?
15         MR. DUKES:  Object to the
16 form.
17     A    Well, certainly, it would have
18 to be after.
19     Q    Yeah.  Just a few months;
20 right?  When was Brother Man fired?
21     A    Probably some time in late
22 September.
23     Q    Now, do y'all have a

## www.AmericanCourtReporting.com
## September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

1  progressive disciplinary policy?
2      A    No.
3      Q    Do you know what that is?
4      A    I'm assuming it -- well, no.
5      Q    Well, let me explain to you.
6  You write somebody up; you suspend them;
7  you fire them; you communicate to them, if
8  the conduct is repeated, that they will be
9  terminated; and you sign -- get them to
10  sign and acknowledge that they've been
11  given that warning.
12      Do y'all have anything like that?
13      A    No, sir.
14      Q    Who else have you fired
15  besides Norris Foster?
16      A    Bill Beckwith, Brother Man.
17  Just those two.
18      Q    Anybody else?
19      A    To my knowledge, just those
20  two.
21      Q    At Sedgefields?
22      A    Yes, sir.
23      Q    What about your crew working

Page 150

1  out there now?  Are they team players?
2      A    Everybody seems to be doing
3  fine.
4      Q    I mean, you're satisfied with
5  the people that work out there, aren't
6  you?
7      A    Yes.
8      Q    Roy Lee?
9      A    Yes.
10      Q    Good man?
11      A    Good man.
12      Q    B. B.?  Is that his name?
13      A    Willie Mack.
14      Q    Will -- Willie Mack.
15      A    Uh-huh.
16      Q    Okay.  Is he a good man?
17      A    Yeah.
18      Q    How much does he get paid now?
19      A    I'd have to look at his -- his
20  sheet to see exactly what it is.
21      Q    Is he getting eight dollars
22  today?
23      A    I don't -- it may be eight.

Page 151

1  It may be seven fifty.  It may be seven
2  seventy-five.  I'm not sure.
3      Q    He's getting seven fifty,
4  isn't he?
5      A    I -- if you say so.  I haven't
6  looked at his sheet.
7      Q    Now, I'm going to show you
8  Exhibit 18, and ask you if you're familiar
9  with that document.  That was just
10  provided today.  But...
11      A    I am familiar with it.
12      Q    Okay.  What is 18?  What is
13  Exhibit 18?
14      A    It is a request from
15  Mississippi for my recommendations for pay
16  raises to be effective in the year 2006.
17      Q    When was that made?  It's not
18  dated.  So --
19      A    I -- Ms. Sherry asked me for
20  it about the 1st of December, somewhere
21  along in there.
22      Q    Hum.  Well, how -- did you do
23  it on your computer?

Page 152

1      A    Did I do it on my computer?  I
2  could have.
3      Q    Well, I'm trying to get some
4  help with the dates and --
5      A    Yeah.  I -- I would have to
6  ask Ms. Howell the day maybe she received
7  it or she had it.  I don't have any
8  particular date on this piece of paper.
9      Q    Right.  Right.  Well, I
10  thought maybe you might have created a
11  document, you know, and saved it or
12  something.  Is there a way to look for the
13  date?
14      A    I certainly can look through
15  my computer and see if it's still in there
16  and the date of it.  Certainly.
17      Q    Okay.  Would you do that and
18  provide that information to Mr. --
19  Mr. Dukes?
20      A    I'll be glad to.
21      Q    All I'm trying to do is
22  determine when that document was created.
23  That's all.  Fair enough?

38 (Pages 149 to 152)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1    A    Fair enough.
2    Q    All right. Well, some time --
3  and -- and we'll go with your best
4  estimate for right now. Some time around
5  the 1st of December, correct, you think is
6  about when you --
7    A    Yeah. Right.
8    Q    Well, why would you be
9  recommending Norris Foster for a raise
10  when all you've done is talk about the
11  problems you had with Norris Foster?
12    A    Well, if Norris was going to
13  stay on, which at that time I assumed he
14  was, I felt like he needed a raise just
15  like everybody else.
16    Q    So his raise wouldn't have
17  been based on his job performance, would
18  it? Because his job performance was
19  lousy, according to you.
20    A    Aspects of his job performance
21  were not up to par.
22    Q    Well, he was going to get,
23  according to that document, a fifty cent

Page 154

1  raise; right? For 2006; correct?
2    A    Correct.
3    Q    At the time, he was making
4  seven dollars an hour; right?
5    A    Correct, yes.
6    Q    And he got a raise before he
7  got fired, didn't he?
8    A    He did.
9    Q    Fifty cents. Just what you
10  recommended; correct?
11    A    Correct.
12    Q    He got a raise on his last
13  check, didn't he?
14    A    If you say that's when it took
15  effect, then that -- that would be
16  correct.
17    Q    So he got a raise on the check
18  that he got fired; correct?
19    A    I would assume that's the
20  case, then.
21    Q    You think that's kind of a
22  mixed message? We're giving you a raise,
23  but we're letting you go.

Page 155

1    MR. DUKES: Object to the
2  form.
3    A    I don't know what you mean by
4  "mixed message." If -- if I'm accurate
5  and this notice was sent in the 1st of
6  December, then at that time, although
7  I might have had some feelings that Norris
8  wasn't doing -- exactly up to par what
9  he's supposed to be, I had not made the
10  decision to terminate him at that time.
11    Q    Okay. Well, did you talk to
12  them?
13    A    To who?
14    Q    To anybody at Mid States. I
15  mean, surely, after you wrote him up,
16  after his job performance took such a turn
17  for the worse, you wouldn't give him a
18  raise, would you?
19    MR. DUKES: Object to the
20  form.
21    A    Well, I think the time frame
22  is -- like I said, when this was written
23  and upon the progression of -- of his

Page 156

1  employment, I can see where this makes
2  logical sense.
3    Q    You couldn't stop his raise?
4    A    Certainly, I could have.
5    Q    But you didn't, did you?
6    A    No, I didn't.
7    Q    You just fired him; right?
8    A    You're right.
9    Q    Okay. I've got just a few
10  housekeeping things here.
11    (WHEREUPON, a document was
12  marked as Plaintiff's Exhibit Number 20
13  and is attached to the original
14  transcript.)
15    Q    I'm going to show you
16  Plaintiff's Exhibit 20. It's a letter
17  that's been produced to me. Does that,
18  Exhibit 20, describe the offer that was
19  made to employees who were working at the
20  time that Mid States sold the -- the --
21  Sedgefields to Tolleson?
22    A    I believe this letter was
23  distributed to each employee.

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 157

1    Q    That's right. Every -- every
2    employee that was working then got a copy
3    of this letter; right? Correct?
4    A    That's correct.
5         (WHEREUPON, a document was
6    marked as Plaintiff's Exhibit Number 21
7    and is attached to the original
8    transcript.)
9    Q    Okay. Now, let me show you
10   21. And does that show and accurately
11   reflect the holidays that were paid to
12   your employees?
13   A    At the time this was written,
14   I would say that was accurate.
15   Q    Okay. And did your employees,
16   like Norris Foster -- were they provided
17   with health insurance?
18   A    Yes. If they chose that they
19   wanted it, they were provided with it,
20   yeah.
21   Q    Well, if you're making eight
22   dollars an hour or seven dollars an hour,
23   you probably want it, don't you?

Page 158

1    A    Certainly.
2    Q    Does Mid State pay most of the
3    expense?
4    A    I think they pay half, and the
5    employee pays half.
6    Q    How much is it? Do you know?
7    A    I don't know off the top of my
8    head.
9    Q    Who at Sedgefields would be
10   the most knowledgeable about Norris'
11   benefits?
12   A    The most knowledgeable person
13   at Mid State would be in their home
14   office, that handles all that type of
15   information.
16   Q    I'm just asking who that is.
17   I don't know.
18   A    I would think Ms. Sherry
19   Howell.
20   Q    Okay. Would she be the one
21   that would have his pay stubs too?
22   A    I would assume they would be
23   in her office, yes.

Page 159

1    Q    Okay. And that would -- would
2    she be the one that would have the records
3    about tips, about bills --
4    A    As far as --
5    Q    Bills and tips?
6    A    It -- she would have access to
7    all of that.
8    Q    And would she have information
9    about how much money y'all made at
10   Sedgefields?
11   A    Certainly.
12   Q    Okay.
13        MR. ROBERSON: I'm working it.
14        MR. ADAMS: Okay.
15        MR. ROBERSON: Let me see
16   these exhibits.
17        Let's go off the record for a
18   second. I think I'm about to wrap up,
19   Mr. Dukes.
20        THE VIDEOGRAPHER: At this
21   time, we're going off the record. The
22   approximate time is 3:36 p.m.
23        (Recess taken.)

Page 160

1        THE VIDEOGRAPHER: At this
2    time, we're going back on the record. The
3    approximate time is 3:37 p.m.
4    Q    (BY MR. ROBERSON)
5    Mr. Carroll, before Joel Norman was hired,
6    Norris worked for Roy Lee, didn't he?
7    A    He did.
8    Q    Is that the only supervisor he
9    had after you were hired and before Joel
10   was hired?
11   A    To my knowledge, yes. Just --
12   just Roy.
13   Q    Did you ever have any
14   complaints by Norris Foster about anything
15   before Joel Norman was hired?
16   A    I believe if -- if -- if
17   anybody complained to him about
18   anything -- and I don't know that it
19   necessarily was just Norris. But it was,
20   in general, we need to be making more
21   money. Just hear that across the board.
22   Q    Okay. Well -- but,
23   specifically, about job -- job issues,

40 (Pages 157 to 160)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 161

1  other than pay, did Norris have any
2  complaints about working at Sedgefields?
3      A    No.
4      Q    That you're aware of.
5      A    Not that I'm --
6      Q    He made you aware of.
7      A    Not that I'm aware of.
8      Q    All right. Now, Roy was his
9  supervisor; correct?
10     A    That is correct.
11     Q    Did Roy have any complaints
12  about Norris' job performance when he
13  worked for him?
14     A    No. Roy did not comment to me
15  about anything, no.
16     Q    Okay. Is -- Roy is a good
17  supervisor, isn't he? Yes?
18     A    Roy does a good job, yes.
19     Q    Okay. And Roy makes his men
20  work, doesn't he?
21     A    He does.
22     Q    I mean, you're satisfied with
23  their job output, aren't you?

Page 162

1      A    I am satisfied.
2      Q    Okay. Now, I want to talk to
3  you about this memo, Exhibit 19.
4          MR. ROBERSON:  Have you got a
5  copy, Carter?
6          MR. DUKES:  Somewhere.
7          MR. ROBERSON:  Okay.
8      Q    (BY MR. ROBERSON)  Well,
9  look. Did you tell Norris, on the last
10  day that he worked there, that it was
11  obvious he was not happy working at
12  Sedgefields? Did you tell him that?
13     A    I did.
14     Q    Based on his attitude and job
15  performance?
16     A    I did.
17     Q    And that -- did you make the
18  decision that day to fire him?
19     A    The ultimate decisions was
20  made on that day, yes, to fire him.
21     Q    Okay. So you told him this.
22  It's obvious he wasn't happy. And then he
23  asked you if he was being fired; is that

Page 163

1  correct?
2      A    That's correct.
3      Q    I mean -- and you said yes,
4  you -- he was being fired; right?
5      A    Correct.
6      Q    And you took his keys?
7      A    Correct.
8      Q    Now, what -- what did he --
9  what did he have keys to?
10     A    Gate keys. Just things of
11  that nature.
12     Q    Okay. I mean, just in order
13  to do his job on the farm, he needed some
14  keys?
15     A    Access to get through the
16  property.
17     Q    Okay. And so that's -- that's
18  a -- every time you fire an employee, you
19  take their keys; is that fair? I mean --
20     A    That's fair.
21     Q    Okay. As I was leaving the
22  barn -- this is a memo that you wrote to
23  the file -- I heard him talking in a

Page 164

1  raised voice to Joel -- that is, Norris
2  was talking in a raised voice -- so I
3  stepped back in the barn to see if I was
4  needed. Norris told me that Suzanne had
5  hired him and this would not be the last I
6  heard from him.
7          Now, was Norris talking to you?
8      A    I stepped -- I did not hear
9  what the conversation were. I heard
10  Norris speaking in a very loud voice to
11  Joel. I stepped back in the barn to see
12  if there was -- what was going on or if I
13  was needed. And then Norris told that
14  statement to me as he was walking out of
15  the barn, across the parking lot.
16     Q    I asked Norris what he meant.
17  He replied, that is what lawyers are for.
18          Is that -- is that what he said?
19     A    That's what he said.
20     Q    Then he went on to say the
21  reason he was being fired was because of
22  his skin color.
23          So that's the second complaint of

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1    race discrimination by Norris Foster,
2    isn't it? Yes?
3        A    Yes.
4        Q    I let him know that I was
5    sorry he felt that way, and then he left;
6    correct?
7        A    Correct.
8        Q    He didn't hit anybody or
9    threaten anybody or do anything like that,
10   did he?
11       A    No.
12       Q    He -- he was upset. Would
13   that be fair to say, he was upset?
14       A    Certainly.
15       Q    And -- and you can understand
16   that, couldn't you? I mean, nobody likes
17   to lose their job, do they?
18       A    No. I wouldn't think so, no.
19       Q    Okay. So you -- it didn't
20   come as a surprise to you that Norris was
21   upset when he was let go, did it?
22       A    No. His emotions at that
23   time, I would think, were normal.

Page 166

1        Q    Okay. And is it fair to say
2    that, just the way Norris left, you
3    believed he felt like he was getting a raw
4    deal? Would that be fair?
5        A    I don't nec --
6            MR. DUKES: Object to the
7    form.
8        A    I don't necessarily think he
9    would think he was getting a raw deal. I
10   would think he was unhappy that he was
11   being fired or let go.
12       Q    Okay. What -- did he ask you
13   what he was being fired for?
14       A    He did.
15       Q    What did you tell him?
16       A    I told him his job performance
17   was not up to par.
18       Q    Did you say anything about him
19   stealing birds?
20       A    No, I didn't.
21       Q    Did anybody?
22       A    I didn't mention anything
23   about stealing birds.

Page 167

1        Q    Did anybody?
2        A    I -- I'm not aware of anybody
3    mentioning -- me, him, or Joel at that
4    time -- about stealing birds.
5        Q    Okay. I'm -- I'm just
6    asking. It's what my son always tells
7    me. Daddy, I'm just asking.
8            It says, on several quail hunts,
9    Norris has displayed a negative attitude.
10   He has made derogatory -- and there's
11   nothing -- about quail hunts in front of
12   guests.
13           That's what you were telling me
14   about when he said Joel wasn't -- he was
15   referring to Joel about not knowing what
16   he was doing or whatever?
17       A    Not just Joel, but the way
18   things were being operated on the quail
19   hunts.
20       Q    Okay. Then this says, Norris
21   has complained to me that they were not
22   receiving hot meals for lunch while they
23   were -- between morning and afternoon

Page 168

1    quail hunts. Sack lunches were delivered
2    to the employees who did not have an
3    opportunity to clock out and go to town.
4            Now, Norris worked on the crew;
5    right?
6        A    That's correct.
7        Q    The guests would go back to
8    the lodge and eat lunch, wouldn't they?
9        A    That is correct.
10       Q    What would the crew do?
11       A    The crew would stay on the
12   clock, and we would provide them with
13   lunch.
14       Q    From the lodge?
15       A    That is correct.
16       Q    Did you take the lunches to
17   them?
18       A    Sometimes I did; sometimes
19   other personnel did.
20       Q    Was it the same thing the
21   guests were eating? Or what was it?
22       A    It had been that way on some
23   occasions. It had been hot meals.

42  (Pages 165 to 168)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 169

1    Q    Norris has called me after
2    hours, on the company radio, complaining
3    and wanting to know where his cash tip
4    money was from guests of the most recent
5    quail hunt.
6         Now, called you after hours. Does
7    that mean you take your radio home?
8    A    I do.
9    Q    And that's where he called
10   you?
11   A    I was at home when he called
12   me. It was probably eight o'clock in the
13   evening.
14   Q    And he asked you where his tip
15   money was?
16   A    He did.
17   Q    What did you tell him?
18   A    I told him that he would get
19   his tip money. That -- that that
20   particular hunt was the Hardaway hunt, and
21   that the tip money wasn't going to be
22   given to him right then and there in cash.
23   It may come to him in his check when it --

Page 170

1    when it was time.
2    Q    Okay. He implied that I was
3    keeping tip money from him when, in fact,
4    time was needed so that correct change
5    could be obtained.
6    A    That has happened as well.
7    Q    Well, that's two different
8    things, isn't it?
9    A    Yes, it is.
10   Q    Because the Hardaway hunt was
11   on his bill, wasn't it?
12   A    It was.
13   Q    So that would be on Norris'
14   check, wouldn't it?
15   A    It would.
16   Q    So you mixed two things up
17   there, didn't you?
18       MR. DUKES: Object to the
19   form.
20   A    No. That particular instance
21   was about the Hardaway, when the other one
22   would have been probably another
23   situation, where I was given a hundred

Page 171

1    dollar bill and asked to split it, you
2    know, three or four ways. And I didn't --
3    it was five-thirty. Banks were closed. I
4    didn't have access to correct change. I
5    would take the tip money back, go the next
6    day, put it appropriately in each envelope
7    for the person that it went to, and
8    distribute it that way.
9    Q    Did y'all have a petty cash
10   box out there?
11   A    We do from time to time.
12   Q    How much money do you keep in
13   it?
14   A    Sometimes I keep as much as
15   five hundred dollars in it.
16   Q    You don't keep change?
17   A    Not exact change like that all
18   the time. It just depends on what's going
19   on. Sometimes there's five
20   one-hundred-dollar bills in there;
21   sometimes it's other stuff.
22   Q    Why would you need petty cash,
23   except to make change for tips?

Page 172

1    A    No. We sell stuff from time
2    to time in the pro shop, or somebody may
3    pay cash for something. It just happened
4    to be, that particular instance, there
5    wasn't that correct amount of change in
6    there.
7    Q    You mean y'all have a pro
8    shop?
9    A    Well, you could call it that.
10   It's more like a closet with some goods in
11   it.
12   Q    What does it sell? Like
13   t-shirts and stuff? Or what -- what is
14   it?
15   A    T-shirts and shirts.
16   Q    Do y'all sell ammo?
17   A    We do from time to time, yes.
18   Q    Do y'all sell guns?
19   A    No.
20   Q    You have to be a dealer to do
21   that.
22   A    You do, yeah.
23   Q    Do y'all have guns, maybe,

43 (Pages 169 to 172)

# American Court Reporting
## toll-free (877) 320-1050

Page 173

1  they can rent?
2      A   No.  We don't provide guns.
3      Q   Okay.  All of these complaints
4  came after I sent the memo to all
5  employees.  That's that memo we talked
6  about; right?
7      A   The tipping memo?
8      Q   Tipping memo.  That's right.
9  Joel has brought to my attention, on
10  several occasions, that no person --
11  others, when instructed to chop an area,
12  would claim they were finished and then,
13  upon inspection, were not.  That's what
14  you talked about not doing his task;
15  right?  Correct?  You need to answer out.
16      A   I'm sorry.  Say -- not doing
17  his what?
18      Q   Task.
19      A   Task.  That's correct.
20      Q   Okay.  Now, Sedgefields is
21  thirteen thousand acres, isn't it?
22      A   The whole place, yes.
23      Q   That's a lot to chop, isn't

Page 174

1  it?
2      A   I don't -- six thousand five
3  hundred acres of it I don't chop.  It's
4  forest land.
5      Q   Okay.  Sixty-five hundred is a
6  lot to chop, isn't it?
7      A   Minus lakes and drains.  It's
8  still a good bit to chop.
9      Q   And you can't always chop all
10  of it, can you?  I mean, there's places a
11  tractor won't go; right?
12      A   If it's to be chopped, the
13  tractor should go through it.
14      Q   I think I asked you this, but
15  did you ever -- you didn't receive tips,
16  did you?
17      A   No, I didn't.
18      Q   So you don't claim any on your
19  tax returns because you didn't get any;
20  right?
21      A   That's correct.
22      Q   Okay.  Well, Mr. Carroll, as
23  much as I hate to, I believe I'm going to

Page 175

1  quit.  You know when you end up -- you're
2  in a hole, you need to quit digging.
3      MR. ROBERSON:  Have you got
4  any questions, Mr. Dukes?
5      MR. DUKES:  No, sir.
6      MR. ROBERSON:  Thank you,
7  sir.
8      THE WITNESS:  You're welcome.
9      THE VIDEOGRAPHER:  This
10  concludes the deposition of David Carroll.
11  This is the 8th day of September 2006, and
12  the time is approximately 3:49 p.m.
13      At this time, we're off the
14  record.
15
16      FURTHER DEPONENT SAITH NOT
17
18
19
20
21
22
23

Page 176

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA  )
4  MONTGOMERY COUNTY )
5      I hereby certify that the above
6  and foregoing deposition was taken down by
7  me in stenotype, and the questions and
8  answers thereto were transcribed by means
9  of computer-aided transcription, and that
10  the foregoing represents a true and
11  correct transcript of the deposition given
12  by said witness upon said hearing.
13      I further certify that I am
14  neither of counsel nor of kin to the
15  parties to the action, nor am I in anywise
16  interested in the result of said cause.
17
18
19      GWENDOLYN P. TIMBIE, CSR
      Certificate No:  AL-CSR-569
20
21  My Commission Expires
   March 4, 2009
22
23

**American Court Reporting**
**toll-free (877) 320-1050**

Page 177

1   INSTRUCTIONS TO THE WITNESS
2
3       PLEASE READ YOUR DEPOSITION OVER
4   CAREFULLY BEFORE YOU SIGN IT. YOU SHOULD
5   MAKE ALL OF YOUR CHANGES ON THE ATTACHED
6   ERRATA SHEET. PLEASE DO NOT MARK ON THE
7   ORIGINAL DEPOSITION.
8       AFTER MAKING ANY CHANGES WHICH YOU
9   HAVE NOTED ON THE ATTACHED ERRATA SHEET,
10  SIGN YOUR NAME ON THE ERRATA SHEET AND
11  DATE IT.
12      THEN SIGN YOUR DEPOSITION AT THE
13  END OF YOUR TESTIMONY IN THE SPACE
14  PROVIDED. YOU ARE SIGNING IT SUBJECT TO
15  THE CHANGES YOU HAVE MADE ON THE ERRATA
16  SHEET, WHICH WILL BE ATTACHED TO THE
17  DEPOSITION.
18      RETURN THE ORIGINAL ERRATA SHEET
19  AND TRANSCRIPT TO AMERICAN COURT REPORTING
20  SERVICE, 2100-A SOUTHBRIDGE PARKWAY, SUITE
21  375, BIRMINGHAM, ALABAMA 35209.
22      ACCORDING TO RULES OF CIVIL
23  PROCEDURE, YOU WILL HAVE THIRTY (30) DAYS

Page 178

1   FROM THE DATE YOU RECEIVED THIS DEPOSITION
2   IN WHICH TO READ, SIGN AND RETURN YOUR
3   DEPOSITION TO THE ABOVE OFFICE. IF YOU
4   FAIL TO DO SO, YOU AUTOMATICALLY WAIVE
5   YOUR RIGHT TO MAKE ANY CORRECTIONS TO YOUR
6   DEPOSITION.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 179

1   SIGNATURE PAGE
2       OF
3   DAVID CARROLL
4
5
6       I HEREBY ACKNOWLEDGE THAT I
7   HAVE READ THE FOREGOING DEPOSITION AND
8   THAT THE SAME IS A TRUE AND CORRECT
9   TRANSCRIPTION OF THE ANSWERS GIVEN BY ME
10  TO THE QUESTIONS PROPOUNDED, EXCEPT FOR
11  THE CHANGES, IF ANY, NOTED ON THE ATTACHED
12  ERRATA SHEET.
13
14
15
16
17
18
19
20
21  SIGNATURE: _____
22
23  DATE: _____

Page 180

1   PAGE   LINE        EXPLANATION
2   _____
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  DEPONENT'S SIGNATURE      DATE
22
23  _____

45  (Pages 177 to 180)