# EXHIBIT    5

# Condensed Transcript

# Deposition of
# David Carroll

### taken on
### March 27, 2007

**Jeffrey Harris, Willie Bernard Mack, Demetrius Parham and Henry Tarver**

**v.**

**Mid-State Land and Timber Company, Incorporated, d/b/a Sedgefields Plantation**

## Case No. 2:06-cv-875-ID-CSC



**Certified Court Reporters and Certified Legal Video Specialists**
334.262.3332  1.888.253.DEPS
Email: depo@baker-baker.com
www.baker-baker.com

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JEFFREY HARRIS, WILLIE

BERNARD MACK, DEMETRIUS

PARHAM and HENRY TARVER,

     Plaintiffs,

vs.          CASE NO. 2:06-cv-875-ID-CSC

MID-STATE LAND AND TIMBER

COMPANY, INCORPORATED,

d/b/a SEDGEFIELDS PLANTATION,

     Defendant.


\*     \*     \*     \*     \*     \*     \*     \*


    The videotaped deposition of DAVID

CARROLL was taken before Cornelia J.

Baker, Certified Court Reporter and

Certified Shorthand Reporter, as

Commissioner, on Tuesday, March 27, 2007,

commencing at approximately 12:22 p.m., in

the law offices of Huckaby, Scott & Dukes,

2100 Third Avenue North, Suite 700,

Birmingham, Alabama, pursuant to the

stipulations set forth herein.

Page 2

```
1   *  *  *  *  *  *  *
2        APPEARANCES
3
4   Representing the Plaintiffs:
5      MR. JERRY D. ROBERSON
       Attorney at Law
6      Roberson & Roberson
       8 Office Park Circle, Suite 150
7      Birmingham, Alabama 35223
8      MR. ALBERT ADAMS
       Attorney at Law
9      Irby Law Firm, L.L.C.
       257 West Broad Street
10     Eufaula, Alabama 36027
11
12  Representing the Defendant:
13     MR. CARTER H. DUKES
       Attorney at Law
14     Huckaby, Scott & Dukes
       Concord Center, Suite 700
15     2100 Third Avenue North
       Birmingham, Alabama 35203
16
17
18  Also present:
19     Mr. Jeff Baker, CLVS
20
21
22
23
24
25
```

Page 4

```
1   is hereby waived, and that said deposition
2   may be introduced at the trial of this
3   case or used in any other manner by either
4   party hereto provided for by the Statute,
5   regardless of the waiving of the filing of
6   same.
7      It is further stipulated and agreed by
8   and between counsel and the witness that
9   the reading and signing of the deposition
10  by the witness is hereby waived.
11
12  *  *  *  *  *  *  *  *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   *  *  *  *  *  *  *
3
4        STIPULATIONS
5
6      It is hereby stipulated and agreed by
7   and between counsel representing the
8   parties that the videotaped deposition of
9   DAVID CARROLL is taken pursuant to the
10  Rules of Civil Procedure, and that said
11  deposition may be taken before Cornelia J.
12  Baker, Certified Court Reporter, as
13  Commissioner, without the formality of a
14  commission; that objections to questions,
15  other than objections as to the form of
16  the questions, need not be made at this
17  time, but may be reserved for a ruling at
18  such time as the deposition may be offered
19  into evidence, or used for any other
20  purpose by either party hereto, provided
21  by the Statute.
22     It is further stipulated and agreed by
23  and between counsel representing the
24  parties in this case, that the filing of
25  the videotaped deposition of DAVID CARROLL
```

Page 5

```
1   *  *  *  *  *  *  *  *
2        INDEX
3
4   EXAMINATION          PAGE
5   BY MR. ROBERSON:       8
    BY MR. DUKES:        114
6
7   EXHIBIT              PAGE
8   Plaintiffs' Exhibit No. 1 .......... 12
    2002 Form 1099 on Donna Monroe
9   Davison
10  Plaintiffs' Exhibit No. 2 .......... 13
    2003 Form 1099 on Donna Monroe
11  Davison
12  Plaintiffs' Exhibit No. 3 .......... 14
    2004 Form 1099 on Donna Monroe
13  Davison
14  Plaintiffs' Exhibit No. 4 .......... 14
    2005 Form 1099 on Donna Monroe
15  Davison
16  Plaintiffs' Exhibit No. 5 .......... 33
    0036, Mid-State Land & Timber
17  Company document prepared 2/23/07
18  Plaintiffs' Exhibit No. 6 .......... 37
    0070-0073, 5/10/05 employment
19  application of Corey Balkcom
20  Plaintiffs' Exhibit No. 7 .......... 38
    0078, 5/23/05 Mid-State Land and
21  Timber Employee Information filled
    out by hiring manager on Corey
22  Balkcom
23  Plaintiffs' Exhibit No. 8 .......... 42
    0001, Mid-State Land & Timber New
24  Management Structure
25
```

Page 6

1
Plaintiffs' Exhibit No. 9 .......... 43
2  0002, Sedgefields Plantation
   Employee Organization Chart,
3  March 24, 2006
4  Plaintiffs' Exhibit No. 10 .......... 44
   12/02/2004, Management Structure
5  Revision
6  Plaintiffs' Exhibit No. 11 .......... 60
   0035
7
   Plaintiffs' Exhibit No. 12 .......... 82
8  0089-0093
9  Plaintiffs' Exhibit No. 13 .......... 92
   0095-0106
10
   Plaintiffs' Exhibit No. 14 .......... 93
11  3/19/07 Declaration by Anthony J.
    Dickey
12
   Plaintiffs' Exhibit No. 15 ....... 104
13  Re-Notice of Deposition of
    Mid-State Land and Timber
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1    THE VIDEOGRAPHER: We are now on
2    the Record. Today is
3    March 27th, 2007. The time
4    is 12:22 p.m.
5        This is the video-
6    taped deposition of
7    Mr. David Carroll, 30(b)(6)
8    corporate representative for
9    Mid-State Land and Timber
10   Company, Incorporated.
11       We are here in the
12   matter of Jeffrey Harris, et
13   cetera, Plaintiffs, versus
14   Mid-State Land and Timber
15   Company, Incorporated, doing
16   business as Sedgefields
17   Plantation, Civil Action No.
18   206-cv-875-ID-CSC in the
19   U.S. District Court for the
20   Middle District of Alabama,
21   Northern Division.
22       At this time all
23   persons present will state
24   their name and affiliation
25   with this case, and

Page 8

1    immediately following, we'll
2    have the swearing-in of the
3    Witness.
4    MR. ROBERSON: My name is Jerry
5       Roberson. I represent the
6       Plaintiffs.
7    MR. ADAMS: Albert Adams, counsel
8       for Plaintiffs.
9    MR. DUKES: My name is Carter
10      Dukes, and I represent
11      Mid-State.
12   MR. CARROLL: David Carroll,
13      corporate representative.
14      DAVID CARROLL,
15   The Witness, having first been duly sworn
16   or affirmed to speak the truth, the whole
17      truth, and nothing but the truth,
18      testified as follows:
19   MR. ROBERSON: Is he going to
20      waive signature, Carter?
21   MR. DUKES: Yeah, that will be
22      fine.
23      EXAMINATION
24   BY MR. ROBERSON:
25      Q. Mr. Carroll, I've met you before.

Page 9

1    I'm Jerry Roberson. I represent the
2    Plaintiffs in this case. And today you have
3    been designated as the corporate represent-
4    ative for Mid-State Land and Timber Company,
5    Inc.; is that correct?
6       A. Yes, sir.
7       Q. And did you formally work for
8    them?
9       A. Yes, sir.
10      Q. In what capacity?
11      A. I was the plantation manager at
12   Sedgefields Plantation.
13      Q. During what period of time, sir?
14      A. I started work there, I believe,
15   April 15th, 2005.
16      Q. Until what date? Until they were
17   sold?
18      A. Until they were sold, that's
19   correct, in 2006.
20      Q. And they sold in May of 2006?
21      A. I believe May 19th.
22      Q. So you were there for a little
23   over a year; is that correct?
24      A. Yes, sir.
25      Q. Now, I'm going to ask you some

Page 10

1  questions about employees that worked at the
2  Mid-State Land and Timber operation in
3  Bullock County, and that's also known as
4  Sedgefields Plantation, correct?
5      A.  Yes, sir.
6      Q.  Now, I know you didn't work
7  there, didn't arrive there until April of
8  2005, and I'm asking about a time period
9  before then.  Have you looked at records to
10  help you gain familiarity and knowledge about
11  those employees?
12      A.  I have.
13      Q.  And you've produced documents or
14  Mid-State has produced documents today,
15  correct?
16      A.  Correct.
17      Q.  Now, I want to show you some
18  documents that I already have from another
19  case about Mid-State Land and Timber Company.
20          Did you sign some interrogatory
21  responses in another case, verification?  Do
22  you recall that?
23      A.  Yes.  I have.
24      Q.  Yeah.  You know I represent
25  Norris Foster as well, correct?

Page 11

1      A.  I do.
2      Q.  And I took your deposition in the
3  Norris Foster case, correct?
4      A.  Correct.
5      Q.  Okay.  Well, Mr. Carroll, who was
6  the manager at Mid-State before you?
7      A.  I believe the manager would be
8  Donna Davidson -- Davison.  Excuse me.
9      Q.  I'm sorry.  What's the last name?
10      A.  D-A-V-I-S-O-N.
11      Q.  Davison?
12      A.  Yes.
13      Q.  And do you know what period of
14  time that she was the manager at Mid-State?
15      A.  I'd probably have to look back in
16  the records to see when she began.
17      Q.  And let me assure you that I
18  don't mind you looking at any of those
19  documents.  If you would, I just want the
20  answer to that question.  So if you need to
21  look at documents to help you with that, I
22  don't object to that.
23          (Witness reviewed document.)
24      A.  I would guess she started in
25  2002.

Page 12

1      Q.  And do you know what her earnings
2  were in 2002?  Do you have a W-2 form for
3  her?
4      A.  I have a 1099.
5      Q.  Well, was she not an employee in
6  2002?
7      A.  The only documents --
8          MR. DUKES:  Object to the form.
9      A.  The only documents that I have
10  are 1099s for her.
11      Q.  Okay.  And your documents are
12  Bates-stamped.  Would you tell me what number
13  you're looking at, please, sir?
14      A.  This is page eight.
15      Q.  Okay.  I'm going to mark as
16  Plaintiffs' Exhibit 1 this document.  And are
17  you -- Donna Monroe Davison, a 2002 1099 from
18  Mid-State Land and Timber Company shows that
19  she made, in the year 2002, $35,796; is that
20  correct?
21          (Whereupon Plaintiffs' Exhibit
22          No. 1 was marked for
23          identification and attached
24          hereto.)
25      A.  That is correct.

Page 13

1      Q.  Now, we don't know when she
2  started working in 2002, correct?
3      A.  I do not.
4      Q.  So that may not be a full year,
5  right?
6      A.  That's correct.
7      Q.  And then I'll show you what I've
8  marked as Exhibit 2, which is a 1099 from
9  Mid-State to Donna Davison for the year 2003.
10  And it shows in that year she earned $54,490;
11  is that correct?
12          (Whereupon Plaintiffs' Exhibit
13          No. 2 was marked for
14          identification and attached
15          hereto.)
16      A.  That is correct.
17      Q.  Did she work on-site, that is, in
18  Bullock County?
19      A.  She did.
20      Q.  Did she live on the property?
21      A.  She did.
22      Q.  Okay.  So in addition to this
23  compensation -- it doesn't appear that she's
24  an employee; that is, she's getting a 1099 --
25  she also received housing; is that fair?

Page 14

1    A. I think she did, yes.
2    Q. Okay. And did she have a
3  vehicle? Do you know?
4    A. I don't know.
5    Q. Okay. I'm going to show you what
6  I've marked as Plaintiffs' Exhibit 3 and ask
7  you if this is Mrs. Davison's 1099 for the
8  year 2004? And, if you would, tell me what
9  she earned as 1099 compensation in that year.
10       (Whereupon Plaintiffs' Exhibit
11          No. 3 was marked for
12          identification and attached
13          hereto.)
14    A. $66,507.34.
15    Q. Now let me show you Plaintiffs'
16  Exhibit 4. This is for the year 2005. And
17  Mrs. Davison, did she leave Mid-State Land
18  and Timber? If you came in April of 2005,
19  did she leave sometime before that?
20       (Whereupon Plaintiffs' Exhibit
21          No. 4 was marked for
22          identification and attached
23          hereto.)
24    A. She did.
25    Q. Do you know where she went to

Page 15

1  work --
2    A. No.
3    Q. -- or what she did?
4    A. I don't know.
5    Q. Do you know if she did anything
6  that would entitle her to compensation from
7  Mid-State after she left Sedgefields?
8    A. I don't know.
9    Q. Well, in 2005 -- I'll show you
10  her 1099 and ask you what amount of
11  compensation did she receive in 2005?
12    A. $33,717.44.
13    Q. And you don't know what time
14  period that's for, but you do agree with me
15  that she stopped working before you arrived
16  in April 15th?
17    A. That's correct.
18    Q. Okay. Now, do you know what
19  Mrs. Davison's duties were?
20    A. Mrs. Davison was hospitality
21  manager and timber manager.
22    Q. Well, do you know what her
23  qualifications were for that position?
24    A. The only thing that I know is
25  that she has a two-year degree in forest

Page 16

1  management.
2    Q. How do you know that?
3    A. Spoke with Ms. Sherry Howell and
4  informed me of that.
5    Q. Who is Ms. Howell?
6    A. She is an employee of Mid-State
7  Land and Timber.
8    Q. Do you have any document, resume,
9  or application or anything for Mrs. Davison?
10    A. I don't.
11    Q. So do you know where her two-year
12  degree is from?
13    A. I don't know which school it's
14  from, no, sir.
15    Q. Do you know if she'd ever worked
16  in the timber industry before?
17    A. I don't.
18    Q. Do you know anything about her
19  prior job experience or her qualifications?
20    A. No, sir.
21    Q. And Mrs. Davison was married to
22  Byron Davison, correct?
23    A. That is correct.
24    Q. Now, are they related by blood or
25  marriage to the owner of Mid-State Land and

Page 17

1  Timber?
2    A. Mrs. Donna is. Was by marriage,
3  yes.
4    Q. All right. Can you explain how
5  she's related?
6    A. Mr. Broadhead's wife, her
7  brother, it was -- that was her husband.
8    Q. Was she at one time married to
9  her brother?
10    A. She was married to Mrs. Broad-
11  head's brother.
12    Q. Right. And she got a divorce and
13  married Mr. --
14    A. He died of a heart attack.
15    Q. Okay. And after his death, she
16  remarried Byron Davison?
17    A. Yes.
18    Q. Is that correct?
19    A. That's correct.
20    Q. So she was a sister-in-law by
21  marriage, correct?
22    A. Correct.
23    Q. Now, did Byron Davison also work
24  at Mid-State?
25    A. He did.

1    Q.  And what was his job?
2    A.  His position was hunt manager.
3    Q.  Okay.  Well, do we know what he
4  made at Mid-State?  I've got a W -- I mean, a
5  1099 for him for 2003 and 2002.  It's Bates
6  No. 9 and -- 8 and 9.  Do you see that he
7  made 14,897 in 2002?
8         (Witness reviewed document.)
9    A.  Yes.
10    Q.  Do you see that?
11    A.  Yes.
12    Q.  And how much did he make in 2003?
13    A.  $36,961.67.
14    Q.  Okay.  Well, but that's -- and he
15  was provided housing as well?
16    A.  Well --
17    Q.  Did he live on the property?
18    A.  I assume, since he was married to
19  Mrs. Davison.
20    Q.  Okay.  Do we know what his duties
21  and responsibilities were?
22    A.  Well, hunt manager is responsible
23  for assigning guests to particular stands
24  where they hunt, to taking care of those
25  guests to and from the hunts; would have a

1  relationship, obviously, with the hospitality
2  manager in making sure the clients got to and
3  from the lodge to the stands and the fields
4  and everything that was around the hunting
5  part of it, the deer hunting part of it.
6    Q.  Would Donna Davison hire people?
7  Did she have hiring and firing ability?
8    A.  Yes.
9    Q.  Would she hire the guides, the
10  people that actually took the people on
11  hunts?
12    A.  I don't know that.
13    Q.  See, that's -- I don't know
14  either.  Would her husband, the hunt manager,
15  do that?  You don't know?
16    A.  I don't know.
17    Q.  Now, do you know when Mr. Byron
18  Davison left the employ of Mid-State, because
19  I don't have anything after 2003 showing he
20  worked there?
21    A.  I don't know.
22    Q.  But we know Mrs. Davison didn't
23  leave until 2005, correct?
24    A.  That's correct.
25    Q.  Well, do you know where he was

1  during that period of time?
2    A.  I don't.
3    Q.  Does anybody at Mid-State Land
4  and Timber?
5    A.  Not to my knowledge.
6    Q.  Do you know what Byron Davison's
7  qualifications were?
8    A.  I don't.
9    Q.  Don't know the level of his
10  education?
11    A.  No.
12    Q.  Sir?
13    A.  No, sir.
14    Q.  Do you have a job application for
15  him?
16    A.  I do not.
17    Q.  Any personnel records for him?
18    A.  Nothing, no more than we have
19  right here in front of us.
20    Q.  The only thing I have is a 1099.
21    A.  That would be it, I guess.
22    Q.  Okay.  Don't know his age?
23    A.  No, sir.
24    Q.  Wouldn't know his race?  He was
25  white, wasn't he?

1    A.  I believe he was, yes, sir.
2    Q.  Okay.  Did you ever meet Byron
3  Davison?
4    A.  No, sir.
5    Q.  Well, do you know how Mid-State
6  could not have an application or a resume or
7  anything on these people?
8    A.  I'm assuming since Mrs. Davison
9  was married into the family, they knew all
10  about her and her husband.
11    Q.  Who's "they"?
12    A.  It would be Mr. Broadhead.
13    Q.  Have you talked to Mr. Broadhead
14  about them?
15    A.  No, sir.
16    Q.  Have you tried to get any
17  information about Byron or Donna Davison?
18    A.  No, sir.
19    Q.  Do you know what the arrangement
20  was?  Was there just a contractual
21  arrangement with these people?
22    A.  I don't know.
23    Q.  You don't know how they were paid
24  other than what's reflected on the 1099?
25    A.  That's all I know, is what's

Page 22

1 reflected on the 1099.
2     Q. Well, do you know my client, Roy
3 Lee?
4     A. I do.
5     Q. Is he a black man?
6     A. Yes, he is.
7     Q. Other than Roy Lee, has there
8 ever been a black man who worked in
9 management at Mid-State Land and Timber
10 Company.
11     A. Not that I'm aware of.
12     Q. Well, are you aware -- at one
13 time, Roy Lee, while he worked in management,
14 was paid by the hour, correct?
15     A. That's correct.
16     Q. And I think initially he made $11
17 an hour, correct?
18     A. Correct.
19     Q. And then he made -- got a raise
20 to $12 an hour, right?
21     A. I'd have to look at the
22 documents, but I believe you.
23     Q. Okay. Well, has there ever been
24 anybody else in management that's ever been
25 paid by the hour?

Page 23

1     A. Not based on the documents I have
2 in front of me -- well, no, I'll take that
3 back. Denise Pierce was paid hourly.
4     Q. What is Denise Pierce's job?
5     A. Denise Pierce is a lodge manager,
6 office manager.
7     Q. Okay. And what are her responsi-
8 bilities?
9     A. Her responsibilities are all
10 duties of running the office; of maintaining
11 the lodge so that it's in good shape, keeping
12 it stocked and the kitchen stocked with
13 necessary items; managing the personnel, the
14 ladies that cook and clean.
15     Q. What was Ms. Pierce's hourly
16 rate?
17     A. I'd have to go back and look and
18 see the documents.
19     Q. Well, please do.
20     (Witness reviewed document.)
21     A. Initially, Denise made $10 an
22 hour.
23     Q. When was that? What year was
24 that?
25     A. 2003.

Page 24

1     Q. Okay. Was that as the manager?
2     A. At that time, I don't know if she
3 held that title or not.
4     Q. Okay. Then what did she make the
5 next year?
6     A. Let's see. $10.75 an hour in
7 2004.
8     Q. Do you know if she was manager
9 then?
10     A. I do not know -- well, I do not
11 know, no.
12     Q. Okay. In 2005, what did she
13 make?
14     A. 11.50 an hour. And she was
15 managing at that time.
16     Q. Okay. You know because you were
17 the manager in 2005, right?
18     A. That's correct.
19     Q. Now, did she normally work
20 inside?
21     A. Most of the time, yes.
22     Q. And she wasn't responsible for
23 grooming the place, was she?
24     A. No.
25     Q. That is, getting it ready for

Page 25

1 hunts or anything?
2     A. Not outside, no.
3     Q. All right. Her work was indoors,
4 making sure that the guests were comfortable
5 and accommodated, correct?
6     A. That was part of her responsi-
7 bility.
8     Q. Fed and the rooms were clean,
9 that type thing, correct?
10     A. Correct.
11     Q. So you'd agree with me she had a
12 much different job, much different responsi-
13 bility than Roy Lee, correct?
14     A. Different, yes.
15     Q. Okay. Can you think of anybody
16 that's ever worked in management that had any
17 responsibility for hunting or hunting
18 operations that's ever been paid by the hour
19 other than Roy Lee?
20     A. We had one young gentleman named
21 Anthony Dickey that worked for a short period
22 of time that was listed as a manager for a
23 brief period of time, and he was paid by the
24 hour.
25     Q. What document do you have that

Page 26

1  shows he was a manager?
2       A.  That was just -- that was told to
3  me.
4       MR. DUKES:  That's previously
5            been produced to you.
6       MR. ROBERSON:  I'm not saying it
7            hadn't.  I just don't --
8       MR. DUKES:  I know.  I know.
9       MR. ROBERSON:  What is it?  I
10           mean, I don't recall it.
11      MR. DUKES:  It's a document that
12           we produced that showed the
13           different managers and their
14           responsibilities.
15      MR. ROBERSON:  Do you know what
16           number it is?
17      MR. DUKES:  I have no idea, but
18           it's come up in depositions
19           before.  In fact, I think in
20           Roy Lee's deposition we
21           talked about it at some
22           length.
23      MR. ROBERSON:  You mean the --
24           are you talking about the
25           organization chart?

Page 27

1       MR. DUKES:  That may be it.  So
2            it may be in two different
3            places.
4       MR. ROBERSON:  Okay.  Well, we'll
5            take a break after a while
6            and try to find that.
7  BY MR. ROBERSON:
8       Q.  Mr. Carroll, you're a manager,
9  correct?
10      A.  Yes, sir.
11      Q.  You're paid a salary, aren't you?
12      A.  I am.
13      Q.  You don't get a 1099?
14      A.  I don't.
15      Q.  Do you know why Donna Davison and
16 Byron Davison got 1099s?
17      A.  I was told that Mrs. Davison
18 initially came to work there to look after
19 some of the timber management aspects of it,
20 and that once she started that, ended up
21 staying on and running the place.
22      Q.  So did she have a consulting
23 arrangement initially?
24      A.  I would assume that was the case,
25 yes.

Page 28

1       Q.  Okay.  Well, you weren't ever
2  hired as a consultant by Mid-State, correct?
3       A.  That is correct.
4       Q.  You were an employee, correct?
5       A.  Correct.
6       Q.  You've got a four-year degree
7  from Auburn, don't you?
8       A.  I do.
9       Q.  And a Master's degree from
10 Auburn, correct?
11      A.  I do.
12      Q.  You get paid a salary, don't you?
13      A.  Yes, sir.
14      Q.  $75,000 a year?
15      A.  Yes, sir.
16      Q.  I mean, that was what you made
17 for Mid-State?
18      A.  Yes, sir.
19      Q.  Okay.  Now, and you hired
20 someone, Joel Norman, correct?
21      A.  I did.
22      Q.  He was to be over the quail
23 hunting operations, correct?
24      A.  Correct.
25      Q.  He is also a white male, correct?

Page 29

1       A.  He is.
2       Q.  And you paid him a salary,
3  correct, or Mid-State paid him a salary?
4       A.  That's correct.
5       Q.  He was provided a truck, correct?
6       A.  Yes.
7       Q.  He was provided lodging or
8  housing on the property, correct?
9       A.  Yes.
10      Q.  And he was paid an annual salary
11 of $70,000 per year, correct?
12      A.  Yes.
13      Q.  He has a two-year degree,
14 correct?
15      A.  Yes.
16      Q.  So you have a Master's degree and
17 a four-year degree, and you get 75, right?
18      A.  That's correct.
19      Q.  He has a two-year degree, and he
20 gets 70, right?
21      A.  That's correct.
22      Q.  Roy Lee doesn't have a degree,
23 does he?
24      A.  Not that I'm aware of.
25      Q.  Doesn't have a college degree,

Page 30

1  does he?
2       A.  That's correct.
3       Q.  He graduated from high school
4  there in Bullock County, didn't he?
5       A.  Yes.
6       Q.  And he worked for numerous years
7  as a supervisor in the -- at the Beaulieu
8  plant?
9            MR. DUKES:  Object to the form.
10      Q.  Do you know what that is?
11      A.  I do.
12      Q.  Okay.  Isn't it a -- well, tell
13 me what it is.
14      A.  Some type of textile mill.
15      Q.  That's right.  And he was a
16 manager there, correct?  He was over -- he
17 supervised people, correct?
18           MR. DUKES:  Object to the form.
19      Q.  Do you know that?
20      A.  I've heard that, yes.
21      Q.  Well, he gave you a resume,
22 didn't he?
23      A.  He didn't give me a resume.
24      Q.  Oh, okay.  Well, he gave
25 Mid-State a resume?

Page 31

1       A.  Yes.
2       Q.  Roy Lee was hired long before
3  you, correct?
4       A.  He was.
5       Q.  He was working there when you
6  arrived, right?
7       A.  He was, yes.
8       Q.  In fact, when you arrived, he was
9  running the plantation, wasn't he?
10           MR. DUKES:  Object to the form.
11      A.  For a brief month or so, yes.
12      Q.  Okay.  He was -- was there
13 anybody at the -- at Sedgefields that was
14 higher than him at that time?
15      A.  He and Denise, I think, shared
16 responsibilities until I was hired.
17      Q.  Okay.  And he was a black man
18 getting paid $11 an hour, correct?
19           MR. DUKES:  Object to the form.
20      A.  I agree, yes.
21      Q.  Now, would you agree with me -- I
22 know you only started working there in April
23 of 2005 -- that Roy Lee works a lot of hours?
24      A.  Roy works a lot of hours.
25      Q.  And normally, if you work more

Page 32

1  than forty hours, the law requires that you
2  be paid time and a half for hours over forty;
3  do you agree with that?
4       A.  I do.
5       Q.  And Roy made a lot of overtime,
6  didn't he, before he went on salary, correct?
7       A.  He did.
8       Q.  And he earned it, because he
9  worked the hours, correct?
10      A.  Correct.
11      Q.  Now, did you make the decision to
12 put him on a salary?
13      A.  Roy came to me and said he would
14 like to be placed on a salary, and he wanted
15 to be more of a management individual, not an
16 hourly worker, with the people he worked
17 with.  I told him if that's what he would
18 like, then I certainly would go to the home
19 office and see if we could arrange that.
20      Q.  Okay.  Was he ultimately placed
21 on a salary?
22      A.  He was.
23      Q.  What is that salary?
24      A.  I'd have to look and see.
25           (Witness reviewed document.)

Page 33

1       A.  It says the annual compensation,
2  $47,230.50 for the year of 2005.
3       Q.  Forty-seven?  Is that what you
4  said?
5       A.  Uh-huh (affirmative response).
6       Q.  What number are you looking at,
7  sir?
8            MR. DUKES:  Thirty-six.
9       A.  Thirty-six.
10      Q.  I'll mark that as an exhibit.
11 I'll show you what I've marked as Exhibit 5.
12 Is that what you're looking at?
13           (Whereupon Plaintiffs' Exhibit
14           No. 5 was marked for
15           identification and attached
16           hereto.)
17      A.  Yes, sir.
18      Q.  Okay.  And what is Exhibit 5, if
19 you know?  Is that y'all's payroll for 2005
20 and 2006?
21      A.  That's correct.
22      Q.  And does it list all of the
23 employees there at Sedgefields Plantation?
24      A.  It does.
25      Q.  All right.  And it's got the

Page 34

1  name.  It says, DOH.  Is that date of hire?
2      A.  That's correct.
3      Q.  Their hours, that is -- is that
4  the total number of hours that they were on
5  the clock for those years?
6      A.  Yes.
7      Q.  And then their annual
8  compensation and their hourly rate, correct?
9      A.  Or biweekly.
10      Q.  Or in your case, biweekly rate?
11      A.  Yes.
12      Q.  That's right.  Okay.  So with
13  your help -- are you familiar -- you worked
14  in 2005, do you know all of these employees?
15      A.  I know most all of them.  Not all
16  of them.
17      Q.  Okay.  Well, I just want to go
18  through this list, and I want to designate
19  what race these people are, if I may, okay?
20      A.  Okay.
21      Q.  Because I don't -- I don't know
22  these people.  And at the top of the list,
23  Yolanda -- I'm not sure how you pronounce
24  that, Armenda-Pineda?
25      A.  Don't know her.

Page 35

1      Q.  Okay.  And she was hired in
2  December of 2004, and she only worked two
3  hundred and ten hours.  So that's why you
4  don't know her, she left before you got
5  there?
6      A.  Yes, sir.
7      Q.  Okay.  Casey Balkcom -- I'm
8  sorry, Corey Balkcom, do you know him?
9      A.  I do.
10      Q.  What race is he?
11      A.  He's black.
12      Q.  A black male?
13      A.  That's correct.
14      Q.  Now, he only worked, looks like
15  ninety-two hours at $7 an hour; is that
16  correct?
17      A.  That's correct.
18      Q.  All right.  Let me see if I can
19  find his information that's in here.  Tell me
20  about Mr. Balkcom, though.  Why did you hire
21  him?  I mean, what was he going to do for
22  y'all?
23      A.  After I had been at the
24  plantation for a few weeks, I sat down and
25  discussed with Roy our immediate needs for

Page 36

1  personnel.  He reflected that we had had a
2  greater personnel in the past and that we
3  were sort of on a bare-bones crew, and that
4  he needed some individuals to help at that
5  time of the year with cutting grass and
6  weedeating and taking care of immediate needs
7  at the plantation.  And this gentleman was
8  recommended to me by Denise Pierce.  She knew
9  him.  He came out and filled out an
10  application for me.  And we hired him on, and
11  he worked for one two-week pay period and
12  then left.
13      Q.  Okay.  Do you know why he left?
14      A.  I don't.
15      Q.  He didn't come talk to you or let
16  you know why he was leaving?
17      A.  Somebody said he got a job at the
18  Hyundai plant up in Montgomery, I guess.  But
19  I don't know that for a fact.
20      Q.  Okay.  Did Mr. Balkcom have any
21  special skills?
22      A.  He listed several things on his
23  application that he could do -- supposedly
24  could do.
25      Q.  And I -- I mean, I know when you

Page 37

1  were there at Mid-State, did y'all check
2  references?
3      A.  I didn't -- no references were
4  checked on our hourly workers that were hired
5  for labor and stuff like that.
6      Q.  Why not?
7      A.  Just at that point, it really
8  wasn't much of a need for it.  We needed to
9  add personnel.  If they said they could cut
10  grass and weed-eat, at that time, we looked
11  at their application, and they were hired or
12  not.
13      Q.  Well, I'm going to show you what
14  I've marked as Exhibit 6 and ask you if
15  that's the application that Mr. Balkcom
16  filled out?
17          (Whereupon Plaintiffs' Exhibit
18          No. 6 was marked for
19          identification and attached
20          hereto.)
21          (Witness reviewed document.)
22      A.  It is.
23      Q.  Does he list that he had worked
24  as a diesel mechanic for twenty years?
25      A.  It does.  It also shows that he

Page 38

1   can't spell the word diesel.
2       Q.  Okay.  Can you do diesel mechanic
3   work without spelling it?
4       A.  I would hope so.
5       Q.  I suspect you can, don't you?
6       A.  Yes, sir.
7       Q.  And in fact, if you're doing
8   diesel mechanic work, you don't really have
9   to spell, do you?
10          MR. DUKES:  Object to the form.
11      A.  Not necessarily.
12      Q.  I'm going to show you what I'm
13  going to mark as Exhibit 7 and ask you what
14  that is?
15          (Whereupon Plaintiffs' Exhibit
16              No. 7 was marked for
17              identification and attached
18              hereto.)
19          (Witness reviewed document.)
20      A.  It's a manager's checklist for
21  employees to be filled out.
22      Q.  Is it for Mr. Balkcom?
23      A.  It is.
24      Q.  What was he hired as?  Does it
25  say?

Page 39

1       A.  Outside laborer.
2       Q.  Okay.  And who hired him?
3       A.  I did.
4       Q.  When you hire someone like that,
5   do you set the wages?
6       A.  Wages are set based on, you know,
7   what I need at the time and what the
8   responsibilities of the person would be that
9   I'm hiring.  So, yeah, I would say that I'm
10  the one responsible for setting those within
11  the guidelines of the company.
12      Q.  Well, that's what I'm asking you,
13  Mr. Carroll.  Do you have to get anybody's
14  approval to pay him, whatever hourly rate
15  that is?
16      A.  No.
17      Q.  Do you have a staffing budget?
18      A.  No.
19      Q.  Well, if you want to hire
20  someone, do you have to get approval from the
21  home office or anyone?
22      A.  Possibly.
23      Q.  Did you for Mr. Balkcom?
24      A.  No, sir.
25      Q.  How much did you pay him?

Page 40

1       A.  $7 an hour.
2       Q.  And you hired him when?
3       A.  5/17/05.
4       Q.  I see.  Do you know how old
5   Mr. Balkcom was?
6       A.  No.  I'd have to look at the
7   application.
8       Q.  Did you know whether Mr. Balkcom
9   had military service?
10      A.  If it lists it on there, then I'm
11  assuming I knew he did.
12      Q.  Yeah.  He served in the marines
13  for nine years; is that important?
14      A.  I guess it can be.
15      Q.  Well, is it important to you?
16  You hired him.
17      A.  What's important to me is that he
18  can do what I need for him to do at the
19  plantation.
20      Q.  And what was it you needed him to
21  do, cut grass?
22      A.  Cut grass, weed-eat, those types
23  of things that we were doing during that time
24  of the year he was hired.
25      Q.  A guy that's a diesel mechanic,

Page 41

1   he'd probably be a pretty valuable employee,
2   wouldn't he?
3           MR. DUKES:  Object to the form.
4       A.  Could be.
5       Q.  I mean --
6       A.  He wasn't there long enough to be
7   anything other than a guy to cut grass.
8       Q.  Okay.  Well, a guy who worked as
9   a diesel mechanic could probably work on your
10  equipment, wouldn't you think?
11          MR. DUKES:  Object to the form.
12      A.  He could, sure.
13      Q.  Yeah.  Is, in fact, some of your
14  equipment diesel equipment?
15      A.  Sure.  We have diesel equipment.
16      Q.  What kind of diesel equipment,
17  tractors or . . .
18      A.  Tractors, sure.  Heavy equipment.
19  At that time, I had a few tractors and a
20  backhoe.
21      Q.  Bulldozer, is that a diesel?
22      A.  It is.  But I didn't have one at
23  that time.
24      Q.  Oh, okay.  What about your
25  skidder?

Page 42

```
 1        A. Didn't have one at that time.
 2        Q. Are they diesel?
 3        A. Yes.
 4        Q. So a diesel mechanic would be a
 5   pretty valuable employee to a 13,000-acre
 6   timber operation, wouldn't they?
 7        MR. DUKES: Object to the form.
 8        A. Could be, yes.
 9        MR. ROBERSON: Off the Record.
10        THE VIDEOGRAPHER: We're going
11             off the Record at 12:59 p.m.
12        (A brief recess was taken.)
13        THE VIDEOGRAPHER: Back on the
14             Record at 1:22 p.m.
15   BY MR. ROBERSON:
16        Q. Mr. Carroll, let me show you what
17   I've marked as Plaintiffs' Exhibit 8. And do
18   you recognize that document?
19        (Whereupon Plaintiffs' Exhibit
20             No. 8 was marked for
21             identification and attached
22             hereto.)
23        (Witness reviewed document.)
24        A. I do.
25        Q. What is Exhibit 8?
```

Page 43

```
 1        A. It's a management structure of
 2   Mid-State Land and Timber.
 3        Q. And is it dated?
 4        A. No, it is not.
 5        Q. All right. Well, who -- let me
 6   see it. All right. And this was produced in
 7   another case, correct, the Norris Foster
 8   case? It says Defendant's Document
 9   Production 0001.
10        A. Okay.
11        Q. And I'll also show you Exhibit 9
12   and ask you if you recognize that document?
13        (Whereupon Plaintiffs' Exhibit
14             No. 9 was marked for
15             identification and attached
16             hereto.)
17        A. I do.
18        Q. And what is Exhibit 9?
19        A. It's an employee organizational
20   chart.
21        Q. Is that when you were the
22   manager?
23        A. That's correct.
24        Q. Okay. And neither of these
25   documents lists Anthony as any kind of
```

Page 44

```
 1   manager, correct?
 2        A. I can personally speak for the
 3   last one, that he was not there when I was
 4   there. So he wouldn't be on that one. For
 5   the other one, I don't know.
 6        Q. Well, it doesn't list him as a
 7   manager, does it?
 8        A. No, it doesn't.
 9        Q. I'm going to show you what I'll
10   mark as Exhibit 10 to your deposition. It's
11   formally Defendant's Exhibit 19, and it's a
12   document dated 12/2/04. Now, who are the
13   Mid-State Board of Directors?
14        (Whereupon Plaintiffs' Exhibit
15             No. 10 was marked for
16             identification and attached
17             hereto.)
18        A. I do not know.
19        Q. I don't know either. That'd be
20   nice to know, wouldn't it?
21        MR. DUKES: Object to the form.
22        Q. Have you made any inquiry into
23   that?
24        A. No, sir.
25        Q. You've been -- you were a manager
```

Page 45

```
 1   there for over a year. Did you ever meet
 2   anybody that was on the Board of Directors?
 3        A. I just met two people that
 4   interviewed me, plus Mr. Broadhead.
 5        Q. Who interviewed you?
 6        A. Ms. Sherry Howell and Mr. Bob
 7   Rae.
 8        Q. Okay. And then Mr. Broadhead is
 9   the owner, correct?
10        A. That's correct.
11        Q. Well, this document was made
12   available to me, and it references approval
13   of the Board of Directors, and it references
14   that Anthony is the hunt manager in December
15   of 2004. You see that?
16        A. It does.
17        Q. Now, what is Roy Lee?
18        A. Farm manager.
19        Q. Okay. Now, do you know when
20   Mr. Byron Davison left the employ of
21   Mid-State?
22        A. I don't know the exact date.
23        Q. Do you know the circumstances
24   surrounding his departure?
25        A. I don't know that.
```

Page 46

1    Q.  Do you know if anyone replaced
2  him as the hunt manager?
3    A.  My understanding is that as soon
4  as Mr. Davison left, that Anthony assumed
5  that position immediately and for a very
6  short time.  And then he wasn't there much
7  more probably than a month, I guess.
8    Q.  He went back to school?
9    A.  I guess so.
10    Q.  About January?
11    A.  I'm not sure of the date.
12    Q.  Okay.  And then who assumed that
13  position?
14    A.  Which position?
15    Q.  The hunt manager.
16    A.  The hunt manager.  Well, once the
17  season is over with, I don't know necessarily
18  there would be a hunt manager for that
19  particular time.
20    Q.  Well, when was deer season over?
21    A.  End of January.
22    Q.  Yeah.  So who was the hunt
23  manager for January?
24    A.  I don't -- I would have thought
25  Anthony was until the end of the season.  I

Page 47

1  thought that's what you were just telling me.
2    Q.  No.  I'm telling you Anthony went
3  back to school, I believe, in January, first
4  of January.
5    A.  I don't know that.  I don't know.
6    Q.  Okay.  Well, have I identified
7  every reason that you claim that you've paid
8  Joel Norman $70,000 a year?
9    MR. DUKES:  Can you restate that
10      question for me?
11    MR. ROBERSON:  Sure.
12    MR. DUKES:  Or if you want to
13      repeat it, I'm not . . .
14  BY MR. ROBERSON:
15    Q.  First of all, did you pay Joel
16  Norman $70,000 a year?
17    A.  I didn't.  I had to get
18  permission to pay him $70,000.
19    Q.  Okay.  Whose permission did you
20  get?
21    A.  I had to talk with Ms. Sherry
22  Howell and Mr. Bob Rae.
23    Q.  Okay.  Did you get their
24  permission?
25    A.  And ultimately, probably

Page 48

1  Mr. Broadhead, although that I didn't speak
2  to him personally, I did get permission.
3    Q.  And Joel Norman has a two-year
4  degree, correct?
5    A.  He does.
6    Q.  He was working at a plantation in
7  Georgia, right?
8    A.  Managing it, yes.
9    Q.  He's handled bird dogs for a long
10  time, right?
11    A.  He has.
12    Q.  And he's -- he's experienced in
13  quail hunting; is that fair?
14    A.  Something I needed at the time,
15  yes.
16    Q.  Okay.  Is there any other reason,
17  other than those things, why you paid --
18  agreed to pay Joel Norman $70,000?
19    MR. DUKES:  Object to the form,
20      that it's been asked and
21      answered.
22    Q.  You can answer.
23    MR. DUKES:  Go ahead.
24    A.  That's what it took to get him to
25  come to work for us.

Page 49

1    Q.  Okay.  How much was he making at
2  the place in Georgia?
3    A.  I don't know.
4    Q.  Well, then how do you know that's
5  what it took?
6    A.  That's what it took for him to
7  say yes to come to work at Sedgefields.
8    Q.  What did y'all offer him
9  originally?
10    A.  Probably around 55, $60,000.
11    Q.  And he said no?
12    A.  That's correct.
13    Q.  And then did you offer him 60?
14    A.  I don't remember the exact
15  process.
16    Q.  Are there any documents about
17  that?
18    A.  No, sir.
19    Q.  All right.  Well, we were going
20  through this chart, and I'm -- do y'all have
21  charts like this, the payroll and employees
22  for the years 2004 and 2003?
23    A.  Which page number is that?
24    Q.  That's 36.
25    A.  '03 and '04 are on page 35.

Page 50

1    Q. Great. Okay. Well, let's go
2  through what I've marked as Exhibit 5, and
3  you just tell me what race these people are
4  and if they're male or female, okay?
5    A. Uh-huh (affirmative response).
6    Q. And we said -- we agreed that
7  Corey Balkcom is a black male. What about
8  William Beckwith?
9    A. He's a white male.
10   Q. And his rate of pay was what?
11   A. It was $8 an hour.
12   Q. Okay. Now, why was he paid $8 an
13 hour?
14   A. Well, I hired him --
15   MR. DUKES: Let me -- who are you
16     asking about?
17   MR. ROBERSON: William H.
18     Beckwith who was hired on
19     8/5/2005.
20   MR. DUKES: Object to the form.
21     It's outside the scope of
22     the 30(b)(6) deposition
23     notice, and it's been asked
24     and answered.
25

Page 51

1  BY MR. ROBERSON:
2    Q. You can tell me.
3    MR. DUKES: Well, I'll tell him
4      if he can tell you.
5        But go ahead and
6      answer until I tell you you
7      can't.
8    A. He was paid that rate because I
9  hired him as an hourly worker and a night
10 watchman.
11   Q. Okay. I know about you, David
12 Carroll. Norris Foster, he's a black male,
13 correct?
14   A. Correct.
15   Q. And he was paid $7 an hour,
16 correct?
17   A. Correct.
18   Q. And he was hired, at least this
19 document -- actually, Norris was rehired. Do
20 you understand that?
21   A. I do.
22   Q. He worked at Sedgefields prior to
23 this, but he was rehired on February 8th,
24 2005, correct?
25   A. Yes.

Page 52

1    Q. All right. Now, Jeffrey Harris
2  was hired 9/16/2005. What race is he?
3    A. Black male.
4    Q. And how much was he paid?
5    A. $7 an hour.
6    Q. Now, who is Stacy Howington?
7    A. I do not know.
8    Q. Hired in December of '04. Only
9  worked four hundred and sixty-one hours. Do
10 you know Stacy, if that's a male or a female?
11   A. I don't know.
12   Q. Okay. Well, did you make any
13 inquiry?
14   MR. DUKES: That's outside the
15     scope of a 30(b)(6)
16     deposition notice.
17   Q. Did you make any inquiry to find
18 out who Stacy was?
19   A. I don't have any knowledge of who
20 Stacy was.
21   Q. Do y'all have any documents for
22 Stacy --
23   A. I haven't seen --
24   Q. -- an application or anything?
25   A. No documents that I've seen, no,

Page 53

1  sir.
2    Q. All right. The next one -- well,
3  Stacy's paid $9 an hour. And we'll just --
4  I'm going to put a question mark, okay?
5  Because we don't know if that's a male,
6  female, or black or white, correct?
7    A. Correct.
8    Q. Okay. William Hubbard?
9    A. A white male.
10   Q. He's paid $8 an hour?
11   A. Yes.
12   Q. Hired December 9th, 2005?
13   A. Yes.
14   Q. Okay. And why was he paid $8 an
15 hour?
16   A. I hired him because he was very
17 proficient at what he did, which was run
18 heavy equipment. I needed that. It was a
19 critical time.
20   Q. All right. Roy Lee, he's a black
21 male, correct?
22   A. Yes.
23   Q. Now, it's got hours. And Roy Lee
24 for the year 2005 worked 2,944 hours; is that
25 correct?

Page 54

```
 1        A.  I don't know if that's correct.
 2  I can tell you that when I came to work there
 3  in 2005, Roy Lee was an hourly employee and
 4  was switched to management during that year.
 5  So I don't know how those hours would
 6  actually reflect the total number of hours
 7  that were worked during that year.
 8        Q.  I mean, that's what -- I read
 9  correctly what's on this document, didn't I?
10        A.  You did.
11        Q.  Okay.  You're just telling me you
12  don't know if that is accurate; is that what
13  you're telling me?
14        A.  Considering he went from hourly
15  to salary, I don't know if that's accurate or
16  not.
17        Q.  Do you know if they still tracked
18  his hours after he went to salary?
19        A.  I don't know.
20        Q.  All right.  Willie Mack?
21        A.  Black male.
22        Q.  What's his rate of pay?
23        A.  $7.50 an hour.
24        Q.  Okay.  And he was hired in 4/2 of
25  '04, correct?
```

Page 55

```
 1        A.  That's correct.
 2        Q.  And he worked 2,167 hours,
 3  correct?
 4        A.  That's correct.
 5        Q.  Dorotea Norman -- I'm sorry,
 6  Nopal, Dorotea Nopal?
 7        A.  I do not know that person.
 8        Q.  Okay.  She only worked about
 9  forty-four hours in March, so we'll put a
10  question mark there.
11        Joel Norman?
12        A.  White male.
13        Q.  Okay.  Demetrius Parham?
14        A.  Black male.
15        Q.  Denise Pierce?
16        A.  White female.
17        Q.  Griselda Tirado?
18        A.  Griselda was not working there at
19  the time that I came there, but I know who
20  she is.
21        Q.  What race is she?
22        A.  She is Latin, a Mexican.
23        MR. DUKES:  Hispanic.
24        THE WITNESS:  Hispanic.  Thank
25        you.  My apologies.
```

Page 56

```
 1        Q.  All right.  If I put H-I-S-P --
 2  okay.
 3        All right.  Brenda Traver?
 4        A.  Tarver.
 5        Q.  Tarver?
 6        A.  Black female.
 7        Q.  And then is that Henry Tarver
 8  also?
 9        A.  That's correct.  Black male.
10        Q.  Are they related?
11        A.  No.
12        Q.  They just have the same last
13  name?
14        A.  That's correct.
15        Q.  Okay.  Charlie Walker?
16        A.  I don't know Charlie.
17        Q.  Okay.  It looks like he's the
18  lowest paid guy here.  You don't know what he
19  did?
20        A.  No, sir.
21        Q.  Katie Woods?
22        A.  Black female.
23        Q.  Okay.  All right.  Then we'll go
24  down to 2006.  It looks like there are fewer
25  employees in 2006; is that -- is that
```

Page 57

```
 1  correct?  Do you agree with that?
 2        A.  Compared to the list in 2005, it
 3  is, yes.
 4        Q.  Okay.  We've got you.  You're a
 5  white male.  Norris Foster.  Now Norris only
 6  worked -- is that seventy hours in 2006?
 7        A.  That's correct.
 8        Q.  Now, does that mean that -- do
 9  y'all hold back; that is, do you get your
10  pay --
11        A.  Every two weeks.
12        Q.  So he actually worked that time
13  in 2005; is that correct?
14        A.  That's correct.
15        Q.  Okay.  And so Norris is right
16  that he got a raise after he got fired?
17        A.  That's not correct.  The raise
18  was established before he was fired.
19        Q.  Okay.  It was established, but it
20  actually showed up on the check he received
21  after he was fired; is that fair?
22        A.  I would think that's fair, yes.
23        Q.  Okay.  So he's a black male, and
24  he got a fifty-cent raise that was
25  established in December, but it didn't show
```

Page 58

1  up or appear on his check until January,
2  correct?
3      A.  That's correct.
4      Q.  And he was fired at the end of
5  December, correct?
6      A.  That's correct.
7      Q.  Okay.  And then we've got Forest
8  Hamm?
9      A.  A white male.
10     Q.  And he's paid $8 an hour?
11     A.  That's correct.
12     Q.  Hired January 20th, 2006?
13     A.  That's correct.
14     Q.  Now, see, look at Norris Foster.
15 On this one, it says his date of hire is
16 9/14/99?
17     A.  That must have been the original
18 date he was hired the first time around.
19     Q.  Right, okay.  Jeffrey Harris,
20 he's a black male?
21     A.  Yes.
22     Q.  And William Hubbard is a white
23 male?
24     A.  Yes.
25     Q.  Roy Lee is a black male?

Page 59

1      A.  Yes.
2      Q.  Now, would this only reflect --
3  since Mid-State was sold on May the 19th,
4  this would only reflect wages earned between
5  January and May; is that --
6      A.  That's correct.
7      Q.  We've got Willie Mack, and he's
8  paid in 2006 $8 an hour?
9      A.  Yes.
10     Q.  And he's a black male, correct?
11     A.  Yes.
12     Q.  Joseph May is a white male?
13     A.  Yes.
14     Q.  Joel Norman is a white male.
15 Demetrius Parham is a black male, correct?
16     A.  Correct.
17     Q.  And Denise -- now, do you see --
18 does it look like Denise goes to a salary in
19 2006?
20     A.  She did.
21     Q.  Did you do that?
22     A.  I did.
23     Q.  Why?
24     A.  I requested that all my managers
25 be placed on salary.

Page 60

1      Q.  Okay.  Henry Tarver is a black
2  male?
3      A.  Yes.
4      Q.  And Brenda Tarver is a black
5  female, and Katie Woods is a black female,
6  correct?
7      A.  Correct.
8      Q.  Okay.  All right.  Let me go back
9  to -- was it page 35 or 36?
10     A.  Thirty-five.
11     Q.  Are you looking at 35?  Let me
12 just mark it.  I can't find mine.  Mr.
13 Carroll, if you would, just do the same
14 thing.  And I'll ask you, in order to make a
15 Record, take my pen and read the name of the
16 individual, the date he's hired -- or he or
17 she is hired, and then write out beside it.
18 If it's a white male, put WM.  If it's a
19 black male, BM.  And female, say the same
20 thing, okay?
21         (Whereupon Plaintiffs' Exhibit
22          No. 11 was marked for
23          identification and attached
24          hereto.)
25         MR. DUKES:  Object to the form.

Page 61

1          It's outside the scope of a
2          30(b)(6).
3          MR. ROBERSON:  Well, you can
4          object.
5  BY MR. ROBERSON:
6      Q.  Go ahead and do it, Mr. Carroll.
7          MR. DUKES:  To the extent that
8          you know.
9          MR. ROBERSON:  Yeah.
10     A.  Okay.  Anthony Dickey.  Do you
11 also want the date of hire?
12     Q.  Date of hire, yes, sir.
13     A.  5/24/2003.
14     Q.  And his hourly rate?
15     A.  $8.50.  And I believe he is a
16 white male.
17     Q.  Okay.
18     A.  Joseph Lee, 4/5/2002.  $6.50.  I
19 don't -- don't know him.
20     Q.  Is that Roy Lee's cousin?
21     A.  I don't know.
22     Q.  I do.  And he's a black male.  So
23 put black male on that.
24     A.  Roy Lee, 9/8/2000.  $11 an hour.
25         Denise Pierce --

Page 62

1    Q. Roy Lee is a black male, right?
2    A. Yes.
3    Q. Okay. Go ahead.
4    A. Denise Pierce, a white female,
5 9/6/2002. Hired at $10 an hour.
6    Q. She was -- is that the year she
7 started?
8    A. I'm assuming.
9    Q. Do you know?
10    A. I don't know. But I think it was
11 about then.
12    Q. Okay. When she started, she was
13 paid $10 an hour; is that correct?
14    A. That's what it says on this
15 sheet.
16    Q. Okay.
17    A. Rosa Rosales, 12/2/2003. $5.65.
18 I don't know her.
19    Q. Okay.
20    A. Anthony Ryan, III, 3/19/2003.
21 $6.50 an hour. I don't know him.
22    Manuel Silva, 11/9/2003, at 6 an
23 hour. I don't know him.
24    Charles Sykes, 2/1/2003. Was
25 paid looks like a salary of 461.54 biweekly.

Page 63

1 And he is a white male, I assume.
2    Q. That's the wildlife biologist; is
3 that correct?
4    A. He was hourly and contract
5 laborer as well I do believe.
6    Q. Yeah. I've seen some documents
7 about him. Okay.
8    A. Kevin Terrell, 10/20/2003. $6 an
9 hour. Don't know him.
10    And Griselda Tirado, 11/19/2003.
11 $6.00 an hour. And we said she was a
12 Hispanic female.
13    That's all for 2003 that I have.
14 2004?
15    Q. Yes, sir.
16    A. Fortino Cisneros, 4/2/2004.
17 $6.50. I don't -- well, I do know who he is.
18 He is a Hispanic male.
19    Q. Was he an outside laborer or
20 had --
21    A. At that time, I don't know. But
22 he -- I know that he is.
23    Q. Okay.
24    A. Anthony Dickey -- the ones I've
25 already mentioned, you want me to do them

Page 64

1 again as well?
2    Q. Anthony Dickey, what was he hired
3 at when he was hired in 2004?
4    A. $8.50. He's a white male.
5    Q. Okay.
6    MR. DUKES: Object to the form.
7    A. Stacy Howington, I don't know.
8    Roy Lee, black male. $11 an
9 hour. 9/8/2000.
10    Willie Mack, black male.
11 4/2/2004. $7.00 an hour.
12    Sonya Martinez, I don't know.
13    Oscar Montiel, I don't know.
14    Q. What hourly rate were those
15 gentleman paid?
16    A. Six and 6.50 an hour.
17    Q. Okay.
18    A. Dorotea Nopal, don't know. $7 an
19 hour.
20    Demetrius Parham is a black male.
21 7/23/2004. $6.50 an hour.
22    Denise Pierce, a white female.
23 9/6/2002. $10.75 an hour.
24    Rosa Rosales, I don't know. She
25 was paid $6.25 an hour.

Page 65

1    Raul Secundino, don't know.
2 $7.00 an hour.
3    Manuel Silva, I don't know.
4 $6.00 an hour.
5    Charles Sykes, a white male.
6 Again, he was paid salary and hourly. It
7 says 461.54 biweekly.
8    Kevin Terrell, I don't know.
9 $6.00 an hour.
10    Griselda Tirado, Hispanic female.
11 $7.00 an hour.
12    And then the last one on the list
13 is Charlie Walker. I don't know. $5.59 an
14 hour.
15    Q. Okay.
16    A. Do you mind if I get the rest of
17 those back that I gave you?
18    Q. Oh, I'm sorry.
19    A. I'm trying to keep them in
20 halfway order, so I will know where
21 everything is.
22    Q. I'll try to do that, too. See if
23 those are --
24    A. That's fine. That stack right
25 there you've got your hands on is the rest of

Page 66

1 them, I think. Let's see.
2      Q.  Well, make sure.
3      A.  And that group right there, I
4 think. Let's see, six and seven. Okay.
5 That's all of them except -- thank you. I
6 think that's your copy.
7      Q.  Okay. Well, do you know -- who
8 was the gentleman that testified -- or not
9 testified, but allegedly told Denise Pierce
10 that Norris Foster was a thief? Do you know
11 who I'm talking about, a guy that used to
12 work at Sedgefields that they ran off?
13      MR. DUKES:  Object to the form.
14      A.  You're saying that this guy was
15 run off or the thief was run off or who was
16 run off?
17      Q.  No. I'm saying this guy used to
18 be a manager at Sedgefields. Is it Joe?
19      A.  I can't think of his name.
20      Q.  Do you know who I'm talking
21 about?
22      A.  I've heard conversations of three
23 or four guys who worked there at one time or
24 another who didn't, but I don't know this
25 exact individual's name.

Page 67

1      Q.  This guy worked there when
2 Broadhead's son worked there.
3      A.  Yeah. I don't -- I don't know
4 him.
5      Q.  Because they used to allegedly
6 use drugs together. You don't know who I'm
7 talking about?
8      A.  Huh-uh (negative response).
9      Q.  No? Is that a no?
10      A.  That's a no. I'm sorry.
11      Q.  All right. Well, where's that
12 boy's deposition? I think he names -- Joe
13 McEarn (phonetic) or something like that.
14      Do you know -- other than Byron
15 Davison, Donna Davison, and yourself and Roy
16 Lee, do you know anybody else that's worked
17 there at Mid-State in management?
18      MR. DUKES:  Object to the form.
19      Other than what's already
20      been stated? Other than
21      what he's already testified
22      to?
23      Q.  Do you know anybody else that's
24 worked there in management?
25      A.  The only other name that comes to

Page 68

1 mind, and I don't know if it was for
2 Mid-State or the previous owner, was a
3 gentleman named Mark Greg. But I believe he
4 worked there before the Broadhead's purchased
5 it.
6      Q.  Okay. Well --
7      McFerrin? Do you know a guy
8 named McFerrin?
9      A.  No. And we mentioned the Sykes
10 fellow that was --
11      Q.  Yeah. Chuck Sykes, he was a
12 wildlife biologist, right?
13      A.  That's right.
14      Q.  Now, is he the one that sued you
15 or was that the other guy?
16      A.  I'm not aware of him suing me,
17 suing the company. He's listed as wildlife
18 manager on this sheet.
19      Q.  Okay. Was there another guy
20 named Dewayne?
21      A.  I don't know a Dewayne.
22      Q.  Okay. Do you know if Mid-State
23 was sued by a wildlife biologist?
24      A.  I don't.
25      Q.  Not during your tenure?

Page 69

1      A.  That's correct.
2      Q.  All right. Have you got all of
3 Roy Lee's W-2 forms over there? I want you
4 to find them if you do.
5      A.  Okay.
6      Q.  If you would, let me know what
7 page they are.
8      A.  All right. I'll just give them
9 to you in chronological order as I come to
10 them, if that's all right.
11      Q.  Yes, sir.
12      A.  The first one is on page 38.
13      Q.  Okay.
14      A.  It's 2003.
15      Q.  How much did he make as a W-2
16 employee in 2003?
17      A.  Wages, tips, total and everything
18 is 35,352.61.
19      Q.  Okay. Does that have another
20 year on there for Roy?
21      A.  That's just 2003.
22      Q.  Right. There's two W-2s. Who's
23 the other one?
24      A.  Oh, it's just a different
25 employee.

Page 70

1   Q. Okay. All right. Go to the next
2  one.
3   A. Okay. 2004.
4   Q. What page are you on?
5   A. Forty-three.
6   Q. Okay. What's his wages?
7   A. Down at the bottom it says
8  44,234.
9   Q. Okay.
10   A. Page 54. 2005 year.
11   Q. Okay.
12   A. The figure at the bottom says
13  48,504.60.
14   Q. Okay. And 2006?
15   A. Yes. Page 62 -- or I can't tell.
16  It may be 3, 63. 2006, total of $19,399.80.
17   Q. That's through May --
18   A. That's correct.
19   Q. -- or part of May, correct?
20   A. Yes, sir.
21   Q. All right. Now, when did Mr. Lee
22  go on a salary?
23   A. Would be sometime during the year
24  of 2005.
25   Q. Well, do you know when it was?

Page 71

1   A. Seems like I made the request
2  during the middle of the summer, so I would
3  assume sometime toward the end of the summer.
4   Q. Well, when did you hire Joel
5  Norman?
6   A. He was hired in September.
7   Q. Yeah. Do you think you might
8  have made it -- since you hired him at a
9  salary, you might have put Mr. Lee on a
10  salary in September?
11     MR. DUKES: Object to the form.
12   A. No. That was done -- or was in
13  the process of doing that before I ever
14  thought about hiring Joel Norman or anybody
15  else. Roy came to me and asked me about it.
16  And I agreed that I would do it for him.
17   Q. Okay. Well, do you know at what
18  time he started being paid effective on a
19  salary?
20   A. I don't.
21   Q. Would y'all have a payroll record
22  that would tell you?
23   A. I would have to check with the
24  home office. I don't have it in front of me.
25   Q. Yeah. Well, y'all have -- don't

Page 72

1  y'all give employees checks?
2   A. Yes, sir.
3   Q. I mean, a paycheck. And so that
4  would reflect when his raise was effective,
5  wouldn't it?
6   A. It should, yes, sir.
7   Q. Well, can you undertake to locate
8  the first salaried check that Roy Lee
9  received and provide that to Mr. Dukes?
10   A. Yes, sir.
11   Q. Okay. And you'll need to do it
12  right away, because I've got to write a brief
13  right away, okay? Fair enough?
14   A. Fair enough.
15   Q. Now, did you provide any
16  documents which relate to the purchase price
17  and sales price of Sedgefields Plantation?
18   A. I have not.
19   Q. And why not?
20     MR. DUKES: We objected to it.
21         The Court didn't order us to
22         produce it. We agreed to
23         provide someone to testify
24         about the sales price and
25         purchase price generally.

Page 73

1         And he's ready to do that.
2   Q. Okay. When did Mid-State Land
3  and Timber purchase Sedgefields?
4   A. I'm not sure of the exact date.
5   Q. What year?
6   A. I believe it was in '98.
7   Q. Okay. And what was the amount?
8   A. Or '96.
9     MR. DUKES: If you don't know,
10         don't --
11   A. I don't -- I don't know. I don't
12  know the exact date. I'm sorry.
13   Q. Well, do you know who purchased
14  it? Did Mid-State?
15   A. I don't know the exact company
16  name that purchased it, no, sir.
17   Q. Did they get a deed? They got
18  13,000 acres in Bullock County. Did they get
19  a deed to it?
20   A. I'm assuming they did.
21   Q. Well, wouldn't that -- wouldn't
22  there be a record of that, Mr. Carroll?
23   A. Yes, sir.
24   Q. How much did they pay?
25   A. The price that was paid for it, I

Page 74

1 believe was 14 million.
2 Q. I see. And did that include all
3 of that acreage and all of the structures on
4 that?
5 A. I don't know what structures were
6 on there at the time, but I'm sure whatever
7 was there went with it.
8 Q. Well, they had a hunting camp
9 there before, didn't they, a lodge?
10 A. A lodge, yes.
11 Q. Sure. Did that include any
12 equipment or do you know?
13 A. I don't know.
14 Q. Well, see, that's why we need to
15 get a copy of those documents, don't we?
16 MR. DUKES: Object to the form.
17 Q. Because that would tell us what
18 they bought for $14 million, wouldn't it?
19 A. Yes, sir.
20 Q. Okay. And they sold it in May of
21 2006; you agree with that?
22 A. Yes, sir.
23 Q. And what did they sell it for?
24 A. The price was around 32 million.
25 Q. Thirty-two million. So you don't

Page 75

1 know when they bought it. Do you think it
2 could have been as late as 1999?
3 A. I don't know.
4 Q. Well, if Norris Foster, if his --
5 if it shows that he was working for them in
6 1999, for Mid-State Land and Timber, do you
7 think they may well have purchased it in
8 1999?
9 MR. DUKES: Object to the form.
10 A. I don't know.
11 Q. Well, let's just assume that they
12 purchased it in 1998 or 1999. So in seven or
13 eight years, what's that, about 125 percent
14 gain?
15 MR. DUKES: Object to the form.
16 Q. Do you know?
17 A. I don't know what the property
18 was of anyone that sold it.
19 Q. And, of course, that would be a
20 long-term capital gain, wouldn't it?
21 MR. DUKES: Object to the form.
22 A. I don't know.
23 Q. Well, if you have an asset -- you
24 agree with me that Mid-State is an -- that
25 Sedgefields was an asset, don't you?

Page 76

1 A. I guess it could be considered
2 that.
3 Q. Yeah. If they held it for more
4 than a year, and then they made a gain, it
5 would be a long-term gain, correct?
6 MR. DUKES: Object to the form.
7 Calls for a legal
8 conclusion --
9 A. You can answer.
10 MR. DUKES: -- beyond the scope.
11 MR. ROBERSON: Doesn't call for a
12 legal conclusion.
13 MR. DUKES: Yeah, it does. I'm
14 not a tax expert. I don't
15 think he is.
16 MR. ROBERSON: Well, I'll be glad
17 to swear me in and testify,
18 because I am.
19 BY MR. ROBERSON:
20 Q. So for the whole time that they
21 operated this hunting lodge, they lost money
22 every year, correct?
23 A. I do not know.
24 Q. Well, for the time period that
25 you operated it as the manager, did they lose

Page 77

1 money?
2 A. Yes.
3 Q. Would you expect them to lose
4 money?
5 MR. DUKES: Object to the form.
6 A. Possibly.
7 Q. Well, you've been in the hunting
8 business for how many years, Mr. Carroll?
9 A. Probably at least ten.
10 Q. Yeah. You ran a hunting camp,
11 didn't you?
12 MR. DUKES: Object to the form.
13 Q. Five Star?
14 A. Yeah, I did.
15 Q. Yeah. Did they own that property
16 or did they just lease it?
17 A. Some of both.
18 Q. Okay. Well, you don't really
19 expect to make a profit by running the
20 hunting operation, do you?
21 A. Some do, and some don't.
22 Q. Okay. Where you make the money
23 is in the appreciation of the land, correct?
24 MR. DUKES: Object to the form.
25 It's outside the scope of a

Page 78

1              30(b)(6) deposition.
2      Q.  You can answer.
3      A.  That's possible.
4      Q.  Well, we know that it's not only
5  possible, the land appreciated from
6  14 million to 32 million in this case, didn't
7  it?
8      A.  That's what it sold for.  I don't
9  know about the appreciation of it.
10     Q.  Well, there's timber on the land,
11 isn't there?
12     A.  Yes.
13     Q.  Don't you expect that that timber
14 is going to get more valuable as time passes?
15     A.  That's a possibility.
16     Q.  Okay.  That's a hope, isn't it?
17     A.  That's a hope.
18     Q.  So if you can sustain, that is,
19 you can endure the losses for the time that
20 you run the hunting camp, then you can make
21 up the money.  They didn't have $18 million
22 in losses during the time that they operated
23 this hunting camp, did they?
24     MR. DUKES:  Object to the form.
25     A.  I don't know.

Page 79

1      Q.  What did -- in the year that you
2  ran the hunting operation, how much did they
3  lose?
4      A.  I don't know the exact figure.
5      Q.  Well, how much?  Was it less than
6  a million dollars?
7      A.  Probably right at a million for
8  that particular year.
9      Q.  That they lost?
10     A.  It's a possibility.
11     Q.  What was your budget?  Your
12 budget wasn't even a million dollars, was it?
13     A.  It was close to a million.
14     Q.  Well, they made some money; that
15 is, they generated some revenue, didn't they?
16     A.  A little bit, yes.
17     Q.  They charged $5,000 a hunt,
18 correct?
19     MR. DUKES:  Object to the form.
20     A.  There's a possibility that you
21 can take a hunt that's $5,000, yes.  A
22 package, let's put it that way, not a hunt.
23     Q.  Well, that's for four quail
24 hunters for a weekend, right?
25     A.  That's correct.

Page 80

1      Q.  Okay.  And, of course, every year
2  that you make a loss, you get some tax
3  benefit for that, don't you?
4      MR. DUKES:  Object to the form.
5         It's outside the scope.
6      Q.  Do you know?
7      MR. DUKES:  Calls for a legal
8         conclusion.
9      Q.  You can answer.
10     A.  I would think so.
11     Q.  Now, one of the areas that I
12 wanted to talk to you about today concerns
13 tips.  And I asked that you provide me with
14 documents that would demonstrate the tips
15 received by employees of Mid-State Land and
16 Timber.  I'm not talking about the lodge
17 employees or the people that waited on
18 tables.  Those aren't the tips I'm talking
19 about.  I'm talking about the tips for the
20 hunt -- from the hunters, okay?
21     A.  Uh-huh (affirmative response).
22     Q.  Is that a yes?
23     A.  Yes.
24     Q.  Have you produced those documents
25 to me?

Page 81

1      A.  I believe I have.
2      Q.  All right.  Tell me what number,
3  what pages they're on.
4      A.  I have page 91.
5      MR. DUKES:  Eighty-nine.
6      A.  Nine, okay.  I have one on 89.
7      MR. DUKES:  Through . . .
8      Q.  Eighty-nine through 94; is that
9  correct?
10     A.  That's correct.
11     Q.  Okay.  I'm going to just make all
12 of those pages Exhibit 12.  And we'll go
13 through it, okay.
14     A.  Okay.
15     Q.  So I can understand what these
16 documents signify.
17     MR. ROBERSON:  Let's go off the
18        Record and change tapes.
19     THE VIDEOGRAPHER:  Going off the
20        record at 2:06 p.m.
21     (A brief recess was taken.)
22     THE VIDEOGRAPHER:  Back on the
23        Record at 2:18 p.m.
24        Beginning of Tape No. 2.
25

Page 82

1   BY MR. ROBERSON:
2       Q. Mr. Carroll, I've got pages 89
3   through 94. I would ask you, if you could,
4   to explain to me what -- well, start with
5   page 89, what I marked as Plaintiffs' Exhibit
6   12. What does this document represent?
7           (Whereupon Plaintiffs' Exhibit
8           No. 12 was marked for
9           identification and attached
10          hereto.)
11      A. Page 89 is an invoice to a
12  customer, Standard Concrete Company. And it
13  shows a half-day quail hunt and gratuity to
14  be disbursed amongst three employees and the
15  amount to be disbursed.
16      Q. Okay. So this is essentially an
17  invoice which shows a $100 tip to the hunting
18  crew, the quail hunting crew, correct?
19      A. That's correct.
20      Q. But this is only for $1,000, that
21  is half a day and two hunters hunt, correct?
22      A. That's correct.
23      Q. Okay. All right. And is this
24  one that they paid on a credit card or can
25  you tell?

Page 83

1       A. I can't tell from this.
2       Q. Okay. All right. Thank you.
3   That's page 89. And does this -- do you know
4   if 89 -- it does relate to Norris, because it
5   says B.B. Norris and Jeff; is that right?
6       A. That's correct. It says a
7   three-way split of $100 between those three
8   individuals.
9       Q. Now, who were the folks -- do you
10  know who the folks were at Standard Concrete?
11      A. The gentleman's name on the
12  invoice is Mason Lampton.
13      Q. Okay. Thank you. All right. Go
14  to page 90.
15      A. Okay.
16      Q. Now -- okay. Are we just
17  referencing this thing, the reference at the
18  bottom of that page?
19      A. That is correct.
20      Q. Okay. It says tip. I will fax
21  copy of invoice to you to forward on to Ron
22  St. John, $100 to be divided between Willie
23  Mack, Jeff Harris, and Norris Foster.
24  Denise. Now, would that be something just
25  like this?

Page 84

1       A. Denise faxed that to the home
2   office. That's why her name is on the end of
3   that. She prepared the weekly payroll
4   schedule and put that note at the bottom to
5   send to the home office.
6       Q. All right. If they gave them
7   cash, there wouldn't be a document, correct?
8       A. That's correct.
9       Q. So what we have is some documents
10  that reflect -- were these credit card tips?
11      A. Either paid by check or credit
12  card, something other than cash, where I sent
13  them the bill, and they asked for the tip to
14  be included on their bill. Then there's a
15  record of it going through their payroll.
16      Q. Okay. And when they receive
17  this, the tip, whether it's by check or by
18  credit card, is that amount placed on their
19  payroll check? Do you know?
20      A. The employee?
21      Q. Yes.
22      A. Yes. Yes, it is.
23      Q. The employee, he receives --
24      A. The deductions are taken out, and
25  the remainder is placed in their payroll.

Page 85

1       Q. Does it have a place on the
2   payroll check that says tip?
3       A. I believe it does, yes.
4       Q. Okay. So if there's a difference
5   between wages and what they actually earned,
6   is that the explanation for that?
7       A. I think on the bottom of the stub
8   of the check it'll have wages. And they have
9   tips and/or other. And it'll have that line
10  item on there.
11      Q. Okay. All right. Page 91.
12  Standard Concrete Company. Again, this one
13  says B. H. Hardaway?
14      A. Different individual.
15      Q. Okay. Works at the same company?
16      A. Uh-huh (affirmative response).
17      Q. And now, this was the full-day
18  hunt, correct, for two days?
19      A. It appears to be a multiple-day
20  hunt, yes.
21      Q. All right. Tip for three
22  helpers, Norris, B.B., and Jeff. And he's
23  got a total of $150 split three ways, right?
24      A. That should be $50 per person,
25  yes.

Page 86

1    Q.  Okay.  Now, is 92 the same thing
2  as 91?
3    A.  Yes.  It has the same invoice
4  number on it.
5    Q.  Okay.  Do you know -- I mean, is
6  there a reason I've got two documents or did
7  they just --
8       MR. DUKES:  There's some
9         additional writing on it.
10   Q.  Okay.  Do you know whose writing
11 that is on page 92?
12   A.  I don't recognize that, no, sir.
13   Q.  Okay.  Page 93.  These are the
14 raises that you referred to?
15   A.  That's correct.
16   Q.  Now, this document is not dated,
17 correct?
18   A.  That's correct.
19   Q.  Do you know when this document
20 was created?
21   A.  I sent this back to Mrs. Howell
22 about the first week of December, right after
23 Thanksgiving.
24   Q.  Okay.  Now, everybody that's
25 listed at the top of this page was getting a

Page 87

1  raise, correct?
2    A.  Not everybody.
3       MR. DUKES:  Object to the form.
4    A.  In the first section, yes.
5    Q.  Yeah.  From Henry Tarver above --
6    A.  Yes.
7    Q.  -- was getting a raise, correct?
8    A.  That's correct.
9    Q.  And all of those people were
10 black, correct?
11   A.  Correct.
12   Q.  The two white guys, Will Hubbard
13 and Adam May, they just started.  They were
14 hired in -- was it November or December?  I
15 think it was November.
16   A.  Later in the year, December --
17 late November or December.
18   Q.  Right.  That is, they just were
19 hired, correct?
20   A.  That's correct.
21   Q.  And they were making $8 an hour,
22 correct?
23   A.  That's correct.
24   Q.  Okay.  And so they weren't
25 getting a raise when they just started and --

Page 88

1    A.  (Witness nodded head.)
2    Q.  Okay.  And Roy Lee was getting a
3  raise to 1,500?
4    A.  A $1,500 raise, yes.
5    Q.  I'm sorry.  You're correct.  I
6  misspoke.  You're right.
7       And Joel Norman, again, he was
8  hired in September for $70,000, right?
9    A.  That's correct.
10   Q.  So he wasn't getting a raise in
11 January, right?
12   A.  That's correct.
13   Q.  But then you were going to put --
14 make Ms. Pierce go to a salary?
15   A.  That's correct.
16   Q.  That's what you'd recommended for
17 her, okay.  And this is a document that you
18 created, correct?
19   A.  That's correct.
20   Q.  All right.  Now, but nobody was
21 getting more than a fifty-cent raise; do you
22 agree with that?
23   A.  Hourly, yes.
24   Q.  All right.  No hourly employee
25 was getting it.  And Norris Foster was

Page 89

1  getting a fifty-cent raise or that's what you
2  had recommended, correct?
3    A.  That's correct.
4    Q.  Well -- okay.  Then 94.  What is
5  94, page 94?
6    A.  It's a payroll sheet with tips
7  included.  For a line item on tips, it says
8  from 3/15/2005 to 5/19/2006.  So that would
9  be tips recorded for the 2005 portion part of
10 the year and 2006 part of the year.
11   Q.  Okay.  Is this really -- see,
12 I'm -- I'm -- I'm having trouble
13 understanding why we're dealing with certain
14 periods.  And maybe it's -- are these just
15 periods of time when they're hunting or do
16 you know why we're dealing with certain time
17 periods?
18      MR. DUKES:  This is within the
19        scope of the protective
20        order that the Court entered
21        in this case.  This is what
22        the Court ordered -- or what
23        we agreed to produce, and
24        the Court entered the
25        protective order.  So this

Page 90

1          is for the period of time
2          within the Court's
3          protective order.
4      Q. Norris Foster, it shows he
5  received $83.00 in tips. And what period of
6  time is this?
7      A. From -- that occurred somewhere
8  between 3/15 and 12/31 of 2005.
9      Q. Okay. And when you -- when we
10 say $83, are we referring to this was the
11 amount on his paystubs?
12     A. That's after taxes, yes.
13     Q. Okay. Jeff Harris got -- looks
14 like $83.34. Maybe he got an extra penny?
15     A. (Witness nodded head.)
16     Q. Roy Lee got $100. Willie Mack
17 got $133. Demetrius Parham got $50.
18        Now, William Hubbard, who only --
19 how long did he work, about a month?
20     A. No. Will was here longer than
21 that.
22     Q. Oh, okay. Was it Adam Mays?
23     A. Adam Mays.
24     Q. Okay. Will Hubbard got $175,
25 correct?

Page 91

1      A. (Witness nodded head.)
2      Q. Is that a yes?
3      A. That's yes.
4      Q. And he's a white male?
5      A. That's correct. And these aren't
6  necessarily total tips, what they might have
7  got in cash. This is obviously what's
8  reported through their paystubs.
9      Q. Well, what crew did William
10 Hubbard work in?
11     A. He worked also in the quail
12 hunting party.
13     Q. With who?
14     A. With whoever else was on the
15 party that day, whether it be Norris or
16 whether it be Jeff Harris or whomever.
17     Q. Norris Foster was fired in
18 December.
19     A. Oh, you mean after?
20     Q. Yeah.
21     A. During his tip time?
22     Q. Will Hubbard got tips in 2006.
23     A. And also, some of those tips
24 came -- he was a turkey hunting guide. He
25 was the only one I had on the plantation that

Page 92

1  could guide for turkeys. So he probably got
2  the bulk of that during turkey season.
3      Q. Okay. Well, how long did William
4  Hubbard work out there?
5      A. I'd have to go back and check the
6  records and see. But I would estimate seven
7  months.
8      Q. All right. And you've provided
9  me some documents, this Exhibit 13. That's
10 these pages. And it's 95 -- Bates stamp
11 No. 95 to page 106?
12        (Whereupon Plaintiffs' Exhibit
13         No. 13 was marked for
14         identification and attached
15         hereto.)
16     A. That's correct.
17     Q. And this just shows -- I think
18 what it shows is that Byron Davison was paid
19 through Pensacola Forestry Services in
20 2000 -- is this four; is that correct?
21     A. '04, yes.
22     Q. Okay. And these are just the
23 monthly amounts that he received?
24     A. That's correct.
25     Q. Is that correct?

Page 93

1      A. Yeah.
2      Q. All right. Now I'm going to show
3  you Exhibit 14. Do you know Anthony Dickey?
4        (Whereupon Plaintiffs' Exhibit
5         No. 14 was marked for
6         identification and attached
7         hereto.)
8      A. I have met Anthony, yes.
9      Q. Okay. Well, did he ever work for
10 you?
11     A. No, sir.
12     Q. How did you meet him?
13     A. One of the pieces of equipment
14 that we purchased from his family's company,
15 I returned to them to have some service work
16 done on it and met him there.
17     Q. What equipment?
18     A. Well, riding lawnmower.
19     Q. Have you seen Exhibit 14? It's
20 his declaration.
21     A. I have.
22     Q. In fact, when was that provided?
23     A. It says the 19th day of March,
24 2007.
25     Q. And today is the 27th day of

Page 94

```
1  March?
2      A.  That's correct.
3      Q.  So eight days ago.  And I got it
4  about two days ago from Mr. Dukes.  Did you
5  have anything to do with getting this
6  document?
7      A.  No, I didn't.
8      Q.  Did your attorney get that for
9  you?
10     A.  I don't know.  It was just in my
11 package of paperwork that I looked at.
12     Q.  Does he say anything in here
13 about ever being a manager of Sedgefields?
14     A.  I don't see the word "manager" in
15 here, no.
16     Q.  Okay.  Mr. Carroll, Sedgefields
17 -- Mid-State Land and Timber sold the
18 plantation in Bullock County to Tollisons,
19 correct?
20     A.  That's correct.
21     Q.  And that sale took place in May
22 of 2006, and they're the people that paid
23 32 million, correct?
24     A.  Yes.
25     Q.  Then you worked as the -- in the
```

Page 95

```
1  same capacity; that is as manager of the
2  plantation for Tollisons, correct?
3      A.  Correct.
4      Q.  And then they have since that
5  time now sold the plantation again; is that
6  correct?
7      MR. DUKES:  Let me stop you right
8          here.  I mean, he's here in
9          his capacity as Mid-State
10         corporate representative.
11         And I don't represent
12         Tollisons, but I would be
13         very careful.  I don't know
14         where you're going.  But
15         don't divulge any confi-
16         dential --
17     MR. ROBERSON:  I'm just going to
18         ask him what he's doing.
19     MR. DUKES:  Okay.  I just want to
20         tell him not to divulge any
21         confidential or business
22         information that may belong
23         to Tollisons.
24     MR. ROBERSON:  Well, I'm
25         certainly not trying to
```

Page 96

```
1          discover any.
2  BY MR. ROBERSON:
3      Q.  But Tollisons sold the
4  plantation, correct?
5      A.  They're in the process, yes.
6      Q.  I mean, has the sale gone through
7  or do you know?
8      A.  It's been sold in different
9  pieces, I believe.  So some probably have,
10 and some probably have not.
11     Q.  Okay.  Well, the point is,
12 Tollisons is not operating the plantation, as
13 you understand it?
14     A.  Currently?
15     Q.  Yes.
16     A.  That is correct.
17     Q.  Okay.  And so your employer at
18 Tollisons has let you go; is that fair or --
19     A.  I was -- it is fair as far as
20 being the manager of Sedgefields Plantation,
21 yes.
22     Q.  Right.  That's right.
23     A.  Yeah.
24     Q.  You're no longer the manager at
25 Sedgefields, correct?
```

Page 97

```
1      A.  That is correct.
2      Q.  But they still have retained you,
3  that is Tollisons.  You're now working as a
4  consultant in their timber operations; is
5  that fair?
6      A.  I do work for Tollison.
7      Q.  Is it -- do you have a consulting
8  relationship with them or a contract --
9      A.  Yeah.
10     Q.  -- or are you an employee?
11     A.  Well, some of both, almost.
12     Q.  Okay.  All right.  Well, you're
13 living in Auburn?
14     A.  I do.
15     Q.  Okay.  And where do you go to
16 work?
17     A.  I don't have any specific place.
18 I travel around.
19     Q.  Okay.  And does Tollisons own
20 timberlands in Alabama?
21     A.  Other than Sedgefields, at this
22 time, I don't know that they own any real
23 estate in Alabama.
24     Q.  Okay.  Well, what type work are
25 you doing for them then?
```

Page 98

1    A. Well, I do -- I do buying and
2  selling of land for them, for what you would
3  call a trader. Kind of what the gentleman
4  who purchased Sedgefields does.
5    Q. Does that mean you go and find
6  properties, and they may want to exchange
7  properties for those properties?
8    A. Well, it would be more of a
9  purchase and possibly a resale.
10   Q. Okay. Well, do you get paid when
11 the transaction occurs or do you get paid
12 every month or how do you --
13   A. Get paid a consulting -- well, a
14 commission, so to speak.
15   Q. Now, these guys like Jeffrey
16 Harris and Norris Foster and Demetrius and
17 all these people, the people that weren't in
18 management, just hourly laborers, did they
19 have health insurance?
20   A. I believe they did. It was
21 accessible to them if they wanted it.
22   Q. Okay. It was their choice
23 whether to get it or not, correct?
24   A. Yeah.
25   Q. It was made available to them.

Page 99

1  Do you know if any of them opted to obtain
2  health insurance?
3    A. I don't. I don't know.
4    Q. And other than health
5  insurance -- was that through Blue Cross or
6  do you know?
7    A. Yes.
8    Q. Other than health insurance, did
9  they have any other employment-related
10 benefits; that is like a 401(k)?
11   A. We did have a 401(k) that they
12 could participate in.
13   Q. Do you know if any of those
14 gentlemen participated in it?
15   A. I don't know.
16   Q. Okay. If they did, would
17 Mid-State match their contributions or pay
18 some percentage of their contributions?
19   A. Yes.
20   Q. All right. How much? Do you
21 know what that --
22   A. I believe they would match up to
23 3 percent of your annual pay.
24   Q. Okay. And other than those two
25 things, do you know if Mid-State provided any

Page 100

1  other employment-related benefits?
2    A. Not that I'm aware of.
3    Q. Did they get holiday pay and
4  vacation pay, that kind of thing?
5    A. Yes.
6    Q. If you had been there for a year,
7  how much vacation did you get?
8    A. I think, after a full year, you
9  were given a week with pay. And after, I
10 think it was three years, you were given
11 two-weeks pay.
12   Q. Okay. Do y'all have personnel
13 files for all employees at Mid-State?
14   A. There were personnel files there,
15 yes.
16   Q. Have you produced any personnel
17 files today?
18   A. Well, the documentation is in
19 front of me here.
20   Q. Okay. Well, for example, Kevin
21 Terrell is listed as an employee who worked
22 at Mid-State during this time period. You
23 don't -- he never worked with you, so you
24 don't know who is he, correct?
25   A. That's correct.

Page 101

1    Q. Does he have an application or
2  anything that you've seen?
3    A. I haven't seen one, no, sir.
4    Q. Well, do you know how he could
5  come to work there and not complete an
6  application? I mean, I know that you didn't
7  hire him or anything, but --
8    A. I don't know if that was possible
9  or not. I don't know.
10   Q. You'd agree with my that there's
11 not any document about Kevin Terrell, right?
12       MR. DUKES: No. Object to the
13         form. I think you're
14         misunderstanding his
15         testimony. The Court order
16         did not require us to
17         produce personnel files for
18         those employees. It only
19         said the Defendant shall
20         produce payroll information.
21   Q. Oh. So you do have personnel
22 files; you just didn't review them?
23   A. I'm assuming that there are
24 personnel files on all employees there.
25   Q. And you didn't review them?

Page 102

1    A. That's correct. I haven't
2 reviewed all of them, no, sir.
3    Q. Okay. Because you didn't want to
4 know what race he was, correct?
5        MR. DUKES: Object to the form.
6    A. No, that's not correct.
7    Q. Well . . . Did y'all have
8 written job descriptions?
9    A. No, sir. Not at the time that I
10 was the manager there.
11    Q. And while you were manager there,
12 did y'all ever do background checks?
13        MR. DUKES: Object to the form;
14            asked and answered.
15    A. I didn't do any background checks
16 on hourly employees that I hired.
17    Q. Okay. Because Jeffrey Harris
18 listed on his application that he had been
19 convicted of a crime. I just wondered if
20 y'all ever investigated that?
21    A. No. He talked to me about it
22 during the interview process.
23    Q. You knew about it?
24    A. Yes, sir.
25    Q. And you hired him?

Page 103

1    A. I did.
2    Q. And did you ever check their
3 credit?
4    A. No, sir.
5    Q. Did you ever check any reference;
6 that is, any previous employer or anything
7 like that?
8    A. Not inasmuch as maybe I ran into
9 somebody in town that they had worked for and
10 talked to them about it. But other than
11 that, no.
12    Q. I mean, you know, Union Springs
13 is kind of a small town. You normally see
14 folks there and might ask somebody if they
15 knew -- what they knew about them, that kind
16 of thing?
17    A. That's correct.
18    Q. Sort of an informal kind of chat?
19        MR. DUKES: Object to the form.
20    A. Yes.
21    Q. Okay. Well, anybody ever tell
22 you anything bad about Norris Foster?
23    A. I didn't hire Norris Foster.
24    Q. All right. Let me mark this as
25 Exhibit 15. Mr. Carroll, were you provided a

Page 104

1 copy of that deposition notice?
2        (Whereupon Plaintiffs' Exhibit
3         No. 15 was marked for
4         identification and attached
5         hereto.)
6        (Witness reviewed document.)
7    A. I believe I was, yes.
8    Q. Read the first thing that's
9 listed there for the areas of inquiry about
10 what I asked the corporate representative to
11 be knowledgeable.
12        MR. DUKES: Jerry, let me object
13            to the form of the question.
14            I don't understand the
15            purpose of the question.
16            When we -- you filed -- we
17            filed objections. You filed
18            a motion to compel. We
19            filed an opposition --
20        MR. ROBERSON: Is that an
21            objection to the form?
22        MR. DUKES: And a protective
23            order. And the Court has
24            entered an order.
25        MR. ROBERSON: Okay.

Page 105

1 BY MR. ROBERSON:
2    Q. What's the first thing that's
3 listed there? Would you read that, please,
4 sir?
5    A. Item No. 1?
6    Q. Yes.
7    A. The names, qualifications,
8 references, job descriptions, duties, salary
9 or wages, or other compensation of all
10 employees of this Defendant who worked at
11 Sedgefields Plantation during the period of
12 time from its purchase until its sale on
13 May 19th, 2006.
14    Q. What's No. 2?
15    A. All personnel files of Mid-State
16 Land and Timber Company employees who worked
17 at Sedgefields Plantation during its period
18 of operation by Mid-State Land and Timber
19 Company.
20    Q. Have you reviewed any personnel
21 files before today?
22    A. No, sir.
23    Q. Why not?
24    A. I reviewed the information that
25 was given to me by my attorney to be

Page 106

1 reviewed.
2      Q. And you didn't look at anything
3 else, did you?
4      A. No, sir.
5      Q. So if he wasn't producing it, you
6 weren't reviewing it, correct?
7      MR. DUKES: Object to the form.
8      Q. Correct?
9      A. I have not reviewed anything
10 other than what he has given me.
11      Q. Okay. That's the only thing I
12 wanted to prove, Mr. Carroll.
13      And you've produced Bates stamp
14 Nos. 1 through what page?
15      A. 106.
16      Q. Okay. Well, Mr. Carroll, I
17 represent black men; do you understand that?
18      A. If you say you do, I understand
19 it.
20      Q. Well, I represent Jeffrey Harris,
21 Henry Tarver, Demetrius Parham and -- and
22 Jeffrey Harris, and Willie Mack, and also Roy
23 Lee. Now, those four gentlemen are all
24 blacks who were hired as laborers; do you
25 agree with that?

Page 107

1      A. Yeah.
2      Q. They all worked at Mid-State as
3 laborers, outside work, correct?
4      A. (Witness nodded head.)
5      Q. Is that yes?
6      A. Yes.
7      Q. All right. None of them was paid
8 $8 an hour --
9      MR. DUKES: Object to the form.
10      Q. -- until 2006. None of them in
11 2005 or four or anytime prior to that were
12 ever paid $8 an hour?
13      A. Roy Lee was paid more than that
14 per hour.
15      Q. I understand Roy Lee, but I'm
16 just talking about these laborers.
17      A. But you mentioned him in that --
18      Q. Okay.
19      A. -- in those list of names. I'm
20 just trying to be accurate.
21      Q. Okay. Well, Roy Lee was hired as
22 a laborer originally, correct?
23      A. That's correct.
24      Q. And he was paid 6.50 an hour when
25 he was hired as a laborer. Did you know

Page 108

1 that?
2      A. If that's what his original pay
3 was?
4      Q. Yeah.
5      A. Okay.
6      Q. And you -- you hired four white
7 males in 2005 and January of 2006, and all
8 those -- all those individuals made $8 an
9 hour, correct?
10      A. That's correct.
11      Q. You hired Chance Hamm, correct?
12      A. I did.
13      Q. You hired Joseph May, correct?
14      A. Correct.
15      Q. And you hired William Hubbard,
16 correct?
17      A. Yes.
18      Q. And you also hired Mr. Beckwith,
19 right?
20      A. Yes.
21      Q. How did you hire Mr. Beckwith?
22 How did you come to know him?
23      MR. DUKES: Object to the form;
24          asked and answered. It's
25          beyond the scope of a

Page 109

1          30(b)(6).
2      Q. You can answer. You can answer.
3      MR. DUKES: He can answer when I
4          tell him to answer.
5          And it's okay to
6          answer.
7      A. I had known Mr. Beckwith for a
8 year or two before I hired him. Lives in the
9 same town that I do.
10      Q. Was he a friend of yours?
11      A. Yes.
12      Q. Did you know where he worked
13 before?
14      A. Yeah. He had -- I know where he
15 had -- had worked at different places, yes.
16      Q. What special skills did
17 Mr. Beckwith have?
18      A. I wouldn't say that he had really
19 special skills. I hired him basically, in my
20 mind, as paying him $7 an hour for labor work
21 like the rest of them. And the other dollar
22 an hour, plus a place, a mobile home, place
23 to stay, was for my night watchman's role.
24      Q. Well, was he not going to get
25 paid overtime for his hours after his labor?

Page 110

1    A. I had not figured that into the
2 way I had set it up with him, no.
3    Q. Wouldn't that violate the Fair
4 Labor Standards Act if you didn't pay a
5 person overtime wages for hours over eight
6 each -- or over forty each week?
7    A. I guess it could. But the way we
8 had it set up, I didn't think it was a
9 problem.
10    Q. Well, is there any document, any
11 writing anywhere that shows that $7 an hour
12 was for his labor and a dollar an hour was
13 for his work as a night watchman?
14    A. No, sir. There is no
15 documentation.
16    Q. Oh. We just have to take your
17 word for that, don't we?
18    MR. DUKES: Object to the form.
19    A. Yes, sir.
20    Q. Okay. Mr. Carroll, what high
21 school did you attend?
22    A. Glenwood High School.
23    Q. Where is that located?
24    A. It's north of Phenix City in Lee
25 County.

Page 111

1    Q. What kind of school is that?
2    A. It's a high school.
3    Q. Private?
4    A. It is, yes, sir.
5    Q. How many black people do they
6 have attending that high school?
7    MR. DUKES: Object to the form.
8    Q. You can answer.
9    A. I don't know the number.
10    Q. Any?
11    A. Yes.
12    Q. Scholarshipped?
13    A. Possibly.
14    Q. Athletic?
15    A. Some were, some weren't.
16    Q. Was it a Christian school -- I
17 mean, religious school?
18    A. No. It doesn't have any specific
19 religious background to it, no, sir.
20    Q. You know some private schools are
21 religious in nature, correct?
22    A. No, sir.
23    Q. This wasn't like that?
24    A. Huh-uh (negative response).
25    Q. Your kids go to public schools in

Page 112

1 Auburn?
2    MR. DUKES: Object to the form.
3    A. Yes, sir.
4    Q. Mr. Carroll, were you the person
5 who set the wages for these people?
6    MR. DUKES: Object to the form.
7    A. I was.
8    THE WITNESS: Excuse me.
9    Q. Do you know that it's wrong to
10 discriminate against someone because of their
11 race?
12    A. Yes, sir, I do.
13    Q. Do you know that that's unlawful?
14    A. Yes, sir, I do.
15    Q. And how old are you Mr. Carroll?
16    A. Forty-three.
17    Q. Did you know that it's been
18 unlawful for all the days that you've been
19 alive? Did you know that?
20    A. If you tell me, I'll assume that
21 it's true.
22    Q. Do you agree with me that a
23 person who discriminates based on race, which
24 is unlawful, should be punished?
25    A. If found that they're guilty of

Page 113

1 it, I assume they should be, yes, sir.
2    Q. If there's proof that a person
3 discriminated based on race, then that person
4 or that company should be punished; do you
5 agree with that?
6    MR. DUKES: Object to the form.
7    A. Yes.
8    Q. Well, what do you think would be
9 a fair punishment for that?
10    MR. DUKES: Object to the form.
11    A. I don't have any idea.
12    Q. Do you think that someone who's
13 been in the military for nine years and
14 served this country for nine years and has
15 worked as a diesel mechanic for twenty years,
16 do you think it would be demeaning to them to
17 pay them less money than you paid a
18 twenty-one-year-old boy?
19    MR. DUKES: Object to the form.
20    A. It would depend on the
21 circumstances.
22    Q. Yeah. Do you think that person
23 might be offended --
24    MR. DUKES: Object to the form.
25    Q. -- under those circumstances?

Page 114

1    A. I don't know.
2    Q. Well, would you be?
3        MR. DUKES: Object to the form.
4    A. Again, it would depend on the
5    circumstances.
6    Q. Well, Mr. Carroll, if Mid-State
7    Land and Timber sold this property in May of
8    2006 for $32 million, what do you think would
9    be a fair punishment for them if there's
10   evidence that they discriminated against my
11   clients on the basis of race?
12       MR. DUKES: Object to the form.
13   A. I couldn't answer that.
14       MR. ROBERSON: Thank you,
15       Mr. Carroll.
16       MR. DUKES: I've got one or two
17       follow-ups.
18           EXAMINATION
19   BY MR. DUKES:
20   Q. You testified earlier that you
21   had not inquired as to the background of
22   Byron Davison. Do you recall speaking with
23   Mrs. Howell about Mr. Davison?
24   A. I do.
25   Q. And based on that conversation,

Page 115

1    did Mrs. Howell tell you anything about his
2    background or say that anyone had been
3    stating anything about his background?
4    A. They basically -- Mrs. Howell
5    basically told me that being the husband of
6    Donna Davison -- and she was hired primarily
7    because she was in the family -- that he was
8    hired along for those same reasons.
9        MR. DUKES: That's all I have.
10       MR. ROBERSON: That's good.
11       THE VIDEOGRAPHER: This concludes
12       the deposition of David
13       Carroll. The time is
14       2:57 p.m. A total of two
15       tapes were used. We're
16       going off the Record.
17   (The videotaped deposition of
18   DAVID CARROLL concluded at
19   approximately 2:57 p.m.)
20   * * * * * * * * * *
21       FURTHER DEPONENT SAITH NOT
22   * * * * * * * * * *
23
24
25

Page 116

1    * * * * * * * * * *
2        REPORTER'S CERTIFICATE
3    * * * * * * * * * *
4
5    STATE OF ALABAMA)
6    COUNTY OF MONTGOMERY)
7
8        I, Cornelia J. Baker, Certified Court
9    Reporter, Certified Shorthand Reporter,
10   and Notary Public in and for the State of
11   Alabama at Large, do hereby certify that
12   on Tuesday, March 27, 2007, pursuant to
13   notice and stipulation on behalf of the
14   Plaintiffs, I reported the videotaped
15   deposition of DAVID CARROLL, who was first
16   duly sworn by me to speak the truth, the
17   whole truth, and nothing but the truth, in
18   the matter of JEFFREY HARRIS, WILLIE
19   BERNARD MACK, DEMETRIUS PARHAM and HENRY
20   TARVER, Plaintiffs, versus MID-STATE LAND
21   AND TIMBER COMPANY, INCORPORATED, d/b/a
22   SEDGEFIELDS PLANTATION, Defendant, Case
23   Number 2:06-cv-875-ID-CSC, now pending in
24   the United States District Court for the
25   Middle District of Alabama, Northern

Page 117

1    Division; that the foregoing pages contain
2    a true and accurate transcription of the
3    examination of said witness by counsel for
4    the parties set out herein; that the
5    reading and signing of said deposition was
6    waived by witness and counsel for the
7    parties.
8        I further certify that I am neither of
9    kin nor of counsel to the parties to said
10   cause, nor in any manner interested in the
11   results thereof.
12       This the 3rd day of April, 2007.
13
14
15
             Cornelia J. Baker
16           Certified Shorthand Reporter,
             Certified Court Reporter and
17           Notary Public for the
             State of Alabama
18
19           My Commission expires 6/9/08.
20
21
22
23
24
25