**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **NORRIS FOSTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **2:06cv405-ID** |
| | ) | |
| **MID STATE LAND &  TIMBER CO.,** | ) | |
| **INC., d/b/a SEDGEFIELDS** | ) | |
| **PLANTATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

In this lawsuit, Plaintiff Norris Foster ("Foster"), an African-American male, sues his former employer, Mid State Land & Timber Co., Inc. ("Mid State"), alleging that Mid State terminated him, paid him less than similarly-situated Caucasian employees, and assigned him undesirable tasks because of his race.  Foster brings his race discrimination claims pursuant to 42 U.S.C. § 1981.

Before the court is Mid State's motion for summary judgment.  (Doc. No. 40.) The motion is accompanied by a memorandum of law and evidence.  (Doc. No. 41.)  Mid State argues that Foster cannot establish a prima facie case of disparate treatment and that, alternatively, Foster cannot rebut the legitimate, nondiscriminatory reasons for its actions.  Foster disagrees; thus, he filed a memorandum of law and evidence in opposition to Mid State's motion.  (Doc. Nos. 44-45.)  Mid State submitted a reply.  (Doc. No. 48.)

After careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that Mid State's motion for summary judgment is due to be granted.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).  Personal jurisdiction and venue are adequately pleaded and not contested.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

2

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing that there is no dispute of material fact or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-23, 325.  The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See id. at 587.

## IV.  FACTS[1]

### A.  Mid State: Generally

From the late 1990s to 2006, Mid State owned a 13,000-acre parcel of property in Bullock County, Alabama, called Sedgefields Plantation ("Sedgefields").  Mid State managed Sedgefields primarily for deer and quail hunting for paying customers. (Carroll Dep. at 18-19, 21-22 (Ex. A to Doc. No. 41)); (Carroll Aff. ¶¶ 2-4 (Ex. B to Doc. No. 41).)  On May 19, 2006, Mid State sold Sedgefields to Tolleson Land & Timber

---

[1] The facts are presented in the light most favorable to Foster.

3

("Tolleson").  (Carroll Aff. ¶ 2 (Ex. N to Doc. No. 41).)[2]  The sale of Mid State resulted

in the termination of the employment of all of Mid State's employees at Sedgefields.

(Id.)


        B.  Mid State's Managers (Lee, Carroll and Norman) and Employees

      Roy Lee ("Lee") worked for Mid State from 2000 until Tolleson bought Mid State

in May 2006.  (Lee Decl. at 1 (Ex. 36 to Doc. No. 45).)  Lee initially was hired to work

as a laborer, but in 2004 he was promoted to a management position.  (Id.)  As a manager,

his title was deer operations manager and head of grounds crew.[3]  (Mid State Employee

Organizational Chart (Ex. 32 to Doc. No. 45)); (Norman Dep. at 67 (Ex. 2 (part 1)

to Doc. No. 45).)  As discussed in more detail in the next subsection, Lee, an African-

American male, hired Foster in February 2005 to work as an outside laborer.  (Lee Dep.

at 58-59 (Ex. I to Doc. No. 41)); (Norman Dep. at 67, 71 (Ex. 2 (part 1) to Doc. No. 45));

(Lee Decl. at 2 (Ex. G to Doc. No. 41).)

---

    [2] The court notes that Carroll submitted three affidavits which are dated August 14, 2006, February 7, 2007, and April 3, 2007.  (See Exs. B, C, N to Doc. No. 41).)

    [3] Lee was a plaintiff in a related employment discrimination lawsuit filed in this court against Mid State.  (See Harris, et al. v Mid State Land & Timber Co, Civil Action No. 2:06cv875-ID.)  In that lawsuit, Lee was joined by four other former Mid State employees: Jeffrey Harris, Willie Mack, Demetrius Parham and Henry Tarver.  Harris, Mack and Tarver are mentioned in this opinion.  The court granted summary judgment in favor of Mid State on all claims in the Harris litigation.  (See id., Orders (Doc. Nos. 54, 61).)

In April 2005, Mid State hired David Carroll ("Carroll") to manage Sedgefields.[4] (Carroll Dep. at 8 (Ex. A to Doc. No. 41).)  Carroll, the general manager and a Caucasian male, was at the top of Mid State's supervisory hierarchy.  (Mid State Employee Organization Chart (Ex. 32 to Doc. No. 45)); (Carroll Dep. at 8, 23-24 (Ex. A to Doc. No. 41).)  During the initial months of his employment, Carroll primarily used the existing staff.  (Carroll Aff. ¶ 3 (Ex. C to Doc. No. 41).)  Thereafter, Carroll "based [his] hiring decisions for Mid State upon what [he] believed to be Mid State's immediate needs at the time and an individual's ability to meet those needs."  (Id.); (see also Carroll Dep. at 137, 141-42 (Ex. A to Doc. No. 41).)

Carroll hired three employees between May 2005 and July 2005.  In May, at Lee's request, Carroll hired Corey Balkcam ("Balkcam"), an African-American male, to meet Mid State's "immediate need for assistance" with mowing fields and performing ground maintenance during the summer months.  (Carroll Aff. ¶ 3 (Ex. C to Doc. No. 41).) Balkcam "worked a couple of weeks" and quit.  (Id.)  After Balkcam quit, Carroll hired Henry Tarver ("Tarver"), an African-American male, on June 7, 2005.  Tarver worked as an outside laborer and performed ground maintenance.  (Lee Dep. at 87 (Ex. D to Doc. No. 41)); (Carroll Aff. ¶ 3 (Ex. C to Doc. No. 41).)

---

[4] The court notes that, immediately prior to Carroll's hiring, there were seven Mid State employees working at Sedgefields.  (Lee Dep. at 78-80 (Ex. D to Doc. No. 41).)  Of those seven employees, six were African American and one, who provided secretarial services, was Caucasian.  (Id.)

On July 25, 2005, Carroll hired William Beckwith ("Beckwith"), a Caucasian male, to work as an outside laborer during the day and also to work as a night watchman. Beckwith's duties as a night watchman required him to remain "on call" if needed by Mid State and to ensure that the facility was locked and that the premises remained free of trespassers.[5]  (Carroll Dep. at 50, 109, 145-46 (Ex. A to Doc. No. 41)); (Carroll Aff. ¶ 3 (Ex. C to Doc. No. 41).)  Based on Beckwith's dual duties as a laborer and a night watchman, Carroll set Beckwith's wages at $8.00 an hour.  (Carroll Dep. at 146 (Ex. A to Doc. No. 41).)

In September 2005, Carroll hired two employees.  On September 6, Carroll hired Jeffrey Harris ("Harris"), an African American male, as an outside laborer.  Harris worked for Mid State for approximately four months, from September 6 until December 30, when he injured his back and was unable to work.  (Harris Dep. at 37, 40 (Ex. F to Doc. No. 41)); (Harris Aff. at 2 (Ex. 14 to Doc. No. 45)); (Lee Dep. at 91 (Ex. D to Doc. No. 41).)

On September 19, 2005, Carroll hired Joel Norman ("Norman"), a Caucasian male, as the quail operations manager.  Norman at the time was the manager of Mill Pond Plantation in Thomasville, Georgia, an area internationally renowned for superior quail hunting.  (Carroll Aff. ¶¶ 3-4 (Ex. B to Doc. No. 41)); (Norman Dep. at 67 (Ex. 2 (part 1)

---

[5] Carroll fired Beckwith on or about September 27, 2005, for stealing gas and not having a "valid drivers' license."  (Carroll Aff. ¶ 3 (Ex. C to Doc. No. 41)); (Def. Answers to Pl. Interrogs., No. 8 (Ex. L to Doc. No. 41).)

to Doc. No. 45).)  Carroll hired Norman to cultivate and manage the land at Sedgefields for wild quail habitation in hopes of returning Sedgefields to its former prominence as a top-rated quail hunting plantation.  (Carroll Aff. ¶ 4 (Ex. B to Doc. No. 41).)

On or about November 21, 2005, during deer hunting season, Carroll hired William Hubbard ("Hubbard") and Joseph May ("May").  (Carroll Aff. ¶ 3 (Ex. C to Doc. No. 41)); (Carroll Dep. at 53, 108, 112 (Ex. 5 to Doc. No. 45).)  May and Hubbard are Caucasian.  (Carroll Dep. at 53, 58 (Ex. 5 to Doc. No. 45).)  During their tenure at Mid State, Hubbard and May were paid $8.00 an hour.  (Id. at 53, 108); (Carroll Dep. at 138 (Ex. A to Doc. No. 41)); (Mid State Employee Records (Exs. 18-19 to Doc. No. 45).)

Carroll says, "Hubbard was paid [$8.00 an hour] because he had specialities working heavy equipment" at his former job with a construction firm.  (Carroll Dep. at 138 (Ex. A to Doc. No. 41).)  Hubbard was "proficient at what he did, which was run heavy equipment.  I needed that.  It was a critical time."  (Carroll Dep. at 53 (Ex. 5 to Doc. No. 45).)  Carroll further explained that Hubbard's skills maneuvering heavy equipment included running a skidder.  At that time, Mid State had just purchased a skidder, and Carroll needed "somebody [who] could operate that piece of equipment proficiently."  (Carroll Dep. at 138-39 (Ex. A to Doc. No. 41)); (see also Hubbard Application at 1 (Ex. 17 to Doc. No. 45).)

Concerning May's employment, Mid State sought to hire an individual with experience trapping predatory animals, such as bobcats and foxes, in order to protect

7

Sedgefields' quail population.[6]  (Carroll Dep. at 137-38 (Ex. A to Doc. No. 41));

(Norman Dep. at 69-70.)  Mid State also needed a mechanic on staff.  (Carroll Dep.

at 137 (Ex. A to Doc. No. 41).)  Carroll says that, at that time, he did not have an

employee on staff knowledgeable in trapping or with experience as a mechanic.  (Id.)

Carroll, thus, hired May, who had trapping and mechanic experience.  (Id. at 108, 138.)

May worked for Mid State for approximately five weeks, quitting on December 29, 2005.

(Carroll Aff. ¶ 3 (Ex. C to Doc. No. 41)); (Mid State Employee Records (Ex. 19 to Doc.

No. 45).)

Carroll hired Chance Hamm ("Hamm"), a Caucasian male, on January 20, 2006,

and paid him $8.00 an hour.  (Carroll Dep. at 58, 113 (Ex. 5 to Doc. No. 45)); (Carroll

Aff. ¶ 3 (Ex. C to Doc. No. 41).)  Hamm was an experienced welder who could make

repairs to "just about any type of equipment."  (Carroll Dep. at 140 (Ex. A to Doc. No.

41)); (Hamm Application for Employment (Ex. J to Doc. No. 41).)  According to Carroll,

Hamm offered Mid State welding skills at a time when Mid State had "equipment that . . .

needed repairing" by a welder.  (Carroll Dep. at 139-40 (Ex. A to Doc. No. 41).)  Carroll

explained that welding requires training; it is "not something you'll pick up and just do at

the drop of a hat and do a good job of it."  (Id. at 140-41.)  Once hired, Hamm taught

Carroll how to weld.  (Id. at 141.)  After Foster's termination, which is discussed later in

---

[6] After Norman was hired in September 2005, Mid State began pre-releasing quail
prior to hunting season with the hope that the birds would remain on the property.  (Norman
Dep. at 69-70 (Ex. 2 (part 1) to Doc. No. 45).)

this opinion, Hamm assumed Foster's "scouting" duties on hunts led by Norman.

(Norman Dep. at 184 (Ex. 2 (part 2) to Doc. No. 45).)  Mack, an African-American male, and Hubbard "assumed" other of Foster's duties.  (Mid State Answer to Interrog. No. 7 (Ex. L to Doc. No. 41).)  After Hamm was hired in January 2006, Mid State did not hire any new employees to work at Sedgefields.  Id.

### C.  Foster's Employment at Mid State

#### 1.  Hiring and Pay

In early 2005, Lee "needed some help" maintaining the property at Sedgefields and also needed assistance with bird hunts.  (Lee Dep. at 55, 58 (Ex. I to Doc. No. 41).)  He wanted an employee who knew how to operate a tractor and was familiar with the layout of the property.  (Id. at 55.)  Lee thought of Foster, who had previously worked with him at Sedgefields.[7]  Lee's superiors, however, initially expressed some apprehension due to an incident of stealing which was recorded in Foster's personnel file, but ultimately approved Lee's choice.  Lee, thus, approached Foster about working again for Mid State at Sedgefields as a full-time outside laborer.  (Id. at 56, 58- 60); (Pl. Dep. at 64-65 (Ex. E to Doc. No. 41).)

---

[7] Foster worked at Sedgefields from 1993 to 2001, when he was laid off.  For some of those years, Sedgefields was under different ownership.  (Pl. Dep. at 51-54, 57 (Ex. E to Doc. No. 45).)  Foster's discrimination claims in this lawsuit do not pertain to his employment which preceded his rehire in February 2005.

Discussing Foster's re-employment, Lee, who would be Foster's supervisor, said to Foster, "If I catch you stealing again, I'm going to fire you."  (Pl. Dep. at 66 (Ex. E to Doc. No. 41).)  Foster replied, "Okay," and agreed to come back to work at Sedgefields.[8]  (Id. at 67); (Lee Dep. at 59 (Ex. I to Doc. No. 41).)  Foster requested that he earn at least the same wage ($8.00 an hour) he was making in his current job.  (Lee Dep. at 60, 62 (Ex. I to Doc. No. 41).)  Lee obtained approval to pay Foster a starting hourly wage of $8.00 with a raise to $9.00 an hour after a month.  (Lee Dep. at 60, 62 (Ex. I to Doc. No. 41)); (Pl. Dep. at 65.)

Foster commenced work at Sedgefields on February 8, 2005, as an outside laborer.  When Foster received his first pay check after two weeks of employment, he learned that he was being paid an hourly wage of $7.00, not $8.00.  (Pl. Dep. at 64, 69, 90-91 (Ex. E to Doc. No. 41)); (Carroll Dep. at 51 (Ex. 5 to Doc. No. 45).)  Foster complained to Lee, who said he would "check" on it.  (Lee Dep. at 62 (Ex. I to Doc. No. 41).)  Lee, thereafter, informed Foster that, because his application for employment listed an "expected" starting wage of $7.00, Mid State decided to pay him $7.00 an hour, rather

---

[8] Foster did not admit or deny stealing when he talked with Lee about working for Mid State again.  During his deposition, however, Foster said that he was unaware that his employment record from his earlier tenure included a notation that he had stolen property. (Pl. Dep. at 65-67); (Lee Decl. (Ex. G to Doc. No. 41).)  Whether the theft did or did not occur is immaterial for purposes of resolving the instant motion.

than $8.00 an hour.[9]  (Id. at 62-64); (Foster Application (Ex. H to Doc. No. 41)); (see also Def. Mem. of Law at 10 (Doc. No. 41).)  Foster worked a few days, but was unable to produce a social security card or an "ID card," as required by Mid State.  (Pl. Dep. at 69 (Ex. E to Doc. No. 41).)  Foster apparently obtained the necessary identification because he returned to work at Sedgefields in March 2005.  His pay remained $7.00 an hour.  (Id. at 69, 90-91.)

Foster never earned $8.00 an hour during his tenure with Mid State.  He eventually received a raise to $7.50 an hour in December 2005, but that raise materialized only in his last paycheck.  (Pl. Dep. at 69 90-91 (Ex. E to Doc. No. 41)); (Carroll Dep. at 57-58 (Ex. 5 to Doc. No. 45).)  In this lawsuit, Foster complains, among other things, that because of his race he was paid less than Beckwith, May, Hubbard and Hamm, who received hourly wages of $8.00 during their employment with Mid State.

### 2.  Foster's Job Responsibilities

As stated, Mid State hired Foster as a full-time outside laborer.[10]  (Id.)  Foster described his duties at Sedgefields in the following way:  "I worked with dogs, horses.  I did tractor work.  I did a little [bull]dozer work [and] . . . work on the backhoe."  (Pl. Dep. at 70, 71 (Ex. E to Doc. No. 41).)  Foster, though, "mostly [was a] tractor driver,"

---

[9] Foster says that his girlfriend filled out the application for him and that, although he signed it, he did not review the completed application.  (Pl. Dep. at 74-75 (Ex. E to Doc. No. 41).)

[10] Mid State designated its employees in one of four work categories:  outside laborer, management, inside domestic, or "other."  (See, e.g., Pl. Ex. 7 (Doc. No. 45).)

while Lee performed the majority of the backhoe and bulldozer work.  (Id. at 70.)  Foster

primarily drove the tractor with a rotary cutter attached and mowed the expansive

property at Sedgefields – a daily chore Foster described as "bush hogging."  (Id. at 71.)

Part of Foster's responsibilities also included cleaning the barn where the horses

were kept.  He shared this task with Harris and sometimes with Mack.  (Id. at 126.)

Sedgefields had eight horses and two mules during the time Foster worked there.  (Id.

at 123.)  The horses were in the barn primarily during hunting season.  During the off-

season, beginning in March and continuing to late September or early October, most of

the horses had their shoes removed and were placed in the "big pasture."  (Id. at 119-20);

(Lee Dep. at 83-86 (Ex. D to Doc. No. 41).)  During this "off-season" time, barn cleaning

duties were minimal.  (Pl. Dep. at 122); (Lee Dep. at 97, 99 (Ex. D to Doc. No. 41).)

Other than his pay, discussed in more detail below, Foster had no complaints

while working for Lee; however, Foster says that his working conditions took a turn for

the worse when Mid State hired Norman on September 19, 2005.  (Pl. Dep. at 104.)

Indeed, "[e]verything was fine until [Norman] started working [at Sedgefields]."  (Id.)

### 3.  Norman's Supervision of Foster

At the end of September or the first of October 2005, Foster began working for

Norman.  (Pl. Dep. at 84-85 (Ex. E to Doc. No. 41)); (Lee Decl. at 2 (Ex. G to Doc. No.

41).)  Norman changed the mowing technique from "bush hogging" to "chopping."  (Pl.

Dep. at 86.)  Initially, under Norman's supervision, Foster assisted Harris with

"chopping."  (Id. at 84-85.)  Foster described chopping as "cutting pathways for the dogs"
and hunters so that they could maneuver through the fields during bird hunting season.
(Id. at 85-86.)  Foster also assisted Norman on bird hunts.  (Pl. Dep. at 86-87 (Ex. 1
to Doc. No. 45).)

Norman and Carroll observed and orally reprimanded Foster for "clipping the
bark" on trees.[11]  (Carroll Dep. at 45-47 (Ex. A to Doc. No. 41)); (see also Mack Dep.
at 79, 85, 86-87 (Ex. K to Doc. No. 41) (testifying that Foster hit and nicked trees after
Norman told him not to do so).  Foster denies that he scraped any trees; he said it was
Harris who scraped trees.  (Pl. Dep. at 152-53, 154 (Ex. E to Doc. No. 41).)

Foster, along with Mack and Harris (also African Americans) worked on
Norman's quail hunting crew.  Foster "handled the dogs"; Harris drove a mule-drawn
wagon; Mack assisted the guests with their horses, dogs and wagon transfers.  (Harris
Aff. at 1-2 (Ex. 14 to Doc. No. 45).)

Foster lodges three specific complaints against Norman.  First, Norman did things
"a little different" with the horses.  (Pl. Dep. at 123 (Ex. E to Doc. No. 41).)  Prior to
Norman coming on board, during the hunting season when the barn was used regularly,
the horses were in the barn only at night, and the barn floors were "naked concrete."  (Id.
at 123-26.)  When Foster let the horses out in the morning, it would only take "one

---

[11] Carroll elaborated that "clipping the trees" means the same thing as "scraping trees
with equipment."  (Carroll Dep. at 46 (Ex. A to Doc. No. 41).)  Clipping the trees "can"
harm the trees and affects "the aesthetic quality of the property."  (Id.)

scoop" to clean each stall, and "maybe fifteen minutes to [clean the whole barn]."  (Id.)
Norman, however, kept and fed the horses in the barn every night during hunting season.
(Lee Dep. at 97 (Ex. D to Doc. No. 41).)  Norman also began padding the concrete floors
of the barn stalls with cedar shavings.  (Id. at 97-98); (Pl. Dep. at 123-24 (Ex. E to Doc.
No. 41).)  According to Foster, with the shavings, there was "a lot more" work involved
in cleaning the barn – what used to take "maybe" fifteen minutes, took 35 to 40 minutes
per stall (with ten to twelve stalls) with the shavings.  (Pl. Dep. at 124-25.)

     Second, Norman told Foster that by January 2006 he was going to have an "all
white crew."  (Id. at 99-100).  Norman also commented two or three times to Foster that
he had never worked on a hunting plantation where "black guides" were employed.  (Id.
at 96-97.)  Also, when Foster and other employees inquired about leaving early on the
day of the Bullock County High School homecoming football game, a "tradition"
observed by past supervisors, Norman said that he would "get him some white boys and
Mexicans to do the job if [they] [didn't] want to do it."  (Pl. Dep. at 128-29 (Ex. 1
to Doc. No. 45)); (see also Harris Aff. at 1-2 (Ex. 14 to Doc. No. 45.)

     Third, Foster says that it was customary for paying clients to tip the laborers at the
end of a hunt but that, except on two occasions, Norman (as well as Carroll) collected
and kept tips which clients intended Foster to receive.[12]  (Pl. Dep. at 132-33 (Ex. E
to Doc. No. 41).)  Foster says that, after one hunt at the beginning of the 2005 season, a

---

[12] Foster says that, when he worked for Lee, he received his proper portion of tips.
(Pl. Decl. (Ex. 37 to Doc. No. 45).)

client told Foster that he left him and another worker $150.00 "a piece," but Foster says that he never received that tip money.  (Id. at 133.)  Consequently, Foster told "a couple of [hunting] clients" that, if they intended to tip him, then they should "give it to [him] in [his] hand, because if they didn't, [he] wasn't going to get it."  (Id. at 158.)  Foster also says that he believes that the only reason he received tips on the two occasions noted above is because he "kept on complaining."  (Id. at 132.)  Mid State warned all employees, including Foster, that complaints about tips would result in termination, and Carroll issued a written policy, dated November 3, 2005, which outlined the new tipping procedures.[13]  (Id. at 132-33, 135.)  Foster, though, continued to complain, lodging his final complaint on the same day he was fired.  (Id. at 132-33.)

### 4.  Foster's Disciplinary Record and Termination

Foster's personnel record contains one disciplinary action.  On December 6, 2005, Norman issued Foster a "formal reprimand."  (Formal Reprimand (Ex. 10 to Doc. No. 45).)  Norman documented Foster's misconduct as follows:  Foster "[w]as instructed to clip horses, feed horses and clean [the] barn.  Employee stopped clipping horses as instructed and began riding horses at approximately 2 p.m. and returned at approximately 3:10 p.m."  (Id.)  Apparently, Norman went to the barn, found that Foster was not there, and wrote the formal reprimand.  (Pl. Dep. at 203 (Ex. 1 to Doc. No. 45).)  Foster,

---

[13] The policy is set out below.

however, says that the clippers broke and that he attempted, without success, to call Norman on the radio.  Consequently, because riding the horses was part of his job, Foster told Harris, "We got these new horses. . . .  Let's just ride around the block, around the circle."  (Id. at 202-03.)

Foster was fired on December 29, 2005.  (Payroll Status Change Form (Foster Ex. 11 to Doc. No. 45).)  Foster recounts the events immediately preceding his termination as follows.

Foster, who had experience working with tree cutters, told Norman that he needed to set "both sides" of the tree cutter "level" in order for it to work properly.  (Pl. Dep. at 163-64 (Ex. 1 to Doc. No. 45).)  Norman told Foster that he "knew what he was doing" and that Foster should "just keep working in the barn."  (Id. at 164.)  The tree cutter promptly broke while Foster was using it.  Foster, who was within earshot of Norman, "looked at [Norman] and started laughing."  (Id.)  Norman walked away, but fifteen to twenty minutes later, Norman reappeared with Carroll.  (Id. at 164-65.)  Carroll told Foster that he "wasn't doing [his] job," that he (Carroll) "wasn't satisfied with [his] work," and that "[today] would be [his] last day at work."  (Id. at 165-66.)  When Foster asked for specifics, Norman and Foster stepped a few feet away to talk privately, and, when they returned, Carroll told Foster that he "stole" fourteen birds on October 14.  (Id. at 167.)  Foster denied stealing birds, got in his truck and left Sedgefields.  (Id. at 167-68.)

Four days later, in a memorandum, dated January 3, 2006, Carroll documented the circumstances surrounding Foster's termination as follows:

[Foster] was dismissed as an employee from Sedgefields Plantation on December 29 at 3 p.m.  Joel Norman[,] his supervisor[,] accompanied me to the barn where [Foster] was cleaning stalls/barn.  I informed [Foster] that it was obvious he was not happy working at Sedgefields based on his attitude and job performance, and that today was his last day at work at the Plantation.  He asked if he was being fired and I told him, yes, and please turn in his keys.

. . .

[Foster] was reprimanded on December 6, 2005, for stopping work and riding horses for an hour or so.  He was supposed to be in the barn clipping horses but quit and without permission from his supervisor Joel Norman saddled a horse and with Jeff Harris went riding.

On several quail hunts [Foster] has displayed a negative attitude.  He has made derogatory [remarks] about quail hunts in front of guests.

. . .

[Foster] has called me after hours on the company radio complaining and wanting to know where his cash tip money was from guests of the most recent quail hunt.  He has implied that I was keeping tip money from him, when in fact time was needed so that correct change could be obtained.  All of these complaints came after I had sent a Memo to all employees regarding tips and how they would be dispersed.

[Norman] has brought to my attention on several occasions that [Foster] and others when instructed to "chop" an area, would claim they were finished and then upon inspection were not.

(Carroll Jan. 3, 2006 Memorandum (Ex. M to Doc. No. 41 & Ex. 38 to Doc. No. 45).)

Moreover, during his deposition taken in connection with this litigation, Carroll discussed the considerations which factored into his decision to terminate Foster:

One reason would be lack of timely performance. . . .  [Foster] had been assigned to do some duties, whether it be cleaning out the barn or

17

roller chopping.  And based on my visiting the sites and seeing the performance that was done there, I concurred with [Norman's] assumption that those things were not getting done on time.  I personally viewed some of the activities in the woods that [Foster] was doing and came to the same conclusion.

Besides completing things in a timely manner, I would say also part of the reason would be . . . a lack of . . . responding to direction such as in the roller chopping and clipping the bark on trees.  I observed personally his doing those things and stopped him and talked to him about it, and it continued to happen.

. . .

[M]aking comments in front of clients that were derogatory to our quail operation.  The issue of being unsatisfied with our tipping policy.

(Carroll Dep. at 45-47 (Ex. A to Doc. No. 41).)

Regarding the tipping policy, the record includes a memorandum, titled "Attitude

is Important," which incorporates Mid State's policy on collecting tips.  (Def. Ex. E

to Doc. No. 41.)  This memorandum, which is dated November 3, 2005, is from Carroll

and is addressed "[t]o all Sedgefields Employees":

The goal of Sedgefields Plantation is to provide our guests with a first class experience.  It does not matter whether guests are here for deer, turkey, quail or just lodging.  We are a service business and our reputation is based on the effort we put forth here at work.  This effort not only applies to when we have guests but to the days when we are preparing the woods and fields for hunters or the lodge and other buildings for our guests['] stay.  The weed-eating, mowing, chopping and cleaning are all important.  In order to be first class, we have to take pride in the work we do.

Tips are not a standard part of your pay when we have guests.  However, some of our guests will want to tip for the great service you provide.  You may receive a tip in one of two ways: (1) cash or (2) it may be included with an upcoming paycheck.  I will not have employees standing around waiting for a tip at the end of the day.  If I see this behavior[,] you will be

18

dismissed from employment at the Plantation.  **If tipping continues to be a problem at the Plantation, it will be stopped.**  Take pride in what you do.

Sedgefields will have a staff that is committed to seeing the Plantation move forward and be known for providing great service.  Employees present/future who are here just for a paycheck, disrupt the work of others and are only concerned with self will find there [sic] employment time at the Plantation to be a short one.  I expect every employee to work hard each day and receive a fair wage for the work they [sic] do, anything less in [sic] not acceptable.  Take pride in what you do.

If you are sick and cannot come to work, I expect you to notify your manager.  Take pride in what you do.

(Id. (emphasis in original).)  Foster received this memorandum.  (Pl. Dep. at 135 (Ex. E to Doc. No. 41).)

Furthermore, in its answers to Foster's interrogatories, attached as an exhibit to the summary judgment motion, Mid State explains that not only did Norman "report[] performance issues" about Foster to Carroll, but that Carroll also "periodically reviewed [Foster's] work" and "personally observed" deficient work by Foster and episodes of poor "attitude."  (Mid State Answer to Interrogs. Nos. 1, 4 (Ex. L to Doc. No. 41).)  Mid State further says that Carroll "investigated the reports made by Norman," that his investigation included speaking with Norman, Foster and Lee about Foster's "work performance," and that Carroll "made the decision to terminate [Foster's] employment with [Mid State]."  (Id.)

In addition, in another interrogatory propounded by Foster inquiring about the reasons for his termination, Mid State answered that Foster was fired "for poor work performance and poor attitude, including, among other things, criticizing his supervisor

19

among co-workers and in front of customers, failure to comply with [Mid State's] policy as to customer tips, failure to follow instructions, failure to timely complete assigned duties, and failure to perform assigned tasks." (<u>Id.</u>, No. 3.)  In the same interrogatory answer, Mid State also directs Foster to Carroll's January 3, 2006 memorandum for "additional information." (<u>Id.</u>)

## D.  <u>The Complaint</u>

On May 4, 2006, Foster filed the instant complaint against Mid State, alleging that it discriminated against him because of his race.  (Compl. (Doc. No. 1).)  Alleging violations of 42 U.S.C. § 1981, Foster brings claims against Mid State for wrongful termination and discrimination in pay and in the terms and conditions of employment. He seeks compensatory damages, punitive damages, payment for lost income and benefits (including back pay), declaratory and injunctive relief, attorney's fees, costs and such other relief as justice may require.  (<u>Id.</u> at 5.)

## V.  DISCUSSION

Mid State moves for summary judgment on Foster's § 1981 discrimination claims. Mid State argues that Foster cannot establish a prima facie case of discrimination, but that even if he could, he cannot refute the legitimate, nondiscriminatory reasons for the adverse actions.  For the reasons to follow, the court agrees with Mid State.

Because Foster does not rely on direct evidence of discrimination to prove his claims, the allocation of proof shifts in accordance with the three-step procedure established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1972).[14]  In the first McDonnell Douglas phase, the employee must produce evidence sufficient to make out a prima facie case, thus giving rise to a presumption that the employer unlawfully discriminated against him in taking the alleged adverse employment action.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).

Next, the employer must rebut this presumption by producing evidence that the negative employment action was motivated instead by a legitimate, nondiscriminatory reason.  Id. at 509.  The employer's "burden is one of production, not persuasion; 'it can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr., 509 U.S. at 509).  Finally, to avoid summary judgment, the plaintiff must respond with evidence, which may include previously produced evidence establishing a prima facie case, which would allow a reasonable jury to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.  See Combs v. Plantation Patterns, 106

---

[14]  The Title VII circumstantial evidence approach to proving employment discrimination also applies to claims brought pursuant to § 1981.  See Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002) ("[A]s we have repeatedly held, 'both of these statutes [i.e., § 1981 and Title VII] have the same requirements of proof and use the same analytical framework.'").  The court, thus, finds that opinions decided under Title VII are relevant to the court's analysis under § 1981.

F.3d 1519, 1528 (11th Cir. 1997); see also Reeves, 530 U.S. at 143. "The result of this three step dance is that the burden is always on plaintiff to show that defendant's action is discriminatory." Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1081 (11th Cir. 2005) (per curiam).

A. Wrongful Termination

1. Prima Facie Case

To state a prima facie case of wrongful termination under § 1981, Foster must show the following: (1) that he is a member of a protected class; (2) that he was qualified for the job; (3) that he suffered an adverse employment action; (4) that he "has engaged-- either (a) disputedly or (b) admittedly--in misconduct similar to persons outside the protected class"; and (5) "that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment." Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 n.6 (11th Cir.), modified on other grounds on denial of reh'rg, 151 F.3d 1321 (11th Cir. 1998); Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 792 (11th Cir. 1999). Under this prima facie formulation, it is not enough for a plaintiff merely to deny that he or she did not commit the alleged infraction. Jones, 137 F.3d at 1311 n.6 ("We stress that . . . no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule."). As pointed out by Foster, the prima facie case is not "rigid or inflexible," Schoenfeld v. Babbitt, 168 F.3d 1257, 1268 (11th Cir. 1999), and there are

more ways than one to raise a presumption of discrimination.  A plaintiff, for example, can bypass the "similarly situated" prongs, set out in <u>Jones</u>, *supra*, by demonstrating instead that he was replaced by someone outside of his protected class.  <u>See Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.</u>, 342 F.3d 1281, 1289 (11th Cir. 2003).  The prima facie elements under this scenario require a plaintiff to show that he "(1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class."  <u>Cuddeback v. Fla. Bd. of Educ.</u>, 381 F.3d 1230, 1235 (11th Cir. 2004).

Under both prima facie frameworks, elements one, two and three are the same.  It is undisputed that Foster is African American and that he suffered an adverse employment action when he was terminated so as to meet the first and third elements.  Element two is not in contention, but elements four and five under <u>Jones</u> and element four under <u>Cuddeback</u> are in dispute.

Citing the evidentiary record with appropriate pinpoint references, Mid State argues that there is no evidence establishing either that Foster's replacement was a non-minority or that a similarly-situated employee not in Foster's protected class engaged in nearly identical conduct as Foster, but was not terminated.  (Def. Mem. of Law at 14-15, 17-19 (Doc. No. 41) (citing Def. Answers to Pl. Interrog., Nos. 7 & 8).)

Foster's argument in response begins and ends with a statement that Foster has "clearly established a prima facie case of discrimination."  (Pl. Mem. of Law at 8 (Doc.

23

No. 50).)  No elaboration is provided.  No evidence is cited.  No distinction is made between Foster's termination, wage and work assignment claims.  It is not the court's function to weed through the summary judgment submissions in search of evidence to support Foster's position.  See Freeman v. City of Riverdale, No. 1:06-cv-2230-WSD-LTW, 2007 WL 1129004, at *6 (N.D. Ga. April 16, 2007); (see also Uniform Scheduling Order § 2 (Doc. No. 6).)  Similarly, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995); see also Nimbus Technologies, Inc. v. SunnData Products, Inc., 484 F.3d 1305, 1309 (11th Cir. 2007) (arguments not raised in the district court are waived on appeal); Pinto v. Universidad De Puerto Rico, 895 F.2d 18, 19 (1st Cir. 1990) ("the court is under no duty to exercise imagination and conjure what a plaintiff might have alleged, but did not, and do counsel's work for him or her").  Based upon Foster's perfunctory brief, the court borrows the parallel appellate rule and finds that Foster has waived any arguments he may have had in opposition to Mid State's well-supported contentions that Foster has failed to establish a prima facie case of discrimination.[15]  In other words, the court will not make arguments for Foster.

Even if the court was to read between the lines of Foster's summary judgment response and pluck out various assertions made by Foster in his "statement of facts," he

---

[15] This finding applies equally to all of Foster's discrimination claims.

has not cited any evidence which shows the existence of a genuine issue of material fact as to the fourth and fifth elements of the <u>Jones</u> prima facie case.  Turning to the <u>Cuddeback</u> prima facie case, the court recognizes that, in his "statement of facts," Foster recites that "Hamm 'replaced' Foster according to Norman," (Pl. Mem. of Law at 6 (Doc. No. 44) (quoting Norman Dep. at 184)), but he does not connect Norman's testimony to any argument or otherwise state its relevance.  Going one step further, though, the court need not decide whether Foster is arguing that he has satisfied the fourth <u>Cuddeback</u> prima facie element or whether Norman's testimony conflicts with the evidence upon which Mid State relies, *i.e.*, Mid State's answers to Foster's interrogatories.[16]  Making another assumption, *i.e.*, that Foster has demonstrated a prima facie case, the court finds that Foster fails to rebut Mid State's legitimate, nondiscriminatory reasons for his termination.

### 2. *Mid State's Proffer of Legitimate, Nondiscriminatory Reasons*

Mid State articulates six nondiscriminatory reasons for terminating Foster.  In its brief, which includes citations to the record, Mid State asserts that Carroll made the decision to terminate Foster's employment because Foster (1) displayed a negative attitude about his employment, (2) criticized his supervisor's hunting skills in front of coworkers and customers, (3) failed to comply with Mid State's policy as to customer

---

[16] Mid State says there is no conflict.  (<u>See</u> Def. Reply at 6 & n.7.)

tips, (4) did not follow work instructions, (5) failed to timely complete assigned duties, and (6) did not perform assigned tasks.  (Def. Mem. of Law at 19-20 (citing Carroll Dep. at 45-47 (Ex. A to Doc. No. 41)); (Def. Answers to Pl. Interrogs. Nos. 1, 3 (Ex. L to Doc. No. 41)); (Carroll Memorandum, dated Jan. 3, 2006 (Ex. M to Doc. No. 41 & Ex. 38 to Doc. No. 45).)

        The court finds, and Foster has not disputed, that Mid State has "clearly set forth, through the introduction of admissible evidence, the reasons for [Foster's] [termination]."  Texas Dep't of Cmty. Affairs v. Burdine ("Burdine"), 450 U.S. 248, 255 (1981).  The court also finds that Mid State's properly-supported reasons are legitimate and non-discriminatory.  Unsatisfactory work performance and violations of work rules constitute legitimate, nondiscriminatory reasons for terminating an employee.  See Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999).  It also is legitimate for an employer to consider as part of its decisionmaking factors touching on attitude and enthusiasm, particularly in service-oriented businesses where such qualities are "vitally important."  Chapman v. AI Trans., 229 F.3d 1012, 1033 (11th Cir. 2000).  Moreover, an employer can legitimately fire an employee based upon its perception that the employee is dissatisfied with his or her job.  See Wolf v. Buss (Am.) Inc., 77 F.3d 914, 920-21 (7th Cir. 1996).

### 3. Foster's Evidence of Pretext

Because Mid State satisfied its burden of producing competent evidence of legitimate, nondiscriminatory reasons for Foster's termination, the burden shifts to Foster to "meet [the proffered] reason[s] head on and rebut [them]." Chapman, 229 F.3d at 1030. Foster has not met this task.

Of the six reasons articulated by Mid State, Foster attempts to rebut only one and part of another and then injects a seventh reason – that Carroll accused him of stealing fourteen birds – and attempts to rebut the truth of this seventh reason. Specifically, essaying to counter the third reason and part of the second reason, above, Foster "denies that he ever criticized Norman in front of guests" and that "he violated the memo regarding the tipping policy." (Pl. Mem. of Law at 11 (Doc. No. 44) (citing Pl. Dep. at 117-18, 158-59.) He also denies that he stole any birds. (Id. at 12 (citing Pl. Dep. at 167).) Foster concludes, without citation to authority, that "[s]urely a [p]laintiff shows pretext when he shows he was fired for a rule violation which did not occur." (Id.)

Mid State argues that, for at least three reasons, Foster has not demonstrated pretext. First, citing Chapman, *supra*, Mid State contends that Foster's failure to rebut all six of its articulated reasons provides sufficient reason to grant summary judgment in its favor on Foster's termination claim. (Def. Reply at 10 (Doc. No. 48).) The court agrees.

The law is well established that "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that *each* of the employer's proffered nondiscriminatory reasons is pretextual." Chapman, 229 F.3d

at 1037 (emphasis added). As stated by this court, a plaintiff must rebut "'*all* of the defendant's proffered nondiscriminatory reasons for its actions,' not just bits and pieces of one or two of them." Pearson v. Prime Healthcare Corp., No. Civ. A. 00-D-61-E, 2000 WL 33224801, at *5 (M.D. Ala. Dec. 27, 2000) (emphasis in original) (quoting Chapman, 229 F.3d at 1037, 1037 n.30), aff'd, 260 F.3d 627 (11th Cir. 2001) (table).

Contrary to Chapman's directives, in his brief, Foster has ignored the majority of Mid State's proffered reasons for terminating him. Mid State's first, fourth, fifth and sixth reasons and part of its second reason are unchallenged. Foster has not refuted that he was dissatisfied with his job, that he failed to perform aspects of his job satisfactorily (such as chopping fields), and that he lodged constant complaints (some directly to Carroll) about not receiving tips. Because Foster has not "knock[ed]" down all of Mid State's proffered reasons, he cannot avoid summary judgment. Chapman, 229 F.3d at 1032. Indeed, as pointed out by Mid State, by his own testimony, Foster admits that he engaged in some of the conduct which Mid State says formed the basis for his termination. (Def. Mem. of Law at 20 (Doc. No. 41).) Namely, Foster admits that he lodged criticism to his coworkers about the manner in which Norman conducted quail hunts. (Pl. Dep. at 116-17, 155-57 (Ex. E to Doc. No. 41).) Foster, thus, concedes that, as charged by Mid State in its second reason, he "criticized his supervisor [Norman] among coworkers." (Def. Answers to Pl. Interrogs., No. 3 (Ex. L to Doc. No. 41).) Mid State recites Foster's criticism as an independent violation and as conduct contributing to its belief that Foster displayed a bad attitude. Foster also concedes that he "kept on

28

complaining" that his tips were withheld even after he received Carroll's memorandum on tipping procedures and a warning that complaints relating to tips could result in termination. (Pl. Dep. at 132-33, 135); (Def. Ex. E to Doc. No. 41.) An employee who admits failing to meet his employer's expectations generally negates any inference of discrimination. See Pearson, 2000 WL 33224801, at *5.

Similarly, Foster does not dispute that he left some of his work undone when assigned the task of chopping a field and that Norman pointed out to him that he had missed "a couple of spots." (Pl. Dep. at 153-54.) Rather, during his deposition, Foster merely made an excuse for why he could not complete his work chopping the fields, asserting that the hilly terrain caused "such a strain on the tractor" that he "didn't bother" chopping areas at the bottom of hills. (Pl. Dep. at 153-154) (Ex. E to Doc. No. 41).) Foster cannot survive summary judgment simply by proffering excuses for his conduct. See Sweeney v. West, 149 F.3d 550, 557 (7th Cir. 1998) ("Establishing pretext requires more than excusing the employer's stated reason for its decision; the plaintiff must call the employer's honesty into question by rebutting the reason given.").

Second, Mid State argues that, on this record, Foster cannot show pretext merely by denying that he committed the charged infractions. Contrary to Foster's unsupported assertion to the contrary, i.e., "[s]urely a [p]laintiff shows pretext when he shows he was fired for a rule violation which did not occur[,]" (Pl. Mem. of Law at 11 (Doc. No. 44), the court agrees with Mid State that "the proper inquiry is not whether Defendant's reasons for terminating Plaintiff were correct, but rather, whether Defendant reasonably

believed Plaintiff committed the infractions that led to his termination." (Def. Reply at 9 (citing EEOC v. Total Sys. Serv., Inc., 221 F.3d 1171, 1175 (11th Cir. 2000)); see also Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."). As stated, Foster "denies that he ever criticized Norman in front of guests," as charged by Mid State in its second reason, but Foster has not argued (much less demonstrated) that Carroll did not in good faith believe that the accusation was true and that Carroll's belief was not the reason for his termination.[17] See Total Sys. Serv., Inc., 221 F.3d at 1176-77.

Foster's argument that he did not violate Mid State's tipping policy, as set out in Mid State's third reason, above, is equally unavailing. Foster denies that he violated Mid State's tipping policy because, rather than "standing around waiting for a tip at the end of the day," as prohibited by the policy (see Ex. to Pl. Dep. (Ex. E to Doc. No. 41)), Foster directly confronted clients during hunts, telling them that if they did not give the tip to him, Foster's supervisor would keep the tip. (Pl. Mem. of Law at 11 (Doc. No. 44) (citing Pl. Dep. at 157-59).) While Foster states that he does not believe that he violated the dictates of the policy, he has not challenged Carroll's assertion that Mid State interpreted the policy differently. Foster also has not argued that Carroll's interpretation

---

[17] The court notes that Foster's explanation offered as a defense to the misconduct outlined in the formal reprimand (which relates to Mid State's fourth, fifth and sixth reasons) fails on the same grounds. (Pl. Dep. at 202-03 (Ex. 1 to Doc. No. 45)); (Carroll Jan. 3, 2006 Memorandum (Ex. M to Doc. No. 41 & Ex. 38 to Doc. No. 45).)

of the policy is unreasonable, and there is no evidence that Carroll, in fact, did not believe

his asserted interpretation.  See Burke-Fowler v. Orange County, Fla., 390 F. Supp.2d

1208, 1214 (M.D. Fla. 2005) ("where an employer and an employee have different

interpretations of a disciplinary rule, there is a rebuttable presumption that the employer

did in fact believe its asserted interpretation"), aff'd, 447 F.3d 1319 (11th Cir. 2006).

Indeed, Mid State's assertion that Foster's admitted conduct is even "more improper"

than merely "standing around" after a hunt is compelling.  (Def. Reply at 8 n.10.)

Furthermore, Foster has not submitted any evidence that Mid State interpreted or

applied its policy in inconsistent ways or that a Caucasian employee engaged in the same

conduct as Foster, but was not terminated.  The record is devoid of any evidence that the

manner in which Carroll applied the policy to Foster's conduct exemplifies selective

enforcement of a work rule in a racially discriminatory manner.[18]  See Berg v. Fla. Dep't

of Labor & Employment Sec., Div. of Vocational Rehab., 163 F.3d 1251, 1255 (11th Cir.

1998) (suggesting that inconsistent application of policies may be circumstantial evidence

of discrimination where there is evidence that the policies were applied to others in an

inconsistent fashion).  In the end, Foster merely disagrees with Carroll's application of

---

[18] This is as good a time as any for the court to note that there also is no evidence that
Caucasian employees received tips when African-American employees did not.  (See
Pl. Dep. at 134-135 (testifying that tipping procedure memorandum was distributed to all
employees and that Foster had no knowledge that Caucasian employees were provided tips
when African-American employees were not)); (see also Def. Mem. of Law at 21 n.21
(arguing that to the extent, if any, Foster asserts a race discrimination claim based upon
distribution of tips, that claim fails as a matter of law).)

the policy to his conduct; however, as the Eleventh Circuit has made clear, "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) (internal marks and citations omitted); Chapman, 229 F.3d at 1030 (a plaintiff cannot establish pretext by "quarreling with the wisdom" of the employer's reason). Absent any evidence that Carroll's interpretation of the policy was racially motivated, this court will not and cannot "second-guess the wisdom of an employer's decisions[.]" Alexander v. Fulton County, Ga., 207 F.3d 1303, 1341 (11th Cir. 2000).

Third, turning to Foster's denial that he stole birds, Mid State points out that it has not offered stealing as a justification for its termination decision at the summary judgment stage. (See Pl. Mem. of Law at 12 (Doc. No. 44)); (Pl. Dep. at 167.) Citing deposition testimony, Mid State asserts that, at best, the testimony reflects that, in addition to the six reasons offered by Mid State, "there could have been one more" upon which Carroll based his decision to terminate Foster. (Def. Reply at 8 n.9.) Foster has not offered any argument that evidence of an additional reason for his termination refutes the legitimacy of the other six reasons offered by Mid State, and as stated earlier, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp., 43 F.3d at 599. In short, on this record, the court agrees with Mid State that Foster cannot defeat summary judgment by denying that he stole birds. (See id. (citing Tidwell v. Carter

Prods., 135 F.3d 1422, 1428 (11th Cir. 1998) (holding that plaintiff failed to establish pretext where defendant offered previously undisclosed additional, but not inconsistent, reason for the plaintiff's termination).)

Notwithstanding his failure to address head on all of Mid State's reasons and his admission that he engaged in at least some of the charged misconduct, Foster argues that he has other evidence which warrants a jury trial on his termination claim. Foster asserts that Norman's derogatory remarks, including the comment about employing an "all white crew," constitute sufficient "circumstantial evidence of race discrimination." (Pl. Mem. of Law at 9 (Doc. No. 44).) Foster relies on Beaver v. Rayonier, Inc., 200 F.3d 723 (11th Cir. 1999). (Id. at 9.)

In Beaver, the Eleventh Circuit considered whether the decisionmaker's age-based disparaging comment that he desired to attract "younger, engineer-type employees or supervisors" was probative of discriminatory intent on a claim that the employee was denied a vacant supervisor position for which he had applied at the time of his reduction-in-force termination. 200 F.3d at 729. The Eleventh Circuit explained,

> While [the general manager's] comment does not rise to the level of direct
> evidence of discrimination, and would not be enough standing alone to
> show a discriminatory motive, a jury could infer from it some age-bias on
> [the general manager's] part when that comment is coupled with the other
> evidence in this case.

Id. at 729-30; see also Eastland v. Tenn. Valley Auth., 704 F.2d 613, 626 (11th Cir. 1983) (testimony of decisionmaker's racial bias, in addition to other evidence, established pretext).

Here, Mid State has submitted evidence that Carroll made the ultimate decision to fire Foster, not Norman.  (See Def. Answers to Pl. Interrogs., Nos. 1, 11 (Ex. L to Doc. No. 41).)  Foster has not submitted any evidence which raises a genuine issue of material fact as to Carroll's authority.  (See, e.g., Def. Reply at 4 n.4.)  In fact, Foster acknowledges that, unlike the general manager in Beaver, Norman was not the decisionmaker, but rather Carroll was.  (Pl. Mem. of Law at 12 (Doc. No. 44).)  In his response to Mid State's summary judgment motion, however, Foster invokes the cat's paw theory, arguing that Norman "tainted" the termination decision.  (Id.)  Mid State refutes that there is evidence to support a cat's paw theory of liability.

The cat's paw theory is a method by which an employee can show that an adverse action was racially motivated even when there is no evidence of discriminatory animus on the part of the decisionmaker.  Under the cat's paw theory,

> if the plaintiff shows that a colleague with a racial animus lacked the power to terminate an employee, but that the colleague made a biased recommendation to her superior that the employee be discharged and that recommendation was followed, it may be inferred that . . . the colleague's racial animus was the cause in fact of the termination.  The superior who carries out the adverse employment action acts merely as the "cat's paw" for the person with the discriminatory animus. . . .  To establish causation under such a theory, however, the plaintiff must establish "that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the [colleague's] recommendation, was an actual cause of the other party's decision to terminate the employee."

Hankins v. Airtran Airways, Inc., No. 06-15406, 2007 WL 1705579, at *6 n.5 (11th Cir. June 14, 2007) (quoting Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331 (11th Cir. 1999) (per curiam)).  The "causal link" between the discriminatory animus and the

34

adverse action (here, a termination) is "broken" where the decisionmaker independently investigates the charges of misconduct against the employee and, based upon that investigation, finds that the employee is guilty of the misconduct.  Id.

The court applies the foregoing principles to the facts of this case.  There is no evidence that Carroll, the decisionmaker, harbored any discriminatory animus.  Foster himself testified that Carroll "wouldn't ever" discriminate against him on the basis of race.  (Pl. Dep. at 130-31 (Ex. E to Doc. No. 41).)  There also is no competent evidence that Carroll was aware of Norman's alleged discriminatory animus.  (See Def. Reply at 5-6 (discussing evidence).)  As stated above, however, the fact that Carroll lacked the requisite discriminatory animus does not end the inquiry under the cat's paw analysis.

Continuing its argument, Mid State contends that there is no evidence that Norman recommended Foster's termination to Carroll.  (Def. Reply at 5.)  Mid State points out that Foster admitted that he does not have any firsthand knowledge of any specific conversation between Norman and Carroll regarding his termination.  (Id. at 4 (citing Pl. Dep. at 131).)  In any event, Mid State asserts that the evidence establishes that "Caroll personally observed performance issues concerning Foster, investigated the reports made by [] Norman, and independently made the decision to terminate Foster's employment with Mid State."  (Def. Reply at 4); (Def. Answers to Pl. Interrogs., Nos. 1, 4); (Carroll Dep. at 45-47 (Ex. A to Doc. No. 41).)  Mid State, thus, argues that there is ample evidence that Carroll conducted an independent investigation of the facts before firing Foster and that the cat's paw theory is unavailing on this record.

35

Assuming without deciding that Norman had sufficient influence over Carroll's decisionmaking (see Def. Answer to Pl. Interrog. No. 1; Pl. Dep. at 164-67), the court finds that the evidence establishes that Carroll made the decision to fire Foster after an independent assessment of his alleged misconduct. Carroll's independent assessment included personal observations of Foster's work performance and attitude, periodic reviews of Foster's work, investigations of performance problems reported to Carroll, discussions with Lee and Foster about job deficiencies and firsthand knowledge of complaints made by Foster concerning Mid State's tipping procedures. (Carroll Dep. at 44-47 (Ex. A to Doc. No. 41)); (Carroll Jan. 3, 2006 Memorandum (Ex. M to Doc. No. 41 & Ex. 38 to Doc. No. 45)); (Def. Answers to Pl. Interrogs. Nos. 1, 4 (Ex. L to Doc. No. 41).)

Foster merely argues in his brief that the cat's paw theory applies because "Carroll fired Foster [based upon] information he received from Norman." (Pl. Mem. of Law at 12 (Doc. No. 44).) Foster does not elaborate upon the type of information Carroll received from Norman, and he does not cite any evidence to support his sweeping assertion. (Id.) Notwithstanding these shortcomings, Foster cannot succeed on a cat's paw theory based solely on an assertion that Carroll considered reports from Norman about Foster's job performance, and his attempt to do so impermissibly dilutes the cat's paw theory of liability. See Roberts v. Randstad North Am., Inc., 231 Fed. Appx. 890, 896 (11th Cir. 2007). As stated, but worth reiterating, the cat's paw theory prohibits a decisionmaker from accepting a racially-biased recommendation only when the decisionmaker fails to independently evaluate the recommendation. See id.; Hankins, 2007 WL 1705579, at *6

36

n.5.  Foster proffers no argument and presents no evidence that Carroll fired him without

conducting an independent investigation.  (See id.)  Foster, thus, fails to establish pretext

pursuant to a cat's paw theory of liability, and, as a result, Norman's alleged racially-

biased comments are irrelevant to his termination.

In sum, Mid State proffered six nondiscriminatory reasons for Foster's termination.

Foster did not produce sufficient (or, in some instances, any) evidence to create a genuine

issue of pretext as to any of Mid State's reasons.  Accordingly, the court finds that

summary judgment is due to be granted in Mid State's favor on Foster's wrongful

termination claim.


B.  Wage Discrimination

Alleging intentional race discrimination in violation of 42 U.S.C. § 1981, Foster

contends that Mid State paid him less than similarly-situated Caucasian employees.

Namely, Foster contends that his hourly wage was $7.00, while Beckwith, May, Hubbard

and Hamm, who are Caucasian, received hourly wages of $8.00.[19]  (Pl. Dep. at 105-07

(Ex. E to Doc. No. 41)); (Pl. Mem. of Law at 9 (Doc. No. 44).)

---

[19] Beckwith, May, Hubbard and Hamm received the same wage throughout their employment.  Foster received a $.50 increase in his hourly wage close in time to his termination.

### 1. Prima Facie Case

To satisfy the prima facie elements "of intentional discrimination in compensation, a plaintiff must establish that (1) [he] belongs to a racial minority; (2) [he] received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) [he] was qualified to receive the higher wage." Cooper v. Southern Co., 390 F.3d 695, 735 (11th Cir. 2004).

Mid State focuses on the similarly-situated requirement of the third element of the prima facie case. Mid State argues for a multitude of specific reasons that the four Caucasian comparators relied upon by Foster are not similarly situated. (Def. Mem. of Law at 23-26 (Doc. No. 41).) Although the existence of a similarly-situated employee is critical to Foster's claim, Foster's brief in opposition to the summary judgment motion contains only a terse discussion on the subject of a valid comparator. Foster argues, with no citation to the record, that he should have been paid at least the same as Beckwith, May, Hubbard and Hamm because he "had 10 years experience working in a hunting crew, had operated heavy equipment all his adult life, and had six years prior military service." (Pl. Mem. of Law at 9.) As explained below, the court finds that Foster has not presented competent evidence that he performed similar jobs or had similar experience or skill levels as those Caucasians with whom he compares himself.

Discussing the similarly-situated aspect of a prima facie case of discrimination, the Eleventh Circuit has stated that a plaintiff must show that the non-minority employee with whom he or she seeks comparison is "similarly situated in all relevant respects

besides race, . . . since '[d]ifferent treatment of *dissimilarly* situated persons does not violate' civil rights laws." Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1273 (11th Cir. 2004) (emphasis in original). To be similarly situated, a plaintiff and a comparator must "perform similar jobs" or, in other words, must "'share[] the same type of tasks.'" Cooper, 390 F.3d at 735 (quoting Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1528 (11th Cir. 1992)). Moreover, a comparator and a plaintiff are dissimilar if they do not have in common "similar levels of experience or education." Id. at 745; see also Mack v. ST Mobile Aerospace Eng'g, 195 Fed. Appx. 829, 843 (11th Cir. July 31, 2006) (affirming summary judgment for employer because plaintiff's comparators possessed specialized training and experience that plaintiff did not have and, thus, plaintiff was not similarly situated to his alleged comparators); Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618-19 (7th Cir. 2000) (holding that employee failed to prove that she was "similarly situated" to her comparators when she did not present evidence that she and coworkers shared similar "attributes, experience, education, and qualifications relevant to the positions sought").

To succeed on his prima facie case, Foster must demonstrate that his job was similar to Beckwith's, May's, Hubbard's and Hamm's higher paying jobs. Cooper, 390 F.3d at 735. This he cannot do. Although Foster and his proposed comparators were characterized as outside laborers, there is unrefuted evidence that the duties of an outside laborer were dependent upon the skills the employee possessed and Mid State's specific

needs at the time of hiring.  Here, the evidence establishes that Foster and his comparators performed and/or were qualified in different skills.

Foster does not dispute that, unlike Beckwith, he did not have night watchman duties and, thus, did not work after hours or remain on call.  Accordingly, because Beckwith assumed additional duties, the court finds that Beckwith is not a similarly-situated comparator.

Foster also does not dispute that he did not perform trapping or mechanic work like May, who had prior experience in both of these areas when hired.  (Pl. Dep. at 83, 110-11); (Carroll Dep. at 137, 141-42 (Ex. A to Doc. No. 41).)  May, thus, is not a valid comparator for purposes of demonstrating the third element of the Cooper prima facie case.

Furthermore, when Hubbard was hired, the evidence establishes that Mid State recently had purchased a skidder and needed someone who could operate it proficiently. Mid State selected Hubbard because he had previous experience using a skidder on his former job with a construction firm.  (Carroll Dep. at 138-39 (Ex. A to Doc. No. 41).) Foster, on the other hand, has not demonstrated that he had similar prior experience operating a skidder or could run one skillfully.  (Pl. Dep. at 55); (see Def. Mem. of Law at 12 n.13 (Doc. No. 41) (pointing to the absence of evidence).)  Hubbard had a unique skill which Foster did not possess, and, consequently, his job duties differed from Foster's.  Hubbard is not similarly situated to Foster.

Mid State's evidence also is uncontradicted that Hamm, who was hired in January 2006, possessed welding skills and that at that time Mid State needed a welder.  (Carroll Dep. at 139-42 (Ex. A to Doc. No. 41)); (Hamm Employment Application (Ex. 22 to Doc. No. 45).)  Foster has not pointed to any evidence that he possessed similar, or for that matter any, welding skills.  (See Foster Dep. at 83 (Ex. E to Doc. No. 41)); (Carroll Dep. at 141 (Ex. A to Doc. No. 41).)

Finally, Mid State argues that Foster is not similarly situated to his proposed comparators because, unlike them, he did not have a valid driver's license.  (Def. Mem. of Law at 23 n.22 (Doc. No. 41) (citing Pl. Dep. at 110-111).)  Because Foster did not have a driver's license, other employees had to chauffeur Foster when his duties required him to operate a vehicle on the public roads.  (Id. (citing Pl. Dep. at 145-46).)  Mid State emphasizes the importance of its employees maintaining a valid driver's license by pointing out that, when Carroll learned that Beckwith did not have one, he fired him.[20] (Id. (citing Carroll Dep. at 111, 144-45 (Ex. A to Doc. No. 41).)  Because Mid State's argument is adequately supported by undisputed evidence, the court finds that Foster's

---

[20] The court curiously notes that, as pointed out by Mid State, shortly after Beckwith was hired, Carroll offered to increase Foster's pay to $8.00 an hour if Foster would obtain a valid driver's license.  (Carroll Dep. at 147-48 (Ex. A to Doc. No. 41)); (Def. Mem. of Law at 10-11 (Doc. No. 41).)  Carroll gave Foster $150.00 to cover any expenses associated with acquiring a valid license.  (Carroll Dep. at 147.)  According to Foster, however, he kept the money but never obtained a license because he was "too lazy."  (Pl. Dep. at 144 (Ex. E to Doc. No. 41).)

failure to obtain a valid driver's license presents yet another distinguishing factor between him and his alleged similarly-situated counterparts.[21]

In sum, the court finds that Beckwith, May, Hubbard and Hamm possessed different skills than Foster and performed different duties uniquely tailored to those skills, and met existing needs and requirements of Mid State that Foster was unable to meet. Beckwith, May, Hubbard and Hamm are not proper comparators.

Foster, however, appears to argue that, even if he is unable to satisfy the traditional prima facie elements, he has two other categories of evidence which are sufficient to raise an inference of discrimination. For the reasons to follow, the court disagrees.

Foster relies on Norman's derogatory remarks, discussed earlier in this opinion. (Pl. Mem. of Law at 9 (Doc. No. 44)); (see Pl. Dep. at 96-97, 99, 128-29 (Ex. E to Doc.

---

[21] It also has not gone unnoticed that Foster was hired at an earlier time than Beckwith, May, Hubbard and Hamm and by a different supervisor. (see Def. Reply at 12 (Doc. No. 48) (noting same).) Lee hired Foster in February 2005, two months prior to Carroll's employment with Mid State. Carroll hired Beckwith on July 25, 2005, May and Hubbard on November 21, 2005, and Hamm on January 20, 2006. See Cooper, 390 F.3d at 736 ("'In a comparator analysis, the plaintiff is matched with a person or person *who have very similar job-related characteristics and who are in a similar situation* to determine if the plaintiff has been treated differently than others who are similar to him.'") (citation omitted) (emphasis in Cooper); see also Grayson v. O'Neill, 308 F.3d 808, 819 (7th Cir. 2002) (holding that the similarly-situated inquiry requires court to "'look at all relevant factors, the number of which depends on the context of the case'") (citation omitted); Jorden v. Walmart Stores, Inc., 332 F. Supp.2d 1172, 1180 (C.D. Ill. 2004) (finding that plaintiff did not satisfy similarly-situated prong of prima facie case because, based on summary judgment record, it was "entirely possible" that "the alleged disparity [in pay] was the result of decisions by different supervisors exercising their discretion").

No. 41).)  The unrefuted evidence, however, demonstrates that Norman did not work for Mid State in February 2005 when Foster was hired and his hourly rate of pay was set. Mid State hired Norman some seven months later on September 19, 2005.  (Carroll Aff. ¶ 3 (Ex. C to Doc. No. 41)); (Pl. Mem. of Law at 2 (Doc. No. 41)); (Lee Dep. at 58-59 (Ex. I to Doc. No. 41).)  Foster has not pointed to any evidence, and the court is aware of none, that, once hired, Norman was the decisionmaker as to employees' wages or that Norman otherwise influenced any decision concerning Foster's pay during Foster's employment.  In fact, in his brief, Foster asserts that, during the time frame that Norman worked for Mid State, Carroll "set employee wages[.]"  (Pl. Mem. of Law at 13 (Doc. No. 50)); (see also (Ex. 30 to Doc. No. 45)); (Carroll Dep. at 112 (Ex. 5 to Doc. No. 45).) The law is clear that "[t]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."  Holifield v. Reno, 115 F.3d 1555, 1562, 1563-64 (11th Cir. 1997).  Here, the court finds that the facts fit within the Holifield premise.  Norman's biased comments simply are not relevant for purposes of resolving Foster's wage discrimination claim.

Foster also submits what is best described as a Mid State personnel pay chart.  The columned chart, depicting figures for the years 2003 through 2006, lists Mid State's employees and their hourly rates of pay or, in some instances, what appears to be a biweekly salary.  Handwritten in the margins are notations indicating the race and sex of some of the employees.  (See Pl. Mem. of Law at 12 (Doc. No. 44)); (Foster Exs. 34 & 35 (Doc. No. 45).)  Foster argues that this chart "clearly show[s]" that Mid State "had a

43

two-tiered compensation scheme" and that "[e]very white hired made more money."  (Pl. Mem. of Law at 12 (Doc. No. 44).)  Citing examples from the chart, Mid State retorts that Foster's argument "exaggerate[s] the evidence," but that, in any event, the pay chart does not have probative value on the issue of discrimination because it "does not take into account duties, skills, and job responsibilities."  (Def. Reply Br. at 12 n.13.)  The court agrees with Mid State.

        In individual disparate treatment cases, "statistics may be relevant to establish that an employer's articulated reason for an employment action is pretextual," Burney v. Rheem Mfg. Co., Inc., 196 F.R.D. 659, 667 (M.D. Ala. 2000) (citing McDonnell Douglas, 411 U.S. at 804-05), "[b]ut statistics alone cannot make a case of individual disparate treatment."  Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1131 (11th Cir. 1984); Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004); see also Dyett v. North Broward Hosp. Dist., No. 03-60804 CIV, 2004 WL 5320812, at *6-*7 (S.D. Fla. 2004) (discussing Carmichael, supra, and rejecting plaintiff's argument that "he can satisfy his disparate treatment prima facie case by solely presenting statistical evidence").  Here, the statistical evidence, which incidentally is not accompanied by any other evidence of discriminatory animus, offers no probative value whatsoever as prima facie proof of discrimination (or, for that matter, proof of pretext).

        Faced with determining whether statistics were "[a]ppropriate" for creating an inference of discriminatory intent in a work force reduction case, the Sixth Circuit held that the data must "eliminate the most common nondiscriminatory explanations for the

disparity." Barnes v. GenCorp, Inc., 896 F.2d 1457, 1466 (6th Cir. 1990); see also Furr v. Seagate Technology, Inc., 82 F.3d 980, 987 (10th Cir. 1996) (finding plaintiffs' statistics flawed because they "grouped all employees together regardless of specialty or skill and failed to take into account nondiscriminatory reasons for the numerical disparities") (citation omitted). Barnes concisely states the goal of multiple regression analysis, but the Supreme Court has recognized that the analysis can be "so incomplete as to be inadmissible as irrelevant." Bazemore v. Friday, 478 U.S. 385, 400 n.10 (1986) (discussing multiple regression analysis offered by plaintiffs in a pattern-and-practice case to demonstrate that African Americans were paid less than similarly-situated Caucasian employees); Cooper, 390 F.3d at 718 n.11 (discussing Bazemore); Wilson, 376 F.3d at 1089 ("Statistics without any analytical foundation are virtually meaningless") (citations omitted).

The proposed statistical evidence does not account for any variables, such as the employee's tenure, acquired skills or the quality or type of the employee's experience from which to measure whether the lower-paid African-American employees are similarly situated to the higher-paid Caucasian employees. Hence, although the chart shows some discrepancies in pay, there is no way for the court to discern whether the discrepancies are the result of racially-discriminatory variables because there are no measurable variables provided. The chart simply is devoid of any analytical value at all, and Foster has not provided any other method of analysis, evidence, argument or explanation which sheds light on the evidentiary relevance of the chart as an indicator of

discrimination.  (See Pl. Mem. of Law at 12, stating only in conclusory fashion that the

chart "clearly show[s]" discrimination (Doc. No. 44).)

Based on the foregoing, the court finds that Foster's contention that Mid State

"had a two[-]tiered compensation scheme," with African-American workers on the

"bottom tier," is wholly conclusory and not supported by any evidence.  (Pl. Mem. of

Law at 12 (Doc. No. 44).)  As a consequence, his argument fails.  See Cooper, 390 F.3d

at 745.  At most, Foster has demonstrated that his hourly wage was less than the hourly

wages of Beckwith, May, Hubbard and Hamm, but this evidence, in and of itself, does

not make a prima facie case.  See Byrd v. Auburn Univ. at Montgomery, No. 2:05CV835,

2007 WL 1140424, *12 (M.D. Ala. Apr. 17, 2007) (explaining that plaintiff "cannot rely

on her own unsubstantiated opinion that the salary decisions were somehow motivated by

gender").

In sum, the court finds that Foster has not established a prima facie case of wage

discrimination under Cooper, *supra*, or otherwise raised a presumption that Mid State

discriminated against him on the basis of race by paying him less than other Caucasian

employees.  See St. Mary's Honor Ctr., 509 U.S. at 506.  Summary judgment, thus, is

warranted under the facts of this case.

### 2. Mid State's Proffer of Legitimate, Nondiscriminatory Reasons and Foster's Evidence of Pretext

Mid State continues its analysis by arguing that, even assuming *arguendo* that Foster had demonstrated a prima facie case, Mid State has proffered legitimate reasons for the pay disparities which are unrebutted by Foster. Although unnecessary for a finding in Mid State's favor, the court agrees and finds that Foster could not establish pretext even if he had presented a prima facie case.

The court finds that Mid State has articulated with adequate specificity and evidentiary support legitimate, nondiscriminatory reasons "which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason" for the pay disparity between Foster and his comparators. St. Mary's Honor Ctr., 509 U.S. at 509 (emphasis in original). As justification for its pay decisions, Mid State has presented evidence that Beckwith, May, Hubbard and Hamm were paid more based upon the specific skills they possessed, the work they performed for Mid State and the needs of Mid State they were able to meet at the time they were hired. (Carroll Dep. at 137, 141-42 (Ex. A to Doc. No. 41)); (Carroll Aff. ¶ 3 (Ex. C to Doc. No. 41).) Mid State says that Beckwith was paid more because he worked after hours as a night watchman. (Carroll Dep. at 109, 145-46 (Ex. A to Doc. No. 41).) Hamm had experience in welding and could make repairs to "just about any type of equipment" and, thus, earned a higher wage than Foster. (Id. at 139-41.)

When May was hired, Mid State asserts that it did not have an employee with experience in trapping or as a mechanic, but that May had experience in both of these areas.  (Id. at 138.)  When Hubbard was hired, Mid State recently had purchased a skidder, needed someone who could run one proficiently, and deemed Hubbard qualified for the task because Hubbard had operated a skidder at his prior job.  (Id. at 138-39.)  It was, thus, Hubbard's and May's prior relevant work experience and additional skills which earned them an $8.00-an-hour wage.

The burden now shifts back to Foster to demonstrate that the reasons offered by Mid State are not the real reasons, but rather a pretext for racial discrimination.  To satisfy his burden on summary judgment, Foster must "present concrete evidence in the form of specific facts which show that [Mid State's] proffered reason[s] [are] mere pretext.  Mere conclusory allegations and assertions will not suffice."  Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).

48

At best, the court finds that Foster merely quibbles with the wisdom of Mid State's pay decisions.[22]  (See, e.g., Pl. Mem. of Law at 10-11.)  42 U.S.C. § 1981, however, is not designed to make federal courts "sit as a super-personnel department that reexamines an entity's business decisions."  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991); see also Combs, 106 F.3d at 1543 (holding that "federal courts do not sit to second-guess the business judgment of employers").  Instead, the issue with which the court must concern itself is whether there is a genuine issue of material fact that Mid State's stated reasons for the pay disparities were pretextual.  Walton v. Johnson &

---

[22] Two examples will suffice.  First, Foster suggests that it would have been a better decision to pay Beckwith overtime compensation to which he allegedly was entitled under the Fair Labor Standards Act, rather than pay him a higher hourly wage.  (Pl. Mem. of Law at 11.)  This argument, however, does not demonstrate that Mid State's reason for paying Beckwith $8.00 an hour is false or that Carroll did not honestly believe that additional compensation was appropriate under the circumstances.  See Nix v. WLCY Radio/Rahall Comms., 738 F.2d 1181, 1187 (11th Cir. 1984) (explaining employer's proffered reason "does not have to be a reason that the judge or jurors would act on or approve").

Second, Foster argues that Mid State's proffered reason for hiring Hamm at $8.00 an hour is implausible because Balkcam, an African-American male, listed welding as a skill on his application for employment with Mid State, yet Mid State paid Balkcam $7.00 an hour.  (Pl. Mem. of Law at 6, 10.)  The court, however, finds that the circumstances surrounding Balkcam's hiring and Hamm's hiring are not comparable.  Balkcam's beginning date of employment preceded Hamm's by eight months:  Balkcam was hired in May 2005, Hamm in January 2006.  Carroll hired Balkcam (at Lee's request) during the season of the year when grounds maintenance work, such as mowing, was needed.  (Carroll Aff. ¶ 3 (Ex. E to Doc. No. 43) (attesting that Balkcam was hired at Lee's request "to meet the immediate need for assistance with mowing the fields and handling ground maintenance in the coming summer months").)  Foster has not pointed to any evidence that Mid State needed a welder in May 2005 or that Balkcam performed any welding work for Mid State.  When Hamm was hired eight months later, at a time when Mid State says that it had an immediate need for a welder, Balkcam was no longer employed with Mid State, as Balkcam worked for Mid State only a "couple of weeks" and quit.  (Id.)

49

Johnson Servs., Inc., 347 F.3d 1272, 1281 (11th Cir. 2003).  After measured

consideration, the court finds that Foster has not presented "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in [Mid State's]

proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of

credence."  Combs, 106 F.3d at 1538 (citation and internal quotation marks omitted).

## C.  Discriminatory Work Assignments

Mid State moves for summary judgment on Foster's discrimination claim premised

on allegations that Mid State assigned him undesirable work assignments because of his

race.  In its opening summary judgment brief, Mid State attempts to discern the

parameters of this unclear claim.  (Def. Mem. of Law at 26-29); (Compl. ¶ 8.)  Mid State

deduces the following from Foster's testimony.  When Foster was hired in early 2005, his

job included cleaning the barn and the horse stables, a job which at different times he

shared with Mack and Harris.  A component of that task included shoveling manure

during seasonal times when the horses occupied the stables.  (Pl. Dep. at 122, 125-26.)

As pointed out by Mid State, Foster does not complain that this initial task assignment

was discriminatory.[23]  (Def. Mem. of Law at 26.)  Rather, during his deposition

testimony, Foster complained that, when Norman became his supervisor, the task of

_____

[23] Mid State notes that, when Foster was hired, all of the outside laborers were African American and, thus, there were no Caucasian employees to whom this task could have been assigned.  (Def. Mem. of Law at 26 (Doc. No. 41)); (see Pl. Dep. at 124-27.)

shoveling horse manure in the barn became arduous because Norman began lining the barn stalls with wood shavings, when previously there was only bare concrete in the stalls.  (See id. at 26 (citing Pl. Dep. at 104, 123-24 (Ex. 1 to Doc. No. 45).)  Mid State argues that the change in Foster's cleaning duties does not constitute the type of "serious and material change" in the terms of Foster's employment required to demonstrate an adverse employment action.  (Def. Mem. of Law at 15.)

In his brief opposing summary judgment, Foster does not mention the foregoing testimony; thus, he has waived any argument he may have had in opposition to Mid State's supported contention that he has not shown an adverse employment action.  See Resolution Trust, 43 F.3d at 599.  Foster, however, complains generally that, once Norman became his supervisor and Mid State hired the "whites," presumably Hubbard and May, Foster had to continue shoveling manure, while the "whites drove tractors." (Pl. Mem. of Law at 11.)  Relatedly, Foster adds that, after the "whites" were hired, he was no longer permitted to work in the tractor which had an air-conditioned cab.  (Id.)  In conclusory fashion, he states that, because of his race, he was assigned "the most onerous tasks."  (Id.)  Again, Foster has not cited any evidence or legal authority in support of these contentions.  (Id.)  Because Foster's contentions are unsupported and conclusory, they are without merit.

Alternatively, assuming for argument only that Foster's contentions properly are before the court, the court will proceed to the merits.  To succeed on his claim of discriminatory work assignments, Foster must establish a prima facie case of

51

discrimination by demonstrating that (1) he is a member of a protected class, (2) he was

subjected to an adverse employment action, (3) Mid State treated similarly-situated

Caucasian employees more favorably and (4) he was qualified to do the job.  Vincent v.

Wells Fargo Guard Servs., Inc. of Fla., 3 F. Supp.2d 1405, 1414 (11th Cir. 1998) (citing

Holifield, 115 F.3d at 1562).  An "adverse employment action is an indispensable

element of a Title VII plaintiff's case."  Davis v. Town of Lake Park, 245 F.3d 1232,

1246 (11th Cir. 2001).  For there to be an adverse employment action, there must be a

"serious and material change in the terms, conditions, or privileges of employment."  Id.

at 1239.  An "employee's subjective view of the significance and adversity of the

employer's action is not controlling; the employment action must be materially adverse as

viewed by a reasonable person in the circumstances."  Id.

     Mid State argues that Foster's barn-cleaning duties and the alleged requirement

that Foster ride in a non-air-conditioned tractor do not rise to the level of adverse

employment actions.  (Def. Mem. of Law at 15); (Def. Reply at 15.)  The court agrees.

Foster does not argue, and there is no evidence, that once Hubbard and May were hired,

he suffered any adverse tangible job effects as result of being required to continue to

clean the barn:  he did not lose any pay or suffer diminished employment benefits as a

result of his barn-cleaning assignment.  Although cleaning the barn may be one of the less

appealing jobs at Sedgefields, "[u]ndesirable work assignments are not adverse

employment actions."  Southard v. Texas Bd. of Crim. Justice, 114 F.3d 539, 555 (5th Cir.

1997).  Relatedly, the court finds that any increased work resulting from the addition of

wood shavings in the barn constitutes a *di minimis* change in Foster's job assignment and is not the type of "serious and material change" in the terms of Foster's employment which qualifies as an adverse employment action.  <u>Davis</u>, 245 F.3d at 1244; <u>Weston-Brown v. Bank of Am. Corp.</u>, 167 Fed. Appx. 76, 80 (11th Cir. 2006) (an adverse employment action "must be more than 'some *de minimis* inconvenience or alteration of responsibilities'") (quoting <u>Doe v. Dekalb County Sch. Dist.</u>, 145 F.3d 1441, 1453 (11th Cir. 1998)).

Similarly, assuming as true that Foster was denied the opportunity to drive the air-conditioned tractor after Hubbard and May were hired, there is no evidence that this change in Foster's working conditions caused him any economic injury in the form of lost pay or benefits.  Mid State's action may have been unfair, "[b]ut the protections of Title VII simply do not extend to 'everything that makes an employee unhappy.'"  <u>Davis</u>, 245 F.3d at 1242 (citation omitted); <u>cf.</u> <u>Reis v. Universal City Dev. Partners, Ltd.</u>, 442 F. Supp. 2d 1238, 1253-54 (M.D. Fla. 2006) (finding denial of transfer to indoor position with heating and air conditioning was not an "adverse employment action" for purposes of retaliation claim).  Accordingly, Foster's claim that Mid State assigned him work in a discriminatory manner based on his race fails at the prima facie stage because he has not demonstrated that he suffered an adverse employment action within the meaning of <u>Davis</u>.  <u>See</u> <u>Coco v. Elmwood Care, Inc.</u>, 128 F.3d 1177, 1180 (7th Cir. 1997) (failure to

establish a prima facie case "is the end of your case if <u>McDonnell Douglas</u> is all that you have to go on").[24]

For all of the reasons asserted above, Foster's claim alleging discriminatory work assignments is unavailing.  Mid State, thus, is entitled to summary judgment on this claim.

## VI.  ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Mid State's motion for summary judgment (Doc. No. 40), be and the same is hereby GRANTED.

A final judgment shall be entered separately.

DONE this 5th day of November, 2007.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE

---

[24] Alternatively, even assuming that Foster could satisfy his prima facie case, the court finds that Foster is unable to show as pretextual Mid State's legitimate, nondiscriminatory reasons for the work assignments.  (<u>See</u>, <u>e.g.</u>, Def. Reply at 16.)